## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LOS ANGELES DODGERS LLC, *et al.*,[1] | ) Case No. 11- *12010* (\_\_\_\_) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |
| | ) |
| | ) |
| | ) |

## DECLARATION OF JEFFREY J. INGRAM IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Jeffrey J. Ingram, being fully sworn, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am currently the Assistant Treasurer of debtor Los Angeles Dodgers LLC ("LAD"). I also serve as Executive Vice President and Secretary of debtors LA Holdco LLC ("HoldCo"), Los Angeles Dodgers Holding Company LLC ("LAD Holding"), LA Real Estate Holding Company LLC ("RealCo Holding"), and LA Real Estate LLC ("RealCo," and together with LAD, HoldCo, LAD Holding and RealCo, the "Debtors"). On the date hereof (the "Commencement Date"), LAD commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). I am familiar with the day-to-day operations, business, and financial affairs of the Debtors, having served as an officer of one or more of those entities since 2004.

2.      I submit this declaration (the "Declaration") to provide the Court and other parties in interest with an overview of the Debtors' operations and to describe the circumstances

---

[1]   The Debtors, together with the last four digits of each Debtor's federal tax identification number are: Los Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567); LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029). The location of the Debtors' corporate headquarters and the service address for the Debtors is: 1000 Elysian Park Avenue, Los Angeles, California 90012.

compelling the commencement of this chapter 11 case. I also submit this Declaration in support of the first day motions and applications (collectively, the "First Day Pleadings") filed by the Debtors substantially contemporaneously herewith by which the Debtors seek relief necessary to enable the Debtors to operate effectively, minimize certain of the potential adverse effects of the commencement of its chapter 11 case, and preserve and maximize the value of the Debtors.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussion with other employees and representatives of the Debtors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration.

4. Section I provides a background description of the Debtors' business, history, and organizational structure, prepetition indebtedness, and the circumstances giving rise to the commencement of the Chapter 11 Case. Section II summarizes the First Day Pleadings and the relief they seek, which the Debtors believe is crucial to their successful reorganization.

## I.     BACKGROUND

**A.     Ownership Structure**

5. Los Angeles Dodgers LLC ("LAD") operates a professional major league baseball club located in the Los Angeles metropolitan area. The club's membership in Major League Baseball ("MLB") is described in the Major League Constitution (the "Major League Constitution"), as assumed by LAD pursuant to an Assumption Agreement, dated as of February 13, 2004.[2]

---

[2]   None of the other Debtors are a party to the Major League Constitution, nor do they have any role in the operation of the baseball club.

6. LAD is a Delaware limited liability company, whose sole member is debtor Los Angeles Dodgers Holding Company LLC ("LAD Holding"), also a Delaware limited liability company. LAD Holding's sole member is debtor LA Holdco LLC ("HoldCo"), also a Delaware limited liability company. Both LAD Holding and HoldCo are holding companies with no operating assets. As described further below, HoldCo is the sole member of debtor LA Real Estate Holding Company LLC ("RealCo Holding"), a Delaware limited liability company. RealCo Holding is the sole member of LA Real Estate LLC ("RealCo"), a Delaware limited liability company that owns Dodger Stadium and the real estate upon which it is located, as well as Dodger Tickets LLC ("Tickets"), a Delaware limited liability company that owns the right to receive future ticket revenue from Dodger games at Dodger Stadium. HoldCo is a wholly owned subsidiary of LA Partners LLC ("LA Partners"), which in turn is a wholly owned subsidiary of The McCourt-Broderick Limited Partnership ("TMBLP"), a Massachusetts limited partnership. TMBLP is the sole member of Blue Landco LLC ("Blue Land"), a Delaware limited liability company that owns the parking lots surrounding Dodgers Stadium. Frank H. McCourt, Jr. ("Mr. McCourt") is the sole limited partner of TMBLP and owns a 90% interest, with the remaining 10% interest owned by TMBLP's sole general partner, The McCourt Company, Inc., a Delaware corporation. None of the parents of HoldCo are debtors in these chapter 11 cases.

**B.     Major League Baseball**

7. The Office of the Baseball Commissioner (the "Commissioner's Office") is an unincorporated association also doing business as Major League Baseball ("MLB") that has as its members thirty baseball clubs. Those clubs are divided into two leagues, the American League and the National League (the Dodgers are in the West division of the National League).

The commissioner of baseball, Allan H. "Bud" Selig (the "Commissioner"), serves as the chief executive officer of Major League Baseball.

## C.    The Los Angeles Dodgers Baseball Club

8.    The Los Angeles Dodgers have a storied history that dates back to the late 1800's. Originally located in Brooklyn, New York, the Dodgers moved to Los Angeles in 1958. Before doing so, the Dodgers broke baseball's color barrier by signing Jackie Robinson in 1945. In 1962, the Los Angeles Dodgers moved into their new home at Dodger Stadium, where they continue to play. The Dodgers have won six World Series championships (five in Los Angeles), the most recent of which occurred in 1988.

## D.    The 2004 Acquisition

9.    The Dodgers were acquired by Fox Entertainment Group, Inc. ("Fox Group") in 1998. After creating a Regional Sports Network ("RSN") associated with the Dodgers, Fox Group made the decision in 2003 to sell the team and the real estate where the stadium and parking lots are located.

10.    Following a sale process, the winning bidder for the assets was Mr. McCourt, who in early 2004 became the owner of the Los Angeles Dodgers, as well as the other assets owned by Fox Group (the "Acquisition"). The purchase by Mr. McCourt, which was unanimously approved by Major League Baseball and supported by the Commissioner, was consummated under two separate agreements. Pursuant to one agreement, Mr. McCourt paid $330 million to purchase the Los Angeles Dodgers. Under a separate agreement, Mr. McCourt paid $100 million to acquire the real estate consisting of Dodger Stadium, the land under the stadium, and about 250 acres of land surrounding the stadium that includes the parking lots.

11.     Under the terms of the Acquisition, the land purchased by Mr. McCourt, including Dodger Stadium and the surrounding parking lots, became an asset of RealCo. Pursuant to a lease agreement between RealCo and LAD executed in 2004, RealCo agreed to lease both the land and the stadium, along with granting associated rights, for a term of 38 years.

12.     A portion of the purchase price for the Acquisition ($125 million) was financed by Fox Group pursuant to a two year loan made to an affiliate of Mr. McCourt. To secure repayment, Mr. McCourt provided, as collateral, 24 acres of undeveloped real estate in the Boston seaport district. The contribution of that property was, at the time of the Acquisition, treated as an equity contribution to fund a large portion of the aggregate purchase price paid under the Acquisition. Two years after the Acquisition, Mr. McCourt transferred that valuable real property to Fox Group in satisfaction of the $125 million repayment obligation.

**E.      Subsequent Financing Transactions**

13.     In May 2005, HoldCo reorganized its subsidiary operations and formed Tickets, which became a subsidiary of RealCo. RealCo and LAD amended their lease agreement to provide for RealCo to lease Dodger Stadium and the underlying land to Tickets, which then subleased the stadium to LAD with the notable exception of the general admission seats. Those seats are not subleased, and tickets for these seats are sold by Tickets, thereby enabling Tickets to earn revenue from Dodger home games.

14.     As part of the reorganization, Tickets entered into two securitization financing transactions. The first, in 2005, generated $250 million that were used to permanently refinance debt incurred under the Acquisition on favorable terms. The second transaction, in 2007, generated $140 million, which was primarily used to pay the cost of upgrading Dodger Stadium and to reimburse LAD for costs that it had incurred to upgrade the stadium. The improvements

made included (a) replacement of all of the seats in the stadium, (b) a new playing surface, (c) drainage improvements, (d) expansion of concession space, (e) reconfiguration of parking lots to improve traffic flow, (f) expansion of the Dugout Club, (g) renovation of the Stadium Club, (h) creation of two new Baseline Box Clubs, (i) significant upgrades to the video in-game experience, and (j) completion of numerous structural and seismic upgrades. Both financing transactions involved the securitization of the income stream from future ticket sales. Importantly, the Commissioner and Major League Baseball approved the formation of Tickets as a wholly owned subsidiary of HoldCo, as well as the securitization of the ticket income stream.

15.     In 2006, RealCo transferred the parking lots and other land surrounding Dodger Stadium (but not Dodger Stadium itself or the land on which the stadium is located) to Blue Land.[3]

**F.      Improved On Field and Off Field Performance Since 2004**

16.     Under Mr. McCourt's stewardship, the 2004 Dodgers won their first playoff game in sixteen years, advanced to back-to-back National League Championship Series (2008 and 2009) for the first time in over 30 years, and appeared in the post-season four times in a six year period for the first time ever since moving to Los Angeles in 1958. During this time period, benefitting from the team's success and the renovation of the stadium, the Dodgers enjoyed consistently high attendance for home games. During the 2009 season, the Dodgers drew 3.8 million fans, the highest attendance in Major League Baseball.

---

[3]     To facilitate that transaction, the boundary lines of the existing parcels were changed in order to enable the stadium and the land under the stadium to be a single parcel that continued to serve as collateral for the financing provided to Tickets. The surrounding land was released from that mortgage. Blue Land borrowed $60 million, secured by the surrounding property, of which $10 million was contributed to LAD. Subsequently, Blue Land borrowed an additional $10 million to purchase an additional parcel of land, which is owned by Blue Land's wholly owned subsidiary, McCourt College Street LLC. Blue Land currently owes $67 million in debt which is scheduled to mature on June 30, 2011.

17.     The Dodgers also recently opened a new state-of-the-art spring training facility in Arizona – a 13,000 person stadium that it shares with the Chicago White Sox. LAD and Chicago White Sox Ltd. are equal members in Camelback Spring Training LLC, a Delaware limited liability company, which operates the facility.

## G.     Sources of Revenue

18.     LAD's primary sources of revenues from the operation of the baseball club consist of the following:

Entertainment Fee. LAD is paid an entertainment fee by RealCo in connection with providing entertainment at Dodger home games. The entertainment fee is paid from proceeds of ticket sales by Tickets.

Broadcasting Rights. LAD receives payments for the licensing of rights to broadcast their games on television (both over the air and by cable television) and on the radio. Currently, LAD is party to a telecast agreement (the "Fox Telecast Agreement") with Fox Sports Net West 2, LLC ("Fox Sports 2"), under which Fox Sports 2 has been granted exclusive cable television rights until the end of the 2013 baseball season. LAD has separate agreements to broadcast games on television and radio.

Sponsorship and Advertising. A substantial portion of revenues is derived from sponsorship and advertising. LAD's major corporate sponsors include Best Buy, Anheuser-Busch, Coca-Cola, Bank of America, United Airlines, and Time Warner.

Concession Income. LAD receives substantial revenue from concessionaires who are authorized to sell food/beverages and souvenirs, both at Dodger Stadium and online.

Major League Central Fund. LAD also is entitled to receive payments indirectly from the Major League central fund ("MLCF"), which generates income primarily through national

telecasting and radio broadcasting revenue. LAD's interest in that revenue is owned by Dodgers Club Trust, a Delaware statutory trust that is 90% owned by LAD and 10% owned by Major League Baseball. The Dodgers Club Trust is party to various credit agreements, evidencing loans secured by the monies payable by MLCF to Dodgers Club Trust and by Dodgers Club Trust to LAD. The outstanding balance of the loans to the Dodgers Club Trust is about $55 million. Distributions from MLCF are subject to approval of the Commissioner as to timing and amount.

Other Significant Revenue Sources. LAD also receives revenue from premium seating, parking, national licensing, spring training, and in some years, sales of postseason tickets.

19.     LAD is required to contribute a substantial amount of its revenue to Major League Baseball for the purpose of revenue sharing with other baseball clubs that receive less revenue than LAD. For example, in 2009, LAD paid about 12.5% of its revenue to other baseball clubs.

20.     For RealCo, the source of its revenue, which comes from Tickets, are sublease payments by LAD and ticket sales by Tickets.

## H.    Events Leading to LAD's Chapter 11 Filing

21.     In 2010, LAD experienced cash flow difficulties. During 2010, LAD lost money as a result of declines in attendance, failed to reach the playoffs, and paid substantial deferred compensation totaling about $22 million. LAD was also required to contribute a large portion of its revenue to revenue sharing. In 2010, this amounted to approximately 10% of total revenue.

22.     To ensure the availability of sufficient capital to pay expenses as they become due, LAD entered into an agreement with Fox Sports in 2010 to obtain a $25 million advance of the payment due under the Fox Telecast Agreement (described below) for the 2011 season. Subsequently, in early 2011, Mr. McCourt obtained a $30 million personal loan from Fox Sports,

of which $23.5 million has been contributed by Mr. McCourt over the past several months to fund LAD's payroll and other expenses.

23.     To date, LAD has remained current in its obligations.  However, LAD is now on the verge of running out of cash, the result of a perfect storm of events.  First, under its financing agreements, Tickets is required to reserve a large portion of its revenues this year because the Collective Bargaining Agreement (the "CBA") with the MLB Players Association is scheduled to expire, which occurs about every five years.  So far, Tickets has reserved about $17 million and expects to reserve as much as an additional $6 million.  Assuming the CBA is extended, that reserved cash will become available to contribute to LAD's operations, but in the meantime, that cash is unavailable.

24.     Second, LAD, which has already paid $10 million in deferred compensation this year, is required to make another payment of $10.5 million in deferred compensation on June 30, 2011.  Making matters even more difficult, on July 1, 2011, LAD is, under the terms of the CBA, required to reserve more than $18 million to prefund deferred compensation that is not payable to the players at issue until 2012.

25.     Third, LAD has experienced a significant decline in attendance this year.  This decline may be attributable in part to the Commissioner's appointment of a "monitor" in April 2011, which generated adverse publicity.  Despite the Commissioner's questionable authority under the Major League Constitution to appoint a monitor and require the monitor's approval of expenditures, LAD has, through the Commencement Date, voluntarily cooperated with the monitor.

26.     For more than a year, LAD has been actively pursuing alternatives to generate sufficient cash to address the liquidity timing challenges described above.  In particular, LAD

has focused on monetizing the exclusive cable television rights for periods after the expiration of the existing Fox Telecast Agreement. The value of those rights is enormous, and when it is able to unlock that value, LAD will be in a position to satisfy all of its existing claims, pay debts as they become due, and generate a substantial return for its equity holder.

27. Section 2(c) of the Fox Telecast Agreement contains a "Right of First Negotiation" provision, which states that "[f]rom October 15, 2012 through November 30, 2012 (the "Exclusive Negotiating Period"), [LAD] and FOX Sports shall negotiate confidentially, exclusively and in good faith with respect to the terms and conditions on which FOX Sports may retain exclusive Cable Television Rights to Exhibit future Games for a subsequent term of at least five years beginning with the 2014 MLB season." The provision further states that LAD "shall not solicit offers from or negotiate with any person or entity (other than Fox Sports) for Cable Television Rights with respect to any future Games at any time preceding November 30, 2012."

28. In an effort to monetize the value of the right to telecast future games on cable without jeopardizing its rights under the existing Fox Telecast Agreement, LAD and its parent companies, led by Mr. McCourt, entered into negotiations with Fox Sports. The transaction, as proposed (the "Proposed Fox Transaction"), contemplated an agreement under which Fox Sports would retain the exclusive cable television rights for a period of 17 years, at rates in excess of the rates currently paid under the Fox Telecast Agreement. Using what the Commissioner has acknowledged are terms that share similar features to transactions by certain other clubs in Major League Baseball, the Proposed Fox Transaction provided that a current Fox Sports subsidiary ("Prime Ticket") will thereafter be owned in part by TMBLP through a wholly owned subsidiary, LA Media LLC ("LA Media").

29.     To address the pressing liquidity issues, the Proposed Fox Transaction provided for a $385 million loan by Fox Sports or one of its affiliates to Prime Ticket, which will be distributed to LA Media.  Mr. McCourt agreed not only to guarantee collection of that loan, but also to personally guarantee repayment of the loan in the event the new agreement with Fox Sports was terminated for reasons other than a material breach by Fox Sports.  As contemplated, a majority of those proceeds were to be used to pay obligations of LAD and provide sufficient working capital, while a substantial portion was to be used to repay outstanding obligations of subsidiaries of TMBLP, including the $67 million owed by BlueLand on its loan, which is scheduled to mature at the end of this month.

30.     The ability of LAD and its parent companies to reach a final agreement with Fox Sports has, however, been complicated by ongoing divorce proceedings between Mr. McCourt and his former wife, Jamie McCourt ("Ms. McCourt").  In those divorce proceedings, Ms. McCourt asserts an ownership interest in the assets of TMBLP and its subsidiaries, including those of LAD, BlueLand, RealCo, and Tickets.  She has also sought an order in those proceedings to compel the sale of the assets of TMBLP.  Although Mr. McCourt disputes that Ms. McCourt has any ownership interest in those assets, Fox Sports was unwilling to enter into the Proposed Fox Transaction with LAD absent the consent of Ms. McCourt.

31.     Throughout the process of the negotiations with Fox Sports, LAD kept the Commissioner and his senior officers fully apprised regarding the status of those negotiations and the terms that were being negotiated.  LAD repeatedly sought the Commissioner's approval of the terms proposed by LAD.  In response, the Commissioner postponed any decision, citing both the unwillingness of Ms. McCourt to consent to the proposed terms, and the unwillingness of Fox Sports to proceed forward absent the consent of Ms. McCourt.

32.     With LAD facing the June 30 deadline to meet its extraordinary non-recurrent payroll and future reserve obligations, the McCourts were able to reach a settlement in their divorce proceeding pursuant to which Ms. McCourt agreed to consent to the Proposed Fox Transaction. Under the terms of the divorce settlement, announced on June 16, 2011, the McCourts agreed that a one day trial would occur in August to determine ownership of the Dodgers. If Mr. McCourt prevailed, then Ms. McCourt would receive a payment of $100 million, which was to be funded in part ($55 million) from the $385 million loan. If Ms. McCourt prevailed, then LAD and the assets owned by TMBLP would be sold with the proceeds to be divided by the Court. The settlement was conditioned upon consummation of the Proposed Fox Transaction, which in turn was conditioned upon the consent of the Commissioner's Office.

33.     In addition, the divorce settlement required that the $385 million in loan proceeds to be received by LA Media under the Proposed Fox Transaction be distributed in a certain manner. Notably, the vast majority of the proceeds, totaling more than $310 million, would be used and distributed as follows: 1) $211.5 million for LAD's operations and working capital; 2) $23.5 million to return the proceeds loaned by Fox Sports to Mr. McCourt which were used to fund payroll and other operational expenses of LAD; and 3) $80 million to repay debt obligations of subsidiaries of the TMBLP, including Blue Land. Of the remaining funds, $50 million would be available to pay Ms. McCourt if Mr. McCourt prevailed in his argument that she lacked an ownership interest in the assets, and the remaining $20 million was to be distributed to the McCourts for legal expenses ($5 million each) and personal use ($5 million each).

34.     As explained above, Fox Sports required the consent of Ms. McCourt in order for it to move forward with the Proposed Fox Transaction. Without the consummation of the Proposed Fox Transaction, LAD would not have access to the cash needed to pay its players and other expenses. Having obtained Ms. McCourt's consent on June 16, 2011, LAD renewed its request that the Commissioner promptly approve the Proposed Fox Transaction.

35.     On June 20, 2011, the Commissioner advised Mr. McCourt that he would not approve the Proposed Fox Transaction. The first reason offered by the Commissioner for his refusal to approve the transaction was the Commissioner's preference that LAD wait until after the expiration of the Right of First Negotiation in December 2012, and negotiate with potential suitors other than Fox Sports prior to entering into any new television rights agreement. But given LAD's immediate cash flow difficulties, and faced with the potential risk that Fox Sports would seek to enforce the Right of First Negotiation, LAD simply did not have the luxury of waiting 18 months until the end of 2012.

36.     The Commissioner also criticized the use of a portion of the $385 million to fund a divorce settlement with Ms. McCourt. In that regard, the Commissioner did not take into account Fox Sports' unwillingness to move forward with any agreement absent Ms. McCourt's consent, which in turn required either a payment to Ms. McCourt or the liquidation of the assets of LAD and the other subsidiaries owned by TMBLP.

37.     Next, the Commissioner criticized the creation of a separate entity not owned by LAD to receive a 35% interest in the RSN. But even the Commissioner acknowledged that "other clubs have entered into transactions that share similar features with the Proposed Transaction."

38.     Finally, the Commissioner complained about the manner in which the sale of the Dodgers to Mr. McCourt was structured, as well as the securitization that occurred shortly thereafter, notwithstanding the fact that: a) both he and Major League Baseball approved those transactions; and b) using the funds generated by the securitization, the existing debt of Holdco's subsidiaries, including LAD, was refinanced on favorable terms and Dodger Stadium was substantially renovated.

39.     Based on the Commissioner's refusal to approve the Proposed Fox Transaction, LAD does not have sufficient cash on hand to meet substantial payroll expenses that come due on June 30, 2011, including the deferred payments owed to former players in 2011 and to be reserved for 2012, or to pay expenses as they become due over the next several weeks.

40.     Accordingly, LAD and the other Debtors negotiated a debtor in possession financing commitment and commenced this chapter 11 case.

I.     **Business Plan**

41.     Through this bankruptcy case, LAD will explore and implement any and all options to maximize the value of the future exclusive cable television rights that have not been granted beyond 2013. Specifically, LAD will propose and, to the extent authorized by this Court, implement procedures that are designed to promote a competitive sale process with respect to those exclusive cable television rights, one that results in the highest and best offer being acceptable to all parties. In fashioning procedures, LAD will give due consideration to Fox Group and the provisions of the Existing Fox Agreement. LAD expects, and the terms of the recently negotiated Fox transaction demonstrate, that a sale or license of exclusive cable television rights will fully resolve all of LAD's financial challenges as well as generate value for the holders of the equity interests in LAD.

42.     In order to implement the above process and achieve its objectives, LAD and the other Debtors have filed for bankruptcy protection and are seeking first day relief from this Court designed to preserve going concern value while LAD implements its strategy. The most important relief sought by LAD is approval of sufficient debtor-in-possession bridge financing to pay expenses over the next 12 months, as well as compliance with its payment obligations to players and others under collective bargaining agreements. LAD also seeks additional relief that will avoid any interruption of the business that would otherwise adversely impact its operations.

## II.     FIRST DAY MOTIONS

43.     The following summarizes the factual background and evidence in support of the relief sought in the First-Day Motions.

## A.     Employee Wage Motion

44.     LAD has filed a *Motion For (I) Authority To Pay Prepetition (A) Wages, Compensation, Payroll Taxes, And Employee Benefits, (B) Business Expenses, And (C) Contributions To, And Under, Employee Benefit Plans, (II) Authority To Pay Prepetition Benefits Providers, And (III) Authorizing Financial Institutions To Honor And Process Checks And Transfers Related To Such Obligations* (the "Employee Wage Motion"). The relief sought in this motion relates only to LAD and not to the other Debtors.

45.     In the ordinary course of its business, LAD incurs payroll and various other obligations and provides other benefits to its employees for the performance of services. As of the Commencement Date, LAD employs approximately 292 regular, full-time individuals whose services are required by LAD year-round, including administrative, sales, customer service, marketing, maintenance and security personnel, as well as broadcasters, coaches, scouts, and player development and other baseball operations personnel (collectively, the "Full-Time

Employees"). In addition to the Full-Time Employees, LAD also employs (i) approximately 37 part-time individuals (collectively, the "Part-Time Employees"); (ii) approximately 1,020 individuals who provide services to LAD only during MLB's active season, including, among others, statisticians, event staff, broadcast crews, and technical staff (collectively, the "Seasonal Employees"); (iii) approximately 250 Dodgers players (the "Players"), and (iv) approximately 4 interns (the "Interns" and, together with the Full-Time Employees, the Part-Time Employees and the Seasonal Employees, the "Non-Player Employees" and, the Non-Player Employees together with the Players, the "Employees").

46.     Out of the approximately 250 Players, there are currently 25 Players on the Dodgers' MLB roster (the "MLB Players"), and the remaining Players play in the minor leagues (the "Minor League Players"). The Players' contracts are all individually negotiated and their compensation varies according to the terms of their contracts and whether they are playing in MLB or the grade of team for which they are playing in the minor leagues.

47.     The approximately 300 Full-Time Employees and 225 Minor League Players not under the terms of a Major League contract are not members of any union. However, the MLB Players, who are under the terms of a Major League contract whether they are currently in the Major Leagues or the Minor Leagues, are members of the Major League Baseball Players Association union. The majority of the Seasonal Employees are members of various unions.

48.     There are five officers of LAD other than me: (i) Frank H. McCourt, Jr. (Chairman of the Board and President); (ii) Ned Colletti (General Manager); (iii) Santiago Fernandez (Senior Vice President, General Counsel and Secretary); (iv) Peter D. Wilhelm (Chief Financial Officer and Treasurer); and (v) Michael D. Young (Chief Revenue Officer).

49. The extent of LAD's payroll obligations to a particular Full-Time Employee depend primarily upon whether such Full-Time Employee is salaried or, alternatively, compensated for services on an hourly basis. As of the Commencement Date, the Full-Time Employees consist of approximately (i) 183 salaried Employees and (ii) 109 non-salaried Employees, who accrue wages on an hourly basis and are entitled to overtime compensation for hours worked in excess of 40 hours per week, or on weekends, equal to 1.5 times their regular hourly pay rate. The Part-Time Employees, Seasonal Employees, and Interns earn wages on an hourly basis.[4]

50. LAD, in the ordinary course of its business, also incurs payroll and various other obligations to the Players. As discussed in more detail below, the nature and extent of LAD's payroll and Employee Benefits obligations to the Players is governed by MLB's collective bargaining agreement with its players and are regulated by MLB and by individual contracts with each Player.

51. LAD has incurred costs and obligations in respect of the Employees that remain unpaid because they accrued, either in whole or in part, prior to the Commencement Date. As a result of LAD's payroll practices, even though accrued prior to the Commencement Date, these obligations will become due and payable in the ordinary course of LAD's business only on or after the Commencement Date. In addition, LAD will continue to incur payroll and other obligations to the Employees on a prospective basis.

52. Due to the fact that a major league baseball team's roster is continually changing, as players are moved from MLB to the minor leagues and vice versa or are moved within the minor leagues, it is impossible to estimate LAD's average monthly gross payroll with complete

---

[4]    2 of the Interns are unpaid.

accuracy. However, based on payments made for the June 15, 2011 payroll date, LAD estimates that they pay approximately $19.624 million in wages per month during the baseball season (including amounts withheld for Withholding Taxes, contributions to the 401(k) Plan and the Flex Program), of which approximately (i) $4.1 million relates to Non-Player Employee obligations and (ii) $15.524 million relates to Player Employee obligations.

## I. Non-Player Employee Obligations

### a. Wages, Salaries and Compensation Expenses

53. Prior to the Commencement Date and in the ordinary course of business, LAD typically pays obligations relating to wages, salary, and compensation for its Non-Player Employees on a semi-monthly basis (for exempt employees) on the 15th and last day of each month for Full-Time Employees and weekly for non-exempt Full-Time Employees, Part-Time Employees, Seasonal Employees and Interns (the "Non-Player Wage Obligations"). The Non-Player Wage Obligations do not include commissions. LAD estimates that of the Non-Player Wage Obligations, other than the Highly Compensated Non-Players Employees (as defined below) no individual is owed wages in excess of $11,725 and thus the full amounts of claims based on those obligations would be entitled to priority under section 507(a)(4) of the Bankruptcy Code.

54. LAD has 8 highly compensated Non-Player Employees (the "Highly Compensated Non-Player Employees").[5] Two of the Highly Compensated Non-Player Employees are involved in the baseball operations of LAD and include baseball executives and

---

[5] As set forth in *Los Angeles Dodgers LLC's Motion For Authority To Perform All Obligations Under Collective Bargaining Agreements* filed concurrently herewith (the "CBA Motion"), LAD's announcers are members of the American Federation of Television and Radio Announcers and their contracts with LAD are governed by a collective bargaining agreement. Pursuant to the CBA Motion, LAD is seeking authority to satisfy its obligations to MLB Players and non-Player Employees subject to collective bargaining agreements when and as they become due.

coaches. Two of the Highly Compensated Non-Player Employees are former employees of LAD who are receiving payments pursuant to severance agreements with LAD. The remaining four Highly Compensated Non-Player Employees are responsible for the overall management and business operations of LAD. As of the Commencement Date, LAD estimates that it owes the Highly Compensated Non-Player Employees between $12,222.22 and $33,611.11. However, LAD believes that due to the unique circumstances of this chapter 11 case, LAD should be allowed to pay the Highly Compensated Non-Player Employees in full in the ordinary course, notwithstanding the provisions of section 507(a)(4) of the Bankruptcy Code.

55. In general, the payroll obligations of LAD, especially as to its Seasonal Employees, vary greatly from pay period to pay period depending on the number of home games the baseball club plays in that particular period. LAD estimates that it pays Seasonal Employees approximately $98,000 per game in hourly wages, not including overtime. LAD estimates that average monthly overtime it pays to Part-Time Employees and Seasonal Employees is approximately $140,000 during the season.

56. In addition to the foregoing Non-Player Wage Obligations and commissions, certain of LAD's Non-Player Employees incur various expenses in the discharge of their duties, such as travel and meal expenses. Because such expenses are incurred in connection with the performance of duties that fall within the scope of such individuals' employment, LAD reimburses such authorized business expenses in full (the "Non-Player Expense Reimbursements") after submission of appropriate documentation to the employee's immediate supervisor and LAD's accounting department. Certain Non-Player Expense Reimbursements are travel-related expenses, and include transportation, hotel and other accommodations, and meals. Non-Player Expense Reimbursements are paid by LAD on a weekly basis. All Non-Player

Expense Reimbursement obligations are administered internally by LAD. Due to the seasonality associated with expenses, it is difficult to estimate a gross monthly average. However, based on June 15, 2011 payroll, LAD estimates the Non-Player Expense Reimbursements average approximately $160,000 per month during the season. LAD estimates that approximately $71,113.70 of prepetition Non-Player Expense Reimbursements will be outstanding as of the Commencement Date.

### b. Obligations in Respect of Payroll Taxes

57. LAD is required by law to withhold from the wages of Employees certain amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit any such withheld amounts to the appropriate taxing authorities (collectively, the "Taxing Authorities"). Based on the June 15, 2011 payroll, LAD estimates that it withholds approximately $379,000 per pay period for obligations relating to Non-Player Wage Obligations during the baseball season. As with other payroll numbers, these amounts vary greatly from pay period to pay period, depending on the number of home games the baseball club plays. LAD is also required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based upon a percentage of gross payroll and subject to state-imposed limits, additional amounts for, among other things, state and federal unemployment insurance (collectively, with the Withholding Taxes, the "Payroll Taxes"). LAD estimates that it owes $122,761 in federal Payroll Taxes as of the Commencement Date. LAD also withholds certain state Payroll Taxes of Non-Player Employees for Taxing Authorities in Alabama, Arizona, California, Colorado, Florida, Georgia, Illinois, Kansas, Kentucky, Massachusetts, Maryland, Michigan, Missouri, North Carolina, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee,

Texas, Utah, Washington and Wisconsin (the "Taxing States"), where certain Non-Player Employees reside. These Payroll Taxes are remitted to the Taxing States at various frequencies, dependent upon the laws of the Taxing States. Some state Payroll Taxes are remitted bi-monthly, while other state Payroll Taxes are remitted as infrequently as quarterly. LAD estimates that it owes $30,951 in state Payroll Taxes as of the Commencement Date.

### c. Non-Player Employee Benefit Plans

58. In the ordinary course of business, LAD has established various benefit plans and policies for its Non–Player Employees, which can be divided into the following categories: (a) bereavement leave, holiday pay, jury duty, family and medical leave, military leave, personal leave, short term disability, personal days, and vacation days (collectively, the "PTO Plans"), (b) medical, dental and vision benefits, life insurance, long-term disability insurance, and flexible benefit plans (collectively, the "Health and Welfare Plans"), (c) 401(k) and pension plan benefits (collectively, the "Retirement Plans"), (d) the severance plans, and (e) The Employee Assistance Plan ((a)-(e) collectively, the "Non-Player Employee Benefit Plans"). In connection with the provision by LAD of the Health and Welfare Plans and the 401(k) Plan, LAD directly deducts specified amounts from otherwise payable Non-Player Wage Obligations.

### (i) Paid Time Off Benefits

59. Under the PTO Plans, all of which are administered internally by LAD, eligible Non-Player Employees accrue paid time off and related benefits based on the following:

### (1) *Vacation*

60. Full-Time Employees who are below the director level are eligible to accrue vacation benefits after six months of continuous service. Vacation is accrued at a specified number of hours per month based on the Employee's length of continuous service. A maximum

of 140 hours of accrued vacation time may be accrued. LAD does not remit payment in lieu of vacation days, unless an employee terminates his or her employment. LAD also reimburses terminated Employees for accrued vacation days, as required by law.

### (2) *Holiday Pay*

61.     Full-Time Employees are given a day off and receive their normal pay for each holiday observed by LAD and identified on a schedule distributed to Employees at the beginning of each year. Part-Time Employees, Seasonal Employees and Interns are given a day off but are not eligible to receive holiday pay.

### (3) *Other Paid Time Off Benefits*

62.     Under the Family & Medical Leave Act 1993, employees are entitled to twelve weeks of unpaid, job-protected leave for certain family and medical reasons (such as the birth or adoption of a child, the care of a spouse, child or parent of the employee or due to the employee's own serious health condition) (the "FMLA Leave"). Under the policy, employees who have been employed for at least one year and for 1,250 hours during the twelve month period immediately preceding the requested leave time are eligible. Employees are entitled to a total of twelve work weeks of FMLA Leave in a rolling 12-month period. If an employee has health benefits through LAD, the employee's benefits will continue while on leave.

63.     In addition, under the short-term disability policy, Full-Time Employees who exhaust their sick leave days and remain medically disabled may be eligible for salary continuation for up to a maximum of six weeks in a 12-month period (the "Short-Term Disability Pay"). Short-term disability may run concurrent with FMLA Leave. Short-Term Disability Pay is intended to compensate employees absent from work due to a temporary medical disability (including pregnancy and childbirth).

64.     In addition, Full-Time Employees are also given reasonable paid bereavement time in the event of a death within the immediate family. The standard amount of time off on account of bereavement is up to three days, but may be increased on an unpaid basis upon approval by LAD. In addition, Full-Time Employees also are eligible for up to ten days of paid leave for jury duty. Finally, LAD will grant leaves of absence as required by law for Employees who are members of the military service. Such Employees will be granted a military leave of absence without pay.

### (ii) Health and Welfare Benefits

65.     LAD sponsors several Health and Welfare Plans to provide benefits to Full-Time Employees, including, without limitation, plans such as (i) medical, dental, and vision, (ii) flexible benefit programs, (iii) life insurance and accidental death and dismemberment ("AD&D") insurance, and (iv) long-term disability benefits.

### (1) *Medical, Dental, and Vision Benefits*

66.     LAD offers various health benefits, including, among others, medical, dental, and vision benefits. These plans are offered to Full-Time Employees and are available to their families. Medical coverage is provided by Highmark Blue Cross Blue Shield through its PPO and EPO plans (the "Medical Plans"). Under the Medical Plans, LAD is required to submit an annual premium of approximately $2,145,083, payable monthly based on monthly participation and enrollment. LAD takes a portion of the wages paid to the Full-Time Employees that subscribe to the Medical Plans and applies that toward the annual premium (the "Employee Contribution"). The annual Employee Contribution is approximately $601,788, leaving LAD's portion of the Medical Plans at approximately $1,543,295 annually. LAD has accrued about $129,000 in monthly obligations for the Medical Plans that have not been paid.

67.     Dental benefits are provided through Aetna through its PPO and DMO plans (the "Dental Plans"), and operate on a similar basis to the Medical Plans. Under the Dental Plans, LAD is required to submit an annual premium of approximately $174,960, payable in equal monthly installments. As with the Medical Plans, the Full-Time Employees that subscribe to the Dental Plans make an Employee Contribution directly from their paychecks. The annual Employee Contribution for the Dental Plans is approximately $69,276, leaving LAD's portion of the Dental Plans at approximately $105,684 annually. LAD has accrued about $8,807 in monthly obligations for the Dental Plans that have not been paid.

68.     Vision benefits are provided through VSP (the "Vision Plan"), and include reduced fees for examinations and eyewear from a network provider. Under the Vision Plan, LAD is required to submit an annual premium of approximately $33,758, payable in equal monthly installments. As with the Medical Plans and Dental Plans, the Full-Time Employees that subscribe to the Vision Plan make an Employee Contribution directly from their paychecks. The annual Employee Contribution for the Vision Plan is approximately $8,475, leaving LAD's portion of the Vision Plan at approximately $25,283 annually. LAD has accrued about $2,107 in monthly obligations for the Vision Plan that have not been paid.

(2) *Flexible Benefits*

69.     LAD employs a flexible benefit plan that provides Full-Time Employees the opportunity to pay for eligible expenses, including health insurance premium contributions, out-of-pocket health care expenses, and dependant care expenses, with pre-tax dollars through payroll deductions programs (the "Flex Program"). The Flex Program allows Full-Time Employees to contribute up to $2,500 per year of pre-tax income through payroll deductions to be used for eligible out-of-pocket medical expense of the Employee or a dependent family

member and up to an additional $5,000 per year to be used for dependent care. Currently 34 Employees participate in the Flex Program with respect to out-of-pocket medical expenses and 10 Employee participate with respect to dependent care. EBS-RMSCO, Inc. administers LAD's Flex Program, but LAD holds the balance of the employee money that has been contributed to the Flex Program. As of June 15, 2011, LAD estimates it is in possession of $30,076.99 withheld from Full-Time Employees Salaries under the Flex Program, which amounts are expected to be used by EBS-RMSCO, Inc. to administer the Flex Program.

(3) <em>Life Insurance and AD&D Insurance</em>

70.    LAD maintains basic life and additional voluntary insurance coverage for all active Full-Time Employees working 30 or more hours per week in the event of serious illness or death. Aetna provides LAD's life insurance plan and AD&D plans, which are maintained under the same insurance policy. The life insurance and AD&D insurance plans provide life and AD&D benefits on behalf of all qualifying Full-Time Employees. In the event that death occurs from a covered accident, both the life and the AD&D benefit would be payable. The life insurance policy provides coverage in an amount equal to two times an Employee's basic annual earnings, rounded to the next higher $1,000, up to a maximum of $500,000. The AD&D plan provides coverage up to a maximum of $500,000. Benefits available under the above-described life insurance policy are reduced by 35% upon the employee reaching the age of 65, and by an additional 15% at the age of 70. Benefits terminate at retirement. The insurance coverage is provided at a fixed annual premium paid by LAD on a monthly basis in advance. LAD estimates its average monthly cost of the life insurance plans is $6,216. All costs associated with the AD&D benefit are paid by participating Employees. LAD estimates that it does not owe any money at this time for the life and AD&D insurance plans.

71.     In addition, all active Full-Time Employees working thirty or more hours per week who have served the eligibility waiting period may purchase additional life insurance through Aetna, on a payroll deduction basis. Such employees may purchase protection up to a maximum of $500,000. Under the policy, it is also possible to insure spouses and dependent children. LAD collects money from the electing Non-Player Employees each pay period, but remits payment to Aetna once per month. LAD does not currently hold any money collected from the electing Non-Player Employees for premiums on the additional life insurance.

(4) *Disability Benefits*

72.     LAD maintains and administers long-term disability plans through Aetna. In addition, as described further above, LAD provides Short-Term Disability Pay, administered by Aetna, for Full-Time Employees, according to their length of service. The long-term disability plan is provided to cover active Full-Time Employees working 30 or more hours per week (the "Long-Term Disability Plan"). At the Commencement Date, 43 Full-Time Employees were covered under the Long-Term Disability Plan. The Long-Term Disability Plan provides 60% of regular monthly base salary, up to a maximum of $5,000 per month, to qualifying employees who may become disabled due to a covered injury or sickness and are unable to work past their 90th day of disability. Benefits are reduced by certain other disability or retirement benefits. Employees who are eligible under the Long-Term Disability Plan receive this benefit until the age of 65 or the Social Security Normal Retirement Age, provided the employee continues to meet the definition of disability. All costs associated with the Long-Term Disability Plan are paid by participating Employees on a payroll deduction basis. LAD prepays this amount on the first of each month, and therefore estimates it does not owe any money on account of the Long-Term Disability Plan.

### (iii) Retirement Plans

73.     LAD also sponsors a retirement investment plan for its Non-Player Employees (the "401(k) Savings Plan").  All Non-Player Employees who have reached the age of 21 are eligible for enrollment in the 401(k) Savings Plan.  LAD matches Employee contributions to the 401(k) Savings Plan at an amount equal to 50% of the Employee's contribution, up to a maximum of 3% of the Employee's salary.

74.     LAD also is a sponsor of a pension plan, the Major League Baseball Plan for Non-Uniformed Personnel (the "Pension Plan").  The Pension Plan is a defined benefit pension plan, and the benefits available to covered Employees upon retirement are determined based on the length of the Employee's service with LAD and the average amount of the Employee's wages while a participant in the Pension Plan.  LAD contributes approximately $1 million to the Pension Plan on a semi-annual basis, with payments made in March and September of each year.

### (iv) Severance Policies

75.     As of the Commencement Date and in the ordinary course of its business, LAD maintains an internally-administered severance plan for all Full-Time Employees and Part-Time Employees, which provides for payment of two week's salary for each completed year of employment, up to a total of six months' salary (the "Severance Policy").  Generally, an Employee is eligible for severance benefits under the Severance Policy if the Employee is permanently terminated by LAD as a result of a reduction in LAD's workforce or an elimination of the Employee's present job position.  The Severance Policy also provides that LAD will provide medical insurance, typically for a period of time equal to the time wages will continue to be paid, in exchange for an Employee's waiver and release of all claims against LAD.

76.     As of the Commencement Date, LAD estimates that no Employees terminated prepetition remain entitled to continued severance payments under the Severance Policy. However, three Employees are receiving benefits pursuant to severance agreements between those Employees and LAD (the "Severance Obligations"). As of the Commencement Date, outstanding payments remaining in respect of the Severance Obligations through the end of 2011 total $617,194.00. LAD believes it could cause potential business disruptions and could even affect the morale of current Employees to not continue to pay the Severance Obligations in the ordinary course. With respect to Employees severed subsequent to the Commencement Date, if any, LAD intends to make payments to those Employees in the ordinary course of business in accordance with the Severance Policy.

**b.      Player Obligations**

77.     As a Major League Baseball Club, the Major League Constitution and Major League Rules govern the affairs of LAD. As a member of MLB, LAD is also subject to the rules and regulations set forth in the CBA. Pursuant to the CBA, MLB dictates permissible terms of MLB player compensation. The current CBA has been in effect since December 20, 2006 and will terminate on December 11, 2011. Labor relations between MLB and the Players are governed by the CBA. Minor League Players are not covered by the provisions of the CBA until such time as they may become MLB Players.

**a.      Player Salaries**

78.     Prior to the Commencement Date and in the ordinary course of business, LAD typically paid obligations relating to player salaries (the "Player Salaries" and, together with the Non-Player Wage Obligations, the "Wage Obligations") on the same semi-monthly basis as

payments to Full-Time Employees.[6] LAD estimates that, as of the Commencement Date, approximately $225,000 in Player Salaries owed to minor league players has accrued but not been paid.[7]

79.     In addition to Player Salaries, certain Players receive signing bonuses. Signing bonuses for amateurs drafted by LAD are paid equally during the year the Player is signed and the following year. LAD estimates that approximately $1,837,800 is owed on account of signing bonuses for Players drafted in 2011. LAD further estimates that approximately $471,000 is owed during the remainder of 2011 on account of signing bonuses for either Players drafted in prior years or international players signed in 2011. Further, certain personnel within LAD's organization have the authorization to sign international Players and provide signing bonuses. Due to the worldwide nature of LAD's business and scouting operations, these signing bonuses may not be reported by the personnel authorizing the signing bonus for a short period of time, meaning LAD may owe additional prepetition obligations for signing bonuses. However, LAD believes that these additional, as yet unreported signing bonuses, if any, would be minimal and are not substantial amounts in comparison to LAD's obligations to Players.

### b.     Obligations in Respect of Payroll Taxes

80.     The Players incur both federal Withholding Tax obligations, and, depending on where any particular game is being played, state Withholding Tax obligations. As the Players travel to various states and Canada to play baseball games, they earn income based on their performance in those individual states and are required to pay taxes to the Taxing Authorities of

---

[6]     All Players are paid semi-monthly during the MLB season, except one Player who is paid on a semi-monthly basis over the course of the year.

[7]     The Player Salaries owed to the MLB Players are in excess of the $11,725 priority cap set forth in section 507(a)(4) of the Bankruptcy Code. Pursuant to the CBA Motion (as defined herein), LAD is seeking authority to satisfy its obligations to MLB Players when and as they become due.

the specific state they are playing in, or Canada, as applicable.[8]  Thus, the MLB Players pay

taxes to various state Taxing Authorities throughout the season, depending on the schedule of the

baseball club.  The aggregate amounts withheld from Players for the various state Taxing

Authorities and Canadian Taxing Authorities from pay period to pay period vary substantially.

As explained above, it is extremely difficult to determine an average state Withholding Tax for

any particular pay period.  However, LAD estimates that as of the Commencement Date, it owes

$134,502 in federal Payroll Taxes and does not owe Payroll Taxes to the various state Taxing

Authorities and Canadian Taxing Authorities.

### c.  Player Benefits

81.    The Players have various benefit plans and policies, which can be divided into the

following categories:  (i) medical insurance, dental insurance, vision care and business travel

accident insurance for MLB Players collectively, "Players Association Health and Welfare

Plan"), (ii) a multiple employer defined benefit plan for MLB Players and other employees (the

"Players Association Pension Plan," and together with the Players Association Health and

Welfare Plan, the "MLB Plan")), (iii) medical insurance, dental insurance, and vision care for the

Minor League Players, (iv) a multiple employer defined benefit plan for minor league players

("Minor League Pension Plan") and (v) 401(k) plan benefits (the "Player 401(k) Plan").

### (i)  General

82.    Pursuant to the current CBA, MLB and the MLB Players Association have

established the MLB Plan.  Contributions to the MLB Plan are made from the Major League

Central Fund (the "Central Fund") established under the Major League Constitution.  Under the

---

[8]    By way of example, if the 25 MLB Players on the current roster travel to Milwaukee, Wisconsin to play a game against the Milwaukee Brewers, those MLB Players are deemed to have earned their salaries for that game in Wisconsin, and are required to remit payments for Wisconsin state income tax to the appropriate Wisconsin Taxing Authority.

Central Fund provision, MLB collects certain revenues from designated sources on behalf of each Major League Baseball club (each, a "Club") and holds those funds for payment of certain designated obligations, including the agreed annual funding of the MLB Plan. The Trustees of the MLB Plan allocate the CBA required contribution by the Clubs between the Players Association Health and Welfare Plan and the Players Association Pension Plan. Revenues in excess of designated expenses are returned to the Clubs on an annual basis. To the extent that revenues were not sufficient to satisfy the contribution obligation to the MLB Plan, each Club would be obligated to fund its pro rata share of any short-fall.

### (ii) Players Association Health and Welfare Plan

83.     The MLB Players, certain Dodgers coaches and various miscellaneous employees (including former players who still have coverage and employees included under the MLB Plan under their employment contract) and spouses and unmarried dependent children, unless such children are full-time students, through a number of separate policies with different providers receive first dollar medical, dental and vision coverage under the Players Association Health and Welfare Plan. The Players Association Health and Welfare Plan offers various health benefits, including, among others, medical, orthodontia, vision, prescription drugs, skilled nursing, out-patient psychiatric, emergency health services, out-patient surgery, and well child-care. LAD deducts premiums from Player paychecks, but has no contribution obligation to the Players Association Health and Welfare Plan.

### (iii) Players Association Pension Plan

84.     MLB Players also participate in the Players Association Pension Plan, which was established pursuant to the CBA. LAD has no contribution obligation to the Players Association Pension Plan.

**(iv) The Minor League Medical and Dental Benefits**

85.     LAD offers medical ("Minor League Medical Plan") and dental ("Minor League Dental Plan") benefits to the Minor League Players.  Minor League Medical Plan benefits are provided through Highmark Blue Cross Blue Shield and LAD pays approximately $11,684.40 in monthly premiums.  Minor League Employees do not contribute to the Minor League Medical Plan premiums unless they elect dependent coverage.  Approximately 15 Minor League Players elect dependent care coverage and contribute $2,053.95 in the aggregate per month.  LAD's portion of the Minor League Medical Plan premiums for Minor League Players who elect dependent coverage is $6,161.70 per month.

86.     Minor League Dental Plan benefits are provided through Highmark Blue Cross Blue Shield and LAD pays approximately $4,477.50 in monthly premiums and Minor League Players contribute approximately $2,985.75 in the aggregate per month.  Dependant care coverage is available under the Minor League Dental Plan and Minor League Players electing dependent care coverage pay all additional premiums.

**(v) Player 401(k) Plan**

87.     Major League Baseball also maintains a retirement investment plan for Players that choose to participate.  Players may contribute the maximum amount allowed by law.  LAD does not contribute to the Player 401(k) Plan.

**d.      Player Expenses**

**(i) Contract Assignment Expenses**

88.     Under the CBA, LAD has the obligation to reimburse a Player for "reasonable" expenses related to the assignment of the Player's contract from one baseball club to another, including, but not limited to, the obligation to reimburse actual expenses incurred in moving to

the home territory of such Player's new club (collectively, the "<u>Assignment Expenses</u>"). LAD estimates that, as of the Commencement Date, no money is accrued but unpaid in respect of Assignment Expenses.

### (ii) Travel Related Expenses

89.     LAD estimates, that as of the Commencement Date, no money is accrued but unpaid in respect of travel related expenses owed to Players resulting from obligations pursuant to the CBA. LAD, through the lease of a private plane, provides transportation to the MLB Players for road games. LAD also pays for the hotel expenses of the MLB Players and provides the MLB Players a *per diem* in cash at the start of any road trip. LAD has similar arrangements with its Minor League Players.

### B.     The Collective Bargaining Agreement Motion

90.     LAD has filed a *Motion For Order Authorizing Los Angeles Dodgers LLC To Perform All Obligations Under Collective Bargaining Agreements* (the "<u>CBA Motion</u>"). The relief sought in this motion relates only to LAD and not to the other Debtors.

### I.     The MLB CBA

91.     As a Major League Baseball Club, the Major League Constitution and Major League Rules govern the affairs of LAD. As a member of MLB, LAD is also subject to the rules and regulations set forth in a collective bargaining agreement between Major League Baseball ("<u>MLB</u>") and the Major League Baseball Players Association (the "<u>MLB CBA</u>"). The current MLB CBA has been in effect since December 20, 2006 and will terminate on December 11, 2011. Labor relations between MLB and the players are governed by the MLB CBA.

92.     Pursuant to the MLB CBA, MLB dictates permissible terms of MLB player compensation. Thus, while players' contracts are all individually negotiated and their

compensation varies according to the terms of their contracts and whether they are playing in

MLB or the level of team for which they are playing in the minor leagues, all players execute a

Uniform Player's Contract, which is governed by the MLB CBA. The MLB CBA is a

comprehensive document and governs the negotiation and approval of player contracts, as well

as the terms thereof. To the extent the provisions of any individual player's contract is

inconsistent with the terms of the MLB CBA, the MLB CBA governs. Once negotiated, a player

contract must be approved by the Commissioner's Office.

93.     Among other things, the MLB CBA provides for minimum player salaries,

maximum salary reductions, salary arbitration, and sets forth grievance procedures with respect

to the foregoing. It also permits contracts to provide for up-front payments, deferred

compensation, and performance bonuses, as well as other forms of additional compensation on a

case-by-case basis.

94.     Consistent with the MLB CBA, LAD has entered into contracts that provide for

the payment of current players and contracts that provide for deferred compensation to be paid to

current and former players. LAD is obligated to pay $92,569,000, exclusive of signing bonuses,

on account of guaranteed player contracts for the 2011 season.

95.     As discussed above, LAD, which has already paid $10 million in deferred

compensation this year, is required to make another payment of $10.5 million in deferred

compensation on June 30, 2011. Moreover, on July 1, 2011, LAD is, under the terms of the

MLB CBA, required to reserve more than $18 million to prefund deferred compensation that is

not payable to the players at issue until 2012.

96.     The MLB CBA also provides for a revenue sharing plan among the thirty Major

League Baseball clubs. Pursuant to the MLB CBA, higher revenue teams, such as the Dodgers,

share a portion of their revenues with lower revenue teams, in an effort to promote a competitive balance on the field. Since 2004, when Mr. McCourt became owner of the Dodgers, LAD has contributed millions of dollars every season to lower revenue clubs. LAD is obligated to make a revenue sharing payment of about $4 million at the end of July.

## II.    The AFTRA CBA

97.     A significant portion of LAD's revenue comes from the sale of television and radio broadcast rights. LAD's radio and television broadcasters are members of the American Federation of Television and Radio Announcers ("AFTRA"), which is a party to a collective bargaining agreement with LAD (the "AFTRA CBA," and together with the MLB CBA, the "CBAs"). The AFTRA CBA governs, among other things, compensation of LAD's broadcasters. Consistent with the terms of the AFTRA CBA, LAD has entered into contracts that provide for the payment of its radio and television broadcasters, which require wages to be paid on LAD's regularly scheduled semi-monthly pay dates.

98.     Under the facts of this case, the failure to assume the CBAs, even if legally possible, would doom this reorganization case, as it would leave LAD without baseball players and announcers.

99.     Thus, under any possible scenario in this chapter 11 case, LAD will be required to assume the CBAs. In order to do so, it is my understanding that LAD will, at a minimum, be required under 11 U.S.C. § 365(b) to cure any outstanding payment obligations. This includes deferred compensation owed not only to current players but also to former players who are owed substantial deferred compensation for past performance, as well as any revenue sharing obligations. It also includes the Dodger television and radio announcers, who are revered in Los Angeles and throughout baseball.

100.    LAD intends to move promptly to assume its collective bargaining agreements. However, LAD faces substantial payments and outlays for reserves that are due at the end of this week.  The failure to make those payments would have enormously adverse consequences, both to its operations and its reputation, that would erode the long-term going concern value of the franchise.  Rather than seek assumption of those agreements as first day relief, LAD instead seeks, as an interim step, authority to pay its obligations when and as they become due.

101.    As explained above, no reorganization of LAD is possible without the assumption of the CBAs.  Delay of such payments would serve no purpose, and would instead cause LAD unnecessary and irreparable harm.

102.    LAD's timely performance of all obligations under the CBAs is in the best interests of the its estate, its creditors, and all parties in interest and will enable LAD to continue to operate its business in an economic and efficient manner without disruption and the relief requested herein is warranted.

**C.      Cash Management Motion**

103.    LAD and RealCo have filed a *Motion Pursuant To Sections 105(a), 363(c), and 345(b) Of The Bankruptcy Code For Order: (I) Authorizing Continued Use Of Cash Management System And Procedures; (B) Authorizing Maintenance And Continued Use Of Existing Bank Accounts And Waiver Of Certain Operating Guidelines Relating To Bank Accounts And The Requirements Of Section 345 Of The Bankruptcy Code; (C) Authorizing The Banks To Honor Certain Prepetition Checks; And (D) Granting Related Relief* (the "Cash Management Motion").  The relief sought in this motion relates to LAD and RealCo and not to the other Debtors.

104.     To manage their businesses efficiently and seamlessly, the Debtors utilize the

Cash Management System, which is a centralized system to collect and transfer the funds

generated by their operations and to disburse funds to satisfy their financial obligations. The

Cash Management System facilitates the Debtors' cash monitoring, forecasting, and reporting,

and enables them to maintain control over the administration of their Bank Accounts, all five of

which are held at BOA.  The accounts and their primary use are:

    a.    Concentration Account (No. 6167) – this is the primary operating account of LAD where all funds are deposited and from which all of the disbursements are made. This is the only account where LAD maintains a non-zero balance.  The funds are kept in the account continuously prior to their disbursement for LAD's operational needs and are not swept, transferred, or invested in any securities.

    b.    Payroll Account (No. 2112) – this is a pass-through zero-balance account used to fund LAD's payroll expenses.  Payroll checks are issued against this account. When a check is posted, funds necessary to cover the check are automatically drawn from the Concentration Account and are immediately disbursed to the check payee.

    c.    A/P Account (No. 0338) – similar to the Payroll Account, this is a pass-through zero-balance account, used for all non-payroll related expenses, with the exception of petty cash expenses.  Upon posting of a check, funds are automatically drawn from the Concentration Account and immediately transferred to satisfy LAD's payment obligation.

    d.    Road Account (No. 5332) – similar to the Payroll and A/P Accounts, this is a zero-balance pass-through account that is used to fund petty cash and other *de minimis* expenses, primarily those incurred by the traveling secretary for the players' needs and accommodations when the team is on the road.

    e.    RealCo Account (No. 6872) – this is the only non-LAD account of the Debtors and is also a zero-balance pass-through account.  When non-debtor Tickets makes a distribution to RealCo, the funds are deposited into the RealCo Account and, from there, are immediately transferred to LAD's Concentration Account.  No funds are kept in this account on a daily basis.

105.     In light of the historically low interest rates, the Debtors decided, in the exercise

of their business judgment, to forego earning interest on funds deposited in the Concentration

Account in exchange for a reduction of BOA's monthly bank fees. All such fees are automatically debited from the Concentration Account as incurred.

106. The Cash Management System serves several distinct uses: cash collection, concentration, and disbursement. All funds earned by the Debtors from any source are deposited directly into the Concentration Account and stay there until such time as a disbursement is made. As described above, LAD has three disbursement accounts – the Payroll Account, the A/P Account, and the Road Account—each of which is a zero-balance account linked to the Concentration Account. Funds only flow through these accounts to cover checks and other debits presented for payment by automatically withdrawing such funds from the Concentration Account and immediately transferring them to the payee.

107. The Debtors believe that modification of the existing Cash Management System or the implementation of a new system would be expensive, and would result in unjustified delay, expense, and disruptions to the detriment of the Debtors' estates and their creditors.

108. The Debtors believe that notwithstanding the U.S. Trustee Guidelines, the continued use of the Bank Accounts is essential to a smooth and orderly transition into, and out of, chapter 11. All parties in interest will be best served by the continued use of such Bank Accounts as it will minimize disruption of the Debtors' businesses. Moreover, such a changeover is unnecessary because the Debtors will perform a "hard close" of their books (including recordation of account balances) as of the Commencement Date, which will ensure that the Debtors and others will be able to differentiate between pre and postpetition transactions, account balances, and obligations. Accordingly, the Debtors request a waiver of the U.S. Trustee Guidelines requiring that they close all existing Bank Accounts and open new debtor in possession accounts.

109. The Debtors further request that BOA be authorized to: (a) continue to administer the Bank Accounts in the manner maintained prior to the Commencement Date, without interruption, in the usual and ordinary course; (b) receive, process, honor, and pay any and all postpetition checks, drafts, wires, or ACH transfers issued or initiated by the Debtors, and drawn on the Bank Accounts by the holders or makers thereof, as the case may be; and (c) honor and pay any check drawn or issued by the Debtors before the Commencement Date to the extent authorized by order of this Court.

110. The Debtors also seek a waiver of the requirement to establish a specific bank account for tax payments. The Debtors believe that their tax obligations can be paid most efficiently out of their existing Bank Accounts, that the U.S. Trustee can adequately monitor the flow of funds into, among, and out of such accounts, and that the creation of a new debtor in possession account designated solely for tax obligations would be unnecessary and inefficient.

111. Furthermore, to minimize administrative expense and delay, the Debtors request authority to continue to use their checks without reference to its status as a debtor in possession. Pursuant to Local Rule 2015-2(a), in the event the Debtors need to purchase new check stock during the pendency of this chapter 11 case, such check stock will include a legend referring to the Debtors as "Debtor in Possession" or "DIP."

112. The Debtors' cash management procedures constitute ordinary course, essential business practices for the Debtors. The Cash Management System provides significant benefits to the Debtors including, *inter alia*, the ability to: (i) control corporate funds; (ii) ensure the maximum availability of funds when necessary; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance information.

113.     The Debtors' business operations require continuing use of the existing Cash Management System, as any serious disruption could have a severe and adverse impact upon the restructuring efforts of the Debtors. Moreover, absent the Debtors' ability to continue to use their cash management practices, it may be difficult for the Debtors to accurately track the location, sources, and uses of its cash. The existing Cash Management System is the most effective mechanism for managing the Debtors' receipts and disbursements.

114.     As described above, the Debtors maintain a Concentration Account, which is a cash deposit account that is not invested in any securities. The Debtors believe that the funds held in the Concentration Account in excess of the amounts insured by the Federal Deposit Insurance Corporation are secure and obtaining bonds to secure these funds is unnecessary and detrimental to the Debtors' estates. The Debtors' believes that there is ample "cause" to waive the deposit, investment, and reporting requirements because the Debtors maintain their Bank Accounts with BOA, one of the largest and most reputable banking institutions, they have no investment accounts, all funds in the Concentration Account (the only non-zero-balance account) are held in cash, and the size of the Debtors' business operations and the costs associated with satisfying the requirements of section 345(b) make satisfying such requirements impracticable.

115.     The Debtors believe it is in the best interests of their estates to continue to follow the banking practices necessitated by the Cash Management System, notwithstanding the requirements of section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines. The Debtors further believe that their deposits in the Concentration Account are held in a commercially reasonable and appropriate manner that is consistent with the intent of section 345 of the Bankruptcy Code. The Debtors submits that the funds are not sufficiently at risk to necessitate strict adherence to the requirements of section 345(b) of the Bankruptcy Code.

Moreover, if granted a waiver, the Debtors will not be required to incur the significant

administrative difficulties and expenses relating to opening new accounts to ensure that all of its

funds are fully insured or invested strictly pursuant to section 345 of the Bankruptcy Code.

Significantly, the Concentration Account is already held with a financial institution that has

executed the Uniform Depository Agreement required by the U.S. Trustee for compliance with

the requirements of section 345(b) of the Bankruptcy Code. However, out of an abundance of

caution, the Debtors requires additional time to ensure that all of the Bank Accounts are in

compliance or come into compliance or seek a further waiver of the requirements of section

345(b) of the Bankruptcy Code. Therefore, the Debtors submit that cause exists for an interim

waiver of the investment and deposit restrictions of section 345(b) of the Bankruptcy Code.

**D.** **Customer Programs Motion**

116. LAD has filed a *Motion For Authority To Honor Prepetition Obligations To*

*Customers And Otherwise Continue Customer Programs In The Ordinary Course Of Business*

(the "Customer Programs Motion"). The relief sought in this motion relates only to LAD and

not to the other Debtors.

117. The business of LAD's most valuable asset, the Los Angeles Dodgers baseball

club, is to play baseball and field championship-caliber teams, and the value of that business lies

in the continued support of its loyal fans. Notwithstanding the filing of this chapter 11 case,

LAD intends to continue to provide its fans with what they have come to expect, a winning

baseball team and a great experience at Dodger Stadium. LAD believes that it must show that

it's committed to doing all that it can to ensure that its fans are not affected by the filing of its

chapter 11 case.

118.     Accordingly, LAD is seeking to honor the commitments made under the "Dodger Dollars" program.  "Dodger Dollars" are certificates that are available in $5 and $10 increments and can be used at Dodger Stadium to purchase merchandise, concessions, parking, and tickets. As of the Commencement Date, LAD estimates that approximately $500,000 in Dodger Dollars is outstanding.

119.     LAD believes the continuation of the Customer Programs constitutes an "ordinary course of business" practice that does not require Court approval.  Nevertheless, out of an abundance of caution, LAD seeks authority, but not direction, to continue, renew, replace, modify, and/or terminate the Customer Programs as it deems appropriate in the ordinary course of business in accordance with its prepetition practices.

120.     LAD believes the continuation of the Customer Programs is necessary for LAD to retain its valuable and loyal fans and customers, and maintain the value of LAD's business for the benefit of all parties in interest.  The failure of LAD to maintain the Customer Programs could imperil LAD's restructuring efforts and damage the goodwill established with its customers.  This is especially so now, in the middle of the baseball season, when the Los Angeles Dodgers play a game almost every day.

121.     Honoring prepetition obligations under the Customer Programs is essential to the ongoing operations of LAD.  Refusing to honor prepetition obligations arising under the Customer Programs could have disastrous effects on LAD's business, as fans (and their friends and relatives) who have purchased or otherwise received Dodger Dollars but are unable to use them while at Dodger Stadium will be unlikely to continue to support them.  Thus, LAD seeks permission to continue the Customer Programs and honor the prepetition obligations thereunder.

**E.     Insurance Motion**

122.    LAD has filed a *Motion For Authority To (A) Continue Its Workers'*
*Compensation, Liability, Property, And Other Insurance Programs And (B) Pay All Obligations*
*In Respect Thereof* (the "Insurance Motion").  The relief sought in this motion relates only to
LAD and not to the other Debtors.

123.    LAD seeks an order authorizing it to continue the Insurance Programs (as defined
below), and to pay any and all obligations under the Insurance Programs, including all
premiums, deductibles, and other fees and costs relating to the Insurance Programs (collectively,
the "Insurance Obligations").  Although LAD believes it can continue its Insurance Programs
and pay postpetition Insurance Obligations in the ordinary course of business, it is seeking the
relief described herein out of an abundance of caution.

124.    To the extent any of LAD's employees hold valid claims under its workers'
compensation program (the "Workers' Compensation Program"), LAD also seeks authorization
to modify the automatic stay imposed by section 362 of the Bankruptcy Code (the "Automatic
Stay") to permit these employees to proceed with their claims under the Workers' Compensation
Program.  This modification of the Automatic Stay pertains solely to claims under the Workers'
Compensation Program.  Any claims relating to any of the Insurance Programs or otherwise shall
remain subject to the Automatic Stay.

125.    In connection with the operation of LAD's business, LAD maintains, in
conjunction with Major League Baseball and Minor League Baseball Trust (the
"Administrator"), workers' compensation, and various liability and property insurance programs
(the "Insurance Programs").  The Insurance Programs provide LAD with insurance coverage for
claims relating to, among other things, damage to Debtor's real and personal property, workers'

compensation, excess liability, automobile liability, fiduciary liability, media liability, foreign

liability, employment practices liability and general liability. The Administrator negotiates and

procures the Insurance Programs on behalf of Major League Baseball teams, including LAD,

from several different insurance carriers (the "Insurance Carriers"). A list of the Insurance

Programs and Insurance Carriers is annexed as Exhibit A to this Motion.[9] The majority of the

Insurance Programs are effective from February 1, 2011 to January 31, 2012 (the "2011 Policy

Period"). LAD is billed by the Administrator and Insurance Carriers for the cost of the Insurance

Programs.

### I. Workers' Compensation Program

126. LAD is required by state law to maintain workers' compensation coverage for its

employees for claims arising from or related to their employment with LAD. The Workers'

Compensation Program covers claims asserted by employees of LAD. Obligations relating to

the Workers' Compensation Program arise under policies obtained from Insurance Carriers that

are selected by the Administrator. The combined 2011 annual premium for the Workers'

Compensation Program is $1,471,977. LAD paid certain premiums in full at the beginning of

the 2011 Policy Period and pays other premiums on a quarterly installment basis in advance. As

of the Commencement Date, LAD owes $658,496 on account of its Workers' Compensation

Program premiums, which is the amount LAD will owe to the Administrator to maintain

coverage under the Workers' Compensation Program for the remainder of the 2011 Policy

Period.

---

[9]    In addition to the Insurance Programs discussed herein, LAD maintains certain insurance programs with respect to, among other things, employee health, dental, disability, and life insurance benefits. These programs are addressed in a separate motion filed contemporaneously herewith that seeks relief in connection with certain employee wage and benefit programs.

127.     As of June 23, 2011, there are 102 open workers' compensation claims (the "Workers' Compensation Claims").  Under the Workers' Compensation Program, LAD has a $500,000 deductible for each Worker's Compensation Claim.  Based on estimates, LAD believes that all Workers' Compensation Claims are within the policy limits of the Workers' Compensation Program.

## II.     Liability and Property Insurance Program

128.     The Administrator has procured and negotiated various liability and property insurance policies on behalf of LAD.  Specifically, the insurance policies provide LAD with insurance coverage for liabilities relating to, among other things, general liability, property, employment practices, fiduciary liability, foreign liability, automobile liability, and media liability.  Continuation of these policies is essential to the ongoing operation and protection of LAD's business.

129.     In addition to the Workers' Compensation Program, LAD is required to pay premiums in connection with its other Insurance Programs (collectively, the "Insurance Premiums").  The Insurance Premiums are based upon a fixed rate established by each Insurance Carrier or by means of a proportional allocation maintained by the Administrator.  The Insurance Premiums for most of the Insurance Programs are determined annually and are paid in full or in quarterly installments in advance over the 2011 Policy Period as described in Exhibit A.  Additionally, LAD has various deductible and coinsurance obligations that are paid based on the amount of claims made against the Insurance Programs, and that are calculated in accordance with the applicable Insurance Program.  As of the Commencement Date, approximately

$244,487[10] will be due under the current existing insurance policies for the remainder of the 2011 Policy Period.

130.     As of the Commencement Date, LAD believes that it does not owe any prepetition amounts due on account of or related to either the Workers Compensation Program or Insurance Policies, including amounts due for unpaid premiums.  However, in an abundance of caution, LAD seeks authority to pay any such prepetition amounts that may become due or become known after the Commencement Date.

**F.     Critical Vendor Motion**

131.     LAD has filed a *Motion For Authority To Pay The Prepetition Claims Of Certain Critical Vendors* (the "Critical Vendor Motion").  The relief sought in this motion relates only to LAD and not to the other Debtors.

132.     LAD seeks an order authorizing, but not directing it, to honor and pay certain prepetition claims (the "Critical Vendor Claims") of critical vendors (the "Critical Vendors") in the ordinary course of business, and directing LAD's banks to continue to honor and pay checks issued prepetition on account of Critical Vendor Claims that have yet to be cashed to ensure that these essential goods and services will continue to be available to LAD without interruption.  By this Motion, LAD seeks authority to pay Critical Vendor Claims in an aggregate amount not to exceed $500,000 (the "Critical Vendor Cap") if LAD determines in its sole discretion that such immediate payment is necessary to prevent irreparable harm and significant disruption to LAD's business operations.  The Critical Vendor Claims that LAD seeks authority to pay on the first day all fall within that stringent criteria.

---

[10]     This amount excludes premiums due under the Workers' Compensation Program.

133.    Notwithstanding the foregoing, LAD reserves the right to seek to increase the Critical Vendor Cap or to otherwise seek appropriate relief from this Court to satisfy Critical Vendor Claims in an amount greater than the Critical Vendor Cap. LAD intends to propose a plan of reorganization that pays all of its unsecured creditors in full, and intends to pursue authority to pay its vendors and suppliers in full prior to plan confirmation after an official committee of unsecured creditors is appointed.

**G.      Utility Motion**

134.    LAD has filed a *Motion For Interim And Final Orders (I) Prohibiting Utility Companies From Altering, Refusing, Or Discontinuing Utility Services, (II) Approving Los Angeles Dodgers LLC's Proposed Form Of Adequate Assurance, (III) Establishing Procedures For Resolving Objections Thereto By Utility Companies, And (IV) Scheduling A Final Hearing Thereon* (the "Utility Motion"). The relief sought in this motion relates only to LAD and not to the other Debtors.

135.    As the owner and operator of a professional baseball team, LAD must ensure that Dodger Stadium and related facilities are operating properly and without interruption. To that end, LAD utilizes water, natural gas, electricity, telephone, and similar utility products and services (collectively, the "Utility Services") provided by approximately four different utility companies (collectively, the "Utility Companies") covering a number of utility accounts. A list of substantially all of the Utility Companies providing Utility Services to LAD as of the Petition Date (the "Utility Service List") is attached to the Utility Motion as Exhibit A thereto. The relief requested pursuant to the Utility Motion is requested with respect to all Utility Companies, and is not necessarily limited to those listed on the Utility Service List.

136.     Ordinarily, LAD pays each of the Utility Companies upon receipt of a monthly invoice for the Utility Services.  To the best of its knowledge, LAD has not had significant defaults or arrearages with respect to undisputed invoices for Utility Services, other than any payment interruptions that may be caused by the commencement of these chapter 11 cases.  LAD estimates that it pays approximately $131,400 per month in the aggregate to the Utility Companies for the Utility Services.

137.     LAD's payment of undisputed invoices for Utility Services are generally made through LAD's cash management system described above.

138.     LAD expects that revenue from operations and the liquidity provided under the terms of its *Emergency Motion For Interim And Final Orders (I) Authorizing Debtors To Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 362, And 364, And (II) Scheduling A Final Hearing Pursuant To Bankruptcy Rules 4001(b) And 4001(c)* will be sufficient to meet all postpetition obligations with respect to Utility Services, and intend to continue to pay all such obligations in a timely manner.  To provide adequate assurance of payment, as set forth in sections 366(b) and (c) of the Bankruptcy Code, however, LAD proposes to deposit within 20 days of the Petition Date an initial sum equal to 50% of LAD's estimated average monthly cost of cumulative Utility Services obtained from Utility Companies that do not otherwise hold deposits or security (the "Adequate Assurance Deposit") into an interest-bearing, segregated account (the "Adequate Assurance Account").  Because LAD's monthly spending on Utility Services is approximately $131,400, the initial Adequate Assurance Deposit will be $65,700.

139.     LAD further proposes to maintain this amount in the Adequate Assurance Account through and until the Final Hearing.  Thereafter, LAD proposes to adjust the amount of the Adequate Assurance Deposit in the Adequate Assurance Account to reflect the following

factors: (i) the termination of Utility Services by LAD regardless of any additional requests for adequate assurance, and (ii) agreements with existing and/or new Utility Companies. These adjustments will permit LAD to maintain the Adequate Assurance Account with an Adequate Assurance Deposit that consistently provides Utility Companies with coverage for half of an average month's usage of the applicable Utility Services.

140.   LAD submits that the Adequate Assurance Deposit and the Adequate Assurance Account, together with the facts and circumstances of LAD's chapter 11 case (together, the "Proposed Adequate Assurance"), constitute sufficient adequate assurance to the Utility Companies, pursuant to Bankruptcy Code sections 366(b) and (c).

## H.   Tax Motion

141.   LAD has filed a *Motion For Order Authorizing Payment Of Certain Prepetition Taxes And Other Government Assessments Pursuant To Sections 105(a), 363(b), 507(a) And 541 Of The Bankruptcy Code* (the "Tax Motion"). The relief sought in this motion relates only to LAD and not to the other Debtors.

142.   By this Motion, LAD seeks an order authorizing, but not directing, LAD to pay sales and use taxes (the "Sales and Use Taxes"), occupancy and business taxes levied by the City of Los Angeles (the "City Taxes"), personal property taxes (the "Property Taxes"), and franchise taxes (the "Franchise Taxes", and together with the Sales and Use Taxes, the City Taxes, and the Property Taxes, the "Taxes")[11] to various federal, state and local taxing and regulatory authorities (collectively, the "Taxing Authorities") that were incurred in the ordinary course of

---

[11]   LAD also remits taxes to taxing authorities in respect of federal, state, and local income taxes, Social Security, and Medicare, which taxes LAD withholds from employees' wages. Remittance of these taxes to the applicable taxing authorities is addressed in the Employee Wage Motion. LAD does not, and should not be deemed by this Motion or by the Employee Wage Motion to: (i) admit to the validity or amount of any Taxes; (ii) waive its right to dispute any Taxes on any ground; (iii) promise to pay any Taxes; or (iv) request authorization to assume any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

business prior to the Commencement Date and are due and owing to the appropriate Taxing Authorities, including those amounts paid by check prior to the Commencement Date that have not yet cleared; and (ii) authorizing all banks and other financial institutions on which such checks or other fund transfers to the Taxing Authorities are drawn to receive, process, honor and pay any and all such checks or other transfers, whether issued or presented prior to or after the Commencement Date.

44.    In the ordinary course of business, LAD is required to collect sales and use taxes (the "Sales and Use Taxes") on the products that it sells directly to consumers and to remit such taxes to the Taxing Authorities on a monthly basis. The Sales and Use Taxes aggregate about $3,000 per month. The taxes are paid in arrears, so while LAD is current on its payments, the Sales and Use Taxes accruing in June 2011 are not due to be paid until early July 2011. As a result, LAD has approximately $3,000 in Sales and Use Taxes that it collected but that have not been remitted to the Taxing Authorities as of the Commencement Date.

45.    LAD also pays several taxes to the City of Los Angeles (the "City Taxes"). City Business Tax is paid on an annual basis and the next payment, in the estimated amount of $418,400, is not due until February 28, 2012. While the City Business Tax is assessed on an annual basis, a portion of that amount has accrued in the pre-petition period. In addition, LAD pays an Occupancy Tax of approximately $7,500 per each game played at the stadium. The Occupancy Tax is due on the 27th day of each month and is paid one month in arrears. Thus, for the thirteen (13) games played in June 2011, LAD has accrued approximately $97,500 in Occupancy Taxes that will be due and payable on July 27, 2011.

46.    Taxing Authorities also impose taxes on LAD relating to the personal property that LAD owns for the operation of its business (the "Property Taxes"). The Property Taxes are

payable annually, and the next payment, in the approximate amount of $366,000, is due on August 31, 2011. A significant portion of the Property Taxes has accrued pre-petition.

47. Finally, LAD incurs and pays franchise taxes, including business licenses and fees (the "Franchise Taxes") in the State of California in exchange for authority to conduct business. Such taxes are paid on an annual basis and aggregate approximately $32,000 per year. LAD is current on the payment of its Franchise Taxes. While LAD believes that it currently owes no prepetition Franchise Taxes, out of an abundance of caution, it hereby seeks authority to pay any Franchise Taxes assessed on LAD after the Commencement Date for prepetition periods. Payment of such taxes is critical to LAD's ability to continue operating in the State of California, and failure to pay could affect LAD's good standing and significantly impair its ability to reorganize.

48. While LAD believes that it is substantially current with respect to the payment of Taxes, LAD seeks to make such payments where (i) Taxes accrued or incurred prepetition were not paid prepetition or were paid in an amount less than actually owed, (ii) payments made prepetition by LAD were lost or otherwise not received in full by any of the Taxing Authorities, or (iii) Taxes incurred for prepetition periods may become due after the commencement of this chapter 11 case.

143. Payment of the Taxes is necessary for LAD to remain in good standing and continue its operations. Certain Taxing Authorities either have not been paid due to the time during the month at which such Taxes are normally remitted, or may have been sent checks for Taxes that may or may not have been presented or cleared as of the Commencement Date. In other cases, obligations may have accrued or are accruing, or are subject to audit or review, but may have not yet become due and payable. Accordingly, LAD seeks authorization for its banks

to honor prepetition wire transfer requests and checks issued by LAD to the Taxing Authorities in payment of prepetition Taxes as described herein that, as of the Commencement Date, have not cleared or been transferred. To the extent that LAD has not yet remitted payment to the Taxing Authorities with respect to certain prepetition Taxes, LAD seeks authorization to issue checks or provide for other means of payment to the Taxing Authorities to the extent necessary to pay such Taxes, including any amounts that may become due after an audit.

## I. DIP Financing Motion

144. The Debtors have filed an Emergency Motion For Interim And Final Orders (I) Authorizing Debtors To Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 362, And 364, And (II) Scheduling A Final Hearing Pursuant To Bankruptcy Rules 4001(b) And 4001(c) (the "DIP Financing Motion"). The relief sought in this motion relates to all Debtors.

145. Both before and after the Commissioner's refusal to approve the Proposed Fox Transaction, the Debtors engaged in an extensive search for financing to meet their ongoing obligations. The Debtors reached out to numerous banks, financial institutions, professional investors, and strategic partners. The Debtors provided prospective financing sources with access to a data room to conduct due diligence. These efforts yielded interest from more than seven potential entities, at least four of whom requested access to the data room.

146. While several parties expressed interest in providing financing, the Debtors only received a proposed commitment from one source - Highbridge Principal Strategies, LLC (the "DIP Lender"). After receiving the DIP Lender' proposal, the Debtors engaged in extensive negotiations, over the course of the days leading up to the commencement of these cases, regarding the terms of a commitment letter to secure postpetition financing. Those negotiations, which were conducted at arm's length, resulted in a commitment from the DIP Lender for a $150

million postpetition financing facility (the "DIP Facility") on the terms and conditions set forth in the term sheet attached to the DIP Financing Motion as Exhibit B (the "DIP Term Sheet").

147. In order to determine the Debtors' funding needs during these chapter 11 cases, the Debtors have, with the assistance of their advisors, analyzed their projected expenses to determine what is necessary to maintain their operations in chapter 11 and foster a successful restructuring. This process resulted in the development of a 13-week cash flow budget, attached to the DIP Financing Motion as Exhibit C (the "Budget"). As outlined above and shown in the Budget, LAD has a number of extraordinary cash outlays that are payable this week and during the next few weeks. For example, LAD requires access to at least $20 million in financing to pay compensation (both current and deferred) that becomes due on June 30, 2011. Immediately thereafter, on July 1, 2011, LAD is required to fund an additional $18.7 million into a reserve for future deferred compensation payments under the collective bargaining agreement with the players' association. The Debtors' anticipate that LAD will need to fund at least one more payroll for its baseball operations before any Final Hearing on the DIP Financing Motion. The Debtors anticipate that the interim borrowing amount will be sufficient to fund their operations pending the Final Hearing.

I.     **No Adequate Alternative to the DIP Facility is Currently Available**

148. In the days and weeks prior to the commencement of these chapter 11 cases, the Debtors explored alternative financing from a number of potential lenders and from a variety of financial institutions. Chief among these alternatives was a media rights agreement with Fox that would have provided sufficient liquidity in both the short term and the future. In the meantime, the Debtors also reached out to institutional lenders, professional investors, and other parties about providing financing for LAD's immediate liquidity crisis.

149. After the Commissioner refused on June 20th to approve the media rights agreement between LAD and Fox, the Debtors redoubled their efforts to find alternative sources of longer term financing. As discussed above, LAD discussed financing possibilities with seven potential lenders, over half of whom conducted due diligence. While LAD received expressions of interest from several sources, only the DIP Lender was willing to provide a commitment for financing of a sufficient amount and within the Debtors' time constraints.

## II. The DIP Facility is Necessary to Preserve Estate Assets and is an Exercise of the Debtor's Sound Business Judgment

150. As discussed above, the DIP Facility is necessary to preserve the value of the Debtors' estates. Specifically, the DIP Facility will allow the Debtors to conduct their operations, pay their obligations to their employees, and administer the chapter 11 cases. Moreover, the availability under the DIP Facility will provide LAD with the time it needs to implement a process to maximize the value of its assets. Without the benefit of the DIP Facility, the Debtors will suffer irreparable harm as they will be unable to meet payroll, which would likely lead to erosion or elimination of what is otherwise a substantial equity interest.

## III. The DIP Facility Terms are Fair, Reasonable and Appropriate

151. As discussed more fully above, the Debtors made concerted, good-faith efforts to obtain credit on the most favorable terms available in the market, notwithstanding the short period of time to generate liquidity following the Commissioner's refusal to approve the Proposed Fox Transaction and the rapidly approaching deadline to meet payroll and other extraordinary obligations. No other lender was willing to provide the $40,000,000 million in funding necessary to meet LAD's payroll obligations on June 30th and July 1st, let alone the additional $110,000,000 offered by the DIP Facility to fund the continued operation of the

Debtors' businesses. Moreover, no entity offered any financing on more favorable terms than those provided in the DIP Facility or within the time permitted.

152.    Against this backdrop, the Debtors and their advisors carefully evaluated the proposed financing offered by the DIP Facility and engaged in arm's-length negotiations with the DIP Lender. Those negotiations resulted in obtaining several operational and economic benefits under the DIP Facility. Ultimately, the Debtors, exercising their sound business judgment, agreed to the DIP Facility as the proposal best suited to the Debtors' needs.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated as of June 27, 2011.

Jeffrey J. Ingram