## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LOS ANGELES DODGERS LLC, *et al.*,[1] | ) Case No. 11- _12010_ (___) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |

## LOS ANGELES DODGERS LLC'S MOTION FOR AUTHORITY TO (A) CONTINUE ITS WORKERS' COMPENSATION, LIABILITY, PROPERTY, AND OTHER INSURANCE PROGRAMS AND (B) PAY ALL OBLIGATIONS IN RESPECT THEREOF

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Los Angeles Dodgers LLC, a debtor and debtor in possession in these chapter 11 cases ("LAD"), hereby requests by this motion (the "Motion"), entry of an order, substantially in the form attached hereto as Exhibit B (the "Proposed Order"), pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") authorizing LAD to (a) continue its workers' compensation, liability, property, and other insurance programs and (b) pay all obligations in respect thereof. In support of this Motion, LAD relies upon and incorporates by reference the *Declaration of Jeffrey J. Ingram in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "Ingram Declaration"), which was filed with the Court concurrently herewith. In further support of the Motion, LAD, by and through its undersigned proposed co-counsel, respectfully represents as follows:

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number are: Los Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567); LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029). The location of the Debtors' corporate headquarters and the service address for the Debtors is: 1000 Elysian Park Avenue, Los Angeles, California 90012.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code.

2.     No previous request for the relief requested herein has been made to this Court or any other court.

## BACKGROUND

3.     On June 26, 2011 (the "Commencement Date"), LAD filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.     LAD intends to continue in the possession of its properties and the management of its businesses as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     As of the date hereof, no trustee or examiner has been appointed in this chapter 11 case, and no committees have been appointed or designated.

**A.     Ownership Structure**

6.     LAD operates a professional major league baseball club located in the Los Angeles metropolitan area.  The club's membership in Major League Baseball ("MLB") is described in the Major League Constitution (the "Major League Constitution"), as assumed by LAD pursuant to an Assumption Agreement, dated as of February 13, 2004.[2]

7.     LAD is a Delaware limited liability company, whose sole member is debtor Los Angeles Dodgers Holding Company LLC ("LAD Holding"), also a Delaware limited

---

[2]     None of the other Debtors are a party to the Major League Constitution nor do they have any role in the operation of the baseball club.

YCST01:11209920.1                                                                                                    069120.1001

liability company. LAD Holding's sole member is debtor LA Holdco LLC ("HoldCo"), also a Delaware limited liability company. Both LAD Holding and HoldCo are holding companies with no operating assets. As described further below, HoldCo is the sole member of debtor LA Real Estate Holding Company LLC ("RealCo Holding"), a Delaware limited liability company. RealCo Holding is the sole member of LA Real Estate LLC ("RealCo"), a Delaware limited liability company that owns Dodger Stadium and the real estate upon which it is located, as well as Dodger Tickets LLC ("Tickets"), a Delaware limited liability company that owns the right to receive future ticket revenue from Dodger games at Dodger Stadium. HoldCo is a wholly owned subsidiary of LA Partners LLC ("LA Partners"), which in turn is a wholly owned subsidiary of The McCourt-Broderick Limited Partnership ("TMBLP"), a Massachusetts limited partnership. TMBLP is the sole member of Blue Landco LLC ("Blue Land"), a Delaware limited liability company that owns the parking lots surrounding Dodgers Stadium. Frank H. McCourt, Jr. ("Mr. McCourt") is the sole limited partner of TMBLP and owns a 90% interest, with the remaining 10% interest owned by TMBLP's sole general partner, The McCourt Company, Inc., a Delaware corporation. None of the parents of HoldCo are debtors in these chapter 11 cases.

## B.    Major League Baseball

8.    The Office of the Baseball Commissioner (the "Commissioner's Office") is an unincorporated association also doing business as Major League Baseball ("MLB") that has as its members thirty baseball clubs. Those clubs are divided into two leagues, the American League and the National League (the Dodgers are in the West division of the National League). The commissioner of baseball, Allan H. "Bud" Selig (the "Commissioner"), serves as the chief executive officer of Major League Baseball.

**C.     The Los Angeles Dodgers Baseball Club**

9.      The Los Angeles Dodgers have a storied history that dates back to the late 1800's. Originally located in Brooklyn, New York, the Dodgers moved to Los Angeles in 1958. Before doing so, the Dodgers broke baseball's color barrier by signing Jackie Robinson in 1945. In 1962, the Los Angeles Dodgers moved into their new home at Dodger Stadium, where they continue to play. The Dodgers have won six World Series championships (five in Los Angeles), the most recent of which occurred in 1988.

**D.     The 2004 Acquisition**

10.     The Dodgers were acquired by Fox Entertainment Group, Inc. ("Fox Group") in 1998. After creating a Regional Sports Network ("RSN") associated with the Dodgers, Fox Group made the decision in 2003 to sell the team and the real estate where the stadium and parking lots are located.

11.     Following a sale process, the winning bidder for the assets was Mr. McCourt, who in early 2004 became the owner of the Los Angeles Dodgers, as well as the other assets owned by Fox Group (the "Acquisition"). The purchase by Mr. McCourt, which was unanimously approved by Major League Baseball and supported by the Commissioner, was consummated under two separate agreements. Pursuant to one agreement, Mr. McCourt paid $330 million to purchase the Los Angeles Dodgers. Under a separate agreement, Mr. McCourt paid $100 million to acquire the real estate consisting of Dodger Stadium, the land under the stadium, and about 250 acres of land surrounding the stadium that includes the parking lots.

12.     Under the terms of the Acquisition, the land purchased by Mr. McCourt, including Dodger Stadium and the surrounding parking lots, became an asset of RealCo.

Pursuant to a lease agreement between RealCo and LAD executed in 2004, RealCo agreed to lease both the land and the stadium, along with granting associated rights, for a term of 38 years.

13.     A portion of the purchase price for the Acquisition ($125 million) was financed by Fox Group pursuant to a two year loan made to an affiliate of Mr. McCourt. To secure repayment, Mr. McCourt provided, as collateral, 24 acres of undeveloped real estate in the Boston seaport district. The contribution of that property was, at the time of the Acquisition, treated as an equity contribution to fund a large portion of the aggregate purchase price paid under the Acquisition. Two years after the Acquisition, Mr. McCourt transferred that valuable real property to Fox Group in satisfaction of the $125 million repayment obligation.

E.      **Subsequent Financing Transactions**

14.     In May 2005, HoldCo reorganized its subsidiary operations and formed Tickets, which became a subsidiary of RealCo. RealCo and LAD amended their lease agreement to provide for RealCo to lease Dodger Stadium and the underlying land to Tickets, which then subleased the stadium to LAD with the notable exception of the general admission seats. Those seats are not subleased, and tickets for these seats are sold by Tickets, thereby enabling Tickets to earn revenue from Dodger home games.

15.     As part of the reorganization, Tickets entered into two securitization financing transactions. The first, in 2005, generated $250 million that were used to permanently refinance debt incurred under the Acquisition on favorable terms. The second transaction, in 2007, generated $140 million, which was primarily used to pay the cost of upgrading Dodger Stadium and to reimburse LAD for costs that it had incurred to upgrade the stadium. The improvements made included (a) replacement of all of the seats in the stadium, (b) a new playing surface, (c) drainage improvements, (d) expansion of concession space, (e) reconfiguration of parking lots to

improve traffic flow, (f) expansion of the Dugout Club, (g) renovation of the Stadium Club, (h) creation of two new Baseline Box Clubs, (i) significant upgrades to the video in-game experience, and (j) completion of numerous structural and seismic upgrades. Both financing transactions involved the securitization of the income stream from future ticket sales. Importantly, the Commissioner and Major League Baseball approved the formation of Tickets as a wholly owned subsidiary of HoldCo, as well as the securitization of the ticket income stream.

16.     In 2006, RealCo transferred the parking lots and other land surrounding Dodger Stadium (but not Dodger Stadium itself or the land on which the stadium is located) to Blue Land.[3]

## F.     Improved On Field and Off Field Performance Since 2004

17.     Under Mr. McCourt's stewardship, the 2004 Dodgers won their first playoff game in sixteen years, advanced to back-to-back National League Championship Series (2008 and 2009) for the first time in over 30 years, and appeared in the post-season four times in a six year period for the first time ever since moving to Los Angeles in 1958. During this time period, benefitting from the team's success and the renovation of the stadium, the Dodgers enjoyed consistently high attendance for home games. During the 2009 season, the Dodgers drew 3.8 million fans, the highest attendance in Major League Baseball.

18.     The Dodgers also recently opened a new state-of-the-art spring training facility in Arizona – a 13,000 person stadium that it shares with the Chicago White Sox. LAD and Chicago

---

[3]     To facilitate that transaction, the boundary lines of the existing parcels were changed in order to enable the stadium and the land under the stadium to be a single parcel that continued to serve as collateral for the financing provided to Tickets. The surrounding land was released from that mortgage. Blue Land borrowed $60 million, secured by the surrounding property, of which $10 million was contributed to LAD. Subsequently, Blue Land borrowed an additional $10 million to purchase an additional parcel of land, which is owned by Blue Land's wholly owned subsidiary, McCourt College Street LLC. Blue Land currently owes $67 million in debt which is scheduled to mature on June 30, 2011.

White Sox Ltd. are equal members in Camelback Spring Training LLC, a Delaware limited liability company, which operates the facility.

## G.  Sources of Revenue

19.  LAD's primary sources of revenues from the operation of the baseball club consist of the following:

Entertainment Fee.  LAD is paid an entertainment fee by RealCo in connection with providing entertainment at Dodger home games.  The entertainment fee is paid from proceeds of ticket sales by Tickets.

Broadcasting Rights.  LAD receives payments for the licensing of rights to broadcast their games on television (both over the air and by cable television) and on the radio.  Currently, LAD is party to a telecast agreement (the "Fox Telecast Agreement") with Fox Sports Net West 2, LLC ("Fox Sports 2"), under which Fox Sports 2 has been granted exclusive cable television rights until the end of the 2013 baseball season.  LAD has separate agreements to broadcast games on television and radio.

Sponsorship and Advertising.  A substantial portion of revenues is derived from sponsorship and advertising.  LAD's major corporate sponsors include Best Buy, Anheuser-Busch, Coca-Cola, Bank of America, United Airlines, and Time Warner.

Concession Income.  LAD receives substantial revenue from concessionaires who are authorized to sell food/beverages and souvenirs, both at Dodger Stadium and online.

Major League Central Fund.  LAD also is entitled to receive payments indirectly from the Major League central fund ("MLCF"), which generates income primarily through national telecasting and radio broadcasting revenue.  LAD's interest in that revenue is owned by Dodgers Club Trust, a Delaware statutory trust that is 90% owned by LAD and 10% owned by Major

League Baseball.  The Dodgers Club Trust is party to various credit agreements, evidencing loans secured by the monies payable by MLCF to Dodgers Club Trust and by Dodgers Club Trust to LAD.  The outstanding balance of the loans to the Dodgers Club Trust is about $55 million.  Distributions from MLCF are subject to approval of the Commissioner as to timing and amount.

Other Significant Revenue Sources.  LAD also receives revenue from premium seating, parking, national licensing, spring training, and in some years, sales of postseason tickets.

20.     LAD is required to contribute a substantial amount of its revenue to Major League Baseball for the purpose of revenue sharing with other baseball clubs that receive less revenue than LAD.  For example, in 2009, LAD paid about 12.5% of its revenue to other baseball clubs.

21.     For RealCo, the source of its revenue, which comes from Tickets, are sublease payments by LAD and ticket sales by Tickets.

## H.     Events Leading to LAD's Chapter 11 Filing

22.     In 2010, LAD experienced cash flow difficulties.  During 2010, LAD lost money as a result of declines in attendance, failed to reach the playoffs, and paid substantial deferred compensation totaling about $22 million.  LAD was also required to contribute a large portion of its revenue to revenue sharing.  In 2010, this amounted to approximately 10% of total revenue.

23.     To ensure the availability of sufficient capital to pay expenses as they become due, LAD entered into an agreement with Fox Sports in 2010 to obtain a $25 million advance of the payment due under the Fox Telecast Agreement (described below) for the 2011 season.  Subsequently, in early 2011, Mr. McCourt obtained a $30 million personal loan from Fox Sports, of which $23.5 million has been contributed by Mr. McCourt over the past several months to fund LAD's payroll and other expenses.

YCST01:11209920.1

069120.1001

24.     To date, LAD has remained current in its obligations.  However, LAD is now on the verge of running out of cash, the result of a perfect storm of events.  First, under its financing agreements, Tickets is required to reserve a large portion of its revenues this year because the Collective Bargaining Agreement (the "CBA") with the MLB Players Association is scheduled to expire, which occurs about every five years.  So far, Tickets has reserved about $17 million and expects to reserve as much as an additional $6 million.  Assuming the CBA is extended, that reserved cash will become available to contribute to LAD's operations, but in the meantime, that cash is unavailable.

25.     Second, LAD, which has already paid $10 million in deferred compensation this year, is required to make another payment of $10.5 million in deferred compensation on June 30, 2011.  Making matters even more difficult, on July 1, 2011, LAD is, under the terms of the CBA, required to reserve more than $18 million to prefund deferred compensation that is not payable to the players at issue until 2012.

26.     Third, LAD has experienced a significant decline in attendance this year.  This decline may be attributable in part to the Commissioner's appointment of a "monitor" in April 2011, which generated adverse publicity.  Despite the Commissioner's questionable authority under the Major League Constitution to appoint a monitor and require the monitor's approval of expenditures, LAD has, through the Commencement Date, voluntarily cooperated with the monitor.

27.     For more than a year, LAD has been actively pursuing alternatives to generate sufficient cash to address the liquidity timing challenges described above.  In particular, LAD has focused on monetizing the exclusive cable television rights for periods after the expiration of the existing Fox Telecast Agreement.  The value of those rights is enormous, and when it is able

to unlock that value, LAD will be in a position to satisfy all of its existing claims, pay debts as they become due, and generate a substantial return for its equity holder.

28.    Section 2(c) of the Fox Telecast Agreement contains a "Right of First Negotiation" provision, which states that "[f]rom October 15, 2012 through November 30, 2012 (the "Exclusive Negotiating Period"), [LAD] and FOX Sports shall negotiate confidentially, exclusively and in good faith with respect to the terms and conditions on which FOX Sports may retain exclusive Cable Television Rights to Exhibit future Games for a subsequent term of at least five years beginning with the 2014 MLB season." The provision further states that LAD "shall not solicit offers from or negotiate with any person or entity (other than Fox Sports) for Cable Television Rights with respect to any future Games at any time preceding November 30, 2012."

29.    In an effort to monetize the value of the right to telecast future games on cable without jeopardizing its rights under the existing Fox Telecast Agreement, LAD and its parent companies, led by Mr. McCourt, entered into negotiations with Fox Sports. The transaction, as proposed (the "Proposed Fox Transaction"), contemplated an agreement under which Fox Sports would retain the exclusive cable television rights for a period of 17 years, at rates in excess of the rates currently paid under the Fox Telecast Agreement. Using what the Commissioner has acknowledged are terms that share similar features to transactions by certain other clubs in Major League Baseball, the Proposed Fox Transaction provided that a current Fox Sports subsidiary ("Prime Ticket") will thereafter be owned in part by TMBLP through a wholly owned subsidiary, LA Media LLC ("LA Media").

30.    To address the pressing liquidity issues, the Proposed Fox Transaction provided for a $385 million loan by Fox Sports or one of its affiliates to Prime Ticket, which will be

-10-

distributed to LA Media.  Mr. McCourt agreed not only to guarantee collection of that loan, but also to personally guarantee repayment of the loan in the event the new agreement with Fox Sports was terminated for reasons other than a material breach by Fox Sports.  As contemplated, a majority of those proceeds were to be used to pay obligations of LAD and provide sufficient working capital, while a substantial portion was to be used to repay outstanding obligations of subsidiaries of TMBLP, including the $67 million owed by Blue Land on its loan, which is scheduled to mature at the end of this month.

31.     The ability of LAD and its parent companies to reach a final agreement with Fox Sports has, however, been complicated by ongoing divorce proceedings between Mr. McCourt and his former wife, Jamie McCourt ("Ms. McCourt").  In those divorce proceedings, Ms. McCourt asserts an ownership interest in the assets of TMBLP and its subsidiaries, including those of LAD, Blue Land, RealCo, and Tickets.  She has also sought an order in those proceedings to compel the sale of the assets of TMBLP.  Although Mr. McCourt disputes that Ms. McCourt has any ownership interest in those assets, Fox Sports was unwilling to enter into the Proposed Fox Transaction with LAD absent the consent of Ms. McCourt.

32.     Throughout the process of the negotiations with Fox Sports, LAD kept the Commissioner and his senior officers fully apprised regarding the status of those negotiations and the terms that were being negotiated.  LAD repeatedly sought the Commissioner's approval of the terms proposed by LAD.  In response, the Commissioner postponed any decision, citing both the unwillingness of Ms. McCourt to consent to the proposed terms, and the unwillingness of Fox Sports to proceed forward absent the consent of Ms. McCourt.

33.     With LAD facing the June 30 deadline to meet its extraordinary non-recurrent payroll and future reserve obligations, the McCourts were able to reach a settlement in their

divorce proceeding pursuant to which Ms. McCourt agreed to consent to the Proposed Fox Transaction. Under the terms of the divorce settlement, announced on June 16, 2011, the McCourts agreed that a one day trial would occur in August to determine ownership of the Dodgers. If Mr. McCourt prevailed, then Ms. McCourt would receive a payment of $100 million, which was to be funded in part ($55 million) from the $385 million loan. If Ms. McCourt prevailed, then LAD and the assets owned by TMBLP would be sold with the proceeds to be divided by the Court. The settlement was conditioned upon consummation of the Proposed Fox Transaction, which in turn was conditioned upon the consent of the Commissioner's Office.

34.     In addition, the divorce settlement required that the $385 million in loan proceeds to be received by LA Media under the Proposed Fox Transaction be distributed in a certain manner. Notably, the vast majority of the proceeds, totaling more than $310 million, would be used and distributed as follows: 1) $211.5 million for LAD's operations and working capital; 2) $23.5 million to return the proceeds loaned by Fox Sports to Mr. McCourt which were used to fund payroll and other operational expenses of LAD; and 3) $80 million to repay debt obligations of subsidiaries of the TMBLP, including Blue Land. Of the remaining funds, $50 million would be available to pay Ms. McCourt if Mr. McCourt prevailed in his argument that she lacked an ownership interest in the assets, and the remaining $20 million was to be distributed to the McCourts for legal expenses ($5 million each) and personal use ($5 million each).

35.     As explained above, Fox Sports required the consent of Ms. McCourt in order for it to move forward with the Proposed Fox Transaction. Without the consummation of the Proposed Fox Transaction, LAD would not have access to the cash needed to pay its players and

other expenses. Having obtained Ms. McCourt's consent on June 16, 2011, LAD renewed its request that the Commissioner promptly approve the Proposed Fox Transaction.

36. On June 20, 2011, the Commissioner advised Mr. McCourt that he would not approve the Proposed Fox Transaction. The first reason offered by the Commissioner for his refusal to approve the transaction was the Commissioner's preference that LAD wait until after the expiration of the Right of First Negotiation in December 2012, and negotiate with potential suitors other than Fox Sports prior to entering into any new television rights agreement. But given LAD's immediate cash flow difficulties, and faced with the potential risk that Fox Sports would seek to enforce the Right of First Negotiation, LAD simply did not have the luxury of waiting 18 months until the end of 2012.

37. The Commissioner also criticized the use of a portion of the $385 million to fund a divorce settlement with Ms. McCourt. In that regard, the Commissioner did not take into account Fox Sports' unwillingness to move forward with any agreement absent Ms. McCourt's consent, which in turn required either a payment to Ms. McCourt or the liquidation of the assets of LAD and the other subsidiaries owned by TMBLP.

38. Next, the Commissioner criticized the creation of a separate entity not owned by LAD to receive a 35% interest in the RSN. But even the Commissioner acknowledged that "other clubs have entered into transactions that share similar features with the Proposed Transaction."

39. Finally, the Commissioner complained about the manner in which the sale of the Dodgers to Mr. McCourt was structured, as well as the securitization that occurred shortly thereafter, notwithstanding the fact that: a) both he and Major League Baseball approved those transactions; and b) using the funds generated by the securitization, the existing debt of Holdco's

-13-

subsidiaries, including LAD, was refinanced on favorable terms and Dodger Stadium was substantially renovated.

40. Based on the Commissioner's refusal to approve the Proposed Fox Transaction, LAD does not have sufficient cash on hand to meet substantial payroll expenses that come due on June 30, 2011, including the deferred payments owed to former players in 2011 and to be reserved for 2012, or to pay expenses as they become due over the next several weeks.

41. Accordingly, LAD and the other Debtors negotiated a debtor in possession financing commitment and commenced this chapter 11 case.

**I.    Business Plan**

42. Through this bankruptcy case, LAD will explore and implement any and all options to maximize the value of the future exclusive cable television rights that have not been granted beyond 2013. Specifically, LAD will propose and, to the extent authorized by this Court, implement procedures that are designed to promote a competitive sale process with respect to those exclusive cable television rights, one that results in the highest and best offer being acceptable to all parties. In fashioning procedures, LAD will give due consideration to Fox Group and the provisions of the Existing Fox Agreement. LAD expects, and the terms of the recently negotiated Fox transaction demonstrate, that a sale or license of exclusive cable television rights will fully resolve all of LAD's financial challenges as well as generate value for the holders of the equity interests in LAD.

43. In order to implement the above process and achieve its objectives, LAD and the other Debtors have filed for bankruptcy protection and are seeking first day relief from this Court designed to preserve going concern value while LAD implements its strategy. The most important relief sought by LAD is approval of sufficient debtor in possession bridge financing to

-14-

pay expenses over the next 12 months, as well as compliance with its payment obligations to players and others under collective bargaining agreements. LAD also seeks additional relief that will avoid any interruption of the business that would otherwise adversely impact its operations.

## RELIEF REQUESTED

44.     LAD seeks an order authorizing it to continue the Insurance Programs (as defined below), and to pay any and all obligations under the Insurance Programs, including all premiums, deductibles, and other fees and costs relating to the Insurance Programs (collectively, the "Insurance Obligations"). Although LAD believes it can continue its Insurance Programs and pay postpetition Insurance Obligations in the ordinary course of business, it is seeking the relief described herein out of an abundance of caution.

45.     To the extent any of LAD's employees hold valid claims under its workers' compensation program (the "Workers' Compensation Program"), LAD also seeks authorization to modify the automatic stay imposed by section 362 of the Bankruptcy Code (the "Automatic Stay") to permit these employees to proceed with their claims under the Workers' Compensation Program. This modification of the Automatic Stay pertains solely to claims under the Workers' Compensation Program. Any claims relating to any of the Insurance Programs or otherwise shall remain subject to the Automatic Stay.

## THE DEBTOR'S INSURANCE PROGRAMS AND RELATED OBLIGATIONS

46.     In connection with the operation of LAD's business, and in conjunction with Major League Baseball and Minor League Baseball Trust (the "Administrator"), LAD maintains workers' compensation, and various liability and property insurance programs (the "Insurance Programs"). The Insurance Programs provide LAD with insurance coverage for claims relating to, among other things, damage to LAD's real and personal property, workers' compensation,

excess liability, automobile liability, fiduciary liability, media liability, foreign liability, employment practices liability and general liability. The Administrator negotiates and procures the Insurance Programs on behalf of Major League Baseball teams, including LAD, from several different insurance carriers (the "Insurance Carriers"). A list of the Insurance Programs and Insurance Carriers is annexed as Exhibit A to this Motion.[4] The majority of the Insurance Programs are effective from February 1, 2011 to January 31, 2012 (the "2011 Policy Period"). LAD is billed by the Administrator and Insurance Carriers for the cost of the Insurance Programs.

## A.    Workers' Compensation Program

47.    LAD is required by state law to maintain workers' compensation coverage for its employees for claims arising from or related to their employment with LAD. The Workers' Compensation Program covers claims asserted by employees of LAD. Obligations relating to the Workers' Compensation Program arise under policies obtained from Insurance Carriers that are selected by the Administrator. The combined 2011 annual premium for the Workers' Compensation Program is $1,471,977. LAD paid certain premiums in full at the beginning of the 2011 Policy Period and pays other premiums on a quarterly installment basis in advance. As of the Commencement Date, LAD owes $658,496 on account of its Workers' Compensation Program premiums, which is the amount LAD will owe to the Administrator to maintain coverage under the Workers' Compensation Program for the remainder of the 2011 Policy Period.

---

[4]    In addition to the Insurance Programs discussed herein, LAD maintains certain insurance programs with respect to, among other things, employee health, dental, disability, and life insurance benefits. These programs are addressed in a separate motion filed contemporaneously herewith that seeks relief in connection with certain employee wage and benefit programs.

YCST01:11209920.1                                                                 069120.1001

48.     As of June 23, 2011, there are 102 open workers' compensation claims (the "Workers' Compensation Claims").  Under the Workers' Compensation Program, LAD has a $500,000 deductible for each Worker's Compensation Claim.  Based on estimates, LAD believes that all Workers' Compensation Claims are within the policy limits of the Workers' Compensation Program.

**B.     Liability and Property Insurance Program**

49.     The Administrator has procured and negotiated various liability and property insurance policies on behalf of LAD.  Specifically, the insurance policies provide LAD with insurance coverage for liabilities relating to, among other things, general liability, property, employment practices, fiduciary liability, foreign liability, automobile liability, and media liability.  Continuation of these policies is essential to the ongoing operation and protection of LAD's business.

50.     In addition to the Workers' Compensation Program, LAD is required to pay premiums in connection with its other Insurance Programs (collectively, the "Insurance Premiums").  The Insurance Premiums are based upon a fixed rate established by each Insurance Carrier or by means of a proportional allocation maintained by the Administrator.  The Insurance Premiums for most of the Insurance Programs are determined annually and are paid in full or in quarterly installments in advance over the 2011 Policy Period as described in Exhibit A.  Additionally, LAD has various deductible and coinsurance obligations that are paid based on the amount of claims made against the Insurance Programs, and that are calculated in accordance with the applicable Insurance Program.  As of the Commencement Date, approximately

$244,487[5] will be due under the current existing insurance policies for the remainder of the 2011 Policy Period.

51.     As of the Commencement Date, LAD believes that it does not owe any prepetition amounts due on account of or related to either the Workers Compensation Program or Insurance Policies, including amounts due for unpaid premiums. However, in an abundance of caution, LAD seeks authority to pay any such prepetition amounts that may become due or become known after the Commencement Date.

**CAUSE EXISTS TO AUTHORIZE THE
CONTINUATION OF THE DEBTOR'S INSURANCE PROGRAMS
AND THE PAYMENT OF THE DEBTOR'S INSURANCE OBLIGATIONS**

52.     Pursuant to section 503(b)(1) of the Bankruptcy Code, a debtor may incur, and the court, after notice and a hearing, shall allow as administrative expenses, among other things, "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1). In addition, pursuant to section 363(b) of the Bankruptcy Code, a debtor may, in the exercise of its sound business judgment and after notice and a hearing, use property of the estate outside of the ordinary course of business. 11 U.S.C. § 363(b). LAD submits that the use of estate funds for the payment of Insurance Obligations is permitted by sections 503(b)(1) and 363(b) of the Bankruptcy Code as necessary costs of preserving their estates.

53.     Courts regularly rely upon the "necessity of payment" doctrine, together with the bankruptcy court's broad grant of equitable authority set forth in section 105(a) of the Bankruptcy Code, in granting a debtor in possession the discretionary authority to pay certain prepetition claims "where payment is necessary to permit the effectuation of the rehabilitative purposes of the Bankruptcy Code." *Pension Benefit Guar. Corp. v. Sharon Steel Corp. (In re*

---

[5]     This amount excludes premiums due under the Workers' Compensation Program.

*Sharon Steel Corp.)*, 159 B.R. 730, 736 (Bankr. D. Del. 1993); *see also In re Motor Coach*, No. 09-078, 2009 WL 330993, at *2 n.5 ("The 'doctrine of necessity' or 'necessity of payment' doctrine is a general rubric for the proposition that a court can authorize the payment of prepetition claims if such payment is essential to the continued operation of the debtor."); *In re Just For Feet*, 242 B.R. 821, 825 (D. Del. 1999) ("The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11."); *In re NVR*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[U]nder 11 U.S.C. § 105 the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to continued operation of business); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (finding "necessity of payment" doctrine justifies payment of prepetition claims where, "payment is necessary to avert a serious threat to the Chapter 11 process."); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (confirming that section 105(a) can be used to "effectuate the policies and provisions of the Bankruptcy Code," including the payment of prepetition claims of creditors pursuant to 363(b)(1) of the Bankruptcy Code and the "necessity of payment" doctrine); *In re Chateaugay Corp.*, 80 B.R. 279, 282 (S.D.N.Y. 1987) (explaining that bankruptcy court's general equitable powers are broad enough to authorize payment of prepetition claims of critical vendors necessary for debtor's continued operation where debtor in possession's fiduciary duties so require); *cf. Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 574 n.8 (3d Cir. 2003) (noting, in dicta, that emergency critical vendor motions are routinely issued as part of the first day proceedings). At this time, LAD does

not believe that any prepetition amounts are due and owing under the Insurance Obligations as of the Commencement Date. To the extent any amounts are later determined to be owed for periods prior to the Commencement Date, as a result of an adjustment or other correction, LAD seeks authority to pay such prepetition claims.

54. This Court has routinely granted the relief requested herein in other chapter 11 cases in this District. *See, e.g., In re Premier Int'l Holdings Inc.*, No. 09-12019 (CSS) (Bankr. D. Del. June 15, 2009); *In re Anchor Blue Retail Group, Inc.*, No. 09-11770 (PJW) (Bankr. D. Del. May 28, 2009); *In re Nortel Networks Inc.*, No. 09-10138 (KJC) (Bankr. D. Del. Feb. 4, 2009); *In re Smurfit-Stone Container Corp.*, No. 09-10235 (BLS) (Bankr. D. Del. Jan. 27, 2009); and *In re Special Devices, Inc.*, No. 08-13312 (MFW) (Bankr. D. Del. Jan. 6, 2009). LAD respectfully submits that similar relief is warranted in this chapter 11 case.

55. LAD believes that its obligations under its Insurance Programs will constitute postpetition obligations of LAD's estate. However, in the unlikely event any Insurance Obligations are prepetition obligations, LAD seeks authority under section 105(a) of the Bankruptcy Code to pay the prepetition Insurance Obligations as necessary and appropriate to carry out LAD's fiduciary duties, as the payment of such obligations will enhance the value of the estate and benefit all parties in interest.

56. For example, in the present case, the nature of LAD's business and the extent of its operations make it essential for LAD to maintain its Insurance Programs on an ongoing and uninterrupted basis. The nonpayment of any Insurance Obligations under any of the Insurance Programs could result in one or more of the Insurance Carriers terminating its existing policies, declining to renew its insurance policies, or refusing to enter into new insurance agreements with LAD in the future. This could leave LAD uninsured, subjecting LAD to the potential of a

substantial liability—a risk that is not prudent in these circumstances. LAD would also then be required to obtain replacement policies on an expedited basis at a significant additional cost.

57.     Moreover, applicable state law mandates that LAD maintain workers' compensation coverage for their employees. 28 U.S.C. § 959(b) requires that a debtor in possession "manage and operate the property in [its] possession . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." Failure by LAD to pay the premiums associated with their Workers' Compensation Program would jeopardize its coverage and expose LAD to substantial civil and criminal liability.

58.     Finally, pursuant to the guidelines established by the Office of the United States Trustee for the District of Delaware, LAD is obligated to remain current with respect to its primary Insurance Programs. Thus, continuation of the Insurance Programs on an uninterrupted basis and payment of the Insurance Obligations are essential to preserve LAD's business and the value of its estate.

59.     To the extent any Insurance Program or related agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, LAD does not, at this time, seek to assume any such contract. Thus, if the Court authorizes the payments described above, such payments should not be deemed to constitute a postpetition assumption of any programs, policies, or agreements related to the Insurance Program as executory contracts pursuant to section 365 of the Bankruptcy Code. LAD is in the process of reviewing these matters and reserves all of its rights under the Bankruptcy Code with respect thereto. Authorization to pay all amounts on account of the Insurance Obligations should not affect LAD's rights to contest the amount or validity of these obligations.

60.     Accordingly, LAD seeks authority, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to honor its Insurance Obligations and continue its Insurance Programs uninterrupted, as such programs were in effect as of the Commencement Date.  LAD submits that payment of obligations due or arising under or related to these Insurance Programs will be paid in the ordinary course of business and in accordance with the terms of these programs and policies and in a manner consistent with prepetition practices.

## THE AUTOMATIC STAY SHOULD BE WAIVED
## FOR WORKERS' COMPENSATION CLAIMS

61.     Section 362(a) of the Bankruptcy Code provides that the filing of a bankruptcy petition operates to stay

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1).  Section 362, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  *Id.* § 362(d)(1).

62.     To the extent LAD's employees hold valid workers' compensation claims, LAD seeks authorization, under section 362(d) of the Bankruptcy Code, to permit these employees to proceed with their claims in the appropriate judicial or administrative forum.  LAD believes cause exists to modify the Automatic Stay because prohibiting LAD's employees from proceeding with their claims could have a detrimental effect on the financial well-being and morale of such employees and lead to their departure.

63.     To this end, and solely with respect to Workers' Compensation Claims covered under the Workers' Compensation Program, LAD seeks to modify the Automatic Stay as it relates to the Workers' Compensation Claims; *provided*, that such claims are pursued in

-22-

accordance with the Workers' Compensation Program and recoveries, if any, are limited to the proceeds from the applicable Workers' Compensation Program. All other claims, including any relating to matters covered by other Insurance Programs, will remain subject to the Automatic Stay. To effectuate the aforementioned modification of the Automatic Stay, LAD requests that the Court waive the stay of a judgment under Bankruptcy Rule 7062 and the requirements under Bankruptcy Rule 9014 relating to contested matters with respect to claims under the Workers' Compensation Program.

64. Pursuant to this Motion, LAD does not seek a waiver, termination, or modification of the Automatic Stay with respect to any other claims or matters, and nothing in this Motion should be construed as a request therefor.

**REQUEST FOR AUTHORITY FOR BANKS
TO HONOR AND PAY CHECKS ISSUED AND ELECTRONIC
FUNDS TRANSFERS REQUESTED TO PAY INSURANCE OBLIGATIONS**

65. LAD draws upon funds in its disbursement account at Bank of America ("Bank of America") to satisfy obligations arising from the Insurance Obligations. LAD requests that the Court authorize and direct Bank of America and any other applicable financial institutions to receive, process, honor, and pay any and all checks drawn or electronic funds transferred to pay the Insurance Obligations, whether such checks were presented prior to or after the Commencement Date. LAD also seeks authority to issue new postpetition checks, or effect new electronic funds transfers, on account of such Insurance Obligations to replace any prepetition checks or electronic funds transfer requests that may be dishonored or rejected as a result of the commencement of LAD's chapter 11 case. LAD submits that it has sufficient liquidity to pay such amounts as they become due in the ordinary course of LAD's businesses.

YCST01:11209920.1

069120.1001

## THE MOTION SATISFIES BANKRUPTCY RULE 6003

66.     Pursuant to Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one (21) days after the petition date if the relief is necessary to avoid immediate and irreparable harm. Fed. R. Bank. P. 6003. As described herein and in the Ingram Declaration, the relief requested is necessary to avoid immediate and irreparable harm to LAD's estates for the reasons set forth above, and LAD accordingly submits that Bankruptcy Rule 6003 has been satisfied.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

67.     To successfully implement the foregoing, LAD seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

68.     Notice of this Motion has been given to (i) the United States Trustee for the District of Delaware; (ii) LAD's forty (40) largest unsecured creditors; (iii) counsel to Major League Baseball; (iv) counsel to the Major League Baseball Players Association; (v) counsel to proposed postpetition secured lender; and (vi) cash management banks. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). LAD submits that, under the circumstances, no other or further notice is required.

## CONCLUSION

WHEREFORE, LAD respectfully requests that the Court enter the Proposed Order, substantially in the form attached hereto as Exhibit B, granting the relief requested in the Motion and such other and further relief as may be just and proper.

| | |
|---|---|
| Dated:  June 27, 2011<br>          Wilmington, Delaware | YOUNG CONAWAY STARGATT & TAYLOR, LLP<br><br>Robert S. Brady (No. 2847)<br>Donald J. Bowman, Jr. (No. 4383)<br>Ryan M. Bartley (No. 4985)<br>The Brandywine Building – 17th Floor<br>1000 West Street, Post Office Box 391<br>Wilmington, Delaware 19899<br>Telephone:  (302) 571-6600<br>Facsimile:  (302) 571-1253<br><br>-and-<br><br>DEWEY & LEBOEUF LLP<br>Bruce Bennett<br>Sidney P. Levinson<br>(*pro hac vice applications forthcoming*)<br>333 South Grand Avenue, Suite 2600<br>Los Angeles, California 90071<br>Telephone:  (213) 621-6000<br>Facsimile:  (213) 621-6100<br><br>-and-<br><br>DEWEY & LEBOEUF LLP<br>Martin J. Bienenstock<br>Philip M. Abelson<br>(*pro hac vice applications forthcoming*)<br>1301 Avenue of the Americas<br>New York, New York 10019<br>Telephone:  (212) 259-8000<br>Facsimile:  (212) 259-6333<br><br>*Proposed Co-Counsel for LAD*<br>*and LAD in Possession* |