## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LOS ANGELES DODGERS LLC, *et al.*,[1] | ) Case No. 11- *12 010* ( ___ ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

### LOS ANGELES DODGERS LLC'S MOTION FOR (I) AUTHORITY TO PAY PREPETITION (a) WAGES, COMPENSATION, PAYROLL TAXES, AND EMPLOYEE BENEFITS, (b) BUSINESS EXPENSES, AND (c) CONTRIBUTIONS TO, AND UNDER, EMPLOYEE BENEFIT PLANS, (II) AUTHORITY TO PAY PREPETITION BENEFITS PROVIDERS, AND (III) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Los Angeles Dodgers LLC, a debtor and debtor in possession in these chapter 11 cases

("LAD"), hereby requests by this motion (the "Motion"), entry of an order, substantially in the

form attached hereto as Exhibit A (the "Proposed Order"), pursuant to sections 105(a) and 363 of

title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) authorizing LAD to pay

prepetition wages, compensation, payroll taxes, and employee benefits, business expenses, and

contributions to, and under, employee benefit plans, (ii) authorizing LAD to pay prepetition

benefits providers, and (iii) authorizing and directing financial institutions to honor and process

prepetition and postpetition checks and transfers related to such obligations. In support of this

Motion, LAD relies upon and incorporates by reference the *Declaration of Jeffrey J. Ingram in*

*Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "Ingram Declaration"),

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number are: Los Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567); LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029). The location of the Debtors' corporate headquarters and the service address for the Debtors is: 1000 Elysian Park Avenue, Los Angeles, California 90012.

which was filed with the Court concurrently herewith.  In further support of the Motion, LAD, by and through its undersigned proposed co-counsel, respectfully represents as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Rules 6003 and 6004 of the Federal Rules.

2.    No previous request for the relief requested herein has been made to this Court or any other court.

## BACKGROUND

3.    On June 26, 2011 (the "Commencement Date"), LAD filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.    LAD intends to continue in the possession of its properties and the management of its businesses as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.    As of the date hereof, no trustee or examiner has been appointed in this chapter 11 case, and no committees have been appointed or designated.

**A.    Ownership Structure**

6.    LAD operates a professional major league baseball club located in the Los Angeles metropolitan area.  The club's membership in Major League Baseball ("MLB") is

described in the Major League Constitution (the "Major League Constitution"), as assumed by LAD pursuant to an Assumption Agreement, dated as of February 13, 2004.[2]

7.    LAD is a Delaware limited liability company, whose sole member is debtor Los Angeles Dodgers Holding Company LLC ("LAD Holding"), also a Delaware limited liability company. LAD Holding's sole member is debtor LA Holdco LLC ("HoldCo"), also a Delaware limited liability company. Both LAD Holding and HoldCo are holding companies with no operating assets. As described further below, HoldCo is the sole member of debtor LA Real Estate Holding Company LLC ("RealCo Holding"), a Delaware limited liability company. RealCo Holding is the sole member of LA Real Estate LLC ("RealCo"), a Delaware limited liability company that owns Dodger Stadium and the real estate upon which it is located, as well as Dodger Tickets LLC ("Tickets"), a Delaware limited liability company that owns the right to receive future ticket revenue from Dodger games at Dodger Stadium. HoldCo is a wholly owned subsidiary of LA Partners LLC ("LA Partners"), which in turn is a wholly owned subsidiary of The McCourt-Broderick Limited Partnership ("TMBLP"), a Massachusetts limited partnership. TMBLP is the sole member of Blue Landco LLC ("Blue Land"), a Delaware limited liability company that owns the parking lots surrounding Dodgers Stadium. Frank H. McCourt, Jr. ("Mr. McCourt") is the sole limited partner of TMBLP and owns a 90% interest, with the remaining 10% interest owned by TMBLP's sole general partner, The McCourt Company, Inc., a Delaware corporation. None of the parents of HoldCo are debtors in these chapter 11 cases.

B.    **Major League Baseball**

8.    The Office of the Baseball Commissioner (the "Commissioner's Office") is an unincorporated association also doing business as Major League Baseball ("MLB") that has as

---

[2]    None of the other Debtors are a party to the Major League Constitution nor do they have any role in the operation of the baseball club.

its members thirty baseball clubs. Those clubs are divided into two leagues, the American

League and the National League (the Dodgers are in the West division of the National League).

The commissioner of baseball, Allan H. "Bud" Selig (the "Commissioner"), serves as the chief

executive officer of Major League Baseball.

## C. The Los Angeles Dodgers Baseball Club

9.      The Los Angeles Dodgers have a storied history that dates back to the late 1800's.

Originally located in Brooklyn, New York, the Dodgers moved to Los Angeles in 1958. Before

doing so, the Dodgers broke baseball's color barrier by signing Jackie Robinson in 1945. In

1962, the Los Angeles Dodgers moved into their new home at Dodger Stadium, where they

continue to play. The Dodgers have won six World Series championships (five in Los Angeles),

the most recent of which occurred in 1988.

## D. The 2004 Acquisition

10.     The Dodgers were acquired by Fox Entertainment Group, Inc. ("Fox Group") in

1998. After creating a Regional Sports Network ("RSN") associated with the Dodgers, Fox

Group made the decision in 2003 to sell the team and the real estate where the stadium and

parking lots are located.

11.     Following a sale process, the winning bidder for the assets was Mr. McCourt, who

in early 2004 became the owner of the Los Angeles Dodgers, as well as the other assets owned

by Fox Group (the "Acquisition"). The purchase by Mr. McCourt, which was unanimously

approved by Major League Baseball and supported by the Commissioner, was consummated

under two separate agreements. Pursuant to one agreement, Mr. McCourt paid $330 million to

purchase the Los Angeles Dodgers. Under a separate agreement, Mr. McCourt paid

-4-

$100 million to acquire the real estate consisting of Dodger Stadium, the land under the stadium, and about 250 acres of land surrounding the stadium that includes the parking lots.

12.     Under the terms of the Acquisition, the land purchased by Mr. McCourt, including Dodger Stadium and the surrounding parking lots, became an asset of RealCo. Pursuant to a lease agreement between RealCo and LAD executed in 2004, RealCo agreed to lease both the land and the stadium, along with granting associated rights, for a term of 38 years.

13.     A portion of the purchase price for the Acquisition ($125 million) was financed by Fox Group pursuant to a two year loan made to an affiliate of Mr. McCourt. To secure repayment, Mr. McCourt provided, as collateral, 24 acres of undeveloped real estate in the Boston seaport district. The contribution of that property was, at the time of the Acquisition, treated as an equity contribution to fund a large portion of the aggregate purchase price paid under the Acquisition. Two years after the Acquisition, Mr. McCourt transferred that valuable real property to Fox Group in satisfaction of the $125 million repayment obligation.

**E.     Subsequent Financing Transactions**

14.     In May 2005, HoldCo reorganized its subsidiary operations and formed Tickets, which became a subsidiary of RealCo. RealCo and LAD amended their lease agreement to provide for RealCo to lease Dodger Stadium and the underlying land to Tickets, which then subleased the stadium to LAD with the notable exception of the general admission seats. Those seats are not subleased, and tickets for these seats are sold by Tickets, thereby enabling Tickets to earn revenue from Dodger home games.

15.     As part of the reorganization, Tickets entered into two securitization financing transactions. The first, in 2005, generated $250 million that were used to permanently refinance debt incurred under the Acquisition on favorable terms. The second transaction, in 2007,

generated $140 million, which was primarily used to pay the cost of upgrading Dodger Stadium and to reimburse LAD for costs that it had incurred to upgrade the stadium. The improvements made included (a) replacement of all of the seats in the stadium, (b) a new playing surface, (c) drainage improvements, (d) expansion of concession space, (e) reconfiguration of parking lots to improve traffic flow, (f) expansion of the Dugout Club, (g) renovation of the Stadium Club, (h) creation of two new Baseline Box Clubs, (i) significant upgrades to the video in-game experience, and (j) completion of numerous structural and seismic upgrades. Both financing transactions involved the securitization of the income stream from future ticket sales. Importantly, the Commissioner and Major League Baseball approved the formation of Tickets as a wholly owned subsidiary of HoldCo, as well as the securitization of the ticket income stream.

16.     In 2006, RealCo transferred the parking lots and other land surrounding Dodger Stadium (but not Dodger Stadium itself or the land on which the stadium is located) to Blue Land.[3]

## F.     Improved On Field and Off Field Performance Since 2004

17.     Under Mr. McCourt's stewardship, the 2004 Dodgers won their first playoff game in sixteen years, advanced to back-to-back National League Championship Series (2008 and 2009) for the first time in over 30 years, and appeared in the post-season four times in a six year period for the first time ever since moving to Los Angeles in 1958. During this time period, benefitting from the team's success and the renovation of the stadium, the Dodgers enjoyed

---

[3]     To facilitate that transaction, the boundary lines of the existing parcels were changed in order to enable the stadium and the land under the stadium to be a single parcel that continued to serve as collateral for the financing provided to Tickets. The surrounding land was released from that mortgage. Blue Land borrowed $60 million, secured by the surrounding property, of which $10 million was contributed to LAD. Subsequently, Blue Land borrowed an additional $10 million to purchase an additional parcel of land, which is owned by Blue Land's wholly owned subsidiary, McCourt College Street LLC. Blue Land currently owes $67 million in debt which is scheduled to mature on June 30, 2011.

consistently high attendance for home games. During the 2009 season, the Dodgers drew 3.8 million fans, the highest attendance in Major League Baseball.

18.    The Dodgers also recently opened a new state-of-the-art spring training facility in Arizona – a 13,000 person stadium that it shares with the Chicago White Sox. LAD and Chicago White Sox Ltd. are equal members in Camelback Spring Training LLC, a Delaware limited liability company, which operates the facility.

## G.    Sources of Revenue

19.    LAD's primary sources of revenues from the operation of the baseball club consist of the following:

Entertainment Fee. LAD is paid an entertainment fee by RealCo in connection with providing entertainment at Dodger home games. The entertainment fee is paid from proceeds of ticket sales by Tickets.

Broadcasting Rights. LAD receives payments for the licensing of rights to broadcast their games on television (both over the air and by cable television) and on the radio. Currently, LAD is party to a telecast agreement (the "Fox Telecast Agreement") with Fox Sports Net West 2, LLC ("Fox Sports 2"), under which Fox Sports 2 has been granted exclusive cable television rights until the end of the 2013 baseball season. LAD has separate agreements to broadcast games on television and radio.

Sponsorship and Advertising. A substantial portion of revenues is derived from sponsorship and advertising. LAD's major corporate sponsors include Best Buy, Anheuser-Busch, Coca-Cola, Bank of America, United Airlines, and Time Warner.

Concession Income. LAD receives substantial revenue from concessionaires who are authorized to sell food/beverages and souvenirs, both at Dodger Stadium and online.

YCST01:11209919.1

069120.1001

Major League Central Fund.  LAD also is entitled to receive payments indirectly from the Major League central fund ("MLCF"), which generates income primarily through national telecasting and radio broadcasting revenue.  LAD's interest in that revenue is owned by Dodgers Club Trust, a Delaware statutory trust that is 90% owned by LAD and 10% owned by Major League Baseball.  The Dodgers Club Trust is party to various credit agreements, evidencing loans secured by the monies payable by MLCF to Dodgers Club Trust and by Dodgers Club Trust to LAD.  The outstanding balance of the loans to the Dodgers Club Trust is about $55 million.  Distributions from MLCF are subject to approval of the Commissioner as to timing and amount.

Other Significant Revenue Sources.  LAD also receives revenue from premium seating, parking, national licensing, spring training, and in some years, sales of postseason tickets.

20.     LAD is required to contribute a substantial amount of its revenue to Major League Baseball for the purpose of revenue sharing with other baseball clubs that receive less revenue than LAD.  For example, in 2009, LAD paid about 12.5% of its revenue to other baseball clubs.

21.     For RealCo, the source of its revenue, which comes from Tickets, are sublease payments by LAD and ticket sales by Tickets.

## H.     Events Leading to LAD's Chapter 11 Filing

22.     In 2010, LAD experienced cash flow difficulties.  During 2010, LAD lost money as a result of declines in attendance, failed to reach the playoffs, and paid substantial deferred compensation totaling about $22 million.  LAD was also required to contribute a large portion of its revenue to revenue sharing.  In 2010, this amounted to approximately 10% of total revenue.

23.     To ensure the availability of sufficient capital to pay expenses as they become due, LAD entered into an agreement with Fox Sports in 2010 to obtain a $25 million advance of

the payment due under the Fox Telecast Agreement (described below) for the 2011 season. Subsequently, in early 2011, Mr. McCourt obtained a $30 million personal loan from Fox Sports, of which $23.5 million has been contributed by Mr. McCourt over the past several months to fund LAD's payroll and other expenses.

24.     To date, LAD has remained current in its obligations.  However, LAD is now on the verge of running out of cash, the result of a perfect storm of events.  First, under its financing agreements, Tickets is required to reserve a large portion of its revenues this year because the Collective Bargaining Agreement (the "CBA") with the MLB Players Association is scheduled to expire, which occurs about every five years.  So far, Tickets has reserved about $17 million and expects to reserve as much as an additional $6 million.  Assuming the CBA is extended, that reserved cash will become available to contribute to LAD's operations, but in the meantime, that cash is unavailable.

25.     Second, LAD, which has already paid $10 million in deferred compensation this year, is required to make another payment of $10.5 million in deferred compensation on June 30, 2011.  Making matters even more difficult, on July 1, 2011, LAD is, under the terms of the CBA, required to reserve more than $18 million to prefund deferred compensation that is not payable to the players at issue until 2012.

26.     Third, LAD has experienced a significant decline in attendance this year.  This decline may be attributable in part to the Commissioner's appointment of a "monitor" in April 2011, which generated adverse publicity.  Despite the Commissioner's questionable authority under the Major League Constitution to appoint a monitor and require the monitor's approval of expenditures, LAD has, through the Commencement Date, voluntarily cooperated with the monitor.

YCST01:11209919.1                                                                    069120.1001

27.     For more than a year, LAD has been actively pursuing alternatives to generate sufficient cash to address the liquidity timing challenges described above.  In particular, LAD has focused on monetizing the exclusive cable television rights for periods after the expiration of the existing Fox Telecast Agreement.  The value of those rights is enormous, and when it is able to unlock that value, LAD will be in a position to satisfy all of its existing claims, pay debts as they become due, and generate a substantial return for its equity holder.

28.     Section 2(c) of the Fox Telecast Agreement contains a "Right of First Negotiation" provision, which states that "[f]rom October 15, 2012 through November 30, 2012 (the "Exclusive Negotiating Period"), [LAD] and FOX Sports shall negotiate confidentially, exclusively and in good faith with respect to the terms and conditions on which FOX Sports may retain exclusive Cable Television Rights to Exhibit future Games for a subsequent term of at least five years beginning with the 2014 MLB season."  The provision further states that LAD "shall not solicit offers from or negotiate with any person or entity (other than Fox Sports) for Cable Television Rights with respect to any future Games at any time preceding November 30, 2012."

29.     In an effort to monetize the value of the right to telecast future games on cable without jeopardizing its rights under the existing Fox Telecast Agreement, LAD and its parent companies, led by Mr. McCourt, entered into negotiations with Fox Sports.  The transaction, as proposed (the "Proposed Fox Transaction"), contemplated an agreement under which Fox Sports would retain the exclusive cable television rights for a period of 17 years, at rates in excess of the rates currently paid under the Fox Telecast Agreement.  Using what the Commissioner has acknowledged are terms that share similar features to transactions by certain other clubs in Major League Baseball, the Proposed Fox Transaction provided that a current Fox Sports subsidiary

YCST01:11209919.1                                                                   069120.1001

("Prime Ticket") will thereafter be owned in part by TMBLP through a wholly owned subsidiary, LA Media LLC ("LA Media").

30.     To address the pressing liquidity issues, the Proposed Fox Transaction provided for a $385 million loan by Fox Sports or one of its affiliates to Prime Ticket, which will be distributed to LA Media.  Mr. McCourt agreed not only to guarantee collection of that loan, but also to personally guarantee repayment of the loan in the event the new agreement with Fox Sports was terminated for reasons other than a material breach by Fox Sports.  As contemplated, a majority of those proceeds were to be used to pay obligations of LAD and provide sufficient working capital, while a substantial portion was to be used to repay outstanding obligations of subsidiaries of TMBLP, including the $67 million owed by Blue Land on its loan, which is scheduled to mature at the end of this month.

31.     The ability of LAD and its parent companies to reach a final agreement with Fox Sports has, however, been complicated by ongoing divorce proceedings between Mr. McCourt and his former wife, Jamie McCourt ("Ms. McCourt").  In those divorce proceedings, Ms. McCourt asserts an ownership interest in the assets of TMBLP and its subsidiaries, including those of LAD, Blue Land, RealCo, and Tickets.  She has also sought an order in those proceedings to compel the sale of the assets of TMBLP.  Although Mr. McCourt disputes that Ms. McCourt has any ownership interest in those assets, Fox Sports was unwilling to enter into the Proposed Fox Transaction with LAD absent the consent of Ms. McCourt.

32.     Throughout the process of the negotiations with Fox Sports, LAD kept the Commissioner and his senior officers fully apprised regarding the status of those negotiations and the terms that were being negotiated.  LAD repeatedly sought the Commissioner's approval of the terms proposed by LAD.  In response, the Commissioner postponed any decision, citing

both the unwillingness of Ms. McCourt to consent to the proposed terms, and the unwillingness of Fox Sports to proceed forward absent the consent of Ms. McCourt.

33.     With LAD facing the June 30 deadline to meet its extraordinary non-recurrent payroll and future reserve obligations, the McCourts were able to reach a settlement in their divorce proceeding pursuant to which Ms. McCourt agreed to consent to the Proposed Fox Transaction. Under the terms of the divorce settlement, announced on June 16, 2011, the McCourts agreed that a one day trial would occur in August to determine ownership of the Dodgers. If Mr. McCourt prevailed, then Ms. McCourt would receive a payment of $100 million, which was to be funded in part ($55 million) from the $385 million loan. If Ms. McCourt prevailed, then LAD and the assets owned by TMBLP would be sold with the proceeds to be divided by the Court. The settlement was conditioned upon consummation of the Proposed Fox Transaction, which in turn was conditioned upon the consent of the Commissioner's Office.

34.     In addition, the divorce settlement required that the $385 million in loan proceeds to be received by LA Media under the Proposed Fox Transaction be distributed in a certain manner. Notably, the vast majority of the proceeds, totaling more than $310 million, would be used and distributed as follows: 1) $211.5 million for LAD's operations and working capital; 2) $23.5 million to return the proceeds loaned by Fox Sports to Mr. McCourt which were used to fund payroll and other operational expenses of LAD; and 3) $80 million to repay debt obligations of subsidiaries of the TMBLP, including Blue Land. Of the remaining funds, $50 million would be available to pay Ms. McCourt if Mr. McCourt prevailed in his argument that she lacked an ownership interest in the assets, and the remaining $20 million was to be

distributed to the McCourts for legal expenses ($5 million each) and personal use ($5 million each).

35.     As explained above, Fox Sports required the consent of Ms. McCourt in order for it to move forward with the Proposed Fox Transaction. Without the consummation of the Proposed Fox Transaction, LAD would not have access to the cash needed to pay its players and other expenses. Having obtained Ms. McCourt's consent on June 16, 2011, LAD renewed its request that the Commissioner promptly approve the Proposed Fox Transaction.

36.     On June 20, 2011, the Commissioner advised Mr. McCourt that he would not approve the Proposed Fox Transaction. The first reason offered by the Commissioner for his refusal to approve the transaction was the Commissioner's preference that LAD wait until after the expiration of the Right of First Negotiation in December 2012, and negotiate with potential suitors other than Fox Sports prior to entering into any new television rights agreement. But given LAD's immediate cash flow difficulties, and faced with the potential risk that Fox Sports would seek to enforce the Right of First Negotiation, LAD simply did not have the luxury of waiting 18 months until the end of 2012.

37.     The Commissioner also criticized the use of a portion of the $385 million to fund a divorce settlement with Ms. McCourt. In that regard, the Commissioner did not take into account Fox Sports' unwillingness to move forward with any agreement absent Ms. McCourt's consent, which in turn required either a payment to Ms. McCourt or the liquidation of the assets of LAD and the other subsidiaries owned by TMBLP.

38.     Next, the Commissioner criticized the creation of a separate entity not owned by LAD to receive a 35% interest in the RSN. But even the Commissioner acknowledged that

"other clubs have entered into transactions that share similar features with the Proposed Transaction."

39.     Finally, the Commissioner complained about the manner in which the sale of the Dodgers to Mr. McCourt was structured, as well as the securitization that occurred shortly thereafter, notwithstanding the fact that: a) both he and Major League Baseball approved those transactions; and b) using the funds generated by the securitization, the existing debt of Holdco's subsidiaries, including LAD, was refinanced on favorable terms and Dodger Stadium was substantially renovated.

40.     Based on the Commissioner's refusal to approve the Proposed Fox Transaction, LAD does not have sufficient cash on hand to meet substantial payroll expenses that come due on June 30, 2011, including the deferred payments owed to former players in 2011 and to be reserved for 2012, or to pay expenses as they become due over the next several weeks.

41.     Accordingly, LAD and the other Debtors negotiated a debtor in possession financing commitment and commenced this chapter 11 case.

**I.      Business Plan**

42.     Through this bankruptcy case, LAD will explore and implement any and all options to maximize the value of the future exclusive cable television rights that have not been granted beyond 2013. Specifically, LAD will propose and, to the extent authorized by this Court, implement procedures that are designed to promote a competitive sale process with respect to those exclusive cable television rights, one that results in the highest and best offer being acceptable to all parties. In fashioning procedures, LAD will give due consideration to Fox Group and the provisions of the Existing Fox Agreement. LAD expects, and the terms of the recently negotiated Fox transaction demonstrate, that a sale or license of exclusive cable

-14-

television rights will fully resolve all of LAD's financial challenges as well as generate value for the holders of the equity interests in LAD.

43.     In order to implement the above process and achieve its objectives, LAD and the other Debtors have filed for bankruptcy protection and are seeking first day relief from this Court designed to preserve going concern value while LAD implements its strategy.  The most important relief sought by LAD is approval of sufficient debtor in possession bridge financing to pay expenses over the next 12 months, as well as compliance with its payment obligations to players and others under collective bargaining agreements.  LAD also seeks additional relief that will avoid any interruption of the business that would otherwise adversely impact its operations.

## RELIEF REQUESTED

44.     By this Motion, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, LAD requests that the Court (i) authorize LAD to pay prepetition wages, compensation, payroll taxes, and employee benefits, business expenses, and contributions to, and under, employee benefit plans (collectively, the "Employee Obligations"), (ii) authorize LAD to pay prepetition benefits providers, and (iii) authorize and direct financial institutions (collectively, the "Banks") to receive, honor, process, and pay any and all prepetition and postpetition checks drawn on LAD's payroll and general disbursement accounts (collectively, the "Disbursement Accounts") and automatic payroll transfers, to the extent that such checks or transfers relate to any of the foregoing Employee Obligations.

## THE DEBTOR'S PREPETITION EMPLOYEE OBLIGATIONS

45.     In the ordinary course of its business, LAD incurs payroll and various other obligations and provides other benefits to its employees for the performance of services.  As of the Commencement Date, LAD employs approximately 292 regular, full-time individuals whose

services are required by LAD year-round, including administrative, sales, customer service, marketing, maintenance and security personnel, as well as broadcasters, coaches, scouts, and player development and other baseball operations personnel (collectively, the "Full-Time Employees"). In addition to the Full-Time Employees, LAD also employs (i) approximately 37 part-time individuals (collectively, the "Part-Time Employees"); (ii) approximately 1,020 individuals who provide services to LAD only during MLB's active season, including, among others, statisticians, event staff, broadcast crews, and technical staff (collectively, the "Seasonal Employees"); (iii) approximately 250 Dodgers players (the "Players"), and (iv) approximately 4 interns (the "Interns" and, together with the Full-Time Employees, the Part-Time Employees and the Seasonal Employees, the "Non-Player Employees" and, the Non-Player Employees together with the Players, the "Employees").

46.     Out of the approximately 250 Players, there are currently 25 Players on the Dodgers' MLB roster (the "MLB Players"), and the remaining Players play in the minor leagues (the "Minor League Players"). The Players' contracts are all individually negotiated and their compensation varies according to the terms of their contracts and whether they are playing in MLB or the grade of team for which they are playing in the minor leagues.

47.     The approximately 300 Full-Time Employees and 225 Minor League Players not under the terms of a Major League contract are not members of any union. However, the MLB Players, who are under the terms of a Major League contract whether they are currently in the Major Leagues or the Minor Leagues, are members of the Major League Baseball Players Association union. The majority of the Seasonal Employees are members of various unions.

48.     There are six officers of LAD: (i) Frank H. McCourt, Jr. (Chairman of the Board and President); (ii) Ned Colletti (General Manager); (iii) Santiago Fernandez (Senior Vice

President, General Counsel and Secretary); (iv) Peter D. Wilhelm (Chief Financial Officer and Treasurer); (v) Michael D. Young (Chief Revenue Officer); and (vi) Jeffrey J. Ingram (Executive Vice President and Assistant Treasurer).

49.     The extent of LAD's payroll obligations to a particular Full-Time Employee depend primarily upon whether such Full-Time Employee is salaried or, alternatively, compensated for services on an hourly basis. As of the Commencement Date, the Full-Time Employees consist of approximately (i) 183 salaried Employees and (ii) 109 non-salaried Employees, who accrue wages on an hourly basis and are entitled to overtime compensation for hours worked in excess of 40 hours per week, or on weekends, equal to 1.5 times their regular hourly pay rate. The Part-Time Employees, Seasonal Employees, and Interns earn wages on an hourly basis.[4]

50.     LAD, in the ordinary course of its business, also incurs payroll and various other obligations to the Players. As discussed in more detail below, the nature and extent of LAD's payroll and Employee Benefits obligations to the Players is governed by MLB's collective bargaining agreement with its players, effective as of December 20, 2006 (the "CBA") and are regulated by MLB and by individual contracts with each Player.

51.     LAD has incurred costs and obligations in respect of the Employees that remain unpaid because they accrued, either in whole or in part, prior to the Commencement Date. As a result of LAD's payroll practices, even though accrued prior to the Commencement Date, these obligations will become due and payable in the ordinary course of LAD's business only on or after the Commencement Date. In addition, LAD will continue to incur payroll and other obligations to the Employees on a prospective basis.

---

[4]     2 of the Interns are unpaid.

52.     Due to the fact that a major league baseball team's roster is continually changing, as players are moved from MLB to the minor leagues and vice versa or are moved within the minor leagues, it is impossible to estimate LAD's average monthly gross payroll with complete accuracy. However, based on payments made for the June 15, 2011 payroll date, LAD estimates that they pay approximately $19.624 million in wages per month during the baseball season (including amounts withheld for Withholding Taxes, contributions to the 401(k) Plan and the Flex Program), of which approximately (i) $4.1 million relates to Non-Player Employee obligations and (ii) $15.524 million relates to Player Employee obligations.

## A.     Non-Player Employee Obligations

### I.     Wages, Salaries and Compensation Expenses

53.     Prior to the Commencement Date and in the ordinary course of business, LAD typically pays obligations relating to wages, salary, and compensation for its Non-Player Employees on a semi-monthly basis (for exempt employees) on the 15th and last day of each month for Full-Time Employees and weekly for non-exempt Full-Time Employees, Part-Time Employees, Seasonal Employees and Interns (the "Non-Player Wage Obligations"). The Non-Player Wage Obligations do not include commissions. LAD estimates that of the Non-Player Wage Obligations, other than the Highly Compensated Non-Players Employees (as defined below) no individual is owed wages in excess of $11,725 and thus the full amounts of claims based on those obligations would be entitled to priority under section 507(a)(4) of the Bankruptcy Code.

54.     LAD has 8 highly compensated Non-Player Employees (the "Highly Compensated Non-Player Employees").[5] Two of the Highly Compensated Non-Player

---

[5]     As set forth in *Los Angeles Dodgers LLC's Motion For Authority To Perform All Obligations Under Collective Bargaining Agreements* filed concurrently herewith (the "CBA Motion"), LAD's announcers are members of

Employees are involved in the baseball operations of LAD and include baseball executives and coaches. Two of the Highly Compensated Non-Player Employees are former employees of LAD who are receiving payments pursuant to severance agreements with LAD. The remaining four Highly Compensated Non-Player Employees are responsible for the overall management and business operations of LAD. As of the Commencement Date, LAD estimates that it owes the Highly Compensated Non-Player Employees between $12,222.22 and $33,611.11. However, as discussed in greater detail herein, LAD believes that due to the unique circumstances of this chapter 11 case, LAD should be allowed to pay the Highly Compensated Non-Player Employees in full in the ordinary course, notwithstanding the provisions of section 507(a)(4) of the Bankruptcy Code.

55.     In general, the payroll obligations of LAD, especially as to its Seasonal Employees, vary greatly from pay period to pay period depending on the number of home games the baseball club plays in that particular period. LAD estimates that it pays Seasonal Employees approximately $98,000 per game in hourly wages, not including overtime. LAD estimates that average monthly overtime it pays to Part-Time Employees and Seasonal Employees is approximately $140,000 during the season.

56.     In addition to the foregoing Non-Player Wage Obligations and commissions, certain of LAD's Non-Player Employees incur various expenses in the discharge of their duties, such as travel and meal expenses. Because such expenses are incurred in connection with the performance of duties that fall within the scope of such individuals' employment, LAD reimburses such authorized business expenses in full (the "Non-Player Expense

---

the American Federation of Television and Radio Announcers and their contracts with LAD are governed by a collective bargaining agreement. Pursuant to the CBA Motion, LAD is seeking authority to satisfy its obligations to MLB Players and non-Player Employees subject to collective bargaining agreements when and as they become due.

Reimbursements") after submission of appropriate documentation to the employee's immediate supervisor and LAD's accounting department. Certain Non-Player Expense Reimbursements are travel-related expenses, and include transportation, hotel and other accommodations, and meals. Non-Player Expense Reimbursements are paid by LAD on a weekly basis. All Non-Player Expense Reimbursement obligations are administered internally by LAD. Due to the seasonality associated with expenses, it is difficult to estimate a gross monthly average. However, based on June 15, 2011 payroll, LAD estimates the Non-Player Expense Reimbursements average approximately $160,000 per month during the season. LAD estimates that approximately $71,113.70 of prepetition Non-Player Expense Reimbursements will be outstanding as of the Commencement Date.

## II.     Obligations in Respect of Payroll Taxes

57.     LAD is required by law to withhold from the wages of Employees certain amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit any such withheld amounts to the appropriate taxing authorities (collectively, the "Taxing Authorities"). Based on the June 15, 2011 payroll, LAD estimates that it withholds approximately $379,000 per pay period for obligations relating to Non-Player Wage Obligations during the baseball season. As with other payroll numbers, these amounts vary greatly from pay period to pay period, depending on the number of home games the baseball club plays. LAD is also required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based upon a percentage of gross payroll and subject to state-imposed limits, additional amounts for, among other things, state and federal unemployment insurance (collectively, with the Withholding Taxes, the "Payroll Taxes"). LAD estimates that it owes $122,761 in federal

-20-

Payroll Taxes as of the Commencement Date. LAD also withholds certain state Payroll Taxes of Non-Player Employees for Taxing Authorities in Alabama, Arizona, California, Colorado, Florida, Georgia, Illinois, Kansas, Kentucky, Massachusetts, Maryland, Michigan, Missouri, North Carolina, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Washington and Wisconsin (the "Taxing States"), where certain Non-Player Employees reside. These Payroll Taxes are remitted to the Taxing States at various frequencies, dependent upon the laws of the Taxing States. Some state Payroll Taxes are remitted bi-monthly, while other state Payroll Taxes are remitted as infrequently as quarterly. LAD estimates that it owes $30,951 in state Payroll Taxes as of the Commencement Date.

### III. Non-Player Employee Benefit Plans

58. In the ordinary course of business, LAD has established various benefit plans and policies for its Non–Player Employees, which can be divided into the following categories: (a) bereavement leave, holiday pay, jury duty, family and medical leave, military leave, personal leave, short term disability, personal days, and vacation days (collectively, the "PTO Plans"), (b) medical, dental and vision benefits, life insurance, long-term disability insurance, and flexible benefit plans (collectively, the "Health and Welfare Plans"), (c) 401(k) and pension plan benefits (collectively, the "Retirement Plans"), (d) the severance plans, and (e) The Employee Assistance Plan ((a)-(e) collectively, the "Non-Player Employee Benefit Plans"). In connection with the provision by LAD of the Health and Welfare Plans and the 401(k) Plan, LAD directly deducts specified amounts from otherwise payable Non-Player Wage Obligations.

### (a) Paid Time Off Benefits

59. Under the PTO Plans, all of which are administered internally by LAD, eligible Non-Player Employees accrue paid time off and related benefits based on the following:

(i) *Vacation*

60.    Full-Time Employees who are below the director level are eligible to accrue vacation benefits after six months of continuous service. Vacation is accrued at a specified number of hours per month based on the Employee's length of continuous service. A maximum of 140 hours of accrued vacation time may be accrued. LAD does not remit payment in lieu of vacation days, unless an employee terminates his or her employment. LAD also reimburses terminated Employees for accrued vacation days, as required by law.

(ii) *Holiday Pay*

61.    Full-Time Employees are given a day off and receive their normal pay for each holiday observed by LAD and identified on a schedule distributed to Employees at the beginning of each year. Part-Time Employees, Seasonal Employees and Interns are given a day off but are not eligible to receive holiday pay.

(iii) *Other Paid Time Off Benefits*

62.    Under the Family & Medical Leave Act 1993, employees are entitled to twelve weeks of unpaid, job-protected leave for certain family and medical reasons (such as the birth or adoption of a child, the care of a spouse, child or parent of the employee or due to the employee's own serious health condition) (the "FMLA Leave"). Under the policy, employees who have been employed for at least one year and for 1,250 hours during the twelve month period immediately preceding the requested leave time are eligible. Employees are entitled to a total of twelve work weeks of FMLA Leave in a rolling 12-month period. If an employee has health benefits through LAD, the employee's benefits will continue while on leave.

63.    In addition, under the short-term disability policy, Full-Time Employees who exhaust their sick leave days and remain medically disabled may be eligible for salary

YCST01:11209919.1

069120.1001

continuation for up to a maximum of six weeks in a 12-month period (the "Short-Term Disability Pay"). Short-term disability may run concurrent with FMLA Leave. Short-Term Disability Pay is intended to compensate employees absent from work due to a temporary medical disability (including pregnancy and childbirth).

64.     In addition, Full-Time Employees are also given reasonable paid bereavement time in the event of a death within the immediate family. The standard amount of time off on account of bereavement is up to three days, but may be increased on an unpaid basis upon approval by LAD. In addition, Full-Time Employees also are eligible for up to ten days of paid leave for jury duty. Finally, LAD will grant leaves of absence as required by law for Employees who are members of the military service. Such Employees will be granted a military leave of absence without pay.

### (b) Health and Welfare Benefits

65.     LAD sponsors several Health and Welfare Plans to provide benefits to Full-Time Employees, including, without limitation, plans such as (i) medical, dental, and vision, (ii) flexible benefit programs, (iii) life insurance and accidental death and dismemberment ("AD&D") insurance, and (iv) long-term disability benefits.

### (i) *Medical, Dental, and Vision Benefits*

66.     LAD offers various health benefits, including, among others, medical, dental, and vision benefits. These plans are offered to Full-Time Employees and are available to their families. Medical coverage is provided by Highmark Blue Cross Blue Shield through its PPO and EPO plans (the "Medical Plans"). Under the Medical Plans, LAD is required to submit an annual premium of approximately $2,145,083, payable monthly based on monthly participation and enrollment. LAD takes a portion of the wages paid to the Full-Time Employees that

-23-

subscribe to the Medical Plans and applies that toward the annual premium (the "Employee Contribution"). The annual Employee Contribution is approximately $601,788, leaving LAD's portion of the Medical Plans at approximately $1,543,295 annually. LAD has accrued about $129,000 in monthly obligations for the Medical Plans that have not been paid.

67.     Dental benefits are provided through Aetna through its PPO and DMO plans (the "Dental Plans"), and operate on a similar basis to the Medical Plans. Under the Dental Plans, LAD is required to submit an annual premium of approximately $174,960, payable in equal monthly installments. As with the Medical Plans, the Full-Time Employees that subscribe to the Dental Plans make an Employee Contribution directly from their paychecks. The annual Employee Contribution for the Dental Plans is approximately $69,276, leaving LAD's portion of the Dental Plans at approximately $105,684 annually. LAD has accrued about $8,807 in monthly obligations for the Dental Plans that have not been paid.

68.     Vision benefits are provided through VSP (the "Vision Plan"), and include reduced fees for examinations and eyewear from a network provider. Under the Vision Plan, LAD is required to submit an annual premium of approximately $33,758, payable in equal monthly installments. As with the Medical Plans and Dental Plans, the Full-Time Employees that subscribe to the Vision Plan make an Employee Contribution directly from their paychecks. The annual Employee Contribution for the Vision Plan is approximately $8,475, leaving LAD's portion of the Vision Plan at approximately $25,283 annually. LAD has accrued about $2,107 in monthly obligations for the Vision Plan that have not been paid.

(ii) *Flexible Benefits*

69.     LAD employs a flexible benefit plan that provides Full-Time Employees the opportunity to pay for eligible expenses, including health insurance premium contributions, out-

of-pocket health care expenses, and dependant care expenses, with pre-tax dollars through payroll deductions programs (the "Flex Program").  The Flex Program allows Full-Time Employees to contribute up to $2,500 per year of pre-tax income through payroll deductions to be used for eligible out-of-pocket medical expense of the Employee or a dependent family member and up to an additional $5,000 per year to be used for dependent care.  Currently 34 Employees participate in the Flex Program with respect to out-of-pocket medical expenses and 10 Employee participate with respect to dependent care.  EBS-RMSCO, Inc. administers LAD's Flex Program, but LAD holds the balance of the employee money that has been contributed to the Flex Program.  As of June 15, 2011, LAD estimates it is in possession of $30,076.99 withheld from Full-Time Employees Salaries under the Flex Program, which amounts are expected to be used by EBS-RMSCO, Inc. to administer the Flex Program.

### (iii) *Life Insurance and AD&D Insurance*

70.     LAD maintains basic life and additional voluntary insurance coverage for all active Full-Time Employees working 30 or more hours per week in the event of serious illness or death.  Aetna provides LAD's life insurance plan and AD&D plans, which are maintained under the same insurance policy.  The life insurance and AD&D insurance plans provide life and AD&D benefits on behalf of all qualifying Full-Time Employees.  In the event that death occurs from a covered accident, both the life and the AD&D benefit would be payable.  The life insurance policy provides coverage in an amount equal to two times an Employee's basic annual earnings, rounded to the next higher $1,000, up to a maximum of $500,000.  The AD&D plan provides coverage up to a maximum of $500,000.  Benefits available under the above-described life insurance policy are reduced by 35% upon the employee reaching the age of 65, and by an additional 15% at the age of 70.  Benefits terminate at retirement.  The insurance coverage is

provided at a fixed annual premium paid by LAD on a monthly basis in advance. LAD estimates its average monthly cost of the life insurance plans is $6,216. All costs associated with the AD&D benefit are paid by participating Employees. LAD estimates that it does not owe any money at this time for the life and AD&D insurance plans.

71.     In addition, all active Full-Time Employees working thirty or more hours per week who have served the eligibility waiting period may purchase additional life insurance through Aetna, on a payroll deduction basis. Such employees may purchase protection up to a maximum of $500,000. Under the policy, it is also possible to insure spouses and dependent children. LAD collects money from the electing Non-Player Employees each pay period, but remits payment to Aetna once per month. LAD does not currently hold any money collected from the electing Non-Player Employees for premiums on the additional life insurance.

(iv) <em>Disability Benefits</em>

72.     LAD maintains and administers long-term disability plans through Aetna. In addition, as described further above, LAD provides Short-Term Disability Pay, administered by Aetna, for Full-Time Employees, according to their length of service. The long-term disability plan is provided to cover active Full-Time Employees working 30 or more hours per week (the "Long-Term Disability Plan"). At the Commencement Date, 43 Full-Time Employees were covered under the Long-Term Disability Plan. The Long-Term Disability Plan provides 60% of regular monthly base salary, up to a maximum of $5,000 per month, to qualifying employees who may become disabled due to a covered injury or sickness and are unable to work past their 90th day of disability. Benefits are reduced by certain other disability or retirement benefits. Employees who are eligible under the Long-Term Disability Plan receive this benefit until the age of 65 or the Social Security Normal Retirement Age, provided the employee continues to

-26-

meet the definition of disability. All costs associated with the Long-Term Disability Plan are paid by participating Employees on a payroll deduction basis. LAD prepays this amount on the first of each month, and therefore estimates it does not owe any money on account of the Long-Term Disability Plan.

### (c) Retirement Plans

73.      LAD also sponsors a retirement investment plan for its Non-Player Employees (the "401(k) Savings Plan"). All Non-Player Employees who have reached the age of 21 are eligible for enrollment in the 401(k) Savings Plan. LAD matches Employee contributions to the 401(k) Savings Plan at an amount equal to 50% of the Employee's contribution, up to a maximum of 3% of the Employee's salary.

74.      LAD also is a sponsor of a pension plan, the Major League Baseball Plan for Non-Uniformed Personnel (the "Pension Plan"). The Pension Plan is a defined benefit pension plan, and the benefits available to covered Employees upon retirement are determined based on the length of the Employee's service with LAD and the average amount of the Employee's wages while a participant in the Pension Plan. LAD contributes approximately $1 million to the Pension Plan on a semi-annual basis, with payments made in March and September of each year.

### (d) Severance Policies

75.      As of the Commencement Date and in the ordinary course of its business, LAD maintains an internally-administered severance plan for all Full-Time Employees and Part-Time Employees, which provides for payment of two week's salary for each completed year of employment, up to a total of six months' salary (the "Severance Policy"). Generally, an Employee is eligible for severance benefits under the Severance Policy if the Employee is permanently terminated by LAD as a result of a reduction in LAD's workforce or an elimination

YCST01:11209919.1 069120.1001

of the Employee's present job position.  The Severance Policy also provides that LAD will provide medical insurance, typically for a period of time equal to the time wages will continue to be paid, in exchange for an Employee's waiver and release of all claims against LAD.

76.     As of the Commencement Date, LAD estimates that no Employees terminated prepetition remain entitled to continued severance payments under the Severance Policy. However, three Employees are receiving benefits pursuant to severance agreements between those Employees and LAD (the "Severance Obligations").  As of the Commencement Date, outstanding payments remaining in respect of the Severance Obligations through the end of 2011 total $604,169.  LAD believes it could cause potential business disruptions and could even affect the morale of current Employees to not continue to pay the Severance Obligations in the ordinary course.  With respect to Employees severed subsequent to the Commencement Date, if any, LAD intends to make payments to those Employees in the ordinary course of business in accordance with the Severance Policy.

## B.     Player Obligations

77.     As a Major League Baseball Club, the Major League Constitution and Major League Rules govern the affairs of LAD.  As a member of MLB, LAD is also subject to the rules and regulations set forth in the CBA.  Pursuant to the CBA, MLB dictates permissible terms of MLB player compensation.  The current CBA has been in effect since December 20, 2006 and will terminate on December 11, 2011.  Labor relations between MLB and the Players are governed by the CBA.  Minor League Players are not covered by the provisions of the CBA until such time as they may become MLB Players.

### I.   Player Salaries

78.   Prior to the Commencement Date and in the ordinary course of business, LAD typically paid obligations relating to player salaries (the "Player Salaries" and, together with the Non-Player Wage Obligations, the "Wage Obligations") on the same semi-monthly basis as payments to Full-Time Employees.[6]  LAD estimates that, as of the Commencement Date, approximately $225,000 in Player Salaries owed to minor league players has accrued but not been paid.[7]

79.   In addition to Player Salaries, certain Players receive signing bonuses.  Signing bonuses for amateurs drafted by LAD are paid equally during the year the Player is signed and the following year.  LAD estimates that approximately $1,837,800 is owed on account of signing bonuses for Players drafted in 2011.  LAD further estimates that approximately $471,000 is owed during the remainder of 2011 on account of signing bonuses for Players drafted in prior years.  Further, certain personnel within LAD's organization have the authorization to sign international Players and provide signing bonuses.  Due to the worldwide nature of LAD's business and scouting operations, these signing bonuses may not be reported by the personnel authorizing the signing bonus for a short period of time, meaning LAD may owe additional prepetition obligations for signing bonuses.  However, LAD believes that these additional, as yet unreported signing bonuses, if any, would be minimal and are not substantial amounts in comparison to LAD's obligations to Players.

---

[6]   All Players are paid semi-monthly during the MLB season, except one Player who is paid on a semi-monthly basis over the course of the year.

[7]   The Player Salaries owed to the MLB Players are in excess of the $11,725 priority cap set forth in section 507(a)(4) of the Bankruptcy Code.  Pursuant to the CBA Motion, LAD is seeking authority to satisfy its obligations to MLB Players when and as they become due.

## II.    Obligations in Respect of Payroll Taxes

80.    The Players incur both federal Withholding Tax obligations, and, depending on where any particular game is being played, state Withholding Tax obligations. As the Players travel to various states and Canada to play baseball games, they earn income based on their performance in those individual states and are required to pay taxes to the Taxing Authorities of the specific state they are playing in, or Canada, as applicable.[8] Thus, the MLB Players pay taxes to various state Taxing Authorities throughout the season, depending on the schedule of the baseball club. The aggregate amounts withheld from Players for the various state Taxing Authorities and Canadian Taxing Authorities from pay period to pay period vary substantially. As explained above, it is extremely difficult to determine an average state Withholding Tax for any particular pay period. However, LAD estimates that as of the Commencement Date, it owes $134,502 in federal Payroll Taxes and does not owe Payroll Taxes to the various state Taxing Authorities and Canadian Taxing Authorities.

## III.    Player Benefits

81.    The Players have various benefit plans and policies, which can be divided into the following categories: (i) medical insurance, dental insurance, vision care and business travel accident insurance for MLB Players collectively, "Players Association Health and Welfare Plan"), (ii) a multiple employer defined benefit plan for MLB Players and other employees (the "Players Association Pension Plan," and together with the Players Association Health and Welfare Plan, the "MLB Plan")), (iii) medical insurance, dental insurance, and vision care for the

---

[8]    By way of example, if the 25 MLB Players on the current roster travel to Milwaukee, Wisconsin to play a game against the Milwaukee Brewers, those MLB Players are deemed to have earned their salaries for that game in Wisconsin, and are required to remit payments for Wisconsin state income tax to the appropriate Wisconsin Taxing Authority.

Minor League Players, (iv) a multiple employer defined benefit plan for minor league players ("Minor League Pension Plan") and (v) 401(k) plan benefits (the "Player 401(k) Plan").

### (a) General

82.     Pursuant to the current CBA, MLB and the MLB Players Association have established the MLB Plan.  Contributions to the MLB Plan are made from the Major League Central Fund (the "Central Fund") established under the Major League Constitution.  Under the Central Fund provision, MLB collects certain revenues from designated sources on behalf of each Major League Baseball club (each, a "Club") and holds those funds for payment of certain designated obligations, including the agreed annual funding of the MLB Plan.  The Trustees of the MLB Plan allocate the CBA required contribution by the Clubs between the Players Association Health and Welfare Plan and the Players Association Pension Plan.  Revenues in excess of designated expenses are returned to the Clubs on an annual basis.  To the extent that revenues were not sufficient to satisfy the contribution obligation to the MLB Plan, each Club would be obligated to fund its pro rata share of any short-fall.

### (b) Players Association Health and Welfare Plan

83.     The MLB Players, certain Dodgers coaches and various miscellaneous employees (including former players who still have coverage and employees included under the MLB Plan under their employment contract) and spouses and unmarried dependent children, unless such children are full-time students, through a number of separate policies with different providers receive first dollar medical, dental and vision coverage under the Players Association Health and Welfare Plan.  The Players Association Health and Welfare Plan offers various health benefits, including, among others, medical, orthodontia, vision, prescription drugs, skilled nursing, out-patient psychiatric, emergency health services, out-patient surgery, and well child-care.  LAD

deducts premiums from Player paychecks, but has no contribution obligation to the Players Association Health and Welfare Plan.

### (c) Players Association Pension Plan

84.     MLB Players also participate in the Players Association Pension Plan, which was established pursuant to the CBA.  LAD has no contribution obligation to the Players Association Pension Plan.

### (d) The Minor League Medical and Dental Benefits

85.     LAD offers medical ("<u>Minor League Medical Plan</u>") and dental ("<u>Minor League Dental Plan</u>") benefits to the Minor League Players.  Minor League Medical Plan benefits are provided through Highmark Blue Cross Blue Shield and LAD pays approximately $11,684.40 in monthly premiums.  Minor League Employees do not contribute to the Minor League Medical Plan premiums unless they elect dependent coverage.  Approximately 15 Minor League Players elect dependent care coverage and contribute $2,053.95 in the aggregate per month.  LAD's portion of the Minor League Medical Plan premiums for Minor League Players who elect dependent coverage is $6,161.70 per month.

86.     Minor League Dental Plan benefits are provided through Highmark Blue Cross Blue Shield and LAD pays approximately $4,477.50 in monthly premiums and Minor League Players contribute approximately $2,985.75 in the aggregate per month.  Dependant care coverage is available under the Minor League Dental Plan and Minor League Players electing dependent care coverage pay all additional premiums.

### (e) Player 401(k) Plan

87.     Major League Baseball also maintains a retirement investment plan for Players that choose to participate.  Players may contribute the maximum amount allowed by law.  LAD does not contribute to the Player 401(k) Plan.

### IV.     Player Expenses

### (a) Contract Assignment Expenses

88.     Under the CBA, LAD has the obligation to reimburse a Player for "reasonable" expenses related to the assignment of the Player's contract from one baseball club to another, including, but not limited to, the obligation to reimburse actual expenses incurred in moving to the home territory of such Player's new club (collectively, the "Assignment Expenses").  LAD estimates that, as of the Commencement Date, no money is accrued but unpaid in respect of Assignment Expenses.

### (b) Travel Related Expenses

89.     LAD estimates, that as of the Commencement Date, no money is accrued but unpaid in respect of travel related expenses owed to Players resulting from obligations pursuant to the CBA.  LAD, through the lease of a private plane, provides transportation to the MLB Players for road games.  LAD also pays for the hotel expenses of the MLB Players and provides the MLB Players a *per diem* in cash at the start of any road trip.  LAD has similar arrangements with its Minor League Players.

### CAUSE EXISTS TO AUTHORIZE PAYMENT OF THE DEBTOR'S EMPLOYEE OBLIGATIONS

90.     Pursuant to section 507(a)(4)(A) of the Bankruptcy Code, claims of Employees of LAD for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Commencement Date are afforded priority unsecured status to

the extent of $11,725 per Employee. Similarly, section 507(a)(5) of the Bankruptcy Code

provides that Employees' claims for contributions to certain employee benefit plans also are

afforded priority unsecured status to the extent of $11,725 per Employee covered by such plan,

less any amount paid pursuant to section 507(a)(4).

91.     Furthermore, section 363(b)(1) of the Bankruptcy Code provides, in pertinent

part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of

the Bankruptcy Code further provides:

> The court may issue any order, process, or judgment that is necessary or
> appropriate to carry out the provisions of this title. No provision of this
> title providing for the raising of an issue by a party in interest shall be
> construed to preclude the court from, *sua sponte*, taking any action or
> making any determination necessary or appropriate to enforce or
> implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

92.     LAD believes that most of the Employee Obligations it seek authority to pay

under the Interim Order relating to the period prior to the Commencement Date constitute

priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code. As priority claims, the

Employee Obligations must be paid in full before any general unsecured obligations of the

Debtors may be satisfied. Accordingly, the relief requested may affect only the timing of the

payment of these priority obligations and will not prejudice the rights of general unsecured

creditors or other parties in interest. Indeed, as of the Commencement Date, LAD believes that a

substantial majority of Employees will not be owed in excess of $11,725 on account of

prepetition wages or benefits.

93.     Courts regularly rely upon the "necessity of payment" doctrine, together with the

bankruptcy court's broad grant of equitable authority set forth in section 105(a) of the

-34-

Bankruptcy Code, in granting a debtor in possession the discretionary authority to pay certain prepetition claims "where payment is necessary to permit the effectuation of the rehabilitative purposes of the Bankruptcy Code." *Pension Benefit Guar. Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 159 B.R. 730, 736 (Bankr. D. Del. 1993); *see also In re Motor Coach*, No. 09-078, 2009 WL 330993, at *2 n.5 ("The 'doctrine of necessity' or 'necessity of payment' doctrine is a general rubric for the proposition that a court can authorize the payment of prepetition claims if such payment is essential to the continued operation of the debtor."); *In re Just For Feet*, 242 B.R. 821, 825 (D. Del. 1999) ("The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11."); *In re NVR*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[U]nder 11 U.S.C. § 105 the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to continued operation of business); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (finding "necessity of payment" doctrine justifies payment of prepetition claims where, "payment is necessary to avert a serious threat to the Chapter 11 process."); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (confirming that section 105(a) can be used to "effectuate the policies and provisions of the Bankruptcy Code," including the payment of prepetition claims of creditors pursuant to 363(b)(1) of the Bankruptcy Code and the "necessity of payment" doctrine); *In re Chateaugay Corp.*, 80 B.R. 279, 282 (S.D.N.Y. 1987) (explaining that bankruptcy court's general equitable powers are broad enough to authorize payment of prepetition claims of critical vendors necessary for debtor's continued operation where debtor in possession's fiduciary duties

so require); *cf. Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 574 n.8 (3d Cir. 2003) (noting, in *dicta*, that emergency critical vendor motions are routinely issued as part of the first day proceedings).

94.     In this case, any delay in payment or failure to pay wages, salaries, commissions, benefits, and other similar items would irreparably impair the Employees' morale, dedication, confidence, and cooperation, and would adversely impact LAD's relationship with its Employees at a time when the Employees' support is critical to LAD's chapter 11 case.  At this critical juncture, LAD simply cannot risk the substantial damage to its business that would inevitably result from a rapid decline in its Employees' morale.  Absent a grant of the relief requested herein, the Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable the Employees to meet their own personal financial obligations.  Without the requested relief, the stability of LAD's operations will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal Employees will seek other employment alternatives.  In addition, it would be inequitable to require LAD's Employees to bear personally the cost of any business expenses they incurred prepetition, for the benefit of LAD, with the understanding that they would be reimbursed.

95.     Additionally, a substantial number of the Employees are protected by the minimum wage and overtime pay requirements of the Fair Labor Standards Act (the "FLSA").  To the extent these protected Employees are not paid by LAD for prepetition wages and overtime payments required under the FLSA, they may seek to hold LAD's management employees and directors liable for such wages and overtime payments.  Indeed, various courts have held that managers may be held independently liable as "employers" for unpaid wages and overtime payments under the FLSA even if the company they serve is in bankruptcy and unable

to pay. *See Boucher v. Shaw*, 572 F.3d 1087, 1093 (9th Cir. 2009) ("[M]anagers are independently liable under the FLSA, and the automatic stay has no effect on that liability."); *Donovan v. Agnew*, 712 F.2d 1509, 1511, 1514 (1st Cir.1983) (finding managers of bankrupt corporation individually liable under FLSA and noting, "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages."); and *Chung v. New Silver Palace*, 246 F.Supp.2d 220, 226 (S.D.N.Y. 2002) ("The automatic stay ... affects only [the debtor]; it does not apply to plaintiff's [FLSA] claims against the [debtor]'s non-debtor co-defendants."). The disruption and discontent among management and the directors resulting from such legal actions under the FLSA could further disrupt LAD's reorganization efforts.

## CAUSE EXISTS TO AUTHORIZE PAYMENT
## OF THE TAXES FROM WAGE OBLIGATIONS

96.     In addition, to the extent LAD collects Payroll Taxes from Wage Obligations, such funds are held in trust by LAD for the benefit of the Taxing Authorities and do not constitute property of LAD's estate. *See, e.g.*, 26 U.S.C. § 7501; 11 U.S.C. § 541(d); *see also Begier v. Internal Revenue Service*, 496 U.S. 53 (1990); *DeChiaro v. New York State Tax Comm'n*, 760 F.2d 432, 433 (2d Cir. 1985) (sales taxes are "trust fund" taxes); *In re Shank*, 792 F.2d 829, 830 (9th Cir. 1986) (sales taxes required by state law to be collected by sellers from their customers are "trust fund" taxes); *In re Am. Int'l Airways, Inc.*, 70 B.R. 102, 103 (Bankr. E.D. Pa. 1987) (excise and withholding taxes); and *In re Tap, Inc.*, 52 B.R. 271, 272 (Bankr. D. Mass. 1985) (withholding taxes). Because the Payroll Taxes are not property of LAD's estate, these funds are not available for the satisfaction of creditors' claims.

97.     To the extent the Payroll Taxes are deemed to be property of LAD's estate under section 541 of the Bankruptcy Code, the Payroll Taxes are afforded priority status under section 507(a)(8) of the Bankruptcy Code.  11 U.S.C. § 507(a)(8).  As priority claims, the Payroll Taxes must be paid in full before any general unsecured obligations of LAD may be satisfied.  LAD submits that sufficient assets exist to pay all Payroll Taxes in full under any plan that may ultimately be proposed and confirmed by this Court.  Accordingly, the relief requested will only affect the timing of the payment of the Payroll Taxes and will not prejudice the rights of general unsecured creditors or other parties in interest.

98.     Many federal and state statutes hold officers and directors of collecting entities personally liable for certain taxes owed by those entities.  *See*, *e.g.*, 26 U.S.C. § 6672.  To the extent the Payroll Taxes were incurred by LAD before the Commencement Date and have not been paid by LAD, certain of LAD's directors, officers, and other employees may be subject to lawsuits or criminal prosecution during the pendency of this chapter 11 case.  Payment of the Payroll Taxes will avoid director and employee loss of focus and loss of morale resulting from the risk of personal liability.  A lawsuit or criminal prosecution against them, and any ensuing liability, would distract personnel from important tasks to the detriment of all parties in interest in this chapter 11 case.  The dedicated and active participation of LAD's directors, officers, and other employees is not only integral to LAD's continued, uninterrupted operations, but also is essential to its successful reorganization.

99.     Payment of Payroll Taxes is critical to LAD's continued, uninterrupted operations.  Non-payment of the Payroll Taxes may cause the Taxing Authorities to take precipitous action, including but not limited to, conducting audits, filing liens, pursuing payment of Payroll Taxes from LAD's directors, officers, and other employees, and seeking to lift the

automatic stay, all of which would disrupt LAD's day-to-day operations and could potentially impose significant costs on LAD's estate.

100. In numerous chapter 11 cases, bankruptcy courts in this district, as well as other districts, have exercised their equitable powers under section 105 of the Bankruptcy Code to authorize debtors to pay prepetition tax obligations. *See, e.g.*, *In re Filene's Basement, Inc.*, No. 09-11525 (MFW) (Bankr. D. Del. May 5, 2009); *In re B.T. Tires Group Holding LLC*, No. 09-11173 (CSS) (Bankr. D. Del. April 3, 2009); *In re Semcrude, L.P.*, No. 08-11525 (BLS) (Bankr. D. Del. July 23, 2008); *In re Sharper Image Corp.*, No. 08-10322 (KG) (Bankr. D. Del. Feb. 20, 2008); *In re Buffets Holdings, Inc.*, No. 08-10141 (MFW) (Bankr. D. Del. Jan. 23, 2008); *In re Tweeter Home Entm't Group, Inc.*, No. 07-10787 (PJW) (Bankr. D. Del. June 13, 2007); *In re Global Home Prods. LLC*, No. 06-10340 (KG) (Bankr. D. Del. Apr. 11, 2006); *In re Nobex Corp.*, No. 05-20050 (PJW) (Bankr. D. Del. Dec. 6, 2005); and *In re AstroPower, Inc.*, No. 04-10322 (MFW) (Bankr. D. Del. Feb. 3, 2004). LAD submits similar relief is warranted in this chapter 11 case.

101. Nothing in this Motion should be construed as impairing LAD's right to contest the amount of any Payroll Taxes that may be owed to any Taxing Authority, and LAD expressly reserve all of its rights with respect thereto.

## THE DEBTOR DOES NOT SEEK A MODIFICATION
## TO EMPLOYEE OBLIGATIONS AND EMPLOYEE BENEFITS

102. LAD does not seek to alter its compensation, vacation and holiday program, or other employee benefit policies at this time. This Motion is intended only to permit LAD, in its discretion, to make payments consistent with LAD's existing policies to the extent that, absent the benefit of an order approving this Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and to permit LAD, in its discretion, to continue to

-39-

honor its practices, programs, and policies with respect to its Employees, as such practices, programs, and policies were in effect as of the Commencement Date. Payment of all Employee Obligations in accordance with LAD's prepetition business practices is in the best interests of LAD's estate, its creditors, and all parties in interest and will enable LAD to continue to operate its business in an economic and efficient manner without disruption. A significant deterioration in Employee morale at this critical time undoubtedly would have a devastating impact on LAD, its customers and vendors, and the value of LAD's assets and businesses. The total amount sought to be paid herein is relatively modest compared with the size of LAD's overall businesses and the importance of the Employees to LAD's chapter 11 case.

103.    In other chapter 11 cases, courts in this district have approved payment of prepetition claims for compensation, benefits, and expense reimbursements similar to those described herein. *See, e.g., In re Premier Int'l Holdings Inc.*, No. 09-12019 (CSS) (Bankr. D. Del. June 15, 2009); *In re Accredited Home Lenders Holding Co.*, No. 09-11516 (MFW) (Bankr. D. Del. May 6, 2009); *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS) (Bankr. D. Del. Feb. 13, 2009); *In re Nortel Networks Inc.*, No. 09-10138 (KJC) (Bankr. D. Del. Jan. 15, 2009); and *In re Semcrude, L.P.* No. 08-11525 (BLS) (Bankr. D. Del. July 23, 2008). Similar relief is warranted in LAD's chapter 11 case.

## CAUSE EXISTS TO AUTHORIZE
## THE CONTINUANCE OF THE SEVERANCE PLAN

104.    The continuation of the Severance Plan is especially critical to maintaining the morale of LAD's Employees. LAD believes that it is wholly within the authority of the Court to authorize the continuance of the Severance Plan for salaried Employees other than Insiders, notwithstanding the Third Circuit Court of Appeals' decision in *In re Hechinger Investment Co. of Delaware*, 298 F.3d 219 (3d Cir. 2002). The severance benefits at issue in *In re Hechinger*

-40-

were based on the employees' length of service with the debtor, and the court held that the employees' severance claims must be allocated according to when the services were rendered. *Id..* at 223. The court held that severance claims based on services rendered prepetition did not qualify as administrative expenses; however, severance claims based on services rendered postpetition did qualify as administrative expenses. *Id.* at 225-26. While the court noted that section 503(b)(1)(A) of the Bankruptcy Code refers to services that are needed for the purpose of "preserving the estate" and that the "estate" does not exist prepetition, the court also stated that the employees in *In re Hechinger* did not show that their prepetition services represented an actual, necessary cost and expense as required under section 503(b)(1)(A) of the Bankruptcy Code. *Id.* at 226.

105.    In contrast to the severance benefits at issue in *In re Hechinger*, the Severance Plan is an actual and necessary cost of LAD's estate. Without continuing such benefits, the Employees may decide to pursue other employment opportunities for fear that they may be terminated at any time without any adequate compensation for their service. Thus, the continuance of such benefits is integral to the success of LAD's operations. In addition, section 503(c) of the Bankruptcy Code provides that "there shall neither be allowed, nor paid . . . a severance payment to *an insider of the debtor . . .*" (emphasis added). LAD only requests that it be authorized to continue the Severance Plan as it relates to salaried Employees other than Insiders. Accordingly, no salaried Employee that is an Insider would be paid severance in contravention of section 503(c)(2) of the Bankruptcy Code. LAD believes the relief requested herein with respect to the continuance of the Severance Plan (as to salaried Employees other than Insiders) is wholly consistent with section 503 of the Bankruptcy Code. Nevertheless, LAD does not seek approval of the Severance Plan as to non-Insider Employees pursuant to the Interim

Order, but instead request that the Court at this time set a hearing on regular notice to consider continuation of the Severance Plan as to non-Insider Employees only.[9]

## APPLICABLE BANKS SHOULD BE AUTHORIZED TO HONOR AND PAY PREPETITION AND POSTPETITION CHECKS ISSUED AND MAKE OTHER TRANSFERS TO PAY THE EMPLOYEE OBLIGATIONS

106.    Approximately one day prior to each scheduled payroll payment date, payroll is funded by transferring funds from one of LAD's general corporate accounts into LAD's payroll account.  Once the funds are received in the payroll account, the funds are then transferred primarily via ACH (*i.e.*, direct deposit) as compensation to Employees, to bank accounts they have designated.  Payroll payments to those Employees who have not arranged for direct deposit are made via checks drawn on LAD's payroll account.  LAD thus requests that the Court authorize the applicable Banks to receive, process, honor, and pay all prepetition and postpetition checks issued or to be issued, and electronic fund transfers requested or to be requested, by LAD in respect of the Employee Obligations from LAD's payroll account and all postpetition checks issued from other Disbursement Accounts with respect to the Employee Obligations.[10]

## NO CONTRACT ASSUMPTION

107.    Authorization to pay all amounts with respect to Employee Obligations shall not be deemed to constitute postpetition assumption or adoption of any contract, program, or policy pursuant to section 365 of the Bankruptcy Code.  Moreover, authorization to pay all amounts with respect to Employee Obligations shall not affect LAD's right to contest the amount or validity of any Employee Obligations, including, without limitation, the Payroll Taxes that may

---

[9]    LAD expressly reserves the right to file a separate motion to seek approval of the Severance Plan as to Insiders and separate motions for post-Commencement Date severance plans for both Insiders and non-Insiders to the extent the pre-Commencement Date Severance Plan is not approved for either group of Employees.

[10]    All non-payroll accounts that are Disbursement Accounts are listed on Schedule 1 to the motion of LAD seeking authority to, among other things, continue using its existing cash management system, which was filed concurrently with this Motion.

be due to any Taxing Authority. Based on the foregoing, LAD submits that the relief requested is necessary and appropriate, is in the best interests of its estate and creditors, and should be granted in all respects.

## THE MOTION SATISFIES BANKRUPTCY RULE 6003

108. Pursuant to Rule 6003 of the Federal Rules of Bankruptcy Procedure, the Court may grant relief regarding the Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one (21) days after the petition date if the relief is necessary to avoid immediate and irreparable harm. Fed. R. Bank. P. 6003. As described herein and in the Ingram Declaration, the relief requested is necessary to avoid immediate and irreparable harm to the Debtors' estates for the reasons set forth above, and the Debtors accordingly submit that Bankruptcy Rule 6003 has been satisfied.

## WAIVER OF BANKRUPTCY RULES 6004(a) and 6004(h)

109. To successfully implement the foregoing, LAD seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

110. Notice of this Motion has been given to (i) the United States Trustee for the District of Delaware; (ii) LAD's forty (40) largest unsecured creditors; (iii) counsel to Major League Baseball; (iv) counsel to the Major League Baseball Players Association; (v) counsel to proposed postpetition secured lender; and (vi) cash management banks. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). LAD submits that, under the circumstances, no other or further notice is required.

## CONCLUSION

WHEREFORE, LAD respectfully requests that the Court enter the Proposed Order, substantially in the forms attached hereto as Exhibit A, granting the relief requested in the Motion and such other and further relief as may be just and proper.

| | |
|---|---|
| Dated: June 27, 2011<br>        Wilmington, Delaware | YOUNG CONAWAY STARGATT & TAYLOR, LLP<br><br><br>Robert S. Brady (No. 2847)<br>Donald J. Bowman, Jr. (No. 4383)<br>Ryan M. Bartley (No. 4985)<br>The Brandywine Building – 17th Floor<br>1000 West Street, Post Office Box 391<br>Wilmington, Delaware 19899<br>Telephone:  (302) 571-6600<br>Facsimile:  (302) 571-1253<br><br>-and-<br><br>DEWEY & LEBOEUF LLP<br>Bruce Bennett<br>Sidney P. Levinson<br>(pro hac vice applications forthcoming)<br>333 South Grand Avenue, Suite 2600<br>Los Angeles, California 90071<br>Telephone:  (213) 621-6000<br>Facsimile:  (213) 621-6100<br><br>-and-<br><br>DEWEY & LEBOEUF LLP<br>Martin J. Bienenstock<br>Philip M. Abelson<br>(pro hac vice applications forthcoming)<br>1301 Avenue of the Americas<br>New York, New York 10019<br>Telephone:  (212) 259-8000<br>Facsimile:  (212) 259-6333<br><br>Proposed Co-Counsel for LAD<br>and LAD in Possession |