## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LOS ANGELES DODGERS LLC[1] | ) Case No. 11- 12010 (___) |
| | ) |
| Debtor. | ) Joint Administration Requested |
| | ) |
| | ) |
| | ) |
| _____ | ) |

### EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
### (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING
### PURSUANT TO 11 U.S.C. §§ 105, 362, AND 364, AND (II) SCHEDULING A
### FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND 4001(C)

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Los Angeles Dodgers LLC ("LAD"), and the above captioned debtors and debtors in

possession in these chapter 11 cases (collectively, the "Debtors"), hereby respectfully submit this

emergency motion (this "Motion") for entry of interim (attached hereto as Exhibit A) and final

orders: (i) authorizing the Debtors to obtain postpetition financing pursuant to section 364 of title

11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"); and (ii)

scheduling a final hearing on the Debtor's motion to incurred such financing on a permanent

basis pursuant to Rules 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").  In support of this Motion, the Debtor relies upon and incorporates by

reference the *First Day Declaration of Jeffrey J. Ingram in Support of Debtor's Chapter 11*

*Petition and Request for First Day Relief* (the "Ingram Declaration"), which was filed with the

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number are: Los
       Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567);
       LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029).  The location of the Debtors'
       corporate headquarters and the service address for the Debtors is:  1000 Elysian Park Avenue, Los Angeles,
       California 90012.

Court concurrently herewith.  In further support of the Motion, the Debtors, by and through its undersigned proposed co-counsel, respectfully represents as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested herein is section 366 of the Bankruptcy Code.

2.      No previous request for the relief requested herein has been made to this Court or any other court.

## BACKGROUND

3.      On June 27, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors intend to continue in the possession of their properties and the management of their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      As of the date hereof, no trustee or examiner has been appointed in these chapter 11 cases, and no committees have been appointed or designated.

**A.      Ownership Structure**

6.      Los Angeles Dodgers LLC ("LAD") operates a professional major league baseball club located in the Los Angeles metropolitan area.  The club's membership in Major League Baseball ("MLB") is described in the Major League Constitution (the "Major League

Constitution"), as assumed by LAD pursuant to an Assumption Agreement, dated as of February 13, 2004.[2]

7.     LAD is a Delaware limited liability company, whose sole member is debtor Los Angeles Dodgers Holding Company LLC ("LAD Holding"), also a Delaware limited liability company. LAD Holding's sole member is debtor LA Holdco LLC ("HoldCo"), also a Delaware limited liability company. Both LAD Holding and HoldCo are holding companies with no operating assets. As described further below, HoldCo is the sole member of debtor LA Real Estate Holding Company LLC ("RealCo Holding"), a Delaware limited liability company. RealCo Holding is the sole member of LA Real Estate LLC ("RealCo"), a Delaware limited liability company that owns Dodger Stadium and the real estate upon which it is located, as well as Dodger Tickets LLC ("Tickets"), a Delaware limited liability company that owns the right to receive future ticket revenue from Dodger games at Dodger Stadium. HoldCo is a wholly owned subsidiary of LA Partners LLC ("LA Partners"), which in turn is a wholly owned subsidiary of The McCourt-Broderick Limited Partnership ("TMBLP"), a Massachusetts limited partnership. TMBLP is the sole member of Blue Landco LLC ("Blue Land"), a Delaware limited liability company that owns the parking lots surrounding Dodgers Stadium. Frank H. McCourt, Jr. ("Mr. McCourt") is the sole limited partner of TMBLP and owns a 90% interest, with the remaining 10% interest owned by TMBLP's sole general partner, The McCourt Company, Inc., a Delaware corporation. None of the parents of HoldCo are debtors in these chapter 11 cases.

**B.     Major League Baseball**

8.     The Office of the Baseball Commissioner (the "Commissioner's Office") is an unincorporated association also doing business as Major League Baseball ("MLB") that has as

---

[2]     None of the other Debtors are a party to the Major League Constitution, nor do they have any role in the operation of the baseball club.

its members thirty baseball clubs. Those clubs are divided into two leagues, the American

League and the National League (the Dodgers are in the West division of the National League).

The commissioner of baseball, Allan H. "Bud" Selig (the "<u>Commissioner</u>"), serves as the chief

executive officer of Major League Baseball.

## C.    The Los Angeles Dodgers Baseball Club

9.      The Los Angeles Dodgers have a storied history that dates back to the late 1800's.

Originally located in Brooklyn, New York, the Dodgers moved to Los Angeles in 1958. Before

doing so, the Dodgers broke baseball's color barrier by signing Jackie Robinson in 1945. In

1962, the Los Angeles Dodgers moved into their new home at Dodger Stadium, where they

continue to play. The Dodgers have won six World Series championships (five in Los Angeles),

the most recent of which occurred in 1988.

## D.    The 2004 Acquisition

10.     The Dodgers were acquired by Fox Entertainment Group, Inc. ("<u>Fox Group</u>") in

1998. After creating a Regional Sports Network ("<u>RSN</u>") associated with the Dodgers, Fox

Group made the decision in 2003 to sell the team and the real estate where the stadium and

parking lots are located.

11.     Following a sale process, the winning bidder for the assets was Mr. McCourt, who

in early 2004 became the owner of the Los Angeles Dodgers, as well as the other assets owned

by Fox Group (the "<u>Acquisition</u>"). The purchase by Mr. McCourt, which was unanimously

approved by Major League Baseball and supported by the Commissioner, was consummated

under two separate agreements. Pursuant to one agreement, Mr. McCourt paid $330 million to

purchase the Los Angeles Dodgers. Under a separate agreement, Mr. McCourt paid

$100 million to acquire the real estate consisting of Dodger Stadium, the land under the stadium, and about 250 acres of land surrounding the stadium that includes the parking lots.

12.  Under the terms of the Acquisition, the land purchased by Mr. McCourt, including Dodger Stadium and the surrounding parking lots, became an asset of RealCo. Pursuant to a lease agreement between RealCo and LAD executed in 2004, RealCo agreed to lease both the land and the stadium, along with granting associated rights, for a term of 38 years.

13.  A portion of the purchase price for the Acquisition ($125 million) was financed by Fox Group pursuant to a two year loan made to an affiliate of Mr. McCourt. To secure repayment, Mr. McCourt provided, as collateral, 24 acres of undeveloped real estate in the Boston seaport district. The contribution of that property was, at the time of the Acquisition, treated as an equity contribution to fund a large portion of the aggregate purchase price paid under the Acquisition. Two years after the Acquisition, Mr. McCourt transferred that valuable real property to Fox Group in satisfaction of the $125 million repayment obligation.

**E.    Subsequent Financing Transactions**

14.  In May 2005, HoldCo reorganized its subsidiary operations and formed Tickets, which became a subsidiary of RealCo. RealCo and LAD amended their lease agreement to provide for RealCo to lease Dodger Stadium and the underlying land to Tickets, which then subleased the stadium to LAD with the notable exception of the general admission seats. Those seats are not subleased, and tickets for these seats are sold by Tickets, thereby enabling Tickets to earn revenue from Dodger home games.

15.  As part of the reorganization, Tickets entered into two securitization financing transactions. The first, in 2005, generated $250 million that were used to permanently refinance debt incurred under the Acquisition on favorable terms. The second transaction, in 2007,

generated $140 million, which was primarily used to pay the cost of upgrading Dodger Stadium and to reimburse LAD for costs that it had incurred to upgrade the stadium. The improvements made included (a) replacement of all of the seats in the stadium, (b) a new playing surface, (c) drainage improvements, (d) expansion of concession space, (e) reconfiguration of parking lots to improve traffic flow, (f) expansion of the Dugout Club, (g) renovation of the Stadium Club, (h) creation of two new Baseline Box Clubs, (i) significant upgrades to the video in-game experience, and (j) completion of numerous structural and seismic upgrades. Both financing transactions involved the securitization of the income stream from future ticket sales. Importantly, the Commissioner and Major League Baseball approved the formation of Tickets as a wholly owned subsidiary of HoldCo, as well as the securitization of the ticket income stream.

16.     In 2006, RealCo transferred the parking lots and other land surrounding Dodger Stadium (but not Dodger Stadium itself or the land on which the stadium is located) to Blue Land.[3]

**F.     Improved On Field and Off Field Performance Since 2004**

17.     Under Mr. McCourt's stewardship, the 2004 Dodgers won their first playoff game in sixteen years, advanced to back-to-back National League Championship Series (2008 and 2009) for the first time in over 30 years, and appeared in the post-season four times in a six year period for the first time ever since moving to Los Angeles in 1958. During this time period, benefitting from the team's success and the renovation of the stadium, the Dodgers enjoyed

---

[3]     To facilitate that transaction, the boundary lines of the existing parcels were changed in order to enable the stadium and the land under the stadium to be a single parcel that continued to serve as collateral for the financing provided to Tickets. The surrounding land was released from that mortgage. Blue Land borrowed $60 million, secured by the surrounding property, of which $10 million was contributed to LAD. Subsequently, Blue Land borrowed an additional $10 million to purchase an additional parcel of land, which is owned by Blue Land's wholly owned subsidiary, McCourt College Street LLC. Blue Land currently owes $67 million in debt which is scheduled to mature on June 30, 2011.

consistently high attendance for home games. During the 2009 season, the Dodgers drew 3.8 million fans, the highest attendance in Major League Baseball.

18.     The Dodgers also recently opened a new state-of-the-art spring training facility in Arizona – a 13,000 person stadium that it shares with the Chicago White Sox. LAD and Chicago White Sox Ltd. are equal members in Camelback Spring Training LLC, a Delaware limited liability company, which operates the facility.

## G.     Sources of Revenue

19.     LAD's primary sources of revenues from the operation of the baseball club consist of the following:

Entertainment Fee. LAD is paid an entertainment fee by RealCo in connection with providing entertainment at Dodger home games. The entertainment fee is paid from proceeds of ticket sales by Tickets.

Broadcasting Rights. LAD receives payments for the licensing of rights to broadcast their games on television (both over the air and by cable television) and on the radio. Currently, LAD is party to a telecast agreement (the "Fox Telecast Agreement") with Fox Sports Net West 2, LLC ("Fox Sports 2"), under which Fox Sports 2 has been granted exclusive cable television rights until the end of the 2013 baseball season. LAD has separate agreements to broadcast games on television and radio.

Sponsorship and Advertising. A substantial portion of revenues is derived from sponsorship and advertising. LAD's major corporate sponsors include Best Buy, Anheuser-Busch, Coca-Cola, Bank of America, United Airlines, and Time Warner.

Concession Income. LAD receives substantial revenue from concessionaires who are authorized to sell food/beverages and souvenirs, both at Dodger Stadium and online.

Major League Central Fund. LAD also is entitled to receive payments indirectly from the Major League central fund ("MLCF"), which generates income primarily through national telecasting and radio broadcasting revenue. LAD's interest in that revenue is owned by Dodgers Club Trust, a Delaware statutory trust that is 90% owned by LAD and 10% owned by Major League Baseball. The Dodgers Club Trust is party to various credit agreements, evidencing loans secured by the monies payable by MLCF to Dodgers Club Trust and by Dodgers Club Trust to LAD. The outstanding balance of the loans to the Dodgers Club Trust is about $55 million. Distributions from MLCF are subject to approval of the Commissioner as to timing and amount.

Other Significant Revenue Sources. LAD also receives revenue from premium seating, parking, national licensing, spring training, and in some years, sales of postseason tickets.

20. LAD is required to contribute a substantial amount of its revenue to Major League Baseball for the purpose of revenue sharing with other baseball clubs that receive less revenue than LAD. For example, in 2009, LAD paid about 12.5% of its revenue to other baseball clubs.

21. For RealCo, the source of its revenue, which comes from Tickets, are sublease payments by LAD and ticket sales by Tickets.

## H. Events Leading to LAD's Chapter 11 Filing

22. In 2010, LAD experienced cash flow difficulties. During 2010, LAD lost money as a result of declines in attendance, failed to reach the playoffs, and paid substantial deferred compensation totaling about $22 million. LAD was also required to contribute a large portion of its revenue to revenue sharing. In 2010, this amounted to approximately 10% of total revenue.

23.     To ensure the availability of sufficient capital to pay expenses as they become

due, LAD entered into an agreement with Fox Sports in 2010 to obtain a $25 million advance of

the payment due under the Fox Telecast Agreement (described below) for the 2011 season.

Subsequently, in early 2011, Mr. McCourt obtained a $30 million personal loan from Fox Sports,

of which $23.5 million has been contributed by Mr. McCourt over the past several months to

fund LAD's payroll and other expenses.

24.     To date, LAD has remained current in its obligations.  However, LAD is now on

the verge of running out of cash, the result of a perfect storm of events.  First, under its financing

agreements, Tickets is required to reserve a large portion of its revenues this year because the

Collective Bargaining Agreement (the "CBA") with the MLB Players Association is scheduled

to expire, which occurs about every five years.  So far, Tickets has reserved about $17 million

and expects to reserve as much as an additional $6 million.  Assuming the CBA is extended, that

reserved cash will become available to contribute to LAD's operations, but in the meantime, that

cash is unavailable.

25.     Second, LAD, which has already paid $10 million in deferred compensation this

year, is required to make another payment of $10.5 million in deferred compensation on June 30,

2011.  Making matters even more difficult, on July 1, 2011, LAD is, under the terms of the CBA,

required to reserve more than $18 million to prefund deferred compensation that is not payable

to the players at issue until 2012.

26.     Third, LAD has experienced a significant decline in attendance this year.  This

decline may be attributable in part to the Commissioner's appointment of a "monitor" in April

2011, which generated adverse publicity.  Despite the Commissioner's questionable authority

under the Major League Constitution to appoint a monitor and require the monitor's approval of

expenditures, LAD has, through the Commencement Date, voluntarily cooperated with the monitor.

27.     For more than a year, LAD has been actively pursuing alternatives to generate sufficient cash to address the liquidity timing challenges described above. In particular, LAD has focused on monetizing the exclusive cable television rights for periods after the expiration of the existing Fox Telecast Agreement. The value of those rights is enormous, and when it is able to unlock that value, LAD will be in a position to satisfy all of its existing claims, pay debts as they become due, and generate a substantial return for its equity holder.

28.     Section 2(c) of the Fox Telecast Agreement contains a "Right of First Negotiation" provision, which states that "[f]rom October 15, 2012 through November 30, 2012 (the "Exclusive Negotiating Period"), [LAD] and FOX Sports shall negotiate confidentially, exclusively and in good faith with respect to the terms and conditions on which FOX Sports may retain exclusive Cable Television Rights to Exhibit future Games for a subsequent term of at least five years beginning with the 2014 MLB season." The provision further states that LAD "shall not solicit offers from or negotiate with any person or entity (other than Fox Sports) for Cable Television Rights with respect to any future Games at any time preceding November 30, 2012."

29.     In an effort to monetize the value of the right to telecast future games on cable without jeopardizing its rights under the existing Fox Telecast Agreement, LAD and its parent companies, led by Mr. McCourt, entered into negotiations with Fox Sports. The transaction, as proposed (the "Proposed Fox Transaction"), contemplated an agreement under which Fox Sports would retain the exclusive cable television rights for a period of 17 years, at rates in excess of the rates currently paid under the Fox Telecast Agreement. Using what the Commissioner has

acknowledged are terms that share similar features to transactions by certain other clubs in Major League Baseball, the Proposed Fox Transaction provided that a current Fox Sports subsidiary ("Prime Ticket") will thereafter be owned in part by TMBLP through a wholly owned subsidiary, LA Media LLC ("LA Media").

30.     To address the pressing liquidity issues, the Proposed Fox Transaction provided for a $385 million loan by Fox Sports or one of its affiliates to Prime Ticket, which will be distributed to LA Media. Mr. McCourt agreed not only to guarantee collection of that loan, but also to personally guarantee repayment of the loan in the event the new agreement with Fox Sports was terminated for reasons other than a material breach by Fox Sports. As contemplated, a majority of those proceeds were to be used to pay obligations of LAD and provide sufficient working capital, while a substantial portion was to be used to repay outstanding obligations of subsidiaries of TMBLP, including the $67 million owed by BlueLand on its loan, which is scheduled to mature at the end of this month.

31.     The ability of LAD and its parent companies to reach a final agreement with Fox Sports has, however, been complicated by ongoing divorce proceedings between Mr. McCourt and his former wife, Jamie McCourt ("Ms. McCourt"). In those divorce proceedings, Ms. McCourt asserts an ownership interest in the assets of TMBLP and its subsidiaries, including those of LAD, BlueLand, RealCo, and Tickets. She has also sought an order in those proceedings to compel the sale of the assets of TMBLP. Although Mr. McCourt disputes that Ms. McCourt has any ownership interest in those assets, Fox Sports was unwilling to enter into the Proposed Fox Transaction with LAD absent the consent of Ms. McCourt.

32.     Throughout the process of the negotiations with Fox Sports, LAD kept the Commissioner and his senior officers fully apprised regarding the status of those negotiations

and the terms that were being negotiated. LAD repeatedly sought the Commissioner's approval of the terms proposed by LAD. In response, the Commissioner postponed any decision, citing both the unwillingness of Ms. McCourt to consent to the proposed terms, and the unwillingness of Fox Sports to proceed forward absent the consent of Ms. McCourt.

33.    With LAD facing the June 30 deadline to meet its extraordinary non-recurrent payroll and future reserve obligations, the McCourts were able to reach a settlement in their divorce proceeding pursuant to which Ms. McCourt agreed to consent to the Proposed Fox Transaction. Under the terms of the divorce settlement, announced on June 16, 2011, the McCourts agreed that a one day trial would occur in August to determine ownership of the Dodgers. If Mr. McCourt prevailed, then Ms. McCourt would receive a payment of $100 million, which was to be funded in part ($55 million) from the $385 million loan. If Ms. McCourt prevailed, then LAD and the assets owned by TMBLP would be sold with the proceeds to be divided by the Court. The settlement was conditioned upon consummation of the Proposed Fox Transaction, which in turn was conditioned upon the consent of the Commissioner's Office.

34.    In addition, the divorce settlement required that the $385 million in loan proceeds to be received by LA Media under the Proposed Fox Transaction be distributed in a certain manner. Notably, the vast majority of the proceeds, totaling more than $310 million, would be used and distributed as follows: 1) $211.5 million for LAD's operations and working capital; 2) $23.5 million to return the proceeds loaned by Fox Sports to Mr. McCourt which were used to fund payroll and other operational expenses of LAD; and 3) $80 million to repay debt obligations of subsidiaries of the TMBLP, including Blue Land. Of the remaining funds, $50 million would be available to pay Ms. McCourt if Mr. McCourt prevailed in his argument

that she lacked an ownership interest in the assets, and the remaining $20 million was to be distributed to the McCourts for legal expenses ($5 million each) and personal use ($5 million each).

35.     As explained above, Fox Sports required the consent of Ms. McCourt in order for it to move forward with the Proposed Fox Transaction. Without the consummation of the Proposed Fox Transaction, LAD would not have access to the cash needed to pay its players and other expenses. Having obtained Ms. McCourt's consent on June 16, 2011, LAD renewed its request that the Commissioner promptly approve the Proposed Fox Transaction.

36.     On June 20, 2011, the Commissioner advised Mr. McCourt that he would not approve the Proposed Fox Transaction. The first reason offered by the Commissioner for his refusal to approve the transaction was the Commissioner's preference that LAD wait until after the expiration of the Right of First Negotiation in December 2012, and negotiate with potential suitors other than Fox Sports prior to entering into any new television rights agreement. But given LAD's immediate cash flow difficulties, and faced with the potential risk that Fox Sports would seek to enforce the Right of First Negotiation, LAD simply did not have the luxury of waiting 18 months until the end of 2012.

37.     The Commissioner also criticized the use of a portion of the $385 million to fund a divorce settlement with Ms. McCourt. In that regard, the Commissioner did not take into account Fox Sports' unwillingness to move forward with any agreement absent Ms. McCourt's consent, which in turn required either a payment to Ms. McCourt or the liquidation of the assets of LAD and the other subsidiaries owned by TMBLP.

38.     Next, the Commissioner criticized the creation of a separate entity not owned by LAD to receive a 35% interest in the RSN. But even the Commissioner acknowledged that

"other clubs have entered into transactions that share similar features with the Proposed Transaction."

39. Finally, the Commissioner complained about the manner in which the sale of the Dodgers to Mr. McCourt was structured, as well as the securitization that occurred shortly thereafter, notwithstanding the fact that: a) both he and Major League Baseball approved those transactions; and b) using the funds generated by the securitization, the existing debt of Holdco's subsidiaries, including LAD, was refinanced on favorable terms and Dodger Stadium was substantially renovated.

40. Based on the Commissioner's refusal to approve the Proposed Fox Transaction, LAD does not have sufficient cash on hand to meet substantial payroll expenses that come due on June 30, 2011, including the deferred payments owed to former players in 2011 and to be reserved for 2012, or to pay expenses as they become due over the next several weeks.

41. Accordingly, LAD and the other Debtors negotiated a debtor in possession financing commitment and commenced this chapter 11 case.

## I. Business Plan

42. Through this bankruptcy case, LAD will explore and implement any and all options to maximize the value of the future exclusive cable television rights that have not been granted beyond 2013. Specifically, LAD will propose and, to the extent authorized by this Court, implement procedures that are designed to promote a competitive sale process with respect to those exclusive cable television rights, one that results in the highest and best offer being acceptable to all parties. In fashioning procedures, LAD will give due consideration to Fox Group and the provisions of the Existing Fox Agreement. LAD expects, and the terms of the recently negotiated Fox transaction demonstrate, that a sale or license of exclusive cable

television rights will fully resolve all of LAD's financial challenges as well as generate value for the holders of the equity interests in LAD.

43.     In order to implement the above process and achieve its objectives, LAD and the other Debtors have filed for bankruptcy protection and are seeking first day relief from this Court designed to preserve going concern value while LAD implements its strategy. The most important relief sought by LAD is approval of sufficient debtor-in-possession bridge financing to pay expenses over the next 12 months, as well as compliance with its payment obligations to players and others under collective bargaining agreements. LAD also seeks additional relief that will avoid any interruption of the business that would otherwise adversely impact its operations.

## PROPOSED DIP FINANCING

44.     Both before and after the Commissioner's refusal to approve the Proposed Fox Transaction, the Debtors engaged in an extensive search for financing to meet their ongoing obligations. The Debtors reached out to numerous banks, financial institutions, professional investors, and strategic partners. The Debtors provided prospective financing sources with access to a data room to conduct due diligence. These efforts yielded interest from more than seven potential entities, at least four of whom requested access to the data room.

45.     While several parties expressed interest in providing financing, the Debtors only received a proposed commitment from one source - HPS-Senior Loan Fund II, L.P., Highbridge Senior Loan Holdings, L.P. and/or other affiliated entities in the Highbridge Senior Loan Fund II family of funds (the "DIP Lenders"). After receiving the DIP Lenders' proposal, the Debtors engaged in extensive negotiations, over the course of the days leading up to the commencement of these cases, regarding the terms of a commitment letter to secure postpetition financing. Those negotiations, which were conducted at arm's length, resulted in a commitment from the

DIP Lender for a $150 million postpetition financing facility (the "DIP Facility") on the terms and conditions set forth in the term sheet attached hereto as Exhibit B (the "DIP Term Sheet").[4] In connection with the DIP Term Sheet, the DIP Lenders, LAD, Mr. McCourt and one of his wholly owned subsidiary entered into that certain Fee Letter, pursuant to which Mr. McCourt agreed to make a payment directly to the DIP Lenders of a portion of the commitment fee and personally guaranteed the payment of the closing commitment payment in the event that any alternative financing or other transaction under which the LAD realized value through a sale of all or any material part of its business or equity or through the license of Media Rights is consummated.

46.     In order to determine the Debtors' funding needs during these chapter 11 cases, the Debtors have, with the assistance of their advisors, analyzed their projected expenses to determine what is necessary to maintain their operations in chapter 11 and foster a successful restructuring. This process resulted in the development of a 13-week cash flow budget, attached hereto as Exhibit C (the "Budget"). As outlined above and shown in the Budget, LAD has a number of extraordinary cash outlays that are payable this week and during the next few weeks. For example, LAD requires access to at least $20 million in financing to pay compensation (both current and deferred) that becomes due on June 30, 2011. Immediately thereafter, on July 1, 2011, LAD is required to fund an additional $18.7 million into a reserve for future deferred compensation payments under the collective bargaining agreement with the players' association.

---

[4]     Except to the extent defined herein, capitalized terms used in this Motion shall have the definitions set forth in the DIP Term Sheet. The terms and conditions of the DIP Facility set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such. For a complete description of the terms and conditions of the DIP Facility, reference should be made to the DIP Facility Documents and the Interim Order (as hereinafter defined). The summary herein is qualified in its entirety by reference to such documents and such order. In the event there is a conflict or inconsistency between this Motion and the operative documents or such order, the operative documents or such order, as applicable, shall control in all respects.

The Debtors' anticipate that LAD will need to fund at least one more payroll for its baseball operations before any Final Hearing on the DIP Motion. The Debtors anticipate that the interim borrowing amount will be sufficient to fund their operations pending the Final Hearing.

### A.    Material Terms of the Proposed DIP Financing

47.    Pursuant to Bankruptcy Rule 4001, the Debtors set forth significant elements of the DIP Facility, as follows:

| | |
|---|---|
| **Administrative Agent** | An entity to be determined by the DIP Lenders. |
| **DIP Lenders** | HPS-Senior Loan Fund II, L.P., Highbridge Senior Loan Holdings, L.P. and/or other affiliated entities in the Highbridge Senior Loan Fund II family of funds (the "<u>DIP Lenders</u>"). |
| **Amount of DIP Facility** | <u>Total DIP Loan Commitment</u>:  $150,000,000.<br><br><u>Initial Availability</u>:  $60,000,000.<br><br><u>Remaining Availability</u>:  $90,000,000 through delay-draw term loans. |
| **Use of Proceeds** | To (i) pay fees and expenses related to this transaction and the Cases, and (ii) fund working capital and general corporate purposes in the ordinary course of business of the Debtors as set forth in a thirteen-week rolling cash flow forecast satisfactory to the DIP Agent and the DIP Lenders in their sole and absolute discretion (the "<u>Budget</u>") (and out of the ordinary course as approved by the DIP Lenders and the Bankruptcy Court to the extent set forth in the approved Budget). |
| **Interest Rate** | All obligations of the Debtors under the Proposed Financing Facility shall bear interest at the LIBOR Rate payable monthly in arrears.  The LIBOR Rate shall be equal to LIBOR plus seven percent (7%) per annum; provided that at no time shall LIBOR be less than three percent (3%) per annum.  All interest and fees shall be computed on the basis of a year of 360 days for the actual days elapsed. |
| **Default Rate** | The default interest rate shall be the interest rate then in effect plus two percent (2%) per annum. |
| **Commitment and Other Fees** | <u>Delayed Draw Fee</u>:  One-half percent (0.50%) of the unused portion of the DIP Loan Commitment, payable monthly in arrears.<br><br><u>Deferred Commitment Fee</u>: $4,500,000, which shall be fully earned and non-refundable as of the Closing Date, and paid on the earlier of |

| | |
|---|---|
| | (i) payment in full of the Proposed Financing Facility and (ii) the Maturity Date.<br><br>Other Fees: All fees, including legal and other professional fees (including any financial advisor to be retained by the DIP Agent), and all reasonable out-of-pocket expenses associated with the transaction (whether incurred pre or postpetition) are to be paid by the Debtors without the need for the filing of any applications with the Bankruptcy Court, plus such other fees as set forth in the Fee Letter. |
| **Security & Super-Priority Claim** | All obligations of the Debtors under the DIP Facility to the DIP Lenders shall be: (X) entitled to super-priority administrative expense claim status pursuant to 11 U.S.C. § 364(c)(1) in each of the Cases, subject only to the Carve-Out; and (Y) secured pursuant to 11 U.S.C. §§ 364(c)(2) and (c)(3) and 364(d) by a first and senior priority lien on all of the Debtors' assets of any kind, including, without limitation, personal property, leases and real property of the Debtors, wherever located, and whether now or hereafter existing, and whether now owned or hereafter acquired, of every kind and description, tangible or intangible, including any and all cash or non-cash proceeds of any of the foregoing and, subject to entry of the Final Order, claims of the Debtors or their estates under Bankruptcy Code sections 542, 544, 545, 547, 548, 550, 551, 553(b) or 724(a), (the "Collateral") and a junior lien on any Collateral that is subject to a lien, to the extent that such a lien is valid, perfected, and unavoidable. |
| **Maturity Date** | All loans are to be repaid in full at the earliest of (i) one (1) year following the Petition Date, (ii) the effective date of a chapter 11 plan (a "Plan") in the Cases which is confirmed by an order of the Bankruptcy Court, (iii) the closing date of a sale of all or any part of the assets of the Debtors under section 363 of the Bankruptcy Code (a "363 Sale") and (iv) the termination by the DIP Agent upon an Event of Default (any such date, the "Maturity Date"). Unless otherwise agreed to by the DIP Lenders and the DIP Agent, any confirmation order entered in the Cases must provide for the repayment in full of the DIP Facility on or before the effective date of the Plan and shall not discharge or otherwise affect in any way the joint and several obligations of the Debtors to the DIP Lenders under the DIP Facility. |
| **Carve-Out** | The Carve-Out shall include the following: (A) (i) allowed unpaid professional fees and disbursements incurred by the Debtors and any official committees appointed in the Cases and provided for in the Budget through the date of the acceleration of amounts outstanding under the DIP Facility (such event, a "Triggering Event"); (ii) the payment of fees required to be paid to the clerk of the Bankruptcy Court and to the office of the U.S. Trustee pursuant to 28 U.S.C. § 1930; and (iii) all reasonable fees and expenses incurred by a trustee |

| | |
|---|---|
| | under section 726(b) of the Bankruptcy Code in an amount not exceeding $25,000 ((i) through (iii) collectively, the "Carve-Out Expenses") and (B) without reducing the Carve-Out Expenses, after the occurrence of a Triggering Event, to the extent allowed at any time, all professional fees and disbursements incurred by the Debtors and any official committees appointed in the Cases in an aggregate amount not to exceed $50,000. |
| **Conditions Precedent** | The obligation of the DIP Lenders to make the initial Loans or extensions of credit in connection with the DIP Facility will be subject to customary conditions precedent, including, without limitation, the following conditions precedent: |
| | (a) the DIP Lenders shall have received such agreements, instruments, approvals, opinions and other documents, each satisfactory to the DIP Lenders in form and substance, as the DIP Lenders may request; |
| | (b) entry of the Interim Order by the Bankruptcy Court, satisfactory in form and substance to the DIP Lenders in their sole and absolute discretion, no later than three (3) Business Days after the Cases are filed, which Interim Order shall not have been reversed, modified, amended, stayed or vacated; |
| | (c) opinions from the Debtors' counsel as to such matters as the DIP Agent and its counsel may reasonably request; |
| | (d) the Debtors shall have paid to the DIP Lenders all fees and expenses then owing to the DIP Lenders on or before the Closing Date; |
| | (e) all filings and pleadings to be filed by the Debtors on the first day of the Cases shall be in form and substance satisfactory to the DIP Agent and the DIP Lenders in their sole and absolute discretion; |
| | (f) the DIP Lenders shall have received such financial and other information regarding the Debtors as the DIP Lenders may request; and |
| | (g) the DIP Agent shall have approved the initial Budget in its |

| | |
|---|---|
| | sole and absolute discretion.<br><br>The obligation of DIP Lenders to make any loans beyond the Initial Availability will be subject to the following conditions precedent: [5]<br><br>    (a) the DIP Loan Documents, in form and substance satisfactory to the DIP Agent and the DIP Lenders in their sole and absolute discretion, shall have been executed;<br><br>    (b) the representations and warranties contained in the DIP Loan Documents shall be true and correct in all material respects as of the applicable borrowing date;<br><br>    (c) no default or event of default shall have occurred and be continuing on the applicable borrowing date; and<br><br>    (d) with respect to any borrowing that is more than twenty (20) days following the Closing Date, entry by the Bankruptcy Court of the Final Order, which Final Order shall not have been reversed, modified, amended, stayed or vacated. |
| **Covenants** | Usual covenants, including, but not limited to, compliance with reporting requirements, provision of financial statements, notices of litigation, defaults and unmatured defaults and other information, compliance with pension, environmental and other laws, inspection of properties, books and records, maintenance of insurance, limitations with respect to liens and encumbrances, dividends and retirement of capital stock, guarantees, sale and leaseback transactions, sales of assets, consolidations and mergers, investments, capital expenditures, loans and advances, indebtedness, operating leases, transactions with affiliates, prepayment of other indebtedness and amendments to material agreements, prohibition on payment of any material prepetition claim, other than as allowed by any first day order of the Bankruptcy Court (provided that such order is in form and substance satisfactory to the DIP Agent and the DIP Lenders in their sole and absolute discretion), without the approval of the DIP Lenders in their sole and absolute discretion.<br><br>Prior to entry of the Final Order, actual expenditures made by the Borrower may not exceed the amounts set forth in the Budget. Upon and following entry of the Final Order, actual expenditures made by the Borrower may not exceed the amounts set forth in the Budget by more than (a) ten percent (10%) for any line item and (b) five percent |

---

[5] Given that the DIP Facility was negotiated in an extremely tight timeframe, the Debtors and the DIP Lenders have not yet negotiated the DIP Credit Agreement. It is anticipated that by the Final Hearing, a credit agreement will be negotiated and will be presented to the Court for approval.

(5%) in the aggregate. Unused amounts set forth in the Budget for any line item may be carried forward and used to fund such line item in the subsequent four one-week Budget periods. Actual revenues received by the Borrowers may not be less than ninety percent (90%) of the amounts set forth in the Budget.

The Debtors shall not seek to reject or terminate, or permit the rejection or termination of, any material license agreement, material real property lease or material contract without the consent of the DIP Lenders.

The DIP Agent's financial advisor shall have reasonable access to the Debtors' officers.

Financial reporting to include: (i) annual, audited financial statements, (ii) quarterly, internally prepared financial statements, (iii) monthly, internally prepared, financial statements, (iv) annual projections, including monthly balance sheet, profit and loss and cash flow figures, (v) weekly Budgets including a comparison of actual performance to projections for the prior week and the prior cumulative four-week period delivered no later than 5:00 p.m. (Eastern time) on Wednesday of each week, (vi) a weekly compliance certificate for the revenue and expenditure covenants, (vii) an updated Budget by the 10th day of each month that is acceptable to the DIP Agent and the DIP Lenders in their sole and absolute discretion in its reasonable discretion, and (viii) other reporting as reasonably required by the DIP Lenders.

| Milestones | The Debtors shall conduct a process to license Borrower's broadcast media rights (the "Media Rights"). The Debtors shall provide a weekly telephonic update on their sale process to the DIP Agent and shall provide such other updates on the sale process as the DIP Agent may request. The sale process is intended to be fully transparent to the DIP Agent and the DIP Lenders, with the DIP Agent to have full and complete access to the Debtors and their representatives on all non-privileged matters pertaining to the sale process. |
|---|---|

As a condition to further funding, the Debtors, the DIP Agent and the DIP Lenders shall, on or prior to July 29, 2011, reach agreement with respect to a process and timing for the license of the Media Rights (the "Milestones"), which Milestones shall require, among other things:

    (a) entry of a final order of the Bankruptcy Court, satisfactory to the DIP Agent and the DIP Lenders in their sole and absolute discretion, approving the transaction (the "Media Rights Order")

| | |
|---|---|
| | shall occur no later than 180 days after the Petition Date; and<br><br>(b) the transaction shall close no later than 45 days after entry of the Media Rights Order. |
| **Events of Default** | Usual events of default, including, but not limited to, payment, cross-default, violation of covenants, breach of representations or warranties, judgment, ERISA, environmental, change of control, loss of material permits, licenses and regulatory approvals and other events of default which are customary in facilities of this nature.<br><br>In addition, an event of default shall occur if: (i)(A) the Interim Order shall not have been entered within three (3) Business Days after the Cases are filed; (B) any of the Cases shall be dismissed or converted to a chapter 7 case; a chapter 11 trustee or an examiner with enlarged powers shall be appointed; any other superpriority administrative expense claim which is senior to or *pari passu* with the DIP Lenders' liens shall be granted without the DIP Agent's and DIP Lenders' consent in their sole and absolute discretion; the Interim Order or the Final Order, as the case may be, shall be stayed, amended, modified, reversed or vacated; (C) the Final Order shall not have been entered within twenty (20) days after the Closing Date; a Plan shall be confirmed in any of the Cases which does not provide for termination of the commitment under the DIP Facility and payment in full in cash of the Debtors' obligations thereunder on the effective date of the Plan; or an order shall be entered which dismisses any of the Cases and which order does not provide for termination of the DIP Facility and payment in full in cash of all obligations thereunder; or (D) the Debtors shall take any action, including the filing of an application, in support of any of the foregoing, or any person other than the Debtors shall do so and such application is not contested in good faith by the Debtors, (ii) the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder of any security interest in any material asset of the Debtors, (iii) the Debtors fail to meet any of the Milestones (defined below), (iv) any material contract is rejected or otherwise terminated or any material property of the Debtors is sold, in each instance, without the consent of the DIP Lenders, (v) termination of the Debtors' rights, privileges and other property rights under the Major League Baseball Constitution or any other baseball-related agreement, or (vi) other events of default to be set forth in the DIP Loan Documents. |
| **Remedies and Modification of the Automatic Stay** | Upon the occurrence and during the continuance of an Event of Default, the DIP Lenders may, in their sole and absolute discretion, suspend or terminate the DIP Loan Commitment. Following three (3) business days' notice of such Event of Default to the Borrower, the official committee of unsecured creditors, and the U.S. Trustee, unless |

| | |
|---|---|
| | such Event of Default is cured within such time or an order of the Bankruptcy Court is entered to the contrary, the DIP Agent shall have relief from the automatic stay to exercise remedies under the DIP Credit Agreement. |
| **Releases** | The Interim Order provides that the Debtors forever and irrevocably release, discharge, and acquit the former, current, or future DIP Parties, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in their capacities as such (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the Financing, the DIP Documents, this Interim Order, or the transactions contemplated hereunder or thereunder including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under title 11 of the United States Code, and (iii) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Parties. |
| **Surcharge Waivers** | Subject to entry of the Final Order, the Collateral shall not be subject to assessment pursuant to section 506(c) of the Bankruptcy Code. |
| **Perfection of Liens Without Compliance with Applicable Laws** | The DIP Agent and DIP Lenders are not required to file financing statements, mortgages, deeds of trust, security deeds, notices of lien, or similar instruments in any jurisdiction or effect any other action to attach or perfect the security interests and liens granted under the DIP Facility Documents and the Interim Order or Final Order; and instead may rely on DIP Facility Documents and Interim Order or Final Order for perfection. |
| **Assignments and Participations** | The DIP Lenders shall be permitted to sell or assign their rights and obligations hereunder, or any part thereof, to any person or entity without the consent of the Debtors, provided, however, that the DIP Lenders shall not assign their rights or obligations hereunder to |

| | another Major League Baseball Club or Major League Baseball, or any affiliate of either of the foregoing. The DIP Lenders shall be permitted to grant participations in such rights and obligations, or any part thereof, to any person or entity without the consent of the Debtors, provided, however, that the DIP Lenders shall not grant participations in such rights and obligations to another Major League Baseball Club or Major League Baseball, or any affiliate of either of the foregoing. |
|---|---|

## B. Supplemental Bankruptcy Rule 4001 and Local Rule 4001-2 Disclosures

48. §506(c) Surcharge Waiver: Bankruptcy Rule 4001(c)(1)(B)(x) and Delaware Local Rule 4001-2(a)(i)(C) require disclosure of provisions in Financing Motions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. Although the DIP Facility contemplates that the DIP Loan Documents and Final Order will provide for a waiver of rights under section 506(c) of the Bankruptcy Code, such rights will not be waived in the Interim Order. The proposed waiver of the Debtors' and estates' rights under section 506(c) of the Bankruptcy Code will be effective only after notice to parties in interest and entry of the Final Order granting such relief. *See* Interim Order at ¶ 31.

49. Liens on Avoidance Actions: Bankruptcy Rule 4001(c)(1)(B)(xi) and Delaware Local Rule 4001-2(a)(i)(D) require disclosure of provisions in Financing Motions that grant the prepetition secured creditor liens on Avoidance Actions. Although the DIP Facility and Final Order contemplate that DIP Lenders will be granted liens on Avoidance Actions or the proceeds thereof, such liens are not granted in the Interim Order. *See* Interim Order ¶ 6(b). The liens against Avoidance Actions will be granted only after notice to parties in interest and entry of the Final Order granting such relief. *See* Interim Order ¶ 6(b).

50. The provisions of the DIP Facility as to which disclosure was required pursuant to Delaware Local Rule 4001-2 are justified under the circumstances of these Chapter 11 Cases.

First and foremost, without the inclusion of such terms; the DIP Lender would not agree to make the DIP Facility available to the Debtors. In light of the unavailability of adequate financing alternatives and for the reasons set forth herein, the Debtors have determined in the exercise of their sound business judgment that agreeing to the terms of the post-petition financing described in this Motion is appropriate under the circumstances of this Chapter 11 Case.

51.     Accordingly, the facts and circumstances of this Chapter 11 Case justify the inclusion of the terms that require disclosure under Delaware Local Rule 4001-2.

## RELIEF REQUESTED

52.     By this Motion, the Debtors request entry of the Interim Order and the Final Order authorizing:

A.     in the case of the Interim Order, the Debtors to borrow up to an aggregate principal amount of $60 million as set forth in the Interim Order, or, in the case of the Final Order, the Debtors to borrow the full amount of the DIP Facility up to an aggregate principal amount of $150 million;

B.     in the case of the Final Order, the Debtors to execute and enter into the DIP Facility Agreement and the other DIP Facility Documents and to perform such other and further acts as may be required by the DIP Facility Documents;

C.     the granting, pursuant to section 364 of first priority liens and security interests in substantially all of the Debtors' assets that are not otherwise subject to a valid and perfected lien in favor of the DIP Agent and the DIP Lenders and all proceeds thereof, to secure any and all of the obligations under the DIP Facility, subject to the Carve-Out and the Permitted Prior Liens; provided, however, the Collateral that is subject to Permitted Prior Liens shall be encumbered by junior liens of the DIP Agent and DIP Lenders;

D.     the granting of superpriority administrative expense claims to the DIP Agent and the DIP Lenders payable from, and having recourse to, all prepetition and postpetition property of the Debtors' estates and all proceeds thereof, subject only to the Carve-Out, to secure any and all of the obligations under the DIP Facility;

E.      pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on this Motion be held before the Court to consider entry of the Interim Order; and

F.      the scheduling of a final hearing (the "Final Hearing"), to be held within twenty (20) days of the Interim Hearing, to consider entry of the Final Order.

## BASIS FOR RELIEF REQUESTED

53.      For the following reasons, the Debtors respectfully submit that they have satisfied the standards applicable for approval of the DIP Facility.

### A.      The DIP Facility Should Be Approved Under Section 364 Of The Bankruptcy Code.

54.      The Debtors propose to obtain financing under the DIP Facility by providing security interests and other liens as set forth above pursuant to sections 364(c) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c). Indeed, section 364(c) financing is appropriate when the debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See In re YL West 87th Holdings I LLC*, 423 BR 421, 441 (Bankr. S.D.N.Y. January 13, 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing"); *In re Ames Dep't Stores. Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under Sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Banks. E.D. Pa. 1987) (secured credit under Section 364(e)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

55. Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

    a.    the debtor is unable to obtain unsecured credit under Section 364(b), *i.e.*, by allowing a lender only an administrative claim;

    b.    the credit transaction is necessary to preserve the assets of the estate; and

    c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*Ames Dep't Stores*, 115 B.R. at 37-39.

56. During the prepetition period, the Debtors, both directly and through their advisors, endeavored to identify potential sources of financing. Based on those discussions with potential lenders, the Debtors have determined that adequate financing on an unsecured basis is not available. Without postpetition financing, the Debtors would not be unable to operate their businesses as a going concern, which would significantly impair the value of the Debtors' assets to the detriment of all stakeholders. Furthermore, by obtaining postpetition financing, the Debtors will be in a position to maximize the value of their assets for the benefit of all stakeholders. Finally, the terms of the DIP Facility are fair, reasonable and adequate given the Debtors' circumstances, all as more fully set forth below.

    *1.    No Adequate Alternative to the DIP Facility is Currently Available.*

57. A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Sections 364(c) of the Bankruptcy Code. *In re YL West 87th Holdings I LLC*, 423 BR 421, 441 (Bankr. Court, S.D.N.Y. Jan. 13, 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing"); *In re General Growth Properties, Inc.*, 412 B.R. at 125 (debtor

has an obligation to make "reasonable efforts, under the circumstances . . .to obtain [unsecured financing], in the ordinary course of business or otherwise").

58.     In the days and weeks prior to the commencement of these Chapter 11 Cases, the Debtors explored alternative financing from a number of potential lenders and from a variety of financial institutions.  Chief among these alternatives was a media rights agreement with Fox that would have provided sufficient liquidity in both the short term and the future.  In the meantime, the Debtors also reached out to institutional lenders, professional investors, and other parties about providing financing for LAD's immediate liquidity crisis.

59.     After the Commissioner refused on June 20th to approve the media rights agreement between LAD and Fox, the Debtors redoubled their efforts to find alternative sources of longer term financing.  As discussed above, LAD discussed financing possibilities with seven potential lenders, over half of whom conducted due diligence.  While LAD received expressions of interest from several sources, only the DIP Lender was willing to provide a commitment for financing of a sufficient amount and within the Debtors' time constraints.

60.     Accordingly, the Debtors have satisfied the requirement of Sections 364(c) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

> 2.     *The DIP Facility is Necessary to Preserve Estate Assets and is an Exercise of the Debtor's Sound Business Judgment.*

61.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994)(approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *Ames Dep't Stores*, 115 B.R. at 38 (noting that other decisions under section 364 find that financing reflects a debtor's business judgment).

Generally, the business judgment standard requires that, absent evidence to the contrary, a debtor in possession is afforded discretion to act with regard to business decision-making. *See In re Simasko Prod. Co.*, 47 B.R. 444, 449 (BAnkr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

62.     As this Court has found, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006). The Debtor's decision to enter into the DIP Facility satisfies this standard.

63.     As discussed above, the DIP Facility is necessary to preserve the value of the Debtors' estates. Specifically, the DIP Facility will allow the Debtors to conduct their operations, pay their obligations to their employees, and administer the Chapter 11 Cases. Moreover, the availability under the DIP Facility will provide LAD with the time it needs to implement to maximize the value of the future exclusive cable television rights that have not been granted beyond 2013. LAD will be able to use this time to propose and, to the extent authorized by this Court, implement procedures that are designed to promote a competitive sale process with respect to those exclusive cable television rights, one that results in the highest and best offer being acceptable to all parties. Without the benefit of the DIP Facility, the Debtors will suffer irreparable harm as they will be unable to meet payroll, which would likely lead to erosion or elimination of what is otherwise a substantial equity interest.

3.     *The DIP Facility Terms are Fair, Reasonable and Appropriate.*

64.     The proposed terms of the DIP Facility Agreement and the other DIP Facility Documents are fair, reasonable, and adequate under the circumstances.

65.     As discussed more fully above, the Debtors made concerted, good-faith efforts to obtain credit on the most favorable terms available in the market, notwithstanding the short

period of time to generate liquidity following the Commissioner's refusal to approve the Proposed Fox Transaction and the rapidly approaching deadline to meet payroll and other extraordinary obligations. No other lender was willing to provide the $40,000,000 million in funding necessary to meet LAD's payroll obligations on June 30th and July 1st, let alone the additional $110,000,000 offered by the DIP Facility to fund the continued operation of the Debtors' businesses. Moreover, no entity offered any financing on more favorable terms than those provided in the DIP Facility or within the time permitted.

66.     Against this backdrop, the Debtors and their advisors carefully evaluated the proposed financing offered by the DIP Facility and engaged in arm's-length negotiations with the DIP Lender. Those negotiations resulted in obtaining several operational and economic benefits under the DIP Facility. Ultimately, the Debtors, exercising their sound business judgment, agreed to the DIP Facility as the proposal best suited to the Debtors' needs.

67.     To further illustrate that the terms are fair, reasonable and adequate, the proposed DIP Facility and the Interim Order provides that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve-Out. In *Ames Dep't Stores*, 34 (Bankr. S.D.N.Y 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. *Ames Dep't Stores,* 115 B.R. at 40; *accord General Growth*, 412 B.R. at 125.

68.     Likewise, the various fees and charges required under the DIP Facility are customary, and approval thereof is appropriate. All of the fees and charges were subject of substantial arms length negotiation and absent approval and payment of such fees and charges, the DIP Lenders would not make the loans. Courts routinely authorize material lender incentives

beyond the explicit liens and other rights specified in Section 364 of the Bankruptcy Code. *See, e.g., In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. B.A.P. 1992) (authorizing credit arrangement under Section 364, including a lender "enhancement fee").

69.     Accordingly, the terms of the DIP Facility are fair, reasonable and adequate, and the DIP Agent and the DIP Lenders under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such facility.

### B.     Interim Approval Should Be Granted

70.     Bankruptcy Rules 4001(b) and (c)(2) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates. *See* Fed.R.Bankr.P. 4001(c)(2).

71.     The Debtors request that the Court authorize the Debtor, on an interim basis pending the Final Hearing, to borrow under the DIP Facility in an amount up to $60 million. As discussed above, this relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and thereby avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing. Absent interim approval of the interim borrowing under the DIP Facility, the Debtors' businesses would suffer immediate and irreparable harm.

### C.     Final Hearing

72.     The Debtors further respectfully request that the Court set a date and time for the Final Hearing to consider the entry of a Final Order approving the relief sought in this Motion no later than twenty (20) after the date of entry of the Interim Order since pursuant to the DIP Credit

Agreement an Event of Default will occur thereunder if the Final Order is not entered within twenty (20) days after the entry of the Interim Order, including without limitation final court approval of the Debtors' borrowings of up to $150 million under the DIP Facility.

## REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF
## STAY TO AVOID IMMEDIATE AND IRREPARABLE HARM

73.    By this Motion, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  For the reasons set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h).

## NOTICE

74.    Notice of this Motion has been given to (i) the United States Trustee for the District of Delaware; (ii) the Debtors' forty (40) largest unsecured creditors; (iii) counsel to Major League Baseball; (iv) counsel to the proposed DIP Lenders; and (v) counsel to the Major League Baseball Players Association.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  The Debtors submit that, under the circumstances, no other or further notice is required.

## NO PREVIOUS REQUEST

75.    No previous request for the relief sought herein has been made by the Debtor to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) enter an Interim Order authorizing the Debtors to borrow up to $60 million on an interim basis pursuant to the terms of the proposed Interim Order, (ii) schedule a Final Hearing on this Motion, (iii) after notice and an opportunity for a hearing, enter a Final Order authorizing the Debtors to borrow up to $150.0 million pursuant to the terms of the DIP Facility Documents, and (iv) grant such other and further relief as is appropriate.

Dated: June 27, 2011
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
Donald J. Bowman, Jr. (No. 4383)
Ryan M. Bartley (No. 4985)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

DEWEY & LEBOEUF LLP
Bruce Bennett (*pro hac vice* admission pending)
Joshua M. Mester (*pro hac vice* admission pending)
333 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Telephone: (213) 621-6000
Facsimile: (213) 621-6100

-and-

DEWEY & LEBOEUF LLP
Martin Bienenstock (*pro hac vice* admission pending)
Philip M. Abelson (*pro hac vice* admission pending)
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8000
Facsimile: (212) 259-6333

*Proposed Co-Counsel for the Debtor and Debtor in Possession*