IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LOS ANGELES DODGERS LLC, *et al.*,[1] | ) | Case No. 11-12010 (KG) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |
| | ) | Re: Docket No. 13 |

**OBJECTION OF MAJOR LEAGUE BASEBALL TO DEBTORS'
MOTION TO OBTAIN POST-PETITION FINANCING AND FOR RELATED RELIEF**

The Office of the Commissioner of Baseball, doing business as Major League Baseball (the "BOC"), hereby submits this objection (the "Objection") to the Emergency Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, and 364, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and 4001(C) [Docket No. 13] (the "DIP Financing Motion") filed by the debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), which requests authority to enter into a $150 million debtor-in-possession financing arrangement (the "Proposed DIP Facility") with a group of lenders in the Highbridge Senior Loan Fund II family of funds (as disclosed in the DIP Financing Motion, the "Proposed DIP Lenders"). The BOC objects to the Proposed DIP Facility for a number of reasons, including that the BOC, acting in the best interests of Baseball and the Los Angeles Dodgers, will provide the Debtors with a DIP loan ("MLB DIP Facility") on substantially better terms than the Proposed DIP Facility. In support of the Objection, the BOC respectfully represents as follows:

---

[1] The Debtors, together with the last four digits of each Debtors' federal tax identification number, are: Los Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567); LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029). The location of the Debtors' corporate headquarters and the service address for the Debtors is: 1000 Elysian Park Avenue, Los Angeles, California 90012.

WM1A 1003345v1 06/28/11

# I.

## INTRODUCTION

1.      Having siphoned off well over $100 million of club revenues and obviously unable to properly distinguish between his personal interests and those of the club, Frank McCourt has driven the Los Angeles Dodgers (the "Club") to a liquidity crisis so severe that, absent extraordinary measures, the Club would be unable to make its payroll. Prior to the commencement of these cases, Mr. McCourt attempted to use that looming disaster to leverage the BOC into approving the sale of the Club's future broadcast rights to pay current expenses and to permit millions more to be misappropriated for his personal use. The BOC rejected this proposal because it was not in the best interests of the Los Angeles Dodgers or Baseball.

2.      Mr. McCourt has now caused the Club to enter Chapter 11 in an attempt to achieve the same result. Instead of leveraging the BOC, his target is now this Court. Threatening the immediate demise of one of Baseball's great teams, he seeks emergency approval of a DIP financing that compels the Club to do exactly what Mr. McCourt improperly sought to do outside of bankruptcy – selling the Club's valuable future broadcast rights to pay current expenses and make significant proceeds available for personal use. The Court should reject this proposal.

3.      In contrast to Mr. McCourt's proposal, the BOC stands ready, willing and able to provide a materially cheaper, no-strings-attached solution to the Debtors' immediate and anticipated cash flow problems over the coming year. The BOC proposal not only relieves the Debtors' immediate liquidity crisis, but also provides a substantial runway for the parties and the Court to find an appropriate resolution to the issues presented by this case on terms that properly

protect the interests of the Debtors, their creditors, their fans and other Major League Baseball clubs.

4. The MLB DIP Facility is less expensive and otherwise superior to the Proposed DIP Facility in six important respects: (a) it eliminates the $4.5 million fee and all other fees that would be required to be paid under the Proposed DIP Facility; (b) it reduces the interest rate by 3.0%; (c) it does not require the Debtors to encumber their assets (including avoidance actions); (d) it does not impose an artificial timeline for disposing of the team's valuable future broadcast rights; (e) it has fewer default triggers; and, (f) unlike the Proposed DIP Facility, it complies with all of the requirements of Bankruptcy Rule 4001. And, the MLB DIP Facility complies with all MLB rules.

5. This case was not filed to restructure debts, since there is sufficient value to pay all obligations in full; rather, these cases were commenced in an attempt by Mr. McCourt to circumvent the Club's obligations under its constituent, governing documents, and to have this Court approve additional debt financing and sale of key assets in violation of those documents and the obligations that the Club has to the BOC. While the DIP Financing Motion claims that the Debtors conducted an extensive search for DIP financing that included reaching out to "numerous banks, financial institutions, professional investors, and strategic partners" the Debtors did not even approach BOC, their most significant strategic relationship and obvious source of a DIP loan, for such financing. (DIP Financing Motion at p. 15, ¶ 44.)

6. The DIP Financing Motion also seeks to mask the significant problems that plague the Debtors which are likely to be exacerbated if the Court were to permit them to proceed with the Proposed DIP Facility. Mr. McCourt is in a conflicted position with the Debtors. He already has funneled much more than $100 million from the Club to him, his

3

family, and related non-debtor entities in derogation of the interests of the Debtors and direct contravention of his written agreements with BOC to operate the Club "in the best interests of the Los Angeles Dodgers and Major League Baseball." In pursuing his own financial interests at the expense of the Club, overleveraging it and draining millions of dollars it needed for capital investment and operations, Mr. McCourt has placed the Debtors in their current, incredible position of not being able to make payroll less than halfway through the regular season. In the process he has alienated fans, sponsors, and business partners, and has eroded public confidence in the Club. In addition, Mr. McCourt improperly filed the Debtors without authority. Pursuant to a Directive of the Commissioner of Baseball issued pursuant to the Major League Constitution, the Los Angeles Dodgers were operating under a Monitor, and the Club was not permitted to take any action outside the ordinary course, including the filing of a bankruptcy petition, without first obtaining the consent of such Monitor. Mr. McCourt simply disregarded this requirement.

7. BOC believe that these circumstances raise threshold issues that will need to be addressed during the initial stages of these chapter 11 cases. Such issues include:

- whether or not the cases were properly filed;
- whether or not the BOC's monitor, Ambassador Thomas Schieffer, is entitled to continue performing his duties during the pendancy of the cases; and
- whether or not Mr. McCourt should be permitted to retain control of the team in chapter 11.

That said, the BOC is content to reserve its rights as to these important matters until after the most important task is addressed--making sure that the Los Angeles Dodgers have sufficient liquidity to continue operations on an uninterrupted basis, but without the imposition of restrictions or requirements that would force the case in a particular direction at this point. The

4

MLB DIP proposal satisfies these requirements and should be approved; the McCourt proposal does not.

**LAD LLC Structure**

8.  Los Angeles Dodgers LLC ("LAD LLC") owns and operates the Los Angeles Dodgers Major League Baseball Club, a professional baseball club located in Los Angeles California, pursuant to the Major League Constitution (the "Major League Constitution") and the various agreements, rules, guidelines, regulations, policies, decisions, and requirements of the BOC adopted thereunder, including but not limited to the Ownership Guidelines (collectively, the "MLB Governing Documents"), as assumed by the Los Angeles Dodgers and Mr. McCourt pursuant to an Assumption Agreement, dated as of February 13, 2004. Pursuant thereto, Mr. McCourt agreed among other things to be bound by the Major League Constitution and rules and regulations of Major League Baseball ("MLB") and to operate the Dodgers in the best interests of the Los Angeles Dodgers and Baseball, and specifically not for the benefit of any other business pursuits or personal interests.

**Major League Baseball**

9.  With a history and tradition dating back to 1869, professional baseball is one of America's oldest organized league sports. From April through October every year, the BOC runs a 162-game regular season and a post-season playoff that determines that season's World Series Champion. Major League Baseball teams are divided into two leagues (American and National) and six divisions (AL East, AL Central, AL West, NL East, NL Central and NL West).

10. The BOC is an unincorporated association of its 30 member clubs. It is headquartered in New York City and is governed by the Major League Constitution. The primary purpose of the BOC is to undertake centralized activities on behalf of the 30 Major

League Baseball clubs. Among other things, the BOC hires and maintains the sport's umpiring crews, and negotiates national marketing, labor, and television contracts.

**The Los Angeles Dodgers**

11. The Los Angeles Dodgers are located in the second most populous metropolitan area in the United States. The Los Angeles Dodgers are one of only 30 Major League Baseball clubs and one of three MLB clubs in Southern California. The Los Angeles Dodgers have a rich and splendid history. While still located in Brooklyn, New York, the Dodgers broke the color barrier by putting Jackie Robinson on a major league field in 1947 before winning their first World Series Championship in 1955. Before the 1958 season, the Dodgers moved from Brooklyn to Los Angeles, where they have since won five additional World Series Championships and nine National League Pennants. Historically, the Los Angeles Dodgers have been strong contenders, with All-Star players supported by a strong fan base. The Los Angeles Dodgers currently compete in the National League West, together with the San Diego Padres, the Colorado Rockies, the Arizona Diamondbacks, and last year's World Series Champion, the San Francisco Giants.

12. The Los Angeles Dodgers home field, located in Chavez Ravine, Los Angeles (the "Stadium"), is an open-air, natural grass ballpark in a beautiful setting. From 2006 to 2009, home attendance for Los Angeles Dodgers games at the Stadium averaged over 46,000 fans per game, well above the league average. To date during the 2011 season, home attendance has dropped almost 20% compared to 2010 attendance, the largest decrease of any MLB club this season.

### Events Leading to the Los Angeles Dodgers Chapter 11 Filing

13. The version of events leading to LAD LLC's Chapter 11 filing described in the DIP Financing Motion misstates certain key facts and omits others. It is not necessary for the Court to resolve these factual inaccuracies in order to make its decision with respect to DIP financing. Nevertheless, the BOC is compelled to address briefly certain of these misstatements and omissions for the Court's benefit.

14. When Mr. McCourt acquired the Club in February 2004 for $421 million, he did so entirely with borrowed funds. As a condition of allowing Mr. McCourt's highly leveraged purchase of the Dodgers, the BOC required that Mr. McCourt agree to provide an additional $30 million in liquid equity within three years through the sale of certain real estate assets or by securing equity investors. Mr. McCourt failed to satisfy this obligation.

15. Instead, Mr. McCourt spent the last seven years monetizing the various assets of the Los Angeles Dodgers by creating a complex network of corporate entities through which he leveraged the Club and its related assets (parking lots, the Stadium, and a securitization vehicle created by Mr. McCourt to obtain revenue from Los Angeles Dodgers' ticket sales) as well as his equity interests therein. This series of transactions includes several which were not disclosed to or approved by the BOC, as required by the rules and regulations of MLB. Mr. McCourt extracted cash from the Club, including substantial amounts from the proceeds of certain of these transactions, so that the Club now finds itself highly leveraged and in the middle of an acute liquidity crisis; so acute that the Club had insufficient liquid assets to make payroll due June 30, 2011.

16. For more than a year the Los Angeles Dodgers have experienced, and continue to experience, cash flow deficiencies. Debtors presently project that the Los Angeles Dodgers need

7

a cash infusion of $150 million solely to continue ordinary course of business operations through the end of 2011.

17. In May 2010, Mr. McCourt requested BOC approval of a proposed $130 million debt offering from LA Holdco to institutional investors to solve the Club's looming liquidity crisis. The BOC supported Mr. McCourt's efforts to raise capital by, among other things, allowing the Club to meet with potential investors at the BOC's offices in New York and by participating in portions of those meetings to express support for the potential deal. Mr. McCourt abandoned this effort when potential investors reacted to negative publicity from his divorce trial by demanding stricter deal terms.

18. In September, 2010, Mr. McCourt and his ex-wife Jamie began a trial to resolve certain issues in the couple's much publicized, acrimonious divorce proceeding that has been pending since 2009. That divorce proceeding was the subject of intense media coverage, and spawned websites and blogs dedicated to the exposure of what their contributors considered the extraordinary personal and financial excesses of the McCourts at the expense of the Club. Public filings in the divorce proceedings and trial testimony revealed that the McCourts drained more than $100 million from the Los Angeles Dodgers to support their lavish lifestyle. In addition, Mr. McCourt and his ex-wife disagree about who owns the Los Angeles Dodgers and who is entitled to exercise certain corporate governance rights over the Club.

19. Due to, among other things, the revelations of Mr. McCourt's mismanagement of the Club, the resulting liquidity crisis facing the Los Angeles Dodgers, and the ensuing loss of public confidence in the Club, on April 25, 2011 the Commissioner of Baseball, in accordance with rights granted under Article II of the Major League Constitution, appointed Ambassador J.

WM1A 1003345v1 06/28/11

Thomas Schieffer as Monitor to oversee the Club's business and financial affairs.[2] Ambassador Schieffer's responsibilities and authority as Monitor include, among other things, approval rights over (a) any expenditure over $5,000 or any commitment to make such an expenditure; (b) any dividend or other distribution of funds from the Club to Mr. McCourt, his family, or any affiliates; and (c) all major operational decisions and any decision out of the ordinary course of business, including actions requiring director or managing member approval. Although Mr. McCourt still owns and controls the Los Angeles Dodgers, substantially all of his significant financial decisions regarding the Club are subject to the approval of Ambassador Schieffer.

**MLB's Denial of the Fox Transaction**

20. Prior to the filing of the bankruptcy petition, Mr. McCourt once again attempted to divert Los Angeles Dodgers assets for his own personal benefit. Mr. McCourt set up a new corporate entity to effect a media rights transaction with Fox. The proposed transaction included a $385 million loan that would be distributed ultimately to the newly formed McCourt affiliate, a substantial portion of which would not go to the Club, and would have required the Club to enter a 17-year media rights agreement with Fox without regard for the best interests of the Los Angeles Dodgers or Baseball.

21. For the numerous reasons that the BOC communicated to Mr. McCourt, including because it was not in the best interests of the Los Angeles Dodgers or the game of Baseball, the BOC denied approval of the Fox transaction. Under the MLB Governing Documents, the BOC has the sole right and responsibility to approve or reject such transactions and neither the Los Angeles Dodgers nor any other Major League Baseball club may enter into such a transaction absent the consent of the BOC.

---

[2] The Debtors contend that the Monitor must cease his duties based upon the automatic stay arising under section 362 of the Bankruptcy Code. MLB reserves all rights to dispute this contention.

22. While the Debtors falsely assert that it was because of the BOC's refusal to approve the Fox transaction that the Los Angeles Dodgers lack funds to meet payroll, the fact of the matter is that the Los Angeles Dodgers cannot meet payroll because of Mr. McCourt's financial mismanagement, extreme leveraging, personal distributions made for his own benefit at the Club's expense, and the resulting decline in attendance caused by the community's extraordinary unhappiness with the Club's owner.

II.

## MLB's PROPOSED DIP FACILITY IS SUPERIOR TO THE PROPOSED DIP FACILITY

23. The MLB DIP Facility is commercially reasonable and a plainly superior financing option for the Debtors as compared to the Proposed DIP Facility.[3]

24. Debtors have failed to satisfy their burden that better financing options are available. Further the MLB DIP Facility is not only cheaper and simpler than the Proposed DIP Facility, but it is superior to the Proposed DIP Facility in six crucial respects: (a) it eliminates the $4.5 million fee and all other fees that would be required to be paid under the Proposed DIP Facility; (b) it reduces the interest rate by 3.0%; (c) it does not require the Debtors to encumber their assets (including avoidance actions); (d) it does not impose an artificial timeline for disposing of the team's valuable future broadcast rights; (e) it has fewer default triggers; and, (f) unlike the Proposed DIP Facility, it complies with all of the requirements of Bankruptcy Rule 4001. And, the MLP DIP Facility complies with all MLB rules.

---

[3] A copy of the proposed MLB DIP Facility is attached hereto as **Exhibit A** (a blacklined version to reflect changes from the Debtors' Proposed DIP Facility) and a proposed order approving the MLB DIP Facility (the "MLB DIP Order") is attached hereto as **Exhibit B** (a blacklined version to reflect changes from the Debtors' Proposed DIP Facility). A copy of a credit agreement in substantially final form is attached hereto as **Exhibit C**. Counsel to MLB provided counsel to the Debtors with copies of these documents prior to filing this Objection. MLB expressly reserves all of its rights and remedies under the MLB Governing Documents and does not waive any such rights.

10

## A. The Debtors Have Failed To Satisfy Their Burden That Better Financing Options Are Not Available.

25. To obtain postpetition secured financing under section 364(c) of the Bankruptcy Code, the Debtors must "sustain the burden of establishing the following" requirements:

> (1) They are unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 503(b)(1)(A); (2) The credit transaction is necessary to preserve the assets of the estate; and (3) The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re St. Mary Hosp., 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988) (citing In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), aff'd, 75 B.R. 553 (E.D. Pa. 1987)). As a corollary to these three requirements, the Debtors also bear the burden of proving "that no better offers, bids, or timely proposals are before the Court." In re Phase-I Molecular Toxicology Inc., 285 B.R. 494, 495-96 (Bankr. D.N.M. 2002) (citing In re Western Pacific Airlines, Inc., 223 B.R. 567, 572 (Bankr. D. Colo. 1997).

26. Here, the Debtors cannot meet their burden. Although the Debtors claim to have diligently pursued a number of potential lenders, the Debtors failed to even approach MLB concerning a possible financing.

## B. The Proposed DIP Facility Charges Excessive Fees and Interest.

27. The Proposed DIP Facility would charge a higher interest than the MLB DIP Facility and grant the DIP Lender a variety of excessive fees that are not included in the MLB DIP Facility, specifically:

    (a) The Proposed DIP Facility would charge interest at LIBOR + 7%, with a 3% LIBOR floor, which results in a minimum 10% rate of interest. (Term Sheet at p. 3.) The MLB DIP Facility charges interest at LIBOR + 5.5%, with a 1.5% LIBOR floor, which results in an interest rate of 7%.

11

(b) The Proposed DIP Facility includes a $4.5 million commitment fee. (Term Sheet at p. 3.) The MLB DIP Facility has no commitment fee.

(c) The Proposed DIP Facility includes a Delayed Draw Fee of 0.50% of the unused portion of the $150 million committed by the Proposed DIP Lenders. (Term Sheet a p. 3.) After the initial $60 million draw projected by the proposed DIP budget, the Debtors would pay $37,500 each month (in unused committed fees). The MLB DIP Facility does not include a delayed draw fee or any similar or equivalent fee.

28. Assuming a full draw on the $150 million committed under the Proposed DIP Facility, the lower interest rate under the MLB DIP Facility would save the Debtors approximately $375,000 each month, and approximately $4.5 million over the course of a year.

29. Assuming the $60 million draw projected under the DIP budget attached as Exhibit C to the DIP Financing Motion, monthly interest payments under the Proposed DIP Facility would be $500,000, while under the MLB DIP Facility monthly payments would be only $350,000, for a monthly savings of $150,000.

30. The Debtors' Term Sheet states that other fees outlined in a Fee Letter may be required under the Proposed DIP Facility, but fails to describe what those fees may be. The MLB DIP Facility is completely documented, ready for execution, and has no fees. Accordingly, any additional fees included in the Proposed DIP Facility by a future Fee Letter are fees that the Debtors will avoid under the MLB DIP Facility.

C. **The MLB DIP Facility Does Not Require Any Collateral.**

31. The Proposed DIP Facility requires first and senior priority liens on all of the Debtors' assets. (Term Sheet at p. 2 – 3.) The MLB DIP Facility does not require any collateral from the Debtors. The Debtors should not encumber their assets with DIP liens when there is no need to do so.

12

### D. The Court Should Not Authorize Liens on Avoidance Actions.

32. Unlike the MLB DIP Facility, the DIP Lenders would receive liens upon "claims of the Companies or their estates under Bankruptcy Code sections 542, 544, 545, 547, 548, 550, 551, 553(b) or 724(a)." (Term Sheet at p. 3.) Avoidance actions are property of the estates created by the Debtors' bankruptcy filings, and are therefore typically reserved for unsecured creditors. See Buncher Co. v. Official Committee of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 250 (3d Cir. 2000) ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away."); In re Cybergenics Corp., 226 F.3d 237, 244 (3d Cir. 2000) (avoidance actions are not property of the debtor but rather are created by operation of bankruptcy law and belong to the Debtors' creditors). Indeed, some courts have expressly prohibited granting liens on such actions or their proceeds. See, e.g., Official Comm. of Unsecured Creditors v. Goold Elecs. Corp., No. 93 C 4196, 1993 WL 408366 at *3-4 (N.D. Ill. Sept. 22, 1993).

### D. Compliance with Bankruptcy Rule 4001(d): Existence of a Credit Agreement

33. Bankruptcy Rule 4001(d) governs attempts by a debtor to obtain credit and specifically requires that a motion for approval of DIP financing "... <u>shall be accompanied by a copy of the agreement</u> and a proposed form of order...." B.R. 4001(d)(1)(A) (emphasis added). DIP financing can go horribly wrong when specific terms of complex financial arrangements are not formalized and reduced to writing, leaving open questions of fact and interpretation. See generally In re Arlington Hospitality, Inc., 368 B.R. 702, 713 (Bankr. N.D. Ill. 2007) (rev'd on other grounds) (stating that "...a debtor must have a loan agreement in hand before filing a motion under section 364...").

34. Notwithstanding the extensive process that the Debtors claim to have endured in search of DIP financing, the terms of the Proposed DIP Facility apparently have not yet been reduced to a final DIP credit agreement. Instead, the Debtors state that they anticipate having a credit agreement negotiated and ready for presentation to the Court by the time of a final hearing on the DIP Financing Motion. (DIP Financing Motion at p. 20, footnote 5.) Inherent in the Debtors' admission that a DIP credit agreement is still being negotiated for later presentation to the Court is that there are terms of the Proposed DIP Facility that require further negotiation and thus have not been agreed between the parties. MLB has completed a credit agreement memorializing the terms of the MLB DIP Facility (attached hereto as Exhibit C in substantially final form). MLB provided counsel to the Debtors with a copy of the credit agreement memorializing the MLB DIP Facility prior to the scheduled first day hearing in these cases.[4]

35. Because it has been reduced to writing in the form of a credit agreement, and therefore complies with Bankruptcy Rule 4001, the MLB DIP Facility can be approved by this Court and executed by the Debtors, while the Proposed DIP Facility does not exist in the form of a credit agreement, remains subject to negotiation and, therefore, cannot be approved by the Court.

### III.

### THE PROPOSED DIP FACILITY VIOLATES MLB GOVERNING DOCUMENTS AND APPLICABLE BANKRUPTCY RULES

36. The Club's execution of the Proposed DIP Facility without BOC approval violates express provisions of the MLB Governing Documents and contravenes relevant Bankruptcy rules. The Proposed DIP Facility should be denied on this basis alone.

---

[4] The Debtors did not even bother to give MLB Notice of the filing of these Chapter 11 cases.

37. Contrary to the Proposed DIP Facility, the MLB DIP Facility is tailored to align the Debtors' operational and financial management in these chapter 11 cases with their legal obligations under MLB Governing Documents. Thus, entry by the Debtors into the MLB DIP Facility will provide stability to the Debtors (and MLB) in the middle of the Baseball season, will lessen litigation cost, expense and distraction, and will be a critical step towards the Debtors' emergence from chapter 11.

### A. Compliance with MLB Governing Documents

38. The MLB Governing Documents require that the BOC review and approve any agreement that extends loans or other financial accommodations to a Major League Baseball club. MLB Ownership Guidelines at § III.

39. Los Angeles Dodgers LLC's own governing agreement recognizes this rule and requires BOC approval of loan agreements such as the Proposed DIP Facility. Under Section 3(b) of the Amended and Restated LLC Agreement of Los Angeles Dodgers LLC, dated May 11, 2005, (i) any grant of a security interest, pledge or other encumbrance of any interest in Los Angeles Dodgers LLC, any member thereof, or the Los Angeles Dodgers is subject to the MLB Governing Documents; (ii) any such security interest, pledge, or other encumbrance that requires the consent of the BOC "is prohibited and shall be null and void unless all applicable consents are obtained in advance"; and (iii) any such consent may be withheld at the sole and absolute discretion of the BOC.

40. In addition, the Debtors failed to seek, much less obtain, approval of the BOC for the Proposed DIP Facility, despite requirement of such approval under the MLB Ownership Guidelines for, among other things, the granting of liens on and security interests in property of

15

the Debtors. (Ownership Guidelines at § III; Term Sheet at pp. 2-3.) Failure to obtain this approval constitutes a default under the MLB Governing Documents that cannot be cured.

41. The Proposed DIP Facility also exceeds the proper scope of section 364 of the Bankruptcy Code by requiring the Debtors to seek approval of the Bankruptcy Court for a process to license the Debtors' broadcast media rights. (See Term Sheet at p. 6, "Milestones.") This process is specifically governed by MLB Governing Documents. Ownership Guidelines, § III. Moreover, it is an event of default under the Proposed DIP Facility if either: (a) the Debtors do not obtain entry of an order approving such process on or before July 29, 2011, or (b) the Debtors do not obtain entry of an order approving a transaction for those rights within 180 days thereafter.

B. **Prohibition on Assignment of Executory Contracts Without BOC Approval**

42. The Debtors' affiliation with MLB drives the vast bulk of the Debtors' economic value and is their single most important attribute. Indeed, the essence of the Club's value is its membership and participation in Major League Baseball, all of which derives from the benefits it receives and obligation to which it commits under the MLB Governing Documents. MLB presents -- and the Dodgers participate in -- an fixed annual schedule of 162 regular season games, produced in accordance with MLB format and rules, culminating in play-offs and ultimately the crowning of a World Series champion. The creation and exploitation of MLB baseball games requires -- and obtains value from -- the collective efforts of the BOC and all 30 of the member clubs. These games generate revenue for the league and the teams in various forms, including: (a) revenue shared among MLB clubs on account of national marketing, licensing, and broadcasting agreements; and, (b) revenue from tickets, parking, concessions and media rights related to MLB games and other MLB events. The Debtors enjoy the economic

16

benefits afforded them by the MLB Governing Documents only because they also are subject to the obligations, restrictions and responsibilities in those same agreements. These reciprocal rights and obligations render the MLB Governing Documents executory agreements for purposes of chapter 365 of the Bankruptcy Code. See 11 U.S.C. § 365. See, e.g., Enterprise Energy Corp. v. United States (In re Columbia Gas System Inc.), 50 F.3d 233, 239 (3d Cir. 1995); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989); see also Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. 439, 460 (1973). The Debtors' restructuring (in whatever form it takes) depends on continuing their lucrative association with MLB through assumption of MLB Governing Documents.

43. Section 365 (c) of the Bankruptcy Code states, in relevant part, that:

> The Trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignments of rights or delegation of duties, if –
>
> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
> (B) such party does not consent to such assumption or assignment

11 U.S.C. § 365(c). Thus, under section 365 of the Bankruptcy Code, the Debtors may neither assume nor assign their interests in the MLB Governing Documents without the consent of BOC. See In re Catapult Entertainment, Inc., 165 F.3d 747 (9th Cir. 1999); In re West Electronics, 852 F.2d 79 (3d Cir. 1988); In re Valley Media, Inc., 279 B.R. 105 (Bankr. D. Del. 2002); In re Access Beyond Technologies, Inc., 237 B.R. 32 (Bankr. D. Del. 1999). Moreover, the Major League Constitution permits BOC to terminate the Debtors' right to operate a Major League Baseball club as a result of the Debtors' commencement of these chapter 11 cases upon a vote of

75% of MLB teams. Major League Constitution at Art. VIII, § 4(l). Although section 365(e)(1) of the Bankruptcy Code generally restricts the effectiveness of such *ipso facto* clauses, that restriction does not apply to the BOC because the Major League Constitution satisfies section 365(e)(2) of the Bankruptcy Code. See 11 U.S.C. § 365(e)(2).

44. In order to assume the MLB Governing Documents and effectuate a successful reorganization, the Debtors will have to cure any default under the MLB Governing Documents that exists at the time those agreements are assumed. See 11 U.S.C. § 365(b)(1) ("If there has been a default in an executory contract or unexpired lease of the debtor, the Trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee – (A) cures, or provides adequate assurance that the trustee will promptly cure, such default....").

45. Because entry by the Debtors into the Proposed DIP Facility would constitute an uncurable breach of the MLB Governing Documents, approval of the Proposed DIP Facility is not in the best interests of the Debtors or their creditors.

46. Further, since the defaults cannot be cured, the MLB Governing Documents never can be assumed, making a successful reorganization for the Debtors impossible and permanently and materially impairing the value of the Debtors to the detriment of their creditors and other stakeholders. On this basis alone, the DIP Financing Motion should be denied.[5]

---

[5] BOC reserves all of its rights against the Debtors for the Debtors' failure to obtain BOC's consent to the commencement of these cases or to the Proposed DIP Facility, including its rights to terminate or modify the MLB Governing Documents with respect to the Debtors or exercise any other right or remedy afforded to it under the MLB Governing Documents. Any action levied by BOC, either in accordance with orders of this Court and compliance with the Bankruptcy Code or imposed as a condition to assumption of the MLB Governing Documents by the Debtors or their successors, may materially impair the value of the Debtors' estates and their ability to reorganize.

## IV.

## CONCLUSION

MLB offers a superior DIP financing facility that, based on its terms alone, should be selected by the Court. Further, MLB did not consent to the filing of these cases and does not consent to the Proposed DIP Facility. In the absence of such consent, and in the absence of a consensual path forward with MLB, this case will engender significant litigation regarding the ability of the Debtors to remain in possession and to reorganize over the objection of MLB. MLB is willing to support the Debtors' operations through the MLB DIP Facility in an effort to be part of the solution to the liquidity crisis the Debtors have created. Accordingly, MLB requests that the Court deny the DIP Financing Motion, grant the MLB DIP Facility, and grant MLB such other and further relief as the Court deems just.

Dated: June 28, 2011

**OFFICE OF THE COMMISSIONER OF BASEBALL**

BY: _____
Jeffrey M. Schlerf (DE ID No. 3047)
FOX ROTHSCHILD LLP
Citizens Bank Center
919 Market Street, Suite 1600
P.O. Box 2323
Wilmington, DE 19899-2323
(302) 654-7444
(302) 656-8920 (Fax)

-and-

Bradley I. Ruskin
Jeffrey W. Levitan
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969- 3000
(212) 969-2900 (Fax)

-and-

Mark K. Thomas
Jeremy T. Stillings
PROSKAUER ROSE LLP
70 West Madison, Suite 3800
Chicago, IL 60602-4342
(312) 962-3550
(312) 962-3551 (Fax)

-and-

Thomas E Lauria
Glenn M. Kurtz
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200
(212) 354-8113 (Fax)

*Counsel to MLB*