IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LOS ANGELES DODGERS LLC, et al.,[1] | ) | Case No. 11-12010-KG |
| | ) | |
| Debtors. | ) | Joint Administration Requested |

**REPLY IN SUPPORT OF DEBTORS' EMERGENCY MOTION
FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS
TO OBTAIN POSTPETITION FINANCING PURSUANT
TO 11 U.S.C. §§ 105, 362, AND 364, AND (II) SCHEDULING
A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c)**

The Debtors submit this reply in support of their DIP Motion and in response to the objection filed by the Office of the Commissioner of Major League Baseball (the "Commissioner").[2]

## INTRODUCTION

Beginning with its very first sentence, the Commissioner's Objection reveals a deep-seated animus against the Debtors and their owner. Dripping with vitriol, the Objection makes dozens of allegations, yet contains no evidence. And at its core, the Objection reveals the overarching desire of the Commissioner to exert a stranglehold over the Debtors and their operations, to the exclusion of this Court and to the detriment of stakeholders.

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number are: Los Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567); LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029). The location of the Debtors' corporate headquarters and the service address for the Debtors is: 1000 Elysian Park Avenue, Los Angeles, California 90012.

[2] *Emergency Motion For Interim And Final Orders (I) Authorizing Debtors To Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 362, And 364, And (II) Scheduling A Final Hearing Pursuant To Bankruptcy Rules 4001(b) And 4001(c)* (the "DIP Motion") [D.I. 13]. Capitalized terms not otherwise defined here have the meanings given to them in the Motion.

In particular, the Commissioner asserts that he has absolute veto power – to be exercised in his "sole and absolute discretion" – over any financing provided to the Debtors. Obj. ¶¶ 38-41. The Commissioner then attempts to exploit that alleged veto power by trying to force upon the Debtors an alternative financing – not coincidentally to be provided by Major League Baseball itself – that would give the Commissioner "sole and absolute discretion" over the Debtors' budget, that would default upon any violation of Major League Baseball's "rules and regulations", that would require the Debtors to fund all of the legal and professional fees and expenses of the Commissioner and Major League Baseball (not just in its capacity as proposed lender but in all capacities, including as a litigant against the Debtors), and to provide a broad indemnity to the Commissioner and Major League Baseball.

The Commissioner's financing proposal is nothing other than a thinly-veiled effort to take total control over the Debtors and these cases. It is clearly inferior to the DIP Facility subject to the DIP Motion. As shown below, nothing in the Bankruptcy Code compels the Debtors to accept financing from an avowed adversary, and the law provides for deference to the Debtors' business judgment in this regard.

As the Commissioner agrees, one thing is clear: "the most important task [to be] addressed [is] making sure that the Los Angeles Dodgers have sufficient liquidity to continue operations on an uninterrupted basis." Obj. ¶ 7. The proposed DIP Facility accomplishes that task and the DIP Motion should be approved.

## BACKGROUND

As set forth more fully in the DIP Motion and the *Declaration Of Jeffrey J. Ingram In Support Of Debtors Chapter 11 Petitions And First Day Motions*, the Debtors commenced these

cases largely to address liquidity issues relating to near-term payroll and other commitments. By the Motion, the Debtors seek approval of the DIP Facility to be funded by the DIP Lenders, which will provide financing to address those commitments and enable the Debtors to reorganize quickly and efficiently.

The Debtors' liquidity issues were caused in large part by the Commissioner. Prior to the petition date, the Debtors negotiated the Proposed Fox Transaction, which was to provide an immediate infusion of hundreds of millions of dollars in cash – more than enough to have satisfied all near-term commitments and to have obviated any need for these bankruptcy cases. Unfortunately, the Commissioner vetoed the Proposed Fox Transaction at the eleventh hour, leaving the Debtors with no choice but to seek alternative financing under the auspices of the Bankruptcy Code.

In fact, it is no secret that the Commissioner is eager to force a change of ownership of the Debtors, and has engaged in what has been reported to be "an effort to keep [Mr.] McCourt from controlling the Dodgers in bankruptcy." *See, e.g.*, L.A. TIMES, *In Filing for Bankruptcy, Dodgers Will Ask the Judge to Override MLB Rules*, June 27, 2011. The Commissioner's efforts seem to be driven by a personal animosity towards Mr. McCourt that unbiased observers have recognized as being "unprecedented." *See, e.g.*, L.A. TIMES, *Legal Rights of Major League Baseball In Question in Dodgers Bankruptcy Case*, June 27, 2011 (quoting Robert K. Rasmussen, USC Law School Dean: "I do think the current ownership of the Dodgers has gotten crossways with MLB in a way that is pretty much unprecedented. Normally, it is a pretty clubby group, the owners. This is certainly the exception.").[3]

---

[3] The Commissioner's personal animus toward the Debtors and their owner is displayed throughout the Objection. *See, e.g.*, Obj. ¶ 1 ("siphoned off $100 million"); ¶ 6 ("pursuing his own financial interests at the expense of the Club"); ¶ 18 ("lavish lifestyle"); ¶ 33 ("Los Angeles Dodgers cannot meet payroll because of Mr.

Prepetition, the Commissioner methodically acted to cut off the Debtors' financing options (including the Proposed Fox Transaction) until the Debtors were left with a stark choice: a distressed sale of the team to a buyer approved by the Commissioner or a bankruptcy filing. Amazingly, now that the Debtors have chosen to protect themselves by filing a bankruptcy case rather than acceding to the Commissioner's unreasonable demands, the Commissioner has made a last-minute financing proposal of his own.

Specifically, last night the Commissioner sent to the Debtors a term sheet for an alternative debtor in possession facility (to be provided by "Baseball Finance LLC") and suggested that it should be the Commissioner (who is not in the business of providing DIP financing or lending money generally) and not the DIP Lenders (who are) to provide the liquidity in bankruptcy that the Commissioner effectively denied the Debtors outside of bankruptcy. The term sheet would give the Commissioner "sole and absolute discretion" over the Debtors' budget, would require the Debtors to fund all of the legal and professional fees and expenses of the Commissioner and Major League Baseball (not just in its capacity as proposed lender but in all capacities, including as a litigant against the Debtors), and would provide a broad indemnity to the Commissioner and Major League Baseball.

As set forth below, this transparently-strategic ploy provides no basis for denying or modifying the relief requested in the Motion or otherwise questioning the Debtors' business judgment in preferring the DIP Facility provided by the DIP Lenders.

---

McCourt's financial mismanagement, extreme leveraging, [and] personal distributions made for his own benefit at the Club's expense").

# ARGUMENT

The Debtors' choice of a lender to provide postpetition financing is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

In the exercise of their sound business judgment, the Debtors have determined that it would be imprudent and unwise to let the Commissioner control the purse strings of these cases (in his "sole and absolute discretion"), particularly when financing on competitive terms is available from the independent DIP Lenders, who lack the agenda and animus of the Commissioner. The simple fact is that the Commissioner has poisoned the relationship between the Debtors and Major League Baseball, and the inescapable conclusion from the Objection and otherwise is that the Commissioner will stop at nothing to force a change of ownership of the Debtors.

The Debtors have no obligation to accept financing from such a determined adversary. To the contrary, courts recognize that "a business decision to obtain credit from a particular lender is almost never based purely on economic terms." *In re ION Media Networks, Inc.*, 2009 Bankr. LEXIS 1700, *13-14 (Bankr. S.D.N.Y. July 6, 2009), a copy of which is attached as *Exhibit A*. The exercise of business judgment requires the Debtors to consider other relevant features of the financing, "including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization."

*Id.* "This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan." *Id.* Simply put, in the context of debtor-in-possession financing:

> ***that which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.***

*Id.* (emphasis added).

Application of the business judgment rule is particularly applicable here. As evidenced by the Proposed Fox Transaction, the Debtors are indisputably solvent – by hundreds of millions of dollars. The Commissioner concedes this. In such a situation, the interests of the Debtors and their equity owners become even more important, as creditors are certain to be paid in full regardless of the terms of the financing during the bankruptcy case.

Moreover, unlike the DIP Lenders (who were selected by the Debtors following an extensive search and an arm's-length negotiation), the Commissioner has no legitimate financial interest in providing debtor in possession financing. Its only interest is strategic and, hence, illegitimate. In fact, it appears that one overarching objective of the Commissioner is to have the Debtors foot the bill for all of the Commissioner's and all of Major League Baseball's "legal and other professional fees" associated not only with the financing transaction but also with "the Debtors or the [bankruptcy] Case", as required by a provision hidden away in the Commissioner's Term Sheet. Given that the Commissioner is in the midst of a legal war against the Debtors – one that certainly will spill over to this Court – the demand for such payment is truly remarkable.

The Debtors' concerns about the Commissioner are not new and are not a pretext. In fact, the Debtors were so concerned that the Commissioner would attempt to seize control over the bankruptcy cases by taking on the position of financier that they insisted that the DIP Facility provided by the DIP Lenders contain terms prohibiting the DIP Lenders from assigning the financing to the Commissioner, Major League Baseball or any of its teams (a condition that the Commissioner naturally excised from his own proposal).

The Debtors' concerns about the Commissioner are legitimate, long standing, and well founded, and provide ample grounds for the Debtors' business judgment in preferring the DIP Facility of the DIP Lenders to the camel-under-the-tent proposal of the Commissioner.

## CONCLUSION

Based on the foregoing, the Court should uphold the exercise of the Debtors' business judgment, overrule the Commissioner's Objection, and approve the DIP Motion.

| Dated: June 28, 2011 Wilmington, Delaware | YOUNG CONAWAY STARGATT & TAYLOR, LLP *[signature]* |
|---|---|
| | Robert S. Brady (No. 2847) Donald J. Bowman, Jr. (No. 4383) The Brandywine Building – 17th Floor 1000 West Street, Post Office Box 391 Wilmington, Delaware 19899 Telephone: (302) 571-6600 Facsimile: (302) 571-1253 -and- DEWEY & LEBOEUF LLP Bruce Bennett Sidney P. Levinson (*pro hac vice applications forthcoming*) 333 South Grand Avenue, Suite 2600 Los Angeles, California 90071 Telephone: (213) 621-6000 Facsimile: (213) 621-6100 -and- DEWEY & LEBOEUF LLP Martin J. Bienenstock Philip M. Abelson (*pro hac vice applications forthcoming*) 1301 Avenue of the Americas New York, New York 10019 Telephone: (212) 259-8000 Facsimile: (212) 259-6333 *Proposed Co-Counsel for LAD and LAD in Possession* |

# Exhibit A



In re: ION MEDIA NETWORKS, INC., et al., Debtors.

Chapter 11, Case No. 09-13125 (JMP), Jointly Administered

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2009 Bankr. LEXIS 1700

July 6, 2009, Decided

COUNSEL: [*1] For Debtors and Debtors in Possession: Jonathan S. Henes, Esq., Joshua Sussberg, Esq., KIRKLAND & ELLIS LLP, New York, New York.

For Cyrus Select Opportunities Master Fund Ltd.: Thomas E. Lauria, Esq., Gerard Uzi, Esq., WHITE & CASE LLP, New York, New York.

Sharon L. Levine, Esq., Wojciech F. Jung, Esq., LOWENSTEIN SANDLER PC, Roseland, NJ.

Mark I. Bane, Esq., ROPES & GRAY LLP, New York, New York.

JUDGES: HONORABLE JAMES M. PECK, UNITED STATES BANKRUPTCY JUDGE.

OPINION BY: JAMES M. PECK

OPINION

MEMORANDUM DECISION DENYING MOTION BY CYRUS SELECT OPPORTUNITIES MASTER FUND LTD TO RECONSIDER ORAL RULING REGARDING THE DEBTORS' MOTION FOR A FINAL ORDER APPROVING DEBTOR-IN-POSSESSION FINANCING

JAMES M. PECK

UNITED STATES BANKRUPTCY JUDGE

*Introduction*

Cyrus Select Opportunities Master Fund Ltd. ("Cyrus") has brought a Motion (the "Motion") seeking reconsideration of the Court's bench ruling delivered at the conclusion of a hearing (the "Hearing") held on July 1 approving debtor-in-possession financing proposed by a group of the Debtors' First Lien Lenders (the "DIP Financing") and overruling Cyrus's opposition to such financing. The Motion was filed on July 2, 2009, the day after the Hearing. The Official Committee of Unsecured [*2] Creditors (the "Committee") filed a joinder to the Motion on July 5, 2009.

Cyrus indicates in the Motion that, in light of the Court's oral ruling, it has reconsidered its own stated position during the Hearing and is prepared now to remove a due diligence contingency applicable to its own competing financing proposal (the "Cyrus Proposal"). Cyrus decided after the Hearing to further sweeten its bid to be chosen as the DIP lender. The Motion asserts that its diligence requirement appears to have been the main reason that the Court sided with the First Lien Lenders at the Hearing and argues for reconsideration contending that the Cyrus financing proposal includes measurably better economic terms and has become clearly superior to the DIP Financing due to the recent elimination of the diligence risk.

In approving the DIP Financing, the Court endorsed a process undertaken by the Debtors in conjunction with their counsel and financial advisors to negotiate financing on the best terms that were available under the circumstances. Evidence presented during the Hearing supports the conclusion that the Cyrus Proposal, while including a number of material terms that are economically superior to [*3] the existing DIP Financing, included certain risk factors, a major one being the risk that the

financing would not close due to the diligence contingency. But this was not the only source of risk considered by the Debtors in evaluating the competing proposals or by the Court in rendering its decision.

Other factors included the risk of a priming fight with the First Lien Lenders and the impact of an intercreditor agreement between the First Lien Lenders and second lien lenders such as Cyrus purporting to restrict the ability of Cyrus to object to DIP financing offered by the First Lien Lenders. These factors, and the desire to secure financing without further delay and uncertainty, combined to support the business decision of the Debtors to seek approval of the DIP Financing.

Cyrus' election to waive the diligence contingency one day after the close of the record may well be a sincere last-ditch attempt to become a viable alternative source of financing, but this strong indication of interest by Cyrus comes too late in what has already become an unusually protracted process to secure workable financing for these Debtors. Given the other factors considered by the Debtors in selecting [*4] the DIP Financing, the fact that Cyrus could have acted earlier to eliminate the diligence requirement and the Debtors' need to move forward without delay with its plans to acquire programming content for the upcoming television season, this latest move by Cyrus does not constitute sufficient cause for the Court to reconsider its bench ruling. Accordingly, the Motion is denied as explained in greater detail below.

*Background*

The Debtors own the largest group of broadcast television stations in the United States. These stations are operated as a nationwide integrated programming network known as "ION Television". The network's programming lineup consists mainly of syndicated TV series, feature films and a limited amount of other entertainment and sports programming. The stations also broadcast so-called infomercials. Revenue is derived from these infomercials and from commercial advertising sales.

During the First Day hearings that took place on May 19, 2009, Debtors sought approval of a DIP Financing proposal offered by certain of its First Lien Lenders. This financing package, negotiated before the filing date, included a variety of terms and conditions that the Court thought to be undesirable, [*5] particularly those provisions that elevated the priority of $ 150 million in prepetition debt held by the lenders and that imposed an extremely tight timetable for developing a plan acceptable to these First Lien Lenders. Certain other holders of first lien indebtedness appeared through counsel at the initial hearing on the financing to complain that they had not been consulted regarding the financing and to indicate a willingness to consider providing financing on more favorable terms.

Following a period of active negotiations with competing groups of holders of the first lien indebtedness as detailed in the supplemental declarations of Brandon Burgess and Steven G, Panagos [1], the Debtors determined that the revised DIP Financing proposed by the First Lien Lenders represented significantly improved financing and sought approval of this new financing facility.

> 1 Debtors filed these supplemental declarations on July 1. These declarations were offered into evidence at the Hearing held later that day and, despite cross-examination of these witnesses by counsel for Cyrus, the substance of both declarations is uncontroverted. These declarations provide the factual basis for the rulings made [*6] on July 1 and for this memorandum decision.

On June 15, 2009, Cyrus filed a limited objection to this DIP financing motion. Cyrus, a holder of second lien debt, asserted that certain special purpose subsidiaries (the "License Subsidiaries") of ION Media Networks, Inc. ("ION") have rights in broadcasting and other licensees, authorizations, waivers and permits issued by the FCC. Cyrus argued that the License Subsidiaries should remain unencumbered and should not be allowed to enter into the proposed DIP Financing, guaranty the financing or grant liens in connection with the financing because, according to Cyrus, these entities will not be benefiting from the DIP advances to the Debtors' operating companies.

On June 29, 2009, Cyrus provided ION with a commitment for DIP financing on substantially the same terms as that offered by the First Lien Lenders with a few specific changes, including: (a) the institution of a marshalling mechanism that requires the DIP financing to be paid first from the non-FCC license-holding debtor entities, (b) pro rata participation in the DIP financing for all existing first lien lenders, *provided* that $ 30 million is reserved for Cyrus [2]; (c) reduction of [*7] the applicable margin from L+1200 bps to L+1000 bps (and from L+1300 bps to L+1100 bps after the effectiveness of the facility extension option); and (d) a reduction in the total percentage of equity Cyrus will receive (i.e., less than 56.25% in the aggregate) if ION opts to convert the DIP to equity in connection with the effectiveness of a plan. Significantly, at the time (two days before the Hearing), the Cyrus financing commitment was subject to satisfactory completion of certain diligence.

> 2 Cyrus' counsel announced during the Hearing that Cyrus would remove this required minimum participation in the facility.

Although the Cyrus proposal included features that were more favorable from an economic point of view, ION and its advisors concluded that the DIP Financing proposed by the First Lien Lenders was the only logical source of financing. This conclusion was influenced by the fact that more than 88% of the First Lien Lenders had agreed either to support or not to object to the financing. Such consensus among the constituency of the First Lien Lenders was significant to ION's advisors because the financing was available only on a priming basis and the First Lien Lenders would not [*8] consent to be primed by any other proposed lender. This meant that the financing could be obtained with reasonable certainty and without the risks and distractions of a priming fight.

The Committee objected to various terms of the DIP Financing but ultimately withdrew its objections to the financing at the Hearing due to a number of last minute concessions made to accommodate the Committee. Thus, at the Hearing, Debtors and the Committee were aligned [3], and Cyrus was the only party that objected to the DIP Financing. Cyrus, through its counsel, argued that its alternative financing was superior, that it was improper and potentially prejudicial to the second lien lenders for the License Subsidiaries to become burdened with DIP indebtedness, that there was no real urgency to approve the financing because ION presently had sufficient liquidity to maintain its operations and could obtain certain programming (i.e. infomercials) at little or no out of pocket cost, and that additional time was needed for a review of ION's business plan by Debtors' creditor constituencies.

> 3 The Committee has switched sides and now joins in the Motion, presumably because the Cyrus Proposal includes a higher carveout [*9] for the Committee's professionals and other more favorable provisions. For the reasons noted, the Committee's support is understandable, but not helpful. This matter has already been fully litigated, and it is too late for the Committee to throw its support to Cyrus.

Counsel for Cyrus cross-examined Mr. Burgess at length regarding the License Subsidiaries. Mr. Burgess testified that ION operated an integrated business and that the Debtors' broadcast operations and programming were needed to maintain the FCC licenses held by the License Subsidiaries. That testimony supports the conclusion that using the proceeds of the DIP Financing to acquire new and varied programming content not only will help the Debtors to attract advertising dollars and fulfill the objectives of the ION business plan but will, coincidentally, help the Debtors to preserve the assets of the License Subsidiaries. The License Subsidiaries will receive an indirect benefit from the improved performance of Debtors' broadcasting operations. Further, delay is detrimental to the future success of these operations, and the DIP Financing is needed immediately so that ION can acquire new programming for its fall schedule.

Cyrus, [*10] through its counsel, also questioned Mr. Panagos of Moelis & Co. regarding the negotiations that lead to the selection of the DIP Financing proposal offered by the First Lien Lenders. Mr. Panagos confirmed that the financing as it has evolved is significantly better than the financing that had been proposed as of the commencement of the bankruptcy cases and acknowledged that the Cyrus proposal was superior to the current iteration of the DIP Financing from an economic perspective. He noted that the diligence condition was a source of concern, however, given the risk that Cyrus had reserved the right to refuse to lend after examining requested materials relating to ION's financial condition and performance. Mr. Panagos also indicated that avoiding a priming fight was an important factor in ION's decision to opt for financing from the First Lien Lenders.

Cyrus knew throughout the Hearing that the diligence condition in its competing financing proposal was a problem. In argument, counsel tried to minimize the impact and severity of the risk by suggesting that a delay of a few days to accommodate the need to review information regarding ION, particularly at the time of the July 4th Holiday, [*11] should have little impact on the Debtors' ability to acquire new programming. At no time during the Hearing did Cyrus indicate any willingness to waive the condition. And even if it had done so, it is not known whether Debtors would have decided to reconsider its business decision regarding the DIP Financing in view of potential complications relating to both a foreseeable contest over priming and the risk of ancillary litigation due to claimed breaches by Cyrus of Section 11.3 of the intercreditor agreement [4]

> 4 During colloquy with counsel for Cyrus and the First Lien Lenders, the Court asked about the enforceability of the limitations imposed under the intercreditor agreement. The responses indicate that (i) Cyrus believes its competing DIP proposal is permitted under the agreement so long as it is not characterized as an objection to the DIP Financing proposed by the First Lien Lenders and (ii) the First Lien Lenders dispute the right of any second lien lender to compete for a DIP financing that is otherwise acceptable to ION. The potential for intercreditor litigation is more than merely theoretical here and may be

brought in any court of competent jurisdiction, including the bankruptcy [*12] court.

*Discussion*

Pursuant to *Bankruptcy Rule 9023, Federal Rule 59(e)* and *Local Rule 9023-1*, in order to be entitled to relief, a party must demonstrate "that the court overlooked controlling decisions or factual matters 'that might materially have influenced its earlier decision.'" *In re Best Payphones, Inc.*, 2007 Bankr. LEXIS 266, 2007 WL 203980, *5 (Bankr. S.D.N.Y. 2007) (quoting *Anglo American Ins. Group, P.L.C. v. CalFed Inc.*, 940 F.Supp. 554, 557 (S.D.N.Y. 1996)). "Alternatively, the movant must demonstrate the need to correct a clear error or prevent manifest injustice." *Griffin Indus., Inc. v. Petrojam, Ltd.*, 72 F. Supp. 2d 365, 368 (S.D.N.Y. 1999). See also *In re Interbank Funding Corp.*, 2007 Bankr. LEXIS 2482, 2007 WL 2080512, *2 (Bankr. S.D.N.Y. 2007) (denying a motion for reconsideration because movant failed to "demonstrate any manifest errors or injustice, newly discovered evidence or change in controlling law"); *In re Adelphia Business Solutions, Inc.*, 2002 Bankr. LEXIS 1604, 2002 WL 31557665, *1 (Bankr. S.D.N.Y. 2002) (denying a motion for reargument for failure to identify factual matters or decisions that the court overlooked).

As Chief Judge Bernstein noted, "[t]he rule permitting reargument must be narrowly construed to avoid repetitive [*13] arguments on issues that the court has already fully considered. Further, the parties cannot advance new facts or arguments, and may not submit affidavits or new material." *In re Stylesite Marketing, Inc.*, 2001 WL 13212, *1 (Bankr. S.D.N.Y. 2001). "This rule is calculated to 'insure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters.'" *In re Jamesway Corp.*, 203 B.R. 543, 546 (Bankr. S.D.N.Y. 1996) (quoting *Carolco Pictures, Inc. v. Sirota*, 700 F.Supp. 169, 170 (S.D.N.Y. 1988)).

Cyrus has failed to show cause to reconsider the bench ruling of July 1 that approved Debtors' amended DIP Financing from the First Lien Lenders [5]. Cyrus has not demonstrated any errors or injustice, nor has Cyrus demonstrated any newly discovered evidence. Newly discovered evidence pursuant to *Rule 59* is "evidence which was in existence at the time of trial of which the moving party was excusably ignorant." *In re Crozier Bros., Inc.*, 60 B.R. 683, 688 (Bankr. S.D.N.Y. 1986). Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible [*14] terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

5 A form of Order approving the DIP Financing was entered on July 6, 2009. (ECF doc. # 142).

The Motion rather simplistically assumes that waiving of the diligence condition should constitute sufficient cause to reopen the issues that were resolved last week at the Hearing. The mistaken assumption is that the Court's ruling was predicated exclusively on the existence of Cyrus's diligence condition. That was certainly one of the reasons for the decision, but it was not the only one. [*15] The ruling relied on the facts as they existed at the time, including the judgment of the Debtors and their advisors regarding the benefits of a financing provided by a significant percentage of the class of First Lien Lenders. The Cyrus offer was not competitive during the Hearing because of the lack of an enforceable financing commitment and the ability of Cyrus to walk from the transaction in its sole discretion after conducting its diligence. The fact that Cyrus has changed its mind does not necessarily change the outcome of the Debtors' deliberative process.

If the Debtors wish to reconsider their business decision because Cyrus is so eager to lend that it has decided to drop demands for diligence, that is a matter appropriately left to the discretion of the Debtors' management and advisory team. The Committee has a statutory right to be consulted, but the decision rests with the debtor-in-possession. Reconsideration may be possible here, but only if ION requests it. The Motion does not allege that the Court made any mistakes as to the law or the facts or failed to understand the evidence presented. Instead, it seeks a second bite at the financing apple on account of Cyrus's own [*16] decision to make its competitive offer more attractive *after* the Hearing.

The DIP Financing is the product of a long process of arms length negotiation, and it is time for that process to end. The Court's ruling at the Hearing was based on the facts as they existed on July 1. The changed circumstances presented in the Motion eliminate one financing contingency but do not amount to cause to reconsider the ruling. That ruling will not be disturbed unless the Debtors choose to substitute the Cyrus financing (or another alternative deemed to be superior) for the one that has

already been approved by the Court. The Motion is denied.

SO ORDERED.

Dated: New York, New York

July 6, 2009

/s/ James M. Peck

HONORABLE JAMES M. PECK

UNITED STATES BANKRUPTCY JUDGE