**<u>EXHIBIT A</u>**

**Utility Motion**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LOS ANGELES DODGERS LLC, *et al.*,[1] | ) | Case No. 11- _12010_ ( _ ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**LOS ANGELES DODGERS LLC'S MOTION FOR INTERIM AND FINAL ORDERS
(I) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR
DISCONTINUING UTILITY SERVICES, (II) APPROVING LOS ANGELES DODGERS
LLC'S PROPOSED FORM OF ADEQUATE ASSURANCE, (III) ESTABLISHING
PROCEDURES FOR RESOLVING OBJECTIONS THERETO BY UTILITY
COMPANIES, AND (IV) SCHEDULING A FINAL HEARING THEREON**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Los Angeles Dodgers LLC, a debtor and debtor in possession in these chapter 11 cases

("LAD"), hereby requests by this motion (the "Motion") entry of an interim order, substantially

in the form attached hereto as Exhibit B (the "Interim Order"), and a final order, substantially in

the form attached hereto as Exhibit C (the "Final Order"), pursuant to section 366 of title 11 of

the United States Code (the "Bankruptcy Code"): (i) prohibiting Utility Companies (as defined

herein) from altering, refusing, or discontinuing services as a result of the commencement of

LAD's chapter 11 case or unpaid prepetition invoices, including the making of demands for

security deposits or accelerated payment terms; (ii) approving LAD's proposed form of adequate

assurance; (iii) establishing procedures for resolving objections thereto by Utility Companies;

and (iv) scheduling a final hearing (the "Final Hearing") to consider granting the relief requested

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number are: Los
Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567);
LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029). The location of the Debtors'
corporate headquarters and the service address for the Debtors is: 1000 Elysian Park Avenue, Los Angeles,
California 90012.

6
6/27/11

herein on a final basis.  In support of this Motion, LAD relies upon and incorporates by reference

the *Declaration of Jeffrey J. Ingram in Support of Debtors' Chapter 11 Petitions and First Day*

*Motions* (the "Ingram Declaration"), which was filed with the Court concurrently herewith.  In

further support of the Motion, LAD, by and through its undersigned proposed co-counsel,

respectfully represents as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue before this Court is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested

herein is section 366 of the Bankruptcy Code.

2.      No previous request for the relief requested herein has been made to this Court or

any other court.

## BACKGROUND

3.      On June 26, 2011 (the "Commencement Date"), LAD filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code.

4.      LAD intends to continue in the possession of its properties and the management

of its businesses as a debtor in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

5.      As of the date hereof, no trustee or examiner has been appointed in this chapter 11

case, and no committees have been appointed or designated.

**A.      Ownership Structure**

6.      LAD operates a professional major league baseball club located in the

Los Angeles metropolitan area.  The club's membership in Major League Baseball ("MLB") is

described in the Major League Constitution (the "Major League Constitution"), as assumed by LAD pursuant to an Assumption Agreement, dated as of February 13, 2004.[2]

7.      LAD is a Delaware limited liability company, whose sole member is debtor Los Angeles Dodgers Holding Company LLC ("LAD Holding"), also a Delaware limited liability company.  LAD Holding's sole member is debtor LA Holdco LLC ("HoldCo"), also a Delaware limited liability company.  Both LAD Holding and HoldCo are holding companies with no operating assets.  As described further below, HoldCo is the sole member of debtor LA Real Estate Holding Company LLC ("RealCo Holding"), a Delaware limited liability company.  RealCo Holding is the sole member of LA Real Estate LLC ("RealCo"), a Delaware limited liability company that owns Dodger Stadium and the real estate upon which it is located, as well as Dodger Tickets LLC ("Tickets"), a Delaware limited liability company that owns the right to receive future ticket revenue from Dodger games at Dodger Stadium.  HoldCo is a wholly owned subsidiary of LA Partners LLC ("LA Partners"), which in turn is a wholly owned subsidiary of The McCourt-Broderick Limited Partnership ("TMBLP"), a Massachusetts limited partnership.  TMBLP is the sole member of Blue Landco LLC ("Blue Land"), a Delaware limited liability company that owns the parking lots surrounding Dodgers Stadium.  Frank H. McCourt, Jr. ("Mr. McCourt") is the sole limited partner of TMBLP and owns a 90% interest, with the remaining 10% interest owned by TMBLP's sole general partner, The McCourt Company, Inc., a Delaware corporation.  None of the parents of HoldCo are debtors in these chapter 11 cases.

**B.      Major League Baseball**

8.      The Office of the Baseball Commissioner (the "Commissioner's Office") is an unincorporated association also doing business as Major League Baseball ("MLB") that has as

---

[2]      None of the other Debtors are a party to the Major League Constitution nor do they have any role in the operation of the baseball club.

its members thirty baseball clubs. Those clubs are divided into two leagues, the American

League and the National League (the Dodgers are in the West division of the National League).

The commissioner of baseball, Allan H. "Bud" Selig (the "Commissioner"), serves as the chief

executive officer of Major League Baseball.

C.    **The Los Angeles Dodgers Baseball Club**

9.    The Los Angeles Dodgers have a storied history that dates back to the late 1800's.

Originally located in Brooklyn, New York, the Dodgers moved to Los Angeles in 1958. Before

doing so, the Dodgers broke baseball's color barrier by signing Jackie Robinson in 1945. In

1962, the Los Angeles Dodgers moved into their new home at Dodger Stadium, where they

continue to play. The Dodgers have won six World Series championships (five in Los Angeles),

the most recent of which occurred in 1988.

D.    **The 2004 Acquisition**

10.    The Dodgers were acquired by Fox Entertainment Group, Inc. ("Fox Group") in

1998. After creating a Regional Sports Network ("RSN") associated with the Dodgers, Fox

Group made the decision in 2003 to sell the team and the real estate where the stadium and

parking lots are located.

11.    Following a sale process, the winning bidder for the assets was Mr. McCourt, who

in early 2004 became the owner of the Los Angeles Dodgers, as well as the other assets owned

by Fox Group (the "Acquisition"). The purchase by Mr. McCourt, which was unanimously

approved by Major League Baseball and supported by the Commissioner, was consummated

under two separate agreements. Pursuant to one agreement, Mr. McCourt paid $330 million to

purchase the Los Angeles Dodgers. Under a separate agreement, Mr. McCourt paid

$100 million to acquire the real estate consisting of Dodger Stadium, the land under the stadium, and about 250 acres of land surrounding the stadium that includes the parking lots.

12.    Under the terms of the Acquisition, the land purchased by Mr. McCourt, including Dodger Stadium and the surrounding parking lots, became an asset of RealCo. Pursuant to a lease agreement between RealCo and LAD executed in 2004, RealCo agreed to lease both the land and the stadium, along with granting associated rights, for a term of 38 years.

13.    A portion of the purchase price for the Acquisition ($125 million) was financed by Fox Group pursuant to a two year loan made to an affiliate of Mr. McCourt. To secure repayment, Mr. McCourt provided, as collateral, 24 acres of undeveloped real estate in the Boston seaport district. The contribution of that property was, at the time of the Acquisition, treated as an equity contribution to fund a large portion of the aggregate purchase price paid under the Acquisition. Two years after the Acquisition, Mr. McCourt transferred that valuable real property to Fox Group in satisfaction of the $125 million repayment obligation.

E.    **Subsequent Financing Transactions**

14.    In May 2005, HoldCo reorganized its subsidiary operations and formed Tickets, which became a subsidiary of RealCo. RealCo and LAD amended their lease agreement to provide for RealCo to lease Dodger Stadium and the underlying land to Tickets, which then subleased the stadium to LAD with the notable exception of the general admission seats. Those seats are not subleased, and tickets for these seats are sold by Tickets, thereby enabling Tickets to earn revenue from Dodger home games.

15.    As part of the reorganization, Tickets entered into two securitization financing transactions. The first, in 2005, generated $250 million that were used to permanently refinance debt incurred under the Acquisition on favorable terms. The second transaction, in 2007,

generated $140 million, which was primarily used to pay the cost of upgrading Dodger Stadium and to reimburse LAD for costs that it had incurred to upgrade the stadium. The improvements made included (a) replacement of all of the seats in the stadium, (b) a new playing surface, (c) drainage improvements, (d) expansion of concession space, (e) reconfiguration of parking lots to improve traffic flow, (f) expansion of the Dugout Club, (g) renovation of the Stadium Club, (h) creation of two new Baseline Box Clubs, (i) significant upgrades to the video in-game experience, and (j) completion of numerous structural and seismic upgrades. Both financing transactions involved the securitization of the income stream from future ticket sales. Importantly, the Commissioner and Major League Baseball approved the formation of Tickets as a wholly owned subsidiary of HoldCo, as well as the securitization of the ticket income stream.

16.    In 2006, RealCo transferred the parking lots and other land surrounding Dodger Stadium (but not Dodger Stadium itself or the land on which the stadium is located) to Blue Land.[3]

**F.    Improved On Field and Off Field Performance Since 2004**

17.    Under Mr. McCourt's stewardship, the 2004 Dodgers won their first playoff game in sixteen years, advanced to back-to-back National League Championship Series (2008 and 2009) for the first time in over 30 years, and appeared in the post-season four times in a six year period for the first time ever since moving to Los Angeles in 1958. During this time period, benefitting from the team's success and the renovation of the stadium, the Dodgers enjoyed

---

[3]    To facilitate that transaction, the boundary lines of the existing parcels were changed in order to enable the stadium and the land under the stadium to be a single parcel that continued to serve as collateral for the financing provided to Tickets. The surrounding land was released from that mortgage. Blue Land borrowed $60 million, secured by the surrounding property, of which $10 million was contributed to LAD. Subsequently, Blue Land borrowed an additional $10 million to purchase an additional parcel of land, which is owned by Blue Land's wholly owned subsidiary, McCourt College Street LLC. Blue Land currently owes $67 million in debt which is scheduled to mature on June 30, 2011.

consistently high attendance for home games. During the 2009 season, the Dodgers drew 3.8 million fans, the highest attendance in Major League Baseball.

18.     The Dodgers also recently opened a new state-of-the-art spring training facility in Arizona – a 13,000 person stadium that it shares with the Chicago White Sox. LAD and Chicago White Sox Ltd. are equal members in Camelback Spring Training LLC, a Delaware limited liability company, which operates the facility.

**G.     Sources of Revenue**

19.     LAD's primary sources of revenues from the operation of the baseball club consist of the following:

Entertainment Fee.  LAD is paid an entertainment fee by RealCo in connection with providing entertainment at Dodger home games. The entertainment fee is paid from proceeds of ticket sales by Tickets.

Broadcasting Rights.  LAD receives payments for the licensing of rights to broadcast their games on television (both over the air and by cable television) and on the radio. Currently, LAD is party to a telecast agreement (the "Fox Telecast Agreement") with Fox Sports Net West 2, LLC ("Fox Sports 2"), under which Fox Sports 2 has been granted exclusive cable television rights until the end of the 2013 baseball season. LAD has separate agreements to broadcast games on television and radio.

Sponsorship and Advertising.  A substantial portion of revenues is derived from sponsorship and advertising. LAD's major corporate sponsors include Best Buy, Anheuser-Busch, Coca-Cola, Bank of America, United Airlines, and Time Warner.

Concession Income.  LAD receives substantial revenue from concessionaires who are authorized to sell food/beverages and souvenirs, both at Dodger Stadium and online.

Major League Central Fund. LAD also is entitled to receive payments indirectly from the Major League central fund ("MLCF"), which generates income primarily through national telecasting and radio broadcasting revenue. LAD's interest in that revenue is owned by Dodgers Club Trust, a Delaware statutory trust that is 90% owned by LAD and 10% owned by Major League Baseball. The Dodgers Club Trust is party to various credit agreements, evidencing loans secured by the monies payable by MLCF to Dodgers Club Trust and by Dodgers Club Trust to LAD. The outstanding balance of the loans to the Dodgers Club Trust is about $55 million. Distributions from MLCF are subject to approval of the Commissioner as to timing and amount.

Other Significant Revenue Sources. LAD also receives revenue from premium seating, parking, national licensing, spring training, and in some years, sales of postseason tickets.

20.    LAD is required to contribute a substantial amount of its revenue to Major League Baseball for the purpose of revenue sharing with other baseball clubs that receive less revenue than LAD. For example, in 2009, LAD paid about 12.5% of its revenue to other baseball clubs.

21.    For RealCo, the source of its revenue, which comes from Tickets, are sublease payments by LAD and ticket sales by Tickets.

H.    **Events Leading to LAD's Chapter 11 Filing**

22.    In 2010, LAD experienced cash flow difficulties. During 2010, LAD lost money as a result of declines in attendance, failed to reach the playoffs, and paid substantial deferred compensation totaling about $22 million. LAD was also required to contribute a large portion of its revenue to revenue sharing. In 2010, this amounted to approximately 10% of total revenue.

23.    To ensure the availability of sufficient capital to pay expenses as they become due, LAD entered into an agreement with Fox Sports in 2010 to obtain a $25 million advance of

the payment due under the Fox Telecast Agreement (described below) for the 2011 season. Subsequently, in early 2011, Mr. McCourt obtained a $30 million personal loan from Fox Sports, of which $23.5 million has been contributed by Mr. McCourt over the past several months to fund LAD's payroll and other expenses.

24.    To date, LAD has remained current in its obligations. However, LAD is now on the verge of running out of cash, the result of a perfect storm of events. First, under its financing agreements, Tickets is required to reserve a large portion of its revenues this year because the Collective Bargaining Agreement (the "CBA") with the MLB Players Association is scheduled to expire, which occurs about every five years. So far, Tickets has reserved about $17 million and expects to reserve as much as an additional $6 million. Assuming the CBA is extended, that reserved cash will become available to contribute to LAD's operations, but in the meantime, that cash is unavailable.

25.    Second, LAD, which has already paid $10 million in deferred compensation this year, is required to make another payment of $10.5 million in deferred compensation on June 30, 2011. Making matters even more difficult, on July 1, 2011, LAD is, under the terms of the CBA, required to reserve more than $18 million to prefund deferred compensation that is not payable to the players at issue until 2012.

26.    Third, LAD has experienced a significant decline in attendance this year. This decline may be attributable in part to the Commissioner's appointment of a "monitor" in April 2011, which generated adverse publicity. Despite the Commissioner's questionable authority under the Major League Constitution to appoint a monitor and require the monitor's approval of expenditures, LAD has, through the Commencement Date, voluntarily cooperated with the monitor.

27.    For more than a year, LAD has been actively pursuing alternatives to generate

sufficient cash to address the liquidity timing challenges described above. In particular, LAD

has focused on monetizing the exclusive cable television rights for periods after the expiration of

the existing Fox Telecast Agreement. The value of those rights is enormous, and when it is able

to unlock that value, LAD will be in a position to satisfy all of its existing claims, pay debts as

they become due, and generate a substantial return for its equity holder.

28.    Section 2(c) of the Fox Telecast Agreement contains a "Right of First

Negotiation" provision, which states that "[f]rom October 15, 2012 through November 30, 2012

(the "Exclusive Negotiating Period"), [LAD] and FOX Sports shall negotiate confidentially,

exclusively and in good faith with respect to the terms and conditions on which FOX Sports may

retain exclusive Cable Television Rights to Exhibit future Games for a subsequent term of at

least five years beginning with the 2014 MLB season." The provision further states that LAD

"shall not solicit offers from or negotiate with any person or entity (other than Fox Sports) for

Cable Television Rights with respect to any future Games at any time preceding November 30,

2012."

29.    In an effort to monetize the value of the right to telecast future games on cable

without jeopardizing its rights under the existing Fox Telecast Agreement, LAD and its parent

companies, led by Mr. McCourt, entered into negotiations with Fox Sports. The transaction, as

proposed (the "Proposed Fox Transaction"), contemplated an agreement under which Fox Sports

would retain the exclusive cable television rights for a period of 17 years, at rates in excess of the

rates currently paid under the Fox Telecast Agreement. Using what the Commissioner has

acknowledged are terms that share similar features to transactions by certain other clubs in Major

League Baseball, the Proposed Fox Transaction provided that a current Fox Sports subsidiary

("Prime Ticket") will thereafter be owned in part by TMBLP through a wholly owned
subsidiary, LA Media LLC ("LA Media").

30.    To address the pressing liquidity issues, the Proposed Fox Transaction provided
for a $385 million loan by Fox Sports or one of its affiliates to Prime Ticket, which will be
distributed to LA Media.  Mr. McCourt agreed not only to guarantee collection of that loan, but
also to personally guarantee repayment of the loan in the event the new agreement with Fox
Sports was terminated for reasons other than a material breach by Fox Sports.  As contemplated,
a majority of those proceeds were to be used to pay obligations of LAD and provide sufficient
working capital, while a substantial portion was to be used to repay outstanding obligations of
subsidiaries of TMBLP, including the $67 million owed by Blue Land on its loan, which is
scheduled to mature at the end of this month.

31.    The ability of LAD and its parent companies to reach a final agreement with Fox
Sports has, however, been complicated by ongoing divorce proceedings between Mr. McCourt
and his former wife, Jamie McCourt ("Ms. McCourt").  In those divorce proceedings,
Ms. McCourt asserts an ownership interest in the assets of TMBLP and its subsidiaries, including
those of LAD, Blue Land, RealCo, and Tickets.  She has also sought an order in those
proceedings to compel the sale of the assets of TMBLP.  Although Mr. McCourt disputes that
Ms. McCourt has any ownership interest in those assets, Fox Sports was unwilling to enter into
the Proposed Fox Transaction with LAD absent the consent of Ms. McCourt.

32.    Throughout the process of the negotiations with Fox Sports, LAD kept the
Commissioner and his senior officers fully apprised regarding the status of those negotiations
and the terms that were being negotiated.  LAD repeatedly sought the Commissioner's approval
of the terms proposed by LAD.  In response, the Commissioner postponed any decision, citing

both the unwillingness of Ms. McCourt to consent to the proposed terms, and the unwillingness of Fox Sports to proceed forward absent the consent of Ms. McCourt.

33.    With LAD facing the June 30 deadline to meet its extraordinary non-recurrent payroll and future reserve obligations, the McCourts were able to reach a settlement in their divorce proceeding pursuant to which Ms. McCourt agreed to consent to the Proposed Fox Transaction. Under the terms of the divorce settlement, announced on June 16, 2011, the McCourts agreed that a one day trial would occur in August to determine ownership of the Dodgers. If Mr. McCourt prevailed, then Ms. McCourt would receive a payment of $100 million, which was to be funded in part ($55 million) from the $385 million loan. If Ms. McCourt prevailed, then LAD and the assets owned by TMBLP would be sold with the proceeds to be divided by the Court. The settlement was conditioned upon consummation of the Proposed Fox Transaction, which in turn was conditioned upon the consent of the Commissioner's Office.

34.    In addition, the divorce settlement required that the $385 million in loan proceeds to be received by LA Media under the Proposed Fox Transaction be distributed in a certain manner. Notably, the vast majority of the proceeds, totaling more than $310 million, would be used and distributed as follows: 1) $211.5 million for LAD's operations and working capital; 2) $23.5 million to return the proceeds loaned by Fox Sports to Mr. McCourt which were used to fund payroll and other operational expenses of LAD; and 3) $80 million to repay debt obligations of subsidiaries of the TMBLP, including Blue Land. Of the remaining funds, $50 million would be available to pay Ms. McCourt if Mr. McCourt prevailed in his argument that she lacked an ownership interest in the assets, and the remaining $20 million was to be

distributed to the McCourts for legal expenses ($5 million each) and personal use ($5 million each).

35.    As explained above, Fox Sports required the consent of Ms. McCourt in order for it to move forward with the Proposed Fox Transaction. Without the consummation of the Proposed Fox Transaction, LAD would not have access to the cash needed to pay its players and other expenses. Having obtained Ms. McCourt's consent on June 16, 2011, LAD renewed its request that the Commissioner promptly approve the Proposed Fox Transaction.

36.    On June 20, 2011, the Commissioner advised Mr. McCourt that he would not approve the Proposed Fox Transaction. The first reason offered by the Commissioner for his refusal to approve the transaction was the Commissioner's preference that LAD wait until after the expiration of the Right of First Negotiation in December 2012, and negotiate with potential suitors other than Fox Sports prior to entering into any new television rights agreement. But given LAD's immediate cash flow difficulties, and faced with the potential risk that Fox Sports would seek to enforce the Right of First Negotiation, LAD simply did not have the luxury of waiting 18 months until the end of 2012.

37.    The Commissioner also criticized the use of a portion of the $385 million to fund a divorce settlement with Ms. McCourt. In that regard, the Commissioner did not take into account Fox Sports' unwillingness to move forward with any agreement absent Ms. McCourt's consent, which in turn required either a payment to Ms. McCourt or the liquidation of the assets of LAD and the other subsidiaries owned by TMBLP.

38.    Next, the Commissioner criticized the creation of a separate entity not owned by LAD to receive a 35% interest in the RSN. But even the Commissioner acknowledged that

"other clubs have entered into transactions that share similar features with the Proposed

Transaction."

39.    Finally, the Commissioner complained about the manner in which the sale of the

Dodgers to Mr. McCourt was structured, as well as the securitization that occurred shortly

thereafter, notwithstanding the fact that:  a) both he and Major League Baseball approved those

transactions; and b) using the funds generated by the securitization, the existing debt of Holdco's

subsidiaries, including LAD, was refinanced on favorable terms and Dodger Stadium was

substantially renovated.

40.    Based on the Commissioner's refusal to approve the Proposed Fox Transaction,

LAD does not have sufficient cash on hand to meet substantial payroll expenses that come due

on June 30, 2011, including the deferred payments owed to former players in 2011 and to be

reserved for 2012, or to pay expenses as they become due over the next several weeks.

41.    Accordingly, LAD and the other Debtors negotiated a debtor in possession

financing commitment and commenced this chapter 11 case.

**I.    Business Plan**

42.    Through this bankruptcy case, LAD will explore and implement any and all

options to maximize the value of the future exclusive cable television rights that have not been

granted beyond 2013.  Specifically, LAD will propose and, to the extent authorized by this

Court, implement procedures that are designed to promote a competitive sale process with

respect to those exclusive cable television rights, one that results in the highest and best offer

being acceptable to all parties.  In fashioning procedures, LAD will give due consideration to

Fox Group and the provisions of the Existing Fox Agreement.  LAD expects, and the terms of

the recently negotiated Fox transaction demonstrate, that a sale or license of exclusive cable

television rights will fully resolve all of LAD's financial challenges as well as generate value for the holders of the equity interests in LAD.

43.    In order to implement the above process and achieve its objectives, LAD and the other Debtors have filed for bankruptcy protection and are seeking first day relief from this Court designed to preserve going concern value while LAD implements its strategy. The most important relief sought by LAD is approval of sufficient debtor in possession bridge financing to pay expenses over the next 12 months, as well as compliance with its payment obligations to players and others under collective bargaining agreements. LAD also seeks additional relief that will avoid any interruption of the business that would otherwise adversely impact its operations.

## THE UTILITY COMPANIES

44.    As the owner and operator of a professional baseball team, LAD must ensure that Dodger Stadium and related facilities are operating properly and without interruption. To that end, LAD utilizes water, natural gas, electricity, telephone, and similar utility products and services (collectively, the "Utility Services") provided by approximately four different utility companies (collectively, the "Utility Companies") covering a number of utility accounts. Attached hereto as Exhibit A is a list of substantially all of the Utility Companies providing Utility Services to LAD as of the Commencement Date (the "Utility Service List"). The relief requested herein is requested with respect to all Utility Companies, and is not necessarily limited to those listed on the Utility Service List.[4]

45.    Ordinarily, LAD pays each of the Utility Companies upon receipt of a monthly invoice for the Utility Services. To the best of its knowledge, LAD has not had significant

---

[4]    Although LAD believes that the list of the Utility Companies attached hereto as Exhibit A is a complete list, LAD reserves the right to supplement the Utility Service List if it is determined that any Utility Company has been omitted. Moreover, LAD reserves the right to assert that any of the entities listed on Exhibit A are not utilities within the scope of section 366(a) of the Bankruptcy Code.

defaults or arrearages with respect to undisputed invoices for Utility Services, other than any

payment interruptions that may be caused by the commencement of this chapter 11 case. LAD

estimates that it pays approximately $131,400 per month in the aggregate to the Utility

Companies for the Utility Services.

46.    LAD's payment of undisputed invoices for Utility Services are generally made

through LAD's cash management system, which is described in the *Motion Pursuant To Sections*

*105(a), 363(c), and 345(b) Of The Bankruptcy Code For Order: (I) Authorizing Continued Use*

*Of Cash Management System And Procedures; (B) Authorizing Maintenance And Continued Use*

*Of Existing Bank Accounts And Waiver Of Certain Operating Guidelines Relating To Bank*

*Accounts And The Requirements Of Section 345 Of The Bankruptcy Code; (C) Authorizing The*

*Banks To Honor Certain Prepetition Checks; And (D) Granting Related Relief* filed concurrently

herewith.

## PROPOSED ADEQUATE ASSURANCE AND PROCEDURES

A.    **The Proposed Adequate Assurance**

47.    LAD expects that revenue from operations and the liquidity provided under the

terms of its *Emergency Motion For Interim And Final Orders (I) Authorizing Debtors To Obtain*

*Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 362, And 364, And (II) Scheduling A*

*Final Hearing Pursuant To Bankruptcy Rules 4001(b) And 4001(c)* filed concurrently herewith,

will be sufficient to meet all postpetition obligations with respect to Utility Services, and intends

to continue to pay all such obligations in a timely manner. To provide adequate assurance of

payment, as set forth in sections 366(b) and (c) of the Bankruptcy Code, however, LAD proposes

to deposit within 20 days of the Commencement Date an initial sum equal to 50% of LAD's

estimated average monthly cost of cumulative Utility Services obtained from Utility Companies

(the "Adequate Assurance Deposit") into an interest-bearing, segregated account (the "Adequate Assurance Account").  Because LAD's monthly spending on Utility Services is approximately $131,400, the initial Adequate Assurance Deposit will be $65,700.

48.    LAD further proposes to maintain this amount in the Adequate Assurance Account through and until the Final Hearing.  Thereafter, LAD proposes to adjust the amount of the Adequate Assurance Deposit in the Adequate Assurance Account to reflect the following factors:  (i) the termination of Utility Services by LAD regardless of any Additional Assurance Requests (as defined below), and (ii) agreements with existing and/or new Utility Companies. These adjustments will permit LAD to maintain the Adequate Assurance Account with an Adequate Assurance Deposit that consistently provides Utility Companies with coverage for half of an average month's usage of the applicable Utility Services.

49.    LAD submits that the Adequate Assurance Deposit and the Adequate Assurance Account, together with the facts and circumstances of LAD's chapter 11 case (together, the "Proposed Adequate Assurance"), constitute sufficient adequate assurance to the Utility Companies, pursuant to Bankruptcy Code sections 366(b) and (c).

50.    These protections ensure that all Utility Companies will be adequately assured of payment throughout this case, and LAD believes no other or further assurance is necessary.  If any Utility Companies believe adequate assurance is required beyond the Proposed Adequate Assurance, however, they must request such additional assurance pursuant to the procedures described below (the "Adequate Assurance Procedures").

**B.    Proposed Adequate Assurance Procedures**

51.    To ensure all Utility Companies receive adequate notice of the Proposed

Adequate Assurance and an opportunity to request different treatment, LAD proposes the

following Adequate Assurance Procedures:

(a)    LAD will serve a copy of this Motion, together with the proposed form of Final Order, substantially in the form attached hereto as Exhibit C, which includes the proposed Adequate Assurance Procedures, on each Utility Company within 3 business days after entry of the Interim Order;

(b)    If a Utility Company is not satisfied with the Proposed Adequate Assurance provided by LAD, the Utility Company must serve a request for additional adequate assurance (the "Additional Assurance Request") upon (i)  Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, Attn: Ian J. Bambrick, Esq., proposed co-counsel to LAD; and (ii) Dewey & LeBoeuf LLP, 333 South Grand Avenue, Suite 2600, Los Angeles, California 90071, Attn: Jason R. Wolf, Esq., proposed co-counsel to LAD;

(c)    Any Additional Assurance Request must (i) be in writing, (ii) set forth the location(s) for which Utility Services are provided, (iii) include a summary of LAD's payment history relevant to the affected account(s), including any security deposits, (iv) identify why the Utility Company believes the Proposed Adequate Assurance is not sufficient, (v) set forth what the Utility Company would accept as satisfactory adequate assurance of payment, and (vi) provide an address, telephone number, and electronic mail address to which LAD may respond to the Additional Assurance Request;

(d)    Upon the receipt of any Additional Assurance Request as set forth above, LAD shall have 30 days from the receipt of such Additional Assurance Request (the "Resolution Period") to negotiate with the Utility Company to resolve the Utility Company's Additional Assurance Request.  During this period, Utility Companies may not discontinue, alter, or refuse service to, or discriminate against, LAD on the basis of any unpaid prepetition charges or the commencement of this chapter 11 case;

(e)    Without further order of this Court, LAD may enter into agreements granting additional adequate assurance to a Utility Company that served an Additional Assurance Request, if LAD, in

its business judgment, determines an Additional Assurance Request is reasonable;

(f)    If LAD determines an Additional Assurance Request is not reasonable and is unable to reach an alternative resolution with the Utility Company before the end of the Resolution Period, LAD will request a hearing before this Court to determine the adequacy of assurances of payment LAD has proposed with respect to the applicable Utility Company (the "<u>Determination Hearing</u>") pursuant to section 366(c)(3) of the Bankruptcy Code;

(g)    Pending resolution of such dispute at the Determination Hearing, the relevant Utility Company shall be prohibited from altering, refusing, or discontinuing service to LAD on the basis of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance; and

(h)    The Proposed Adequate Assurance shall be deemed adequate assurance of payment for any Utility Company that fails to serve an Additional Assurance Request.

## RELIEF REQUESTED

52.    By this Motion, LAD seeks entry of the Interim Order and the Final Order, pursuant to section 366 of the Bankruptcy Code: (i) prohibiting Utility Companies from altering, refusing, or discontinuing services as a result of the commencement of LAD's chapter 11 case or unpaid prepetition invoices, including the making of demands for security deposits or accelerated payment terms; (ii) approving LAD's proposed form of adequate assurance; (iii) establishing procedures for resolving objections thereto by Utility Companies; and (iv) scheduling the Final Hearing to consider granting the relief requested herein on a final basis.

53.    LAD further requests the Final Hearing be held within 25 days of the Commencement Date to ensure that, if a Utility Company argues it can unilaterally refuse service to LAD on the 31st day after the Commencement Date, LAD will have the opportunity to request modifications to the proposed Adequate Assurance Procedures, or such other and further relief from this Court as may be necessary, to avoid potential termination of any Utility Service.

## BASIS FOR THE RELIEF REQUESTED

54.     Pursuant to section 366 of the Bankruptcy Code, during the first 20 days following the commencement of a bankruptcy case, a utility may not alter, refuse, or discontinue service to, or discriminate against, a debtor solely on the basis of the commencement of a case or the failure of the debtor to pay a prepetition debt for utility services provided. *See* 11 U.S.C. § 366(a). Following the 20-day period, however, utility companies may alter, refuse, or discontinue service if the debtor does not furnish "adequate assurance of payment" of postpetition utility service obligations. *See* 11 U.S.C. § 366(b). Furthermore, following the 30-day period after the commencement of a bankruptcy case, utility companies may alter, refuse, or discontinue service if the debtor does not provide adequate assurance of payment of postpetition utility service that is "satisfactory to the utility."[5] 11 U.S.C. § 366(c)(2). Section 366 of the Bankruptcy Code provides, in relevant part, as follows:

     (a)     Except as provided in subsections (b) and (c) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

     (b)     Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

* * *

---

[5]   There is an apparent discrepancy between subsections (b) and (c) of section 366 of the Bankruptcy Code: those two subsections set forth different time periods during which a utility is prohibited from altering, refusing, or discontinuing utility service. While section 366(b) of the Bankruptcy Code allows a utility to alter, refuse, or discontinue service "if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment," section 366(c)(2) of the Bankruptcy Code allows a utility in "a case filed under chapter 11" to alter, refuse, or discontinue service to a chapter 11 debtor "if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service ...." 11 U.S.C. § 366.

(c)(2)    Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility.

11 U.S.C. § 366.

55.    If the Utility Companies terminate Utility Services to LAD, LAD's operations will cease. To avert such harm, LAD would be required to pay whatever amounts are demanded by the Utility Companies to maintain necessary Utility Services. Accordingly, by this Motion and pursuant to section 366 of the Bankruptcy Code, LAD seeks entry of an Interim Order and Final Order: (i) prohibiting Utility Companies from altering, refusing, or discontinuing Utility Services to LAD, (ii) approving LAD's Proposed Adequate Assurance, and (iii) approving the proposed Adequate Assurance Procedures.

56.    The policy underlying section 366 of the Bankruptcy Code is to protect debtors from utility providers discontinuing, altering, or refusing to provide utility service upon the filing of a bankruptcy case, while at the same time providing utility companies with adequate assurance that the debtor will pay for postpetition services. *See* H.R. REP. No. 95-595, at 350 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6306.

57.    Section 366(c) of the Bankruptcy Code was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), effective as of October 17, 2005. Section 366(c) provides clarity as to what constitutes assurance of payment and what factors must be excluded from a court's determination as to the adequacy of the assurance of payment. More specifically, section 366(c)(1) defines "assurance of payment" to mean certain specified forms of security, thereby limiting a court's discretion as to what constitutes "other security" within the meaning of section 366(b) of the Bankruptcy Code. Further, section

366(c)(1)(B) affirmatively excludes from the definition of assurance of payment the availability of an administrative expense priority claim. In addition, section 366(c)(3)(B) eliminates certain factors from consideration that courts prior to the enactment of BAPCPA had used to determine whether adequate assurance of payment had been provided.[6]

58.     While section 366(c) clarifies what constitutes adequate assurance of payment, Congress did not abrogate the fundamental premise of section 366(b), or the relevant case law construing such section, by enacting section 366(c). That is, section 366(c), like section 366(b), provides that the Court is free to determine what amount, if any, is necessary to provide adequate assurance of payment to a utility company. While a court may no longer consider certain facts in determining what constitutes adequate assurance of payment, section 366(c) continues to permit a court to determine the amount of deposit necessary to meet the adequate assurance standard. Under section 366(c) of the Bankruptcy Code, there is nothing to prevent a court from deciding, as was a typical practice before the enactment of BAPCPA, that, on the facts of the case before it, the amount required of a debtor to adequately assure payment to a utility company is nominal, or even zero. *See In re Pac-West Telecomm, Inc.*, No. 07-10562 (BLS) (Bankr. D. Del. May 2, 2007) (approving adequate assurance of a one-time supplemental prepayment to each utility company equal to prorated amount of one week's charges); and *In re The N.Y. Racing Ass'n, Inc.*, No. 06-12618 (JMP) (Bankr. S.D.N.Y. Dec. 1, 2006) (approving adequate assurance of a two-week deposit based on historical average as well as procedures for opting out).

59.     In addition, the applicable standard for assurance of payment continues to be "adequate." Courts construing section 366(b) have long recognized that adequate assurance of payment need not constitute an absolute guarantee of the debtor's ability to pay. *See, e.g., In re*

---

[6]    Section 366(c)(4) of the Bankruptcy Code also permits a utility company to recover or offset against a prepetition security deposit without notice or an order of the court.

*Caldor, Inc. – N.Y.*, 199 B.R. 1, 3 (S.D.N.Y. 1996) ("Section 366(b) requires [a] [b]ankruptcy [c]ourt to determine whether the circumstances are sufficient to provide a utility with 'adequate assurance' of payment. The statute does not require an 'absolute guarantee of payment.'") (citations omitted) (hereinafter "Caldor"), *aff'd sub nom. Virginia Elec. & Power Co. v. Caldor, Inc. - N.Y.*, 117 F.3d 646 (2d Cir. 1997); *Steinebach v. Tucson Elec. Power Co. (In re Steinebach)*, 303 B.R. 634, 641 (Bankr. D. Ariz. 2004) ("Adequate assurance of payment is not, however, absolute assurance .... [A]ll § 366(b) requires is that a utility be protected from an unreasonable risk of non-payment"); *In re Penn Jersey Corp.*, 72 B.R. 981, 982 (Bankr. E.D. Pa. 1987) (stating that section 366(b) of the Bankruptcy Code "contemplates that a utility receive only such assurance of payment as is sufficient to protect its interests given the facts of the debtor's financial circumstances").

60.     Furthermore, courts have recognized that "[i]n deciding what constitutes 'adequate assurance' in a given case, a bankruptcy court must 'focus upon the need of the utility for assurance, and ... require that the debtor supply *no more than that*, since the debtor almost perforce has a conflicting need to conserve scarce financial resources.'" *Caldor*, 117 F.3d at 650 (emphasis in original) (quoting *Penn Jersey*, 72 B.R. at 985); *see also In re Penn Cent. Transp. Co.*, 467 F.2d 100, 103-04 (3d Cir. 1972) (upholding lower court's decision that no utility deposits were necessary where such deposits "would jeopardize the continuing operation of the [debtor] merely to give further security to suppliers who already are reasonably protected").

61.     This Court has discretion to modify any request for assurance of payment and such assurance of payment need only be adequate. By offering the Proposed Adequate Assurance and the Adequate Assurance Procedures, LAD seeks to implement an organized and orderly process that would avoid the need to address numerous requests from Utility Companies

individually and haphazardly, at a critical period in its chapter 11 case, when its efforts should be focused on stabilizing its operations and maximizing value for its stakeholders. The process contemplated by the Adequate Assurance Procedures is essential to LAD's smooth transition into chapter 11 and will aid in its restructuring efforts. Moreover, the Adequate Assurance Procedures will ensure that all parties act in good faith by establishing a fair process. It will also ensure that a Utility Company cannot use the passage of time as leverage to force LAD to accede to an exorbitant request to avoid having essential services denied to it.

62.    Similar relief to the relief requested herein has been granted by this Court. *See, e.g.*, *In re Anchor Blue, Inc.*, Case No. 11-10100 (PJW) (Bankr. D. Del. Jan. 12, 2011); *In re Trade Secret, Inc.*, Case No. 10-12153 (KG) (Bankr. D. Del. July 7, 2010); *In re Capmark Financial Group Inc.*, Case No. 09-13684 (CSS) (Bankr. D. Del. Nov. 25, 2009); *In re Accredited Home Lenders Holding Co.*, No. 09-11516 (MFW) (Bankr. D. Del. June 22, 2009); *In re Aleris Int'l Inc.*, No. 09-10478 (BLS) (Bankr. D. Del. Feb. 13, 2009); and *In re Nortel Networks Inc.*, No. 09-10138 (KJC) (Bankr. D. Del. Feb. 4, 2009). LAD respectfully submits that similar relief is warranted in this chapter 11 case.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

63.    To successfully implement the foregoing, LAD seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

64.    Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against LAD, a waiver of LAD's rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code. Likewise, notwithstanding any authorization that may be granted pursuant to this Motion,

LAD maintains the sole discretion to determine whether any claims asserted against LAD related to Utility Services are valid and whether to honor such claims.

## NOTICE

65.     Notice of this Motion has been given to (i) the United States Trustee for the District of Delaware; (ii) LAD's forty (40) largest unsecured creditors; (iii) counsel to Major League Baseball; (iv) counsel to the Major League Baseball Players Association; and (v) counsel to proposed postpetition secured lender. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). Additionally, notice of (i) the Court's entry of the Interim Order and (ii) the hearing before the Court on the Final Order will be provided to the Utility Companies in the manner provided for in the Interim Order. LAD submits that, under the circumstances, no other or further notice is required.

## CONCLUSION

WHEREFORE, LAD respectfully requests an interim order (i) prohibiting Utility

Companies from altering, refusing, or discontinuing Utility Services to LAD, (ii) approving

LAD's Proposed Adequate Assurance, (iii) approving the proposed Adequate Assurance

Procedures, (iv) scheduling the Final Hearing to consider granting the relief requested herein on

a permanent basis, and (v) granting such other and further relief as the Court deems just and

proper.

| | |
|---|---|
| Dated: June 27, 2011<br>Wilmington, Delaware | YOUNG CONAWAY STARGATT & TAYLOR, LLP<br><br>Robert S. Brady (No. 2847)<br>Donald J. Bowman, Jr. (No. 4383)<br>Ryan M. Bartley (No. 4985)<br>The Brandywine Building – 17th Floor<br>1000 West Street, Post Office Box 391<br>Wilmington, Delaware 19899<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br><br>-and-<br><br>DEWEY & LEBOEUF LLP<br>Bruce Bennett<br>Sidney P. Levinson<br>(*pro hac vice applications forthcoming*)<br>333 South Grand Avenue, Suite 2600<br>Los Angeles, California 90071<br>Telephone: (213) 621-6000<br>Facsimile: (213) 621-6100<br><br>-and-<br><br>DEWEY & LEBOEUF LLP<br>Martin J. Bienenstock<br>Philip M. Abelson<br>(*pro hac vice applications forthcoming*)<br>1301 Avenue of the Americas<br>New York, New York 10019<br>Telephone: (212) 259-8000<br>Facsimile: (212) 259-6333<br><br>*Proposed Co-Counsel for LAD and LAD in Possession* |

# EXHIBIT A

### UTILITY SERVICE LIST

## EXHIBIT A
## (SCHEDULE OF UTILITY COMPANIES)

| Utility Company | Address | Account Number(s) | Type of Utility Service |
|---|---|---|---|
| Los Angeles Department of Water and Power | PO Box 30808 Los Angeles, CA 90030 | 1 44 00255 01210 00 0000 1 01<br><br>1 44 80855 01750 00 0000 1 01<br><br>1 44 31560 01000 00 9003 2 01<br><br>1 44 31560 01000 00 9002 1 01<br><br>1 44 00255 01100 00 9003 2 01 | Water and Electricity |
| The Gas Company | PO Box C Monterey Park, CA 91756 | 020 302 9000 7 | Gas |
| SRP | PO Box 80062 Prescott, AZ 86304 | 557-733-003 | Electricity |
| Southwest Gas Corporation | 10851 N Black Canyon Hwy Phoenix, AZ  85029<br><br>PO Box 98890 Las Vegas, NV 89150-0101 | 421-7636666-003<br><br>421-7636652-003<br><br>421-7636774-003<br><br>421-7636671-003 | Gas |

# EXHIBIT B

**PROPOSED INTERIM ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LOS ANGELES DODGERS LLC, *et al.*,[1] | ) | Case No. 11-_____ (___) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Ref. Docket No. _____** |
| | ) | |
| | ) | |
| | ) | |

## INTERIM ORDER (I) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING UTILITY SERVICES, (II) APPROVING LOS ANGELES DODGERS LLC'S PROPOSED FORM OF ADEQUATE ASSURANCE, (III) ESTABLISHING PROCEDURES FOR RESOLVING OBJECTIONS THERETO BY UTILITY COMPANIES, AND (IV) SCHEDULING A FINAL HEARING

Upon the motion (the "Motion")[2] of Los Angeles Dodgers LLC, a debtor and debtor in possession herein (, the "LAD"), for an order (i) prohibiting LAD's utility companies (collectively, the "Utility Companies") from altering, refusing, or discontinuing utility services to LAD, (ii) approving LAD's proposed form of adequate assurance, (iii) establishing procedures for resolving objections thereto by Utility Companies, and (iv) scheduling a final hearing (the "Final Hearing") to consider granting the relief requested in the Motion on a permanent basis, all as more fully described in the Motion; and upon the Ingram Declaration; and due and sufficient notice of the Motion having been given; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by this Motion is in the best interests of LAD, its estates, its creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor, it is hereby;

---

[1]  The Debtors, together with the last four digits of each Debtor's federal tax identification number are: Los Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567); LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029). The location of the Debtors' corporate headquarters and the service address for the Debtors is: 1000 Elysian Park Avenue, Los Angeles, California 90012.

[2]  Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

**ORDERED, ADJUDGED, AND DECREED, that:**

1.      The Motion is granted on an interim basis.

2.      LAD is authorized, but not directed, to pay on a timely basis and in accordance with its prepetition practices, all undisputed invoices for postpetition Utility Services provided by the Utility Companies; *provided, however*, that the foregoing payments may only be made in accordance with the terms of any order approving and authorizing postpetition financing and any applicable budget under such financing order.

3.      LAD shall, on or before 20 days after the Commencement Date, deposit a sum of $65,700, equal to 50% of LAD's estimated average monthly cost of Utility Services (the "Adequate Assurance Deposit"), into an interest-bearing, segregated account (the "Adequate Assurance Account," and together with the Adequate Assurance Deposit, the "Proposed Adequate Assurance"), for the purpose of providing each Utility Company adequate assurance of payment of its postpetition Utility Services to LAD.

4.      Pending the Final Hearing on the Motion, or further order of this Court, all Utility Companies are prohibited from altering, refusing, or discontinuing Utility Services to, or discriminating against, LAD on account of the commencement of this chapter 11 case or any unpaid prepetition charges.

5.      Nothing in this Interim Order shall prejudice or otherwise affect the rights of Utility Companies under section 366(c)(4) of the Bankruptcy Code.

6.      Nothing in the Motion, the Utility Service List, or this Interim Order shall be deemed to constitute the postpetition assumption of any executory contract between LAD and any third-party.

7.    Nothing in the Motion, the Utility Service List, or this Interim Order is intended or shall be deemed to constitute a finding that any entity is or is not a utility company hereunder or under section 366 of the Bankruptcy Code.

8.    Within the 3 business days after the entry of this Interim Order, the Motion and this Interim Order shall be served on each Utility Company that LAD believes could be affected by the Motion and all other parties required to receive service pursuant to Rule 2002-1(b) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware.  LAD's service of the Motion and the Interim Order, which includes the proposed Adequate Assurance Procedures, on the Utility Companies shall not constitute an admission or concession that such entities are "utilities" within the meaning of section 366 of the Bankruptcy Code, and LAD reserves all rights and defenses with respect thereto.

9.    The requirements of Bankruptcy Rule 6004(a) are hereby waived to avoid immediate and irreparable harm to LAD.

10.    Notwithstanding any applicability of Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

11.    The Final Hearing on the Motion shall be held on _____, 2011 at ___:___ __.m. (prevailing Eastern Time).  Any objections or responses to entry of a final order approving the Motion shall be filed on or before _____, 2011 at ___:___ __.m. (prevailing Eastern Time) (the "Objection Deadline") and, at the same time, served on the following parties:  (i) counsel to LAD, and (ii) the Office of the United States Trustee for the District of Delaware.  If no objections are filed to the Motion and the Court's entry of the proposed Final Order prior to the Objection Deadline, the Court may enter the proposed Final Order without further notice or a hearing.

12.     This Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation or implementation of this Interim Order.

Dated:  June ___, 2011
        Wilmington, Delaware

                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT C

## PROPOSED FINAL ORDER

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LOS ANGELES DODGERS LLC, *et al.*,[1] | ) Case No. 11-_____ (____) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Ref. Docket No. _____** |
| | ) |
| | ) |

## FINAL ORDER (I) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING UTILITY SERVICES, (II) APPROVING LOS ANGELES DODGERS LLC'S PROPOSED FORM OF ADEQUATE ASSURANCE, AND (III) ESTABLISHING PROCEDURES FOR RESOLVING OBJECTIONS THERETO BY UTILITY COMPANIES

Upon the motion (the "Motion")[2] of Los Angeles Dodgers LLC, a debtor and debtor in possession herein (, the "LAD"), for an order (i) prohibiting LAD's utility companies (collectively, the "Utility Companies") from altering, refusing, or discontinuing utility services to LAD, (ii) approving LAD's proposed form of adequate assurance, and (iii) establishing procedures for resolving objections thereto by Utility Companies, all as more fully described in the Motion; and upon the Ingram Declaration; and the Court having entered an order on June ____, 2011 (the "Interim Order") granting the relief requested in the Motion on an interim basis; and due and sufficient notice of the Motion and Interim Order having been given; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by this Motion is in the best interests of LAD, its estates, its creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor, it is hereby;

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number are: Los Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567); LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029). The location of the Debtors' corporate headquarters and the service address for the Debtors is: 1000 Elysian Park Avenue, Los Angeles, California 90012.

[2]    Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

**ORDERED, ADJUDGED, AND DECREED, that:**

1.      The Motion is granted on a final basis.

2.      LAD is authorized, but not directed, to pay on a timely basis and in accordance
with its prepetition practices, all undisputed invoices for postpetition Utility Services provided
by the Utility Companies; *provided, however*, that the foregoing payments may only be made in
accordance with the terms of any order approving and authorizing postpetition financing and any
applicable budget under such financing order.

3.      LAD shall maintain the Adequate Assurance Account, as provided in this Order,
for the purpose of providing each Utility Company with adequate assurance of payment of its
postpetition Utility Services to LAD.  The Adequate Assurance Account shall be maintained
with a minimum balance of $65,700, equal to 50% of LAD's estimated average monthly cost of
Utility Services (the "Adequate Assurance Deposit"), which may be adjusted to account for:
(i) the termination of Utility Services by LAD regardless of any Additional Assurance Requests,
and (ii) agreements with Utility Companies.

4.      Except in accordance with the procedures set forth herein and further order of this
Court, all Utility Companies (including, without limitation, those identified in the Utility Service
List, attached to the Motion as Exhibit A) are (i) prohibited from altering, refusing, or
discontinuing Utility Services to, or discriminating against, LAD on account of the
commencement of this chapter 11 case or any unpaid prepetition charges and (ii) deemed to have
received adequate assurance of payment in compliance with section 366 of the Bankruptcy Code.

5.      The adequate assurance procedures (the "Adequate Assurance Procedures"), as
follows, are approved:

(a)      If a Utility Company is not satisfied with the Proposed Adequate Assurance
provided by LAD, the Utility Company must serve a request for additional

adequate assurance (the "Additional Assurance Request") upon (i) Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, Attn: Ian J. Bambrick, Esq., proposed co-counsel to LAD; and (ii) Dewey & LeBoeuf LLP, 333 South Grand Avenue, Suite 2600, Los Angeles, California 90071, Attn: Jason R. Wolf, Esq., proposed co-counsel to LAD;

(b)     Any Additional Assurance Request must (i) be in writing, (ii) set forth the location(s) for which Utility Services are provided, (iii) include a summary of LAD's payment history relevant to the affected account(s), including any security deposits, (iv) identify why the Utility Company believes the Proposed Adequate Assurance is not sufficient, (v) set forth what the Utility Company would accept as satisfactory adequate assurance of payment, and (vi) provide an address, telephone number, and electronic mail address to which LAD may respond to the Additional Assurance Request;

(c)     Upon the receipt of any Additional Assurance Request as set forth above, LAD shall have 30 days from the receipt of such Additional Assurance Request (the "Resolution Period") to negotiate with the Utility Company to resolve the Utility Company's Additional Assurance Request.  During this period, Utility Companies may not discontinue, alter, or refuse service to, or discriminate against, LAD on the basis of any unpaid prepetition charges or the commencement of this chapter 11 case;

(d)     Without further order of this Court, LAD may enter into agreements granting additional adequate assurance to a Utility Company that served an Additional Assurance Request, if LAD, in its business judgment, determines an Additional Assurance Request is reasonable;

(e)     If LAD determines an Additional Assurance Request is not reasonable and is unable to reach an alternative resolution with the Utility Company before the end of the Resolution Period, LAD will request a hearing before this Court to determine the adequacy of assurances of payment LAD has proposed with respect to the applicable Utility Company (the "Determination Hearing") pursuant to section 366(c)(3) of the Bankruptcy Code;

(f)     Pending resolution of such dispute at the Determination Hearing, the relevant Utility Company shall be prohibited from altering, refusing, or discontinuing service to LAD on the basis of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance; and

(g)     The Proposed Adequate Assurance shall be deemed adequate assurance of payment for any Utility Company that fails to serve an Additional Assurance Request.

6.    Nothing in this Order prejudices or otherwise affects the rights of Utility Companies under section 366(c)(4) of the Bankruptcy Code.

7.    LAD is authorized, but not directed, to supplement (a "Utility Service List Supplement") the Utility Service List at any time, provided, however, that LAD shall increase the Adequate Assurance Deposit by an amount equal to 50% of LAD's estimated average monthly cost of Utility Services provided by any Utility Company (a "Supplemental Utility Company") that is included on any Utility Service List Supplement. Any Supplemental Utility Company shall be governed by this Final Order, and shall be served with a copy of this Final Order within 3 business days after the Utility Service List Supplement is supplemented. Any Adequate Assurance Request made by a Supplemental Utility Company shall comply with the terms of this Final Order.

8.    Nothing in the Motion, the Utility Service List, any Utility Service List Supplement, or this Final Order shall be deemed to constitute the postpetition assumption of any executory contract between LAD and any third-party.

9.    The requirements of Bankruptcy Rule 6004(a) are hereby waived to avoid immediate and irreparable harm to LAD.

10.    Notwithstanding any applicability of Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

11.    This Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation or implementation of this Order.

Dated: _____, 2011
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE