## EXHIBIT A

## DIP Motion

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LOS ANGELES DODGERS LLC[1] | ) | Case No. 11- 12010 (___) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING
PURSUANT TO 11 U.S.C. §§ 105, 362, AND 364, AND (II) SCHEDULING A
FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND 4001(C)**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Los Angeles Dodgers LLC ("LAD"), and the above captioned debtors and debtors in

possession in these chapter 11 cases (collectively, the "Debtors"), hereby respectfully submit this

emergency motion (this "Motion") for entry of interim (attached hereto as Exhibit A) and final

orders: (i) authorizing the Debtors to obtain postpetition financing pursuant to section 364 of title

11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"); and (ii)

scheduling a final hearing on the Debtor's motion to incurred such financing on a permanent

basis pursuant to Rules 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").  In support of this Motion, the Debtor relies upon and incorporates by

reference the *First Day Declaration of Jeffrey J. Ingram in Support of Debtor's Chapter 11*

*Petition and Request for First Day Relief* (the "Ingram Declaration"), which was filed with the

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number are: Los
Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567);
LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029).  The location of the Debtors'
corporate headquarters and the service address for the Debtors is:  1000 Elysian Park Avenue, Los Angeles,
California 90012.

*13*
*6/27/11*

Court concurrently herewith. In further support of the Motion, the Debtors, by and through its undersigned proposed co-counsel, respectfully represents as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is section 366 of the Bankruptcy Code.

2.     No previous request for the relief requested herein has been made to this Court or any other court.

## BACKGROUND

3.     On June 27, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.     The Debtors intend to continue in the possession of their properties and the management of their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     As of the date hereof, no trustee or examiner has been appointed in these chapter 11 cases, and no committees have been appointed or designated.

**A.     Ownership Structure**

6.     Los Angeles Dodgers LLC ("LAD") operates a professional major league baseball club located in the Los Angeles metropolitan area. The club's membership in Major League Baseball ("MLB") is described in the Major League Constitution (the "Major League

Constitution"), as assumed by LAD pursuant to an Assumption Agreement, dated as of February 13, 2004.[2]

7.    LAD is a Delaware limited liability company, whose sole member is debtor Los Angeles Dodgers Holding Company LLC ("LAD Holding"), also a Delaware limited liability company. LAD Holding's sole member is debtor LA Holdco LLC ("HoldCo"), also a Delaware limited liability company. Both LAD Holding and HoldCo are holding companies with no operating assets. As described further below, HoldCo is the sole member of debtor LA Real Estate Holding Company LLC ("RealCo Holding"), a Delaware limited liability company. RealCo Holding is the sole member of LA Real Estate LLC ("RealCo"), a Delaware limited liability company that owns Dodger Stadium and the real estate upon which it is located, as well as Dodger Tickets LLC ("Tickets"), a Delaware limited liability company that owns the right to receive future ticket revenue from Dodger games at Dodger Stadium. HoldCo is a wholly owned subsidiary of LA Partners LLC ("LA Partners"), which in turn is a wholly owned subsidiary of The McCourt-Broderick Limited Partnership ("TMBLP"), a Massachusetts limited partnership. TMBLP is the sole member of Blue Landco LLC ("Blue Land"), a Delaware limited liability company that owns the parking lots surrounding Dodgers Stadium. Frank H. McCourt, Jr. ("Mr. McCourt") is the sole limited partner of TMBLP and owns a 90% interest, with the remaining 10% interest owned by TMBLP's sole general partner, The McCourt Company, Inc., a Delaware corporation. None of the parents of HoldCo are debtors in these chapter 11 cases.

**B.    Major League Baseball**

8.    The Office of the Baseball Commissioner (the "Commissioner's Office") is an unincorporated association also doing business as Major League Baseball ("MLB") that has as

---

[2]    None of the other Debtors are a party to the Major League Constitution, nor do they have any role in the operation of the baseball club.

its members thirty baseball clubs. Those clubs are divided into two leagues, the American

League and the National League (the Dodgers are in the West division of the National League).

The commissioner of baseball, Allan H. "Bud" Selig (the "Commissioner"), serves as the chief

executive officer of Major League Baseball.

## C.    The Los Angeles Dodgers Baseball Club

9.    The Los Angeles Dodgers have a storied history that dates back to the late 1800's.

Originally located in Brooklyn, New York, the Dodgers moved to Los Angeles in 1958. Before

doing so, the Dodgers broke baseball's color barrier by signing Jackie Robinson in 1945. In

1962, the Los Angeles Dodgers moved into their new home at Dodger Stadium, where they

continue to play. The Dodgers have won six World Series championships (five in Los Angeles),

the most recent of which occurred in 1988.

## D.    The 2004 Acquisition

10.    The Dodgers were acquired by Fox Entertainment Group, Inc. ("Fox Group") in

1998. After creating a Regional Sports Network ("RSN") associated with the Dodgers, Fox

Group made the decision in 2003 to sell the team and the real estate where the stadium and

parking lots are located.

11.    Following a sale process, the winning bidder for the assets was Mr. McCourt, who

in early 2004 became the owner of the Los Angeles Dodgers, as well as the other assets owned

by Fox Group (the "Acquisition"). The purchase by Mr. McCourt, which was unanimously

approved by Major League Baseball and supported by the Commissioner, was consummated

under two separate agreements. Pursuant to one agreement, Mr. McCourt paid $330 million to

purchase the Los Angeles Dodgers. Under a separate agreement, Mr. McCourt paid

$100 million to acquire the real estate consisting of Dodger Stadium, the land under the stadium, and about 250 acres of land surrounding the stadium that includes the parking lots.

12.     Under the terms of the Acquisition, the land purchased by Mr. McCourt, including Dodger Stadium and the surrounding parking lots, became an asset of RealCo. Pursuant to a lease agreement between RealCo and LAD executed in 2004, RealCo agreed to lease both the land and the stadium, along with granting associated rights, for a term of 38 years.

13.     A portion of the purchase price for the Acquisition ($125 million) was financed by Fox Group pursuant to a two year loan made to an affiliate of Mr. McCourt. To secure repayment, Mr. McCourt provided, as collateral, 24 acres of undeveloped real estate in the Boston seaport district. The contribution of that property was, at the time of the Acquisition, treated as an equity contribution to fund a large portion of the aggregate purchase price paid under the Acquisition. Two years after the Acquisition, Mr. McCourt transferred that valuable real property to Fox Group in satisfaction of the $125 million repayment obligation.

### E.     Subsequent Financing Transactions

14.     In May 2005, HoldCo reorganized its subsidiary operations and formed Tickets, which became a subsidiary of RealCo. RealCo and LAD amended their lease agreement to provide for RealCo to lease Dodger Stadium and the underlying land to Tickets, which then subleased the stadium to LAD with the notable exception of the general admission seats. Those seats are not subleased, and tickets for these seats are sold by Tickets, thereby enabling Tickets to earn revenue from Dodger home games.

15.     As part of the reorganization, Tickets entered into two securitization financing transactions. The first, in 2005, generated $250 million that were used to permanently refinance debt incurred under the Acquisition on favorable terms. The second transaction, in 2007,

generated $140 million, which was primarily used to pay the cost of upgrading Dodger Stadium and to reimburse LAD for costs that it had incurred to upgrade the stadium. The improvements made included (a) replacement of all of the seats in the stadium, (b) a new playing surface, (c) drainage improvements, (d) expansion of concession space, (e) reconfiguration of parking lots to improve traffic flow, (f) expansion of the Dugout Club, (g) renovation of the Stadium Club, (h) creation of two new Baseline Box Clubs, (i) significant upgrades to the video in-game experience, and (j) completion of numerous structural and seismic upgrades. Both financing transactions involved the securitization of the income stream from future ticket sales. Importantly, the Commissioner and Major League Baseball approved the formation of Tickets as a wholly owned subsidiary of HoldCo, as well as the securitization of the ticket income stream.

16.     In 2006, RealCo transferred the parking lots and other land surrounding Dodger Stadium (but not Dodger Stadium itself or the land on which the stadium is located) to Blue Land.[3]

## F.     Improved On Field and Off Field Performance Since 2004

17.     Under Mr. McCourt's stewardship, the 2004 Dodgers won their first playoff game in sixteen years, advanced to back-to-back National League Championship Series (2008 and 2009) for the first time in over 30 years, and appeared in the post-season four times in a six year period for the first time ever since moving to Los Angeles in 1958. During this time period, benefitting from the team's success and the renovation of the stadium, the Dodgers enjoyed

---

[3]     To facilitate that transaction, the boundary lines of the existing parcels were changed in order to enable the stadium and the land under the stadium to be a single parcel that continued to serve as collateral for the financing provided to Tickets. The surrounding land was released from that mortgage. Blue Land borrowed $60 million, secured by the surrounding property, of which $10 million was contributed to LAD. Subsequently, Blue Land borrowed an additional $10 million to purchase an additional parcel of land, which is owned by Blue Land's wholly owned subsidiary, McCourt College Street LLC. Blue Land currently owes $67 million in debt which is scheduled to mature on June 30, 2011.

consistently high attendance for home games. During the 2009 season, the Dodgers drew 3.8 million fans, the highest attendance in Major League Baseball.

18.     The Dodgers also recently opened a new state-of-the-art spring training facility in Arizona – a 13,000 person stadium that it shares with the Chicago White Sox. LAD and Chicago White Sox Ltd. are equal members in Camelback Spring Training LLC, a Delaware limited liability company, which operates the facility.

## G.     Sources of Revenue

19.     LAD's primary sources of revenues from the operation of the baseball club consist of the following:

Entertainment Fee. LAD is paid an entertainment fee by RealCo in connection with providing entertainment at Dodger home games. The entertainment fee is paid from proceeds of ticket sales by Tickets.

Broadcasting Rights. LAD receives payments for the licensing of rights to broadcast their games on television (both over the air and by cable television) and on the radio. Currently, LAD is party to a telecast agreement (the "Fox Telecast Agreement") with Fox Sports Net West 2, LLC ("Fox Sports 2"), under which Fox Sports 2 has been granted exclusive cable television rights until the end of the 2013 baseball season. LAD has separate agreements to broadcast games on television and radio.

Sponsorship and Advertising. A substantial portion of revenues is derived from sponsorship and advertising. LAD's major corporate sponsors include Best Buy, Anheuser-Busch, Coca-Cola, Bank of America, United Airlines, and Time Warner.

Concession Income. LAD receives substantial revenue from concessionaires who are authorized to sell food/beverages and souvenirs, both at Dodger Stadium and online.

Major League Central Fund. LAD also is entitled to receive payments indirectly from the Major League central fund ("MLCF"), which generates income primarily through national telecasting and radio broadcasting revenue. LAD's interest in that revenue is owned by Dodgers Club Trust, a Delaware statutory trust that is 90% owned by LAD and 10% owned by Major League Baseball. The Dodgers Club Trust is party to various credit agreements, evidencing loans secured by the monies payable by MLCF to Dodgers Club Trust and by Dodgers Club Trust to LAD. The outstanding balance of the loans to the Dodgers Club Trust is about $55 million. Distributions from MLCF are subject to approval of the Commissioner as to timing and amount.

Other Significant Revenue Sources. LAD also receives revenue from premium seating, parking, national licensing, spring training, and in some years, sales of postseason tickets.

20. LAD is required to contribute a substantial amount of its revenue to Major League Baseball for the purpose of revenue sharing with other baseball clubs that receive less revenue than LAD. For example, in 2009, LAD paid about 12.5% of its revenue to other baseball clubs.

21. For RealCo, the source of its revenue, which comes from Tickets, are sublease payments by LAD and ticket sales by Tickets.

## H. Events Leading to LAD's Chapter 11 Filing

22. In 2010, LAD experienced cash flow difficulties. During 2010, LAD lost money as a result of declines in attendance, failed to reach the playoffs, and paid substantial deferred compensation totaling about $22 million. LAD was also required to contribute a large portion of its revenue to revenue sharing. In 2010, this amounted to approximately 10% of total revenue.

23. To ensure the availability of sufficient capital to pay expenses as they become due, LAD entered into an agreement with Fox Sports in 2010 to obtain a $25 million advance of the payment due under the Fox Telecast Agreement (described below) for the 2011 season. Subsequently, in early 2011, Mr. McCourt obtained a $30 million personal loan from Fox Sports, of which $23.5 million has been contributed by Mr. McCourt over the past several months to fund LAD's payroll and other expenses.

24. To date, LAD has remained current in its obligations. However, LAD is now on the verge of running out of cash, the result of a perfect storm of events. First, under its financing agreements, Tickets is required to reserve a large portion of its revenues this year because the Collective Bargaining Agreement (the "CBA") with the MLB Players Association is scheduled to expire, which occurs about every five years. So far, Tickets has reserved about $17 million and expects to reserve as much as an additional $6 million. Assuming the CBA is extended, that reserved cash will become available to contribute to LAD's operations, but in the meantime, that cash is unavailable.

25. Second, LAD, which has already paid $10 million in deferred compensation this year, is required to make another payment of $10.5 million in deferred compensation on June 30, 2011. Making matters even more difficult, on July 1, 2011, LAD is, under the terms of the CBA, required to reserve more than $18 million to prefund deferred compensation that is not payable to the players at issue until 2012.

26. Third, LAD has experienced a significant decline in attendance this year. This decline may be attributable in part to the Commissioner's appointment of a "monitor" in April 2011, which generated adverse publicity. Despite the Commissioner's questionable authority under the Major League Constitution to appoint a monitor and require the monitor's approval of

expenditures, LAD has, through the Commencement Date, voluntarily cooperated with the monitor.

27. For more than a year, LAD has been actively pursuing alternatives to generate sufficient cash to address the liquidity timing challenges described above. In particular, LAD has focused on monetizing the exclusive cable television rights for periods after the expiration of the existing Fox Telecast Agreement. The value of those rights is enormous, and when it is able to unlock that value, LAD will be in a position to satisfy all of its existing claims, pay debts as they become due, and generate a substantial return for its equity holder.

28. Section 2(c) of the Fox Telecast Agreement contains a "Right of First Negotiation" provision, which states that "[f]rom October 15, 2012 through November 30, 2012 (the "Exclusive Negotiating Period"), [LAD] and FOX Sports shall negotiate confidentially, exclusively and in good faith with respect to the terms and conditions on which FOX Sports may retain exclusive Cable Television Rights to Exhibit future Games for a subsequent term of at least five years beginning with the 2014 MLB season." The provision further states that LAD "shall not solicit offers from or negotiate with any person or entity (other than Fox Sports) for Cable Television Rights with respect to any future Games at any time preceding November 30, 2012."

29. In an effort to monetize the value of the right to telecast future games on cable without jeopardizing its rights under the existing Fox Telecast Agreement, LAD and its parent companies, led by Mr. McCourt, entered into negotiations with Fox Sports. The transaction, as proposed (the "Proposed Fox Transaction"), contemplated an agreement under which Fox Sports would retain the exclusive cable television rights for a period of 17 years, at rates in excess of the rates currently paid under the Fox Telecast Agreement. Using what the Commissioner has

acknowledged are terms that share similar features to transactions by certain other clubs in Major

League Baseball, the Proposed Fox Transaction provided that a current Fox Sports subsidiary

("Prime Ticket") will thereafter be owned in part by TMBLP through a wholly owned

subsidiary, LA Media LLC ("LA Media").

30.     To address the pressing liquidity issues, the Proposed Fox Transaction provided

for a $385 million loan by Fox Sports or one of its affiliates to Prime Ticket, which will be

distributed to LA Media.  Mr. McCourt agreed not only to guarantee collection of that loan, but

also to personally guarantee repayment of the loan in the event the new agreement with Fox

Sports was terminated for reasons other than a material breach by Fox Sports.  As contemplated,

a majority of those proceeds were to be used to pay obligations of LAD and provide sufficient

working capital, while a substantial portion was to be used to repay outstanding obligations of

subsidiaries of TMBLP, including the $67 million owed by BlueLand on its loan, which is

scheduled to mature at the end of this month.

31.     The ability of LAD and its parent companies to reach a final agreement with Fox

Sports has, however, been complicated by ongoing divorce proceedings between Mr. McCourt

and his former wife, Jamie McCourt ("Ms. McCourt").  In those divorce proceedings,

Ms. McCourt asserts an ownership interest in the assets of TMBLP and its subsidiaries, including

those of LAD, BlueLand, RealCo, and Tickets.  She has also sought an order in those

proceedings to compel the sale of the assets of TMBLP.  Although Mr. McCourt disputes that

Ms. McCourt has any ownership interest in those assets, Fox Sports was unwilling to enter into

the Proposed Fox Transaction with LAD absent the consent of Ms. McCourt.

32.     Throughout the process of the negotiations with Fox Sports, LAD kept the

Commissioner and his senior officers fully apprised regarding the status of those negotiations

and the terms that were being negotiated. LAD repeatedly sought the Commissioner's approval of the terms proposed by LAD. In response, the Commissioner postponed any decision, citing both the unwillingness of Ms. McCourt to consent to the proposed terms, and the unwillingness of Fox Sports to proceed forward absent the consent of Ms. McCourt.

33.     With LAD facing the June 30 deadline to meet its extraordinary non-recurrent payroll and future reserve obligations, the McCourts were able to reach a settlement in their divorce proceeding pursuant to which Ms. McCourt agreed to consent to the Proposed Fox Transaction. Under the terms of the divorce settlement, announced on June 16, 2011, the McCourts agreed that a one day trial would occur in August to determine ownership of the Dodgers. If Mr. McCourt prevailed, then Ms. McCourt would receive a payment of $100 million, which was to be funded in part ($55 million) from the $385 million loan. If Ms. McCourt prevailed, then LAD and the assets owned by TMBLP would be sold with the proceeds to be divided by the Court. The settlement was conditioned upon consummation of the Proposed Fox Transaction, which in turn was conditioned upon the consent of the Commissioner's Office.

34.     In addition, the divorce settlement required that the $385 million in loan proceeds to be received by LA Media under the Proposed Fox Transaction be distributed in a certain manner. Notably, the vast majority of the proceeds, totaling more than $310 million, would be used and distributed as follows: 1) $211.5 million for LAD's operations and working capital; 2) $23.5 million to return the proceeds loaned by Fox Sports to Mr. McCourt which were used to fund payroll and other operational expenses of LAD; and 3) $80 million to repay debt obligations of subsidiaries of the TMBLP, including Blue Land. Of the remaining funds, $50 million would be available to pay Ms. McCourt if Mr. McCourt prevailed in his argument

that she lacked an ownership interest in the assets, and the remaining $20 million was to be distributed to the McCourts for legal expenses ($5 million each) and personal use ($5 million each).

35. As explained above, Fox Sports required the consent of Ms. McCourt in order for it to move forward with the Proposed Fox Transaction. Without the consummation of the Proposed Fox Transaction, LAD would not have access to the cash needed to pay its players and other expenses. Having obtained Ms. McCourt's consent on June 16, 2011, LAD renewed its request that the Commissioner promptly approve the Proposed Fox Transaction.

36. On June 20, 2011, the Commissioner advised Mr. McCourt that he would not approve the Proposed Fox Transaction. The first reason offered by the Commissioner for his refusal to approve the transaction was the Commissioner's preference that LAD wait until after the expiration of the Right of First Negotiation in December 2012, and negotiate with potential suitors other than Fox Sports prior to entering into any new television rights agreement. But given LAD's immediate cash flow difficulties, and faced with the potential risk that Fox Sports would seek to enforce the Right of First Negotiation, LAD simply did not have the luxury of waiting 18 months until the end of 2012.

37. The Commissioner also criticized the use of a portion of the $385 million to fund a divorce settlement with Ms. McCourt. In that regard, the Commissioner did not take into account Fox Sports' unwillingness to move forward with any agreement absent Ms. McCourt's consent, which in turn required either a payment to Ms. McCourt or the liquidation of the assets of LAD and the other subsidiaries owned by TMBLP.

38. Next, the Commissioner criticized the creation of a separate entity not owned by LAD to receive a 35% interest in the RSN. But even the Commissioner acknowledged that

"other clubs have entered into transactions that share similar features with the Proposed Transaction."

39.     Finally, the Commissioner complained about the manner in which the sale of the Dodgers to Mr. McCourt was structured, as well as the securitization that occurred shortly thereafter, notwithstanding the fact that: a) both he and Major League Baseball approved those transactions; and b) using the funds generated by the securitization, the existing debt of Holdco's subsidiaries, including LAD, was refinanced on favorable terms and Dodger Stadium was substantially renovated.

40.     Based on the Commissioner's refusal to approve the Proposed Fox Transaction, LAD does not have sufficient cash on hand to meet substantial payroll expenses that come due on June 30, 2011, including the deferred payments owed to former players in 2011 and to be reserved for 2012, or to pay expenses as they become due over the next several weeks.

41.     Accordingly, LAD and the other Debtors negotiated a debtor in possession financing commitment and commenced this chapter 11 case.

**I.     Business Plan**

42.     Through this bankruptcy case, LAD will explore and implement any and all options to maximize the value of the future exclusive cable television rights that have not been granted beyond 2013. Specifically, LAD will propose and, to the extent authorized by this Court, implement procedures that are designed to promote a competitive sale process with respect to those exclusive cable television rights, one that results in the highest and best offer being acceptable to all parties. In fashioning procedures, LAD will give due consideration to Fox Group and the provisions of the Existing Fox Agreement. LAD expects, and the terms of the recently negotiated Fox transaction demonstrate, that a sale or license of exclusive cable

television rights will fully resolve all of LAD's financial challenges as well as generate value for the holders of the equity interests in LAD.

43.     In order to implement the above process and achieve its objectives, LAD and the other Debtors have filed for bankruptcy protection and are seeking first day relief from this Court designed to preserve going concern value while LAD implements its strategy. The most important relief sought by LAD is approval of sufficient debtor-in-possession bridge financing to pay expenses over the next 12 months, as well as compliance with its payment obligations to players and others under collective bargaining agreements. LAD also seeks additional relief that will avoid any interruption of the business that would otherwise adversely impact its operations.

## PROPOSED DIP FINANCING

44.     Both before and after the Commissioner's refusal to approve the Proposed Fox Transaction, the Debtors engaged in an extensive search for financing to meet their ongoing obligations. The Debtors reached out to numerous banks, financial institutions, professional investors, and strategic partners. The Debtors provided prospective financing sources with access to a data room to conduct due diligence. These efforts yielded interest from more than seven potential entities, at least four of whom requested access to the data room.

45.     While several parties expressed interest in providing financing, the Debtors only received a proposed commitment from one source - HPS-Senior Loan Fund II, L.P., Highbridge Senior Loan Holdings, L.P. and/or other affiliated entities in the Highbridge Senior Loan Fund II family of funds (the "DIP Lenders"). After receiving the DIP Lenders' proposal, the Debtors engaged in extensive negotiations, over the course of the days leading up to the commencement of these cases, regarding the terms of a commitment letter to secure postpetition financing. Those negotiations, which were conducted at arm's length, resulted in a commitment from the

DIP Lender for a $150 million postpetition financing facility (the "DIP Facility") on the terms and conditions set forth in the term sheet attached hereto as Exhibit B (the "DIP Term Sheet").[4] In connection with the DIP Term Sheet, the DIP Lenders, LAD, Mr. McCourt and one of his wholly owned subsidiary entered into that certain Fee Letter, pursuant to which Mr. McCourt agreed to make a payment directly to the DIP Lenders of a portion of the commitment fee and personally guaranteed the payment of the closing commitment payment in the event that any alternative financing or other transaction under which the LAD realized value through a sale of all or any material part of its business or equity or through the license of Media Rights is consummated.

46. In order to determine the Debtors' funding needs during these chapter 11 cases, the Debtors have, with the assistance of their advisors, analyzed their projected expenses to determine what is necessary to maintain their operations in chapter 11 and foster a successful restructuring. This process resulted in the development of a 13-week cash flow budget, attached hereto as Exhibit C (the "Budget"). As outlined above and shown in the Budget, LAD has a number of extraordinary cash outlays that are payable this week and during the next few weeks. For example, LAD requires access to at least $20 million in financing to pay compensation (both current and deferred) that becomes due on June 30, 2011. Immediately thereafter, on July 1, 2011, LAD is required to fund an additional $18.7 million into a reserve for future deferred compensation payments under the collective bargaining agreement with the players' association.

---

[4]    Except to the extent defined herein, capitalized terms used in this Motion shall have the definitions set forth in the DIP Term Sheet. The terms and conditions of the DIP Facility set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such. For a complete description of the terms and conditions of the DIP Facility, reference should be made to the DIP Facility Documents and the Interim Order (as hereinafter defined). The summary herein is qualified in its entirety by reference to such documents and such order. In the event there is a conflict or inconsistency between this Motion and the operative documents or such order, the operative documents or such order, as applicable, shall control in all respects.

The Debtors' anticipate that LAD will need to fund at least one more payroll for its baseball operations before any Final Hearing on the DIP Motion. The Debtors anticipate that the interim borrowing amount will be sufficient to fund their operations pending the Final Hearing.

## A.  Material Terms of the Proposed DIP Financing

47.     Pursuant to Bankruptcy Rule 4001, the Debtors set forth significant elements of the DIP Facility, as follows:

| Administrative Agent | An entity to be determined by the DIP Lenders. |
|---|---|
| DIP Lenders | HPS-Senior Loan Fund II, L.P., Highbridge Senior Loan Holdings, L.P. and/or other affiliated entities in the Highbridge Senior Loan Fund II family of funds (the "DIP Lenders"). |
| Amount of DIP Facility | Total DIP Loan Commitment: $150,000,000.

Initial Availability: $60,000,000.

Remaining Availability: $90,000,000 through delay-draw term loans. |
| Use of Proceeds | To (i) pay fees and expenses related to this transaction and the Cases, and (ii) fund working capital and general corporate purposes in the ordinary course of business of the Debtors as set forth in a thirteen-week rolling cash flow forecast satisfactory to the DIP Agent and the DIP Lenders in their sole and absolute discretion (the "Budget") (and out of the ordinary course as approved by the DIP Lenders and the Bankruptcy Court to the extent set forth in the approved Budget). |
| Interest Rate | All obligations of the Debtors under the Proposed Financing Facility shall bear interest at the LIBOR Rate payable monthly in arrears. The LIBOR Rate shall be equal to LIBOR plus seven percent (7%) per annum; provided that at no time shall LIBOR be less than three percent (3%) per annum. All interest and fees shall be computed on the basis of a year of 360 days for the actual days elapsed. |
| Default Rate | The default interest rate shall be the interest rate then in effect plus two percent (2%) per annum. |
| Commitment and Other Fees | Delayed Draw Fee: One-half percent (0.50%) of the unused portion of the DIP Loan Commitment, payable monthly in arrears.

Deferred Commitment Fee: $4,500,000, which shall be fully earned and non-refundable as of the Closing Date, and paid on the earlier of |

| | |
|---|---|
| | (i) payment in full of the Proposed Financing Facility and (ii) the Maturity Date.<br><br>Other Fees: All fees, including legal and other professional fees (including any financial advisor to be retained by the DIP Agent), and all reasonable out-of-pocket expenses associated with the transaction (whether incurred pre or postpetition) are to be paid by the Debtors without the need for the filing of any applications with the Bankruptcy Court, plus such other fees as set forth in the Fee Letter. |
| **Security & Super-Priority Claim** | All obligations of the Debtors under the DIP Facility to the DIP Lenders shall be: (X) entitled to super-priority administrative expense claim status pursuant to 11 U.S.C. § 364(c)(1) in each of the Cases, subject only to the Carve-Out; and (Y) secured pursuant to 11 U.S.C. §§ 364(c)(2) and (c)(3) and 364(d) by a first and senior priority lien on all of the Debtors' assets of any kind, including, without limitation, personal property, leases and real property of the Debtors, wherever located, and whether now or hereafter existing, and whether now owned or hereafter acquired, of every kind and description, tangible or intangible, including any and all cash or non-cash proceeds of any of the foregoing and, subject to entry of the Final Order, claims of the Debtors or their estates under Bankruptcy Code sections 542, 544, 545, 547, 548, 550, 551, 553(b) or 724(a), (the "Collateral") and a junior lien on any Collateral that is subject to a lien, to the extent that such a lien is valid, perfected, and unavoidable. |
| **Maturity Date** | All loans are to be repaid in full at the earliest of (i) one (1) year following the Petition Date, (ii) the effective date of a chapter 11 plan (a "Plan") in the Cases which is confirmed by an order of the Bankruptcy Court, (iii) the closing date of a sale of all or any part of the assets of the Debtors under section 363 of the Bankruptcy Code (a "363 Sale") and (iv) the termination by the DIP Agent upon an Event of Default (any such date, the "Maturity Date"). Unless otherwise agreed to by the DIP Lenders and the DIP Agent, any confirmation order entered in the Cases must provide for the repayment in full of the DIP Facility on or before the effective date of the Plan and shall not discharge or otherwise affect in any way the joint and several obligations of the Debtors to the DIP Lenders under the DIP Facility. |
| **Carve-Out** | The Carve-Out shall include the following: (A) (i) allowed unpaid professional fees and disbursements incurred by the Debtors and any official committees appointed in the Cases and provided for in the Budget through the date of the acceleration of amounts outstanding under the DIP Facility (such event, a "Triggering Event"); (ii) the payment of fees required to be paid to the clerk of the Bankruptcy Court and to the office of the U.S. Trustee pursuant to 28 U.S.C. § 1930; and (iii) all reasonable fees and expenses incurred by a trustee |

| | |
|---|---|
| | under section 726(b) of the Bankruptcy Code in an amount not exceeding $25,000 ((i) through (iii) collectively, the "Carve-Out Expenses") and (B) without reducing the Carve-Out Expenses, after the occurrence of a Triggering Event, to the extent allowed at any time, all professional fees and disbursements incurred by the Debtors and any official committees appointed in the Cases in an aggregate amount not to exceed $50,000. |
| **Conditions Precedent** | The obligation of the DIP Lenders to make the initial Loans or extensions of credit in connection with the DIP Facility will be subject to customary conditions precedent, including, without limitation, the following conditions precedent:<br><br>(a) the DIP Lenders shall have received such agreements, instruments, approvals, opinions and other documents, each satisfactory to the DIP Lenders in form and substance, as the DIP Lenders may request;<br><br>(b) entry of the Interim Order by the Bankruptcy Court, satisfactory in form and substance to the DIP Lenders in their sole and absolute discretion, no later than three (3) Business Days after the Cases are filed, which Interim Order shall not have been reversed, modified, amended, stayed or vacated;<br><br>(c) opinions from the Debtors' counsel as to such matters as the DIP Agent and its counsel may reasonably request;<br><br>(d) the Debtors shall have paid to the DIP Lenders all fees and expenses then owing to the DIP Lenders on or before the Closing Date;<br><br>(e) all filings and pleadings to be filed by the Debtors on the first day of the Cases shall be in form and substance satisfactory to the DIP Agent and the DIP Lenders in their sole and absolute discretion;<br><br>(f) the DIP Lenders shall have received such financial and other information regarding the Debtors as the DIP Lenders may request; and<br><br>(g) the DIP Agent shall have approved the initial Budget in its |

| | |
|---|---|
| | sole and absolute discretion. |
| | The obligation of DIP Lenders to make any loans beyond the Initial Availability will be subject to the following conditions precedent:[5] |
| | (a) the DIP Loan Documents, in form and substance satisfactory to the DIP Agent and the DIP Lenders in their sole and absolute discretion, shall have been executed; |
| | (b) the representations and warranties contained in the DIP Loan Documents shall be true and correct in all material respects as of the applicable borrowing date; |
| | (c) no default or event of default shall have occurred and be continuing on the applicable borrowing date; and |
| | (d) with respect to any borrowing that is more than twenty (20) days following the Closing Date, entry by the Bankruptcy Court of the Final Order, which Final Order shall not have been reversed, modified, amended, stayed or vacated. |
| **Covenants** | Usual covenants, including, but not limited to, compliance with reporting requirements, provision of financial statements, notices of litigation, defaults and unmatured defaults and other information, compliance with pension, environmental and other laws, inspection of properties, books and records, maintenance of insurance, limitations with respect to liens and encumbrances, dividends and retirement of capital stock, guarantees, sale and leaseback transactions, sales of assets, consolidations and mergers, investments, capital expenditures, loans and advances, indebtedness, operating leases, transactions with affiliates, prepayment of other indebtedness and amendments to material agreements, prohibition on payment of any material prepetition claim, other than as allowed by any first day order of the Bankruptcy Court (provided that such order is in form and substance satisfactory to the DIP Agent and the DIP Lenders in their sole and absolute discretion), without the approval of the DIP Lenders in their sole and absolute discretion. |
| | Prior to entry of the Final Order, actual expenditures made by the Borrower may not exceed the amounts set forth in the Budget. Upon and following entry of the Final Order, actual expenditures made by the Borrower may not exceed the amounts set forth in the Budget by more than (a) ten percent (10%) for any line item and (b) five percent |

---

[5] Given that the DIP Facility was negotiated in an extremely tight timeframe, the Debtors and the DIP Lenders have not yet negotiated the DIP Credit Agreement. It is anticipated that by the Final Hearing, a credit agreement will be negotiated and will be presented to the Court for approval.

| | |
|---|---|
| | (5%) in the aggregate. Unused amounts set forth in the Budget for any line item may be carried forward and used to fund such line item in the subsequent four one-week Budget periods. Actual revenues received by the Borrowers may not be less than ninety percent (90%) of the amounts set forth in the Budget.<br><br>The Debtors shall not seek to reject or terminate, or permit the rejection or termination of, any material license agreement, material real property lease or material contract without the consent of the DIP Lenders.<br><br>The DIP Agent's financial advisor shall have reasonable access to the Debtors' officers.<br><br>Financial reporting to include: (i) annual, audited financial statements, (ii) quarterly, internally prepared financial statements, (iii) monthly, internally prepared, financial statements, (iv) annual projections, including monthly balance sheet, profit and loss and cash flow figures, (v) weekly Budgets including a comparison of actual performance to projections for the prior week and the prior cumulative four-week period delivered no later than 5:00 p.m. (Eastern time) on Wednesday of each week, (vi) a weekly compliance certificate for the revenue and expenditure covenants, (vii) an updated Budget by the 10th day of each month that is acceptable to the DIP Agent and the DIP Lenders in their sole and absolute discretion in its reasonable discretion, and (viii) other reporting as reasonably required by the DIP Lenders. |
| **Milestones** | The Debtors shall conduct a process to license Borrower's broadcast media rights (the "Media Rights"). The Debtors shall provide a weekly telephonic update on their sale process to the DIP Agent and shall provide such other updates on the sale process as the DIP Agent may request. The sale process is intended to be fully transparent to the DIP Agent and the DIP Lenders, with the DIP Agent to have full and complete access to the Debtors and their representatives on all non-privileged matters pertaining to the sale process.<br><br>As a condition to further funding, the Debtors, the DIP Agent and the DIP Lenders shall, on or prior to July 29, 2011, reach agreement with respect to a process and timing for the license of the Media Rights (the "Milestones"), which Milestones shall require, among other things:<br><br>(a) entry of a final order of the Bankruptcy Court, satisfactory to the DIP Agent and the DIP Lenders in their sole and absolute discretion, approving the transaction (the "Media Rights Order") |

| | |
|---|---|
| | shall occur no later than 180 days after the Petition Date; and<br><br>(b) the transaction shall close no later than 45 days after entry of the Media Rights Order. |
| **Events of Default** | Usual events of default, including, but not limited to, payment, cross-default, violation of covenants, breach of representations or warranties, judgment, ERISA, environmental, change of control, loss of material permits, licenses and regulatory approvals and other events of default which are customary in facilities of this nature.<br><br>In addition, an event of default shall occur if: (i)(A) the Interim Order shall not have been entered within three (3) Business Days after the Cases are filed; (B) any of the Cases shall be dismissed or converted to a chapter 7 case; a chapter 11 trustee or an examiner with enlarged powers shall be appointed; any other superpriority administrative expense claim which is senior to or *pari passu* with the DIP Lenders' liens shall be granted without the DIP Agent's and DIP Lenders' consent in their sole and absolute discretion; the Interim Order or the Final Order, as the case may be, shall be stayed, amended, modified, reversed or vacated; (C) the Final Order shall not have been entered within twenty (20) days after the Closing Date; a Plan shall be confirmed in any of the Cases which does not provide for termination of the commitment under the DIP Facility and payment in full in cash of the Debtors' obligations thereunder on the effective date of the Plan; or an order shall be entered which dismisses any of the Cases and which order does not provide for termination of the DIP Facility and payment in full in cash of all obligations thereunder; or (D) the Debtors shall take any action, including the filing of an application, in support of any of the foregoing, or any person other than the Debtors shall do so and such application is not contested in good faith by the Debtors, (ii) the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder of any security interest in any material asset of the Debtors, (iii) the Debtors fail to meet any of the Milestones (defined below), (iv) any material contract is rejected or otherwise terminated or any material property of the Debtors is sold, in each instance, without the consent of the DIP Lenders, (v) termination of the Debtors' rights, privileges and other property rights under the Major League Baseball Constitution or any other baseball-related agreement, or (vi) other events of default to be set forth in the DIP Loan Documents. |
| **Remedies and Modification of the Automatic Stay** | Upon the occurrence and during the continuance of an Event of Default, the DIP Lenders may, in their sole and absolute discretion, suspend or terminate the DIP Loan Commitment. Following three (3) business days' notice of such Event of Default to the Borrower, the official committee of unsecured creditors, and the U.S. Trustee, unless |

| | |
|---|---|
| | such Event of Default is cured within such time or an order of the Bankruptcy Court is entered to the contrary, the DIP Agent shall have relief from the automatic stay to exercise remedies under the DIP Credit Agreement. |
| **Releases** | The Interim Order provides that the Debtors forever and irrevocably release, discharge, and acquit the former, current, or future DIP Parties, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in their capacities as such (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the Financing, the DIP Documents, this Interim Order, or the transactions contemplated hereunder or thereunder including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under title 11 of the United States Code, and (iii) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Parties. |
| **Surcharge Waivers** | Subject to entry of the Final Order, the Collateral shall not be subject to assessment pursuant to section 506(c) of the Bankruptcy Code. |
| **Perfection of Liens Without Compliance with Applicable Laws** | The DIP Agent and DIP Lenders are not required to file financing statements, mortgages, deeds of trust, security deeds, notices of lien, or similar instruments in any jurisdiction or effect any other action to attach or perfect the security interests and liens granted under the DIP Facility Documents and the Interim Order or Final Order; and instead may rely on DIP Facility Documents and Interim Order or Final Order for perfection. |
| **Assignments and Participations** | The DIP Lenders shall be permitted to sell or assign their rights and obligations hereunder, or any part thereof, to any person or entity without the consent of the Debtors, provided, however, that the DIP Lenders shall not assign their rights or obligations hereunder to |

| | another Major League Baseball Club or Major League Baseball, or any affiliate of either of the foregoing. The DIP Lenders shall be permitted to grant participations in such rights and obligations, or any part thereof, to any person or entity without the consent of the Debtors, provided, however, that the DIP Lenders shall not grant participations in such rights and obligations to another Major League Baseball Club or Major League Baseball, or any affiliate of either of the foregoing. |
|---|---|

## B.    Supplemental Bankruptcy Rule 4001 and Local Rule 4001-2 Disclosures

48.    §506(c) Surcharge Waiver: Bankruptcy Rule 4001(c)(1)(B)(x) and Delaware Local Rule 4001-2(a)(i)(C) require disclosure of provisions in Financing Motions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. Although the DIP Facility contemplates that the DIP Loan Documents and Final Order will provide for a waiver of rights under section 506(c) of the Bankruptcy Code, such rights will not be waived in the Interim Order. The proposed waiver of the Debtors' and estates' rights under section 506(c) of the Bankruptcy Code will be effective only after notice to parties in interest and entry of the Final Order granting such relief. *See* Interim Order at ¶ 31.

49.    Liens on Avoidance Actions: Bankruptcy Rule 4001(c)(1)(B)(xi) and Delaware Local Rule 4001-2(a)(i)(D) require disclosure of provisions in Financing Motions that grant the prepetition secured creditor liens on Avoidance Actions. Although the DIP Facility and Final Order contemplate that DIP Lenders will be granted liens on Avoidance Actions or the proceeds thereof, such liens are not granted in the Interim Order. *See* Interim Order ¶ 6(b). The liens against Avoidance Actions will be granted only after notice to parties in interest and entry of the Final Order granting such relief. *See* Interim Order ¶ 6(b).

50.    The provisions of the DIP Facility as to which disclosure was required pursuant to Delaware Local Rule 4001-2 are justified under the circumstances of these Chapter 11 Cases.

First and foremost, without the inclusion of such terms; the DIP Lender would not agree to make the DIP Facility available to the Debtors. In light of the unavailability of adequate financing alternatives and for the reasons set forth herein, the Debtors have determined in the exercise of their sound business judgment that agreeing to the terms of the post-petition financing described in this Motion is appropriate under the circumstances of this Chapter 11 Case.

51.    Accordingly, the facts and circumstances of this Chapter 11 Case justify the inclusion of the terms that require disclosure under Delaware Local Rule 4001-2.

## RELIEF REQUESTED

52.    By this Motion, the Debtors request entry of the Interim Order and the Final Order authorizing:

A.    in the case of the Interim Order, the Debtors to borrow up to an aggregate principal amount of $60 million as set forth in the Interim Order, or, in the case of the Final Order, the Debtors to borrow the full amount of the DIP Facility up to an aggregate principal amount of $150 million;

B.    in the case of the Final Order, the Debtors to execute and enter into the DIP Facility Agreement and the other DIP Facility Documents and to perform such other and further acts as may be required by the DIP Facility Documents;

C.    the granting, pursuant to section 364 of first priority liens and security interests in substantially all of the Debtors' assets that are not otherwise subject to a valid and perfected lien in favor of the DIP Agent and the DIP Lenders and all proceeds thereof, to secure any and all of the obligations under the DIP Facility, subject to the Carve-Out and the Permitted Prior Liens; provided, however, the Collateral that is subject to Permitted Prior Liens shall be encumbered by junior liens of the DIP Agent and DIP Lenders;

D.    the granting of superpriority administrative expense claims to the DIP Agent and the DIP Lenders payable from, and having recourse to, all prepetition and postpetition property of the Debtors' estates and all proceeds thereof, subject only to the Carve-Out, to secure any and all of the obligations under the DIP Facility;

E.    pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on this Motion be held before the Court to consider entry of the Interim Order; and

F.    the scheduling of a final hearing (the "Final Hearing"), to be held within twenty (20) days of the Interim Hearing, to consider entry of the Final Order.

## BASIS FOR RELIEF REQUESTED

53.    For the following reasons, the Debtors respectfully submit that they have satisfied the standards applicable for approval of the DIP Facility.

### A.    The DIP Facility Should Be Approved Under Section 364 Of The Bankruptcy Code.

54.    The Debtors propose to obtain financing under the DIP Facility by providing security interests and other liens as set forth above pursuant to sections 364(c) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c). Indeed, section 364(c) financing is appropriate when the debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See In re YL West 87th Holdings I LLC*, 423 BR 421, 441 (Bankr. S.D.N.Y. January 13, 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing"); *In re Ames Dep't Stores. Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under Sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Banks. E.D. Pa. 1987) (secured credit under Section 364(e)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

55.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.     the debtor is unable to obtain unsecured credit under Section 364(b), *i.e.*, by allowing a lender only an administrative claim;

b.     the credit transaction is necessary to preserve the assets of the estate; and

c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*Ames Dep't Stores*, 115 B.R. at 37-39.

56.     During the prepetition period, the Debtors, both directly and through their advisors, endeavored to identify potential sources of financing. Based on those discussions with potential lenders, the Debtors have determined that adequate financing on an unsecured basis is not available. Without postpetition financing, the Debtors would not be unable to operate their businesses as a going concern, which would significantly impair the value of the Debtors' assets to the detriment of all stakeholders. Furthermore, by obtaining postpetition financing, the Debtors will be in a position to maximize the value of their assets for the benefit of all stakeholders. Finally, the terms of the DIP Facility are fair, reasonable and adequate given the Debtors' circumstances, all as more fully set forth below.

*1.     No Adequate Alternative to the DIP Facility is Currently Available.*

57.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Sections 364(c) of the Bankruptcy Code. *In re YL West 87th Holdings I LLC*, 423 BR 421, 441 (Bankr. Court, S.D.N.Y. Jan. 13, 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing"); *In re General Growth Properties, Inc.*, 412 B.R. at 125 (debtor

has an obligation to make "reasonable efforts, under the circumstances . . .to obtain [unsecured financing], in the ordinary course of business or otherwise").

58.     In the days and weeks prior to the commencement of these Chapter 11 Cases, the Debtors explored alternative financing from a number of potential lenders and from a variety of financial institutions.  Chief among these alternatives was a media rights agreement with Fox that would have provided sufficient liquidity in both the short term and the future.  In the meantime, the Debtors also reached out to institutional lenders, professional investors, and other parties about providing financing for LAD's immediate liquidity crisis.

59.     After the Commissioner refused on June 20th to approve the media rights agreement between LAD and Fox, the Debtors redoubled their efforts to find alternative sources of longer term financing.  As discussed above, LAD discussed financing possibilities with seven potential lenders, over half of whom conducted due diligence.  While LAD received expressions of interest from several sources, only the DIP Lender was willing to provide a commitment for financing of a sufficient amount and within the Debtors' time constraints.

60.     Accordingly, the Debtors have satisfied the requirement of Sections 364(c) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

> 2.     *The DIP Facility is Necessary to Preserve Estate Assets and is an Exercise of the Debtor's Sound Business Judgment.*

61.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994)(approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *Ames Dep't Stores*, 115 B.R. at 38 (noting that other decisions under section 364 find that financing reflects a debtor's business judgment).

Generally, the business judgment standard requires that, absent evidence to the contrary, a debtor in possession is afforded discretion to act with regard to business decision-making. *See In re Simasko Prod. Co.*, 47 B.R. 444, 449 (BAnkr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

62.     As this Court has found, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006). The Debtor's decision to enter into the DIP Facility satisfies this standard.

63.     As discussed above, the DIP Facility is necessary to preserve the value of the Debtors' estates. Specifically, the DIP Facility will allow the Debtors to conduct their operations, pay their obligations to their employees, and administer the Chapter 11 Cases. Moreover, the availability under the DIP Facility will provide LAD with the time it needs to implement to maximize the value of the future exclusive cable television rights that have not been granted beyond 2013. LAD will be able to use this time to propose and, to the extent authorized by this Court, implement procedures that are designed to promote a competitive sale process with respect to those exclusive cable television rights, one that results in the highest and best offer being acceptable to all parties. Without the benefit of the DIP Facility, the Debtors will suffer irreparable harm as they will be unable to meet payroll, which would likely lead to erosion or elimination of what is otherwise a substantial equity interest.

3.     *The DIP Facility Terms are Fair, Reasonable and Appropriate.*

64.     The proposed terms of the DIP Facility Agreement and the other DIP Facility Documents are fair, reasonable, and adequate under the circumstances.

65.     As discussed more fully above, the Debtors made concerted, good-faith efforts to obtain credit on the most favorable terms available in the market, notwithstanding the short

period of time to generate liquidity following the Commissioner's refusal to approve the Proposed Fox Transaction and the rapidly approaching deadline to meet payroll and other extraordinary obligations. No other lender was willing to provide the $40,000,000 million in funding necessary to meet LAD's payroll obligations on June 30th and July 1st, let alone the additional $110,000,000 offered by the DIP Facility to fund the continued operation of the Debtors' businesses. Moreover, no entity offered any financing on more favorable terms than those provided in the DIP Facility or within the time permitted.

66.     Against this backdrop, the Debtors and their advisors carefully evaluated the proposed financing offered by the DIP Facility and engaged in arm's-length negotiations with the DIP Lender. Those negotiations resulted in obtaining several operational and economic benefits under the DIP Facility. Ultimately, the Debtors, exercising their sound business judgment, agreed to the DIP Facility as the proposal best suited to the Debtors' needs.

67.     To further illustrate that the terms are fair, reasonable and adequate, the proposed DIP Facility and the Interim Order provides that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve-Out. In *Ames Dep't Stores*, 34 (Bankr. S.D.N.Y 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. *Ames Dep't Stores*, 115 B.R. at 40; *accord General Growth*, 412 B.R. at 125.

68.     Likewise, the various fees and charges required under the DIP Facility are customary, and approval thereof is appropriate. All of the fees and charges were subject of substantial arms length negotiation and absent approval and payment of such fees and charges, the DIP Lenders would not make the loans. Courts routinely authorize material lender incentives

beyond the explicit liens and other rights specified in Section 364 of the Bankruptcy Code. *See, e.g., In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. B.A.P. 1992) (authorizing credit arrangement under Section 364, including a lender "enhancement fee").

69.     Accordingly, the terms of the DIP Facility are fair, reasonable and adequate, and the DIP Agent and the DIP Lenders under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such facility.

## B.     Interim Approval Should Be Granted

70.     Bankruptcy Rules 4001(b) and (c)(2) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates. *See* Fed.R.Bankr.P. 4001(c)(2).

71.     The Debtors request that the Court authorize the Debtor, on an interim basis pending the Final Hearing, to borrow under the DIP Facility in an amount up to $60 million. As discussed above, this relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and thereby avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing. Absent interim approval of the interim borrowing under the DIP Facility, the Debtors' businesses would suffer immediate and irreparable harm.

## C.     Final Hearing

72.     The Debtors further respectfully request that the Court set a date and time for the Final Hearing to consider the entry of a Final Order approving the relief sought in this Motion no later than twenty (20) after the date of entry of the Interim Order since pursuant to the DIP Credit

Agreement an Event of Default will occur thereunder if the Final Order is not entered within twenty (20) days after the entry of the Interim Order, including without limitation final court approval of the Debtors' borrowings of up to $150 million under the DIP Facility.

## REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF
## STAY TO AVOID IMMEDIATE AND IRREPARABLE HARM

73.      By this Motion, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). For the reasons set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h).

## NOTICE

74.      Notice of this Motion has been given to (i) the United States Trustee for the District of Delaware; (ii) the Debtors' forty (40) largest unsecured creditors; (iii) counsel to Major League Baseball; (iv) counsel to the proposed DIP Lenders; and (v) counsel to the Major League Baseball Players Association. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). The Debtors submit that, under the circumstances, no other or further notice is required.

## NO PREVIOUS REQUEST

75.      No previous request for the relief sought herein has been made by the Debtor to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) enter an Interim Order authorizing the Debtors to borrow up to $60 million on an interim basis pursuant to the terms of the proposed Interim Order, (ii) schedule a Final Hearing on this Motion, (iii) after notice and an opportunity for a hearing, enter a Final Order authorizing the Debtors to borrow up to $150.0 million pursuant to the terms of the DIP Facility Documents, and (iv) grant such other and further relief as is appropriate.

Dated: June 27, 2011
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
Donald J. Bowman, Jr. (No. 4383)
Ryan M. Bartley (No. 4985)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

DEWEY & LEBOEUF LLP
Bruce Bennett (*pro hac vice* admission pending)
Joshua M. Mester (*pro hac vice* admission pending)
333 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Telephone: (213) 621-6000
Facsimile: (213) 621-6100

-and-

DEWEY & LEBOEUF LLP
Martin Bienenstock (*pro hac vice* admission pending)
Philip M. Abelson (*pro hac vice* admission pending)
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8000
Facsimile: (212) 259-6333

*Proposed Co-Counsel for the Debtor and Debtor in Possession*

## EXHIBIT A

Interim Order

# IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LOS ANGELES DODGERS LLC, *et al.*,[1] | ) Case No. 11- 12010 (____) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |
| | ) Ref. Docket No.: _____ |
| | ) |
| | ) |

## INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, AND 364, AND (II) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)

Upon consideration of the motion (the "Motion")[2], dated June 27, 2011 of Los Angeles

Dodgers LLC ("LAD"), and the other above-captioned debtors and debtors-in-possession

(collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases") for entry

of an interim order (the "Interim Order") and a final order (the "Final Order") pursuant to sections

105, 362, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the

"Bankruptcy Code"), and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules for the Bankruptcy

Court for the District of Delaware, seeking, among other things:

    (i)    The Court's authorization for the Borrower (as defined below) to obtain

postpetition financing (the "Financing") consisting of a superpriority delayed draw term loan

facility in an aggregate principal amount of up to $150,000,000 (the "DIP Facility") with an

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number are: Los Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567); LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029). The location of the Debtors' corporate headquarters and the service address for the Debtors is: 1000 Elysian Park Avenue, Los Angeles, California 90012.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Term Sheet as applicable

initial draw of $60 million upon entry of the Interim Order and the remaining $90 million available from time to time following entry of the Final Order in additional drawings, each in a principal amount not less than $10 million, and other financial accommodations, allocated as follows:

DIP Facility. A superpriority delayed draw term loan facility in the principal amount of $150,000,000 (the "DIP Commitments" and the term loans made thereunder, the "DIP Term Loans") to be secured by liens on all of the property, assets or interests in property or assets of each Debtor, each Debtor's "estate" (as defined in the Bankruptcy Code), in each case of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each subsidiary of such Debtor, money, investment property, deposit accounts, all commercial tort claims and other causes of action (including any and all actions arising under sections 542, 544, 545, 547, 548, 550, 551, 553(b) and 724(a) of the Bankruptcy Code (collectively, "Avoidance Actions")), all cash and cash equivalents of the Debtors and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above (collectively, with respect to all such entities, the

2

"Collateral") and entered into between, on the one hand, LAD (the "Borrower"), as debtor and debtor-in-possession under the Bankruptcy Code, and, on the other hand, [_____], as administrative agent and collateral agent (the "DIP Agent") and certain financial institutions that are party to the DIP Term Sheet and DIP Loan Agreement (as defined below) from time to time with respect to the DIP Facility (each a "DIP Lender," and together with the DIP Agent, the "DIP Parties") with all obligations under the DIP Documents (as defined below) to be guaranteed (the "Guarantee"), with respect to obligations of the Borrower, unconditionally and jointly and severally by each of the Debtors other than Borrower (together, the "Guarantors"), with such Guarantees to be secured by liens on all Collateral.[3]

(ii)     The Court's authorization for the Debtors to execute and deliver a promissory note from Borrower in favor of the DIP Lenders (the "Note"), the Guarantees and, upon entry of the Final Order additional final documentation consistent with the terms of (or as may be required by) the DIP Term Sheet, including a final loan agreement (as the same may be amended or modified, the "DIP Loan Agreement") and all additional documentation (the "DIP Loan Documents" and together with the DIP Loan Agreement, the DIP Term Sheet, the Note and the Guaranties, the "DIP Documents"), and to perform such other and further acts as may be required in connection with the DIP Documents;

(iii)     The Court's authorization for the use of proceeds of the Financing extended to the Borrower as expressly provided in the DIP Documents and in accordance with the Budget (A) to pay costs, fees and expenses of the DIP Parties as provided for in the Interim Order and

---

[3]     A term sheet setting forth the material terms of the DIP Facility is attached as Exhibit A hereto (the "DIP Term Sheet").

069120.1001

the DIP Documents, as well as all scheduled payments of interest and principal thereunder, (B) to provide working capital and for other general corporate purposes of the Debtors, and (C) to pay administration costs of these Chapter 11 Cases and claims or amounts approved by this Court, *provided that* payments of (A) above shall be made from the proceeds of the DIP Facility whether or not included in the then-applicable Budget;

(iv)    The Court granting in favor of the DIP Lenders and any other parties referred to in the DIP Documents (collectively, the "<u>DIP Secured Parties</u>") with respect to the respective DIP Obligations (as defined below), in accordance with the relative priorities as set forth more fully below, and subject to, after the Carve-Out Effective Date (as defined below), the Carve-Out (as defined below):

(a)    pursuant to Bankruptcy Code section 364(c)(1), joint and several superpriority administrative expense claim status in the Chapter 11 Cases, which claims in respect of the DIP Facility shall be superior to any and all other claims;

(b)    pursuant to Bankruptcy Code section 364(c)(2), a first priority lien on all unencumbered assets of the Debtors and their estates (now or hereafter acquired and all proceeds thereof); and

(c)    pursuant to Bankruptcy Code section 364(c)(3), a junior lien on all assets of the Debtors and their estates that, as of the Filing Date, is subject to valid, perfected, and non-avoidable liens in favor of third parties (now or hereafter acquired and all proceeds thereof), except as otherwise set forth herein.

4

069120.1001

(v)     The Court to vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(vi)     The Court to waive any applicable stay (including under Bankruptcy Rule 6004) and provide for immediate effectiveness of this Interim Order;

(vii)     Pursuant to Bankruptcy Rule 4001, the Court order that an interim hearing on the Motion be held before this Court to consider entry of this Interim Order, authorizing that during the period commencing on the date (the "Interim Order Entry Date") of this Court's entry of this Interim Order and ending on the earlier of (a) the date this Court enters the Final Order and (b) the occurrence of the DIP Loan Maturity Date (as defined in the DIP Documents) (such period, the "Interim Period"), a portion of the DIP Commitments shall be borrowed by the Borrower (the "Initial Availability"), subject to (i) delivery by the Debtors of the Budget, and (ii) compliance with the terms, conditions and covenants contained in the DIP Term Sheet and this Interim Order, in an amount equal to the lesser of $60,000,000 or such other amount as may be approved by order of this Court, to be made available during the Interim Period in accordance with the Budget; and

(viii)     The Court to schedule a final hearing (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis and authorizing the balance of the borrowings under the Financing on a final basis, as set forth in the Motion filed with this Court.

The interim hearing on the Motion having been held on June [ ] , 2011 (the "Interim Hearing"); and based upon all of the pleadings filed with the Court, the evidence presented at the Interim Hearing and the entire record herein; and the Court having heard and resolved or

overruled all objections to the interim relief requested in the Motion; and the Court having noted

the appearances of all parties in interest; and it appearing that the relief requested in the Motion

is in the best interests of the Debtors, their estates, and creditors; and the Debtors having

provided notice of the Motion as set forth in the Motion and it appearing that no further or other

notice of the Motion need be given; and after due deliberation and consideration, and sufficient

cause appearing therefor:

**BASED ON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

      A.    <u>Filing Date</u>. On June 27, 2011 (the "<u>Filing Date</u>"), the Debtors

commenced their Chapter 11 Cases by filing voluntary petitions for relief under the Bankruptcy

Code. The Debtors are operating their businesses and managing their affairs as debtors-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or

examiner has been appointed in any of these Chapter 11 Cases.

      B.    <u>Jurisdiction; Venue</u>. The Court has jurisdiction over these cases, the

parties, and the Debtors' property pursuant to 28 U.S.C. §1334. This is a core proceeding

pursuant to 28 U.S.C. §157(b)(2)(D). Venue of the Chapter 11 Cases and the Motion is proper

under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are

sections 105, 362, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and

9014 and the Local Bankruptcy Rules.

      C.    <u>Committee Formation</u>. No official committee of unsecured creditors has

yet been appointed in any of these Chapter 11 Cases.

---

[4]   Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

069120.1001

D.    Stipulations.  In requesting the Financing under the DIP Documents, the Debtors permanently, immediately, and irrevocably acknowledge, represent, stipulate, and agree that:

(i)    in entering into the DIP Facility, and as consideration therefor, the Debtors hereby agree that until such time as all DIP Obligations are indefeasibly paid in full in cash and completely satisfied, and the commitments are terminated in accordance with the terms of the this Interim Order or the DIP Documents, as applicable, the Debtors will not (except as expressly permitted by this Interim Order or the DIP Documents) in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens, security interests, or claims provided under the DIP Documents or this Interim Order to the DIP Parties by offering a subsequent lender or any party-in-interest a superior *or pari passu* lien or claim pursuant to section 364 of the Bankruptcy Code, or otherwise, without the consent of the DIP Parties in their sole and absolute discretion;

(ii)    the DIP Parties are not control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Documents or this Interim Order;

(iii)    as of the date hereof, there exist no claims or causes of action against any of the DIP Parties with respect to, in connection with, related to, or arising from the Financing that may be asserted by the Debtors or any other person or entity;

(iv)    as of the date hereof, there were no other liens on or security interests in the Collateral except for certain existing liens that, to the extent such liens are determined to be valid, perfected, binding, and enforceable, are permitted hereunder; and

(v)      the Debtors forever and irrevocably release, discharge, and acquit the former, current, or future DIP Parties, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in their capacities as such (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the Financing, the DIP Documents, this Interim Order, or the transactions contemplated hereunder or thereunder including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under title 11 of the United States Code, and (iii) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Parties.

E.      Purpose and Necessity of Financing. The Debtors require the financing described in the Motion and as expressly provided in the DIP Documents and this Interim Order (i) to pay costs, fees and expenses of the DIP Parties, as provided for in the DIP Documents and this Interim Order, as well as all scheduled payments of interest and principal thereunder, (ii) to

8

069120.1001

provide working capital and for other general corporate purposes of the Debtors, and (iii) to pay administration costs of these Chapter 11 Cases and claims or amounts approved by this Court, *provided that* payments of (i) above shall be made from the proceeds of the DIP Facility whether or not they are included in the then-applicable Budget. If the Debtors do not obtain authorization to borrow under the DIP Documents and this Interim Order and the DIP Loans are not approved, the Debtors will suffer immediate and irreparable harm. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other financing under sections 364(c) or (d) of the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Documents and this Interim Order. A loan facility in the amount provided by the DIP Documents and this Interim Order is not available to the Debtors without granting the DIP Parties superpriority claims, liens, and security interests, pursuant to sections 364(c)(1), (2), (3) of the Bankruptcy Code, as provided in this Interim Order. After considering all alternatives, the Debtors have concluded, in the exercise of their prudent business judgment, that the loan facility provided under the DIP Documents and this Interim Order represents the best and only working capital financing available to them at this time. The DIP Facility is the only loan available to the Debtors and the Debtors have been unsuccessful in their attempts to find any alternative financing. Additionally, the terms of the Financing are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

    F.    <u>Good Cause</u>. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Documents and this Interim Order, is vital to the Debtors, their estates and creditors and stakeholders. The liquidity to be provided under the DIP Documents and this Interim Order will enable the Debtors to continue to operate their

businesses in the ordinary course and preserve the value of their businesses. The Debtors' estates will be immediately and irreparably harmed if this Interim Order is not entered. Good cause has, therefore, been shown for the relief sought in the Motion.

G. Good Faith. The Financing, the DIP Documents and this Interim Order have been negotiated in good faith and at arm's length among the Debtors and the DIP Parties, and all of the obligations and indebtedness arising under, in respect of or in connection with the Financing, the DIP Documents and this Interim Order, including without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and this Interim Order, and any other obligations under the DIP Documents and this Interim Order, including, without limitation, credit extended in respect of overdrafts and related liabilities and other depositary, treasury, hedging, swap , and cash management services and other clearing services provided by any DIP Lender, DIP Agent or their respective affiliates (all of the foregoing collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Obligations, the Postpetition Liens (as defined below), and the Superpriority Claims (as defined below), shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and the terms, conditions, benefits, and privileges of this Interim Order regardless of whether this Interim Order is subsequently reversed, vacated, modified, or otherwise is no longer in full force and effect or the Chapter 11 Cases are subsequently converted or dismissed.

YCST01:11210535.1

069120.1001

H. Consideration. All of the Debtors will receive and have received fair consideration and reasonably equivalent value in exchange for access to the DIP Loans and all other financial accommodations provided under the DIP Documents and this Interim Order.

I. Immediate Entry of Interim Order. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). The permission granted herein to enter into the DIP Facility and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates, creditors and stakeholders as its implementation will, among other things, allow for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing businesses and further enhance the Debtors' prospects for a successful restructuring. Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED:**

1. Disposition. The Motion is granted on an interim basis and on the terms set forth herein. Any objections to the Motion with respect to the entry of this Interim Order that have not previously been withdrawn, waived, settled, or resolved and all reservations of rights included therein are hereby denied and overruled on their merits with prejudice.

2. Effectiveness. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Filing Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and

11

there shall be no stay of execution or effectiveness of this Interim Order.

3. <u>Authorization of the Financing.</u>

(a) The Debtors are hereby authorized to enter into the DIP Facility and the DIP Documents, including the DIP Term Sheet, the terms of which are incorporated herein by reference. Prior to entry of the Final Order, the DIP Documents (other than the DIP Credit Agreement) and this Interim Order shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Parties in respect of the Initial Availability. Following entry of the Final Order, the financial and credit accommodations to be provided to the Debtors by the DIP Parties in respect of the Financing (including amounts borrowed under the Initial Availability) shall be governed by the DIP Documents and the Final Order.

(b) The Borrower is hereby authorized to borrow money pursuant to the DIP Documents and this Interim Order, and the Borrower and the Guarantors are hereby authorized to unconditionally guaranty (on a joint and several basis) such borrowings and the Borrowers' other obligations under the DIP Documents and this Interim Order, up to an aggregate principal amount of $150,000,000, <u>(provided, however</u> that during the Interim Period no more than $60,000,000 may be borrowed by the Borrower), plus interest, costs, fees and other expenses and amounts provided for in the DIP Documents and this Interim Order, in accordance with the terms of the DIP Documents and this Interim Order, which shall be used solely as expressly provided in the DIP Documents, this Interim Order and the Budget (i) to pay costs, fees and expenses of the DIP Parties, as provided for in the DIP Documents and this Interim Order, as well as the scheduled payments of principal and interest thereunder, (ii) to provide working capital and for other general corporate purposes of the  Debtors, and (iii) to pay administration costs of these Chapter 11 Cases and claims or amounts approved by this Court; <u>provided</u> that payments

of (i) above shall be made from the proceeds of the DIP Facility whether or not such amounts are included in the then-applicable Budget.

(c)   In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be required or necessary for the Debtors' performance of their obligations under the Financing, including, without limitation:

(i)   the execution, delivery and performance of the DIP Documents, including, without limitation, the DIP Term Sheet and the Note, any guarantees, any security and pledge agreements, and any mortgages contemplated thereby,

(ii)   the execution, delivery and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Documents for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors and the DIP Parties may agree;

(iii)   the non-refundable payment of the fees referred to in the DIP Documents and this Interim Order and costs and expenses as may be due in accordance with the DIP Documents and this Interim Order, and

(iv)   the performance of all other acts required under or in connection with the DIP Documents and this Interim Order.

(d)   The DIP Documents and this Interim Order constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each person or entity party

13

thereto in accordance with their respective terms for all purposes during the Chapter 11 Cases, any subsequently converted case of any Debtor under chapter 7 of the Bankruptcy Code or after the dismissal of any case. No obligation, payment, transfer, or grant of security under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 547, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity.

4.    Carve-Out.

(a)    The Debtors' obligations to the DIP Parties and the liens and superpriority claims granted herein shall be subject and subordinate only to, after a Carve-Out Effective Date, payment of the Carve-Out. For the purposes of this Order "Carve-Out" shall mean (A)(i) subject to the terms of this Interim Order and the Budget, all allowed fees and expenses of the professionals by the Debtors and any statutory committees appointed in the Chapter 11 Cases (each, a "Committee") accrued on or before the first business day (the "Carve-Out Effective Date") following the delivery by the DIP Parties of a Carve-Out Trigger Notice (as defined below), whether approved by this Court before or after the Carve-Out Effective Date (ii) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States trustee pursuant to 28 U.S.C. § 1930(a); and (iii) reasonable fees and expenses of a trustee under

14

section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000 ((i), (ii) and (iii) collectively, the "Carve-Out Expenses"); and (B) on and after the Carve-Out Effective Date an amount not exceeding $50,000 in the aggregate, which amount may be used (subject to the terms of this Interim Order and the Budget) to pay, to the extent allowed at any time, all fees or expenses incurred by the professionals retained by the Debtors and Committee, on or after the Carve-Out Effective Date, *provided* that (x) the Carve-Out Expenses shall neither be reduced nor increased by the amount of any compensation or reimbursement of expenses incurred, awarded or paid on or prior to the Carve-Out Effective Date in respect of which the Carve-Out is invoked or by any fees, expenses, indemnities or other amounts paid to any agent or lender (or any of their respective attorneys or agents under the DIP Facility or otherwise), and (y) nothing herein shall be construed to impair the ability of any entity to object to the fees, expenses, reimbursement or compensation described above. "Carve-Out Trigger Notice" means a written notice delivered by the DIP Parties to the Borrower and its counsel, the U.S. Trustee, and lead counsel to any Committees, which notice may be delivered following the occurrence and during the occurrence of an Event of Default, expressly stating that it is a Carve-Out Trigger Notice hereunder.

5. <u>Superpriority Claims</u>. The DIP Parties are hereby granted an allowed superpriority administrative expense claim (the "<u>Superpriority Claim</u>") pursuant to section 364(c)(1) of the Bankruptcy Code for all DIP Obligations, having priority over any and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a

YCST01:11210535.1

069120.1001

judgment lien or other nonconsensual lien, levy or attachment, which Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof. The Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to, after the Carve-Out Effective Date, the Carve-Out. Except as expressly set forth herein, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

6. Postpetition Liens.

(a) To secure the DIP Obligations, the following are granted in favor of the DIP Lenders:

(i) a first priority, perfected security interest in, and lien, under section 364(c)(2) of the Bankruptcy Code upon all Collateral of each Debtor and of each Debtor's estate that, on or as of the Filing Date is not subject to valid, perfected, and non-avoidable liens; *provided however*, that any such lien shall not extend to any leasehold where the terms of the lease would prohibit the imposition of such lien, but provided further that such lien shall extend to the proceeds of any such leasehold;

(ii) a junior lien, under section 364(c)(3) of the Bankruptcy Code upon all of the Collateral of each Debtor and of each Debtor's estate that is, as of the Filing Date, subject to valid, perfected, and non-avoidable liens in favor of third parties;

(b) The liens created as described in clauses (i) and (ii) above (the "Postpetition Liens") shall cover all property and assets of the Debtors and their estates (now or hereafter acquired and all proceeds thereof), except (i) until entry of the Final Order, Avoidance Actions; and (ii) as otherwise agreed to by the DIP Parties.

16

(c)     The Postpetition Liens shall be effective immediately upon the entry of this Interim Order and subject only to, (i) after the Carve-Out Effective Date, payment of the Carve-Out, and (ii) valid, perfected and unavoidable preexisting liens on the Collateral.

(d)     Except as provided in this Interim Order, the Postpetition Liens shall not at any time be (i) made subject or subordinated to, or made *pari passu* with any other lien, security interest or claim existing as of the Filing Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise, or (ii) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code.

(e)     The Postpetition Liens shall be and hereby are fully perfected liens and security interests, effective and perfected upon the date of this Interim Order without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements or other agreements, such that no additional steps need be taken by the DIP Parties to perfect such interests. Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors, or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person, in order for any of the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other collateral, shall have no force or effect with respect to the transactions granting in favor of the DIP Lenders a priority security interest in such fee, leasehold or other interest or other collateral or the proceeds of any assignment, sale or other transfer thereof, by any of the Debtors in favor of the DIP Lenders, in accordance with the terms of the DIP Documents and this Interim Order.

17

(f)     The Postpetition Liens, Superpriority Claim, and other rights, benefits, and remedies granted under this Interim Order and the DIP Documents in favor of the DIP Lenders, shall continue in these Chapter 11 Cases, in any superseding case or cases under the Bankruptcy Code (including without limitation any case for any Debtor under chapter 7 of the Bankruptcy Code) (a "Superseding Case"), and following any dismissal of the Chapter 11 Cases, and such liens and claims shall maintain their priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly paid in full in cash and completely satisfied and the DIP Lenders' commitments have been terminated in accordance with the DIP Documents.

(g)     If any additional direct or indirect subsidiary of Holdco (each, a "Subsequent Debtor") commences a Chapter 11 Case, such Subsequent Debtor shall become a Guarantor and be bound by the terms of the DIP Documents and this Interim Order, and such Subsequent Guarantor shall grant in favor of the DIP Lenders, a lien on any Collateral of such Subsequent Debtor, which lien shall be a Postpetition Lien on the same terms and with the same limitations as provided for herein and in the DIP Documents.

7.     Fees. All fees paid and payable, and costs and/or expenses reimbursed or reimbursable by the Debtors to the DIP Parties are hereby approved.  The Debtors are hereby authorized and directed to promptly pay all such fees, costs, and expenses on demand, without the necessity of any further application with the Court for approval or payment of such fees, costs or expenses.  Notwithstanding anything to the contrary herein, the fees, costs and expenses (other than those of professionals retained by the DIP Parties) of the DIP Parties, whether incurred prior to or after the Filing Date shall be deemed fully earned, non-refundable, irrevocable, and non-avoidable as of the date of this Interim Order; *provided* that with respect to fees and expenses of professionals of the DIP Agent and the DIP Lenders incurred after the date of

069120.1001

this Interim Order, the Debtors shall provide copies of invoices of such professionals of the DIP Agent and the DIP Lenders to the Committee and the United States Trustee. All unpaid fees, costs, and expenses shall be included and constitute part of the principal amount of the DIP Obligations and be secured by the Postpetition Liens.

8.    Authority to Execute and Deliver Necessary Documents.

(a)    All of the liens described herein with respect to the assets of the Debtors shall be effective and perfected as of the entry of this Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

(b)    Each of the Debtors is hereby further authorized and directed to (i) perform all of its obligations under the DIP Documents and this Interim Order, and such other agreements as may be required by the DIP Documents and this Interim Order to give effect to the terms of the financing provided for therein and in this Interim Order, and (ii) perform all acts required under the DIP Documents and this Interim Order.

(c)    The Debtors shall execute all documents and take all actions required to effectuate the DIP Documents and this Interim Order, including, without limitation, executing all instruments which may be requested by the DIP Parties.

(d)    All obligations under the DIP Documents and this Interim Order shall constitute valid and binding obligations of each of the Debtors enforceable against each of them, and each of their successors and assigns, in accordance with their terms and the terms of this Interim Order. No obligation, payment, transfer, or grant of a security interest under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to avoidance, reduction, setoff,

19

recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity.

9.   Amendments, Consents, Waivers, and Modifications.

The Debtors, with the express written consent of the DIP Lenders, may enter into any amendments, consents, waivers, or modifications to the DIP Documents without the need for further notice and hearing or any order of this Court, provided that such amendments, consents, waivers, or modifications do not (i) shorten the Maturity Date, (ii) increase commitments, the rate of interest payable under the DIP Documents and this Interim Order, or require the payment of a fee, or (iii) change any Event of Default, add any covenants or amend the covenants in the DIP Documents and this Interim Order, in each case as applicable to the Debtors, in any such case to be materially more restrictive; *provided, however*, that a copy of any such amendment, consent, waiver or other modification shall be served by the Debtors on the U.S. Trustee and the Committee (as that term is defined below).  No consent shall be implied by any other action, inaction, or acquiescence of any of the DIP Parties.

10.   Perfection of Postpetition Liens.

(a)   The DIP Parties are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder, in each case without the necessity to pay any mortgage recording fee or similar fee or tax.  Whether or not the DIP Parties shall, in their sole discretion, chooses to file such financing statements, trademark

filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge dispute or subordination, at the time and on the date of entry of this Interim Order. The Debtors shall, if requested, execute and deliver to the DIP Parties all such agreements, financing statements, instruments and other documents as the DIP Parties may reasonably request to more fully evidence, confirm, validate, perfect, preserve, and enforce the Postpetition Liens. All such documents will be deemed to have been recorded and filed as of the Filing Date.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Administrative Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Interim Order for filing and recording.

11.     [Intentionally Omitted].

12.     <u>Budget; Use of Proceeds</u>. All expenditures of the Debtors shall be made pursuant to and in accordance with the Budget. The Debtors shall submit an updated Budget to the DIP Parties on a weekly basis, each of which shall be satisfactory to the DIP Parties in their sole and absolute discretion. Subject to entry of the Final Order, actual expenditures made by the Debtors shall not exceed the amounts set forth in the Budget. Upon and following entry of the Final Order and execution of the DIP Documents, expenditures made by the Debtors shall not exceed the amounts set forth in the Budget by more than (a) ten percent (10%) for any line item and (b) five percent (5%) in the aggregate. Actual revenues received by the Debtors shall not be less

21

069120.1001

than ninety percent (90%) of the amounts set forth in the Budget.

13. _Financial Reporting_. The Debtors shall provide the DIP Parties with (i) annual, audited financial statements, (ii) quarterly, internally prepared financial statements, (iii) monthly, internally prepared, financial statements, (iv) annual projections, including monthly balance sheet, profit and loss and cash flow figures, (v) weekly Budgets, including a comparison of actual performance to projections for the prior week and the prior cumulative four-week period, delivered no later than 5:00 p.m. (Eastern time) on Wednesday of each week, (vi) a weekly compliance certificate for the revenue and expenditure covenants, (vii) an updated Budget by the 10th day of each month that is acceptable to the DIP Parties in their sole and absolute discretion, and (viii) other reporting as reasonably required by the DIP Parties.

14. _Milestones_. As a condition to further funding, the Debtors and the DIP Parties shall, on or prior to July 29, 2011, reach agreement with respect to a process and timing for the license of the broadcast media rights of the Debtors, in each case in a manner satisfactory to the DIP Parties (the "_Milestones_"), which Milestones shall require, among other things:

    (a)    entry of a final order of this Court, satisfactory to the DIP Parties in their sole and absolute discretion, approving the transaction (the "_Media Rights Order_") shall occur no later than 180 days after the Filing Date; and

    (b)    the transaction shall close no later than 45 days after entry of the Media Rights Order.

15. _Events of Default_. The occurrence of any of the following events shall constitute an "_Event of Default_" under the DIP Term Sheet and this Interim Order:

    (a)    the Debtors' failure to make any payments of principal or interest on amounts owing hereunder;

(b)    any of the Chapter 11 Cases shall be dismissed or converted to a chapter 7 case;

(c)    a chapter 11 trustee or an examiner with enlarged powers shall be appointed in the Chapter 11 Cases;

(d)    any other superpriority administrative expense claim that is senior to or *pari passu* with the DIP Parties' liens shall be granted without the DIP Parties' consent in their sole and absolute discretion;

(e)    the Interim Order or the Final Order, as the case may be, shall be stayed, amended, modified, reversed or vacated;

(f)    the Final Order, in form and substance satisfactory to the DIP Parties in their sole and absolute discretion, shall not have been entered within twenty (20) days after entry of this Interim Order;

(g)    a plan shall be confirmed in any of the Chapter 11 Cases that does not provide for termination of the commitment under the Financing and payment in full in cash of the Debtors' obligations thereunder on the effective date of the plan, or an order shall be entered that dismisses any of the Chapter 11 Cases and does not provide for termination of the Financing and payment in full in cash of all obligations thereunder;

(h)    the Debtors shall take any action, including the filing of an application, in support of any of (b) through (g) hereof, or any person other than the Debtors shall do so and such application is not contested in good faith by the Debtors;

(i)    this Court shall enter an order granting relief from the automatic stay to the holder of any security interest in any material asset of the Debtors;

(j)     the Milestones are not agreed to by July 29, 2011 or the Debtors fail to meet any of the Milestones;

(k)     any material contract is rejected or otherwise terminated or any material property of the Debtors is sold, in each instance, without the consent of the DIP Parties in their sole and absolute discretion;

(l)     termination of the Debtors' rights, privileges and other property rights under the Major League Baseball Constitution or any other baseball-related agreement;

(m)     any Debtor's failure to perform, in any respect, any of the terms, conditions or covenants or their obligations under the DIP Documents or this Interim Order; or

(n)     any other Event of Default as set forth in the DIP Documents.

16.     <u>Remedies Upon Event of Default</u>.  Upon the occurrence of and during the continuance of an Event of Default, (i) the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in this Interim Order and the DIP Documents, and (ii) the DIP Parties, shall be entitled to take any act or exercise any right or remedy as provided in this Interim Order or the DIP Documents, including, without limitation, immediately suspending or immediately terminating the DIP Facility pending further order of the Court.  The DIP Parties shall have no obligation to lend or advance any additional funds to or on behalf of the Debtors, or provide any other financial accommodations to the Debtors, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

17.     <u>Automatic Stay Modified</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code hereby are, to the extent applicable, vacated, and modified to the extent necessary without the need for any further order of this Court:

(a)     [Intentionally Omitted]; and

(b)     following a default or an Event of Default under the DIP Documents and this Interim Order, the DIP Parties are authorized to exercise any and all of their rights and remedies in accordance with the terms of the DIP Documents and this Interim Order, and to take all actions required or permitted by the DIP Documents and this Interim Order without necessity of further Court orders; *provided* that the DIP Parties shall give three (3) business days notice to the Debtors, the U.S. Trustee, and any Committee of such action; *provided further*, however, that this Interim Order shall not prejudice the rights of any party-in-interest to oppose the exercise of the DIP Parties' remedies; *provided further*, that the only issue that may be raised by all entities in opposition thereto shall be whether a default or Event of Default has in fact occurred and is continuing, and all entities hereby waive their right to seek any relief, whether under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit or restrict, or delay the exercise or benefit of, the rights and remedies of DIP Parties under the DIP Documents or this Interim Order.

18.     <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to, *inter alia*, section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP Parties all protections afforded by section 364(e) of the Bankruptcy Code.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by any of the Debtors to the DIP Parties, prior to the date of receipt by the DIP Parties of written notice of the effective date of such action or (ii) the validity and enforceability of any lien, claim, or priority authorized or created under the DIP Documents and this Interim Order. Notwithstanding any such reversal, stay, modification, or vacatur, any postpetition

YCST01:11210535.1

069120.1001

indebtedness, obligation or liability incurred by any of the Debtors to the DIP Parties, prior

to written notice to the DIP Parties of the effective date of such action, shall be governed in

all respects by the original provisions of this Interim Order and the DIP Parties shall be entitled to

all the rights, remedies, privileges, and benefits granted herein and in the DIP Documents with

respect to all such indebtedness, obligations or liability.

19.    <u>Restriction on Use of Lenders' Funds</u>. Notwithstanding anything herein to the

contrary, no Collateral, proceeds thereof, proceeds of the Financing, or any portion of the

Carve-Out may be used by any of the Debtors, their estates, any Committee, any trustee or

examiner appointed in these Chapter 11 Cases or any chapter 7 trustee, or any other person, party or

entity to, in any jurisdiction anywhere in the world, directly or indirectly (a) request authorization

to obtain postpetition financing (whether equity or debt) or other financial accommodations

pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than (i) from the

DIP Parties or (ii) if such financing is sufficient to indefeasibly pay all DIP Obligations in full

in cash and such financing is immediately so used; (b) assert, join, commence, support,

investigate, or prosecute any action for any claim, counter-claim, action, cause of action,

proceeding, application, motion, objection, defense, or other contested matter seeking any order,

judgment, determination, or similar relief against, or adverse to the interests of, in any

capacity, the Releasees, with respect to any transaction, occurrence, omission, or action,

including, without limitation, (i) any action arising under the Bankruptcy Code; (ii) any so-

called "lender liability" claims and causes of action; (iii) any action with respect to the validity

and extent of the DIP Obligations, the Superpriority Claims, or the validity, extent, perfection,

and priority of the Postpetition Liens, (iv) any action seeking to invalidate, set aside, avoid, reduce,

set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup

YCST01:11210535.1                                                          069120.1001

against, disallow, impair, raise any defenses, cross-claims, or counter claims or raise any other

challenges under the Bankruptcy Code or any other applicable domestic or foreign law or

regulation against or with respect to the Postpetition Liens or the Superpriority Claims, in whole

or in part; (v) appeal or otherwise challenge this Interim Order, the Final Order, the DIP

Documents, or any of the transactions contemplated herein or therein; and/or (vi) any action that

has the effect of preventing, hindering, or delaying (whether directly or indirectly) the DIP

Parties in respect of their liens and security interests in the Collateral or any of their rights,

powers, or benefits hereunder or in the DIP Documents anywhere in the world; and/or (c) pay

any claim of a pre-petition creditor except in accordance with the DIP Documents and this

Interim Order and the Budget (except as otherwise authorized by order of this Court, *provided

that* such order is in form and substance satisfactory to the DIP Parties in their sole and absolute

discretion).  Any claim incurred in connection with any activities described in subparagraph (b)

of this paragraph 19 shall not constitute an allowed administrative expense claim for

purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

20.    <u>Collateral Rights</u>.  In the event that any person or entity that holds a lien or

security interest in Collateral of the Debtors or their estates that is junior and/or subordinate to

the Postpetition Liens in such Collateral of the Debtors or their estates receives or is paid the

proceeds of such Collateral of the Debtors or their estates, or receives any other payment with

respect thereto from any other source, prior to indefeasible payment in full in cash and the

complete satisfaction of all DIP Obligations under the DIP Documents and this Interim Order, and

termination of the commitments in accordance with the DIP Documents and this Interim Order,

such junior or subordinate lienholder shall be deemed to have received, and shall hold, the

proceeds of any such Collateral of the Debtors or their estates in trust for the DIP Parties, and

YCST01:11210535.1                                                                    069120.1001

shall immediately turnover such proceeds to the DIP Parties for application in accordance with the DIP Documents and this Interim Order.

21. <u>Prohibition on Additional Liens</u>. Except as provided in the DIP Documents and/or this Interim Order, the Debtors shall be enjoined and prohibited from, at any time during the Chapter 11 Cases unless and until the DIP Obligations have been indefeasibly paid in full, granting liens on the Collateral or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are senior to, *pari passu* with or junior to the liens granted in favor of the DIP Lenders, except in accordance with the DIP Documents and this Interim Order.

22. <u>No Waiver</u>. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Parties may have to bring or be heard on any matter brought before this Court.

23. <u>Sale/Conversion/Dismissal/Plan</u>.

(a)     No order providing for either the sale of the ownership of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code shall be entered by the Court unless, in connection and concurrently with any such event, (i) the proceeds of such sale shall be used to satisfy, in cash, the DIP Obligations in accordance with the DIP Documents; and (ii) such sale is expressly permitted under the DIP Documents and this Interim Order.

(b)     No motion shall be filed by any Debtor seeking dismissal or conversion of these Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code, or seeking appointment of a chapter 11 trustee or an examiner with expanded powers unless and until (x) the DIP Obligations are indefeasibly paid in full in cash and completely satisfied and the commitments

under the DIP Documents and this Interim Order are terminated in accordance therewith or (y) the DIP Parties expressly consent in writing. If an order dismissing or converting any of these cases under sections 305 or 1112 of the Bankruptcy Code or otherwise or an order appointing a chapter 11 trustee or an examiner with expanded powers is at any time entered, and unless otherwise agreed to by the DIP Parties, such order shall provide that (i) the Postpetition Liens and Superpriority Claim, granted hereunder and in the DIP Documents shall continue in full force and effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Interim Order until all DIP Obligations are indefeasibly paid in full, in cash and completely satisfied and the commitments under the DIP Documents and this Interim Order are terminated in accordance therewith, (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the Postpetition Liens and the Superpriority Claim, and (iii) all postpetition indebtedness, obligation or liability incurred by any of the Debtors to the DIP Parties, prior to the date of such order, including without limitation, the DIP Obligations, shall be governed in all respects by the original provisions of this Interim Order, and the DIP Parties, shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Documents with respect to all such indebtedness, obligations or liability.

24.  Priority of Terms.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the DIP Documents, the terms and provisions of this Interim Order shall govern.

25. <u>No Third Party Beneficiary.</u> Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

26. <u>Rights Under Section 363(k).</u> The full amount of the DIP Obligations may be used to "credit bid" for the assets and property of the Debtors as provided for in section 363(k) of the Bankruptcy Code, in accordance with the terms of the DIP Documents and this Interim Order without the need for further Court order authorizing the same.

27. <u>Headings.</u> Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

28. <u>Final Hearing Date.</u> The Final Hearing to consider the entry of the Final Order approving the relief sought in the Motion shall be held on July [ ], 2011 at [ ]before the Honorable [ ], at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801.

29. <u>No Consent.</u> No action, inaction or acquiescence by any of the DIP Parties, including funding the Debtors' ongoing operations under this Interim Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Parties, to a charge against the Collateral pursuant to sections 506(c) or 105(a) of the Bankruptcy Code. The DIP Parties shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

30. <u>Waiver.</u> Effective upon entry of this Interim Order, no person or entity shall be entitled, directly or indirectly, to (a) except as expressly provided by paragraph 4 of this Interim Order, charge or recover from the Carve-Out or the Collateral by operation of section 105 of the Bankruptcy Code or otherwise or (b) direct the exercise of remedies or seek (whether by order

069120.1001

of this Court or otherwise) to marshal or otherwise control the disposition of Collateral or

Property after an Event of Default under the DIP Documents or this Interim Order, or termination

or breach under the DIP Documents or this Interim Order.

31. **Section 506(c) Claims.** Subject to the entry of the Final Order, no costs or

expenses of administration which have or may be incurred in the Chapter 11 Cases at any

time during the Interim Financing Period (and subject to the entry of the Final Order, any

time after the expiration of the Interim Financing Period) shall be charged against the DIP

Parties, their respective claims or interests, and/or the Collateral pursuant to Section 506(c)

of the Bankruptcy Code or otherwise without the prior written consent of the DIP Parties in

their sole and absolute discretion, and no such consent shall be implied from any other

action, inaction or acquiescence by any of the DIP Parties.

32. **Adequate Notice.** The notice given by the Debtors of the Interim Hearing was

given in accordance with Bankruptcy Rules 2002 and 4001(c)(2), and the Local Bankruptcy

Rules, and was adequate and sufficient. Under the circumstances, no further notice of the

request for the relief granted at the Interim Hearing is required. The Debtors shall promptly mail

copies of this Interim Order and notice of the Final Hearing to the Notice Parties, any known

entity effected by the terms of the Final Order, and any other entity requesting notice after the

entry of this Interim Order. Any objection to the relief sought at the Final Hearing shall be

made in writing setting forth with particularity the grounds thereof, and filed with the Court and

served so as to be underlined actually received no later than seven (7) days prior to the Final Hearing by the

following: (i) co-counsel to the Debtors, Dewey & Lebouf LLP, 333 Grand South Avenue,

Suite 2600, Los Angeles, California 90071, Attn: Bruce Bennett, Esq. and Young, Conaway,

Stargatt & Taylor LLP, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 301,

Wilmington, Delaware 19801, Attn: Robert S. Brady, Esq. and (ii) co-counsel to the DIP

Parties, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New

York, 10004, Attn: Gary L. Kaplan, Esq., and Richards, Layton & Finger P.A., One Rodney

Square, P.O. Box 551, Wilmington, Delaware 19899, Attn: Mark Collins, Esq.

    33.   <u>Binding Effect on Successors and Assigns</u>.  The DIP Documents and the

provisions of this Interim Order, including all findings herein, shall be binding upon all parties-

in-interest in these Chapter 11 Cases, including, without limitation, the Debtors, the DIP Parties,

and any Committee or examiner appointed in these Chapter 11 Cases, and their respective

successors and assigns (including any trustee or fiduciary hereinafter appointed as a legal

representative of the Debtors or with respect to the property of the estates of the Debtors)

whether in these Chapter 11 Cases, in any Successor Cases, or upon any dismissal of any such

chapter 11 or chapter 7 case and shall inure to the benefit of the DIP Parties, and the Debtors

and their respective successors and assigns, *provided, however,* that the agreement of the DIP

Parties to extend financing shall terminate upon the appointment of any chapter 7 or 11 trustee,

examiner with expanded powers, or similar responsible person appointed for the estates of the

Debtors.  In determining to make any loan (whether under the DIP Documents, this Interim

Order, the Note, or otherwise), or in exercising any rights or remedies as and when permitted

pursuant to this Interim Order or the DIP Documents, the DIP Parties shall not (i) be deemed to

be in control of the operations of the Debtors, (ii) owe any fiduciary duty to the Debtors, their

respective creditors, shareholders, or estates.  Each stipulation, admission and agreement

contained in this Interim Order shall also be binding upon all other parties in interest, including, any

Committee, under all circumstances and for all purposes.

YCST01:11210535.1

069120.1001

34.     <u>Retention of Jurisdiction</u>.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.


Dated: Wilmington, Delaware
June _____, 2011

_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

Commitment Letter



**Highbridge
Principal Strategies, LLC**

40 WEST 57TH STREET
NEW YORK, NY 10019
TEL 212 287-6805
FAX 646-495-4450

June 27, 2011

Mr. Jeffrey J. Ingram
Executive Vice President
McCourt Group LLC
1000 Elysian Park Avenue
Los Angeles, CA 90012

Dear Jeff:

You have advised Highbridge Principal Strategies, LLC, as manager of affiliates who are willing to provide debtor-in-possession financing (collectively, the "Lender") that Los Angeles Dodgers LLC (the "Borrower") and certain of its affiliates as set forth in Exhibit A (collectively, the "Guarantors" and together with the Borrower, the "Obligors") are seeking debtor-in-possession financing in connection with a voluntary reorganization of Borrower and certain affiliates upon the filing of a petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

    1.   Commitments

The Lender is pleased to advise you that it is willing, subject to the terms and conditions of this letter agreement and the summary term sheet (the "Term Sheet"), attached as Exhibit A hereto, to provide the Borrower with debtor-in-possession financing (the "Commitment"), through a superpriority senior secured delayed draw term facility (the "DIP Facility") in an amount not to not to exceed $150,000,000 consisting of: (i) $60,000,000 (the "Interim Order Commitment Amount") available on the date of, and subject to the terms and conditions of, the Interim Order (as defined in Exhibit A); and (ii) $90,000,000 (the "Final Order Commitment Amount"); in each case subject to the terms and conditions set forth herein.

Subject to approval by orders entered into by the Bankruptcy Court and to the terms and conditions set forth herein and in the Term Sheet, the Lender hereby commits to act as sole administrative agent (in such capacity, the "DIP Administrative Agent") for the DIP Facility. Prior to or after execution of the mutually acceptable definitive loan documentation for the DIP Financing (the "DIP Loan Documents"), which shall be satisfactory to the Lender, the Lender reserves the right to assign or syndicate all or part of the commitments hereunder to one or more other lenders who will participate in the DIP Facility (collectively with the Lender, the "DIP Lenders") that will become party to such definitive credit documentation, provided, however, that the Lender or DIP Administrative Agent shall not assign or grant participations in any part of the Commitments to another Major League Baseball Club or Major League Baseball, or any affiliate of either of the foregoing.

1

Subject to approval by orders entered into by the Bankruptcy Court, the Lender's commitments and agreements hereunder are subject to (a) there not occurring or becoming known to the DIP Lenders any condition or circumstance which the Lender shall determine has had, or could reasonably be expected to have, a material adverse effect on (x) the DIP Financing, (y) the property, assets, nature of assets, business, operations, liabilities, condition (financial or otherwise) or prospects of the Obligors taken as a whole since May 1, 2011, or (z) the rights or remedies of the DIP Lenders or the ability of the Obligors to perform their obligations to the DIP Lenders under the DIP Facility (each, a "Material Adverse Effect"); provided, that neither (i) Major League Baseball's rejection of the Obligors' potential media rights transaction with Fox on June 20, 2011, nor (ii) the commencement of the Case and the events leading to the Case or resulting therefrom in and of themselves shall constitute a Material Adverse Effect, (b) the preparation, negotiation, execution and delivery of the DIP Loan Documents satisfactory to the DIP Lenders in their sole discretion, (c) your compliance with the terms of this Commitment Letter and the fee letter with respect to the DIP Facility dated the date hereof (the "Fee Letter"), (d) the payment in full of all fees, expenses and other amounts payable under this Commitment Letter, the Fee Letter (including the payment of a commitment fee to the DIP Lenders as set forth therein), and the DIP Loan Documents, and (e) the other conditions set forth or referred to herein and in the Term Sheet.

2.    Fees and Expenses; Indemnification.

In consideration of the execution and delivery of this Commitment Letter by the Lender, the Obligors agree, jointly and severally, to pay the fees and expenses set forth in the DIP Facility Term Sheet and in the Fee Letter as and when payable in accordance with the terms thereof.

The Obligors further agree, on a joint and several basis, to indemnify and hold harmless each of the Lender, the other DIP Lenders and each of their respective affiliates and all their respective officers, directors, partners, trustees, employees, shareholders, advisors, agents, professionals, attorneys and controlling persons and each of their respective heirs, successors and assigns, in their capacities as such (each, an "Indemnified Person") from and against any and all losses, liabilities, obligations, claims, damages, penalties, actions, judgments, suits, and related reasonable and documented out of pocket costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel (including the fees and disbursements of advisors to counsel) and advisors to the Lender) and, in each case, to which any Indemnified Person may become subject arising out of or in connection with (including with respect to the execution, delivery, enforcement, performance and administration of) this Commitment Letter, the DIP Facility, the loans made pursuant to the DIP Facility, the DIP Loan Documents, the use of the proceeds therefrom, any of the other transactions contemplated by this Commitment Letter, any other transaction related thereto, the Interim Order (as defined in the Term Sheet), the Final Order (as defined in the Term Sheet), and any such other documents related thereto (regardless of whether the Indemnified Person is a party to the litigation or other proceeding giving rise thereto) or any claim, litigation, investigation or proceeding relating to any of the foregoing (regardless of whether any Indemnified Person is a party thereto), (all the foregoing in this clause (a), collectively, the "Indemnified Liabilities") and to reimburse each Indemnified Person promptly upon demand for all legal (of a single law firm for all Indemnified Persons) and other expenses reasonably incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating

2

to any of the foregoing (including, without limitation, in connection with the enforcement of the indemnification obligations set forth herein), provided that the Debtors shall not have any obligation hereunder to the Indemnified Persons with respect to Indemnified Liabilities arising from the gross negligence, bad faith or willful misconduct of any such person (or any of its directors, trustees, officers, employees, affiliates, controlling persons, agents, successors and assigns) as determined by a final and non-appealable order of the Bankruptcy Court.

### 3. Expiration of Commitment.

The Lender's willingness and commitments with respect to the DIP Facility as set forth above will expire at 9:00 a.m. (EST), on June 27, 2011 unless on or prior to such time you have executed and returned to the Lender a copy of this Commitment Letter and the Fee Letter; furthermore, if the Lender has not received the Commitment Fee, pursuant to the Fee Letter, in immediately available funds via wire transfer by 2:00 p.m. (EST), on June 27, 2011, the Lender may terminate all of the Lender's commitments with respect to the DIP Facility. If you do so execute and deliver to the Lender this Commitment Letter and the Fee Letter, the Lenders agree to hold the Interim Order Commitment Amount available for you until the earlier of (i) a material breach by the Obligors under this Commitment Letter or (ii) June 30, 2011 (the "Closing Date"), and in no event shall the Interim Order Commitment Amount be available after such date for any reason whatsoever without the consent of the Lender unless the Interim Order (as defined in Exhibit A), on terms and conditions satisfactory to the Lender, shall have been entered on or before such date. Notwithstanding the foregoing, until such time as duly executed DIP Loan Documents are entered into, the Obligors shall be fully and unconditionally bound by their obligations contained in this Commitment Letter, the Fee Letter and terms and conditions set forth in the Term Sheet.

### 4. Confidentiality

This Commitment Letter and the Fee Letter and the terms and conditions contained herein may not be disclosed by the Obligors to any person or entity and such of your and their agents and advisors as need to know and agree to be bound by the provisions of this paragraph or as required by applicable law or compulsory legal process (in which case you agree to inform us promptly thereof)) without the prior written consent of the Lender, provided, however, that the Borrower shall be permitted to file the Commitment Letter and the Fee Letter with the Bankruptcy Court in the Case, if directed by the Bankruptcy Court and provided that the Borrower shall request that the Bankruptcy Court accept the filing of the Commitment Letter or the Fee Letter under seal.

### 5. Survival

The provisions of this Commitment Letter relating to the payment of fees and expenses, indemnification and confidentiality and the provisions of Sections 2 and 4 hereof will survive the expiration or termination of the Commitments or this Commitment Letter (including any extensions) and the execution and delivery of the DIP Loan Documents.

### 6. Choice of Law; Jurisdiction; Waivers

This Commitment Letter will be governed by and construed in accordance with the laws of the State of New York without regards to principles of conflicts of law to the extent that the application of the laws of another jurisdiction will be required thereby. The Obligors, Lender,

DIP Lenders, and DIP Administrative Agent hereby irrevocably submit to the exclusive jurisdiction to the Bankruptcy Court in respect of any suit, action or proceeding arising out of or relating to the provisions of this Commitment Letter or the Fee Letter and irrevocably agree that all claims in respect of any such suit, action or proceeding may be heard and determined in any such court. The Obligors, Lender, DIP Lenders, and DIP Administrative Agent hereby waive any objection that they may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in any such court, and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum **The parties hereto hereby waive, to the fullest extent permitted by applicable law, any right to trial by jury with respect to any action or proceeding arising out of or relating to this Commitment Letter or the Fee Letter.**

### 7. Patriot Act

In order to comply with the USA PATRIOT Act, the DIP Lenders must obtain, verify and record information that sufficiently identifies each entity (or individual) that enters into a business relationship with the DIP Lenders. As a result, in addition to your corporate name and address, the DIP Lenders will obtain your corporate tax identification number and certain other information. The DIP Lenders may also request relevant corporate resolutions and other identifying documents.

### 8. Miscellaneous

a. By executing this Commitment Letter, Borrower hereby represents and warrants to Lender that it has authority commence the Case without the need for any third party consents or approvals.

b. This Commitment Letter may be executed in one or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument. Delivery of an executed signature page of this Commitment Letter by facsimile transmission will be effective as delivery of a manually executed counterpart hereof. This Commitment Letter may not be amended or waived except by an instrument in writing signed by the Lender and you.

c. This Commitment Letter, including the attached Exhibits and Schedules, and the Fee Letter set forth the entire understanding of the parties hereto as to the scope of the Commitments and the obligations of the Lender and the DIP Lenders hereunder. This Commitment Letter supersedes all prior understandings and proposals, whether written or oral, between any of the DIP Lenders and you relating to any financing or the transactions contemplated hereby. This Commitment Letter is in addition to the agreements of the parties contained in the Fee Letter.

d. This Commitment Letter has been and is made solely for the benefit of the parties signatory hereto, the Indemnified Persons, and their respective heirs, successors and assigns, and nothing in this Commitment Letter, expressed or implied, is intended to confer or does confer on any other person or entity any rights or remedies under or by reason of this Commitment Letter or the agreements of the parties contained herein.

Should the terms and conditions of the proposal contained herein meet with your approval, please indicate your acceptance by signing and returning a copy of this Commitment Letter.

Should the terms and conditions of the proposal contained herein meet with your approval, please indicate your acceptance by signing and returning a copy of this Commitment Letter.

Very truly yours,

Highbridge Principal Strategies, LLC

By: _M Patter_

Name: Michael Patterson
Title: Managing Director

**Agreed and Accepted on this**
**____ day of June, 2011:**

By: _____
   Name:
   Title:

Agreed and Accepted on this
26 day of June, 2011:

Los Angeles Dodgers LLC

By: _____
    Name: Jeffrey J. Ingram
    Title: Assistant Treasurer

# LA HOLDCO LLC
## AND ITS SUBSIDIARIES
## TERM SHEET FOR PROPOSED DEBTOR IN POSSESSION FINANCING[1]

| | |
|---|---|
| **BORROWER:** | Los Angeles Dodgers LLC (the "Borrower"), a Delaware corporation, as debtor and debtor in possession in a case (the "Case") to be filed under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The date on which the Case commences is referred to herein as the "Petition Date". |
| **GUARANTORS:** | LA Holdco LLC, Los Angeles Dodgers Holding Company LLC, LA Real Estate Holding Company LLC and LA Real Estate LLC (together with the Borrower, each a "Company" and together, the "Companies"). (All Guarantors to commence Cases.) To the extent that any other direct or indirect subsidiary of LA Holdco LLC commences a Case, such entity shall become a Guarantor hereunder. |
| **COLLATERAL AGENT:** | An entity to be determined by the Lenders in their sole and absolute discretion (the "Collateral Agent"). |
| **ADMINISTRATIVE AGENT:** | An entity to be determined by the Lenders in their sole and absolute discretion (the "Administrative Agent" and collectively with the Collateral Agent, the "Agent"). |
| **LENDERS:** | HPS-Senior Loan Fund II, L.P., Highbridge Senior Loan Holdings, L.P. and/or other affiliated entities in the Highbridge Senior Loan Fund II family of funds (the "Lenders"). |
| **PROPOSED FINANCING FACILITY:** | A senior secured delayed-draw term loan credit facility (the "Proposed Financing Facility") in an amount sufficient to be consistent with the Use of Proceeds (as discussed below) and not to exceed $150 million. Under the Proposed Financing Facility, the Lenders would provide a delayed-draw term loan (the "DIP Loan Commitment"), with not more than $60 million of the Proposed Financing Facility (the "Initial Availability") available to the Borrower following the entry of the order (in form and substance satisfactory to the Lenders in their sole and absolute discretion) approving the Proposed Financing Facility on an interim basis (the "Interim Order"), subject to the terms and conditions of the Interim Order and a note to be executed by the Borrower in favor of the Lender. The remaining portion of the Proposed Financing Facility will be available to the Borrower from time to time prior to |

---

[1]    The terms and conditions set forth in this Term Sheet for Proposed Debtor in Possession Financing (the "Term Sheet") are to be used solely as a basis for continued discussions and do not constitute a commitment to provide a financing commitment of any sort or to prepare, negotiate, execute or deliver such a commitment. All figures, terms, and conditions are subject to change or withdrawal at any time. This Term Sheet is confidential and may not be disseminated to any person or entity other than the Borrower and Borrower's agents without the express prior written consent of the Lenders.

the Maturity Date following the entry of the order (in form and substance satisfactory to the Lenders in their sole and absolute discretion) approving the Proposed Financing Facility on a final basis (the "Final Order"), subject to the terms and conditions of of the definitive financing documents (the "Loan Documents"). For the avoidance of doubt, it is contemplated that the Initial Availability will be made available to Borrower subject to the terms of the Interim Order, with the remaining balance being made available only upon execution of the Loan Documents, which shall be satisfactory to the Agent and the Lender in their sole and absolute discretion, and entry of the Final Order.

TERM:

All loans are to be repaid in full at the earliest of (i) one (1) year following the Petition Date, (ii) the effective date of a chapter 11 plan (a "Plan") in the Cases which is confirmed by an order of the Bankruptcy Court, (iii) the closing date of a sale of all or any part of the assets of the Companies under section 363 of the Bankruptcy Code (a "363 Sale") and (iv) the termination by the Agent upon an Event of Default (any such date, the "Maturity Date"). Unless otherwise agreed to by the Lenders and the Agent, any confirmation order entered in the Cases must provide for the repayment in full of the Proposed Financing Facility on or before the effective date of the Plan and shall not discharge or otherwise affect in any way the joint and several obligations of the Companies to the Lenders under the Proposed Financing Facility.

MANDATORY AND
OPTIONAL
PREPAYMENTS:

Customary mandatory prepayments (with a corresponding permanent reduction in the DIP Loan Commitments) to be included in the Loan Documents (including sale of assets, casualty events and tax refunds). Prepayment in whole or in part of the Proposed Financing Facility prior to the Maturity Date would not result in a prepayment fee (other than, in the case of a full prepayment, the Deferred Commitment Fee (as defined below)). There shall be no re-borrowing of amounts repaid under the DIP Loan Commitment.

CLOSING DATE:

The first date on which (i) all Loan Documents satisfactory to the Lenders are executed by the Companies party thereto, the Agent and the Lenders and (ii) the Interim Order shall have been entered on the Bankruptcy Court's docket and shall not be subject to a stay (the "Closing Date"). Borrowings under the Proposed Financing Facility are subject to the entry of the Interim Order or the Final Order, as the case may be, which order shall not be subject to any stay.

COLLATERAL:

All obligations of the Companies under the Proposed Financing Facility to the Lenders shall be: (X) entitled to super-priority administrative expense claim status pursuant to 11 U.S.C. § 364(c)(1) in each of the Cases, subject only to (A) (i) allowed unpaid professional fees and disbursements incurred by the Companies and any official committees appointed in the Cases and provided for in the Budget through the date of the acceleration of amounts outstanding under the Proposed Financing Facility (such event, a "Triggering Event"); (ii) the payment of fees required to be paid to the clerk of the Bankruptcy Court and to the office of the U.S. Trustee pursuant to 28 U.S.C. § 1930; and (iii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $25,000 ((i) through (iii) collectively, the "Carve-Out Expenses") and (B) without reducing the Carve-Out Expenses, after the occurrence of a Triggering Event, to the extent allowed at any time, all professional fees and disbursements incurred by the Companies and any official committees appointed in the Cases in an aggregate amount not to exceed $50,000; and (Y) secured pursuant to 11 U.S.C. §§ 364(c)(2) and (c)(3) and 364(d) by a first and senior priority lien on all of the Companies' assets of any kind, including, without limitation, personal property, leases and

real property of the Companies, wherever located, and whether now or hereafter existing, and whether now owned or hereafter acquired, of every kind and description, tangible or intangible, including any and all cash or non-cash proceeds of any of the foregoing and, subject to entry of the Final Order, claims of the Companies or their estates under Bankruptcy Code sections 542, 544, 545, 547, 548, 550, 551, 553(b) or 724(a), (the "Collateral") and a junior lien on any Collateral that is subject to a lien, to the extent that such a lien is valid, perfected, and unavoidable..

Subject to entry of the Final Order, the Collateral shall not be subject to assessment pursuant to section 506(c) of the Bankruptcy Code.

The security interests in and liens on the Collateral shall be (i) first priority, not subject to subordination, but subject to (a) the Carve-Out Expenses and (b) valid, perfected and unavoidable preexisting liens on the Collateral and (ii) perfected pursuant to orders of the Bankruptcy Court without need for further recordings or filings in connection with the creation, perfection or enforcement of such security interests and liens, provided that the Companies shall make or authorize any such recordings or filings requested by the Agent in its reasonable discretion. No liens will be released until all amounts due under the Proposed Financing Facility are indefeasibly paid in full.

|                       |                                                                 |
|-----------------------|-----------------------------------------------------------------|
| **INTEREST RATES:**   | All obligations of the Companies under the Proposed Financing Facility shall bear interest at the LIBOR Rate payable monthly in arrears. The LIBOR Rate shall be equal to LIBOR plus seven percent (7%) per annum; provided that at no time shall LIBOR be less than three percent (3%) per annum. All interest and fees shall be computed on the basis of a year of 360 days for the actual days elapsed. |

The default interest rate shall be the interest rate then in effect plus two percent (2%) per annum.

**AMORTIZATION:** None.

**FEES:** Delayed Draw Fee: One-half percent (0.50%) of the unused portion of the DIP Loan Commitment, payable monthly in arrears.

Deferred Commitment Fee: $4,500,000, which shall be fully earned and non-refundable as of the Closing Date, and paid on the earlier of (i) payment in full of the Proposed Financing Facility and (ii) the Maturity Date.

**USE OF PROCEEDS:** To (i) pay fees and expenses related to this transaction and the Cases, and (ii) fund working capital and general corporate purposes in the ordinary course of business of the Companies as set forth in a thirteen-week rolling cash flow forecast satisfactory to the Agent and the Lenders in their sole and absolute discretion (the "Budget") (and out of the ordinary course as approved by the Lenders and the Bankruptcy Court to the extent set forth in the approved Budget).

The Borrower shall submit an updated Budget to the Agent and the Lenders on a weekly basis, each of which shall be satisfactory to the Agent and the Lenders in their sole and absolute discretion.

**CONDITIONS PRECEDENT TO CLOSING DATE:** The obligation of Lenders to make the initial Loans or extensions of credit in connection with the Proposed Financing Facility will be subject to customary conditions precedent, including, without limitation, the following conditions precedent:

(a) the Lenders shall have received such agreements, instruments, approvals,

3

opinions and other documents, each satisfactory to the Lenders in form and substance, as the Lenders may request;

(b) entry of the Interim Order by the Bankruptcy Court, satisfactory in form and substance to the Lenders in their sole and absolute discretion, no later than three (3) Business Days after the Cases are filed, which Interim Order shall not have been reversed, modified, amended, stayed or vacated;

(c) opinions from the Companies' counsel as to such matters as the Agent and its counsel may reasonably request;

(d) the Companies shall have paid to the Lenders all fees and expenses then owing to the Lenders on or before the Closing Date;

(e) all filings and pleadings to be filed by the Companies on the first day of the Cases shall be in form and substance satisfactory to the Agent and the Lenders in their sole and absolute discretion;

(f) the Lenders shall have received such financial and other information regarding the Companies as the Lenders may request; and

(g) the Agent shall have approved the initial Budget in its sole and absolute discretion.

CONDITIONS PRECEDENT TO ALL BORROWINGS:

The obligation of Lenders to make any Loans beyond the Initial Availability will be subject to the following conditions precedent:

(a) the Loan Documents, in form and substance satisfactory to the Agent and the Lenders in their sole and absolute discretion, shall have been executed;

(b) the representations and warranties contained in the Loan Documents shall be true and correct in all material respects as of the applicable borrowing date;

(c) no default or event of default shall have occurred and be continuing on the applicable borrowing date; and

(d) with respect to any borrowing that is more than twenty (20) days following the Closing Date, entry by the Bankruptcy Court of the Final Order, which Final Order shall not have been reversed, modified, amended, stayed or vacated.

REPRESENTATIONS AND WARRANTIES:

Usual representations and warranties, including, but not limited to, corporate existence and good standing, authority to enter into and enforceability of loan documentation, validity of Interim Order and/or Final Order, governmental approvals, non-violation of other material agreements other than as a result of the commencement of the Cases as well as defaults under the MLB Constitution, financial statements, litigation, compliance with environmental, pension and other laws, taxes, insurance, absence of Material Adverse Change, absence of default or unmatured default under the Proposed Financing Facility and priority of the Lenders' liens.

COVENANTS:

Usual covenants, including, but not limited to, compliance with reporting requirements, provision of financial statements, notices of litigation, defaults and unmatured defaults and other information, compliance with pension, environmental and other laws, inspection of properties, books and records, maintenance of insurance, limitations with respect to liens and encumbrances, dividends and retirement of capital stock, guarantees, sale and leaseback transactions, sales of assets, consolidations and mergers, investments, capital expenditures, loans and advances, indebtedness, operating leases, transactions with affiliates, prepayment of other indebtedness and amendments to material agreements, prohibition on payment of any material prepetition claim, other

4

than as allowed by any first day order of the Bankruptcy Court (provided that such order is in form and substance satisfactory to the Agent and the Lenders in their sole and absolute discretion), without the approval of the Lenders in their sole and absolute discretion.

Prior to entry of the Final Order, actual expenditures made by the Borrower may not exceed the amounts set forth in the Budget. Upon and following entry of the Final Order, actual expenditures made by the Borrower may not exceed the amounts set forth in the Budget by more than (a) ten percent (10%) for any line item and (b) five percent (5%) in the aggregate. Unused amounts set forth in the Budget for any line item may be carried forward and used to fund such line item in the subsequent four one-week Budget periods. Actual revenues received by the Borrowers may not be less than ninety percent (90%) of the amounts set forth in the Budget.

The Companies shall not seek to reject or terminate, or permit the rejection or termination of, any material license agreement, material real property lease or material contract without the consent of the Lenders.

The Agent's financial advisor shall have reasonable access to the Companies' officers.

Financial reporting to include: (i) annual, audited financial statements, (ii) quarterly, internally prepared financial statements, (iii) monthly, internally prepared, financial statements, (iv) annual projections, including monthly balance sheet, profit and loss and cash flow figures, (v) weekly Budgets including a comparison of actual performance to projections for the prior week and the prior cumulative four-week period delivered no later than 5:00 p.m. (Eastern time) on Wednesday of each week, (vi) a weekly compliance certificate for the revenue and expenditure covenants, (vii) an updated Budget by the 10th day of each month that is acceptable to the Agent and the Lenders in their sole and absolute discretion in its reasonable discretion, and (viii) other reporting as reasonably required by the Lenders.

EVENTS OF DEFAULT:   Usual events of default, including, but not limited to, payment, cross-default, violation of covenants, breach of representations or warranties, judgment, ERISA, environmental, change of control, loss of material permits, licenses and regulatory approvals and other events of default which are customary in facilities of this nature.

In addition, an event of default shall occur if: (i)(A) the Interim Order shall not have been entered within three (3) Business Days after the Cases are filed; (B) any of the Cases shall be dismissed or converted to a chapter 7 case; a chapter 11 trustee or an examiner with enlarged powers shall be appointed; any other superpriority administrative expense claim which is senior to or *pari passu* with the Lenders' liens shall be granted without the Agent's and Lenders' consent in their sole and absolute discretion; the Interim Order or the Final Order, as the case may be, shall be stayed, amended, modified, reversed or vacated; (C) the Final Order shall not have been entered within twenty (20) days after the Closing Date; a Plan shall be confirmed in any of the Cases which does not provide for termination of the commitment under the Proposed Financing Facility and payment in full in cash of the Companies' obligations thereunder on the effective date of the Plan; or an order shall be entered which dismisses any of the Cases and which order does not provide for termination of the Proposed Financing Facility and payment in full in cash of all obligations thereunder; or (D) the Companies shall take any action, including the filing of an application, in support of any of the foregoing, or any person other than the Companies shall do so and such application is not contested in good faith by

5

the Companies, (ii) the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder of any security interest in any material asset of the Companies, (iii) the Companies fail to meet any of the Milestones (defined below), (iv) any material contract is rejected or otherwise terminated or any material property of the Companies is sold, in each instance, without the consent of the Lenders, (v) termination of the Companies' rights, privileges and other property rights under the Major League Baseball Constitution or any other baseball-related agreement, or (vi) other events of default to be set forth in the Loan Documents.

MILESTONES:      The Companies shall conduct a process to license Borrower's broadcast media rights (the "Media Rights"). The Companies shall provide a weekly telephonic update on their sale process to the Agent and shall provide such other updates on the sale process as the Agent may request. The sale process is intended to be fully transparent to the Agent and the Lenders, with the Agent to have full and complete access to the Companies and their representatives on all non-privileged matters pertaining to the sale process.

As a condition to further funding, the Companies, the Agent and the Lenders shall, on or prior to July 29, 2011, reach agreement with respect to a process and timing for the license of the Media Rights (the "Milestones"), which Milestones shall require, among other things:

(a) entry of a final order of the Bankruptcy Court, satisfactory to the Agent and the Lenders in their sole and absolute discretion, approving the transaction (the "Media Rights Order") shall occur no later than 180 days after the Petition Date; and

(b) the transaction shall close no later than 45 days after entry of the Media Rights Order.

REMEDIES:      Upon the occurrence and during the continuance of an Event of Default, the Lenders may, in their sole and absolute discretion, suspend or terminate the DIP Loan Commitment. Following three (3) days' notice of such Event of Default to the Borrower, the official committee of unsecured creditors, and the U.S. Trustee, unless such Event of Default is cured within such time or an order of the Bankruptcy Court is entered to the contrary, the Agent shall have relief from the automatic stay to exercise remedies under the Proposed Financing Agreement.

CERTAIN MISCELLANEOUS PROVISIONS:      Customary for facilities of this type, including, without limitation, taxes, indemnity and expenses, funding protections to be set forth in the Loan Documents.

CERTAIN PROVISIONS OF THE INTERIM ORDER AND FINAL ORDER:      The Interim Order and Final Order shall be in form and substance satisfactory to the Lenders in their sole and absolute discretion and contain provisions prohibiting the Companies from incurring any indebtedness that (x) ranks *pari passu* with or senior to the Proposed Financing Facility or (y) benefits from a first or second priority lien under section 364 of the Bankruptcy Code.

GOVERNING LAW:      All documentation in connection with the Proposed Financing Facility shall be governed by the laws of the State of New York applicable to agreements made and performed in such State except as governed by the Bankruptcy Code.

ASSIGNMENTS, PARTICIPATIONS, ETC.:      The Lenders shall be permitted to sell or assign their rights and obligations hereunder, or any part thereof, to any person or entity without the consent of the Companies, provided, however, that the Lenders shall not assign their

rights or obligations hereunder to another Major League Baseball Club or Major League Baseball, or any affiliate of either of the foregoing. The Lenders shall be permitted to grant participations in such rights and obligations, or any part thereof, to any person or entity without the consent of the Companies, provided, however, that the Lenders shall not grant participations in such rights and obligations to another Major League Baseball Club or Major League Baseball, or any affiliate of either of the foregoing.

OUT-OF-POCKET
EXPENSES:

All fees, including legal and other professional fees (including any financial advisor to be retained by the Agent), and all reasonable out-of-pocket expenses associated with the transaction are to be paid by the Companies without the need for the filing of any applications with the Bankruptcy Court.

All borrowings by the Borrower, all costs, fees and expenses of the Agent and the Lenders (including the fees and expenses of the Agent's and the Lenders' professionals), and all other obligations owed to the Lenders shall be charged to the loan account to be established under the Proposed Financing Facility, unless such costs, fees, expenses and other obligations have been paid by the Companies on a current basis.

## EXHIBIT C

Budget

Cash Flow Projections
Jane YE – September 7, 11
($000)

|  | Actual | | | | | | | | Projection | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Period Ending Friday** | 6/17/2011 | 6/24/2011 | 7/1/2011 | 7/8/2011 | 7/15/2011 | 7/22/2011 | 7/29/2011 | 8/5/2011 | 8/12/2011 | 8/19/2011 | 8/26/2011 | 9/2/2011 | 9/9/2011 | 9/16/2011 | 9/23/2011 | 9/30/2011 |
| **Beginning Balance** | $ 6,702 | $ 5,543 | $ 3,163 | $ 13,502 | $ 19,338 | $ 11,714 | $ 30,594 | $ 19,335 | $ 10,336 | $ 25,380 | $ 23,302 | $ 23,502 | $ 17,107 | $ 17,091 | $ 19,726 | $ 19,848 |
| **Inflows:** | | | | | | | | | | | | | | | | |



9/28/2011

CashFlowFil