# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| LOS ANGELES DODGERS LLC, *et al.*,[1] | ) | Case No. 11-12010 (KG) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Hearing Date: July 20, 2011 at 10:00 a.m. (ET)[2] |

## OBJECTION OF MAJOR LEAGUE BASEBALL TO FINAL APPROVAL OF DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, AND 364, AND (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND 4001(C)

The Office of the Commissioner of Baseball, doing business as Major League Baseball ("Major League Baseball"), hereby submits this objection (the "Objection") to final approval of the Emergency Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, and 364, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) [Docket No. 13] (the "DIP Financing Motion") filed by Los Angeles Dodgers LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors"), which requests authority to enter into a $150 million debtor-in-possession financing arrangement (the "Highbridge DIP Facility") with a group of lenders in the Highbridge Senior Loan Fund II family of funds (collectively and as disclosed in the DIP Financing Motion, "Highbridge"). In support of the Objection, Major League Baseball

---

[1]     The Debtors, together with the last four digits of each of the Debtors' federal tax identification number, are: Los Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567); LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029). The location of the Debtors' corporate headquarters and the service address for the Debtors is 1000 Elysian Park Avenue, Los Angeles, California 90012.

[2]     By agreement among Major League Baseball and the Debtors, Major League Baseball's objection deadline was extended to July 14, 2011 at 4:00 p.m. (ET).

WM1A 1004453v1 07/14/11

adopts and incorporates by reference its initial objection to the DIP Financing Motion [Docket No. 27] (the "Initial DIP Financing Objection"), and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.     Major League Baseball's primary objection to the DIP Financing Motion is simple:  the Debtors cannot satisfy their burden of proving that the terms of the Highbridge DIP Facility are fair and reasonable and that no better financing alternatives are available.  As explained by the Court:

> [T]he issue before me on July 20th is going to be strictly whether or not the Debtors have met their burden under Bankruptcy Code Section 364 to show that they were unable to obtain unsecured financing, that the terms of the Highbridge facility are fair and reasonable. And clearly the Court will also compare that financing with the proposed financing from Major League Baseball.

July 7, 2011 Hr'g Tr. at 30:23-31:4.

2.     First and foremost, Major League Baseball is offering to provide postpetition financing to the Debtors under a proposed credit facility (the "MLB DIP Facility") on an administrative priority basis only under section 364(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").  This fact alone precludes approval of the Highbridge DIP Facility under the explicit requirements of section 364(c) of the Bankruptcy Code, as section 364(c) provides that a court may only authorize the obtaining of secured credit thereunder if a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense."  11 U.S.C. § 364(c).

3.     Moreover, both the economic and non-ecomomic terms of the MLB DIP Facility are vastly superior to those of the Highbridge DIP Facility.  Among other more favorable features, the MLB DIP Facility:

2

(a)    substantially reduces the fees required to be paid under the Highbridge DIP Facility, which are almost $10 million;

(b)    reduces the interest rate by 3 percentage points, which, assuming a full draw on the $150 million committed under the Highbridge DIP Facility, would save the Debtors $4,500,000 over the course of a year;

(c)    does not require the Debtors to encumber any of their assets (including avoidance actions);

(d)    contains fewer events of default, and excludes certain defaults contained in the Highbridge DIP Facility that may very well occur in these cases;

(e)    provides for a maturity date of November 30, 2012, which is after the conclusion of the Right of First Negotiation period under the existing Fox Telecast Agreement;

(f)    limits the reimbursement of the legal fees and expenses of the lender (in its capacity as such) to those reasonable fees and expenses incurred in connection with the MLB DIP Facility;

(g)    includes Major League Baseball's agreement, upon the closing of the MLB DIP Facility, to cause the Major League Baseball Trust to waive the default pursuant to Section 6.01(f) of the Club Trust Agreement that occurred as a result of the commencement of these chapter 11 cases; and

(h)    has been reduced to writing in the form of a credit agreement (the "MLB Credit Agreement")[3] and disclosed to the Court and parties in interest as required by Rule 4001(c)(1)(A) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.    Notably, the Debtors do not even attempt to argue that a single economic term of the Highbridge DIP Facility is in any way better for their estates. Indeed, the Debtors concede that the MLB DIP Facility is superior for all of the above reasons. See, e.g., July 7,

---

[3]    Copies of the MLB Credit Agreement, summary term sheet, and commitment letter are attached hereto as Exhibits "A-1", "B-1" and "C-1". Blacklines reflecting revisions to these documents against the versions filed with the Initial DIP Objection are attached hereto as Exhibits "A-2", "B-2" and "C-2". Finally, blacklines of the Major League Baseball term sheet and commitment letter against the Highbridge term sheet and commitment letter are attached hereto as Exhibits "B-3" and "C-3"; see also Declaration of John McHale Jr. (the "McHale Decl."), which will be filed concurrently herewith.

2011 Hr'g Tr. at 29:24-30:1 (As recognized by the Court, "I think it's been conceded that on the economic terms Major League Baseball's proposed financing is superior.").[4]

5.      Nevertheless, the Debtors have explicitly refused to engage in negotiations with Major League Baseball concerning the proposed MLB DIP Facility. The Debtors have cited to a handful of terms of Major League Baseball's proposals as an excuse for ignoring them *in toto*. As explained below, however, in every instance, Major League Baseball has addressed each and every purported concern, but the Debtors still have declined negotiations. Now, as their only remaining excuse for rejecting Major League Baseball's overtures, the Debtors allege that the substantively better MLB DIP Facility must represent a thinly-veiled effort to take control over the Debtors and their chapter 11 cases. That is simply not the case.

6.      The Debtors fail to identify a single term of the MLB DIP Facility that provides Major League Baseball with some inappropriate level of control or ability to harm the Debtors. The Court has made it clear that it intends to review the terms of the MLB DIP Facility "to determine whether or not there are terms within that financing which are burdensome to, potentially burdensome to the Dodgers, are designed to exert control over the Dodgers." July 7, 2011 Hr'g Tr. at 30:1-5. The terms of the MLB DIP Facility are in fact customary and reasonable. Indeed, the terms of the MLB DIP Facility were largely based on the term sheet for the Highbridge DIP Facility, subject to significantly improving the deal. Additionally, even if the MLB DIP Facility were to provide Major League Baseball with any sort of indirect control over the Debtors (which it does not), the Debtors and their estates remain subject to this Court's jurisdiction and oversight. See July 7, 2011 Hr'g Tr. at 31:6-9 ("The Court will still have

---

[4]      A copy of the July 7, 2011 hearing transcript is attached hereto as Exhibit "D".

oversight over the application of the DIP facility and will exercise that authority if and when appropriate or if and when requested to do so.").

7.      As such, there is simply no reasonable business purpose to justify approval of the economically inferior Highbridge DIP Facility. The only explanation for accepting inferior and substantially more expensive financing is that Mr. McCourt, as the decision maker of the Debtors, has allowed personal reasons to dictate the Debtors' refusal to even consider postpetition financing from Major League Baseball, regardless of the best interests of the Debtors' estates and stakeholders. In fact, as explained further below, Mr. McCourt has significant conflicts of interest with respect to the DIP Financing Motion, including, among other potential conflicts, a substantial personal financial stake in obtaining approval of the Highbridge DIP Facility over alternative financing proposals. ███████████████

███████████████████████████████

███████

8.      Because the decision maker was conflicted, the Debtors must discharge their considerable burden of proving entire fairness, which they cannot do. By selecting Highbridge, Mr. McCourt personally benefitted in the amount of ███████, and the Debtors correspondingly are harmed by paying almost $15 million more in financing costs ███████ ███████████ unnecessarily encumbering their assets, and accepting serious default risk. The transaction selected by Mr. McCourt is entirely unfair.

9.      Major League Baseball confirms its commitment and wherewithal to provide DIP financing to the Debtors pursuant to the MLB DIP Facility. See McHale Decl. Accordingly, the Court should deny approval of the Highbridge DIP Facility and instead approve the economically superior MLB DIP Facility.

WM1A 1004453v1 07/14/11

**BACKGROUND**

**A.     The Debtors' Chapter 11 Cases**

10.     On June 27, 2011 (the "Petition Date"), and without prior notice to Major League Baseball (or Jamie McCourt or Fox Sports), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").

11.     The Debtors continue to manage their estates as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered.

12.     On July 13, 2011, the United States Trustee for the District of Delaware appointed the official committee of unsecured creditors in these Chapter 11 Cases. As of the date hereof, no trustee or examiner has been appointed in the Chapter 11 Cases.

**B.     Major League Baseball**

13.     Major League Baseball is an unincorporated association of its 30 member clubs (the "MLB Clubs"), including the Los Angeles Dodgers (the "Dodgers"). The association is headquartered in New York City and is governed by the Major League Constitution (the "MLB Constitution"). The economic value of each of the MLB Clubs is dependent on its affiliation with Major League Baseball. Indeed, the value of the MLB Clubs is derived almost exclusively from their ability to compete with other MLB Clubs—an opportunity only available via membership in Major League Baseball. Further, membership in Major League Baseball also provides the participating MLB Clubs with exclusive access to numerous other benefits, including, but not limited to, (a) operating lines of credit and comprehensive insurance programs with favorable terms and rates arranged by Major League Baseball, (b) income from various

6

nationwide media and licensing agreements, (c) the scouting of talented new players, and (d) pro rata ownership stakes in business ventures organized and operated by Major League Baseball for the benefit of the MLB Clubs. As a price of that membership and the benefits derived therefrom, each of the MLB Clubs, including the Dodgers, has independently and severally agreed to be bound to the MLB Constitution and the various agreements, rules, guidelines, regulations, bulletins, directives, policies, decisions, and requirements of Major League Baseball adopted thereunder (collectively, the "Baseball Agreements").

14. Through enforcement of the MLB Clubs' obligations under the Baseball Agreements, Major League Baseball maintains the integrity of and public confidence in the national game of baseball ("Baseball"). Major League Baseball ensures that matters requiring discipline are investigated and dealt with swiftly, that all MLB Clubs and owners recognize the interdependent relationship each MLB Club has with every other MLB Club and that the clubs and owners act consistently with that relationship, including owning and operating each MLB Club for its own sake, in a sound fiscal manner, and not for the benefit of other businesses or individuals. In short, Major League Baseball acts to protect each MLB Club's valuable interest in being a member of Major League Baseball. As such, the interests of the Dodgers are closely aligned with those of Major League Baseball and the other 29 MLB Clubs.

## C. Mismanagement of the Dodgers

15. In February 2004, Mr. McCourt acquired the Dodgers from Fox Baseball Holdings, Inc. (an affiliate of Fox Entertainment Group, Inc.) for $421 million. Pursuant to the sale, and as a condition to Major League Baseball's approval thereof, Mr. McCourt and the Dodgers, through various agreements, including an Assumption Agreement dated February 13, 2004, acknowledged their obligations to comply with (a) all of the terms and conditions imposed

7

by Major League Baseball, including any rules, guidelines and procedures promulgated by the Commissioner of Baseball (the "Commissioner"), and (b) all of the duties, liabilities, responsibilities and obligations of an MLB Club under the Baseball Agreements.

16.     When Mr. McCourt acquired the Dodgers in 2004, he did so almost entirely with borrowed funds. As a condition of allowing Mr. McCourt's highly leveraged purchase of the Dodgers, Major League Baseball required that Mr. McCourt agree to provide an additional $30 million in liquid equity within three years through the sale of certain real estate assets or by securing equity investors. Mr. McCourt failed to satisfy that obligation.

17.     Instead, Mr. McCourt spent the last seven years monetizing the Dodgers' various assets by creating a complex network of corporate entities through which he leveraged the Dodgers and its related assets (including parking lots, Dodger Stadium, and a securitization vehicle created by Mr. McCourt to obtain revenue from Dodgers ticket sales) as well as his equity interests therein. Mr. McCourt also extracted cash from the Dodgers, including substantial amounts from the proceeds of certain of these transactions. Among other things, Mr. McCourt has taken out ███████████ in direct and indirect payments to him, his family, and affiliated entities from the Dodgers, leaving the Dodgers in a liquidity crisis so acute that they had insufficient liquid assets to make payroll due June 30, 2011. Several of these transactions were not disclosed to or approved by Major League Baseball, notwithstanding that such disclosure and approval was required under the Baseball Agreements.

18.     In May 2010, Mr. McCourt requested that Major League Baseball approve a proposed $130 million debt offering from one of the Dodgers' holding companies to institutional investors to solve the Dodgers' looming liquidity crisis. Major League Baseball supported Mr. McCourt's efforts to raise capital by, among other things, allowing the Dodgers to

8

meet with potential investors at Major League Baseball's offices in New York and by participating in portions of those meetings to express support for the potential deal. Mr. McCourt, however, abandoned this effort when potential investors reacted to negative publicity from his divorce trial by demanding stricter deal terms.

19.     In September 2010, Mr. McCourt and his ex-wife Jamie began a trial to resolve certain issues in the couple's much publicized, acrimonious divorce proceeding that has been pending since 2009. That divorce proceeding was the subject of intense media coverage, and spawned websites and blogs dedicated to the exposure of what their contributors considered the extraordinary personal and financial excesses of Mr. McCourt at the expense of the Dodgers. Public filings in the divorce proceedings and trial testimony revealed that Mr. McCourt systemically siphoned millions of dollars out of the Dodgers to finance his lavish lifestyle and satisfy his other personal debts. Also, at his direction and without the consent of Major League Baseball, Mr. McCourt had caused the Debtors to spin off key assets of the Dodgers (e.g., the Dodger Stadium parking lots) to separate entities in an attempt to evade oversight and regulation by Major League Baseball. In addition, Mr. McCourt and his ex-wife disagree about who owns the Dodgers and who is entitled to exercise certain corporate governance rights over the Dodgers.

20.     Moreover, additional concerns over Mr. McCourt's ability to continue operating the Dodgers in a manner consistent with the quality standards of Major League Baseball became apparent by opening day of the Dodgers' 2011 season. On March 31, 2011, Mr. Bryan Stow, a fan of another MLB Club, was severely beaten at Dodger Stadium. The incident highlighted the apparent deficiencies in security provided by the Debtors, which compromised the safety of fans and patrons to the detriment of the Dodgers and Major League

WM1A 1004453v1 07/14/11

Baseball. This deficiency was further exacerbated by the extraordinary number of complaints received by the Commissioner, in which Dodgers fans and fans of other MLB Clubs expressed their concern over the lack of security at Dodger Stadium.

**D.      Appointment of the Monitor**

21.      Due to, among other things, the revelations of Mr. McCourt's mismanagement of the Dodgers, the resulting liquidity crisis facing the Dodgers, the ensuing loss of public confidence in the team, and the potential harm all of the foregoing would cause to the game of Baseball, the Commissioner, acting pursuant to his express authority under the Baseball Agreements, issued a directive on April 25, 2011 (the "Directive") authorizing and appointing Ambassador J. Thomas Schieffer as the Dodgers' monitor (the "Monitor") to oversee and monitor the Dodgers' day-to-day operations and its business and financial affairs.

22.      The responsibilities and authority of the Monitor under the Directive include, among other things, the right to review and approve (a) any expenditure over $5,000 or any commitment to make such an expenditure; (b) any dividend or other distribution of funds from the Dodgers to Mr. McCourt, his family, or any affiliates; and (c) all major operational decisions and any decision out of the ordinary course of business, including actions requiring director or managing member approval. Although Mr. McCourt still controls the Dodgers, substantially all of Mr. McCourt's significant financial decisions regarding the Dodgers are subject to the review and approval of the Monitor since the Directive was issued.

23.      Although the Debtors provided the Monitor with some access to their business prior to the commencement of these Chapter 11 Cases, the Debtors have since informed the Monitor and Major League Baseball of their position that the Monitor is enjoined by the automatic stay under section 362 of the Bankruptcy Code from performing his responsibilities

10

under the Directive. In response, Major League Baseball sent a letter to the Debtors' counsel explaining that the automatic stay does not apply to the Monitor's oversight and monitoring responsibilities under the Directive and demanding that the Debtors cooperate fully with the Monitor in the continued performance of his duties pursuant to the Directive, including by providing the Monitor with immediate access to the Dodgers' facilities and employees. As of the date of this Motion, the Debtors have not responded to Major League Baseball's demand.

**E.**     **The Debtors' Failure to Obtain Reasonable Prepetition Financing**

        24.     The Debtors allege that they were forced into chapter 11 on account of Major League Baseball's refusal to approve a media rights transaction with Fox Sports (the "Proposed Fox Transaction") and the liquidity crisis that purportedly ensued as a result. DIP Financing Motion ¶ 40. The facts, however, tell otherwise. As described above, Major League Baseball supported Mr. McCourt's efforts to raise capital pursuant to the $130 million debt offering proposed in May 2010. The Proposed Fox Transaction, however, represented yet another attempt by Mr. McCourt to divert the assets of the Dodgers for his own personal benefit. Among other troubling aspects of the deal, the Proposed Fox Transaction included a $385 million loan that would be distributed ultimately to a newly formed McCourt affiliate, a substantial portion of which would not go to the Dodgers, and would have required the Dodgers to enter into a 17-year media rights agreement with Fox Sports without regard for the best interests of the Dodgers or Baseball. Major League Baseball was unwilling to approve the Proposed Fox Transaction, which would have crippled the Dodgers financially for over a decade.

        25.     The Debtors' allegation that they could not obtain any reasonable, non-DIP financing seems highly unlikely given the Debtors' admission that their estates have "enormous asset values" and that their liabilities are "modest . . . by comparison[.]" June 28,

11

2011 Hr'g Tr. at 13:12-13.[5] ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████[7]

## F. The Debtors' Refusal to Negotiate with Major League Baseball on Postpetition Financing

26. Consistent with their prepetition refusal to work with Major League Baseball to address their financial difficulties, the Debtors failed to contact Major League Baseball about DIP financing in their purportedly "extensive search for financing" from "numerous banks, financial institutions, professional investors, and strategic partners." DIP Financing Motion ¶ 44. ████████████████████████

████████████████████████████████████████████████████

████████████ Instead, Mr. McCourt and the Debtors negotiated and entered into the $150 million Highbridge DIP Facility and, on the Petition Date, filed their DIP Financing Motion seeking Court approval of the Highbridge DIP Facility on an interim and final basis.

27. Although Major League Baseball, through discovery, is just now beginning to learn of the facts and circumstances surrounding the prepetition negotiation of the Highbridge DIP Facility, ████████████████████████████████████████

████████████████████████████████████████████

---

[5]     A copy of the June 28, 2011 hearing transcript is attached hereto as Exhibit "E".

[6]     ██████████████████████████████████████
██████████████

[7]     ███████████████████████ is attached hereto as Exhibit "F".



28.

29.     Upon learning of the bankruptcy filing and the proposed financing offered by Highbridge, Major League Baseball promptly offered the Debtors postpetition financing in the form of the MLB DIP Facility, which is on terms clearly superior to those offered by Highbridge. In particular, the MLB DIP Facility:

(1)     substantially reduces the fees required to be paid under the Highbridge DIP Facility, which are almost $10 million;

(2)     reduces the interest rate by 3 percentage points;

(3)     does not require the Debtors to encumber their assets (including avoidance actions);

---

8       ████████████ is attached hereto as Exhibit "G".

9       ████████████ is attached hereto as Exhibit "H".

10      ████████████████████████████████
        ████ is attached hereto as Exhibit "I".

13

(4)     contains fewer events of default;

(5)     provides for a maturity date of November 30, 2012, which is after the conclusion of the Right of First Negotiation period under the existing Fox Telecast Agreement;

(6)     limits the reimbursement of the legal fees and expenses of the lender (in its capacity as such) to those reasonable fees and expenses incurred in connection with the MLB DIP Facility;

(7)     includes Major League Baseball's agreement, upon the closing of the MLB DIP Facility, to cause the Major League Baseball Trust to waive the default pursuant to Section 6.01(f) of the Club Trust Agreement that occurred as a result of the commencement of these Chapter 11 Cases; and

(8)     has been reduced to writing in the form of the MLB Credit Agreement and disclosed to the Court and parties in interest as required by Bankruptcy Rule 4001(c)(1)(A).

30.     The Debtors do not dispute that the MLB DIP Facility is superior for all those reasons, and do not claim that a single economic term of the Highbridge DIP Facility is in any way superior. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

31.     In fact, the Debtors have described the MLB DIP Facility as "under market." July 7, 2011 Hr'g Tr. 25:11-15. Nevertheless, the Debtors have refused to engage in substantive discussions with Major League Baseball concerning the MLB DIP Facility. The Debtors initially asserted that they could not talk to Major League Baseball until Major League Baseball provided them a written term sheet. See Declaration of Thomas E Lauria [Docket No.

14

142, Exh. B] (the "Lauria Dec.") ¶ 2. Major League Baseball promptly provided the Debtors with a term sheet, but the Debtors did not respond. Id. Major League Baseball then reached out to the Debtors again, and was told that the Debtors would not talk until Major League Baseball provided a proposed credit agreement. Id. at ¶ 3. That was an unusual demand given the timing of the Debtors' need for financing. Indeed, it was later discovered that Highbridge had not (and still has not, to our knowledge) provided the Debtors with a credit agreement. Nonetheless, Major League Baseball worked all night and forwarded the MLB Credit Agreement to the Debtors. Id. Yet, the Debtors still refused to negotiate, this time claiming that Major League Baseball's Initial DIP Financing Objection somehow barred any negotiations, even though the objection was filed primarily to document the MLB Credit Agreement and explain to the Court and parties in interest the reasons why the MLB DIP Facility was superior to the Highbridge DIP Facility. Id.

32.    On June 28, 2011, just prior to the hearing on interim approval of the DIP Financing Motion (the "Interim DIP Hearing"), the Debtors' counsel finally returned calls from Major League Baseball's counsel, and identified four issues with respect to the MLB DIP Facility. See Lauria Dec. ¶ 4. Major League Baseball immediately agreed to change its proposal to remedy each of the purported concerns. Id.[11] Nonetheless, the Debtors still refused to agree to any process for negotiating and finalizing the terms of the MLB DIP Facility. Id.

---

[11]    Specifically, Major League Baseball revised the terms of the MLB DIP Facility to address the Debtors' issues by: (i) replacing the provision providing Major League Baseball with "sole and absolute discretion" over the financing and budget with a provision providing that Major League Baseball retained the right to seek relief from the Court upon a finding that the financing or budget is inappropriate or unreasonable; (ii) removing a provision that provided a default upon violation of Major League Baseball's rules and regulations; (iii) providing that the payment of Major League Baseball's fees and expenses is limited to those incurred in connection with the financing and the Chapter 11 Cases; and (iv) providing that the indemnity by the Debtors of Major League Baseball is limited to its capacity as a lender.

33.    At the Interim DIP Hearing, Major League Baseball obtained significant concessions from Highbridge, including (a) the elimination of the "Milestones," which artificially required a sale of the Dodgers' media rights, and (b) the reduction of the exit fee (then disclosed as being only $4.5 million) that Highbridge will receive in the event that the MLB DIP Facility is approved in lieu of the Highbridge DIP Facility at the Final DIP Hearing. June 28, 2011 Hr'g Tr. at 42:1-25. These concessions were reflected in the Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, and 364, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) [Docket No. 52] (the "Interim DIP Order").

34.    Pursuant to the Interim DIP Order, the Court approved the Highbridge DIP Facility on an interim basis only and authorized the Debtors to borrow up to $60 million of the proposed $150 million term loan facility, with the availability of the remaining $90 million subject to entry of a final order approving the Highbridge DIP Facility. The Court scheduled a final hearing on the DIP Financing Motion for July 20, 2011 (the "Final DIP Hearing").

35.    Since the Interim DIP Hearing, Major League Baseball has continued to reach out to the Debtors in an attempt to negotiate the terms of the MLB DIP Facility, as contemplated by the resolution at the Interim DIP Hearing, but the Debtors have refused to speak. See Lauria Dec. ¶ 5. Instead, the Debtors have spent their time issuing broad discovery requests related to Mr. McCourt's personal disputes with Major League Baseball, and other issues wholly unrelated to the DIP Financing Motion. See Debtors' Motion to Compel Production of Documents and Certain Deposition Witnesses [Docket No. 109] (the "Motion to Compel") and Major League Baseball's objection thereto [Docket No. 142]. Notably, the Court

16

denied the Debtors' Motion to Compel at the hearing on July 7, 2011. In connection therewith, the Court stated as follows:

> I think it's been conceded that <u>on the economic terms Major League Baseball's proposed financing is superior.</u> We will have an opportunity, however, at the [Final DIP Hearing] to determine whether or not there are terms within that financing which are burdensome to, potentially burdensome to the Dodgers, are designed to exert control over the Dodgers. That's the sort of issue, I think, that is relevant to the DIP financing motion . . . . [T]he Debtors are seeking discovery here to establish that the commissioner is antagonistic to the Debtors, is treating them hostilely in comparison to his treatment of other baseball teams facing similar circumstances . . . . <u>And on a narrow issue of financing, that sort of discovery seems to me to be not relevant.</u>

July 7, 2011 Hr'g Tr. at 29:24-30:17 (emphasis added). Further, the Court noted that:

> [T]he issue before me on July 20th is going to be strictly whether or not the Debtors have met their burden under Bankruptcy Code Section 364 to show that they were unable to obtain unsecured financing, that the terms of the Highbridge facility are fair and reasonable. And clearly the Court will also compare that financing with the proposed financing from Major League Baseball.

July 7, 2011 Hr'g Tr. at 30:23-31:4.

36. On July 8, 2011, counsel to Major League Baseball sent a letter to Debtors' counsel (the "July 8th Letter")[12] reiterating that Major League Baseball stands ready, willing and able to negotiate the terms of the MLB DIP Facility. The July 8th Letter further noted that Major League Baseball had already addressed the four concerns with respect to the MLB DIP Facility raised by the Debtors prior to the Interim DIP Hearing, and requested that the Debtors identify any additional concerns they may have had and schedule a conference call to discuss.

---

[12]     A copy of the July 8th Letter is attached hereto as Exhibit "J".

WM1A 1004453v1 07/14/11

37.     In response to the July 8th Letter, the Debtors' counsel sent a letter to

Major League Baseball's counsel on July 12, 2011 (the "July 12th Letter")[13] stating that the

Debtors will not negotiate DIP financing with Major League Baseball.  The Debtors asserted that

the MLB DIP Facility offered by Major League Baseball reflects "a determination by MLB to

dictate the manner in which these bankruptcy cases would be conducted . . . ."  July 12th Letter

at 2.  Specifically, the Debtors allege that, under the MLB DIP Facility:

(a)     The Debtors could not dispose of any significant property (including media rights) without Major League Baseball's consent;

(b)     The Debtors would be prohibited from incurring debt or granting liens without Major League Baseball's consent;

(c)     The Debtors would be prohibited from taking any action that Major League Baseball believes to be in violation of the "MLB Rules and Regulations";

(d)     The Debtors would be required to pay not only the legal fees and expenses incurred by Major League Baseball in connection with the MLB DIP Facility, but also any other fees incurred by Major League Baseball in connection with the Chapter 11 Cases; and

(e)     The Debtors would be subject to the risk of Major League Baseball refusing to extend the maturity date of the MLB DIP Facility, which may need to be extended given that it is prior to the conclusion of the Right of First Negotiation period under the existing Fox Telecast Agreement.

July 12th Letter at 3-5.

38.     The MLB Credit Agreement has been modified to address all of the

Debtors' concerns.  First, Major League Baseball has modified the MLB Credit Agreement so

that the Debtors are now permitted under the MLB DIP Facility to (i) dispose of the estates'

assets or property (provided that at least $400 million of value remains in the Debtors' estates

---

[13]     A copy of the July 12th Letter is attached hereto as Exhibit "K".

following any such disposal),[14] and (ii) incur new debt or grant postpetition liens and/or

superpriority administrative claims in respect of such new debt (provided that (x) the aggregate

principal amount thereof shall not exceed $250,000,000 at any one time outstanding and (y) the

proceeds thereof are used for general corporate purposes including repaying the DIP

obligations).[15]  Second, a violation of the MLB Rules and Regulations by the Debtors is not a

default under the MLB Credit Agreement.  Third, the MLB Credit Agreement now limits the

reimbursement of legal fees and expenses under the MLB DIP Facility to those reasonable fees

and expenses incurred by the lender, in its capacity as such.[16]  Finally, the MLB Credit

Agreement now provides that its maturity date is November 30, 2012, which is after the

conclusion of the Right of First Negotiation period under the existing Fox Telecast Agreement.[17]

Thus, Major League Baseball has addressed every objection raised by the Debtors with respect to

the objective terms of the MLB DIP Facility.[18]

        39.      The July 12th Letter, however, alleges that there may be other hidden,

objectionable provisions in the MLB Credit Agreement:

> [T]he proposed MLB Credit Agreement contains a number of
> provisions (the meaning of some of which are buried within the
> definitions) that, depending on how they are intended or
> interpreted by MLB, could lead to an immediate default by the
> Debtors upon its execution.  To be sure, our firm could expend

---

[14]      Specifically, the disposal of estate assets and property is permitted, provided that (x) after giving effect to any such disposal and the application of the proceeds thereof, the aggregate fair market value of the remaining assets of the Debtors (on a consolidated basis) that are not subject to a lien, shall be no less than $400,000,000 (plus the aggregate outstanding amount of all superpriority administrative claims against the Debtors), and (y) the proceeds thereof shall be used for general corporate purposes including the repayment of the DIP obligations.  MLB Credit Agreement § 7.4.

[15]      MLB Credit Agreement §§ 7.1; 7.2.

[16]      MLB Credit Agreement at § 11.6.

[17]      MLB Credit Agreement § 1.1.

[18]      For the avoidance of doubt, the modifications to the MLB Credit Agreement do not waive any rights Major League Baseball may have under the Baseball Agreements or applicable law.

> significant time and effort to ferret out those provisions, but we
> would remain concerned that MLB might nevertheless assert a
> default that was not apparent to us from our review of the
> document.

July 12th Letter at 4. There is simply no basis for this allegation. The terms of the MLB DIP

Facility are customary and reasonable (indeed, subject to improving the economics of the deal,

they were largely based on the Highbridge DIP Facility) and such terms have been fully

disclosed. Further, the Debtors, who are represented by sophisticated counsel, are more than

capable of "ferreting" out any objectionable provisions. In fact, Major League Baseball has

repeatedly requested a copy of the Highbridge credit agreement so that it could prepare its credit

agreement in accordance with the terms that the Debtors had already determined to be

acceptable, but the Debtors have not yet disclosed such agreement. In any event, Major League

Baseball is confident that a mutually agreeable credit agreement could be negotiated if the

Debtors were willing to engage in negotiations.

G.     **Undisclosed Fees in Connection with the Highbridge DIP Facility**

            40.     In their DIP Financing Motion, the Debtors stated that the fees they are

required to pay under the Highbridge DIP Facility include the following:

- Delayed Draw Fee: One-half percent (0.50%) of the unused portion of the DIP
  Loan Commitment, payable monthly in arrears.

- Deferred Commitment Fee: $4,500,000, which shall be fully earned and non-
  refundable as of the Closing Date, and paid on the earlier of (i) payment in full of
  the Proposed Financing Facility and (ii) the Maturity Date.

- Other Fees: All fees, including legal and other professional fees (including any
  financial advisor to be retained by the DIP Agent), and all reasonable out-of-
  pocket expenses associated with the transaction (whether incurred pre or
  postpetition) are to be paid by the Debtors without the need for the filing of any
  applications with the Bankruptcy Court, plus such other fees as set forth in the
  Fee Letter.

20

DIP Financing Motion at 17-18 (emphasis added). The Debtors also noted that, "[i]n connection with the [Highbridge] DIP Term Sheet, . . . Mr. McCourt entered into that certain Fee Letter, pursuant to which Mr. McCourt . . . personally guaranteed the payment of the closing commitment payment in the event that any alternative financing . . . is consummated." See DIP Financing Motion ¶ 45. Notably, the only "closing commitment payment" that had been disclosed by the Debtors was the $4.5 million Deferred Commitment Fee.

41.    To ascertain the extent of Mr. McCourt's guaranty obligations and fees payable under the Highbridge DIP Facility, Major League Baseball requested, on several occasions, a copy of the Fee Letter from the Debtors. Despite repeated requests, the Debtors did not provide Major League Baseball with a copy of the Fee Letter until July 9, 2011, and did not file it with the Court until July 12, 2011 (i.e., two weeks after the Interim DIP Order was entered), and then only doing so under seal. Notably, the Fee Letter sets forth the following



[19]

---

[19]    ████████████████ is attached hereto as Exhibit "L".

WM1A 1004453v1 07/14/11



42.     Although the DIP Financing Motion states that the Debtors are required to

pay the "other fees as set forth in the Fee Letter" under the Highbridge DIP Facility, the Debtors

failed to disclose to the Court that one of those fees was a ████████████ fee in the amount

of $5.25 million ████████████████████████████ This amount is in

addition to the $4.5 million Deferred Commitment Fee (assuming the Highbridge DIP Facility is

approved) disclosed in the DIP Financing Motion, for a total ████████ fee of $9.75 million.

Further, as set forth in the Fee Letter, ████████████████████████

████████████████████████████.

43.     The Debtors neglected to disclose this material information to the Court at

the Interim DIP Hearing.  As noted above, as a condition to resolving Major League Baseball's

objections to interim approval of the Highbridge DIP Facility (with full reservation of rights to

object to final approval), the Debtors and Highbridge agreed that if the MLB DIP Facility is

approved in lieu of the Highbridge DIP Facility at the Final DIP Hearing, Highbridge's exit fee

will be reduced to $250,000.  June 28, 2011 Hr'g Tr. at 42:10-17.

44.     Given that the Debtors had not yet disclosed the Fee Letter or the $5.25

million ██████████████████ to the Court, Major League Baseball's counsel sought to

clarify the amount of commitment fees on the record of the Interim DIP Hearing:

> MR. LAURIA: Great. And the second thing I wanted to be clear on
> is that the fee, the exit fee at $250,000 is a reduction from what's
> contemplated by the term sheet from four and a half million
> dollars.
>
> THE COURT: Yes; four and a half million dollars down to
> $200,000.
>
> MR. LAURIA: 250.
>
> THE COURT: I'm sorry, 250, I have the right number. Yes.

June 28, 2011 Hr'g Tr. at 44:5-13.

45.     At no point during the Interim DIP Hearing did counsel to the Debtors or

Highbridge correct the record or disclose to the Court that the total ████████ fees were $9.75

million, not $4.5 million.

## H.     Mr. McCourt's Conflicts of Interest

46.     Mr. McCourt has a substantial economic interest in selecting Highbridge.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████[20]█████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[20]     █████████████████████████ are attached hereto as Exhibits "M" and "N".

████████████████████████ [21] Given the lack of disclosure to the Court concerning

these fee arrangements, Mr. McCourt has a continuing conflict of interest in ensuring that the

Highbridge DIP Facility be approved on a final basis.

      47.    At the very same time that Mr. McCourt was negotiating the Highbridge

DIP Facility, ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ [22] Clearly, Mr. McCourt has not allowed these bankruptcy cases to

change his practice of using the Debtors as his personal piggy-bank.

---

[21]    ████████████████ is attached hereto as Exhibit "O".

[22]    ████████████████ is attached hereto as Exhibit "P".

## OBJECTION

I.   **The Debtors have Failed to Satisfy their Burden of
     Proving that Better Financing Options are Not Available**

48.   To obtain postpetition secured financing under section 364(c) of the

Bankruptcy Code, the Debtors must "sustain the burden of establishing the following"

requirements:

> (1) They are unable to obtain unsecured credit per 11 U.S.C. §
> 364(b), i.e., by allowing a lender only an administrative claim per
> 11 U.S.C. § 503(b)(1)(A); (2) The credit transaction is necessary to
> preserve the assets of the estate; and (3) The terms of the
> transaction are fair, reasonable, and adequate, given the
> circumstances of the debtor-borrower and the proposed lender.

In re St. Mary Hosp., 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988) (citing In re Crouse Group, Inc.,

71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), aff'd, 75 B.R. 553 (E.D. Pa. 1987)).  With respect to

the first requirement, section 364(c) specifically provides that a court may only authorize the

obtaining of secured credit thereunder if a debtor is "unable to obtain unsecured credit allowable

under section 503(b)(1) of this title as an administrative expense." 11 U.S.C. § 364(c).

Consequently, "a court . . . may not approve any credit transaction under subsection (c) unless

the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section

364(a) or (b)." In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990)

(emphasis added).

49.   Unlike the Highbridge DIP Facility, which grants liens on all of the

Debtors' assets (including avoidance actions), Major League Baseball is only requesting

administrative claims in connection with the MLB DIP Facility.  See MLB Credit Agreement at

§ 8.1.  Accordingly, the Highbridge DIP Facility cannot be approved under the explicit statutory

requirements of section 364(c).

WM1A 1004453v1 07/14/11

50.     For example, in <u>In re St. Mary Hospital</u>, the court refused to approve the debtor's proposed DIP financing under section 364(c), in part because the debtor did not seek alternative financing from *potential sources* that may have offered "a very reasonable alternative . . . or outright grants of financial assistance." 86 B.R. at 402. Here, the Debtors did not even attempt to obtain alternative DIP financing from Major League Baseball – an obvious potential source. Worse, once Major League Baseball, acting on its own initiative in the best interests of the Dodgers, actually offered economically superior alternative financing, the Debtors refused to negotiate. As such, the Debtors have fallen woefully short of satisfying their burden of proving that they attempted, but failed, to obtain unsecured credit under section 364(a) or (b).

51.     Further, as a corollary to the three requirements enumerated in <u>In re St. Mary Hosp.</u>, the Debtors also bear the burden of proving "that no better offers, bids, or timely proposals are before the Court." <u>In re Phase-I Molecular Toxicology Inc.</u>, 285 B.R. 494, 495-96 (Bankr. D.N.M. 2002) (<u>citing</u> <u>In re W. Pac. Airlines, Inc.</u>, 223 B.R. 567, 572 (Bankr. D. Colo. 1997)). Here, the Debtors cannot meet this burden with respect to the Highbridge DIP Facility because it is clearly inferior to the MLB DIP Facility. <u>See</u> July 7, 2011 Hr'g Tr. at 29:24-30:1 (recognizing that "on the economic terms Major League Baseball's proposed financing is superior"). Specifically, the Highbridge DIP Facility (a) requires the Debtors to pay exorbitant fees and interest, (b) requires the Debtors to encumber all of their assets (including avoidance actions), (c) contains additional events of default not present in the MLB DIP Facility, and (d) does not comply with the requirements of Bankruptcy Rule 4001.

26

## A.    The Highbridge DIP Facility Charges Excessive Fees and Interest

52.    The Highbridge DIP Facility charges a much higher interest rate than the

MLB DIP Facility and grants Highbridge a variety of excessive fees not required by the MLB

DIP Facility.  Specifically:

(a)    The Highbridge DIP Facility provides for interest at LIBOR + 7%, with a 3% LIBOR floor, which results in a minimum 10% rate of interest.  See Term Sheet attached to the DIP Financing Motion as Exhibit "B" (the "Highbridge Term Sheet") at 3.  The MLB DIP Facility charges interest at LIBOR + 5.5%, with a 1.5% LIBOR floor, which results in an interest rate of 7%.  See MLB Credit Agreement at § 3.3.  Thus, the MLB DIP Facility interest rate is 3% lower.

(b)    The Highbridge DIP Facility includes a $4.5 million deferred commitment fee.  See Highbridge Term Sheet at 3.  The Highbridge DIP Facility also includes an undisclosed $5.25 million ▮▮▮▮▮▮▮▮▮▮ fee (as described above).  The MLB DIP Facility does not require any commitment fee, which alone makes it $9,750,000 cheaper.

(c)    The Highbridge DIP Facility includes a Delayed Draw Fee of 0.50% of the unused portion of the $150 million committed by Highbridge.  See Highbridge Term Sheet at 3.  The MLB DIP Facility does not require a delayed draw fee or any similar or equivalent fee.

53.    Assuming a full draw on the $150 million committed under the

Highbridge DIP Facility, the lower interest rate under the MLB DIP Facility would save the

Debtors approximately $375,000 each month, and approximately $4.5 million over the course of

a year.  The Debtors recognize that the Highbridge DIP Facility is too expensive.  ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮[23]  Unlike the Highbridge DIP Facility, which includes nearly $10 million in

---

[23]    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is attached hereto as Exhibit "Q".

fees, the MLB DIP Facility has no fees. Accordingly, the MLB DIP Facility is economically far superior to the Highbridge DIP Facility proposed by the Debtors.

**B.**     <u>The Highbridge DIP Facility Unnecessarily Encumbers the Debtors' Assets</u>

54.     The Highbridge DIP Facility requires first and senior priority liens on all of the Debtors' assets. Highbridge Term Sheet at 2-3. The MLB DIP Facility requires <u>no collateral</u> from the Debtors. The Debtors should not encumber any, let alone all, of their assets with liens when there is no need to do so. Unsecured financings typically cost more, yet here Major League Baseball's unsecured DIP financing is substantially cheaper.

55.     Further, the Highbridge DIP Facility provides Highbridge with liens upon "claims of the Companies or their estates under Bankruptcy Code sections 542, 544, 545, 547, 548, 550, 551, 553(b) or 724(a)." Highbridge Term Sheet at 3. Avoidance actions are property of the estates created by the Debtors' bankruptcy filings, and are therefore typically reserved for unsecured creditors. <u>See</u> <u>Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV</u>, 229 F.3d 245, 250 (3d Cir. 2000) ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away."); <u>In re Cybergenics Corp.</u>, 226 F.3d 237, 244 (3d Cir. 2000) (avoidance actions are not property of the debtor but rather are created by operation of bankruptcy law and belong to the debtors' creditors). Indeed, some courts have expressly prohibited granting liens on such actions or their proceeds. <u>See, e.g.</u>, <u>Official Comm. of Unsecured Creditors v. Goold Elecs. Corp.</u>, No. 93 C 4196, 1993 WL 408366 at *3-*4 (N.D. Ill. Sept. 22, 1993).

56.     There is simply no reasonable business purpose justifying the encumbrance of the Debtors' avoidance actions or even its other assets as proposed under the

28

Highbridge DIP Facility, particularly where, as here, Major League Baseball has offered the MLB DIP Facility, which does not require any collateral from the Debtors.

**C.    The Highbridge DIP Facility Contains
          Unnecessary and Inappropriate Events of Default**

57.    The Highbridge DIP Facility contains several events of default (the "Additional Events of Default") that are not present in the MLB DIP Facility. Specifically, these include (a) dismissal or conversion to chapter 7 of the Chapter 11 Cases, (b) appointment of a chapter 11 trustee or an examiner, and (c) termination of the Debtors' rights, privileges and other property rights under the MLB Constitution or any other Baseball Agreement. Compare Highbridge Term Sheet at 5-6 with MLB Credit Agreement at § 10.1.

58.    These Additional Events of Default unnecessarily burden the Debtors with restrictions and place them at a greater risk of defaulting under the Highbridge DIP Facility, as compared to the MLB DIP Facility. Indeed, as explained by the court in In re Ames Dep't Stores, Inc.:

> It is . . . the practice of this [c]ourt **not to approve financing arrangements containing clauses triggering default on the appointment of a trustee or examiner** under section 1104. Such entrenchment of management may not be in the best interests of the estate and only precludes parties-in-interest from seeking to redress fraud or gross mismanagement through such an appointment.

115 B.R. at 38 (emphasis added).

59.    These provisions are particularly problematic here because there very well may be a need to appoint a trustee or examiner given Mr. McCourt's conflicts and behavior. Likewise, Mr. McCourt has violated the MLB Constitution and other Baseball Agreements, so a loss of privileges is also a possibility in these cases. Accordingly, given the presence of the

29

unnecessary and burdensome Additional Events of Default and their potential effect on parties' rights in these Chapter 11 Cases, the Court should not approve the Highbridge DIP Facility.

### D. The Highbridge DIP Facility Does Not Comply with Bankruptcy Rule 4001

60.    Bankruptcy Rule 4001(c) governs attempts by a debtor to obtain credit and specifically provides that a motion for approval of postpetition financing ". . . shall be accompanied by a copy of the agreement and a proposed form of order . . . ." Fed. R. Bankr. P. 4001(c)(1)(A) (emphasis added); see also 9 Collier on Bankruptcy ¶ 4001.07[2][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("The rule requires that a copy of the proposed credit agreement always accompany the motion.").

61.    Inexplicably, the terms of the Highbridge DIP Facility have not yet been reduced to a final credit agreement. Instead, the Debtors state that they anticipate having a credit agreement negotiated and ready for presentation to the Court by the time of the Final DIP Hearing. DIP Financing Motion at 20 n.5. Therefore, it appears that the Debtors are still negotiating the terms of the Highbridge DIP Facility. In contrast, Major League Baseball has prepared and fully disclosed the MLB Credit Agreement, thereby allowing the Court and all parties in interest to review and understand the terms of the proposed financing. Indeed, Major League Baseball provided a copy of the MLB Credit Agreement to the Debtors prior to the Interim DIP Hearing, and attached a copy of the agreement to the Initial DIP Financing Objection.

62.    Because the terms of the MLB DIP Facility have been reduced to writing in the form of a credit agreement, thus complying with Bankruptcy Rule 4001(c)(1)(A), the MLB Credit Agreement can be executed by the Debtors and approved by this Court, while, as of the

WM1A 1004453v1 07/14/11

date of this Objection, the Highbridge DIP Facility does not even appear to exist in the form of a credit agreement, remains subject to negotiation and, therefore, cannot be approved by the Court.

## II. The Highbridge DIP Facility Violates the Baseball Agreements

63. The Baseball Agreements require that Major League Baseball review and approve any agreement that extends loans or other financial accommodations to an MLB Club. MLB Ownership Guidelines at § III. Further, Los Angeles Dodgers LLC's own governing agreement specifically recognizes this rule and requires Major League Baseball approval of loan agreements such as the Highbridge DIP Facility. Under Section 3(b) of the Amended and Restated LLC Agreement of Los Angeles Dodgers LLC, dated May 11, 2005, (i) any grant of a security interest, pledge or other encumbrance of any interest in Los Angeles Dodgers LLC, any member thereof, or the Dodgers is subject to the Baseball Agreements; (ii) any such security interest, pledge, or other encumbrance that requires the consent of Major League Baseball "is prohibited and shall be null and void unless all applicable consents are obtained in advance"; and (iii) any such consent may be withheld at the sole and absolute discretion of Major League Baseball.

64. The Debtors failed to seek, much less obtain, approval of Major League Baseball for the Highbridge DIP Facility. Thus, if the Highbridge DIP Facility is approved on a final basis, the Debtors will have triggered a default under the Baseball Agreements that cannot be cured. As explained in the Initial DIP Objection, since the default cannot be cured, the Baseball Agreements cannot be assumed, thus jeopardizing the Debtors' ability to successfully reorganize and materially impairing the value of the Debtors to the detriment of their creditors and other stakeholders. On this basis alone, the Court should not approve the Highbridge DIP Facility.

31

## III.     The DIP Financing Motion is Subject to Heightened Scrutiny

65.     The Debtors are not entitled to any deference based on their business judgment here because Mr. McCourt, the ultimate owner of the Debtors and the person making the judgment, is conflicted. As explained above, Mr. McCourt is conflicted in respect of the specific issue of DIP financing because he has a very substantial ███████ personal economic stake in obtaining final approval of the Highbridge DIP Facility. Accordingly, the Court must apply a heightened level of scrutiny when considering the Debtors' choice of DIP financing. See Nixon v. Blackwell, 626 A.2d 1366, 1375-76 (Del. 1993) (holding that transactions approved by managers who stood to benefit from such transactions and were, therefore, on both sides of the transactions were subject to the "entire fairness" test) (citing Sinclair Oil Corp. v. Levien, 280 A.2d 717 (Del. 1971); Weinberger v. UOP, Inc., 457 A.2d 701 (Del. 1983)); In re Bidermann Indus., 203 B.R. 547, 551 (Bankr. S.D.N.Y 1997) (applying heightened scrutiny to transaction because chief executive officer was conflicted and finding debtors were "completely misguided" in asserting that the business judgment rule should apply in light of "manifest self-dealing"); In re Integrated Res., Inc., 147 B.R. 650, 656-58 (Bankr. S.D.N.Y. 1992) (finding Delaware corporate law principles have "vitality by analogy" for chapter 11 debtors incorporated in Delaware and holding appropriate test for debtors' business decision is entire fairness, not business judgment, when a predominantly interested board has "financial interests in the transaction adverse to the corporation"); see also 7 Collier on Bankruptcy ¶ 1108.07[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (noting the application of "the most searching standard of review" to "transactions in which there is a potential for managerial self-dealing").

WM1A 1004453v1 07/14/11

66.     Specifically, the Debtors have the burden of proving entire fairness in price and process, a daunting burden. See Solomon v. Armstrong, 747 A.2d 1098, 1113 (Del. Ch. 1999), aff'd, 746 A.2d 277 (Del. 2000) ("The burden of proving entire fairness is often a daunting task[.]"); Adelphia Comm'ns Corp. v. Rigas (In re Adelphia Comm'ns Corp.), 323 B.R. 345, 385 (Bankr. S.D.N.Y. 2005) (same); Pereira v. Cogan, 267 B.R. 500, 508 (S.D.N.Y. 2001) (same); see also Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC), 444 B.R. 51, 106 (Bankr. D. Del. 2010) ("The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.") (quoting Weinberger v. UOP, 457 A.2d at 710. The Debtors cannot meet this burden given that, as explained above, (i) the Debtors appear to have conducted a limited search for alternative sources of prepetition and postpetition financing, and (ii) the Highbridge DIP Facility is economically inferior, and significantly so, to the MLB DIP Facility for which the Debtors have refused even to engage in negotiations.

67.     Put succinctly, by selecting Highbridge, Mr. McCourt personally benefitted in the amount of ██████████, and the Debtors correspondingly are harmed by having to pay almost $15 million more in financing costs ████████████████████████, encumber their assets, and accept serious default risk. The transaction selected by Mr. McCourt is entirely unfair.

## IV.    Major League Baseball's Alleged Animus Does not Justify Favoring the Highbridge DIP Facility over the Economically Superior MLB DIP Facility

68.     The Debtors have asserted in their reply to the Initial DIP Financing Objection [Docket No. 35] (the "Debtors' Reply") that Major League Baseball seems to be "driven by a personal animosity" and that such alleged animosity justifies their preference of the

33

Highbridge DIP Facility over the economically superior MLB DIP Facility. Debtors' Reply at 3, 7. The evidence is clear that there is no animosity against the Dodgers, a valued member of Major League Baseball. ███████████████████████████████████ ███████████████████████████████████████████████. It is no secret that Major League Baseball has taken issue with Mr. McCourt's gross mismanagement and repeated attempts to divert the assets of the Dodgers for his own personal benefit. However, the pertinent inquiry here is not what financing proposal is in the best interest of Mr. McCourt, but rather, what proposal is in the best interest of the Debtors and their estates. Indeed, as evidenced by Mr. McCourt's conflicts described above, the two interests may be completely divergent. In contrast, Major League Baseball's primary objective is to maintain the integrity of and public confidence in Baseball, and thereby protects each MLB Club's valuable interest in being a member of Major League Baseball. In this regard, the Debtors' interests are closely aligned with those of Major League Baseball and the other 29 MLB Clubs.

69.     Further, the Debtors have not cited a single case stating that lender animus is a factor that should be considered in weighing the merits of a postpetition financing proposal. Courts generally do not inquire into the internal decision-making of prospective lenders, but rather focus on the objective terms of the financing proposal and its benefit to the estate. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. at 40 ("[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); In re Barbara K. Enters., Inc., No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) ("To support a financing request, a debtor should provide evidence of a potential benefit to

the estate in obtaining the financing."). Thus, this Court denied discovery as to the alleged motivations of Major League Baseball: "[T]he Debtors are seeking discovery here to establish that the commissioner is antagonistic to the Debtors, is treating them hostilely in comparison to his treatment of other baseball teams facing similar circumstances . . . . And on a narrow issue of financing, that sort of discovery seems to me to be not relevant." July 7, 2011 Hr'g Tr. at 30:10-17.

70.     Here, although the Debtors allege that the MLB DIP Facility "is nothing other than a thinly-veiled effort to take control over the Debtors and these cases[,]" (Debtors' Reply at 6), the Debtors fail to identify a single term of the MLB DIP Facility that provides Major League Baseball with some inappropriate level of control or ability to harm the Debtors. To the contrary, the terms of the MLB DIP Facility are customary and reasonable and, unlike the Highbridge DIP Facility, such terms have been memorialized in a credit agreement and fully disclosed to the Court and all parties in interests. Indeed, the terms of the MLB DIP Facility were largely based on the Highbridge DIP Facility, subject to significantly improving the deal and making modifications to address the four concerns raised by the Debtors immediately prior to the Interim DIP Hearing and the concerns set forth in the July 12th Letter. Additionally, even if the MLB DIP Facility were to provide Major League Baseball with any effective control over the Debtors (which it does not), the Debtors and their estates remain subject to this Court's jurisdiction and oversight. See July 7, 2011 Hr'g Tr. at 31:6-9 ("The Court will still have oversight over the application of the DIP facility and will exercise that authority if and when appropriate or if and when requested to do so."). Moreover, Highbridge is a hedge fund with no disclosed relationship to the Debtors, and the Debtors do not purport to know anything about Highbridge's motivations for providing financing. ████████████████████████

35

71.     Finally, the Debtors' reliance on the unreported decision in In re ION

Media Networks, Inc., No. 09-13125, 2009 WL 2902568 (Bankr. S.D.N.Y. July 6, 2009), is

misplaced.[24] See Debtors' Reply at 5-6. ION Media involved a motion for reconsideration of a

DIP financing proposal that had already been approved over a competing proposal.  In that case,

the court noted that "[r]elevant features of the financing must be evaluated, including non-

economic elements such as the timing and certainty of closing, the impact on creditor

constituencies and the likelihood of a successful reorganization."  Id. at *4.  In particular, the

"non-economic" concerns of the ION Media court were a diligence condition that allowed the

prospective lender under the competing DIP proposal to walk away from the transaction at its

sole discretion and the risk of ancillary litigation between the prospective lender and other

creditors.  Id.  The court denied the prospective lender's motion for reconsideration based on the

fact that the only new evidence—the prospective lender's waiver of the diligence out—arose

after the court approved the other financing agreement.

72.     Here, the ION Media decision is inapposite.  There is no dispute that the

MLB DIP Facility is superior to the Highbridge DIP Facility.  Moreover, there is no issue

regarding the enforceability of Major League Baseball's financing commitment or disparate

impact on creditor constituencies.  Instead, the issue is whether the Debtors (at the direction of

their conflicted owner) should be permitted to burden their estates with inferior, costly financing

---

[24]      ION Media has not been cited by any other court in a published opinion.

36

simply because Mr. McCourt dislikes Major League Baseball. Certainly, the answer must be "no" and, thus, the DIP Financing Motion should be denied.

## RESERVATION OF RIGHTS

73.    Major League Baseball is currently conducting discovery and has not yet been provided with a copy of the Highbridge credit agreement. Accordingly, Major League Baseball reserves the right to supplement and amend this Objection and introduce evidence at the Final DIP Hearing related to the DIP Financing Motion and this Objection. Further, Major League Baseball reserves the right to respond, further object, join in, or amend any objection herein with respect to any argument or objection made by any person relating to the DIP Financing Motion.

WM1A 1004453v1 07/14/11

## CONCLUSION

74.     For the foregoing reasons, Major League Baseball respectfully requests that the Court deny final approval of the Highbridge DIP Facility and instead approve the MLB DIP Facility.  A copy of the proposed order approving the MLB DIP Facility is attached hereto as Exhibit "R".[25]

Dated: July 14, 2011
Wilmington, Delaware

                                    OFFICE OF THE COMMISSIONER
                                    OF BASEBALL

                                    By:     /s/ Jeffrey M. Schlerf
                                          Jeffrey M. Schlerf, Esq. (DE ID No. 3047)
                                          Eric M. Sutty, Esq. (DE ID No. 4007)
                                          L. John Bird, Esq. (DE ID No. 5310)
                                          FOX ROTHSCHILD LLP
                                          Citizens Bank Center
                                          919 North Market Street, Suite 1600
                                          Wilmington Delaware 19801
                                          (302) 654-7444

                                          -and-

                                          Thomas E Lauria
                                          Glenn M. Kurtz
                                          John K. Cunningham
                                          WHITE & CASE LLP
                                          1155 Avenue of the Americas
                                          New York, NY 10036
                                          (212) 819-8200

                                          -and-

                                          Bradley I. Ruskin
                                          Jeffrey W. Levitan
                                          PROSKAUER ROSE LLP
                                          Eleven Times Square
                                          New York, NY 10036
                                          (212) 969-3000

---

[25]     Additionally, a blackline of this proposed order against the Interim DIP Order is attached hereto as Exhibit "S".

38

-and-

Mark K. Thomas
Jeremy T. Stillings
PROSKAUER ROSE LLP
70 West Madison, Suite 3800
Chicago, IL 60602-4342
(312) 962-3550

*Counsel to the Office of the*
*Commissioner of Baseball*