# EXHIBIT 39

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Case No. 09-12010 (KG) |
| | ) Chapter 11 |
| LOS ANGELES DODGERS LLC, *et al.* | ) |
| | ) Courtroom No. 3 |
| Debtors. | ) 824 Market Street |
| | ) Wilmington, Delaware 19801 |
| | ) |
| | ) |
| | ) July 20, 2011 |
| | ) 10:00 A.M. |

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:
Young Conaway Stargatt & Taylor, LLP
By: ROBERT S. BRADY, ESQ.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899
(302) 571-6600

Dewey & LeBoeuf LLP
By: BRUCE BENNETT, ESQ.
SIDNEY P. LEVINSON, ESQ.
MATTHEW WALSH, ESQ.
333 South Grand Avenue, Suite 2600
Los Angeles, California 90071

ECRO: GINGER MACE

Transcription Service:
Reliable
1007 N. Orange Street
Wilmington, Delaware 19801
Telephone: (302) 654-8080
E-Mail: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording: transcript produced by transcription service.

A. Yes.
Q. So those fees total approximately $9.8 million dollars, correct?
A. Yes.
Q. And there are no such fees in the MLB DIP proposal, correct?
A. Correct.
Q. So the MLB DIP proposal was about $9.8 million dollars less expensive just on fees alone, correct?
A. Yes.
Q. And in addition to that Highbridge charged a half a percent on the delayed draw, correct?
A. Yes.
Q. So they charge you when you're not actually accessing the money, correct?
A. Yes.
Q. And Major League Baseball has no such fee, correct?
A. Correct.
Q. And if you combine those two matters then at least as originally proposed the Highbridge facility is more than $14 million dollars more expensive than the Baseball costs assuming that all the funds are accessed, correct?
A. Can you walk me through the math please?
Q. About $9.8 million dollars on fees and about $4 and a half million dollars more in interest, right?

A. Again I think the interest is less but yes. I understand what you're saying.
Q. And that's substantial, correct?
A. Yes.
Q. In fact, if you look as a percentage of the total cost the Highbridge facility was approximately 16½% of the available funds, correct?
A. Do that math for me.
Q. Sure. The interest rate was 10%, correct?
A. Yes.
Q. And fees of about $9.8 million over available funds of a $150 million is --
A. I follow you, yes.
Q. Okay and so it's about 16½%, correct?
A. Yes.
Q. Which is substantially more expensive than Baseball's 7%, correct?
A. Yes.
Q. And, of course, the Debtors knew that the fees were high, correct?
A. We knew they were but we had comps from other deals and we felt that the Highbridge deal fell within the comparables, so.
Q. Let me have you turn to Major League Baseball Exhibit #1 in your binder, sir.

Q. And the Debtors do not believe that Major League Baseball holds any animist towards the Dodgers, correct?
A. Correct.
Q. And so the contrary the Dodgers are an important of Major League Baseball, correct?
A. Yes.
Q. They are a storied franchise, correct?
A. Yes.
Q. And they are issues between Major League Baseball and Mr. McCourt but that's between them not Major League Baseball and the Dodgers, correct?
A. Well, correct, but there have been --
Q. Thank you. And in any case you're not even aware of any basis for believing that Major League Baseball has any animist even towards Mr. McCourt, correct?
A. Define basis? I mean.
Q. Turn to page 66 of your deposition?
A. I'm still there, sir.
Q. All right let's start on line 9.
"Question: Certainly you're not aware of any basis for believing that Major League Baseball has any particular animist towards Mr. McCourt, correct?
Answer: No.
Question: You're not aware, correct?
Answer: Right, correct."

Q. That was your sworn testimony at your deposition last week, correct?
A. Yes.
Q. And you can't identify any way in which Major League Baseball would benefit from harming the Dodgers, correct?
A. Correct.
Q. In fact, you agree that baseball does not want to harm the Dodgers, correct?
A. Correct.
Q. And, in fact, Major League Baseball has always been cooperative with the team right to the present, correct?
A. Correct.
Q. Now the Debtors have suggested in their reply that Highbridge might waive defaults but, in fact, it's fair to say that you expect Highbridge would act in its own best interest under the terms of the DIP proposal that would be approved, correct?
A. They would yes.
Q. Certainly Debtors expect Highbridge would require strict compliance with the terms of the DIP facility, correct?
A. Correct.
Q. And Highbridge would take all actions that were in its best interest in the event of a default, correct?
A. Yes.
Q. And regarding any purported concern about baseball the

Q. All right now Highbridge says on the third line down -- well I'll start this. Highbridge starts by talking about getting a closing fee of three and a quarter percent, correct?
A. Where did you start on the top line?
Q. Second line at this point
A. Okay it's on the top okay.
Q. And they say, then Highbridge says to you and it talks about getting $500,000.00 from Mr. McCourt, correct?
A. Yes.
Q. And a second lien; a personal guarantee and a second lien on Montana Land from Mr. McCourt, correct?
A. Yes.
Q. And then says structuring it this way is not ideal for us as it puts the risk of getting a deal done or it puts as it, but the deal -- let me re-read that. I think it's missing a word, but I'll read it verbatim. Structuring it this way is not ideal for us as it puts the risk on getting the deal done, but certainly makes his desire to do a deal away from us less so given the cash and the pledge, right?
A. Yes.
Q. And you understood that Highbridge's view was that if Mr. McCourt had a personal guarantee that he would be less likely to deal with someone other than Highbridge, correct?
A. Yes.

Q. In other words because Mr. McCourt would be on the hook for cash and a pledge of his land, he would be less likely to accept the deal for someone other than Highbridge, MLB or anyone else, correct?
A. Less likely but not absolutely.
Q. And you agreed with that, correct? That he'd be less likely to deal with anyone else, correct?
A. It depends on the terms of who anyone else is but yes.
Q. You agree with that, correct?
A. Depends. Depends what those other terms are available.
Q. Okay well how about this. What if the other terms available were 3% less in an interest rate and no fees? Those are substantially better terms, correct?
A. Those terms are, yes.
Q. But Mr. McCourt did not select MLB, correct?
A. Correct.
Q. And I mean at this time, Mr. McCourt is having financial difficulties personally, correct?
A. His plans put pressure on him yes.
Q. Five million dollars is a lot of money to Mr. McCourt at this point in time, correct?
A. Yes.
Q. As you testified Mr. McCourt is going through a very highly publicized and expensive divorce, correct?
A. Yes.

Q. In fact, he filed the motion just last week to reduce the amount of support because he says he can't pay it, right?
A. Yes.
Q. And he was in need of capital, right?
A. At the time yes.
Q. He's still in need of capital, right?
A. Yes he is.
Q. And at the time as you testified the Blue Landco loan from Sovereign was coming due on June 30th correct?
A. Yes.
Q. So Mr. McCourt needed capital for that as well, right?
A. He did.
Q. He did, correct?
A. Yes.
Q. And he also was trying to raise personal capital right?
A. Yes.

MR. KURTZ: And before I move to 12, Your Honor, I offer MLB Exhibit #11 into evidence.

THE COURT: Yes, sir, any objection?

MR. WALSH: No, Your Honor.

THE COURT: It is admitted.

(MLB Exhibit #11 received into evidence.)

BY MR. KURTZ:
Q. Please turn MLB Exhibit #12.
A. Okay.

THE COURT: Entire fairness requires fairness of price and fairness of process.

MR. LAURIA: Process, correct. And, that's what's missing, the process. What you're supposed to do is get an independent committee, with independent advisors, separate counsel, to go make the decision. We all know that. We've all confronted these type of problems where there are conflicts.

And, you know what you're supposed to do. The debtor didn't do it here. In fact, just the opposite. The witness, basically, testified Mr. McCourt was out making decisions, you know, almost without consulting with people, from time-to-time.

So, what should we do? As a practical matter, Your Honor, I want to try to come back to your question. We're here to provide the financing. We're not going to let this team fall. We'll provide it on a term sheet, in an order, on an interim basis, if we have to, until we can get language of a credit agreement worked out and agreed to.

If the Court gives us direction, we're going to follow it. Life is too short. Major League Baseball is too important to create a problem. We're here to solve a problem, not to create one. We may have disputes with Mr. McCourt, I don't know how they're going to get resolved.

I do say one thing that's kind of interesting about circumstances. Every other constituent in this case has their own counsel, somehow Mr. McCourt seems to be

getting represented by the debtors' counsel. And, I just think we've got to keep that in mind, that there is a difference between the interest of equity and the duties and obligations of the debtor to act as a fiduciary for all stakeholders which include Major League Baseball. I don't know what we do with that, but it's a problem.

When you read the papers, you could put McCourt at the top and you'd have a hard time saying that that's not McCourt's pleading as opposed to baseball's pleading.

UNIDENTIFIED ATTORNEY: Dodgers pleading.

THE COURT: Dodgers.

MR. LAURIA: I'm sorry, sorry.

THE COURT: I understood, Mr. Lauria. I'm sure you're tired.

MR. LAURIA: Your Honor, I think I've addressed the thing that I intended to address and the arguments that were made by the Dodgers in their closing. And, so I think I'll sit down and just ask that the Court deny the motion, with the expectation that counsel's representation that the consequence of denial is that the Dodgers will have to take baseball's loan under those circumstances.

THE COURT: Thank you. Thank you, Mr. Lauria. Mr. Kenny, yes, sir. Thank you, Mr. Lauria, I appreciate your argument.

MR. KENNEY: Your Honor, I promise to be much briefer than anybody who has gone ahead of me.

they buried it with miscellaneous fees and the garbage fees. You know, the warehouse fee, the postage fee, the Fed. Ex. fee, okay? Not a five and a quarter million dollar fee that you bury like that.

If they want to say the disclosed it, Your Honor, what they did is, they sprinkled clues throughout the pleading. And that if you were really astute and you caught on in the very brief amount of time you had, you realized something's missing here, and then if you ask exactly the right question, maybe you would find out what that fee was. I didn't know it was a five and a quarter million dollar fee the first day, Your Honor. I would have had a fit. I would have been in conniptions in front of you, Your Honor. I don't think Your Honor knew about it. Okay? And, then to hear Mr. Bennett say, well, it's because you didn't ask, you know, Your Honor, it's their job to disclose. It's not my job, it's not your job to ferret out the information as we've cited in our objection. So, for somebody to sit here and say that, well, look, we made adequate disclosure --

THE COURT: What is the remedy for that?

MR. KENNEY: Your Honor, I'm not sure today is the day for that remedy.

THE COURT: Okay. Is a remedy to deny the motion?

MR. KENNEY: Your Honor, I'm not sure that that is necessarily going to be an effective remedy. In fact, that could be a situation that winds up hurting the estate more. Okay? I just want to point it out because Mr. Bennett got up