# EXHIBIT 42

*Office of the Commissioner*
MAJOR LEAGUE BASEBALL

ALLAN H. (BUD) SELIG
*Commissioner of Baseball*

June 20, 2011

***VIA EMAIL AND OVERNIGHT DELIVERY***

Mr. Frank H. McCourt, Jr.
Los Angeles Dodgers Baseball Club
c/o McCourt Group
9420 Wilshire Boulevard, Suite 300
Beverly Hills, California 90212

Dear Frank:

Over the past several months, you have submitted to my Office, for its review and approval, multiple variations of a proposed media rights transaction among you, Los Angeles Dodgers LLC (the "Club"),[1] certain of your affiliated entities and Fox Sports Net, Inc. and its affiliates (collectively, "Fox"). The most recent version of this proposed transaction is reflected in the draft documents sent by your counsel, Robert A. Sacks, to Rob Manfred on June 7, 2011 (as modified by the Term Sheet described below, the "Proposed Transaction").

As you have recognized, all Club television agreements (including all cable and satellite television agreements) are subject to approval by the Office of the Commissioner pursuant to the rules and regulations of Major League Baseball, including, without limitation, my memorandum of November 9, 2005 regarding control interest transfers and the bulletin dated November 10, 2005 from Jonathan Mariner regarding securitization of Major League Club assets. These rules and regulations have been promulgated under the authority granted to the Office of the Commissioner under Article XI, Section 3 of the Major League Constitution. Both you and the Club have explicitly agreed in writing to comply with and adhere to the Major League Constitution and all of the foregoing rules and regulations pursuant to, among other things, your application to acquire the Dodgers and the Assumption Agreement dated February 13, 2004 among you, the Club and the Office of the Commissioner of Baseball.

[1] This letter's reference to Los Angeles Dodgers LLC as "the Club" is without prejudice to any claim, defense, argument or other position that my Office, Major League Baseball or the Major League Clubs may have regarding any of the rights, duties or obligations of any affiliate of the Club to which you have transferred, or that has otherwise acquired, any rights, assets or properties related to the Los Angeles Dodgers, including each such entity's obligation to be bound by, and to comply with, all obligations of "the Club" as such term is used in the Major League Constitution and all rules and regulations promulgated thereunder.

777 E. Wisconsin Avenue
Suite 3060
Milwaukee, WI 53202
(414) 225-8900 / Fax (414) 225-8910

I have previously expressed to you my serious concerns about certain aspects of the Proposed Transaction in letters dated February 24, 2011, March 24, 2011 and April 19, 2011. Yet, over the last two months, you and your attorneys have repeatedly demanded that I "immediately approve the Fox transaction" (including with respect to multiple prior incarnations that you had represented to be "final") and have asserted that my "continued delay" was harming both the Club and you personally. As you know, over this period, for several reasons, there was no transaction before me for approval. First, Fox unequivocally informed my Office that it was not prepared to proceed with the Proposed Transaction unless and until you resolved your dispute with Ms. McCourt. Second, Ms. McCourt had raised issues regarding your authority to cause the Club to enter into the Proposed Transaction in light of, among other things, her position that the Superior Court injunction that has been in place prevented you from entering into the transaction without her consent. This issue now appears to be resolved, as this past Friday, June 17, 2011, you provided my Office with a copy of a "Binding Term Sheet" between you and Ms. McCourt (the "Term Sheet"), which, among other things, reflects that she now "consent[s] to the proposed Fox transaction" and that the parties would take steps to secure its approval. The Term Sheet also modifies, significantly, the allocation and use of the proceeds of the Proposed Transaction.

Despite these persistent issues and the numerous changes to the terms of the Proposed Transaction over the last several months, both I and my representatives repeatedly assured you that once there was an actual transaction for me to consider and, further, after my Office's investigation of the Dodgers' finances and operations had advanced sufficiently to allow me to make a determination, I would evaluate the Proposed Transaction in light of all relevant facts and circumstances. I now have a transaction before me, and believe that I now have a sufficient understanding of those facts and circumstances to allow me to render my decision.

Accordingly, I have considered the Proposed Transaction in the form presented to my Office on June 7, as modified by the terms of the Term Sheet, taking into account all of the information that is available to me.[2] Unfortunately, much of the information that I have learned about the Proposed Transaction and the extraordinary circumstances surrounding the Dodgers is, to say the least, troubling. While any one of the factors identified below would alone give me serious pause, collectively, and viewing the Proposed Transaction in the context of the Club's and your overall situation, they demonstrate overwhelmingly that the Proposed Transaction is neither in the long-term interests of the franchise nor consistent with the best interests of the game of Baseball. For all of these reasons, I cannot approve the Proposed Transaction.

- <u>Failure to Pursue All Opportunities</u>. First, as you well know, although the Club's current Telecast Rights Agreement with Fox does not expire until after the 2013 season,

---

[2] I note that the draft documents that you submitted on June 7, 2011 modified the terms of the transaction that you had previously proposed (and represented to be "final"). In addition to a new letter agreement, which contains terms of particular relevance to my previously-stated concerns, the June 7 documents change the nature of your personal guarantee from a guarantee of collection to a guarantee of payment (and waive any right of subrogation, reimbursement or other recourse or defense that you may have against the RSN) in the event that the Telecast Rights Agreement is terminated for any reason other than the RSN's material breach.

beginning on November 30, 2012, you will be able to solicit offers from, and negotiate with, other parties that indicate an interest in the Club's media rights. By entering into the Proposed Transaction, however, you would never hear these offers. Instead, because of your desperate need for immediate cash (to address your financial problems and the Club's liquidity crisis, and to settle your divorce), you have proposed an early and lengthy extension to the Club's existing contract with Fox without hearing or considering other options.

Simply put, it is clear that you are pursuing the Proposed Transaction now, rather than waiting until you can "test the market," due to your own personal financial and marital issues. In fact, as your chief financial officer told representatives of my Office on April 5, 2011, you would not even be considering a media rights transaction at this time were it not for the Club's "financial duress." That situation is compounded by your need to finance the $100 million payment you would owe to Ms. McCourt should you prevail in your divorce proceeding. This duress has caused you to put the Club in the disadvantageous position of negotiating with a single party under significant financial pressure and without the benefit of the leverage that sports properties typically achieve when all potential licensees are invited to bid to acquire their rights. You had no choice but to accept a deal with the only party with which you could negotiate.

I recognize, of course, that the Proposed Transaction contemplates a meaningful increase in the rights fees payable to the Club – at least as compared to the arrangement you negotiated with Fox in 2003. But the Club would have substantially more leverage in its negotiations, and would likely be able to command better terms, were it to wait until the "exclusive negotiation period" with Fox expires when it can offer those rights to all interested parties. At that point, the Club would likely have multiple offers to choose from and could fully maximize its rights fees through a competitive process, as the Los Angeles Lakers recently did. Alternatively, management could potentially seek to launch the Dodgers' own (or at least a majority-owned) regional sports network, as you had planned until recently. The Proposed Transaction forecloses all of these opportunities. By foregoing these and other options that may be superior, you put your personal needs before the Club's and failed to act in the best long-term interests of the franchise and of Baseball.

- <u>Acceleration of Club Revenues</u>. The Proposed Transaction effectively accelerates hundreds of millions of dollars of the franchise's television revenues over the next 17 seasons in exchange for an up-front payment from Fox that would be received by one of your affiliated entities. While other clubs have received signing bonuses and other up-front payments as part of media rights deals, the $385 million that would be accelerated as part of the Proposed Transaction far exceeds any up-front payment previously received by any other club. No other owner has sacrificed so much of his team's future for an immediate payoff.

As I have previously expressed to you in my letters, I am concerned that at some point during the term of the Proposed Transaction, the Club will be unable to adapt to unexpected circumstances because you have accelerated such a substantial amount of its media revenues. In fact, you yourself shared the same concern in 2009, as Jeff Ingram recounted in his testimony in your divorce proceeding, when he explained your "preference" to wait until 2013 or 2014 before opening a dialogue with Fox:

> Q: What did you say to Frank McCourt and what did Frank McCourt say to you in substance on that topic?
>
> A: Okay. I said, "As we look at our options to raise the money we need to run the business, one of those options is to do a deal with FOX." And Frank noted that FOX has very tough negotiators, they're very smart, and he's not convinced we would get a very good deal from FOX at this time to do a capital raise, and that we'd <u>hamstring the business in the future</u> by getting them to do something now.

Yet today "hamstringing the business" is exactly what you are proposing, by taking such an up-front payment rather than waiting until the Club can fully exploit its rights. Indeed, the Dodgers are already suffering from the effects of accelerated television revenues, as the Club's 2011 media rights receipts have been reduced by the amount you asked Fox to advance in late 2010 (without disclosure to, or approval from, my Office). The risks arising from the Proposed Transaction are similar, but given the unprecedented size of this advance, could have consequences that are exponentially more adverse and long-lasting.

- <u>Division of Club Assets</u>. Despite your repeated attempts to characterize the Proposed Transaction as a "capital infusion" or an "equity contribution," that is simply not the case. There is no new equity in this transaction. Rather, all you are doing is selling the Dodgers' media rights to an affiliated entity and transferring to yourself, for no consideration to the Club, an extraordinarily valuable Club asset – <u>i.e.</u>, the right to pursue a Dodgers-branded regional sports network. In fact, you have formed an entirely new entity, LA Media LLC, which you apparently plan to own outside of LA Holdco LLC, the parent of the Club, and which would receive the 35% equity interest in Fox Sports Net West 2, LLC (the "<u>RSN</u>") and the $385 million up-front payment. While other clubs have entered into transactions that share similar features with the Proposed Transaction, the division of Club assets that you have proposed is particularly unsettling in light of the Club's current financial state and your previous efforts to separate key assets from the franchise.

  As you know, this is not the first time you have financed your current cash needs by segregating significant revenue streams and mortgaging the future of the franchise. Indeed, as your attorneys acknowledged in a recent submission to the Superior Court,

the monetization of future Club income streams has been a regular and ongoing part of the manner in which you have operated the Dodgers business. For example, in 2005, you restructured your enterprise to transfer the right to sell tickets to Dodgers games to a special purpose vehicle, Dodger Tickets LLC. You then utilized that vehicle to securitize and borrow $390 million against those ticket revenues, and applied a large part of the proceeds of those borrowings to make distributions to you personally or to satisfy your personal debts. As a result, the Club no longer collects its own ticket revenue and must wait for an affiliated entity to satisfy approximately $32 million of debt service before any remaining ticket revenue can be transferred to the Club to fund baseball operations. You have also undertaken similar transactions – dividing key assets from the Club and borrowing against those assets – with respect to the land adjacent to Dodger Stadium. These transactions have contributed significantly to the Club's current financial problems.

By disapproving the Proposed Transaction, I am ensuring that Los Angeles Dodgers LLC will have the opportunity to fully exploit its media rights for itself and/or retain up to 100% of the proceeds of a Dodgers-branded network. Or, alternatively, it could potentially partner with another media company, while retaining majority control. Regardless, having already altered its rights with respect to ticket revenues, the Club cannot afford to lose yet another valuable asset.

- Use of Proceeds for Non-Baseball Purposes. Fundamentally, the Proposed Transaction continues to exacerbate your ongoing pattern of using Club funds and Club-generated revenues to pay for your personal needs and obligations. Over the past three months, you have proffered various (and ever-changing) explanations regarding your use of the $385 million up-front payment from Fox. When you submitted a version of the Proposed Transaction to my Office on March 31, 2011, you indicated that $155 million of the proceeds would be used for a settlement payment to Ms. McCourt, another $100 million would be used to pay the debts of certain of your affiliated entities (but without reducing the Club's indebtedness at all), and up to $30 million would be distributed to you personally. After reviewing that proposal, my staff informed you and your representatives that I was troubled by your efforts to spend money that rightfully belongs to the Dodgers – and that was generated by accelerating the Club's television revenues and selling the Club's right to launch its own regional sports network – to fund your personal expenses. This concern intensified when we learned that since 2004, you and your family members have received – through distributions and other payments – over $180 million from the Dodgers enterprise.

  When you submitted your next proposal on April 27, 2011, you purported to address this concern by representing to my staff, the Dodger fans and the general public that the vast majority of the $385 million would be "invested into the Dodgers." But, when you submitted your June 7 proposal, those documents indicated that you would be using $100 million of the proceeds of the Proposed Transaction to pay personal obligations and debts of your affiliated entities – much of which, I note, were incurred to finance

your lifestyle, including your purchases of various residences and real estate in Malibu, Vail, Montana and Cabo.

And now it appears that your plan has changed again by further increasing the amount of the Fox payment that would be used by you and Ms. McCourt personally, rather than by the Club. Under last week's proposal, as reflected in the Term Sheet, you would immediately be spending at least $173.5 million (over 45% of the total up-front payment) for purposes that are entirely unrelated to Baseball. These would include:

- $50 million to Ms. McCourt, assuming that you prevail at the trial that is scheduled for August 4, 2011 (notably, if you do not prevail, you and Ms. McCourt would personally retain that $50 million);
- $5 million to you, to be used "as [you] desire;"
- $5 million to Ms. McCourt, again, to be used "as she … desires;"
- $10 million to the numerous law firms that represent (or have represented) either you or Ms. McCourt;
- $23.5 million that would initially go to the Club, but which would apparently be distributed to you personally; and
- $80 million to repay indebtedness of your affiliated entities.

Further, while you maintain that the remaining $211.5 million would initially be "used for" the Dodgers, in actuality, a large portion of that amount would be needed to satisfy existing debts and past due payables and to fill the significant hole in the Club's working capital (part of which was caused by the advance the Club received from Fox last year). Moreover, in just two years, you could owe Ms. McCourt another $45 million, for which you appear to have no other source of payment other than these funds. (I note that the June 7 documents contemplate that the Club would continue to make cash distributions to you, so long as it can remain technically solvent.)

I note that I have also received your letter of June 18, 2011, in which you reiterate your request that I approve the Proposed Transaction, and suggest that you and I, together with Rob Manfred, meet so that we can "come to closure on a constructive path going forward." However, after I received your letter, your counsel sent a letter to ours – which is entirely at odds with the tone of your letter – threatening to sue me and to pursue "acrimonious" and "extensive" litigation designed to embarrass me and Major League Baseball and to cause harm to all constituents (including the Dodgers franchise). In the first instance, putting aside the obvious fact that such a lawsuit would violate both the Major League Constitution and the contractual commitments that both you and the Club (and all other Major League Clubs) have made, these threats clearly

do not put things on a "constructive path." Indeed, they are utterly contrary to the best interests of Baseball.[3]

Second, your letter asserts, without explanation or support, that I should not take into account the Dodgers' current financial condition and operational state, and the facts that I have learned about the past financing and operations of the Club, in determining whether the Proposed Transaction is in the franchise's long-term interest and the best interests of Baseball. Apparently you believe that I should make these decisions in a vacuum, without the context of the relevant facts and circumstances related to the Dodgers. To me, that makes no sense. It is not the manner in which I have approached decisions concerning matters involving other clubs, each of which has turned on the unique circumstances of the particular club.

Third, while you indicate that you are prepared to modify the use of the $80 million that is allocated in your Term Sheet to pay certain "indebtedness" or to "commit" to obtaining certain "third party equity," you do so without any specifics and with an immediate qualifier that intentionally side-steps and asks me to ignore the unique circumstances in which you have placed the Dodgers. I should note that, regardless of how you applied that $80 million in the short-term, you would continue to have an excessive amount of personal and enterprise debt that can only be serviced and repaid out of Club funds.[4]

In sum, despite your pledge to make the Dodgers the "best franchise in baseball," you are not selling the Club's media rights and other valuable assets to improve the Club's on-field performance, renovate Dodger Stadium or enhance the fan experience. Rather, you would be continuing an eight-year pattern of exploiting the Dodgers franchise to finance your own personal needs, which would undoubtedly risk further erosion of public confidence in the Dodgers. Given the history of your ownership and the Club's current financial condition, I cannot approve a transaction that would allow you to extract millions upon millions more from this storied franchise.

- Short-Term Fix. I understand that you have provided my staff with a set of optimistic projections. However, based on our more realistic estimates, it appears that the

---

3 I should add that you and your counsel have been urging me for weeks to render a decision in this matter, even though it was clear that there was no final transaction for me to consider. In this context, now that the transaction finally is ripe for consideration, you request that I delay making a decision so that you can meet with me personally. As you know, I met with you in New York in April and our representatives have met many times to discuss this transaction. In fact, you acknowledged in your letter that "Rob [Manfred] and his staff understand the terms of the transaction." Moreover, I gave you an opportunity to submit in writing whatever additional material you wanted me to consider and you have, in fact, sent me a letter. While I will give due consideration to everything you have submitted, under the circumstances, I see no need for further delay.

4 As to your pledge to raise equity, we have been down that road many times before. When you bought the Club in 2004, you committed to raise $30 million, but failed to fulfill that commitment. Moreover, I have been asking you for some time to raise real equity from new investors – not the intercompany transfers that you characterize as equity – to address the Club's financial problems. But I have seen no meaningful progress in that effort to date.

Proposed Transaction would be nothing more than a short-term fix to the Club's precarious cash position. Once your assumptions are corrected to (i) provide for revenue sharing on the $385 million and the value of the 35% equity interest in the RSN, (ii) take fully into account the steep recent decline in the Dodgers' ticket sales and (iii) reflect the diversion of $173.5 million of Club-generated funds to you and your former wife and the repayment of your debts, there is little, if any, basis for these projections. In fact, we have estimated that after revenue-sharing, taxes, transaction costs, payment of your debts and satisfaction of your $45 million obligation to Ms. McCourt, the Club would require additional liquidity as early as 2013; otherwise, it would again have difficulty paying its players, satisfying its financial obligations to the other Major League Clubs, operating a first-class baseball franchise and ensuring that Dodger Stadium provides a safe and enjoyable environment for Dodgers fans.[5] The operation of a Major League Baseball Club in such a manner is clearly not in the best interests of Baseball.

- No Assurance of Ownership Support. Many of my concerns about the Proposed Transaction, including the acceleration of Club revenues and the resulting risk of operating losses in future seasons, are exacerbated by your personal financial situation. I recently received a copy of your personal financial statement[6] and was shocked to see that, other than your interests in the Dodgers and its affiliated entities, you had only $264,000 of liquid assets as of December 31, 2010. If I had assurance that you had the financial wherewithal to solve any cash flow problems that the Club may face in the future by making an equity contribution, I might be less concerned about the acceleration of the Club's television revenues. However, that is certainly not the case here.

- Uncertainty Regarding Ownership. As you know, on August 4, 2011, under your proposal, the Superior Court would determine the validity of Ms. McCourt's claims to an interest in the Dodgers. You have agreed in the Term Sheet that should Ms. McCourt prevail at this trial, the Dodgers franchise and related assets would be sold

---

5 By contrast, were you to arrange for a $385 million equity contribution, there would be no tax liability or revenue sharing obligation.

6 I note that although Rob Manfred requested a copy of your personal financial statement at the meeting that your representatives had with him on April 5, 2011, and despite the fact that Santiago Fernandez, the Club's general counsel, stated emphatically in a letter to Mr. Manfred dated April 14: "To be clear, Mr. McCourt will submit personal financial information as soon as it has been completed," we did not receive your financial statement until May 25, 2011 – six weeks later (and, even then, without much of the information that had been requested). Moreover, the document that we received indicates that it was prepared on February 18, 2011, which indicates that the delay was not, as Mr. Fernandez suggested, due to a delay in completing the personal financial statement. This is but one of a number of misrepresentations that you and your representatives have made to me and my staff, as have been detailed in certain letters from our counsel to yours.

under the Court's supervision.[7] Thus, there would appear to be a meaningful chance that the Dodgers would be sold in the next few months in your proposed scenario.

Yet, were you to enter into the Proposed Transaction prior to the sale, the next owner of the Dodgers would be bound by the Fox contract, but of course would not have the benefit of the $385 million up-front payment, as much of it will have already been spent. Virtually any potential buyer would want the opportunity to negotiate his or her own media rights agreement. Under the scenario you propose, however, the buyer would be forced to accept a transaction in which the franchise was saddled for the next 17 years with a contract under which the annual rights fees were agreed to in the absence of market competition and reduced by the amount of revenues you have accelerated in the form of the up-front advance.

In short, this transaction would not – as you have publicly asserted – enhance the value of the Club. And, as you well know, when any franchise sells for a lower price, the value of each Major League franchise is potentially affected.

- <u>Length of Term</u>. The length of your proposed telecast rights agreement also raises concerns. Under the Proposed Transaction, your arrangement with Fox would continue for 17 years without any mechanism to revalue the Dodgers' television rights if, in the future, they become more valuable. Of course, the duration of a particular contract is not, in and of itself, determinative; other Clubs have entered into long-term telecast agreements. However, the length of the term does oblige me to closely examine how the transaction would affect the Club, not just this season and next, but for the next 17 years. As Commissioner Kuhn recognized in a bulletin to the Major League Clubs dated September 7, 1984, telecast arrangements have the potential to be disguised control transfers, particularly where the arrangement "extends for a substantial term of years, since those rights would then be unavailable to prospective purchasers of the franchise." Of course, the possibility that the franchise may soon be sold only amplifies this problem. Regardless of how long you continue to own the Dodgers, the franchise – and its subsequent owners – would be bound by this deal until the year 2027.

- <u>Increase in Enterprise Debt</u>. The Proposed Transaction also increases the overall amount of debt that is attributable to the Dodgers' enterprise. As best we can tell, you and your affiliated entities are currently responsible for over $550 million of debt (not including the $60 million of credit lines on which you are a co-signor). Even though you have proposed to repay $80 million of enterprise and personal debt from the proceeds of the Fox payment, under the Proposed Transaction, you would incur (i) an additional $385 million of debt to Fox pursuant to your personal guarantee (which would be subject to immediate repayment upon an early termination of the Telecast Rights Agreement, except under certain circumstances), and 35% of which would be serviced from funds that would otherwise be available to support the franchise, and (ii)

---

[7] Of course, such a sale would require the approval of three-fourths of the Major League Clubs pursuant to Article V, Section 2(b)(2) of the Major League Constitution.

a $45 million debt to Ms. McCourt, which would be secured by a pledge of your equity in the entities that own the Dodgers and your 35% interest in the RSN. Based on the June 7 documents and the Term Sheet, we estimate that, after giving effect to the Proposed Transaction, you and the Dodgers enterprise (including all of your affiliated entities) would have over $900 million of total indebtedness, all of which could be serviced from only one source – Club revenues. For all of the reasons that I have stated in my previous letters, this incredible amount of enterprise and personal debt threatens the stability of the franchise and is, simply put, unacceptable.

- Increase in Your Personal Liabilities. Also disquieting is the substantial increase in your personal liabilities that would arise from the Proposed Transaction. As I noted above, under the Proposed Transaction, you would be personally guaranteeing $385 million of new debt and assuming a $45 million obligation to Ms. McCourt, despite the fact that your personal balance sheet calculates your net worth to be $162 million and reflects (as noted above) only $264,000 of liquid assets. In addition, you are obligated to pay $650,000 per month to Ms. McCourt in spousal support (the timing and future amounts of which would be affected by your future proceedings). Moreover, as also noted above, the June 7 documents indicate – for the first time – that your guarantee is not a mere guarantee of collection that exists solely for tax purposes, but a full guarantee of payment that would be triggered if the Fox contract is terminated for any reason other than Fox's material breach. And, if the Fox contract were terminated, you would have no right of subrogation, reimbursement or other recourse against the RSN. In other words, you would be personally responsible for immediately repaying the entire unamortized portion of the $385 million, without any means of satisfying that liability. Finally, by consummating the Proposed Transaction, you would inherit a tax liability that we believe may be as high as $100 million.[8] Were any of these debts or liabilities to become due, the Club would again be subjected to crisis and chaos on account of your personal finances.

- Motivated by Personal Interests. Above all, it is has become apparent to me that the Proposed Transaction is motivated not by the Dodgers' long-term interests, but rather by your own personal needs at the moment. I have no doubt that were it not for your own liquidity and marital issues and the Club's resulting state of "financial duress," you would not be pursuing, and would not be asking me to approve, this transaction. As the Dodgers' control owner, you have the duty to manage the Club "for its own sake, in a

---

8 With regard to taxes, I note that the Proposed Transaction has been designed, at least in part, to defer this substantial tax liability over a period of many years. While you have orally suggested a willingness to modify the structure, you have not suggested any potential modifications. The IRS might well challenge your tax position, especially in light of the fact that, as we have recently learned, the IRS is already auditing your 2006, 2007 and 2008 tax returns. I also understand that neither of the two prestigious law firms representing you in connection with the Proposed Transaction is giving you a formal tax opinion, which suggests that the risk of immediate liability is not inconsequential. Of course, should the IRS prevail, you could be required to pay the tax immediately, plus interest and possible penalties as well. What is even more worrisome to me, however, is the thought of one of our owners engaging in a prolonged public dispute with the IRS.

sound fiscal manner, and not for the benefit of another business," and a contractual commitment to operate the Dodgers "with the intention of being profitable and with respect to all operations and control in the best interests of the Los Angeles Dodgers and Major League Baseball." Instead, you have run the Club consistently for your own benefit and that of your family members, and your lifestyle, with little or no regard for the distinction between the Club's finances and your own. In light of that track record, I cannot accept a 17-year contract that is motivated by your desire to solve your personal financial and marital problems, rather than by what is in the long-term interests of the Dodgers and the game of Baseball.

For all of these reasons, taken together, I cannot approve the Proposed Transaction.

I hope you understand the reasons for my decision. If you have any questions regarding my decision or this letter, I will make my staff and counsel available to you and your advisors to discuss them with you.

Finally, I trust that it goes without saying, but I will remind you that any attempt or effort to proceed with the Proposed Transaction notwithstanding my determination will violate the rules of Baseball and constitute a failure or refusal to comply with a "requirement of the Commissioner" within the meaning of Article VIII, Section 4(f) of the Major League Constitution.

Very truly yours,

Allan H. Selig
Commissioner of Baseball

cc: Rob Manfred