**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re<br><br>LOS ANGELES DODGERS LLC, *et al.*,[1]<br><br>        Debtors. | )  Chapter 11<br>)<br>)  11-12010 (KG)<br>)  Jointly Administered<br>)<br>)  **Hearing date: October 31, 2011, at 12:00 p.m.**<br>)  **Objection deadline: October 24, 2011, at 4:00 p.m.**<br>)<br>)  **Re: Docket Nos. 443 & 476** |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' (A) OBJECTION TO
LOS ANGELES DODGERS LLC'S MOTION FOR ORDERS (I) APPROVING
MARKETING PROCEDURES FOR THE LICENSING OF TELECAST RIGHTS,
INCLUDING THE SCHEDULING OF AN AUCTION, OBJECTION DEADLINE, AND
DISPOSITION HEARING; AND (II) APPROVING AND AUTHORIZING THE
LICENSING OF TELECAST RIGHTS TO THE HIGHEST AND BEST BIDDER AND
(B) STATEMENT WITH RESPECT TO THE MOTION OF MAJOR LEAGUE
BASEBALL TO TERMINATE EXCLUSIVITY OR, IN THE ALTERNATIVE,
TO COMPEL THE DEBTORS TO SEEK ASSUMPTION OR REJECTION OF
THE BASEBALL AGREEMENTS**

The Official Committee of Unsecured Creditors (the "Committee") of Los Angeles

Dodgers LLC, *et al.* (the "Debtors") hereby submits the following objection to (A) *Los Angeles*

*Dodgers LLC's Motion For Orders: (I) Approving Marketing Procedures For The Licensing Of*

*Telecast Rights, Including The Scheduling Of An Auction, Objection Deadline, And Disposition*

*Hearing; And (II) Approving And Authorizing The Licensing Of Telecast Rights To Highest And*

*Best Bidder* (the "Marketing Procedures Motion") [Dkt. No. 443]; and statement with respect to

(B) *the Motion of Major League Baseball to Terminate Exclusivity or, in the Alternative, to*

*Compel the Debtors to Seek Assumption or Rejection of the Baseball Agreements* (the

---

[1] The Debtors in these chapter 11 cases (along with the last four digits of each Debtor's federal tax identification number) are:  Los Angeles Dodgers LLC (3133); LAD Holding Company LLC (4851); LA Holdco LLC (2567); LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029).  The service address for all Debtors is: Dodger Stadium, 1000 Elysian Park Avenue, Los Angeles, California 90012.

ny-997631

"Termination Motion" and, together with the Marketing Procedures Motion, the "Motions")[2] [Dkt. No. 476].  In support of this objection and statement (the "Objection and Statement"), the Committee respectfully represents as follows:

<b><u>PRELIMINARY STATEMENT</u></b>

1.     Both the Debtors and MLB posit that unsecured creditors are currently contemplated to receive a 100% recovery of their claim amounts plus interest.  The Committee, as the fiduciary for those creditors, therefore frames the complicated issues before the Court very simply:  Could the relief requested in either the Debtors' Marketing Procedures Motion or MLB's Termination Motion jeopardize that recovery?  After carefully analyzing the arguments made by the various parties in interest and conferring at length with the Debtors and MLB, the Committee concludes that the answer with respect to the Marketing Procedures Motion is "yes." Further, although the sale of the team through a process supported by MLB as proposed in the Termination Motion addresses many of the risks posed by a sale of the Telecast Rights, the details of such a process are unclear.  Accordingly, the Committee believes that the Court should defer ruling on the Termination Motion for a limited period of time in order to give the parties an opportunity to develop a consensual exit strategy.

2.     The successful marketing of the Debtors' Telecast Rights, pursuant to the Marketing Procedures Motion, requires the Debtors to clear a number of significant hurdles, including obtaining a favorable resolution on each of the following matters:  (a) whether Fox's Future Acquisition Rights (defined below) are unenforceable; (b) whether the Commissioner's refusal to approve the sale of the Telecast Rights is not being made in accordance with the

---

[2] Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Marketing Procedures Motion or the Termination Motion, as applicable.

Baseball Agreements or is not made in good faith; and (c) whether the Debtors can assume the Baseball Agreements without MLB's consent. Although it may be possible for the Debtors to succeed on all of the points necessary to complete a sale of the Telecast Rights and to thereafter emerge from bankruptcy with their MLB franchise intact, there are significant legal and practical hurdles that make such a path difficult and costly, with no certainty of success. The Committee cannot gamble the 100% recoveries of its constituents on such a risky proposition when it believes there are other, safer alternatives (i.e., a prompt sale of the team), especially since it is unclear that pursuing such a course will provide any upside to the Debtors' estates.

3.    While the Committee believes that a sale of the team as proposed by MLB may ultimately prove to be the best course of action to ensure full and prompt payment to unsecured creditors, it is easier said than done. Great care must be taken to fashion a plan process that provides for the smooth transition of ownership and safeguards the concerns of the Debtors' creditors. The Committee is hopeful that if exclusivity is continued for a short period of time and the Debtors are directed to engage in good faith negotiations with MLB and the Committee, a compromise can be reached among the parties that will permit a prompt, orderly, and *consensual* exit from bankruptcy that is supported by the Committee and MLB.

4.    For this strategy to succeed, however, it is necessary for the Court to reach a decision on the central issue—whether the Debtors can proceed on their own to sell the Telecast Rights over the objections of Fox and MLB, and whether the Debtors can assume the Baseball Agreements over the objection of MLB.[3] It is only after the Court rules on these important

---

[3] This Court's September 30, 2011 Order Scheduling Evidentiary Hearing (dkt. 508) set forth nine issues to be addressed at the upcoming evidentiary hearing. Each of the issues raised by the Court is of obvious importance to the underlying merits of the arguments for and against the relief being sought by both parties. The Committee respectfully submits that a determination on the issues set forth above is the determination that is most likely to set the stage for fruitful exit strategy discussions.

3

matters that the parties in interest can attempt to cooperatively formulate the Debtors' exit strategy. For these reasons, the Marketing Procedures Motion should be denied, and the Court should defer ruling on the Termination Motion for approximately thirty (30) days in order to allow the parties to formulate and propose an alternative reorganization strategy in light of the decisions made by the Court following the evidentiary hearing, including whether MLB's consent is required with respect to any plan of reorganization.

## BACKGROUND

5.      On June 27, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court, District of Delaware. On June 28, 2011, the Bankruptcy Court entered an order directing joint administration of the Debtors' cases under Case Number 11-12010 [Dkt. No. 40]. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession. No trustee or examiner has been appointed in these cases.

6.      On July 13, 2011, the United States Trustee for the District of Delaware appointed a five (5) member Committee pursuant to section 1102(a)(1) of the Bankruptcy Code [Dkt. No. 190].[4]

7.      Los Angeles Dodgers LLC ("LAD") and Fox Sports Net West 2, LLC ("Fox") are currently parties to that certain Telecast Rights Agreement dated November 2, 2001 (as amended, the "Fox Agreement"), pursuant to which LAD granted Fox an exclusive license to broadcast Dodgers games through the 2013 season in exchange for licensing fees. In addition,

---

[4] The members of the Committee are: (i) AVM Systems Limited Partnership, (ii) Conservators to Bryan Stow, (iii) LA Radio LLC, (iv) Major League Baseball Players Association, and (v) Pyro Events, Inc.

the Fox Agreement grants Fox certain rights of first negotiation and first refusal (collectively, the

"Future Acquisition Rights") with respect to any future licensing of the Debtors' Telecast Rights.

8.      On September 16, 2011, the Debtors filed the Marketing Procedures Motion, by

which they seek authority to auction the Telecast Rights now, notwithstanding Fox's Future

Acquisition Rights.

9.      On September 23, 2011, MLB filed the Termination Motion, in which MLB

asserts that the sale of the Debtors' Telecast Rights would inevitably lead to an unconfirmable

plan of reorganization, and the Debtors' exclusivity therefore should be terminated in order to

allow other parties to propose confirmable plans.  In the alternative, MLB requests that the

Debtors be compelled to assume or reject the Baseball Agreements.

## ARGUMENT

### A.      Marketing Procedures Motion

10.      The Debtors assert that the sale of their Telecast Rights will provide them with

sufficient liquidity to, among other things, pay all existing claims in full, retire existing financing

facilities, and provide cash for ongoing operational needs.  *Marketing Procedures Motion*, ¶ 8.

The success of this plan depends on a significant number of hurdles being cleared.  Most

importantly:

a.      The Court must find that Fox's Future Acquisition Rights are unenforceable (or can be rejected with limited damages and no specific performance required);

b.      The Court must find that the Commissioner's refusal to approve the sale of the Telecast Rights is not made in accordance with the Baseball Agreements or is not made in good faith and that the Debtors can close the transaction over such objection; and

c.      The Court must find that the Debtors can assume the Baseball Agreements without MLB's consent.

ny-997631                                5

11.      If the Court finds that Fox's Future Acquisition Rights are enforceable, the Debtors have suggested that they will reject the Fox Agreement and attempt to proceed with the sale of their Telecast Rights.[5]  Rejection of the Fox Agreement will give rise to a rejection damages claim by Fox that is uncertain in amount.  Fox has asserted that such damages could be "of immense size", potentially diluting general unsecured creditors' recoveries.[6]  *Fox Objection*, ¶¶ 1, 17.  The Debtors dispute this, (*see Debtors' Termination Objection*, ¶ 133), as will the Committee if Fox does assert such damage claims.  But because the issue of the *amount* of Fox's potential damages claim is not before the Court at this time, the Committee cannot risk proceeding down a path that, if the Debtors prove to be incorrect, could jeopardize creditor recoveries.

12.      Further, even if the Court were to find that MLB's numerous objections to any sale of the Telecast Rights are not consistent with the Baseball Agreements or are not made in good faith, there is no assurance that the Commissioner would not have good and valid reasons to later oppose any actual sale of the Telecast Rights that may arise from the Debtors' proposed marketing process.  It cannot be disputed that MLB has at least some approval rights with respect to the Debtors' proposed sale of their Telecast Rights.  At a minimum, given the adversarial stance of the parties, the continued pursuit of a sale of the Telecast Rights would likely lead to further litigation, delay, and uncertainty, at substantially more cost to the estate.  At worst, if

---

[5] *Debtors' Objection to Motion of Major League Baseball to Terminate Exclusivity or Compel Assumption or Rejection of the Baseball Agreements* (the "Debtors' Termination Objection") [Dkt. No. 590], ¶ 133.

[6] Fox has further asserted that, even if the Fox Agreement is rejected, Fox will nonetheless be entitled to specific performance of the Future Acquisition Rights.  *Objection of Fox Sports Net West 2, LLC to Los Angeles Dodgers LLC's Motion for Orders: (I) Approving Marketing Procedures for the Licensing of Telecast Rights, Including the Scheduling of an Auction, Objection Deadline, and Disposition Hearing; and (II) Approving and Authorizing the Licensing of Telecast Rights to the Highest and Best Bidder* (the "Fox Objection") [Dkt. No. 586], ¶¶ 60-62, 65.  Although the Committee takes no position with respect to such argument at this time, the potential requirement of specific performance raises further concerns regarding the impact a sale of the Telecast Rights would have on unsecured creditors' recoveries.

MLB is correct, the sale of the Telecast Rights without MLB's consent would constitute a breach of the Baseball Agreements.  Because the Debtors would be unable to cure that breach, it could render the entire sale process futile.[7]  *Termination Motion*, ¶ 46.

13.    Further, although the Debtors are "confident that the disposition of the Telecast Rights in the near term will generate more than sufficient liquidity to enable the Debtors to emerge from bankruptcy and meet LAD's operational needs into the foreseeable future" (*Marketing Procedures Motion*, ¶ 13), the Committee has significant reservations regarding the ability of an auction to generate maximum value for the Telecast Rights when it is being conducted in the shadow of almost-certain litigation and opposition by MLB.[8]  Both the specter of significant damage claims asserted by Fox (which Fox would presumably use as currency in any bid for future Telecast Rights) and the likelihood that the winner of an auction must then go toe-to-toe with MLB could chill bidding.

14.    Finally, if the Debtors pursue a sale that cannot ultimately be closed for any of the reasons described above, they will have wasted valuable time and money and may run out of liquidity entirely while they scramble to devise an alternative exit strategy.  That is in no party's best interest.

15.    Accordingly, because it seems unlikely that the Debtors can clear each of these hurdles before embarking on a sale of the Telecast Rights, the Committee, as the fiduciary for all unsecured creditors, opposes the Debtors' Marketing Procedures Motion.  The Committee

---

[7] *See also Objection of Major League Baseball to Los Angeles Dodgers LLC's Motion for Orders: (I) Approving Marketing Procedures for the Licensing of Telecast Rights, Including the Scheduling of an Auction, Objection Deadline, and Disposition Hearing; and (II) Approving and Authorizing the Licensing of Telecast Rights to the Highest and Best Bidder* [Dkt. No. 589], ¶ 46.

[8] *See generally Declaration of Edwin S. Desser in Support of Major League Baseball's (1) Objection to Los Angeles Dodgers LLC's Media Rights Motion, and (2) Motion to Terminate Exclusivity* [Dkt. No. 593] (asserting that it is not advisable to pursue the sale of the Telecast Rights at this time).

respectfully submits that pursuing a prompt sale of the team is the most prudent course of action in these cases.

Specific Concerns with Proposed Marketing Procedures

16.     In the event that the Court approves the Marketing Procedures Motion and authorizes the Debtors to proceed with an auction and sale of the Telecast Rights, the Committee has some specific proposals regarding the procedures themselves, as set forth below. The auction process set forth in the Marketing Procedures Motion generally contemplates that the Committee will be consulted and given an opportunity to raise and attempt to consensually resolve objections only after various steps in the process have been completed. A more efficient and transparent process would give the Committee full consultation rights on a real-time basis. Accordingly, the Committee requests that, if the Marketing Procedures Motion is approved, the sale procedures therein be modified to ensure that the Committee and its members are granted full access and consultation rights throughout the sale process, rather than only after the fact.[9]

**B.     Termination Motion**

17.     By the Termination Motion, MLB requests that the Court terminate the Debtors' plan exclusivity in order to allow MLB to propose a plan providing for the sale of the Dodgers, which MLB asserts will, among other things, pay all allowed claims in full. *Termination Motion*, ¶ 10, Ex. A. A plan process supported by MLB eliminates many of the risks associated with a sale of the Telecast Rights. First, the MLB plan proposes that the Fox Agreement not be

---

[9] Specifically, the Committee believes, among other things, that the marketing procedures should be modified to provide for: (a) consultation rights with respect to all marketing materials, the list of parties to be solicited prior to commencement of the marketing process commencing, and the transaction documents; (b) full Committee access to the data room; (c) periodic updates on process developments and developments by each party; (d) consultation rights on all bids received and the valuation methodology; (e) consultation rights on any changes to auction procedures/requirements; and (f) Committee attendance and consultation rights at the auction, including with respect to the determination of winning bidder and the review of final documents.

breached, eliminating any damages claims that might dilute unsecured creditors' recoveries. *Termination Motion*, ¶ 10(vi).  Second, the MLB plan requires assumption of the Baseball Agreements in full with MLB's consent.  This avoids all legal disputes regarding the Commissioner's authority and the attendant risk that the Debtors will not be able to exit bankruptcy with an MLB franchise.

18.     In its broad strokes, the MLB plan to sell the Dodgers appears to the Committee to provide the most secure course for the prompt and full payment of unsecured creditors' claims.  However, the Committee's fiduciary duties require that it have a full understanding of how such a process would actually be implemented before the Committee can endorse a team sale.  For example, at a minimum, it is unclear how a sale of the team would be undertaken. Who would run the sale process?  How would potential purchasers be qualified and selected? How would bids be compared?  On what time table would such a sale proceed?  What would be the involvement of various stakeholders?  How would a sale address the parking lots outside of Dodger Stadium (and any other assets related to operations that are not owned by any Debtor)?

19.     The Committee does not believe that the Debtors' estates or their creditors will benefit from the uncertainty that may be created by terminating the Debtors' exclusivity without a clear, confirmable exit strategy in place.  To the contrary, the Committee believes that the 100% recoveries that general unsecured creditors currently stand to receive will be best protected if these chapter 11 cases remain as orderly and focused as possible.  The Committee also does not believe it is appropriate at this time to foreclose the possibility of a settlement between the Debtors and MLB.  Ultimately, the Committee's hope is that, if and when the Marketing Procedures Motion is denied, the parties thereafter will be able to agree upon a process that can move this case forward on a *consensual* basis.  Terminating exclusivity now, which would most

likely be followed by a competing plan process, would irreversibly entrench the Debtors and MLB in their current adversarial positions.

20.     To this end, the Committee suggests that the Court defer ruling on the Termination Motion for approximately thirty (30) days following entry of an order regarding the Marketing Procedures Motion.[10]  With a ruling from the Court as to whether MLB's consent is required with respect to any plan of reorganization as a framework for discussions going forward and without the distractions of the unfeasible Marketing Procedures Motion, the parties should be given the opportunity to formulate and propose an adequately detailed exit strategy that will give rise to a clearly confirmable plan of reorganization.[11]

21.     The Committee believes that, within the modest thirty day period requested, it will become readily apparent whether the parties are capable of arriving at a consensual plan process that will enable them to move forward with a confirmable plan.  If they are not, then the issue of plan exclusivity should be revisited by the Court so that potential plan proponents other than the Debtors can step forward.  The Committee submits that this course of action will avoid creating yet another "sideshow" in these cases to the detriment of the Debtors' estates and their unsecured creditors, while creating an environment conducive to the development of a consensual process that can maximize value and ensure that the interests of all parties are protected.

---

[10] The Committee believes that the alternative relief requested by MLB in the Termination Motion—that the Debtors be compelled to assume or reject the Baseball Agreements now—would also have a significant impact on the relative positions of MLB and the Debtors and on these chapter 11 cases generally.  Accordingly, the Committee suggests that the proposed thirty day postponement should apply to consideration of this alternative request for relief as well.

[11] The Committee assumes that such a plan would likely include the prompt sale of the Dodgers, but does not rule out the possibility of other alternatives, such as the sale of a substantial interest in the team consistent with the requirements of the Baseball Agreements sufficient to satisfy the Debtors' current and projected liquidity needs.

**RESERVATION OF RIGHTS**

22.     The Committee reserves all rights to supplement, amend, and modify its position as set forth in this Objection and Statement, particularly in light of discovery that continues to be taken in connection with these matters and following the conclusion of the evidentiary hearing scheduled to be held October 31, November 1, 2, and 4, 2011 pursuant to the *Order Scheduling Evidentiary Hearing* entered by the Court on September 30, 2011 [Dkt. No. 508].

**CONCLUSION**

23.     For the reasons set forth herein, the Committee respectfully requests that the Court (a) deny the Marketing Procedures Motion, or, in alternative, modify the Marketing Procedures Motion as described above, (b) defer ruling on the Termination Motion for approximately thirty (30) days following entry of an order regarding the Marketing Procedures Motion, and (c) grant such other and further relief as the Court deems just and proper.

Dated: October 24, 2011
          Wilmington, Delaware

**PINCKNEY, HARRIS & WEIDINGER, LLC**

         **/s/ Donna L. Harris**
Donna L. Harris (DE No. 3740)
Joanne P. Pinckney (DE No. 3344)
Kevin M. Capuzzi (DE No. 5462)
1220 North Market Street, Suite 950
Wilmington, Delaware 19801
Telephone:  (302) 504-1497
Facsimile:  (302) 442-7046

                 - and -

**MORRISON & FOERSTER LLP**
Brett H. Miller (admitted *pro hac vice*)
Lorenzo Marinuzzi (admitted *pro hac vice*)
Todd M. Goren (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

**ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS**