**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>LOS ANGELES DODGERS LLC, *et al.,*[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 11-12010 (KG)<br><br>(Jointly Administered)<br><br>    Re: Docket No.: 443<br><br><br>Hearing date: October 31, 2011, at 10:00 a.m. |

**REPLY TO OBJECTIONS OF FOX SPORTS NET WEST 2, LLC AND MAJOR
LEAGUE BASEBALL TO LOS ANGELES DODGERS LLC'S MOTION FOR
ORDERS: (I) APPROVING MARKETING PROCEDURES FOR THE
LICENSING OF TELECAST RIGHTS, INCLUDING THE SCHEDULING OF AN
AUCTION, OBJECTION DEADLINE, AND DISPOSITION HEARING; AND
(II) APPROVING AND AUTHORIZING THE LICENSING OF TELECAST
RIGHTS TO THE HIGHEST AND BEST BIDDER**

---

[1]   The Debtors, together with the last four digits of each Debtor's federal tax identification number are: Los Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567); LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029). The location of the Debtors' corporate headquarters and the service address for the Debtors is: 1000 Elysian Park Avenue, Los Angeles, California 90012.

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ........................................................................... 1

II.  SUMMARY OF THE LIMITED DISCOVERY PRODUCED BY MLB ...................... 3

III. ARGUMENT ................................................................................................... 15

    A.   The Debtors Can Consummate A Media Rights Transaction Without
         The Commissioner's Approval ......................................................................... 15

        1.   The Commissioner's Decision Is Reviewable By This Court .................. 16

        2.   The Commissioner Must Exercise His Contractual
            Consent Rights In Good Faith .......................................................... 17

            a.   The Commissioner Cannot, In Good Faith, Disapprove Any
                Proposed Telecast Rights Transaction That Does Not Create
                A "Control Interest Transfer" ........................................................... 20

            b.   The Commissioner Cannot, In Good Faith, "Destroy The
                Value Of [The Debtors'] Estates" By Withholding His
                Consent To Assumption Of The Baseball Agreements. ................ 21

        3.   The Commissioner Has Violated The Baseball Agreements And
            Applicable Law By Ignoring LAD's Rudimentary Due Process Rights .. 23

        4.   The Commissioner Continues To Exceed His Authority
            Under The Baseball Agreements ................................................... 25

    B.   The Debtors' Management Decisions Should Be Reviewed
         Under the Business Judgment Rule ............................................................... 26

    C.   The Debtors' Decision To Market The Telecast Rights
         At This Time Is A Sound Exercise Of Business Judgment ............................. 30

        1.   Consummation Of A Telecast Rights Transaction Offers A
            Comprehensive Solution To The Debtors' Liquidity Issues ................... 31

        2.   LAD's Efforts To Market The Telecast Rights Are Not "Premature" ..... 33

    D.   Fox's Contractual Rights May Be Adjusted In Bankruptcy ................................ 42

        1.   Advancement Of The Exclusive Negotiating Period
            With Fox Is Essential To The Debtors' Reorganization ........................ 42

2.      The Right Of First Refusal Prevents LAD From Realizing
        The Full Value Of The Telecast Rights ........................................ 46

3.      The Implications Of Rejecting The Fox Contract, If Required,
        Are Minimal .................................................................................. 46

4.      Section 365(n) Is Inapplicable ..................................................... 49

E.   The Entire Fairness Standard Is Also Satisfied ........................................ 51

F.   The Marketing Procedures Are Appropriate ............................................ 55

CONCLUSION ...................................................................................................... 61

# TABLE OF AUTHORITIES

**Page**

**Cases**

*1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.,*
  485 A.2d 199 (D.C. 1984) ...................................................................... 19

*Anthony's Pier Four, Inc. v. HBC Assocs.,*
  583 N.E.2d 806 (Mass. 1991) ................................................................ 19

*Astoria Bedding v. Northside P'ship,*
  657 N.Y.S.2d 796 (App. Div. 1997) ...................................................... 19

*Atlanta National League Baseball Club, Inc. v. Kuhn,*
  432 F. Supp. 1213 (N.D. Ga. 1977) ...................................................... 16

*Auerbach v. Great Western Bank,*
  88 Cal. Rptr. 2d 718 (Ct. App. 1999) ................................................... 48

*Berke v. TRI Realtors,*
  257 Cal. Rptr. 738 (Ct. App. 1989) ...................................................... 17

*Charles O. Finley & Co. v. Kuhn,*
  569 F.2d 527 (7th Cir.), *cert. denied,* 439 U.S. 876 (1978) .......... 16, 17, 24

*Commodity Futures Trading Comm'n v. Weintraub,*
  471 U.S. 343 (1985) ......................................................................... 18, 27

*Continental Sec. Corp. v. Shenandoah Nursing Home P'ship,*
  188 B.R. 205 (W.D. Va. 1995) .............................................................. 43

*Copeland v. Baskin Robbins U.S.A.,*
  117 Cal. Rptr. 2d 875 (Ct. App. 2002) ................................................. 48

*Dalton v. Educ. Testing Serv.,*
  87 N.Y.2d 384 (1995) ........................................................................... 18

*Fyke v. The Screen Shop,*
  No. H025555, 2005 Cal. App. Unpub. LEXIS 3630 (Ct. App. Apr. 21, 2005) ...... 47

*In re Beatriz Ready Mix, Inc.,*
  2009 Bankr. LEXIS 241 (Bankr. D.P.R. Feb. 3, 2009) ......................... 42

*In re Capital Acquisitions & Mgt. Corp.,*
  341 B.R. 632 (N.D. Ill. 2006) ............................................................... 46

*In re Cloverleaf Enterps. Inc.*,
No. 09-20056, 2010 WL 1445487 (Bankr. D. Md. April 2, 2010)............................. 53

*In re Fleishman*,
138 B.R. 641 (Bankr. D. Mass. 1992) ...................................................................... 45

*In re Gen. Growth Props., Inc.*,
409 B.R. 43 (Bankr. S.D.N.Y. 2009)................................................................... 27, 43

*In re IT Group, Inc.*,
302 B.R. 483 (D. Del. 2003)...................................................................................... 45

*In re Mushroom Transp. Co.*,
382 F.3d 325 (3d Cir. 2004) ...................................................................................... 27

*In re O'Brien Envtl. Energy, Inc.*,
188 F.3d 116 (3d Cir. 1999) ...................................................................................... 45

*In re Seda France, Inc.*,
No. 10-12948, 2011 Bankr. LEXIS 2874 (Bankr. W.D. Tex. July 22, 2011) ........... 43

*In re Performance Nutrition, Inc.*,
239 B.R. 93 (Bankr. N.D. Tex. 1999)........................................................................ 53

*In re Philadelphia Athletic Club, Inc.*,
15 B.R. 60 (Bankr. E.D. Pa. 1981) ........................................................................... 27

*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999) ...................................................................................... 44

*In re Trico Marine Servs., Inc.*,
450 B.R. 474 (Bankr. D. Del. 2011)........................................................................... 45

*In Re Zais Inv. Grade Ltd. VII*,
No. 11–20243, 2011 WL 3795169 (Bankr. D.N.J. Aug. 26, 2011)............................ 43

*In re Zenith Elec. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999)............................................................................ 53

*L.A. Mem'l Coliseum Comm'n v. NFL*,
791 F.2d 1356 (9th Cir. 1986) ............................................................................. 17, 18

*Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp.*
*(In re Hechinger Inv. Co. of Dela.)*,
327 B.R. 537 (D. Del. 2005)................................................................................. 27, 29

*Markham v. Bradley*,
173 P.3d 865 (Utah Ct. App. 2007) .......................................................................... 19

*McKenna v. Case,*
 507 N.Y.S. 2d 777 (App. Div. 1986)................................................................................. 18

*Milwaukee Am. Ass'n v. Landis,*
 49 F.2d 298 (D.C. Ill. 1931) ............................................................................................. 16

*Moran v. Erk,*
 901 N.E.2d 187 (N.Y. 2008)............................................................................................. 18

*NBA v. Motorola, Inc.,*
 105 F.3d 841 (2d Cir. 1997) ............................................................................................. 49

*NMSBPCLDHB, L.P. v. Integrated Telecom Express, Inc.*
 *(In re Integrated Telecom Express, Inc.),*
 384 F.3d 108 (3d Cir. 2004) ............................................................................................. 44

*Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.,*
 137 F. Supp. 2d 502 (S.D.N.Y. 2001) ............................................................................. 29

*Red Sail Easter Ltd. Partners, L. P. v. Radio City Music Hall Prods., Inc.,*
 No. 120361992, WL 251380 (Del. Ch. Sept. 29, 1992)................................................... 48

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.,*
 765 N.Y.S.2d 575 (App. Div. 2003).................................................................................. 18

*State Dept. of Health Servs. v. Superior Court,*
 79 P.3d 556 (Cal. 2003).................................................................................................... 46

*Weinberger v. UOP, Inc.,*
 457 A.2d 701 (Del. 1983) ................................................................................................. 51

*West v. Bechtel Corp.,*
 117 Cal. Rptr. 2d 647 (Ct. App. 2002) ............................................................................. 47

**Statutes**

11 U.S.C. § 101(35A) ................................................................................................................ 49

11 U.S.C. § 365(n)..................................................................................................................... 50

11 U.S.C. § 365(n)(1)(B) ........................................................................................................... 50

11 U.S.C. § 365(n)(2)(C)............................................................................................................ 50

**Other Authorities**

Bill Plaschke, *Baseball Takes Control of Dodgers,*
L.A. Times, Apr. 21, 2011 .................................................................................... 12

Bill S. Shaikin & Scott Gold, *Former Rangers President Agrees to Oversee Dodgers,*
L.A. Times, Apr. 25, 2011 .................................................................................... 23

Christina Settimi, *Baseball's Cable Kings,*
Forbes, Apr. 22, 2009 .......................................................................................... 35

David Barron, *Astros, Rockets Finalize Deal to Launch TV Network
Comcast SportsNet Houston to Show Games Starting in Fall of 2012,*
Houston Chronicle, Oct. 29, 2010 ....................................................................... 34

Joe Flint, *Time Warner Cable, Lakers Strike 20-Year TV Deal,*
L.A. Times, Feb. 14, 2011 ............................................................................... 34, 36

John Helyar & Scott Soshnick, *Selig Bends Rules to Fit
in Effort to Oust McCourt From Dodgers,*
Bloomberg News, October 24, 2011 ....................................................................... 4

John Lombardo & John Ourand, *Lakers, Time Warner Cable Run Fast Break,*
Sports Bus. J., Feb. 21, 2011 ............................................................................... 36

John Ourand, *Comcast Close to Houston TV Rights Deal,*
Sports Bus. J., May 21, 2010 ............................................................................... 37

John Ourand, *In Houston, a Shootout Over Astros Rights,*
Sports Bus. J., Feb. 22, 2010 ............................................................................... 37

Jonah Keri, *How Television Could Launch a Rangers Dynasty,*
Grantland, Sept. 2, 2011 ................................................................................. 35, 38

Steve Dilbeck, *Selig Sends Security Task Force to Dodger Stadium,*
L.A. Times, Apr. 15, 2011 .................................................................................... 11

Tim Brown, *Schieffer Candid About Challenge with Dodgers,*
Yahoo! Sports, Apr. 26, 201 ............................................................................... 12

Los Angeles Dodgers LLC ("LAD" and, together with its affiliated debtors and debtors in possession, the "Debtors") hereby submits its reply ("Reply") to the objections filed by Fox Sports Net West 2, LLC and Major League Baseball (respectively, the "Fox Objection" and the "MLB Objection") to LAD's Motion For Orders: (I) Approving Marketing Procedures For The Licensing Of Telecast Rights, Including The Scheduling Of An Auction, Objection Deadline, And Disposition Hearing; And (II) Approving And Authorizing The Licensing Of Telecast Rights To The Highest And Best Bidder (the "LAD Motion"). In support of the Reply, the Debtors submit the supplemental declarations of Sidney Levinson ("Supp. Levinson Decl."), Peter Cohen ("Cohen Rebuttal Decl.") and Timothy Coleman ("Coleman Rebuttal Decl.").

## I.    PRELIMINARY STATEMENT

1.    In the MLB Objection, the Commissioner reaffirms his intent to withhold his approval of *any* Telecast Rights transaction that LAD may propose, and offers a number of reasons for this decision purportedly having to do with a lack of business justification or fairness. However, the limited discovery that the Debtors have been permitted to take and received thus far reveals that this decision in fact has nothing to do with the merits or the timing of the proposed marketing process, and everything to do with the Commissioner's relentless effort to block all avenues of liquidity that are available to LAD, seize control over the team from Mr. McCourt, and install a new owner of his choosing – all in the name of "the best interests of Baseball," but in reality in breach of the Baseball Agreements.

2.    Moreover, it is clear that the Commissioner's decision to pursue this course of action was not based upon facts learned or determined as part of an investigation. He had in fact made up his mind to force out Mr. McCourt long before he began "monitoring" the team through the eyes of his appointed representative, J. Thomas Schieffer, whose self-described role

- 1 -

consisted of "stepp[ing] in under the best interest of baseball clause to take control of the franchise." Indeed, the Commissioner had not even begun his investigation of the team under Mr. McCourt's stewardship when the "monitor" was appointed, even though the Baseball Agreements explicitly require an investigation before any "preventive, remedial or punitive action" can be taken by the Commissioner.

3.      The Commissioner's powers under the MLB Constitution may be broad, but they are constrained by MLB's own governing documents, the duty to act in good faith, and fundamental due process considerations. At trial, the Debtors will show that the Commissioner has exceeded his powers in each of these areas by deliberately starving LAD of the cash it needs to operate, destroying the reputation of the team and its management, and attempting to frustrate the Debtors' reorganization in chapter 11.

4.      The Debtors will also demonstrate at the evidentiary hearing that the Commissioner's several pretexts for withholding his consent for LAD to pursue a Telecast Rights transaction at this time are invalid, because they are addressed by the proposed Marketing Procedures. First and foremost, *Mr. McCourt is not conflicted with respect to the decision to license the Telecast Rights because he will not receive any of the proceeds.* Because such proceeds are property of LAD's estate, this Court would need to approve any distributions to Mr. McCourt outside the ordinary course of business, and Mr. McCourt is not seeking any such approval in the LAD Motion. Having reached a settlement with Jamie McCourt which removes any claims that she may have to the team, Mr. McCourt has many options for raising the capital necessary to fund that settlement that do not involve distributing assets of the Debtors. The Commissioner's assertion that any Telecast Rights transaction will feature an "excessive upfront

-2-

payment" for the purpose of making a distribution to Mr. McCourt or other entities outside of the Debtors' capital structure is simply make believe.

5.      The Commissioner's other excuse for opposing the LAD Motion – that it would cause a breach of the Fox Contract – is unavailing.  LAD certainly recognizes that modifying Fox's bargained-for contractual right of first negotiation and limited right of first refusal is not to be taken lightly.  However, Fox's contractual rights, like those of many other parties to contracts with chapter 11 debtors, must take a back seat to LAD's right to reorganize its business, particularly since Fox will suffer minimal, if any, damages as a result of the implementation of the Marketing Procedures.  Specifically, Fox will be given the opportunity to negotiate exclusively with LAD for a 45-day period as contemplated by the Fox Contract, participate as a Qualified Bidder in any subsequent auction, and continue broadcasting Dodgers games on the same economic terms through the expiration of the current Fox Contract at the conclusion of the 2013 season, regardless of whether Fox is the Successful Bidder for the post-2013 Telecast Rights.

6.      For all of these reasons, LAD's business decision to pursue a Telecast Rights transaction at this time should be respected, and the Court should approve the Marketing Procedures and authorize LAD to implement the proposed marketing process for the Telecast Rights.  During that process, definitive information will become available to the Court and all parties in interest concerning the value of the Telecast Rights and the viability of the reorganization strategy adopted by the Debtors.

## II.      SUMMARY OF THE LIMITED DISCOVERY PRODUCED BY MLB

7.      Just a sampling of the small number of internal documents produced by the Commissioner to date illustrates that the Commissioner was, beginning no later than the fourth

quarter of 2010, looking for any excuse he could find to deny the Dodgers the liquidity it needed to meet operating expenses until it could monetize the valuable Telecast Rights that are the subject of this Motion.

8.      The Commissioner's efforts to deprive the Dodgers of liquidity date back to at least November 2010, when LAD initially approached the Commissioner with a proposal to borrow $200 million from Fox. At that time, ██████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████[1]███████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████

9.      There was no such other debt, and indeed, ████████████████████████ ████████████████████████████████████ None of the discovery produced by the Commissioner supports any conclusion that the loan from Fox would result in too much Club debt. The Commissioner then took a more proactive approach by leaning on Fox

---

[1]    As at least one MLB executive has acknowledged, debt held by such entities is not subject to the Commissioner's jurisdiction (or the DSR calculations). *See* Supp. Levinson Decl., Ex. 25 (John Helyar & Scott Soshnick, *Selig Bends Rules to Fit in Effort to Oust McCourt From Dodgers,* Bloomberg News, October 24, 2011) (quoting Robert Manfred of MLB as stating that debt excesses of Texas Rangers "were at the holding-company level, beyond the reach of the sport's ability to monitor and enforce the debt rule").

to discourage any loan.

10.     When the Commissioner's efforts to strong arm Fox failed, he and his staff came up with another approach – using his "best interest" powers even though the Dodgers were DSR compliant.

11.     At that time, LAD was seeking financing as a bridge to the end of the 2012 season when LAD would be in a position to negotiate an agreement to license its valuable future Telecast Rights beyond 2013.  As part of that effort,

- 5 -

[REDACTED] The Commissioner denounced this action, [REDACTED]

[REDACTED]

[REDACTED]

12.     As described in LAD's opposition to the MLB Motion, the Commissioner sent a series of increasingly threatening letters to Mr. McCourt in February and March 2011, all critical of various proposals by LAD to raise the cash needed to meet operating expenses.  By late March, the Commissioner had LAD on the ropes, and he knew it. [REDACTED]

[REDACTED]

13.     [REDACTED]

[REDACTED]

14.     [REDACTED]



Fox was clearly willing to extend the needed financial bridge for LAD to make it to the end of 2012, without the need for MLB to intervene.

15.     Confronted with a stone wall of the Commissioner's making in his efforts to obtain financing for LAD, Mr. McCourt negotiated a personal loan from Fox of $30 million that was not subject to approval by the Commissioner.  Mr. McCourt then made the proceeds of this loan available to the team as an equity contribution to cover LAD's payroll and operating expenses.  That loan was secured solely by a personal malpractice claim belonging to

Mr. McCourt, arising from a court judgment entered in the divorce trial as a result of actions taken by his former lawyers at Bingham McCutchen LLP.

16. If the Commissioner had been genuinely concerned about the well-being of the Dodgers, he would have welcomed Mr. McCourt's efforts to reach into his own pocket to fund up to $30 million to pay the expenses of the baseball club, which cost LAD nothing and did not increase LAD's liability or debt obligation. ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

17. When Mr. McCourt refused to buckle under to that threat and decided to proceed with the loan, the Commissioner's reaction was swift and ruthless. First, he set about fabricating the public misimpression that security at Dodger Stadium was somehow inadequate. This is, by far, the most unforgivable action taken by the Commissioner during this entire saga, and has caused enormous and irreparable harm to the Dodgers, Mr. McCourt and the game of baseball. Just two weeks earlier, immediately following the attack on Brian Stow on Opening Day, ███████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

████████████████████████████



18.

19.

20.    Even though security was more than adequate on Opening Day, the Dodgers had

on their own initiative, shortly after Opening Day, taken immediate steps to determine how

security could be further improved. On April 6, 2011, LAD engaged former LAPD chief William Bratton to conduct a thorough review of stadium security to develop a long-term stadium plan. The Dodgers had also brought in additional LAPD personnel. In short, the Dodgers were clearly on top of the situation.

21.    Despite MLB's own conclusion that ███████████████████████████ and their knowledge that the Dodgers were taking proactive steps to review security, on April 15, 2011 – just four days after his letter to Mr. McCourt regarding the $30 million personal loan – the Commissioner dispatched a six-person delegation to Dodger Stadium led by John McHale.

███████████████████████████████████████████

██████████████████████

22.    More telling, the Commissioner, with Mr. McHale's assistance, deliberately publicized this act through a press release designed to foster the public misimpression that there were in fact deficiencies in security at Dodger Stadium. A press release prepared by Pat Courtney, MLB's senior vice president of public relations, announced publicly that "[a] delegation of officials from the Office of the Commissioner of Baseball has been conducting a thorough analysis regarding security at Dodger Stadium at the direction of Commissioner Allan H. (Bud) Selig." The press release included the following quote by the Commissioner:

> Security is paramount to Major League Baseball. We are grateful
> to the City of Los Angeles and the Los Angeles Police Department
> for their comprehensive efforts on this critical issue. We will assist
> in any way we can in order to maintain a safe, secure environment
> at Dodger Stadium and to ensure that each fan's game-day
> experience exceeds their expectations.

Supp. Levinson Decl., Ex. 9 (email from John McHale, Jr. to Pat Courtney dated April 15, 2011).

23.    As if the Commissioner's press release were not damaging enough, ███████████

████████████████████████████████████████████

- 10 -

████████████████████████████████████████████████████

████████████████████████████████████████████ That

same day, Bill Shaikin of the Los Angeles Times (████████████████████

████████████) posted a blog entitled "Security sends task force to Dodger Stadium."

Supp. Levinson Decl., Ex. 10 (Steve Dilbeck, *Selig Sends Security Task Force to Dodger*

*Stadium*, L.A. Times, Apr. 15, 2011). ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ Mr. McHale was quoted as saying that "he and other MLB officials had met with Selig

'on a daily basis' since the attack." He further stated that "it is important that the Dodgers

promptly hire a full-time head of security, a position that has been vacant for four months."

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

24.     The Commissioner did not, of course, stop there. On April 19, 2011 – eight days

after his letter regarding the $30 million personal loan from Fox – ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

25.    To date, the Commissioner has inexplicably failed to produce a single internal email or document related to the decision to appoint the "monitor." Such documents would, of course, shed further light into the Commissioner's true motivation in taking that action, which finds no authority under the Major League Constitution and whose timing is suspicious (coming in the wake of Mr. McCourt's willingness to put his own money into the team). But this Court need look no further than the public comments J. Thomas Schieffer, who was appointed as "monitor" on April 25, 2011, to conclude that the Commissioner had taken control of the Dodgers:

> •    Mr. Schieffer was quoted to say that, "[t]he Commissioner of baseball doesn't take over a franchise unless there's a problem." When asked in that same interview whether the Dodgers could be restored with Mr. McCourt as the owner, Mr. Schieffer said "I'm not going to get into that. We'll see what happens as we go forward. I do hope my experience in management can help there." He went so far as to compare his task as monitor for the Dodgers to "dealing with the North Koreans." Supp. Levinson Decl., Ex. 11 (Tim Brown, *Schieffer Candid About Challenge with Dodgers,* Yahoo! Sports, Apr. 26, 2011).

> •    Later in a live television interview on KCAL9, Mr. Schieffer was asked "who was in charge" of the Dodgers. He replied, "[w]ell, Major League Baseball, the Commissioner of baseball has stepped in under the best interest of baseball clause to take control of the franchise." *See* http://losangeles.cbslocal.com/ 2011/04/29/dodger-exec-tom-schieffer-discusses-his-role-as-monitor/.

26.    To the public, the Commissioner justified the investigation and his appointment of Mr. Schieffer by stating "I have taken this action because of my deep concerns regarding the finances and operations of the Dodgers." Supp. Levinson Decl., Ex. 12 (Bill Plaschke, *Baseball Takes Control of Dodgers,* L.A. Times, Apr. 21, 2011). Of course, no one at MLB told the press that there had been no investigation and that there was not a single written determination that

anything was wrong with the Dodgers. Unfortunately, the Commissioner's own actions described above damaged the public's confidence and goodwill towards the Dodgers.

27. The harm to the Dodgers was also exacerbated by public comments by Mr. Schieffer, who repeatedly suggested over the following days and weeks that there was a problem with the Dodgers and Mr. McCourt and that he (Mr. Schieffer) was there to get to the bottom of it. Mr. Schieffer was nonetheless permitted to continue to make these comments, despite multiple requests by the Dodgers that he office cease making these statements which were undermining public confidence in the Club and Mr. McCourt causing significant harm.

28. Not surprisingly, the Commissioner's one-two punch in April of the security task-force and the appointment of the monitor was followed by a dramatic reduction in attendance at Dodger games. That drop in attendance reduced revenues and, of course, worsened LAD's already difficult liquidity situation.

29. Those actions set the stage for what the Commissioner likely assumed would be the denouement. ███████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████

████████████████████████



30. Ultimately, by letter dated June 20, 2011, the Commissioner rejected the Proposed Fox Transaction. But in doing so, he offered a number of grounds that did in fact criticize the terms of the underlying "proposed TV deal with Fox," even though other clubs have entered into similar transactions (*i.e.*, the length of the term, the fact that it was negotiated years before its expiration, the existence of an upfront payment, the structuring of the deal to provide for an equity interest in Prime Ticket held by an affiliate of the Club, etc.). He also criticized the fact that the Proposed Fox Transaction provided for use of the funds to reduce the "inherent debt levels" of entities above the Debtors in the capital structure, an issue that was a purported cause of concern in April.

31. ███████████████████████████████ ███████████████████████████████ ████████████████████████████████████ If the Commissioner were reviewing the transaction on the merits, he would have been expected to welcome that proposal. ████████████

- 14 -



32. By the end of June 2011, when LAD faced substantial payment obligations for deferred compensation and other operating expenses, the Commissioner had blocked every path available to LAD to raise the cash needed to meet its payment obligations – other than relief under chapter 11, which the Debtors sought.

## III. ARGUMENT

### A. The Debtors Can Consummate A Media Rights Transaction Without The Commissioner's Approval

33. The Commissioner claims that the Debtors' decision to pursue a Telecast Rights transaction at this time is "futile," not because it is economically unfeasible, but because he will not approve *any* Telecast Rights transaction that is presented to him following the conclusion of the marketing and auction process, nor will he consent to the Debtors' assumption of the Baseball Agreements unless the team is sold.

34. Under the marketing process proposed by the Debtors, LAD will seek the Commissioner's approval of any agreement to license the Telecast Rights. LAD Mot. 19. Only if the Commissioner refuses to approve the bid that emerges from that process for reasons that violate applicable agreements, violate applicable law, or lack good faith, will LAD seek a determination from this Court that the Commissioner has exceeded his authority and that the transaction should be approved. As discussed below, each of the above grounds constitutes a

well-established limit on the Commissioner's authority to deny approval of any bid that results from the marketing process.

### 1.     The Commissioner's Decision Is Reviewable By This Court

35.     The Commissioner argues that his actions are not subject to any judicial review, pointing both to the "waiver of recourse" clause under the MLB Constitution and the general judicial deference afforded to internal decisions of private associations.  MLB Objection ¶¶ 67-68.

36.     The cases cited by the Commissioner on this point make clear, however, that regardless of the waiver of recourse clause, courts will not refrain from reviewing the internal decisions of MLB "1) where the rules, regulations or judgments of the association are *in contravention to the laws of the land or in disregard of the charter or bylaws of the association*; and 2) where the association has *failed to follow the basic rudiments of due process of law*." *Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527, 544 (7th Cir.), *cert. denied*, 439 U.S. 876 (1978) (emphasis added).

37.     Accordingly, in *Atlanta National League Baseball Club, Inc. v. Kuhn*, 432 F. Supp. 1213 (N.D. Ga. 1977), the district court invalidated a punitive sanction imposed by Commissioner that was not within his authority to impose under the Major League Baseball agreement.  And in *Milwaukee Am. Ass'n v. Landis*, 49 F.2d 298 (D.C. Ill. 1931), the court noted, in discussing the extent of the Commissioner's powers under the Baseball Agreements, that "[n]o doubt the decision of any arbiter, umpire, engineer, or similar person endowed with the power to decide may not be *exercised in an illegal manner*, that is fraudulently, *arbitrarily, without legal basis for the same or without any evidence to justify action*." *Id.* at 303 (emphasis added).

38.     The Commissioner therefore cannot hide behind the waiver of recourse clause where he has acted in contravention of the Baseball Agreements and in violation of rudimentary principles of due process.[2]

### 2.     The Commissioner Must Exercise His Contractual Consent Rights In Good Faith

39.     In similar fashion, this Court has already recognized that "the Commissioner must act in good faith, with fair dealing and not arbitrarily or irrationally." Scheduling Order 8 (citing Texas Rangers' Bidding Procedures and *L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356 (9th Cir. 1986). The Commissioner apparently disagrees with this Court's conclusion that he must act in good faith in carrying out his duties under the Baseball Agreements, and attempts to distinguish *L.A. Coliseum* on the grounds that in that case, the court did not specifically address any waiver of recourse provision in the NFL's governing documents. MLB Objection ¶ 77. In *Charles O. Finley & Co. v. Kuhn*, however, the court soundly rejected the notion that the MLB waiver of recourse clause provides the Commissioner with any special insulation from judicial review that he would not otherwise have under the common law of private associations:

> [T]he waiver of recourse clause contested here *seems to add little if anything to the common law nonreviewabiltiy of private association actions.* This clause can be upheld as coinciding with the common law standard disallowing court interference. We view its inclusion in the Major League Agreement merely as a manifestation of the intent of the contracting parties to insulate

---

[2]  The so-called "abstention doctrine" touted by the Commissioner (MLB Objection ¶ 71) – for which the Commissioner cites only California cases, notwithstanding his assertion that New York law governs the Baseball Agreements – adds nothing to this analysis, and merely confirms that courts are not reluctant to interfere in the affairs of a private association where, as here, the association has violated clear and unambiguous provisions of its own governing documents or exercised its discretion in an unreasonable and arbitrary fashion. *Berke v. TRI Realtors*, 257 Cal. Rptr. 738, 740 (Ct. App. 1989) ("The courts will, nevertheless, accept jurisdiction over private voluntary organizations when the aggrieved party can demonstrate an abuse of discretion and a clear, unreasonable, and arbitrary invasion of his or her private rights.").

> from review decision made by the Commissioner concerning the
> subject matter of actions taken *in accordance with his grant of*
> *powers.*

569 F.2d at 543. Thus, *L.A. Coliseum* cannot be distinguished based on the absence of any waiver of recourse clause in the NFL bylaws.

40.     The Commissioner also attempts to duck the requirement to act in good faith in approving a Telecast Rights transaction by arguing that the covenant of good faith and fair dealing does not apply to contractual provisions that expressly allow a party to exercise its discretion.   MLB Objection ¶ 78.  However, it is well established that "even an explicitly discretionary contractual right may not be exercised in bad faith so as to frustrate the other party's right to benefit under the agreement." *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.,* 765 N.Y.S.2d 575, 587 (App. Div. 2003) (citations omitted); *see also Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389 (1995) (where the contract in question contemplates the exercise of discretion, the duty of good faith and fair dealing "includes a promise not to act arbitrarily or irrationally in exercising that discretion").

41.     The cases cited by the Commissioner on this point generally rely upon *Moran v. Erk,* 901 N.E.2d 187 (N.Y. 2008), in which the New York Court of Appeals declined to read a good faith requirement into an attorney approval contingency clause contained in a residential real estate contract.  The holding in *Moran* is narrow, however, as it was based in large part on the court's reluctance to institute "a regime where 'question[s] of fact precluding summary judgment' would 'usually [be] raise[d]' by a disappointed would-be seller or buyer any time an attorney disapproved a real estate contract pursuant to an attorney approval contingency." *Id.* at 191 (quoting *McKenna v. Case,* 507 N.Y.S. 2d 777 (App. Div. 1986)).  The court noted, moreover, that the plain language of the contract made the parties' right to receive any "fruits" of the contract *contingent* on attorney approval in the first instance. *Id.* at 190.  Thus, the pledge

- 18 -

that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" had not even come into effect. *Id.* Here, in contrast, the Commissioner is not merely fulfilling an agreed contingency to the effectiveness of the entire contract, but implementing its terms in the most fundamental sense.[3]

42.    Any doubt as to whether courts will hold parties to the duty of good faith and fair dealing in exercising discretionary consent rights is resolved by the numerous cases in which courts have found that parties who exercise such rights for an ulterior purpose have acted in bad faith. *E.g., Astoria Bedding v. Northside P'ship*, 657 N.Y.S.2d 796, 797 (App. Div. 1997) (landlord's withholding of consent to sublet based on a minor technicality in the lease was unreasonable where lease agreement gave plaintiff the right to sublet subject to the landlord's approval); *Markham v. Bradley*, 173 P.3d 865, 871-73 (Utah Ct. App. 2007) (sellers unreasonably used discretion where they had changed their minds about sale prior to submission of certain financial information from buyers but then used that information as a pretext to reject the sale); *Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806, 820-21 (Mass. 1991) (use of discretionary approval right to force other party to "sweeten the deal" breached the covenant of good faith and fair dealing); *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 208-09 (D.C. 1984) (landlord may not unreasonably refuse consent to a sublease that fully protects the landlord's economic bargain under the prime lease).

43.    Thus, the Commissioner cannot evade the duty of good faith and fair dealing that is inherent in the Baseball Agreements, and may not in bad faith, and for the ulterior purpose of

---

[3]    The cases cited by the Commissioner relating to the exercise of a unilateral termination right, MLB Objection ¶ 79, have no relevance here. The Commissioner has no right under the MLB Constitution to unilaterally terminate the Baseball Agreements with respect to LAD. Indeed, involuntary termination of an MLB club requires the approval of three-fourths of all MLB clubs.

seizing control of the Dodgers and effecting a sale of the team, withhold his approval of a

Telecast Rights transaction or prevent LAD from assuming the Baseball Agreements.

a.    The Commissioner Cannot, In Good Faith, Disapprove Any Proposed Telecast Rights Transaction That Does Not Create A "Control Interest Transfer"

44.    The Commissioner premises his alleged right to veto *any* proposed Telecast

Rights transaction on ██████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████

45.    ███████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████ As the

Commissioner has asserted in resisting all discovery regarding the meaning or interpretation of

the Baseball Agreements, Objection of MLB to Debtors' Mot. Recons. Scheduling Order ¶ 32,

Oct. 4, 2011, ECF No. 532, this language is clear and unambiguous. Therefore, the Commissioner is estopped from claiming that it means anything other than what it says: ████

████████████████████████████

46.    The Commissioner has expressed many purported reasons for his resolute determination to reject any Telecast Rights transaction at this time, but none of them has anything to do with the potential transfer of a control interest. ████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████

47.    Thus, by refusing to consent to *any* Telecast Rights transaction that LAD may propose at the conclusion of the marketing process, the Commissioner is once again using his authority to review broadcast agreements for control issues as a pretext to force a sale of the Club, a power that he lacks the authority to exercise unilaterally.

      b.    <u>The Commissioner Cannot, In Good Faith, "Destroy The Value Of [The Debtors'] Estates" By Withholding His Consent To Assumption Of The Baseball Agreements.</u>

48.    As an additional basis for his argument that marketing and auctioning the Telecast Rights is "futile," the Commissioner asserts that the Debtors cannot assume the Baseball Agreements without his consent, which will not be forthcoming in the event that the Debtors

persist in their efforts to license the Telecast Rights. MLB Objection ¶ 46. Relatedly, he argues that attempting to auction the Telecast Rights at this time would be "futile" because the Commissioner's threats to kick the Dodgers out of Major League Baseball will scare away potential bidders. MLB Objection ¶ 46 ("There is no value in the Media Rights or for that matter the Club if the Club is terminated by Major League Baseball, and no knowledgeable party will meaningfully bid for the Media Rights in such a scenario.").

49.     Putting aside for the moment the merits of the Commissioner's various legal arguments, the practical implications of the Commissioner's position are staggering. Does the Commissioner truly believe that the best interests of the Dodgers and of MLB are served by forcing a rejection of the Baseball Agreements and permanently refusing LAD access to the benefits of league membership (thereby depriving the other MLB teams of the Dodgers' revenue-sharing contributions)? The answer to this question is plainly no. It is self-evident that the best interests of LAD and MLB are served by the Dodgers remaining in the league and the Debtors' assumption of the Baseball Agreements is therefore all but inevitable. Rather, the Commissioner once again seeks to use his contractual consent rights as a litigation tactic, a sword of Damocles to hang over the Debtors' heads in an effort to prevent them from successfully reorganizing.

50.     Neither the Commissioner nor this Court is currently in possession of sufficient facts to determine the central issue in this case, i.e., whether LAD "breached or didn't breach the Baseball Agreements." Order Den. LAD's Mot. Modify Scheduling Order 2, Oct. 7, 2011, ECF No. 570. LAD submits that if the Commissioner cannot prove to this Court that LAD breached the Baseball Agreements, then he cannot, in good faith, continue to withhold his consent to the

assumption of those agreements. To do otherwise would be to willfully destroy the Debtors' value, an act that cannot under any circumstances be justified by the "best interests of Baseball."

### 3. The Commissioner Has Violated The Baseball Agreements And Applicable Law By Ignoring LAD's Rudimentary Due Process Rights

51. On April 25, 2011, the Commissioner appointed a "monitor" with purported authority over much of the Dodgers organization, including approval of any expenditure in excess of $5,000. In his impatience, the Commissioner failed to follow the Baseball Agreements and MLB's own rules and regulations that require an investigation take place *before* exercising any powers under the "best interests of baseball" clause.

52. The Major League Constitution imposes an affirmative duty upon the Commissioner to conduct an investigation before taking actions to remedy "any act, transaction or practice charged, alleged or suspected to be not in the best interests of the national game of Baseball." (MLB Constitution Art. II, § 2(c) (giving Commissioner the power to "determine, *after investigation*, what preventive, remedial or punitive action is appropriate in the premises, and to take such action either against Major League Clubs or individuals, as the case may be") (emphasis added).

53. Incredibly, the Dodgers received *no written documentation* of the grounds for appointment of the monitor prior to Mr. Schieffer's arrival in Los Angeles, and were, in the words of Bill Shaikin of the Los Angeles Times, "blindsided by Selig's decision to intervene." Bill S. Shaikin & Scott Gold, *Former Rangers President Agrees to Oversee Dodgers*, L.A. Times, Apr. 25, 2011. To take such a serious step, and in a manner that was clearly orchestrated to garner as much negative publicity for the Dodgers and Mr. McCourt as possible, without first providing appropriate notice and an opportunity for LAD to be heard, amounts not only to a breach of the MLB Constitution, but also a fundamental "failure to follow the basic rudiments of

due process of law" that is forbidden even to private associations such as MLB in dealing with their members. *Charles O. Finley & Co.*, 569 F.2d at 544.

54.

But the Commissioner's promise of an opportunity to be heard was mere pretense, because Mr. Schieffer (no doubt acting at the direction of MLB) made perfectly clear from the moment that he stepped off the plane in Los Angeles that he had been sent to "take over the franchise."

55.    Appointment of the monitor constitutes action by the Commissioner that is, at best, "preventive" and at worst, "punitive" or "remedial." Once again, the language of the Baseball Agreements is clear and unambiguous: the Commissioner cannot undertake such action without first (i) concluding an investigation that yielded adverse findings and (ii) then providing the Team with a full and fair opportunity to be heard with respect to those adverse findings. LAD was not presented with any adverse findings, nor given any opportunity to be heard before the monitor was installed. The Commissioner thus committed a clear breach of the Baseball Agreements and deprived LAD of due process.

### 4.    The Commissioner Continues To Exceed His Authority Under The Baseball Agreements

56.    During these bankruptcy cases, the Commissioner continues to take actions that exceed his authority under the Baseball Agreements. Specifically, the Commissioner seeks to effect either (i) an involuntary sale of the Dodgers, through termination of the Debtors' exclusivity and the filing of a plan centered around a sale of the team under the auspices of MLB; or (ii) an involuntary termination of the Dodgers' MLB franchise, through the refusal to consent to LAD's assumption of the Baseball Agreements.[4] Although the Commissioner may have broad powers under the "best interests of Baseball" clause, the Major League Constitution expressly provides that the Commissioner "shall take no action in the best interests of Baseball" on certain actions requiring a vote of the Clubs at a Major League Meeting. Kurtz Decl. Ex. 1 (MLB Constitution), at Art. II, § 4. Those actions, set forth in Article II, Section 9 and in Article V, Section 2(a) or (b), include "[t]he involuntary termination of the rights, privileges and properties of a Major League Club pursuant to the procedures of Article VIII hereof," which enables the Commissioner to dispose of any and all assets of a Major League Club. *Id.*

57.    Thus, any decision made to force Mr. McCourt's subsidiary, LAD, to sell its interest in the Dodgers requires the vote at a Major League Meeting of three-fourths of the Clubs. Moreover, the procedures require the Commissioner to present a written charge identifying the basis for the proposed involuntary termination and an opportunity for the affected Club to be heard. No such written charge has ever been presented, nor did any vote of the Clubs take place.

* * *

---

[4]    As fully explained in the Debtors' objection to the MLB Motion, the Commissioner's consent is not required for LAD to assume the Baseball Agreements.

58.     The fact that the Commissioner has prejudged the merits of pursuing a Telecast Rights transaction *before any transaction has in fact been presented to him* – just as he prejudged Mr. McCourt's stewardship of the team and effectively put the team into receivership before conducting an actual investigation – demonstrates that he is acting in bad faith and/or with an improper motive.  His refusal to even consider a transaction that results from an open marketing process designed to yield the highest and best bid, when combined with the evidence that is discussed above (and other evidence to be presented at trial) showing that the Commissioner has long been  determined to oust Mr. McCourt and seize control of the team himself, demonstrates his lack of good faith.  Accordingly, even if this Court determines that the Commissioner's authority to withhold consent to a proposed Telecast Rights transaction extends beyond control issues (which it does not), he does not have the authority – even under the "best interests of baseball" clause – to act in bad faith.  This court therefore can and should authorize LAD to license the Telecast Rights to the Successful Bidder[s] notwithstanding the Commissioner's refusal to provide his consent.

**B.     The Debtors' Management Decisions Should Be Reviewed Under the Business Judgment Rule**

59.     A central premise of the MLB Objection is that the Debtors should be deprived of the benefit of the business judgment rule with respect to their chosen reorganization strategy because the decision to market the Telecast Rights at this time was tainted by an alleged conflict of interest on the part of Mr. McCourt.  This ignores, however, that the interests of the Debtors and Mr. McCourt as their equity holder are in fact perfectly aligned with respect to the proposed Marketing Procedures.  As such, the Commissioner has not alleged facts to meet his initial burden to demonstrate that an actual conflict of interest exists.

60.     A party seeking to displace the business judgment rule with the entire fairness standard "has the burden at the outset to rebut the rule's presumption by proving that the directors breached "any one of the triads of their fiduciary duty – good faith, loyalty or due care." *Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Dela.)*, 327 B.R. 537, 549 (D. Del. 2005) (citations omitted).  Here, the Commissioner has not even alleged, much less proven, any concrete breach of fiduciary duty by Mr. McCourt.  Rather, the Commissioner broadly accuses Mr. McCourt of "elevating his economic interests over those of the Debtors" and speculates that Mr. McCourt is "causing the Debtors to try to sell the Media Rights in order to generate cash that he can take to finance his divorce, his other personal debts and his lavish lifestyle." MLB Objection ¶ 17.

61.     Far from constituting a breach of fiduciary duty, however, the Debtors' decision to pursue a Telecast Rights transaction at this time is entirely consistent with – and driven by – the Debtors' fiduciary duty to maximize value for creditors and equity holders alike.  *E.g.*, *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) (trustee/debtor in possession "has the duty to maximize the value of the estate"); *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (noting "the trustee's fiduciary duty to maximize the value of the bankruptcy estate") (citations omitted).   As a matter of general corporate law, and bankruptcy law, that fiduciary duty includes a duty to equity holders in the case of a solvent debtor.  *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 64 (Bankr. S.D.N.Y. 2009) ("the directors of a solvent corporation are authorized – indeed, required – to consider the interests of the shareholders in exercising their fiduciary duties"); *In re Philadelphia Athletic Club, Inc.*, 15 B.R. 60, 62 (Bankr. E.D. Pa. 1981) ("where, as here, the rights of all creditors are fully protected, it is incumbent on the court to seek to protect the interests of the equity holders as well").

62.    Even more fundamentally, as the Commissioner well knows, the Debtors have a liquidity problem that is only temporarily solved with DIP financing. The Commissioner has never denied this, and indeed, stepped forward to provide postpetition DIP financing for the Debtors in exactly the amount that they requested. To reorganize its business, LAD must resolve this issue. The Commissioner has not suggested that there is some other, preferable reorganization strategy that the Debtors were prevented from pursuing due to a conflict of interest. It cannot be a conflict of interest for a chapter 11 debtor in possession to pursue a viable reorganization strategy where liquidation is the only other alternative that has been suggested.

63.    Moreover, at this stage of the proceedings, the Debtors have not actually made the determination to enter into any particular Telecast Rights transaction. Instead, they have elected to commence a marketing process that will almost certainly generate the opportunity for LAD to enter into a Telecast Rights transaction that provides value to the Debtors that is consistent with, or exceeds, the value of the Proposed Fox Transaction. It remains uncertain, however, what form that transaction will ultimately take. For this reason, the Commissioner's apparent assumption that the Successful Bid[s] will duplicate certain features of the Proposed Fox Transaction such as the inclusion of a substantial upfront payment, or the allocation of certain proceeds to entities outside of the Debtors' capital structure, is misplaced. Indeed, the one thing that can be said with certainty is that despite the Commissioner's protestations to the contrary, **any and all proceeds of the transaction – whatever form it may take – will be distributed to, and retained by, the Debtors or their subsidiaries, and not Mr. McCourt.**

64.    Under these circumstances, the Court cannot possibly find that Mr. McCourt is committing a breach of his fiduciary duties to the Debtors by seeking to market the Telecast Rights. To prove that such a breach had occurred, the Commissioner would have to demonstrate

-28-

that Mr. McCourt was either "on both sides of the transaction" or that he stands to derive "personal financial benefit from it in the sense of self-dealing, *as opposed to a benefit which devolves upon the corporation or all stockholders generally.*" *Hechinger*, 327 B.R. at 549 (emphasis added, citations omitted). Mr. McCourt plainly cannot be accused of being on both sides of any proposed transaction in which the Telecast Rights are licensed to an unaffiliated third party such as Fox or Time Warner. Moreover, given that the proceeds from any proposed transaction will be received by the Debtors and not Mr. McCourt, any benefit to Mr. McCourt will be derived solely from his status as equity holder. This type of benefit, which accrues equally to all shareholders, is patently insufficient to overcome the presumption of the business judgment rule. *See Official Comm. of the Unsecured Creditors of Color Tile, Inc, v. Investcorp S.A.*, 137 F. Supp. 2d 502, 512 (S.D.N.Y. 2001) (finding no conflict of interest where certain shareholders supported proposed acquisition that would increase the likelihood of an IPO, allowing the shareholders to cash out on their investments, because all shareholders would be benefitted by an IPO).

65.     As the sole support for his theory that Mr. McCourt intends to pillage the proceeds of any Telecast Rights transaction, the Commissioner observes that the projected amount of "excess cash" in the Illustrative Liquidity Projections is roughly equal to the amount of cash that he alleges was being used for "non-baseball purposes" under the Proposed Fox Transaction. This, he speculates, cannot possibly be a coincidence. To begin with, the Commissioner once again conveniently ignores that Mr. McCourt was prepared to ███████

████████████████████████████████████████████

████████████████████████████ More fundamentally, the Commissioner utterly misconstrues the purpose of the Illustrative Liquidity Projections. The projections demonstrate

that a Telecast Rights transaction that is as good as or better than the Proposed Fox Transaction will comfortably meet LAD's liquidity needs, *leaving it with a huge amount of cash to weather any unforeseen shortfalls.* Obviously, the assumption is that the excess cash remains in the team.

66.     To say that a Telecast Rights transaction will generate a "significant return to equity" therefore does not mean that all "excess cash" will be distributed to shareholders, it means that equity will benefit from the recapitalization of LAD and the resulting increase in the team's value.  It means, moreover, that the equity of the financially stabilized and prosperous reorganized debtors will have sufficient value to satisfy Mr. McCourt's obligations not related to LAD through any number of transactions that are not subject to the Commissioner's approval, including financing that does not encumber any of the Debtors' assets, sales of a minority interest or interests, or a sale of the team outside of bankruptcy.

67.     Thus, the Commissioner has failed to meet his initial burden to demonstrate that Mr. McCourt has breached his fiduciary duty to the Debtors so as to justify application of the entire fairness standard.  The Court should therefore apply the business judgment rule in evaluating the Debtors' decision to market the Telecast Rights at this time.

**C.      The Debtors' Decision To Market The Telecast Rights At This Time Is A Sound Exercise Of Business Judgment**

68.     MLB further contends that the decision to pursue a Telecast Rights transaction at this time is not a valid exercise of business judgment because it is "premature," and will cause LAD to breach certain provisions of the Fox Contract.  MLB Objection ¶¶ 23, 46-52.  This ignores the economic reality currently faced by the Debtors, and the tremendous benefits to be realized by marketing the Telecast Rights now.  It also ignores the fact that this Court can, under applicable law, adjust the contractual rights of Fox where those rights unduly interfere with the

Debtors' ability to reorganize and realize the full value of their assets, and that Fox will not be meaningfully damaged if the proposed Marketing Procedures are approved.

### 1.    Consummation Of A Telecast Rights Transaction Offers A Comprehensive Solution To The Debtors' Liquidity Issues

69.    The Commissioner makes much of Mr. McCourt's alleged "personal liquidity crisis," while ignoring that of the Debtors. He blithely states, for example, that "[a]t this time, the Debtors have sufficient capital to operate," MLB Objection ¶ 18, without also noting that the Debtors do not have enough capital to emerge from bankruptcy and repay the $150 million DIP Facility, or sustain their long-term operations.

70.    It goes without saying that the DIP Facility provided by MLB was not intended to be a long-term solution to the Debtors' liquidity issues. By its terms, that facility expires on November 30, 2012, before the Debtors could bring the Telecast Rights to market under the terms of the Fox Contract. Therefore, absent recurring securement of alternate exit financing, the Debtors must find another means to access the funds necessary to repay the DIP Facility in full, emerge from bankruptcy, and operate their business going forward. Implicitly acknowledging this fact, the Commissioner proposes, as an alternative to the Debtors' chosen reorganization strategy, to terminate the Debtors' exclusivity and put the team up for sale on terms dictated by him.

71.    The Commissioner's strategy amounts to using a sledgehammer to crack a nut. As shown by the Illustrative Liquidity Projections – which represent the core analysis performed by the Debtors and their professionals in determining to pursue a Telecast Rights transaction at this time – a transaction comparable to the Proposed Fox Transaction would provide more than enough liquidity for LAD to emerge from bankruptcy and meet its ongoing cashflow needs.

72.     The MLB Objection is notably thin when it comes to any specific criticism of the Illustrative Liquidity Projections. The Commissioner instead attempts to discredit Mr. Coleman, stating that he "has no expertise or experience with respect to sports media rights transactions, and his projections prepared in anticipation of litigation . . . are substantially inflated over the actual business projections that the Debtors created and submitted to Major League Baseball in the ordinary course of business." MLB Objection ¶ 57. As to Mr. Coleman's qualifications, neither the Commissioner nor his expert, Mr. Desser, have explained why an extensive background in sports media (as opposed to an extensive background in restructuring and chapter 11 reorganization) is necessary in order to conduct a comprehensive analysis of the finances of a chapter 11 debtor in possession, and assist management in developing a viable exit strategy based upon sound financial projections.[5]

73.      The Illustrative Liquidity Projections make clear, however, that the Debtors would be able to meet their existing debt obligations with plenty of cash to spare. Any personal obligations of Mr. McCourt are irrelevant,

---

[5]     Regarding the so-called "Business Projections," LAD is unsure of which projections the Commissioner is referencing. Unless the Commissioner can substantiate his contentions and point to specific inconsistencies between the "Business Projections" and the Illustrative Liquidity Projections, the Court should disregard these statements.

because the proceeds of a Telecast Rights transaction will not be used to satisfy those obligations.

74.     MLB's only other criticism of the projections is that the upfront payment included in the Proposed Fox Transaction should be subject to revenue sharing.[6]  MLB Objection ¶¶ 40, 58.  While the Debtors believe that MLB has not required that upfront payments received by other teams be subject to revenue sharing, the issue is largely irrelevant.  Based upon the assumptions used in the Illustrative Liquidity Projections, ████████████████████ ████████████████████████████████████ a fact which the Commissioner apparently does not dispute.  This amount is more than enough to cover any revenue sharing obligations that LAD might conceivably have with respect to the upfront payment, as well as other unforeseen expenses.

75.     The Commissioner has therefore failed to offer any valid reason why this Court should second-guess the Debtors' own financial projections and the business decisions that are based on them.

2.     **LAD's Efforts To Market The Telecast Rights Are Not "Premature"**

76.     The Commissioner's primary criticism of LAD's business decision to pursue a Telecast Rights transaction at this time is that it is "premature" to do so prior to the expiration of the Exclusive Negotiating Period under the Fox Contract on November 30, 2012.  In support of this argument, the Commissioner offers the declaration of Edwin S. Desser ("Desser Decl.").  Mr. Desser opines that the marketing process for the Telecast Rights proposed by LAD will not

---

[6]   The Commissioner also generally complains that the Illustrative Liquidity Projections were prepared in anticipation of this litigation, but this is no basis to conclude that they are inaccurate.  Indeed, in performing the analysis that went into the Illustrative Liquidity Projections, the Debtors and their advisors were cognizant of their role as fiduciaries of the debtors' bankruptcy estates, and knew that the projections would be scrutinized by MLB and by the Court and defended as both highly accurate and readily achievable.

maximize the value of the Debtors and their assets.  He bases that opinion in large part on his experience advising other teams on the licensing of their media rights, including the Los Angeles Lakers in early 2011 and the Houston Astros in 2010.

77.     As explained in the Rebuttal Declaration of Peter Cohen filed concurrently herewith, however, the actual circumstances of those recent transactions, including those in which Mr. Desser claims to have advised other teams, contradicts the opinions that he now offers on behalf the Commissioner with respect to LAD.

78.     Industry Trends.  Mr. Desser opines that based on "industry trends," LAD would be able to get 10-20% more for the media rights if they were marketed 1 or 2 years from now instead of today.  Based on that opinion, he asserts that LAD should delay marketing those rights until the Fox Contract is closer to its expiration.  Desser Decl. ¶ 12.

79.     In offering that opinion, Mr. Desser fails to mention that the Los Angeles Lakers entered into a telecast agreement with Time Warner in February 2011, even though the existing agreement with Fox Sports Network was not scheduled to expire until the end of the 2011-2012 season, more than a year later.  *See* Supp. Levinson Decl., Ex. 16 (Joe Flint, *Time Warner Cable, Lakers Strike 20-Year TV Deal,* L.A. Times, Feb. 14, 2011).   He also fails to refer to the fact that the Houston Astros and Houston Rockets, two other teams he claims to have represented in the licensing of their telecast rights, entered into an agreement with Comcast to form an RSN in October 2010.  *See* Supp. Levinson Decl., Ex. 17 (David Barron, *Astros, Rockets Finalize Deal to Launch TV Network Comcast SportsNet Houston to Show Games Starting in Fall of 2012,* Houston Chronicle, Oct. 29, 2010).  They did so even though both the Astros and Rockets were under contract to Fox Southwest for two more seasons (the Astros until the end of the 2012 season, the Rockets until the end of the 2011-2012 season.  While Houston may have

renegotiated its Media Rights Agreement with Fox Pursuant to an option clause in its contract, they still chose to exercise that clause before the maturity of the contract.  Presumably, if Mr. Desser thought that industry trends would lead to a 10-20% increase within one or two years, those teams should have been advised to wait until 2012 to market their rights.   Cohen Rebuttal Decl. ¶¶ 7-8.

80.      Likewise, the Texas Rangers (who Mr. Desser does not appear to have represented) entered into an agreement to license future telecast rights in September 2010, even though their existing agreement did not expire until the end of the 2014 season, more than three and one-half years later.  Supp. Levinson Decl., Ex. 18 (Jonah Keri, *How Television Could Launch a Rangers Dynasty,* Grantland, Sept. 2, 2011).  Under Mr. Desser's reasoning, the Rangers and their new owners should have waited two to three years before negotiating a long-term telecast rights agreement. Cohen Rebuttal Decl. ¶ 9.  Mr. Desser also refers to the fact that "the Los Angeles Angels are expected to close a new transaction."  Desser Decl. ¶ 51.  But, according to press reports, the Angels and Fox are currently parties to a long-term telecast rights agreement that extends until 2016, *five* years away.  *See* Supp. Levinson Decl., Ex. 19 (Christina Settimi, *Baseball's Cable Kings,* Forbes, Apr. 22, 2009).  Cohen Rebuttal Decl. ¶ 10.

81.      LAD seeks to pursue a strategy consistent with that adopted by the Lakers, the Astros, the Rockets, the Rangers and the Angels, under which it can realize the value of the Telecast Rights now rather than waiting another year and risk a decline in the market, especially given the uncertain macroeconomic environment we currently face.  Right now the market is vibrant and the competition in the Los Angeles market is intense, as proven by how aggressively Time Warner moved in securing the telecast rights of the Lakers.  Time Warner will likely, by virtue of its agreement with the Lakers to broadcast games on two RSNs (one English, one

Spanish), be seeking content in the summer months that complements the premier quality and viewer interest of the Lakers in the winter. The Dodgers are the only Los Angeles team that can provide such content to Time Warner in the near term, given that the Angels are under contract until 2016 (and, if they reach agreement with Fox to extend the term of that agreement, will be unavailable for perhaps decades). The same is true for Fox, which will face a void in its programming on Prime Ticket if it does not retain the right to broadcast Dodger games beyond 2013. There is no business justification to delay the marketing and license of the Telecast Rights. Cohen Rebuttal Decl. ¶ 11.

82. <u>Length of Marketing Process.</u> Mr. Desser suggests that the marketing process proposed by LAD is "premature and condensed" and therefore will attract fewer bidders than if the rights were marketed at the conclusion of the exclusive negotiating period with Fox. He further claims that potential bidders will not make a decision "on a whim" or "at the drop of a hat." Desser Decl. ¶ 21.

83. Again, the experience of Mr. Desser's own clients tells a different story. For example, the agreement between Time Warner and the Los Angeles Lakers was announced less than two months after the expiration of the exclusive negotiating period between the Lakers and Fox. *See* Supp. Levinson Decl., Ex. 20 (John Lombardo & John Ourand, *Lakers, Time Warner Cable Run Fast Break,* Sports Bus. J., Feb. 21, 2011). Tim Harris, the senior vice president and chief marketing officer for the Lakers, was quoted as saying that "the courtship happened quickly." *See id.*; Flint, *Time Warner Cable, Lakers strike 20-year TV deal, supra.* Cohen Rebuttal Decl. ¶ 13. Likewise, under its existing agreement with Fox Sports, the Houston Astros and Houston Rockets were not entitled to negotiate with other carriers until late 2009. Baron, *supra.* By February 2010, there were reportedly four bidders (Fox, Comcast, AT&T, and a

fourth unknown bidder) in the running, with Comcast having emerged as the clear favorite by no later than May 2010. *See* Supp. Levinson Decl., Ex. 21 (John Ourand, *In Houston, a Shootout Over Astros Rights* Sports Bus. J., Feb. 22, 2010), Supp. Levinson Decl., Ex. 22 (John Ourand, *Comcast Close to Houston TV Rights Deal,* Sports Bus. J., May 21, 2010). Cohen Rebuttal Decl. ¶ 14.

84.     Given the "unique and scarce" opportunity to enter into an agreement to broadcast Dodger games, Desser Decl. at ¶ 11, any courtship of LAD would occur on an equally fast timetable, along the lines Mr. Desser has witnessed first-hand in his prior engagements. In addition, and as opposed to the other recent telecast opportunities mentioned above, the opportunity to broadcast one of the premier teams in Baseball in the second largest television market in the United States is a vitally strategic business opportunity that will appeal not only to Los Angeles market incumbents Fox and Time Warner, but may also appeal to other major broadcasters. Each of those potential bidders will already have substantial familiarity with the Los Angeles market, particularly Time Warner given its recent courtship of the Lakers, and Fox given its long history in this market. Any bidder will be able to put in place any procedures necessary to enable them to bid competitively at the auction. Cohen Rebuttal Decl. ¶ 15.

85.     <u>Length of Time to Fully Negotiate and Document Telecast Rights Transaction.</u> Mr. Desser asserts that LAD would need a period of 6-18 months in order to fully negotiate and document a Telecast Rights transaction. Desser Decl. ¶ 23. Again, Mr. Desser's opinion is inconsistent with other transactions, including those in which he claims to have been involved. For example, according to news reports, the Lakers and Time Warner negotiated and documented their agreement in less than two months – not the three year period suggested by Mr. Desser in his declaration. Desser Decl. ¶ 23. Comcast and the Astros/Rockets appear to

have taken about five months from the time that Comcast emerged as the leading bidder in May 2010 to the date that the agreement was finalized in October 2010. *Compare* Ourand, *supra,* with Barron, *supra.* The new owners of the Texas Rangers apparently were negotiating a new media rights agreement with Fox and multiple parties concurrently as they negotiated to by the Team and entered into an agreement with Fox just seven weeks after the sale of the team in August 2010 – for a deal that does not commence until the 2014 season. Supp. Levinson Decl., Ex. 18 (Jonah Keri, *How Television Could Launch a Rangers Dynasty,* Grantland, Sept. 2, 2011). Thus, potential suitors of LAD's Telecast Rights would be able to move as quickly as required to negotiate and document an agreement to acquire the Telecast Rights. Cohen Rebuttal Decl. ¶ 16.

86.    <u>Current Team Performance and Ownership.</u> Mr. Desser also maintains that "the best time to sell a team's media rights is typically when the team is at its best" and that "the Dodgers are in a rut." Desser Decl., ¶ 26. Yet, contrary to Mr. Desser's opinion, his client, the Astros, entered into a long-term agreement at the end of the 2010 season even though the team's win-loss record was under .500 in both 2010 and 2009 – worse than the 82-79 record posted by the Dodgers in 2011. Indeed, the Astros had the worst record in baseball last year and have enjoyed only one winning season since 2005, whereas the Dodgers reached the National League Championship Series in 2008 and 2009. Yet, nobody would suggest that the value of Astros' media rights has been reduced. As Mr. Desser will surely acknowledge, sports media rights are valuable to cable, satellite and other distributors because they help to differentiate a distributor's service in intensely local competitive markets and command premium advertising rates despite the ups and downs of a team's record in any given season. Mr. Desser's opinion simply ignores the long-term nature of sports media rights agreements, under which potential acquirers will take a long-term view recognizing that the team's performance is likely to vary significantly over a

term of 10 or more years.  Moreover, as Mr. Desser himself observes, "[s]ports media rights are unique and scarce," and their value is tied to "mid-term to long-term cable and satellite affiliation agreements, which include annual escalations.  Desser Decl. ¶ 10.  These factors lessen the importance of the team's performance in any particular year.  Cohen Rebuttal Decl. ¶ 17.

87.     Mr. Desser further opines that the possibility of Mr. McCourt's continued ownership of the team, and related "concerns regarding the capitalization of the Dodgers coming out of bankruptcy," will chill bidding on the Telecast Rights.  Desser Decl. ¶ 25.  This likely will not be a factor considered by potential bidders, a fact that is best evidenced by the willingness of Fox to offer multiple new Telecast Rights agreements to the Dodgers during the crest of the negative publicity surrounding Mr. McCourt, including after the Commissioner appointed a "monitor" for the Debtors' operations.  Cohen Rebuttal Decl. ¶ 18.

88.     In any event, Mr. Desser fails to take into account that a new Telecast Rights agreement will resolve the existing concerns regarding the capitalization of the team and provide LAD with more than sufficient cash to emerge from bankruptcy and meet its operating needs.  Indeed, it is telling that Mr. Desser, whose company claims to have expertise in the valuation of media rights, has not challenged the assumptions used in the Illustrative Liquidity Projections which are based on the terms of the Proposed Fox Transaction.  Using those hypothetical assumptions would result in the team having excess cash of approximately $175 million at the end of 2012, increasing to nearly $200 million in 2016.  Cohen Rebuttal Decl. ¶ 19.

89.     Increase in Value of Club With New Telecast Rights Agreement in Place. Mr. Desser opines that if the Dodgers were to be sold either now or in the future, "any prospective purchasers of the Dodgers would likely want to negotiate their own media rights agreement," suggesting that entering into a Telecast Rights transaction now will reduce the

overall value of the Debtors.  Desser Decl. ¶ 39.  The Debtors are not seeking to liquidate the Dodgers.  But even if they were, it is notable that in the case of the Houston Astros, who Mr. Desser claims to have represented, their owner made the decision to enter into a long-term telecast rights agreement in 2010, and then less than a year later, announced an agreement to sell the team (including its stake in the RSN with Comcast) in mid-May 2011.  Compare Houston Chronicle, "Astros, Rockets finalize deal to launch TV network," October 29, 2010, with MLB.com, "Astros complete sale to Crane, pending approval," May 16, 2011. Cohen Rebuttal Decl. ¶ 21.

90.     There are sound reasons – many of them set forth in Mr. Desser's declaration – for why it makes far more sense to take the approach of the Astros and market and license the Telecast Rights prior to any sale of the Club.  As Mr. Desser points out, "[t]he true value of the Media Rights is reached only when the team enters into a binding agreement licensing them, and the specific terms of any proposed licensing agreement are customized for the particular parties in the transaction."  Desser Decl. ¶ 28.  Accordingly, without a Telecast Rights agreement in place, it will be difficult for any potential buyer of the Club to assign the "true value" of the Telecast Rights in making any bid to purchase the Club.  This challenge will lead to a substantial discount in any value ascribed to the Telecast Rights and is something that the Debtors or, in fact, any seller of any asset would seek to avoid.  Cohen Rebuttal Decl. ¶ 21.

91.     Mr. Desser might have a point if the only prospective purchasers of the Club were media companies who would look to purchase the team in order to acquire the Telecast Rights.  But as Mr. Desser correctly observes, the trend is for media companies to sell their teams.  Desser Decl. ¶ 40.  The most relevant example is Fox's sale of the Dodgers to Mr. McCourt in 2004, but Mr. Desser offers numerous similar examples, including:  1) the sale of the Atlanta

Braves by Turner Broadcasting; 2) the sale of the Philadelphia Flyers and 76ers by Comcast; 3) the sale of the Anaheim Angels and Anaheim Ducks by Disney; 4) the sale of the Chicago Cubs by the Tribune Company; 5) the sale of New York Knicks and Rangers by Cablevision. *Id.* Given the challenge that any purchaser who is not a media company will face in ascribing value to the Telecast Rights, the best way to assure that the value of the Telecast Rights can be realized in a sale of the Club is to market and license the Telecast Rights prior to any sale. Cohen Rebuttal Decl. ¶ 22.

92.    Dodger-Branded RSN.  Finally, Mr. Desser questions whether LAD could successfully pursue a media rights transaction that involves launching a new RSN devoted exclusively to Dodgers telecasts.  However, it would not be difficult to obtain the necessary capital to launch a Dodgers-branded RSN, either through an asset-based loan, an equity partner (such as a hedge fund), or a short-term credit arrangement. Cohen Rebuttal Decl. ¶ 23.  RSNs such as YES and SNY have a proven track record for generating huge returns for their investors. Given that track record and the desirability of the Los Angeles market, many different types of entities would be eager to finance such a venture.  Cohen Rebuttal Decl. ¶ 24.

93.    For all of the above reasons, the testimony of Mr. Desser is not credible, and if anything, tends to support the conclusion that the Debtors' decision to proceed with licensing of the Telecast Rights well in advance of the expiration of the current Fox Contract, is a sound exercise of business judgment.

### D.    Fox's Contractual Rights May Be Adjusted In Bankruptcy

94.    Unable to refute the fundamental economic benefits of pursuing a Telecast Rights transaction at this time, both MLB and Fox imagine terrible consequences flowing from the Debtors' possible rejection of the Fox Contract.  Such consequences, they assert, could undo any

benefits to be realized by the Debtors from consummation of a Telecast Rights transaction. These arguments are not grounded in reality.

95.     First, based upon the legal authorities cited in the LAD Motion, this Court can and should advance the Exclusive Negotiating Period under the Fox Contract, and decline to enforce Fox's accompanying limited right of first refusal, without the need for LAD to reject the Fox Contract. Second, even if the Debtors were to reject the Fox Contract, Fox would be required to mitigate any resulting damages. Following rejection of the Fox Contract, the Debtors would offer Fox the opportunity to broadcast Dodger games during the remaining two-year term of the existing Fox Contract on the same economic terms as previously agreed. Thus, Fox's damages would be minimal at best.

### 1.     **Advancement Of The Exclusive Negotiating Period With Fox Is Essential To The Debtors' Reorganization**

96.     Having already spent months negotiating a new Telecast Rights agreement with LAD prior to the bankruptcy filing, Fox now suddenly claims that its negotiations with LAD must proceed according to the exact schedule set forth in the Fox Contract. This is nonsense. The reason for Fox's recent flip-flop is not difficult to discern: Fox is attempting to scare off other bidders for the Telecast Rights and thereby obtain an advantage that it would not enjoy if LAD were to wait an additional year before marketing the Telecast Rights as contemplated by the terms of the Fox Contract.

97.     Fox apparently does not dispute that "a court may exercise equitable discretion to refuse to enforce a [contractual] provision where 'there is no substantial economic detriment to the [non-debtor counterparty] shown and where enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.'" *In re Beatriz Ready Mix, Inc.*, 2009 Bankr. LEXIS 241 (Bankr. D.P.R. Feb. 3, 2009); *Continental Sec. Corp. v. Shenandoah Nursing*

*Home P'ship*, 188 B.R. 205 (W.D. Va. 1995) ("[B]ankruptcy courts have significant power to rewrite contracts in pursuit of an equitable resolution of a Chapter 11 petition."). Instead, Fox argues that because LAD is indisputably solvent on a balance sheet basis – albeit insolvent on a cash flow basis – LAD is somehow acting in bad faith by invoking the Court's equitable powers to adjust the relationship between a debtor and its contractual counterparty.

98.     Fox is mistaken. It is well established that the Bankruptcy Code does not require that a debtor be balance sheet insolvent prior to filing bankruptcy, and that the protections of the Bankruptcy Code are available to a debtor that is solvent on a balance sheet basis, but facing genuine financial distress, as is indisputably the case here. *E.g., In re General Growth Prop., Inc.*, 409 B.R. 43, 61 (Bankr. S.D.N.Y. 2009) (petition not filed in bad faith where debtors were current on their mortgages, which were not due for another three years, but had poor refinancing prospects outside of bankruptcy); *In re Seda France, Inc.*, No. 10-12948, 2011 Bankr. LEXIS 2874 (Bankr. W.D. Tex. July 22, 2011) ("The Code contains no requirement that debtors be insolvent; *a solvent debtor may nevertheless be in financial difficulty, seek relief under the Code in good faith, and modify the rights of creditors.*") (emphasis added). Moreover, a debtor may in good faith file bankruptcy in order to avoid burdensome contractual provisions that would foreclose the debtor from realizing the full value of its assets. *In Re Zais Inv. Grade Ltd. VII*, No. 11–20243, 2011 WL 3795169 at *8 (Bankr. D.N.J. Aug. 26, 2011) (rejecting contention that petitioning creditors had an improper purpose in filing an involuntary petition where they were seeking to maximize value for creditors by avoiding certain contractual restrictions on the debtor's ability to manage CDO securities). [7]

---

[7]    Fox's argument that the LAD Motion constitutes a "bad faith abuse of the Bankruptcy Code," Fox Objection ¶¶ 41-45, is not to be taken seriously, nor is MLB's contention that the Debtors are using these bankruptcy cases as "an excuse to selectively override the Baseball

99.     Thus, where a contractual provision threatens the debtor's very ability to utilize the provisions of the Bankruptcy Code to effect a successful reorganization, that provision is subject to the equitable powers of the bankruptcy court, regardless of whether or not the debtor is solvent. The court's task in determining whether and to what extent to modify contractual rights in bankruptcy based upon equitable considerations is to weigh the burdens of such modification on the contract counterparty against the benefits to the debtor and its creditors.

100.     In this case, there is no comparison between the respective benefits and burdens of Fox and LAD when it comes to advancement of the Exclusive Negotiating Period. On the one hand, the benefit to LAD is immediate and substantial: it will permit the Debtors to proceed with a reorganization strategy that will maximize value and enable the Debtors to emerge from bankruptcy as quickly as possible without liquidating their assets. On the other hand, the burden to Fox is minimal: Fox will enjoy the same 45-day exclusive negotiation period that it bargained for, only a year earlier. One could speculate endlessly about whether Fox will do better or worse in its negotiations with LAD now vs. a year from now; there is no way to know for certain.[8] It is clear, however, that the Debtors will benefit tremendously from the ability to put their financial

---

Agreements." MLB Objection ¶ 44. The Third Circuit cases cited by Fox and MLB are in no way analogous to the circumstances of this case. In *NMSBPCLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 123-24 (3d Cir. 2004), the debtor was both "highly solvent" *and* "cash rich" and not facing any impending problems. Moreover, the debtor filed *only* to take advantage of a specific bankruptcy code section, not for a reorganizational purpose. *In re SGL Carbon Corp.*, 200 F.3d 154, 164 (3d Cir. 1999) is likewise inapposite because the debtor was explicit that it was filing only to evade antitrust litigation, which was not particularly threatening to the corporation, and there was no other financial distress in sight. Moreover, it is disingenuous for Fox or MLB to make these allegations, when both of them appeared at the hearing regarding approval of the Debtors' DIP Facility and made no suggestion that Debtors cash flow difficulties were contrived or that the requested financing was unnecessary.

[8]     If the Commissioner's expert is to be believed, and the Telecast Rights will be worth 10-20% more one year from now than they are today, Desser Decl. ¶ 12, then Fox stands to reap substantial benefits from the advancement of the Exclusive Negotiating Period.

- 44 -

difficulties behind them by licensing the Telecast Rights at this time. The Court should therefore exercise its equitable discretion to advance the Exclusive Negotiating Period under the Fox Contract as requested in the LAD Motion.[9]

### 2. The Right Of First Refusal Prevents LAD From Realizing The Full Value Of The Telecast Rights

101. Further, Fox's limited right of first refusal should not be enforced for the reasons set forth in the LAD Motion. The cases cited by Fox on this issue are inapposite. *In re IT Group, Inc.*, 302 B.R. 483, 488 (D. Del. 2003) does not establish, as Fox suggests, that courts in this district will enforce a right of first refusal in bankruptcy. Instead, Judge Farnan merely noted in that case that the bankruptcy court "does retain some discretion in determining whether

---

[9] Fox also contends that the Future Acquisition Rights constitute an "interest" in property that is subject to the protections of sections 363(e) and (f). Fox Objection ¶¶ 62, 72. Fox is incorrect that the LAD Motion seeks relief under section 363(f) (which MLB apparently recognizes, MLB Objection ¶51 n.22). This is because Fox has no "interest" in the Telecast Rights within the meaning of that section. *See In re Fleishman*, 138 B.R. 641 (Bankr. D. Mass. 1992) (finding that a right of first refusal with respect to real property was not a covenant, but a contractual right that was extinguished via rejection of the contract). For this reason, LAD is not required to provide adequate protection of any "interest" that Fox may have, nor is LAD required under Rule 7001 to file an adversary proceeding in order to obtain the relief that it seeks.

MLB (but not Fox) also claims LAD must commence an adversary proceeding pursuant to Rule 7001 because the LAD Motion purportedly seeks "declaratory relief," MLB Objection ¶ 47 n.18, but this argument improperly "elevates form over substance." *In re Trico Marine Servs., Inc.*, 450 B.R. 474, 476 n.2 (Bankr. D. Del. 2011) (looking to the substance, rather than the form, of a "make-whole" interest payment in determining that a debtor was not required to file a Rule 7001 adversary proceeding). The "basic relief" LAD seeks is approval of the Marketing Procedures; even if enjoining enforcement of the Fox ROFR/ROFN is covered by Rule 7001 (and LAD contests that it is), such relief is, at best, ancillary to the requested relief and thus does not require the commencement of an adversary proceeding. As the Third Circuit has explicitly stated, a bankruptcy court must "look[] at the essence of the relief sought" and "only classic equitable relief, such as specific performance" need be commenced by adversary proceeding pursuant to Rule 7001. *In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116, 123 (3d Cir. 1999) (because the amounts of cure claims related to the assumption or rejection of an executory contract was ancillary to the "basic relief" sought, the debtor was permitted to seek such relief in a contested matter).

provisions that do not explicitly prohibit assignment qualify as *de facto* anti-assignment clauses rendering them unenforceable," and concluded that he was "not persuaded that enforcing the right of first refusal *in this case* would hamper the Debtors' ability to assign the property or foreclose the estate from realizing the *full value* of the [property]." (emphasis added).

102.    This case is distinguishable because here, enforcement of the right of first refusal *would* hamper LAD's ability to license the Telecast Rights and realize their full value.  Unlike the typical situation where a party simply has the right to match offers received by the debtor,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████    *In re Capital Acquisitions & Mgt. Corp.*, 341 B.R. 632 (N.D. Ill. 2006) is also inapposite for the same reason.  The Court should, therefore, decline to enforce Fox's limited right of first refusal as requested in the LAD Motion.

### 3.    The Implications Of Rejecting The Fox Contract, If Required, Are Minimal

103.    Even if this Court declines to exercise its equitable discretion to advance the Exclusive Negotiating Period and disregard Fox's limited right of first refusal, LAD can reject the Fox Contract with little risk of incurring any material liability to Fox.  If rejection of the Fox Contract proves necessary, any potential damages asserted by Fox are subject to Fox's duty to mitigate its damages.  *E.g., State Dept. of Health Servs. v. Superior Court*, 79 P.3d 556, 456 (Cal. 2003) ("A generally recognized principle of the law of damages is that 'a party must make reasonable efforts to mitigate damages, and recovery will not be allowed for damages that a party should have foreseen and could have avoided by reasonable effort without undue risks, expense, or humiliation.'").

104. If LAD were to reject the Fox Contract, it could offer Fox Sports the opportunity to mitigate its damages simply by allowing Fox to continue to broadcast Dodger games for the remaining term of the Fox Contract. In *Fyke v. The Screen Shop*, No. H025555, 2005 Cal. App. Unpub. LEXIS 3630 (Ct. App. Apr. 21, 2005), the plaintiff had ordered custom windows from the defendant, a retailer, and placed a substantial deposit with her credit card. *Id.* at *7. After the retailer placed the order for the custom windows with a distributor, the plaintiff withdrew her deposit, subsequently suing the retailer for damages for the cost of replacement windows. *Id.* at *9-10. The court found that the plaintiff failed to mitigate her damages because she refused to purchase the windows that were manufactured to her exact specifications from the distributor at prices that were available at the time of her original order. *Id.* at *32-33.

105. A similar finding was made in *West v. Bechtel Corp.*, 117 Cal. Rptr. 2d 647 (Ct. App. 2002). In *West*, an employee claimed damages for lost wages based upon the employer's alleged breach of an employment agreement. After his termination, the employer offered West several opportunities to work on other projects, none of which were accepted. *Id.* at 655. The court held that "[s]ince it is indisputable that West was offered comparable, or substantially similar, employment, and he admittedly made no effort whatsoever to pursue such employment, it must be concluded that he failed to mitigate his damages as a matter of law; any other result would ignore the obligation to mitigate." *Id.* at 662.

106. Like the plaintiffs in *Fyke* and *West*, it would be unreasonable for Fox Sports to reject LAD's offer to provide Fox Sports the exact consideration for which it contracted on nearly the same terms and conditions – the right to broadcast Dodger games through 2013. This reasonable opportunity mitigates all damages that Fox Sports could assert with respect to the substantial majority of the Fox Contract.

107. The only remaining provisions of the Fox Contract at issue relate to Fox Sport's right of first negotiation and right of first refusal. The marketing procedures proposed in the LAD Motion will offer Fox Sports the equivalent of those rights. Phase One of the marketing procedures contemplates a 45-day exclusive negotiation period with Fox Sports for the right to broadcast Dodger games from 2014 and beyond. The only difference between what LAD offers and the rights under the Fox Contract are that the negotiation will happen one year earlier than scheduled. Under those circumstances, Fox Sports cannot assert any damages. Even where the right of first negotiation has been ignored, courts have held that, at most, the only damages that could be asserted for such a breach would be out-of-pocket costs in conducting the negotiations, and may or may not include lost opportunity costs. *See Copeland v. Baskin Robbins U.S.A.*, 117 Cal. Rptr. 2d 875, 885 (Ct. App. 2002); *Auerbach v. Great Western Bank*, 88 Cal. Rptr. 2d 718, 732 (Ct. App. 1999). Any other damages are speculative. A party "cannot recover lost expectations (profits) because there is no way of knowing what the ultimate terms of the agreement would have been or even if there would have been an agreement." *Copeland,* 117 Cal. Rptr. 2d at 885; *Red Sail Easter Ltd. Partners, L. P. v. Radio City Music Hall Prods., Inc.*, No. 120361992, WL 251380, at *7 (Del. Ch. Sept. 29, 1992) ("[P]roof of the breach of a contractual provision that goes no further than according to one side a right of first negotiation with respect to a future transaction cannot, as a matter of law, without more, support an award of damages. Many cases might be cited in support of this proposition.) "

108. Likewise, LAD has offered Fox Sports the equivalent of its right of first refusal. Under the marketing procedures proposed by LAD, Fox Sports will have the automatic right to participate in the bidding and auction process for the Telecast Rights. ███████████████

[REDACTED]

109.    Accordingly, it is unlikely that Fox Sports can assert any meaningful damages, either as a result of court approval of the LAD Motion or in the event the Debtors are required to reject the Fox Contract.

### 4.    Section 365(n) Is Inapplicable

110.    Fox makes the unsubstantiated statement that the Fox Contract is an intellectual property license that is subject to section 365(n) of the Bankruptcy Code.  Fox Objection ¶65. Upon closer review of both the Fox Contract and section 365(n), it appears that section 365(n) at best has limited application to the Fox Contract.

111.    By its terms, section 365(n) is limited to "intellectual property" licenses.  Very few of Fox's rights under the Fox Contract qualify as "intellectual property" licenses.  First, it is well-settled that "trademarks" are not included in the definition of "intellectual property" under the Bankruptcy Code. *See*, 11 U.S.C. § 101(35A). [REDACTED]

[REDACTED] Second, the broadcast of live-action sporting events is not itself a work of authorship, or copyright. "[R]ecorded broadcasts of [sports] games—as opposed to the games themselves – are . . . entitled to copyright protection [under title 17]." *NBA v. Motorola, Inc.*, 105 F.3d 841, 847 (2d Cir. 1997) (contrasting "the expression or description of the game that constitutes the broadcast" and which is "protected under copyright law" with "facts from the broadcasts" which are not so protected). [REDACTED]

[REDACTED]

112.   Fox seems to suggest that because an agreement may contain a license of intellectual property that Fox would be entitled to retain *all* of its rights under the Fox Contract, including rights that are not included in the license to use intellectual property – in this case the right of first negotiation and right of first refusal.  The plain text of section 365(n) is to the contrary.  Section 365(n)(1)(B) permits the licensee "to retain its rights (including a right to enforce any exclusivity provision of such contract, *but excluding any other right under applicable non bankruptcy law to specific performance of such contract*) . . . under such contract . . . *to such intellectual property*."  11 U.S.C. § 365(n)(1)(B) (emphasis added).  ▮▮

113.   Moreover, Fox fails to acknowledge that if 365(n) were to apply to rejection of the Fox Contract and Fox elected to retain its rights under section 365(n), then section 365(n)(2)(C) deems Fox to have waived "any right of setoff it may have with respect to such contract under this title or applicable nonbankruptcy law; and any claim allowable under section 503(b) of this title arising from performance of such contract."  11 U.S.C. § 365(n).  In essence, if Fox elected to retain its intellectual property license rights, it would be deemed to waive the very damage claim that it alleges would arise as a result of rejection of the Fox Contract.

*   *   *

114.   In summary, the decision to pursue a Telecast Rights transaction at this time is a valid exercise of LAD's business judgment and the Marketing Procedures should be approved.

### E.    The Entire Fairness Standard Is Also Satisfied

115.    Should the Court determine that the Debtors' decision to market the Telecast Rights should be judged according to the entire fairness standard, the result would be no different.

116.    The "entire fairness" doctrine requires a determination that both the sale **process** and the **price** are fair. As stated by the Delaware Supreme Court:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed [transaction], including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.

*Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

117.    As to process, the Debtors have demonstrated that the LAD Motion and the Marketing Procedures proposed therein are the product of careful analysis by LAD's management in consultation with the Debtors' independent financial advisors, Blackstone Advisory, as well as their bankruptcy counsel. Coleman Decl. ¶ 9 (Blackstone Advisory has "worked with LAD to identify and explore all available alternatives for LAD to access the liquidity it needs in order to operate its business"); Wilhelm Decl. ¶¶ 14-15 (noting that management has "analyzed LAD's potential liquidity requirements to emerge from bankruptcy and meet its operational needs over the next several years" in consultation with Blackstone Advisory). At the heart of LAD's analysis are the Illustrative Liquidity Projections prepared by LAD and Blackstone Advisory which, as noted above, the Commissioner has not critiqued in any meaningful way. As such, *the Commissioner has cited no evidence to contradict the testimony of Messrs. Coleman and Wilhelm regarding LAD's postpetition evaluation of its options for*

*emerging from bankruptcy, and resulting determination to pursue a Telecast Rights transaction.*

118.   Instead, the Commissioner appears to suggest that the fact that, as a result of their postpetition analysis, the Debtors have not departed from their prepetition strategy for addressing their liquidity issues via licensing of the Telecast Rights somehow proves that this strategy is ill-considered. MLB Objection ¶ 19 ("The record is clear that Mr. McCourt was trying to sell the Media Rights before he hired a purported expert to say that the market was favorable."). To the contrary, it confirms that the Commissioner's rejection of the Proposed Fox Transaction was unreasonable.

119.   Thus, the Illustrative Liquidity Projections, combined with the uncontroverted testimony of Messrs. Coleman and Wilhelm, show that LAD's process in determining to pursue a Telecast Rights transaction was entirely fair and appropriate.

120.   As to fair price, the Marketing Procedures will result in a competitive bidding process in which the value of the Telecast Rights will be market-tested. Such a process will, by its very nature, produce the highest and best offer for the Telecast Rights. LAD therefore believes that it will produce a price that is not only fair, but unprecedented in terms of recent MLB media rights deals. Furthermore, the Commissioner can hardly complain that openly marketing the Telecast Rights will not generate a fair price for them when that is what he has been advocating all along.

121.   MLB has not (and cannot) cite a single case in which a court found a sale of assets in accordance with a court-approved auction process open to all qualified bidders to be unfair either in terms of process or price. All of the cases cited by MLB where a court declined to approve a proposed sale of assets pursuant to section 363 on fairness grounds involve a

- 52 -

situation where the interested officer conspired with the proposed purchaser or otherwise failed to sufficiently expose the assets to the marketplace. *In re Performance Nutrition, Inc.*, 239 B.R. 93 (Bankr. N.D. Tex. 1999) (former president, director and chief executive officer of the debtor conspired to sell the debtor's assets via a 363 sale to another company, in exchange for employment and stock options from the purchaser); *In re Cloverleaf Enterps. Inc.*, No. 09-20056, 2010 WL 1445487 (Bankr. D. Md. April 2, 2010) (debtor "decide[d], at the time of the filing of the case, that it would sell out to [the proposed buyer]," and "negotiated an agreement that precluded the marketing of its assets to anyone else. . . .").

122.    In contrast, where the allegedly interested party does not "unduly influence" the marketing process, courts have found the entire fairness test to be satisfied. *E.g., In re Zenith Elec. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999). In *Zenith*, the debtor filed a prepack plan of reorganization involving a restructuring of the investment of LGE, Zenith's largest shareholder and creditor, which was opposed by the equity committee and various other shareholders. *Id.* at 97. The court found that the transaction was fair because "LGE did not object or impede Zenith's efforts to find a different strategic investor or purchaser" and moreover, "any undue influence which LGE might have had over Zenith was countered by the Bondholders participation (through separate professionals) in negotiating the Plan." *Id.* at 109. Similarly here, LAD is seeking to market the Telecast Rights to all interested parties, not just Fox, and both MLB and the Committee will be actively involved in the marketing process.

123.    The various cases cited by the Commissioner involving the diversion of corporate assets by a corporate fiduciary are inapposite. MLB Objection ¶ 33. As noted above, all proceeds of a Telecast Rights transaction that is approved by this Court will remain with the Debtors. As such, the Commissioner's claim that any proposed Telecast Rights transaction to

emerge from the marketing process will feature a large payout to Mr. McCourt, or will be structured in the same manner as the Proposed Fox Transaction, is erroneous.

124.   Relatedly, the Commissioner's allegation that LAD is imperiling its future operations by "merely selling the Media Rights to the party willing to write the biggest check," MLB Objection ¶ 38, is utter nonsense. The Marketing Procedures explicitly provide that, in determining the Successful Bid[s], "LAD **shall consider all factors it deems relevant,** including, without limitation, the amount of the cash component of the purchase price (including both the annual rights fees and any upfront cash payment), the size of any equity interest offered to LAD or its affiliates the nature of such interest and the characteristics of the pertinent entity, the cost of any bidder protections, the form of consideration being offered, the likelihood of a Qualified Bidder's ability to close a transaction and the timing thereof, the ability of a Qualified Bidder to obtain any required approvals and permits, any contingencies relating to a Qualified Bidder's offer, and the net benefit to LAD's estate." LAD Mot. ¶ 28, p.19 (emphasis added). The Commissioner has not identified any reason why LAD and its advisors, in consultation with both MLB and the Committee, will not be able to weigh each of the above factors, and any others that may be relevant, in selecting the Successful Bid[s].

125.   The proposed marketing process will therefore generate a price for the Telecast Rights that is more than fair, and thus both prongs of the entire fairness test are satisfied.

F.   **The Marketing Procedures Are Appropriate**

126.   In addition to his opinions regarding the timing of LAD's decision to market the Telecast Rights, Mr. Desser, who does not claim to have any experience with respect to the sale or other disposition of assets in chapter 11 cases, nonetheless offers a number of opinions as to why he believes that the Telecast Rights should not be licensed in this chapter 11 proceeding and that the marketing process proposed by the Debtors in the LAD Motion will not maximize the

- 54 -

value of the Media Rights. As explained in the Rebuttal Declaration of Timothy Coleman filed concurrently herewith, however, Mr. Desser's conclusions in this area are also unsupported.

127. <u>Ability to Evaluate Bids for the Telecast Rights In Bankruptcy.</u> Mr. Desser argues that the Telecast Rights "are not the type of asset whose value can be easily and fairly determined through a simple auction in bankruptcy." Desser Decl. ¶ 27. He bases his assertion largely on his view that the Telecast Rights are not a "hard asset, like a warehouse," but rather "are a very complex bundle of interrelated intellectual property assets, opportunities, procedures and protections extending well into the future." Desser Decl. ¶ 28.

128. As this Court well knows, however, examples of successful bankruptcy sales involving assets of far greater complexity and magnitude than LAD's Telecast Rights abound. Such transactions have included the sale in bankruptcy of enterprises with multinational operations, multiple business lines, and intangible assets such as intellectual property rights, contracts, and trademarks. Many of those sales have involved revenues and values far in excess of those associated with the Telecast Rights of LAD. A sampling of such transactions in which Blackstone Advisory has been directly involved is set forth in the Coleman Rebuttal Declaration and includes:

- Representation of Comcast in connection with the acquisition by Comcast and Time Warner of the assets of cable provider Adelphia Communications, for a purchase price of $12.5 billion in cash plus 16% of the common stock of Time Warner Cable. Both Comcast and Time Warner are potential bidders for the LAD Telecast Rights and their success in acquiring the assets of Adelphia is just one example of their ability to determine the value of a complex asset in the context of a bankruptcy sale.

- Representation of Cable & Wireless America in a sale that was complicated due to the company's multiple business lines, differences in liabilities to be assumed, and the deteriorating liquidity situation at the company.

- Representation of Enron Corporation on the sale of over a dozen assets including the sale of a long-term licensing agreement for Enron's wholesale energy trading business to UBS, a process that was complicated by the business' web of outstanding trading positions, as well as Prisma Energy, a holding company for a

- 55 -

portfolio of different assets in multiple jurisdictions each of which had regulatory issues to address.

- Representation of Flying J in its sale of the core retail business to Pilot Travel Centers, a sale which was complicated due to anti-trust concerns and the need to evaluate stock in the merged company as part of the consideration.

- Advising the lenders during the sale and auction of Philly News, a sale process that involved the negotiation of multiple union contracts.

Coleman Rebuttal Decl. ¶ 6.

129.    Moreover, Mr. Desser's suggestion that it is difficult to value the Telecast Rights is contradicted by the website of his own company, which offers as one of its services "[a]ssessments of the Fair Market Value (FMV) of media rights." Even if difficult for Mr. Desser, Blackstone Advisory is well qualified to determine the value of an equity interest in an RSN to the extent such consideration is offered by any potential bidder. Coleman Rebuttal Decl. ¶ 7.

130.    Mr. Desser further expresses the view that the different forms of consideration that bidders may offer would be too complicated to evaluate and compare in a bankruptcy auction. Desser Decl. ¶ 32. He is mistaken. Once again, as this Court well knows, successful bankruptcy auctions frequently involve the evaluation and comparison of very convoluted forms of consideration. In addition to cash, commonly used forms of consideration include credit bids, earn-out structures, equity interests in the acquiring companies, and liability assumption. Such sales are typically memorialized in an asset purchase agreement that is often custom-tailored to the specific demands and needs of each individual bidder and may contain myriad provisions that may impact the economic valuation of each proposal. Investment bankers and restructuring advisors such as Blackstone regularly engage in comparing the value of competing bids with different terms and preparing analyses designed to level-set different bids so that the auction can

be run on an "apples-to-apples" basis. This is a standard procedure in the bankruptcy auction of any complex asset. Coleman Rebuttal Decl. ¶ 8.

131. LAD's Telecast Rights are no more complex than any other large complex asset that is sold in a bankruptcy court auction. The likely consideration for LAD's Telecast Rights, which may take the form of upfront cash payments, multi-year cash payments or interests in RSNs, is comparable to the types of consideration commonly received in the bankruptcy court auctions of other large complex assets. Coleman Rebuttal Decl. ¶ 9.

132. Mr. Desser also expresses concern that the marketing procedures for the Telecast Rights will be unduly focused on obtaining the "best" financial deal to maximize the value of the Telecast Rights, without taking into account the impact that the choice of a media partner might have on the operation of the Club. Desser Decl. ¶¶ 29-31. Here, Mr. Desser shows apparent ignorance for the "highest and best" standard used in bankruptcy to evaluate bids. This standard allows for consideration of both financial *and* non-financial benefits. As a consequence, LAD's review of any bids would take into account factors such as the compatibility of potential partners with the Club. Coleman Rebuttal Decl. ¶ 10.

133. Finally, with respect to valuation of the Telecast Rights, Mr. Desser states in his declaration that "[t]he true value of the Media Rights is reached only when the team enters into a binding agreement licensing them . . . ." Desser Decl. ¶ 28. To the extent that is correct, then it follows that the best way to determine the "true value" of the Telecast Rights is to proceed with the marketing process outlined by Blackstone and LAD, which will enable LAD to enter into an agreement with the bidder and realize that "true value." Coleman Rebuttal Decl. ¶ 11.

134. The Marketing Procedures Allow for an "Open Market." Mr. Desser is misinformed when he claims that the marketing procedures proposed by LAD will not provide

for an "open market" to license the Telecast Rights. Desser Decl. ¶ 13. He bases his opinion on the terms of the Fox Contract, and the rights of first negotiation and right of first refusal that exist under that agreement. He fails to take into account that, pursuant to the LAD Motion, LAD is seeking a determination by this Court that the provisions of the Fox Contract to which he refers are unenforceable. Such a ruling will, if obtained, allow for the license of the Telecast Rights to occur in an "open market," which Mr. Desser concedes will "maximize the value of media rights." Desser Decl. ¶ 13. Coleman Rebuttal Decl. ¶ 12.

135.    The Marketing Procedures Are Sufficiently Flexible. Mr. Desser misapprehends both the proposed marketing procedures and the bankruptcy sale process generally when he opines that LAD must, in connection with the licensing of Telecast Rights, follow a "boilerplate procedure applicable to common Chapter 11 assets." Desser Decl. at ¶ 32. The marketing procedures are not required to, and do not attempt to detail every possible term of a potential agreement. To the contrary, the marketing procedures were specifically designed to allow for flexibility. For this very reason, LAD and its advisors made the decision not to seek court approval of a form Telecast Rights Agreement and instead leave the door open for a variety of proposals. Coleman Rebuttal Decl. ¶ 13.

136.    LAD expects that the discussions to take place with potential bidders will facilitate LAD's determination of which potential bid structures are most suitable for LAD and will maximize the value of the LAD Telecast Rights and, by extension, the enterprise value of the Debtors. The marketing procedures described in the LAD Motion will enable the Debtors to communicate with potential bidders to solicit feedback to determine not only which bid structures may be proposed, but also to evaluate how those structures might be modified to

generate maximum value for LAD's license of the Telecast Rights. Coleman Rebuttal Decl. ¶ 14.

137. The proposed marketing procedures are flexible in other respects. For example, LAD and its advisors will have the ability to extend the marketing process beyond 60 days if they conclude that such an extension might lead to an increase in the value received for the Telecast Rights. In addition, there is flexibility to specify a bid format or otherwise leave the format open, as well as to determine whether bids are Qualified Bids, even if certain requirements are not satisfied. Coleman Rebuttal Decl. ¶ 15.

138. <u>The Potential Adjustment of Contractual Rights of Third Parties Will Not Deter Potential Bidders.</u> The fact that the marketing procedures for the license of the Telecast Rights contemplate some adjustment of contractual rights, including the potential determination that certain provisions of the Fox Contract are unenforceable or the rejection of executory contracts, will not discourage potential bidders from participating in an auction process. Most of the potential bidders in this process are well acquainted with the purchase of assets in bankruptcy. Moreover, the marketing procedures and any resulting auction will occur under the oversight of the Bankruptcy Court, which will have reviewed and approved the proposed bidding procedures in advance, and in the process, determined whether LAD is entitled to move forward with that process. Under these circumstances, it is difficult to believe that sophisticated parties such as Time Warner, Comcast, or Fox would hesitate to bid at an auction simply because LAD is seeking to adjust contractual rights in the bankruptcy proceeding. Coleman Rebuttal Decl. ¶ 16.

139. In similar fashion, the threat of "potential discipline from Major League Baseball" against the Dodgers will not deter potential bidders. The marketing procedures specifically provide for the Debtors to obtain the Commissioner's approval of any transaction, and provide

for the Debtors to obtain court approval in the absence of such consent only if the Commissioner is determined by the Court to have acted in bad faith or to have violated the law or the Baseball Agreements. Under those circumstances, both LAD and any bidders for the Telecast Rights will have the protection of a court order to prevent the Commissioner from making good on his threat that the other owners will vote to terminate the Dodgers franchise. And in any event, it is difficult to conceive that even the current Commissioner would take such action, given the well-recognized importance of the Dodgers to Major League Baseball. Coleman Rebuttal Decl. ¶ 17.

\* \* \*

140. In conclusion, regardless of whether the Court reviews the Debtors' decision to pursue a Telecast Rights transaction at this time under the business judgment rule or the entire fairness standard, the Court should approve the Marketing Procedures and allow LAD to commence the marketing process that will enable it to emerge from bankruptcy.

## CONCLUSION

Based upon the foregoing, the Debtors respectfully submit that the Court should grant the relief requested in the LAD Motion, and such other relief as the Court may deem appropriate.

Dated: October 24, 2011       YOUNG CONAWAY STARGATT & TAYLOR, LLP
      Wilmington, Delaware

*/s/ Ryan M. Bartley*
Robert S. Brady (No. 2847)
Pauline K. Morgan (No. 3650)
Donald J. Bowman, Jr. (No. 4383)
Ryan M. Bartley (No. 4985)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

DEWEY & LEBOEUF LLP
Bruce Bennett
Sidney P. Levinson
Joshua M. Mester
333 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Telephone: (213) 621-6000
Facsimile: (213) 621-6100

-and-

DEWEY & LEBOEUF LLP
Martin J. Bienenstock
Philip M. Abelson
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8000
Facsimile: (212) 259-6333

*Co-Counsel for Debtors and Debtors in Possession*

US1 30670264.1

-61-