## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| LOS ANGELES DODGERS LLC, *et al.*,[1] | ) | Case No. 11-12010 (KG) |
|  | ) |  |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |
|  | ) |  |
|  | ) | **Hearing Date:  October 31, 2011 at 12:00 p.m. (ET)** |
|  | ) | **Re: Docket Nos. 476 and 590** |

# REPLY OF MAJOR LEAGUE BASEBALL IN FURTHER SUPPORT OF ITS MOTION TO TERMINATE EXCLUSIVITY OR, IN THE ALTERNATIVE, TO COMPEL THE DEBTORS TO SEEK ASSUMPTION OR REJECTION OF THE BASEBALL AGREEMENTS

---

[1]    The Debtors, together with the last four digits of each of the Debtors' federal tax identification number, are: Los Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567); LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029). The location of the Debtors' corporate headquarters and the service address for the Debtors is 1000 Elysian Park Avenue, Los Angeles, California 90012.

NEWYORK 8297616 (2K)

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .............................................................................................................6

    A.      Mr. McCourt's Past Performance Is Irrelevant To The Issues In This Case ...........6

            1.      Dodger Stadium ...........................................................................................6
            2.      Inadequate Security.....................................................................................7
            3.      Dodger Dream Foundation ..........................................................................7
            4.      Financial Performance .................................................................................8

    B.      Mr. McCourt's Misuse Of The Dodgers' Funds........................................................9

            1.      Mr. McCourt Took $61.16 Million From The Dodgers To Pay Off His
                    Personal Debts .........................................................................................10
            2.      Mr. McCourt Took $73 Million From The Club's Parking Revenues ......10
            3.      Mr. McCourt Improperly Took $55 Million Directly From The
                    Dodgers ....................................................................................................13
            4.      Monetizing The Dodgers' Ticket Sales .....................................................14
             5.      Central Fund Distributions.........................................................................14
             6.      Mr. McCourt Breached His Obligation To Provide $30 Million In
                      Equity.......................................................................................................15
             7.      The Denial Of The Seasonal Credit Line Was Fully Justified...................16

    C.      Mr. McCourt Filed This Bankruptcy To Force A Media Rights Transaction
          Over The Commissioner's Objection .....................................................................17

    D.      Major League Baseball Is Not Seeking An Immediate Liquidation......................18

ARGUMENT..................................................................................................................................18

I.      THE DEBTORS FAIL TO REBUT THE CLEAR FACTS AND EVIDENCE
      ESTABLISHING CAUSE TO TERMINATE EXCLUSIVITY ......................................18

    A.      Exclusivity Should Be Terminated Because The Debtors' Reorganization
          Strategy Is Not Viable..............................................................................................18

            1.      The Debtors' Plan Is Futile Because Debtors Cannot Sell The Media
                    Rights Without Major League Baseball's Approval...................................19
            2.      The Debtors' Plan Is Futile Because The Debtors' And Mr.
                    McCourt's Breaches Preclude Assumption Of The Baseball
                    Agreements ................................................................................................28
            3.      The Debtors Cannot Assume The Baseball Agreements Because They
                    Are Not Assignable....................................................................................40
            4.      The Debtors' Plan Is Futile Also Because No One Will Bid To
                    Purchase The Media Rights Unless The Dodgers Are A Part Of Major
                    League Baseball .........................................................................................53

B.      Exclusivity Should Be Terminated Also Because The Debtors Are Pursuing
        The Interests Of Only Mr. McCourt ...................................................................53

C.      Termination Of Exclusivity Will Bring These Chapter 11 Cases To A Swift
        And Successful Conclusion ...............................................................................55

II.     If The Debtors' Exclusivity Is Not Terminated, Then The Debtors Should Be
        Compelled To Seek Assumption Of The Baseball Agreements Before Pursuing A
        Media Rights Transaction ..........................................................................................57

CONCLUSION.....................................................................................................................60

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

Affiliated Gov't Employees' Distrib. Co. v. Comm'r of Internal Revenue,
   322 F.2d 872 (9th Cir. 1963) ...................................................................................42

Allentown Ambassadors, Inc. v. Northeast American Baseball, LLC (In re Allentown
   Ambassadors, Inc.),
   361 B.R. 422 (Bankr. E.D. Pa. 2007) .................................................... 40-41, 42, 52

Am. Needle, Inc. v. NFL,
   130 S. Ct. 2201 (2010).............................................................................................51

Bd. of Trade of City of Chicago v. Johnson,
   264 U.S. 1 (1924).....................................................................................................45

Bd. of Trs. of Mich. State Univ. v. Research Corp.,
   898 F.Supp. 519 (W.D. Mich. 1995) .......................................................................49

Bellini Imps., Inc. v. The Mason & Dixon Lines, Inc.,
   944 F.2d 199 (4th Cir. 1991) ...................................................................................36

Cal Dairies Inc. v. RSUI Indem. Co.,
   617 F. Supp. 2d 1023 (E.D. Cal. 2009)....................................................................12

Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust  (In re Nat'l Gypsum Co.),
   208 F.3d 498 (5th Cir. 2000) ...................................................................................58

Charles O. Finley & Co. v. Kuhn,
   569 F.2d 527 (7th Cir. 1978) ...................................................................................22

Data-Link Sys., Inc. v. Whitecomb Keller Mort. Co., Inc.
   (In re Whitcomb & Keller Mortg. Co.),
   715 F.2d 375, 379 (7th Cir. 1983) .....................................................................58, 59

Fransmart, LLC v. Freshii Dev., LLC,
   768 F. Supp. 2d 851 (E.D. Va. 2011) ......................................................................49

In re Al's Transmission Serv., Inc.,
   No. 95-1-1579, 1995 WL 781697 (Bankr. D. Md. Dec. 28, 1995) ........................36

In re Capital Acquisitions & Management Corp.,
   341 B.R. 632 (Bankr. N.D. Ill. 2006) ......................................................................29

In re Central Ice Cream Co.,
    59 B.R. 476 (Bankr. N.D. Ill. 1985) ................................................................55

In re Dana Corp.,
    350 B.R. 144 (Bankr. S.D.N.Y. 2006) ...........................................................58

In re Deppe,
    110 B.R. 898 (Bankr. D. Minn. 1990) .....................................................34, 40

In re Dewey Ranch Hockey, LLC,
    414 B.R. 577 (Bankr. D. Ariz. 2009) ............................................ 34, 46, 52-53

In re Empire Equities Capital Corp.,
    405 B.R. 687 (Bankr. S.D.N.Y. 2009) ...........................................................34

In re Golden Books Family Entm't, Inc.,
    269 B.R. 300 (Bankr. D. Del. 2001) ...............................................................52

In re Golden Books Family Entm't, Inc.,
    269 B.R. 311 (Bankr. D. Del. 2001) ...............................................................51

In re Greektown Holdings, LLC,
    No. 08-53104-WSD 2009 WL 1653461 (E.D. Mich. May 13, 2009) ......................................32

In re Grove Rich Realty Corp.,
    200 B.R. 502 (Bankr. E.D.N.Y. 1996) ......................................................48, 50

In re Hernandez,
    287 B.R. 795 (Bankr. D. Ariz. 2002) .............................................................58

In re Joshua Slocum Ltd.,
    922 F.2d 1081 (3d Cir. 1990)..........................................................................32

In re Ketchum,
    1 F. 840 (S.D.N.Y. 1880)................................................................................45

In re Lehigh Valley Prof'l Sports Clubs, Inc.,
    No. 00-11296DWS, 2000 WL 290187 (Bankr. E.D. Pa. Mar. 14, 2000)......................... 23-24

In re Lehigh Valley Prof'l Sports Clubs, Inc.,
    No. 00-11296DWS, 2002 WL 1349586 (Bankr. E.D. Pa. June 6, 2002) ......................... 24-25

In re Marvel Entm't Group, Inc.,
    209 B.R. 832 (D. Del. 1997)...........................................................................35

In re N.C.P. Mktg. Group, Inc.,
    337 B.R. 230 (D. Nev. 2005) .........................................................................51

In re New Breed Realty Enters. Inc.,
    278 B.R. 314 (Bankr. E.D.N.Y. 2002)...................................................................31, 34, 40

In re New Era Co.,
    115 B.R. 41 (Bankr. S.D.N.Y. 1990)...................................................................47

In re NuGelt, Inc.,
    142 B.R. 661 (Bankr. D. Del. 1992)....................................................................55

In re Rachels Indus., Inc.,
    109 B.R. 797 (Bankr. W.D. Tenn. 1990)..............................................................32

In re Resource Tech. Corp.,
    254 B.R. 215 (Bankr. N.D. Ill. 2000) ..................................................................59

In re Rooster, Inc.,
    100 B.R. 228 (Bankr. E.D. Pa. 1989) ..................................................................48

In re Schick,
    235 B.R. 318 (Bankr. S.D.N.Y. 1999)..................................................................46

In re St. Mary's Hosp.,
    89 B.R. 503 (Bankr. E.D. Pa. 1988) ....................................................................58

In re Sunrise Rests., Inc.,
    135 B.R. 149 (Bankr. M.D. Fla. 1991) .................................................................51

In re Tudor Motor Lodge Assocs., Ltd. P'ship,
    102 B.R. 936 (Bankr. D.N.J. 1989) .....................................................................36

In re Valley Media, Inc.,
    279 B.R. 105, 135-36 (Bankr. D. Del 2002).........................................................52

In re Walden Ridge Dev., LLC,
    292 B.R. 58 (Bankr. D.N.J. 2003) .......................................................................32

In re Wauka, Inc.,
    39 B.R. 734 (Bankr. N.D. Ga. 1984) ...................................................................29

In re West Electronics, Inc.,
    852 F.2d 79 (3d Cir. 1988)..................................................................................40

In re XMH Corp.,
    647 F.3d 690 (7th Cir. 2011) ..............................................................................51

Krebs Chrysler-Plymouth, Inc. v. Valley Motors Inc.,
    141 F.3d 490 (3d Cir. 1998).................................................................................51

L.L. Brown Paper Co. v. Hydroiloid, Inc.,
  118 F.2d 674 (2d Cir. 1941)..................................................................................49

Levin v. NBA,
  385 F. Supp. 149 (S.D.N.Y. 1974)........................................................................46

Lifemark Hosps., Inc. v. Liljeberg Enters., Inc. (In re Liljeberg Enters., Inc.),
  304 F.3d 410 (5th Cir. 2002) ................................................................................31

Mid-S. Grizzlies v. NFL,
  550 F. Supp. 558 (E.D. Pa. 1982) ........................................................................46

Morales-Alejandro v. Med. Card Sys., Inc.,
  486 F.3d 693 (1st Cir. 2007)................................................................................21

N. Am. Soccer League v. NFL,
  670 F.2d 1249 (2d Cir. 1982)..........................................................................42, 46

N.H.L. Players Assoc. v. Bettman,
  1994 WL 738835 (S.D.N.Y. Nov. 9, 1994).............................................................22

Northrop Grumman Tech. Servs. Inc. v. The Shaw Group, Inc. (In re IT Group Inc.),
  302 B.R. 483 (D. Del. 2003).................................................................................29

O'Dell v. Boyden,
  150 F. 731 (6th Cir. 1906) ...................................................................................45

Page v. Edmunds,
  187 U.S. 596 (1903).............................................................................................45

Pyramid Operating Auth., Inc. v. City of Memphis
  (In re Pyramid Operating Authority, Inc.),
  144 B.R. 795 (Bankr. W.D. Tenn. 1992).................................................................35

Raddison Design Management v. Cummins,
  No. 07-92, 2008 WL 55998 (W.D. Pa. Jan. 3, 2008) ...............................................45

Sally Beauty Co. v. Nexxus Prods. Co.,
  801 F.2d 1001 (7th Cir. 1986) .......................................................................48-49, 50

Varisco v. Oroweat Food Co. (In re Varisco),
  16 B.R. 634 (Bankr. M.D. Fla. 1981) .....................................................................52

## STATE CASES

Branagan v. Buckman,
122 N.Y.S. 610 (N.Y. Sup. Ct. 1910) ................................................................................43, 44

Cal. Trial Lawyers Ass'n v. Super. Ct.,
187 Cal. App. 3d 575 (1986) .................................................................................................21

Capano v. Wilmington Country Club,
2001 WL 1359252 (Del. Ch. 2001) ......................................................................................43

Dalton v. Educ. Testing Serv.,
87 N.Y.2d 384 (N.Y. 1995) ...................................................................................................27

Greenwood v. Bldg. Trades Council of Sacramento,
233 P. 823 (Cal. Dist. Ct. App. 1925).............................................................................. 43-44

Markham v. Bradley,
173 P.3d 865 (Utah Ct. App. 2007) .......................................................................................27

N.Y. Bank Note Co. v. Hamilton Bank Note Engraving & Printing Co.,
73 N.E. 48 (N.Y. 1905)....................................................................................................47, 50

New England Iron Co. v. Gilbert Elevated R.R. Co.,
91 N.Y. 153 (1883) ................................................................................................................47

Platt v. Jones,
96 N.Y. 24 (N.Y. Ct. App. 1884)..........................................................................................45

Powell v. Waldron,
89 N.Y. 328 (N.Y. Ct. App. 1882).........................................................................................45

Prof'l Hockey Corp. v. World Hockey Ass'n,
191 Cal. Rptr. 773 (Cal. Ct. App. 1983)................................................................................53

Richbell Info. Servs., Inc. v. Jupiter Partners,
765 N.Y.S.2d 575 (N.Y. App. Div. 2003) .............................................................................27

## FEDERAL STATUTES

11 U.S.C. § 362...........................................................................................................................35, 36

11 U.S.C. § 363...................................................................................................................................46

11 U.S.C. § 365........................................................................................................................... passim

11 U.S.C. § 541...................................................................................................................................51

## TREATISES

6 Am. Jur. 2d Assocs. & Clubs § 17 ....................................................................... 42-43

John D. Calamari & Joseph M. Perillo, Calamari & Perillo Hornbook on Contracts
    § 18.28 (6th ed. 2009) ..............................................................................................48

The Office of the Commissioner of Baseball, doing business as Major League Baseball ("Major League Baseball"), files this reply (the "Reply") to the objection [Docket No. 590] (the "Objection") of Los Angeles Dodgers LLC ("LAD") and its affiliated debtors and debtors in possession (collectively, with LAD, the "Debtors") to the motion of Major League Baseball to Terminate Exclusivity or, in the Alternative, to Compel the Debtors to Seek Assumption or Rejection of the Baseball Agreements in the above-captioned chapter 11 cases (the "Chapter 11 Cases") [Docket No. 476] (the "Motion to Terminate Exclusivity").[2] In further support of the Motion to Terminate Exclusivity, Major League Baseball respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Major League Baseball established in its Motion to Terminate Exclusivity that the Debtors, under the control of a badly conflicted owner in a severe liquidity crisis, are refusing to take any action towards a confirmable plan of reorganization. Rather, Mr. McCourt is trying to force a sale of the Dodgers' valuable Media Rights, over the objection of Major League Baseball, so that he can pay his personal debts. Indeed, Mr. McCourt filed these Chapter 11 Cases specifically to override the Commissioner's approval rights with respect to a Media Rights Transaction. Mr. McCourt's plan is futile because he cannot use the Bankruptcy Code to except himself from the rules of Baseball. The Commissioner has determined, in the exercise of

---

[2]      Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Motion to Terminate Exclusivity. In support of this Reply, Major League Baseball submits the Third Supplemental Declaration of Glenn M. Kurtz (the "Kurtz Third Supp."), filed contemporaneously herewith. Unless otherwise stated, references to "Exhibits" (or "Ex.") herein refer to exhibits to the Kurtz Third Supp. Also referenced herein are the (i) Declaration of Glenn M. Kurtz [Docket No. 480] (the "Kurtz Decl."), filed in connection with the Motion to Terminate Exclusivity, (ii) the Supplemental Declaration of Glenn M. Kurtz [Docket No. 533] (the "Kurtz Supp."), filed in Opposition to the Motion to Modify Scheduling Order, (iii) the Second Supplemental Declaration of Glenn M. Kurtz [Docket No. 594] (the "Kurtz Second Supp.") and (iv) the Declaration of Edwin S. Desser [Docket No. 593] (the "Desser Decl.") filed in connection with the Opposition To The Motion For Orders (I) Approving Marketing Procedures For The Licensing Of Telecast Rights, Including The Scheduling Of An Auction, Objection Deadline, And Disposition Hearing; And (II) Approving And Authorizing The Licensing Of Telecast Rights To The Highest And Best Bidder.

1

his discretion, not to approve a sale of the Media Rights at this time. Thus, continuing to pursue the Debtors' plan premised on a Media Rights sale is a waste of time.

2.      Mr. McCourt's plan is futile because the consummation of a Media Rights Transaction, over the objection of the Commissioner, would constitute an incurable breach of the Baseball Agreements, precluding assumption and eliminating the considerable value of the estates. Thus, the only way for the Dodgers to emerge from bankruptcy is through a sale of the Club. Major League Baseball would have no objection to maintaining the Debtors' exclusivity if they would pursue such a sale in an expeditious and diligent manner, but Mr. McCourt refuses to do so. Mr. McCourt's proposed plan to sell the Media Rights has forced the issue and necessitated termination of the Debtors' exclusivity. The 2012 season is fast approaching, with work needing to begin immediately, and a continued delay in these cases will harm the Dodgers, Major League Baseball and the 29 other MLB Clubs. The only way to move these cases forward is to terminate exclusivity to permit a sale of the Club.[3]

3.      The Debtors' Objection makes clear that they have no legitimate basis for opposing the relief sought in the Motion to Terminate Exclusivity. Indeed, the Debtors' positions are simply remarkable. For instance, the Debtors argue that:

- Mr. McCourt does not have to follow the rules of Baseball, unlike the other 29 owners of MLB Clubs, because the Commissioner appointed a Monitor to protect the Dodgers supposedly before he completed his investigation. (Obviously, all MLB Clubs must follow the rules of Baseball. Moreover, the Commissioner is authorized to take action to protect an MLB Club at any time. In this case, the Commissioner, having begun his investigation of the Dodgers, determined that a

---

[3]     Alternatively, the Debtors should be compelled to assume the Baseball Agreements. Mr. McCourt is running these Chapter 11 Cases on the mistaken premise that he is not subject to the terms of the Baseball Agreements. The sooner the Debtors' obligations are declared, the sooner Mr. McCourt will take steps to sell the Club and allow the Debtors to exit bankruptcy. A motion to compel assumption of the Baseball Agreements may lead to the same inevitable results, a sale of the Club, but will take much longer than terminating exclusivity, which delay will harm all the parties in interest in these Chapter 11 Cases, but it would nonetheless accelerate the process as compared to the Debtors' futile plan to sell the Media Rights.

2

Monitor was needed. Mr. McCourt's repudiation of the Baseball Agreements is troubling.)

- Mr. McCourt was free to take almost $190 million from the Dodgers, putting them into bankruptcy, because there is no rule that bars distributions to owners. (The fact that the Debtors, the parties that were looted, would argue that Mr. McCourt was permitted to take nearly $190 million further highlights the problem with having Mr. McCourt, a non-debtor, controlling these Chapter 11 Cases. In any case, owners, of course, are not allowed under the Baseball Agreements to take Club assets in a fiscally irresponsible fashion, as Mr. McCourt did here.)

- The authority of the Commissioner to take action that he determines to be in the best interests of Baseball is unenforceable. (The Commissioner's express power to take action in the best interests of Baseball is clear and fundamental under the Baseball Agreements. Each of the 30 MLB Clubs granted that basic and foundational power to the Commissioner, and Mr. McCourt's repudiation of that obligation is again troubling.)

- An unincorporated association, like Major League Baseball, "can limit its membership as it sees fit in its rules and bylaws, and courts will not interfere with determinations by the association as to who may be admitted to membership," but somehow cannot prohibit a member from assigning its rights, and forcing a new member into the unincorporated association without the approval of the other members. (Objection at ¶ 152) In support of that illogical and incorrect argument, the Debtors cite to cases permitting the assignment of a seat on a stock exchange, where the governing rules permit such assignments. (An MLB Club is nothing like a seat on a stock exchange, and the Baseball Agreements expressly prohibit assignment. Moreover, the law is uniform that membership in an unincorporated association is not freely transferable, absent an express provision in the governing rules permitting assignment without the consent of the other members.)

4.      The Debtors repeatedly argue that the Commissioner has a heavy burden of proving misconduct, but in fact the Commissioner has no burden at all. To the contrary, under the MLB Constitution, the Commissioner's decisions are final, and not subject to judicial review except in circumstances not present in this case. Nonetheless, the Commissioner's decision not to approve the Media Rights Transaction not only was not made in bad faith, is was plainly

3

correct and well supported. The Debtors do not, and cannot, identify any evidence of bad faith. Rather, the evidence is that Mr. McCourt is not acting in the Debtors' best interests in seeking to sell the Dodgers' Media Rights—one of the last significant revenue-generating assets that Mr. McCourt has not already fully exploited—prematurely and in breach of the Fox Telecast Agreement so that he can divert money needed by the Dodgers in order to pay his personal debts. Indeed, Mr. McCourt's liquidity crisis likely has substantially worsened, as it has been widely reported that he now owes $130 million to Jamie McCourt, pursuant to a divorce settlement. Mr. McCourt is conflicted and cannot discharge his burden of proving entire fairness, much less demonstrating that the Commissioner's decision not to approve the Media Rights Transaction at this time constitutes bad faith.

5.      Unable to prove bad faith on the merits, Mr. McCourt fabricates an absurd story about a "furious" Commissioner out to harm him. The Commissioner has worked cooperatively with Mr. McCourt for years, but now needs to protect the Dodgers and Baseball from further harm. Mr. McCourt cannot continue taking money out of the Dodgers to satisfy his personal debts. And the Debtors cannot establish bad faith by repeatedly misstating that the Commissioner has prejudged some unknown transaction and determined not to approve any sale of the Media Rights. The Commissioner has outlined the fundamental problems with a premature sale of the Dodgers' Media Rights at this time, and every potential transaction under the Debtors' proposed Bidding Procedures suffers from the same flaws. The Commissioner has made no determination with respect to a sale of the Media Rights, in compliance with, and after the expiration of, Fox Sports' exclusivity rights and where value is not diverted to Mr. McCourt to pay his personal debts. Indeed, the Dodgers will certainly be allowed to enter into an appropriate Media Rights transaction under the appropriate circumstances.

4

6. The Court has to decide the appropriate course for these Chapter 11 Cases, and the choices are clear. It bears repeating that Mr. McCourt's proposal is to plow ahead with a futile plan that will lead to irreparable harm to all stakeholders, including (i) the Debtors, by placing them in an incurable breach of the Baseball Agreements (subjecting the Club to potential discipline, including possible termination from the League), by diverting the Debtors' revenues and by placing the Debtors in breach of the Fox Telecast Agreement, and by subjecting the Club to a substantial damages claim by Fox Sports; (ii) Major League Baseball, by violating its important rights and authorities under the Baseball Agreements; (iii) the other 29 MLB Clubs, which operate in compliance with the Baseball Agreements and share revenues; (iv) Fox Sports, by breaching the Fox Telecast Agreement; and (v) Dodgers fans, who have lost faith in Mr. McCourt and want well-capitalized new ownership.

7. Major League Baseball's proposal to sell the Club pursuant to the MLB Plan will benefit everyone: (i) the Dodgers will be owned by a properly capitalized owner, the value of their Media Rights will not be diverted from the Club, the Club will not be placed into an incurable breach of the Baseball Agreements, and the prior breaches will be cured or forgiven; (ii) Major League Baseball will not have its contract rights and important controls violated, and will have the Dodgers as a strong MLB Club; (iii) the other 29 MLB Clubs will benefit from the Dodgers being operated as a healthy MLB Club, and from the revenues and fan interest that will be generated by a strong Dodgers Club; (iv) Fox Sports will not have its contract breached; (v) Dodgers fans will be able and willing to support their team with confidence; and (vi) Mr. McCourt will likely receive hundreds of millions of dollars, allowing him to pay his bills and emerge a very wealthy man.

5

NEWYORK 8297616 (2K)

## STATEMENT OF FACTS

### A.    Mr. McCourt's Past Performance Is Irrelevant To The Issues In This Case

8.    The Debtors devote a substantial portion of their Statement of Facts to claiming that Mr. McCourt has improved the Dodgers. Mr. McCourt's self-promotion is irrelevant. One, Mr. McCourt's qualifications to own an MLB Club are not currently at issue. The issues here are (i) the Commissioner's judgment as to the proposed Media Rights Transaction, and (ii) the Debtors' ability to exit Chapter 11 with a viable plan. Two, it is the Commissioner who has the sole authority to evaluate Mr. McCourt's conduct as an owner of an MLB Club, not Mr. McCourt or even this Court. Three, Mr. McCourt focuses primarily on 2004 through 2008, before the facts of Mr. McCourt's misconduct became public, negatively impacting the Dodgers and creating such a drag on the Club as to force it into bankruptcy. In addition, Mr. McCourt omits critical information about the matters he raises, as addressed below.

### 1.    Dodger Stadium

9.    Mr. McCourt touts the Club's spending on certain renovations to Dodger Stadium. Mr. McCourt omits, however, the fact that the renovations and other critical capital expenditures were put on indefinite hold due to lack of funds and remain incomplete to this day.

6

NEWYORK 8297616 (2K)

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████[4]

## 2. Inadequate Security

10. Mr. McCourt asserts that he was "the first Dodgers owner to hire uniformed Los Angeles Police Department ("LAPD") officers for games." (Objection at ¶ 24) Mr. McCourt is correct to point out the benefits of uniformed police officers at games. Mr. McCourt, however, omits the fact that he removed uniformed police officers before the 2011 season, including the opening game when Mr. Stow was so seriously injured. Further, the Debtors ignore other security deficiencies at Dodger Stadium, including the lack of adequate lighting in the stadium parking lots, their executives' lack of ballpark operating experience, a lack of experienced security executive staff, the lack of security personnel by mid-game, the ease of unauthorized access to the stadium, and an absence of necessary safety signage present in and around the stadium and in the outer parking lots. ███████████████████

██████████████████████████████████████████████████

████████████████████████████████

## 3. Dodger Dream Foundation

11. Mr. McCourt touts that his work for the Dodger Dream Foundation ("DDF") reflects his contributions to the community. (Objection at ¶ 27) Mr. McCourt,

---

[4] The Debtors' assertion that the Commissioner chose Dodger Stadium to host the 2009 World Baseball Classic Finals because of improvements to Dodgers Stadium is mistaken. (Objection at ¶ 22) Dodger Stadium was selected primarily because of: (i) the size of the stadium, (ii) the demographics of the area, (iii) international awareness of the stadium, and (iv) the weather in Los Angeles during early- to mid-March, when the 2009 finals were held.

NEWYORK 8297616 (2K)

however, omits the scandals involving DDF. Mr. McCourt caused the Debtors to use DDF funds to pay an excessive salary to Howard Sunkin, which was the subject of a California Attorney General ("AG") investigation and ultimately had to be reimbursed by LAD. ██████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

#### 4.    Financial Performance

12.    Mr. McCourt notes that the Dodgers were losing approximately ███ million per year when he purchased the team. Those losses illustrate why owners must have substantial wealth and liquidity. MLB Clubs often lose money. Indeed, many MLB Clubs lose money every year. ██████████████████████████████████ ████████████████████████████ Mr. McCourt has stripped away most of the substantial revenue-generating assets that belonged to the Dodgers, and has virtually no liquidity to fund losses for the Club going forward.

13.    Mr. McCourt also disregards the fact that any improved financial performance did not benefit the Dodgers, but rather himself. Mr. McCourt diverted nearly ███ million for himself and his family. As to the Dodgers, payroll is down, Dodger Stadium renovations are stalled and there are insufficient reserves to fund necessary capital expenditures.

14.    Moreover, Mr. McCourt's assertion that he dramatically improved earnings, by comparing the Dodgers' EBITDA under Fox Sports Baseball Holdings, Inc. (an

8

affiliate of Fox Entertainment Group, Inc. ("Fox")) with the Dodgers' EBITDA since he purchased the team, is misleading. (Objection at ¶¶ 28-29)  Mr. McCourt omits that Fox owned the Dodgers debt free.  In contrast, debt service payments made by the Dodgers under Mr. McCourt are not reflected in EBITDA. ████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████ Mr. McCourt also cherry picks years for comparison.  Other years portray a different picture. ██████████████████████

████████████████████████████████████████████

██████████████████████████████

## B.      Mr. McCourt's Misuse Of The Dodgers' Funds

15.      Mr. McCourt's claim that the Commissioner is attempting to "starve" the Dodgers of cash is incredible.  It is Mr. McCourt who has starved the Dodgers of cash.  Mr. McCourt admits that he siphoned-off almost ███ million from the Dodgers to pay his personal debts and fund his lavish lifestyle. The Debtors' defense of Mr. McCourt's takings again highlights the fact that the Debtors cannot separate themselves from Mr. McCourt, as required. Obviously, the Dodgers and Mr. McCourt have a serious conflict of interest as to Mr. McCourt's use of the Debtors' cash.  An unconflicted representative of the Dodgers would not argue that Mr. McCourt's looting of the Dodgers' assets to fund his lavish lifestyle, leaving the Debtors in bankruptcy, was appropriate.

9

1.   **Mr. McCourt Took ▆ Million**
     **From The Dodgers To Pay Off His Personal Debts**

16.   Although the Debtors admit that Mr. McCourt took almost ▆ million directly from the Club, they try to suggest that ▆ million of that amount should be ignored because it was used to retire Mr. McCourt's personal debt from purchasing the Club. (Objection at ¶ 52) Notably, Mr. McCourt used the Debtors' assets to pull out of the Club the very purported equity contributions that he touts in the preceding section of the Debtors' Objection, and in the process further encumbered the Club with debt.

17.   Mr. McCourt also misstates that none of the money was used to support his lavish lifestyle, citing no evidence. In fact, Mr. McCourt has no earnings outside of the Dodgers to support his lavish lifestyle, including his eight homes. (Kurtz Decl., Ex. 37 (McCourt July 15 Declaration at ¶¶ 3, 4)) Thus, the money that Mr. McCourt diverted from the Dodgers was necessarily used to support his lavish lifestyle.

2.   **Mr. McCourt Took ▆ Million From**
     **The Club's Parking Revenues**

18.   Mr. McCourt argues that another ▆ million he took out of the Club should be ignored because the immediate transferor was Blue Landco. (Objection at ¶¶ 53, 54) All of the monies that Mr. McCourt took from Blue Landco were generated by the Dodgers. Specifically, all the monies received by Blue Landco were funneled from LAD as lessee through LA Real Estate LLC ("Realco"), the entity holding the Dodgers' parking lots and Dodger Stadium, both Debtors here. Furthermore, by burdening Blue Landco with ▆ million of debt, Mr. McCourt has further harmed the Club as its parking revenues must be used not only to fund personal distributions to Mr. McCourt, but also service Blue Landco's debt obligations.

19.   Mr. McCourt argues that it was never intended for Major League Baseball to have oversight with respect to those real estate assets, including Dodger Stadium and the

10

Dodgers' parking lots. (Objection at ¶ 33)  That assertion is completely untrue.  Major League

Baseball and Mr. McCourt always understood that all the real estate assets were "Club assets"

that were subject to the Baseball Agreements and the rules and regulations of the Commissioner.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Furthermore, when Major League Baseball learned of the structure of the Tickets I securitization

in 2005, it also required Mr. McCourt and all of the Club entities—including those that owned

the stadium and parking lots—to execute the Subservience Agreement that further made it clear

that those entities were subject to the oversight of Major League Baseball and must continue to

comply with the Baseball Agreements. (Kurtz Decl., Ex. 3 (Subservience Agreement at 1) (each

of the Debtors were "subject to the terms and conditions of the MLB Governing Documents.")

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

11

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

20.     Notwithstanding the fact that the parking lots were Club assets, on June 28, 2006, without informing Major League Baseball or obtaining any of the necessary approvals, Mr. McCourt caused the Debtors to transfer the Dodgers' parking lots to Blue Landco, a non-Club entity, for no payment or other consideration. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

21.     The Debtors admit that they never disclosed the transfer to Major League Baseball (Objection at ¶ 57), much less obtained the proper approvals, but contend that the parking lots were not related to "Baseball Related Activities" under the Subservience Agreement. (Objection at ¶ 62) This argument is frivolous. The term "related to" is broad as a matter of law. Cal Dairies Inc. v. RSUI Indem. Co., 617 F. Supp. 2d 1023, 1031-32 (E.D. Cal. 2009) ("related" is "a commonly used word with a broad meaning that encompasses a myriad of relationships"). The stadium parking lots are obviously related to the operation of the Dodgers for home games. Indeed, the parking lots are essential to the Dodgers' operations because the Stadium is not accessible by any significant public transit system. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[5]     The Debtors' argument that the parking lots are "rented out for filming, special events and other non-parking related activities" is irrelevant. (Objection at ¶ 56) The Dodgers have leased the parking lots and, ████████

12

### 3. Mr. McCourt Improperly Took ▆▆ Million Directly From The Dodgers

22.     Mr. McCourt admits that he took even more cash directly from the Dodgers, but says it was "only" ▆▆ million, and argues that there was no rule against the distributions. (Objection at ¶¶ 61, 62)  The fact that an owner can take distributions under appropriate circumstances does not mean that an owner can take distributions from an MLB Club in a way that leaves the MLB Club insufficiently capitalized and ultimately in need of bankruptcy protection.

23.     Mr. McCourt also offers the baseless argument that taking ▆▆ million (part of a total of almost ▆▆ million) has "not materially affected the overall equity value of the Baseball team, as the average yearly distribution represented a small fraction of the total LAD equity." (Objection at ¶ 25)  The untapped equity value of a Club is irrelevant.  The question is the ability of the Club to operate, and Mr. McCourt's takings have required a bankruptcy filing. Indeed, Mr. McCourt left the Dodgers unable to make payroll.  Mr. McCourt is correct that he will receive a very substantial equity distribution in the event of a sale, but the issue now is that Mr. McCourt's takings have left the Dodgers in a financial mess.

24.     The Debtors' effort to blame the financial condition of the Club on deferred compensation payments is baseless.  (Objection at ¶ 63)  The amount owed by each Club in deferred compensation is a product of that Club's negotiations with its players, and any deferred compensation payments due here are of Mr. McCourt and the Dodgers' own making. Additionally, the 29 other MLB Clubs have the same obligations, yet have not filed for

---

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ n any case, renting out of the Club's real property for a few non-Baseball activities would not make the property unrelated to the Club's Baseball activities.  Moreover, although Mr. McCourt argues that he planned to develop the land surrounding the Stadium for non-Baseball purposes, he has not done so.

13

bankruptcy protection. The Dodgers are in bankruptcy because Mr. McCourt has taken almost $190 million out of the Club and has completely alienated the Dodgers' fan base.

### 4. Monetizing The Dodgers' Ticket Sales

25. Mr. McCourt argues that the Commissioner cannot criticize the Tickets I transaction because he "praised it publicly." (Objection at ¶ 44) Mr. McCourt omits that he gave the Commissioner only a limited amount of time to review the transaction and the Commissioner ultimately allowed the transaction to proceed only as an accommodation to Mr. McCourt. Moreover, the Commissioner expressed serious concerns with Mr. McCourt's securitization of a clear Club asset. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

### 5. Central Fund Distributions

26. Ignoring this Court's rulings, the Debtors argue that the Commissioner has treated the Debtors' differently because Major League Baseball considered withholding a scheduled distribution from the Major League Central Fund. Although the issue is irrelevant, as the Debtors well know, █████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

14

NEWYORK 8297616 (2K)

**6.     Mr. McCourt Breached His Obligation
To Provide $█ Million In Equity**

27.     Mr. McCourt argues that, in addition to pledging certain lands, he made equity contributions by issuing a $40 million note to Fox Baseball and a $31 million convertible note to Fox Baseball Holdings, Inc.  (Objection at ¶ 39)  Mr. McCourt, however, omits the fact that he made an additional commitment to provide ██ million in cash to the Dodgers, and refused to honor his commitment.  Moreover, shortly after the acquisition of the Club, Mr. McCourt took cash from the Dodgers to pay off the $71 million in Fox notes, eliminating any claimed equity contribution and putting more debt on the Club.  Indeed, Mr. McCourt has taken so much money from the Dodgers that, rather than contribute an additional ██ million in equity, he has eliminated almost all of his equity capital in the Club.

28.     Mr. McCourt contends that he made an "equity investment" of $37,950,000 in the team.  (Objection at ¶ 48)  ███████████████████████ ████████████████████████████████████████ ███████████████████████████████████████ █████████████████████████ Mr. McCourt also argues that he provided equity in 2011 in the amount of $23.5 million, after borrowing $30 million from Fox Sports, ██████████ ███████████████████████████████████████ █████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████ █████████████████████████████████████ ██████████████████████████████████████

15

NEWYORK 8297616 (2K)

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████ Mr. McCourt ignored the Commissioner's concerns and took the loan anyway. Moreover, unless Mr. McCourt recovers on his personal malpractice claim, the only source of income for him to repay that loan is the Dodgers. And Mr. McCourt also fails to disclose that he used ████ million of the loan for himself and tried to take the $23.5 million back out of the Club, even though the Club was on the brink of a payroll default and a chapter 11 filing. (See Ex. 29 (Letter from Robert A. Sacks to Bradley I. Ruskin, dated Apr. 27, 2011))

### 7.    The Denial Of The Seasonal Credit Line Was Fully Justified

29.    Mr. McCourt continues to claim animus based on his incorrect argument that Major League Baseball changed the calculation of EBITDA for purposes of calculating the Dodgers' compliance with the Debt Service Rule ("DSR") in order to deny the Club access to the seasonal line of credit in breach of prior agreements. (Objection at ¶ 77) Mr. McCourt's argument is wrong.

30.    First, like any other line of credit, the borrower must qualify for the loan. Here, the denial was based on six independent reasons, not simply the calculation of EBITDA for the DSR: ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

16

████████████████████████████████████████████████

████████████████████████████████████████████

31.     Second, the change in the calculation of EBITDA was not a change in methodology, but rather a change in facts. At issue is the annual lease payment of $14 million for use of the parking lots. At the time of the initial arrangement, Major League Baseball believed that the parking lots were owned by the Dodgers, as they had been prior to Mr. McCourt's unauthorized transfer for no consideration. Thus, on a consolidated basis, the lease payments netted out: the $14 million in revenues by one of the Dodgers' entities was offset by the $14 million in expense by another Dodgers entity. Later, Major League Baseball learned that Mr. McCourt had made an unauthorized transfer of the parking lots to Blue Landco and was not consolidating Blue Landco with the other Debtors. Consequently, the lease payments were a fixed obligation, there were no offsetting revenues, and it was no longer appropriate to exclude the obligation from EBITDA. The Debtors do not, and cannot, identify any conceivable basis for simply ignoring the Club's $14 million per year fixed obligation in calculating EBITDA (where the corresponding revenues are not being consolidated by the Debtors). Major League Baseball was also concerned when it learned that the parking revenues were being used to service debt on the parking lots that had not been disclosed or included in the DSR calculations. Thus, it was Mr. McCourt who changed the circumstances, requiring a different accounting treatment.

**C.     Mr. McCourt Filed This Bankruptcy To Force A Media Rights Transaction Over The Commissioner's Objection**

32.     The Debtors' suggestion that they developed "a workable strategy for LAD to access the liquidity it needs in order to emerge from bankruptcy and operate its business" through a Media Rights Transaction is untrue. (Objection at ¶ 88) Mr. McCourt filed this bankruptcy specifically to effect a sale of the Media Rights, well before hiring Blackstone, a

17

financial advisor with no real expertise or experience in sports media rights transactions, and to effect a solution to Mr. McCourt's personal financial problems.

**D.   Major League Baseball Is Not
      Seeking "An Immediate Liquidation"**

33.   The Debtors argument that Major League Baseball seeks "an immediate liquidation" is wrong.[6] To the contrary, Major League Baseball seeks the sale of the Dodgers as a going concern, so that the storied franchise can continue to participate as a member of Major League Baseball. The Debtors' position raises again the serious concern about control of these cases. Only Mr. McCourt could view the sale of the Dodgers as a "liquidation."

**ARGUMENT**

**I.**

**THE DEBTORS FAIL TO REBUT THE CLEAR FACTS AND EVIDENCE
ESTABLISHING CAUSE TO TERMINATE EXCLUSIVITY**

**A.   Exclusivity Should Be Terminated Because The
      Debtors' Reorganization Strategy Is Not Viable**

34.   As set forth in the Motion to Terminate Exclusivity, it is plain that exclusivity should be terminated here. The Debtors will not take any action towards a confirmable reorganization plan, but instead are pursuing a reorganization strategy premised on a Media Rights Transaction that is fundamentally flawed, is contrary to the best interests of Baseball, will not be approved by Major League Baseball, and has no prospect of success. Mr. McCourt is conflicted, and is causing the Debtors to pursue a Media Rights sale to further his personal interests in paying his personal debts. Such a sale would be wasteful and prejudicial to the estates. Even if the Debtors could go forward with the proposed sale of the Media Rights,

---

[6]   A liquidation is generally defined as a process by which the debtor's property and assets are converted to cash and redistributed. See BLACK'S LAW DICTIONARY (9th ed. 2009) (defining liquidation as the "process — under Chapter 7 of the Bankruptcy Code — of collecting a debtor's nonexempt property, converting that property to cash, and distributing the cash to the various creditors.")

18

they would not be able to assume the Baseball Agreements, which would effectively eliminate all of the value of the estates.

1.   **The Debtors' Plan Is Futile Because Debtors Cannot Sell The Media Rights Without Major League Baseball's Approval**

35.   As discussed in the Motion to Terminate Exclusivity, any Media Rights Transaction is subject to the approval of Major League Baseball.  (Motion to Terminate Exclusivity at ¶¶ 61-63)  The Debtors' arguments to the contrary are incorrect as a matter of law and fact.

a.   **The Commissioner Has Approval Rights Under The Baseball Agreements**

36.   It is clear under the Baseball Agreements that any Media Rights Transaction is subject to the approval of Major League Baseball under the best interests of Baseball authority and under the Ownership Guidelines, ██████████████████████████

████████████████████████████████████████

██████  (Motion to Terminate Exclusivity at ¶¶ 61-63)  The Debtors' argument that the Commissioner's decision making is limited to reviewing only transactions that transfer control is wrong.  (Objection at ¶¶ 106-107)

37.   First, the Commissioner is expressly authorized by the MLB Constitution to protect the best interests of Baseball, to take preventive and remedial actions where he deems it appropriate, and to take such steps as may be necessary to protect the integrity of, and public confidence in, Baseball.  (See Kurtz Decl., Ex. 1 (MLB Constitution) at Art. II, §§ 2–6)  There is nothing in the MLB Constitution or the other Baseball Agreements, including the Ownership Guidelines, that limits the Commissioner's power to reject a Media Rights Transaction that he determines is not in the best interests of Baseball.  Indeed, neither the Ownership Guidelines nor

19

any other Baseball Agreements limit the Commissioner's authority to reject such agreements for any reason, including that such agreements may not be in the best interests of Baseball, and such determinations are not confined to "control interest issues."

38.    The MLB Constitution was in fact amended to "provide the Commissioner with additional flexibility to…ensure that Clubs act in a fiscally responsible manner…" following the decision in <u>Atlanta Nat'l League Baseball v. Kuhn</u>, 432 F. Supp. 1213 (N.D. Ga. 1977). ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████

39.    <u>Second</u>, the Ownership Guidelines do not limit Major League Baseball's review of the proposed Media Rights Transactions to the types of "control interest issues" implied by the Debtors. ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████  ██████████████████

█████████████████████████████████

20

NEWYORK 8297616 (2K)

███████████████████████████████████ (Kurtz Decl., Ex. 4 (Ownership Guidelines) at 7)

(emphasis added)

40.    Third, "control interest issues" include a host of matters that are considered by Major League Baseball in evaluating any proposed media rights transaction and are not limited, as the Debtors apparently contend, █ ████████████████████████████

████████████████ (Objection at ¶ 106) Rather, Major League Baseball has highlighted a number of "control interest issues," all of which were specifically identified by the Commissioner to Mr. McCourt in the June 20 Letter when the Commissioner declined to approve the Proposed Fox Transaction, which forms the baseline assumptions for the Media Rights Motion.

41.    Fourth, it is the Commissioner who interprets the Baseball Agreements: "[a]ny rules, resolutions or regulations adopted as provided in this Constitution shall be binding on the Major League Clubs . . . . *The authority of the Commissioner shall include the authority to determine finally a disagreement over a rule, resolution, regulation or this Constitution.*" (Kurtz Decl., Ex. 1 (MLB Constitution) at Art. IV) (emphasis added).  Courts do not interfere with a party's rights of interpretation such as the express right here provided to the Commissioner to interpret the Baseball Agreements.  See, e.g., (Objection to Media Rights Sale at ¶¶ 68-70); see also Cal. Trial Lawyers Ass'n v. Super. Ct., 187 Cal. App. 3d 575, 580-81 (1986) ("[T]he initial question in determining whether judicial action is appropriate is whether the challenged action 'plainly contravenes' the association's bylaws."); Morales-Alejandro v. Med. Card Sys., Inc., 486 F.3d 693, 698 (1st Cir. 2007) (finding that when an administrator has "discretionary authority to interpret the terms of the plan and to determine a claimant's eligibility for benefits, [courts] will uphold the decision unless it is arbitrary,

21

capricious, or an abuse of discretion"); cf. N.H.L. Players Assoc. v. Bettman, 1994 WL 738835, at *33-34 (S.D.N.Y. Nov. 9, 1994) ("Plaintiff's argument suggests that the ruling was unauthorized because Bettman purportedly had no authority to grant relief of this nature. Obviously, however, the arbitrator has the authority to interpret pertinent portions of the offer sheet in determining its effect and validity. In substance, Miller's real complaint is that he disagrees with Bettman's interpretation of this provision, but that is not a basis for vacating the decision. "). Thus, the Commissioner is the final arbiter regarding the interpretation of the MLB Constitution and the Ownership Guidelines, and clearly has approval authority with respect to media rights transactions.

42.    Fifth, professional sports leagues are unique organizations, and courts routinely decline to review their internal governance, rules and regulations, often applying the abstention doctrine to bar review of an independent voluntary organization's interpretation of its own rules. (See Objection to Media Rights Motion at ¶¶ 68-7)  Courts simply do not substitute their judgments for the internal judgments of unincorporated associations, particularly in a case like this involving the Commissioner's judgment as to what is in the best interests of Baseball and how to protect those unique interests. See, e.g., Charles O. Finley & Co. v. Kuhn, 569 F.2d 527, 542-43 (7th Cir. 1978) (recognizing the common law non-reviewability of actions by private associations such as Major League Baseball).

43.    Sixth, contrary to their litigation position, the Debtors have repeatedly acknowledged, in the ordinary course of their business, that Major League Baseball must approve any Media Rights Transaction. (See Kurtz Second Supp., Ex. 2 (Letter from Robert A. Sacks to Robert D. Manfred, Jr., dated June 7, 2011) (enclosing the Proposed Fox Transaction "for [Major League Baseball]'s review and approval"); Ingram Decl. at ¶¶ 35-39)  Debtors have

22

also recognized Major League Baseball's approval rights during the pendency of these cases,

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

44.     Seventh, the Commissioner also specifically directed Mr. McCourt in correspondence in early 2011 ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

45.     The Debtors place great emphasis on an unreported decision, In re Lehigh Valley Prof'l Sports Clubs, Inc., No. 00-11296DWF, 2000 WL 290187 (Bankr. E.D. Pa. Mar. 14, 2000), as being "on point." (Objection at ¶ 97) Lehigh Valley is not binding, not correct, distinguishable and, notably, provides an ominous warning as to the risks of allowing the Debtors to pursue their futile plan.

46.     The court in Lehigh Valley denied the league's motion to terminate exclusivity in that case because, unlike here, the league did not establish that the debtors' reorganization strategy was futile. Lehigh Valley, 2000 WL 290187, at *4-5. The league sought termination of exclusivity as a creditor of the debtor, arguing that it had obtained a blocking

---

7 ████████████████████████████████████████████████
████████████████████████████

position over any reorganization plan by virtue of the fact that it had acquired a certain percentage of claims. Id. at *5. The court found (i) the league did not show that its purchase of claims gave it a blocking position over any plan of reorganization proposed by the debtors, and (ii) even if the league held a blocking position, the debtor "may be able to propose a plan that garners the support of another impaired class and utilize the cramdown provisions of § 1129(b) to secure confirmation." Id. Here, unlike in LehighValley , there is an absolute impediment to confirmation in the fact that the Debtors cannot sell the Media Rights without Major League Baseball's approval and could not assume the Baseball Agreements if they consummate a sale of the Media Rights. Thus, even if they could go forward with the sale, the Debtors would not be able to assume the Baseball Agreements, rendering the sale worthless.

47.     Importantly, however, Lehigh Valley provides an ominous precedent for this case. In a subsequent decision following conversion of the case to chapter 7, the Lehigh Valley court noted that the chapter 7 trustee proposed a sale of the team that would bring funds into the estate that were roughly equal to the amount originally offered by the league in the first month of the case. See In re Lehigh Valley Prof'l Sports Clubs, Inc., No. 00-11296DWS, 2002 WL 1349586, at *8 (Bankr. E.D. Pa. June 6, 2002).[8] The court also stated that, in previously denying the league's motion to terminate exclusivity, it relied on the representations by the team's owner that he had personal assets and/or could secure outside financing to fund the team. Id. Those representations proved to be "misleading." See id. As the court explained in detail:

> When this Chapter 11 case was filed, the Debtor was subjected to an immediate motion to terminate exclusivity (the "Exclusivity Motion") by the League seeking to file its own plan of reorganization. That proposed creditor plan contemplated payment of $575,000 to the estate and the subordination of the League's

---

[8] The proposed cash consideration was $580,000 and $575,000 by the buyers and the league, respectively. Such offers also contained non cash components, including a credit bid by the buyer and subordination of claims by the league.

24

claims of $630,000. In re Lehigh Valley Professional Sports, Inc., 2000 WL 290187 (Bankr. E.D. Pa. March 14, 2000). The Debtor, under the control of Thomas X. Flaherty, not surprisingly contested the Exclusivity Motion. After a lengthy evidentiary hearing, *I denied the Exclusivity Motion finding that to do otherwise* would remove any incentive for the League to work with the Debtor to reorganize its affairs *and could result in the forfeiture of a valuable asset. Id. at \*8.* The latter conclusion was animated by the testimony of the Debtor's business valuation expert, Stephen Scherf of Parente Randolf ("Parente") who valued the Membership at between $3 million to $8.7 million. Id. at *5. In those halcyon early days of the case, it appeared that the League sought to acquire the Membership at a bargain price. *Also influential in my ruling was Flaherty's representation that he had personal assets and/or would be able to secure outside financing to fund the expenses of fielding the Black Diamonds during the 2000 League season. Flaherty's confidence in his ability to finance operations and secure an investment partner willing to acquire the Membership out of bankruptcy was, it turns out, misplaced and misleading.*

*What began as a contentious case turned out to be an extremely expensive case. . . .*

\* \* \*

With the case 18 months old and all attempts at reorganization having failed, I converted the case to one under Chapter 7 on September 7, 2001. Doc. No. 469. . . .

\* \* \*

Under this construct, the Trustee's deal brings in $580,000 of cash so long as the Settlement Agreement is also approved.

Id. at *2-3 (internal footnotes omitted) (emphasis added).

48.     The ultimate outcome of the "contentious" and "extremely expensive"

proceedings in Lehigh Valley serve as a warning here. That case is exactly the type of result that

Major League Baseball is seeking to avoid in these Chapter 11 Cases.[9] Here, the Debtors' and

Mr. McCourt's confidence in their ability to sell the Media Rights over the objection of Major

---

[9]     In fact, just like the owner in Lehigh Valley, Mr. McCourt also hopes to rely on the inflated valuations of the Dodgers and their Media Rights prepared by Blackstone Advisory Partners L.P., the Debtors' expert witnesses.

25

League Baseball, avoid a substantial damages claim by Fox Sports, and ultimately assume the Baseball Agreements is "misplaced and misleading." And, unlike in Lehigh Valley, there is no risk of a "forfeiture of a valuable asset." To the contrary, a sale of the Club will maximize the value of the Dodgers, and provide a full recovery to every party in interest, and enormous wealth to Mr. McCourt. It is certainly clear the court in Lehigh Valley, relied on so heavily by the Debtors, would not make the same mistake again.

> **b.** **The Debtors Cannot Litigate Decisions By Major League Baseball**

49. As discussed in Major League Baseball's Objection to the Sale Motion, the MLB Constitution expressly prohibits Clubs from seeking to litigate decisions of Major League Baseball. (Media Rights Objection at ¶¶ 63-79) As this Court has recognized, the Commissioner's "power to determine who in baseball can or cannot do what is nearly unparalleled in the business world." (See Scheduling Order at 8; see also October 5, 2011 Hearing Tr. at 64:14-16) Courts routinely enforce non-recourse provisions. (Media Rights Objection at ¶¶ 64-71)

> **c.** **The Commissioner's Decisions Are Not Subject To Review Under A Good Faith Standard**

50. This Court has stated that the Commissioner must act in good faith, with fair dealing and not arbitrarily or irrationally. (Scheduling Order at 9) The Court, however, did not have the benefit of a response by Major League Baseball proving the Debtors wrong. (Objection to Media Rights Motion at ¶¶ 75-79) Moreover, the implied covenant of good faith and fair dealing cannot be used to vary the express terms of the Baseball Agreements or impose

26

limitations on the Commissioner's discretion not to approve the sale of Media Rights. (Id. at ¶¶ 78-79). The cases cited by the Debtors are not to the contrary.[10]

### d.    In Any Case, The Commissioner Has Not Acted In Bad Faith

51.    Any party asserting that discretion has been exercised in bad faith bears a heavy burden of proof, and any review of the Commissioner's decision making here is required to be extremely deferential, essentially limited to fraud or dishonesty. (Id. at ¶¶ 80-82) Here, the Commissioner's decision is plainly not in bad faith. Indeed, the Commissioner's decision is correct, though he is not required to make any such showing.

52.    The Debtors' argument that "the Commissioner has prejudged the merits of pursuing a Telecast Rights transaction *before any transaction has in fact been presented to him*" simply ignores the facts. (Objection at ¶ 110) (emphasis in original). Contrary to the Debtors' implication, the relevant facts are already known. The Commissioner fully analyzed and made a determination with respect to the previously proposed Fox Sports transaction, and the Debtors have simply repackaged that proposed transaction as their "baseline." (Objection at ¶ 8 n. 3) And the Commissioner has evaluated the merits of the proposed Media Rights Transaction and determined not to approve the transaction for the same reasons, among others. Any transaction that could be generated under the Bidding Procedures would suffer from the same offending facts and circumstances. Any sale of the Media Rights at this time would breach the Fox Telecast Agreement, divert important Dodgers' revenues to Mr. McCourt personally,

---

[10]    See, e.g., Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (N.Y. 1995) (no obligation may be implied by duty of good faith and fair dealing that "would be inconsistent with other terms of the contractual relationship"); Richbell Info. Servs., Inc. v. Jupiter Partners, L.P., 765 N.Y.S.2d 575, 587 (N.Y. App. Div. 2003) (recognizing courts should avoid using implied covenant of good faith and fair dealing to create new duties that negate explicit rights under a contract); Markham v. Bradley, 173 P.3d 865, 871-72 (Utah Ct. App. 2007) (applying Utah law) (covenant of good faith and fair dealing "cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante [and] cannot create rights and duties inconsistent with express contractual terms").

27

subject the Debtors to protracted litigations and substantial damages claims by Fox Sports, and fail to maximize the Media Rights for numerous reasons, including that: (i) most potential bidders will not participate in the auction, (ii) Media Rights are not the type of asset that can be sold in an auction, (iii) there is insufficient time to negotiate a proper Media Rights transaction in an auction, (iv) the fact that the Debtors are in bankruptcy will depress value, and (v) Mr. McCourt's role as an owner will depress value. (Desser Decl. ¶¶ 21-43) Those concerns are magnified here because Mr. McCourt has monetized or otherwise exploited the Dodgers' ticket sales and parking revenue, siphoned off almost $190 million in direct and indirect cash distributions from Club revenues, forced the Debtors into bankruptcy, and proposed to divert funds from a sale of the Media Rights away from the Club to himself. Simply, the proposed sale of the Media Rights would harm Major League Baseball, the Dodgers, the 29 other MLB Clubs, Fox Sports and the fans.

2. **The Debtors' Plan Is Futile Also Because The Debtors' And Mr. McCourt's Breaches Preclude Assumption Of The Baseball Agreements**

   a. **A Media Rights Transaction Would Breach The Baseball Agreements And Breach The Fox Telecast Agreement**

53. Even if the Debtors are able to sell the Media Rights, they still would be unable to successfully reorganize. If Mr. McCourt and the Debtors consummate the Media Rights Transaction over the objection of Major League Baseball, they would breach the Baseball Agreements and be precluded from assuming those agreements. (Motion to Terminate Exclusivity at ¶¶ 66-68) Thus, allowing the Debtors' plan to go forward would be completely futile.

54. Consummating a Media Rights Transaction would also result in a breach of the Fox Telecast Agreement which would constitute grounds for the Club's potential

28

termination from the League. (Id. at ¶ 108) The Debtors' argument that Major League Baseball has not identified a breach of the Fox Telecast Agreement is puzzling. (Objection at ¶ 129) Major League Baseball has clearly identified the obvious fact that the Debtors' proposed Bidding Procedures would violate the exclusivity provisions of the Fox Telecast Agreement. (Motion to Terminate Exclusivity at ¶ 108) Moreover, the Debtors themselves have acknowledged that fact, asking the Court to declare the exclusivity provisions unenforceable. (Media Rights Motion at ¶ 1b) And Fox Sports has already sued the Debtors based on their breach or anticipatory repudiation.

55.    The Debtors' argument that the exclusivity provisions in the Fox Telecast Agreement are unenforceable in bankruptcy is also wrong. (Objection at ¶¶ 132-39) A right of first negotiation and right of first refusal are enforceable under the applicable law of this and other districts. See, e.g. Northrop Grumman Tech. Servs, Inc. v. The Shaw Group, Inc. (In re IT Group Inc.), 302 B.R. 483, 488 (D. Del. 2003) (the right of first refusal was not an impermissible ipso facto clause that restricts assignment and, as such, was enforceable under section 365(f) of the Bankruptcy Code); see also In re Capital Acquisitions & Management Corp., 341 B.R. 632 (Bankr. N.D. Ill. 2006) (same); In re Wauka, Inc., 39 B.R. 734, 735, 738 (Bankr. N.D. Ga. 1984) (holding a party in interest's right of first refusal to be valid and enforceable in a sale of the debtor's asset); (see also Objection to Media Rights Motion at ¶¶ 48-49). At a minimum, Fox Sports' lawsuit ensures protracted and uncertain litigation that cannot be resolved before the proposed sale by the Debtors, which would lock the Debtors into an incurable breach. The Debtors' argument that Fox Sports can simply mitigate its damages by broadcasting games through its current contract ignores the claims. (Objection at ¶ 133- 134) Fox Sports' damages are based on the loss of the exclusive opportunity to extend the contract, the very purpose of the

29

NEWYORK 8297616 (2K)

exclusivity provisions. Fox Sports will measure its damages based on the lost opportunity for a multiple-year transaction, not based on the loss attendant to the existing contract.

56.    The Debtors' assertion that permitting negotiations with Fox Sports for 45 days will make them whole (Objection at ¶ 137) makes no sense. Fox Sports has a right of first negotiation and right of first refusal under the Fox Telecast Agreement through November 2012, not a period of 45 days.[11] The Debtors cannot unilaterally rewrite the Fox Telecast Agreement to shorten the exclusivity periods, and claim the duration of exclusivity was somehow immaterial. The Debtors do not, and cannot, cite any authority whatsoever to support their position. Mr. McCourt's cavalier treatment of the Dodgers' liability, in order to solve his own liquidity crisis, cannot be justified.

57.    The Debtors' argument that their potential breach of the Fox Telecast Agreement cannot prevent them from assuming the Baseball Agreements because cross-default provisions are unenforceable in bankruptcy is also wrong. (Objection at ¶ 130-31)

58.    First, the provision of the MLB Constitution at issue is not a cross-default provision, under which a default of one agreement automatically results in a default in another agreement. Rather, the breach of the Fox Telecast Agreement provides a potential basis for the Club's involuntary termination from the League. Article VIII, Section 4(j) of the MLB Constitution expressly provides that "[t]he rights, privileges and other property rights of a [MLB Club] . . . may be terminated . . . involuntarily, with the approval of three-fourths of all [MLB Clubs], if the Club in question shall…[f]ail or refuse to fulfill its contractual obligations…." See Kurtz Decl., Ex. 1 (MLB Constitution) at Art. VIII, § 4(j).

---

[11]    The Debtors' argument that Fox Sports will receive the same thing, except "the negotiation will happen one year earlier than scheduled," (Objection at ¶ 137) is also nonsensical. In fact, Fox Sports was already negotiating with the Debtors, and in any case the exclusivity provisions were designed to take into account the entire term of the current contract.

30

59.     Second, the right of Major League Baseball to enforce Article VIII, Section 4(j) is integral to its authority under the MLB Constitution. The purpose of this provision is to give Major League Baseball (with the requisite approval of MLB Clubs) the ability, if necessary, to protect the goodwill and integrity of Baseball in the very scenario presented here. Major League Baseball has a legitimate interest in protecting against MLB Clubs that breach their contractual obligations to third parties. It is essential for Major League Baseball to have the authority to police MLB Clubs that put themselves in the type of default at issue here with respect to Fox Sports, where such breaches will have a negative impact on the image of the League, result in distracting litigation and have a potential effect on the ability of other MLB Clubs to enter into similar contracts with valuable business partners of Major League Baseball. Consequently, the involuntary termination provision in the Baseball Agreements should be enforceable even if construed as a cross default provision because "[e]nforcement of a cross-default provision should not be refused where to do so would thwart the non-debtor's bargain." Lifemark Hosps., Inc. v. Liljeberg Enters., Inc., (In re Liljeberg Enters., Inc.), 304 F.3d 410, 445 (5th Cir. 2002); Kopel v. Campanile (In re Kopel), 232 B.R. 57, 66 (Bankr. E.D.N.Y. 1999) (same).

        b.    **Existing Defaults Also Preclude Assumption Of The Baseball Agreements**

60.     In addition to the prospective breaches in connection with a Media Rights Transaction, there are a number of existing, incurable breaches that preclude assumption of the Baseball Agreements without the consent of Major League Baseball.[12]

---

[12]     It is well established that a debtor may not assume or assign executory contracts where there exists an incurable breach. (Motion to Terminate Exclusivity at ¶ 67); see also In re New Breed Realty Enters. Inc., 278 B.R. 314, 321 (Bankr. E.D.N.Y. 2002) ("Where the default is non-monetary and is not curable, the debtor is precluded from assuming an executory contract only if the default was material or if the default caused 'substantial economic

NEWYORK 8297616 (2K)

61.    As a threshold matter, the Debtors' suggestion that Major League Baseball must "prove that [the Commissioner] has fully performed all of his obligations under the Baseball Agreements" (Objection at ¶ 114) is mistaken.  It is the Debtors who have the burden of establishing all of the elements of assumption under section 365, and a counterparty merely has the initial burden of establishing that a default exists.  See, e.g., In re Rachels Indus., Inc., 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990) ("In a proceeding under § 365, the party moving to assume a lease has the ultimate burden of persuasion that the lease is one subject to assumption and that all requirements for assumption have been met. . . ."); In re Greektown Holdings, LLC, No. 08-53104-WSD, 2009 WL 1653461, at *2 (E.D. Mich. May 13, 2009) (once a party establishes evidence of a default, "the burden shifts back to the debtor to provide satisfactory proof that the default has either been cured, or will promptly be cured, and that there is adequate assurance of future performance.").  Furthermore, Major League Baseball's compliance with all of its obligations under the Baseball Agreements is not a condition to the Debtors and Mr. McCourt's duty to perform thereunder.  The Debtors agreed to be bound by the Baseball Agreements in order to operate a Club within the League, and the Commissioner's compliance with the Baseball Agreements is not a prerequisite for complying with the duties that the Debtors owe to the other 29 Clubs and the League.  In any event, Major League Baseball has at all times fully complied with all of its obligations under the Baseball Agreements.

---

detriment.'") (quoting In re Joshua Slocum Ltd., 922 F.2d 1081, 1092 (3d Cir. 1990)); In re Walden Ridge Dev., LLC, 292 B.R. 58, 67 (Bankr. D.N.J. 2003).

32

i.    **Mr. McCourt And The Debtors Are Not**
       **Operating The Club In The Best Interests of**
       **Baseball**

62.    Mr. McCourt and the Debtors have failed to act in the best interests of

Baseball (and the Dodgers) and breached their obligations under the Baseball Agreements by,

among other things:

- Mr. McCourt siphoning almost ████ million out of the Club – ████████████ ████████████████████ – to fund personal and business obligations unrelated to the business of Baseball, leaving the Club insufficiently capitalized and ultimately in need of bankruptcy protection;

- Failing to disclose and obtain approval for loans secured by Club assets in violation of the Ownership Guidelines;

- Mr. McCourt failing to comply with his promise, which was a condition of his purchase of the Club, to make a ████ million liquid equity contribution to the Dodgers to provide working capital to fund any unexpected shortfall in the operation of the Team;

- Failing to disclose and obtain the Commissioner's approval for the transfer of real estate including the Dodgers parking lots from Realco to Blue Landco, and the subsequent lease arrangement between Blue Landco and Realco;

- Failing to disclose and obtain the approval of the loans secured by the Club's parking lots in violation of the Ownership Guidelines;

- Refusing to comply with the Commissioner's 2011 Directive appointing a monitor to oversee and monitor the day-to-day operations, business and finances of the Dodgers;

- Filing a voluntary petition in bankruptcy without the approval of the Monitor;

- Pursuing a premature sale of the Media Rights over the objection of Major League Baseball, and in breach of the Fox Telecast Agreement, in order to allow Mr. McCourt to fund his personal obligations at the expense of the Debtors and other stakeholders;

- Failing to deal candidly with Major League Baseball;

- Pursuing the economically inferior Highbridge DIP in order to ensure that Mr. McCourt did not lose money that was tied to approval of the Highbridge DIP and to ensure that Highbridge would provide financing to Blue Landco, a non-debtor entity owned by Mr. McCourt.

33

NEWYORK 8297616 (2K)

63. None of the defaults are curable. The Debtors and Mr. McCourt cannot undo their failure to abide by the terms of the Baseball Agreements. See, e.g., In re Empire Equities Capital Corp., 405 B.R. 687, 691(Bankr. S.D.N.Y. 2009) (debtors' failure to close transaction in timely manner was "incurable" breach preventing assumption); In re New Breed Realty Enters., Inc., 278 B.R. 314, 320 (Bankr. E.D.N.Y. 2002) ("[D]ebtor's failure to close the sale on or before the time of the essence closing date... constitutes a non-monetary default which cannot be cured because it is a historical fact"); In re Deppe, 110 B.R. 898, 904 (Bankr. D. Minn. 1990) (precluding assumption of contract where debtor "cannot 'undo' the historical event" constituting non-monetary default). Mr. McCourt cannot go back and operate the Club in the best interests of Baseball and somehow avoid putting the Club into bankruptcy. Nor can the Debtors "undo" their default by simply making monetary payments to Major League Baseball— financial accommodations cannot cure the Debtors' non-compliance with the Baseball Agreements, which are designed to protect the unique and interrelated interests of the MLB Clubs and the value and integrity of Baseball. Cf. In re Dewey Ranch Hockey, LLC, 414 B.R. 577, 593 (Bankr. D. Ariz. 2009) (finding that financial accommodations could not adequately protect the non-monetary interests of the NHL in enforcing its league's constitution). Thus, the Debtors can assume the Baseball Agreements only if Major League Baseball agrees to waive those defaults.

64. The Debtors' intention "to offer proof" that they complied with their obligations under the Baseball Agreements misunderstands the rules. It is not for the Debtors, representing a single owner, to determine whether they are acting in the best interests of Baseball. Rather, the Clubs have vested in the Commissioner the sole authority to make those determinations. The Debtors also argue that the best interests of Baseball authority is too vague.

34

(Objection at ¶ 117)[13] To the contrary, the Commissioner's authority to act in the best interests of Baseball is a clear and fundamental right. And standards of good faith, the very standards the Debtors ask this Court to apply, are no more particular.

### ii.   Failure To Comply With The Directive And Expelling The Monitor Constitute A Breach Of The Baseball Agreements

65.   The Debtors' failure to comply with the Commissioner's directive appointing a monitor is a clear and direct violation of the MLB Constitution and, therefore, the Baseball Agreements. (Motion to Terminate Exclusivity at ¶ 107)

66.   The Debtors cannot avoid the consequences of refusing to comply with the Commissioner's 2011 Directive by characterizing the violation as a mere "[a]pplication of the automatic stay." (Objection at ¶¶ 119-121) Even if the automatic stay applies to the appointment and activities of the Monitor (and it does not),[14] section 362 of the Bankruptcy Code does not relieve the Debtors of their breaches. Rather, the automatic stay only prevents Major League Baseball from enforcing its remedies against the Debtors for such breach. See, e.g.,

---

[13] In support of their argument, the Debtors cite Pyramid Operating Auth., Inc. v. City of Memphis (In re Pyramid Operating Auth., Inc.), 144 B.R. 795, 823 (Bankr. W.D. Tenn. 1992). That case is neither binding nor applicable to the circumstances here. In that case, the court considered whether four contracts governing the management and operation of a sports arena were properly terminated before the commencement of the bankruptcy case. One of the contracts required the debtor to "conduct the management and operation of the [arena] . . . as a *first class facility* with integrity and *good faith* and in a manner that *it believes to be in the best interests* of the [arena] and [the City of Memphis]." Id. at 823 (emphasis in original). The contract also required any notice of default to allege specific acts or omissions to show willful default. Id. at 823. The court found that the notice of default given to the debtor was insufficient to terminate that agreement because the notice of default "contained no specific acts or omissions to support the alleged events of default so as to warrant the termination." Id. at 827. There is no such requirement under the Baseball Agreements to specify violations, though Major League Baseball has done so. Nor did the contracts in Pyramid provide the counterparty with the express right to interpret the terms of the agreement, as is the case here. In any case, the Debtors and Mr. McCourt are fully on notice regarding the misconduct that constitutes the breaches here.

[14] The duties of the Monitor do not constitute an exercise of control over property of the estate that might violate the automatic stay. The oversight and monitoring activities of the Monitor pursuant to the Directive are essentially matters of corporate governance. It is well settled that such matters are not subject to the automatic stay under section 362 of the Bankruptcy Code. See, e.g., In re Marvel Entm't Grp., Inc., 209 B.R. 832, 838 (D. Del. 1997).

35

Bellini Imps., Inc. v. Mason & Dixon Lines, Inc., 944 F.2d 199, 201 (4th Cir. 1991) (recognizing that, although "a creditor must obtain relief from the stay to satisfy a judgment against property of the bankruptcy estate[,]" the automatic stay did not bar an action against the debtor arising from the debtor's the post-petition breach of contract); In re Al's Transmission Serv., Inc., No. 95-1-1579, 1995 WL 781697, at *2 (Bankr. D. Md. Dec. 28, 1995) (finding the same and noting that "[the stay] was not enacted to allow the [d]ebtor to benefit from the breach of a post-petition contract."); see also In re Tudor Motor Lodge Assocs., Ltd. P'ship, 102 B.R. 936, 955, 957 (Bankr. D.N.J. 1989) (finding that, notwithstanding the automatic stay, debtor materially breached license agreement based, in part, on debtor's continued postpetition failure to comply with the "quality assurance system" under the license agreement, and therefore could not cure). Thus, regardless of whether section 362 stays enforcement of the Commissioner's 2011 Directive, the Debtors breached the Baseball Agreements by expelling the Monitor.

67.    The Debtors' argument that the Commissioner lacked authority to appoint the Monitor until he had completed his investigation is also wrong. First, the Commissioner has the general authority to take such punitive actions as he deems appropriate under the circumstances in the best interests of Baseball. (See, e.g., Kurtz Decl., Ex. 1 (MLB Constitution) at Art. II, § 3) The Commissioner's punitive authority is not just limited to those matters enumerated in Article II, Section 3 of the MLB Constitution, and also includes "such other actions as the Commissioner may deem appropriate", which included the appointment of the Monitor here. (Id. at Art. II, § 3(g)) The Commissioner also has the authority to act "on any matter that involves the integrity of, or public confidence in, the national game of Baseball", which includes any deterioration of public confidence in the ability of a Club to compete or in Major League Baseball as a whole. (See Kurtz Decl., Ex. 1 (MLB Constitution) at Art. II, § 4)

36

Thus, to protect the best interests of Baseball, and prevent further denuding of the Dodgers' assets, the Commissioner was authorized to issue the 2011 Directive appointing the Monitor to oversee and exercise approval rights over the Debtors' corporate governance and business affairs.

68.    Second, the MLB Constitution also provides that the Commissioner has the power to impose any preventive measures he deems appropriate to protect the best interests of Baseball. (See Kurtz Decl., Ex. 1 (MLB Constitution) at Art. II, § 2(c)) ("The functions of the Commissioner shall include ... [t]o determine, after investigation, what preventive, remedial or punitive action is appropriate in the premises, and to take such action either against Major League Clubs or individuals, as the case may be."). Contrary to the Debtors' suggestion, the language in this provision of the MLB Constitution is "after investigation," not "after all aspects of the investigation have been completed." In any case, the Commissioner appointed the Monitor "after investigation."

37

69.     Although the Commissioner continued the investigation, he had already determined, based on the substantial evidence of misconduct, that the Monitor was necessary in order to protect the Dodgers from further harm.  The Commissioner was not required to finalize a lengthy investigation before taking action to protect the Dodgers.  The Debtors accuse the Commissioner of "haste," but Mr. McCourt's methodical stripping and exploiting of the Dodgers' assets, coupled with his stated desperate need for cash, required the Commissioner to act quickly to protect the Club.

70.     Third, it is the Commissioner who interprets the Baseball Agreements. See supra at ¶ 41.  Thus, the Commissioner's interpretation of his authority under the MLB Constitution trumps the Debtors'.

### iii.     Entry Into The Highbridge DIP Is A Material Breach

71.     The Debtors' entry into the Highbridge DIP facility is also a clear breach of the Baseball Agreements.  The Debtors do not, and cannot, contest that fact:

> Q: And, in fact, you are aware that the Debtors' actions in obtaining loans from non-traditional sources without the approval of the Commissioner, in fact, constitutes a default or a breach of the Major League Baseball Agreements, correct?
>
> A. Yes.

(Ex. 33 (DIP Hr'g Tr.) at 166:17-21 (Testimony of Jeffrey Ingram).

72.     Instead, the Debtors argue that the breach was not material because there was no substantial economic harm.  (Objection at ¶¶ 126-27)  The Debtors are wrong.  One, the Debtors breached one of the most fundamental obligations of a Major League Baseball Club on which the interrelationships of the Clubs relies, and Debtors cannot avoid their breach by

38

characterizing it as immaterial.  Two, the Debtors paid Highbridge $5,975,000, and spent more than $1 million dollars trying to avoid a superior financing, so the breach certainly caused material harm to the Dodgers and, therefore, Major League Baseball.[15]

73.    The Debtors' argument that MLB had not made a superior loan offer to the Debtors until the final agreement was negotiated is without merit.  As this Court found, "A comparison of the Highbridge Loan and the proposed Baseball Loan clearly shows the substantial economic superiority of the Baseball Loan."  (DIP Order at 4)  Moreover, the Debtors admitted that Major League Baseball's terms were superior in every respect.  (Kurtz Decl., Ex. 39 (DIP Hr'g Tr.) at 157:19-158:4)  Mr. McCourt's argument that "the Highbridge DIP ultimately produced demonstrative benefits to the bankruptcy estates" is just remarkable.  Major League Baseball made a superior offer on day one, yet the Debtors paid $5,975,000 to Highbridge in order to relieve Mr. McCourt of his obligation to pay most of this amount ($5.25 million).  The benefits of the Major League Baseball proposal were achieved only because the Court effectively required the Debtors to take the financing.

74.    The Debtors' argument that their breach was cured when they ultimately agreed to the loan provided by Major League Baseball is puzzling.  The Debtors breached the Baseball Agreements by entering into the Highbridge DIP Facility and expending significant amounts of money in fees and expenses.  Those actions, and the attendant breaches of the Baseball Agreements, cannot be undone and are not cured just because the Court effectively required the Debtors to take the Major League Baseball loan by not approving the Highbridge

---

[15]    It is disingenuous for the Debtors to argue that because Major League Baseball consented to the Highbridge DIP on an interim basis it is precluded from now asserting the Debtors' breach relating to the Highbridge DIP prevents the Debtors from assuming the Baseball Agreements.  Major League Baseball specifically reserved all its rights to object to the Highbridge DIP on a final basis.  (Ex. 34 (June 28 Hr'g Tr.) at 42:21-43:1) (Debtors' counsel recognizing and acknowledging that "Major League Baseball reserves whatever rights they may have, and are waiving none by agreeing to this transaction, none with respect to the final hearing, by agreeing to this transaction.").

39

NEWYORK 8297616 (2K)

DIP. See, e.g., In re New Breed Realty Enters., Inc., 278 B.R. 314, 320 (Bankr. E.D.N.Y. 2002) ("[D]ebtor's failure to close the sale on or before the time of the essence closing date… constitutes a non-monetary default which cannot be cured because it is a historical fact"); In re Deppe, 110 B.R. 898, 904 (Bankr. D. Minn. 1990) (precluding assumption of contract where debtor "cannot 'undo' the historical event" constituting non-monetary default).

### 3. The Debtors Cannot Assume The Baseball Agreements Because They Are Not Assignable

75. In addition to the fact that the Debtors cannot assume the Baseball Agreements because of the prospective and existing breaches discussed above, they also cannot assume those agreements without Major League Baseball's consent because they are not assignable as a matter of law. Notwithstanding the Debtors' efforts to discredit the "hypothetical test" adopted by the Third Circuit in In re West Electronics, Inc., 852 F.2d 79 (3d Cir. 1988), they have acknowledged, as they must, that the hypothetical test is the binding law of this Circuit. (Objection at ¶ 141 n.23) Under that test, the Debtors cannot assume the Baseball Agreements because applicable law bars the assignment of such agreements absent Major League Baseball's consent.

76. The Debtors' reliance on Allentown Ambassadors, Inc. v. Northeast American Baseball, LLC (In re Allentown Ambassadors, Inc.), 361 B.R. 422 (Bankr. E.D. Pa. 2007) is misplaced. First, Allentown is a decision from outside Delaware and is not controlling. Second, Allentown addressed the ability to transfer interests in an LLC under North Carolina law. It did not analyze whether membership in an *unincorporated association* (like that of Major League Baseball) could be assigned. The sole "applicable law" at issue in Allentown was a North Carolina statute on limited liability companies ("LLC") that, as the court found, explicitly permitted assignment of certain interests in the LLC. 361 B.R. at 455. The opposite is

40

the case here, where, under all applicable laws, assignment is not permitted. (See infra at ¶¶ 80-99.) Third, the court decided the issue on summary judgment. Id. at 457. Thus, the Allentown court never determined the issue of nonassignability,[16] making clear that it made "no finding at this time that the Debtor's membership interest actually survived the *ipso facto* provision of the [LLC]." Id. at 457.

77.    Even under the Allentown court's analysis, where the governing law prohibits assignments, the Baseball Agreements would not be assignable under the West Electronics hypothetical test. The court in Allentown applied a three-step analysis to make its determination:

- "[I]dentify the specific nature of the contractual property rights that are at issue";

- "[C]onsider whether the contractual rights are assignable under applicable law, by evaluating whether the governing . . . statute or common law expresses a clear policy that the identity of the contracting party is crucial to the contract or to public safety with respect to the type of contract at issue"; and

- If the applicable statute or common law is equivocal, "determin[e] whether the identity of an assignee would be material to the non-debtor, taking into consideration the nature of the enterprise in which the debtor and the non-debtor are engaged."

Id. at 454-55. An affirmative finding as to either of the second or third prong will prevent assumption or assignment of the contract. See id. Although the section 365(c) analysis is hypothetical, "[w]hat is not hypothetical is the focus on [the] nature of the debtor's business and *the legitimate expectations of the non-debtor party* to the executory contract." Id. at 454 n. 69 (emphasis added). The court found that section 365(c) requires that the applicable law "expresses a clear policy that the identity of the contracting party is crucial to the contract". Id.

---

[16]    Indeed, the court even questioned its own analysis of the LLC statute at issue, which was done in the light most favorable to the defendant debtor, commenting that it was "heavily dependant on semantics." Id. at 456.

41

NEWYORK 8297616 (2K)

at 453.  Even if "applicable law" does not express such a policy, if the identity of an assignee

would be material to the nondebtor party, section 365(c)(1) will bar assignment.  Id. at 454-55.

78.     Here, Major League Baseball easily satisfies the second step of the

analysis.  Applicable law, including the common law[17] of unincorporated associations, sports

franchises, joint ventures, partnerships, relationships of trust and confidence and federal

intellectual property law, is clear and unequivocal that the identity of the parties is crucial.

(Motion to Terminate Exclusivity at ¶ 72-80)

79.     Major League Baseball satisfies the third prong of the Allentown analysis

as well.  The identity of an assignee of the Baseball Agreements is material to Major League

Baseball and the other 29 MLB Clubs.  As every Club owner, including Mr. McCourt, knows,

any transfer of ownership interest in an MLB Club requires the approval of Major League

Baseball and/or the members of the association that is Major League Baseball.

### a.   The Baseball Agreements Are Not Assignable Under Applicable Law

#### i.   Law Of Unincorporated Associations Prevents Assignment

80.     The law is uniform that membership in an unincorporated association is

not assignable.  (Motion to Terminate Exclusivity at ¶ 72)  Indeed, the identity of the members of

an unincorporated association is not only crucial, but is the crux of what makes the association.[18]

See, e.g., 6 Am. Jur. 2d Assocs. & Clubs § 17 ("Membership in a voluntary unincorporated

---

[17]    The court in Allentown recognized that "applicable law" includes common law.  See id. at 454-56.

[18]    If members of a private association could freely assign their membership to anyone of their choosing,
without the consent of the association or the other members, such an association could no longer be properly
characterized as a *private* association.  See, e.g., N. Am. Soccer League v. NFL, 670 F.2d 1249, 1251 (2d Cir. 1982)
(recognizing that team owners receive a "non-assignable franchise" upon becoming a member of the NFL);
Affiliated Gov't Employees' Distrib. Co. v. Comm'r of Internal Revenue, 322 F.2d 872, 873 (9th Cir. 1963) (noting
that membership in California retail association was not transferable).  Rather, the association would be more akin to
a public organization, which, over time following subsequent assignments, would lose its private nature or
exclusivity.

association generally is held to be a privilege which may be accorded or withheld, and not a right which can be gained independently and then enforced. Generally, courts will not compel admission to a voluntary association . . . ." (footnotes omitted)).

81.    The Debtors suggest that the mere fact that unincorporated associations will typically develop rules and regulations to restrict membership indicates that there is no general prohibition on assignment. (Objection at ¶ 150) That novel proposition is not supported by the law.

82.    The decision in Branagan v. Buckman, 122 N.Y.S. 610 (N.Y. Sup. Ct. 1910), directly addresses the issue. In that case, the court recognized "the unanimous view of the courts and of the textwriters that membership in such [a voluntary] association is not transferable, at least without the consent of the association itself." Id. at 614. The Debtors seek to refute that obvious, common sense statement of the law by arguing that the Branagan decision only supports the proposition that a voluntary association can limit its membership through its rules and bylaws. (Objection at ¶ 152) The association that was subject of the decision in Branagan, however, *had no written bylaws or other governing agreements*. Yet, the court still found that the membership interest was not assignable. As such, the Branagan decision makes clear that, regardless of any rules or regulations adopted by the organization, a membership in a private, unincorporated association is *not* assumable or assignable for purposes of section 365(c)(1). See also Capano v. Wilmington Country Club, 2001 WL 1359254, at *4 (Del. Ch. 2001) ("Membership in voluntary associations is generally viewed as a privilege that may be withheld, not as a right that may be independently enforced"); Greenwood v. Bldg. Trades Council of Sacramento, 233 P. 823, 828 (Cal. Dist. Ct. App. 1925) ("Membership in a voluntary

43

association is …a privilege which may be withheld, or accorded on such terms and conditions as the association sees fit to impose") (quoting 3 Cal. Jur. 350, § 5).

83.     The Debtors' attempt to distinguish Branagan by arguing that the case addresses only "the familiar proposition that a voluntarily association could limit its membership as its sees fit in its rules and bylaws, and courts will not interfere with determinations by the association as to who may be admitted to membership." (Objection at ¶ 153)  But that is precisely the point.  Because it is settled—or familiar, to use Debtors' terms—that voluntary associations can limit their membership, such memberships are not assignable.  Indeed, Branagan specifically found that there was a "unanimous view of the courts and of the text writers that membership in such an association is not transferable, at least without the consent of the association itself." Branagan, 122 N.Y.S. at 614.

84.     Owners cannot assign membership in country clubs, religious organizations, cooperatives or any other unincorporated association.  (See, e.g., supra at ¶ 81)  In addition, notwithstanding the fact that there are thousands of them, owners cannot assign even a single one of the thousands of Dunkin Donuts.  See Dunkin' Donuts Inc. v. Sharif, Inc., No. 04-2272, 2006 WL 1149474, at *5 (10th Cir. 2006) (finding that Dunkin' Donuts could withhold consent to transfer of franchise to a buyer it had deemed unacceptable).  Plainly, an owner cannot assign an MLB Club, a member of perhaps the most exclusive association in the country.

85.     Tellingly, the Debtors cannot point to a single decision in which a court found that membership in an unincorporated association is freely transferable.  Instead, the Debtors rely on a series of cases addressing whether membership in a stock exchange constituted "property" within the meaning of the Bankruptcy Act of 1898 that would transfer to the trustee in bankruptcy.  (Objection at ¶ 153)  Those cases are totally irrelevant.  In those cases, unlike here,

NEWYORK 8297616 (2K)

the applicable rules and bylaws—adopted with the consent of the members of those associations—permitted the transfer under certain circumstances and transfers were permitted only in accordance with such rules.[19] Moreover, this case is not under the Bankruptcy Act, the Dodgers are not a seat on the stock exchange, and Baseball is nothing like securities trading. The owners of the individual seats on a stock exchange are not part of an integrated enterprise, have no obligation to deal with one another, do not even have to trade stocks, and do not share revenues.[20]

### ii. The Law Governing Professional Sports Leagues, A Subset Of The Law Of Unincorporated Associations, Prevents Assignment

86.     Courts recognize the right of professional sports leagues (which often are unincorporated associations) to control the identity of their members. The Debtors' argument that the cases cited by Major League Baseball do not address "the transferability of a membership in a professional sports league independent of contractual anti-assignment provisions contained in the league's governing documents" mischaracterizes the findings in those cases. (Objection at ¶ 157) Each of the cases recognizes the unique nature of professional sports leagues, where the economically interdependent character of the membership necessarily requires protections against the unfettered transfer of such membership. For example, the court

---

[19]     See Bd. of Trade of City of Chicago v. Johnson, 264 U.S. 1, 12 (1924) (finding that membership can be transferred under rules of the board) ; Page v. Edmunds, 187 U.S. 596, 600-02 (1903) (affirming sale of membership in stock exchange "subject to the constitution and bylaws of the Philadelphia Stock Exchange regulating membership therein"); O'Dell v. Boyden, 150 F. 731, 735 (6th Cir. 1906) (finding transfer "subject to the conditions imposed by the articles of the association"); In re Ketchum, 1 F. 840, 841 (S.D.N.Y. 1880) ("the consent of a committee of the stock exchange is necessary to a transfer of this right"); Platt v. Jones, 96 N.Y. 24, 31 (N.Y. Ct. App. 1884) (finding that the seat in the stock exchange could be transferred subject to the conditions contained in governing constitution and by-laws); Powell v. Waldron, 89 N.Y. 328, 331-32 (N.Y. Ct. App. 1882) (transfer of membership on exchange not at issue)

[20]     The Debtors' reliance on Raddison Design Management v. Cummins, No. 07-92, 2008 WL 55998 (W.D. Pa. Jan. 3, 2008), is misplaced. The case was decided under Pennsylvania contract law. Id., at 6. It did not involve an unincorporated association, nor did it involve the proposed assignment of membership The law of unincorporated associations is nevertheless clear that approval by Major League Baseball and its member Clubs would be required to assign the agreements. (See Motion to Terminate Exclusivity at ¶ 72)

45

in Levin v. NBA, 385 F. Supp. 149, 152 (S.D.N.Y. 1974), did not rest its holding on an interpretation of the NBA's governing documents or any anti-assignment clause contained therein; rather, it concluded that, irrespective of the NBA's reason for declining to approve an agreement for the sale of the Boston Celtics, the NBA had not acted improperly in rejecting the proposed sale. See id. at 152. Similarly, although acknowledging the rules governing the awarding of new franchises, the Mid-South Grizzlies court also noted that the unique nature of professional sports leagues requires that leagues maintain a level of control over the transfer of membership interests. See Mid-South Grizzlies v. NFL, 550 F. Supp. 558, 562 (E.D. Pa. 1982). "[The] business interdependence [of] team owners, through their leagues, invariably require[s] that the sale of a franchise be approved by a majority of team owners rather than by the selling owner alone.'" Id. at 566 (quoting N. Am. Soccer League v. NFL, 670 F.2d at 1253).

87.     In re Dewey Ranch Hockey, LLC is on point.  414 B.R. 577, 593 (Bankr. D. Ariz. 2009).  In that case, the court rejected an attempt by the debtor to transfer its NHL franchise to a third party notwithstanding the approval rights of the NHL.  The Debtors' response that the Court relied on section 363(e), rather than section 365(c)(1), of the Bankruptcy Code, misses the point.  The reason that the Debtor could not provide adequate assurances of future performance was that the proposed transfer would contravene the NHL's membership selection rights.  Id. at 591.  Thus, the court specifically recognized the sports league's right not to approve the assignment of the NHL franchise to a new owner over the objection of the league.

### iii.     The Law Governing Joint Ventures, Partnerships, and LLC Law Prevents Assignment

88.     Major League Baseball is like a joint venture (which follows partnership law), and joint venture interests cannot be assigned.  (Motion to Terminate Exclusivity at ¶¶ 75-76); see also In re Schick, 235 B.R. 318, 325 (Bankr. S.D.N.Y. 1999) ("[T]he right to choose

one's partners is a fundamental tenet of partnership law. Thus, the trustees cannot force the Objectants to accept substitute 'performance' from or render performance to a stranger."); see also In re New Era Co., 115 B.R. 41, 44 (Bankr. S.D.N.Y. 1990) (holding that, notwithstanding purported assignment of partnership interest, "it is settled law in New York that unless the parties have agreed otherwise, a person cannot become a member of a partnership interest without the consent of all the partners"). The Debtors agree, offering only the irrelevant argument that "a partner's economic interests in the partnership are freely assignable, while full admission to the partnership requires consent of the other partners." (Objection at ¶ 156) The issue here is the assignability of the Baseball Agreements, not some purported, and unidentified, economic interest in Major League Baseball.

### iv. The Law Governing Contracts Involving Personal Trust And Confidence Prohibits Assignment

89.     Contracts involving personal trust and confidence also are not assignable. The Debtors' primary response is to argue that LAD is a corporation and, therefore, "there is no such thing as a relationship with personal trust and confidence." (Objection ¶ 162) The Debtors' argument fails for several reasons.

90.     Even a cursory review of the Debtors' cited authority reveals that the Debtors' statement of the law is inaccurate.[21] The fact that persons choose to operate out of a corporate form is irrelevant to the law prohibiting assignment of contracts based on personal trust

---

[21]     Notably, in one of these cases, the court found that a contract for the printing of elevated railroad tickets could not be assigned without the counterparty's consent because, although "there [was] no personal or human equation in the management of a corporation, there [was] a legal equation which may [have been] of the utmost importance to parties contracting with it" and, as such, the counterparty "could not be obliged to [e]ntrust its money collected on the sale of the presses to the responsibility of an entirely different corporation from that with which it had contracted . . . ." N.Y. Bank Note Co. v. Hamilton Bank Note Engraving & Printing Co., 73 N.E. 48, 52 (N.Y. 1905). The Debtors' reliance on a case from 1883, New England Iron Co. v. Gilbert Elevated R.R. Co., 91 N.Y. 153, 167 (1883), is similarly misplaced. New England Iron does not hold that contracts with corporations are somehow excluded from "confidence and trust," but rather merely acknowledges that a contract involving a contractor that delegates work to agents may not necessarily involve personal trust and confidence. In any case, the cases to the contrary are legion, and have been decided within this century or the last century.

47

NEWYORK 8297616 (2K)

and confidence.[22]  Indeed, as a case relied on by the Debtors reflects, "it is possible for a corporation to contract where the basis of the bargain is the personal performance of individuals within that company, *the delegation of which would be ineffective.*"  In re Rooster, Inc., 100 B.R. 228, 233 n.12 (Bankr. E.D. Pa. 1989) (emphasis added).  This is the view that has been accepted by modern commentators:

> It has been intimated that the duty of a corporation is always delegable because a corporation's performance necessarily involves a delegation of duties to individuals.  This is too broad a statement.  It is possible to conceive of a contract with a corporation under which the basis of the bargain is the personal performance of particular individuals within the corporate structure and delegation to another corporation or person would be ineffective.  For example, a corporation producing motion pictures for a distribution company could not delegate its duties to another corporation producing motion pictures if the effect of the delegation is to deprive the other party to the contract of the contemplated performance of famous "stars," or directors.

John D. Calamari & Joseph M. Perillo, Calamari and Perillo's Hornbook on Contracts § 18.28 (6th ed. 2009) (footnotes omitted).

91.     Thus, courts routinely bar assignment of contracts between corporations that are based on trust and confidence.  In re Grove Rich Realty Corp., 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996) (finding that contract between third party and corporate debtor was "akin to a personal service contract which involves a matter of personal trust and confidence between the original contracting parties. It is patently unfair in such cases to require a non-debtor third party to accept performance from anyone other than the original contract vendee, unless the contract clearly provides for the right to assign to another contract vendee."); Sally Beauty Co. v. Nexxus Prods. Co., 801 F.2d 1001, 1008 (7th Cir. 1986) (finding that because defendant "should

---

[22]     The Debtors argue that "a substitute for personal character is the charter of the corporation," (Objection at ¶ 163) disregarding the fact that the "charter" for Major League Baseball prohibits assignment.

48

not be forced to accept performance of the distributorship agreement by [a corporate assignee], we hold that the contract was not assignable without [defendant's] consent."). Major League Baseball does not cease to operate on the basis of trust and confidence with the MLB Clubs simply because the MLB Clubs or their owners adopt a corporate form to carry their holdings.[23]

92.     The Debtors' quotation of Fransmart, LLC v. Freshii Dev., LLC in the Objection is incomplete in a material manner, omitting the relevant text, without ellipses or other indication. 768 F. Supp. 2d 851 (E.D. Va. 2011). The Debtors rely on the following quote: "The rationale for not allowing the free assignability of personal services contracts is that performance by a particular person is a material term of the contract; yet, that rationale does not apply in cases where the contract is between two corporate entities." (Objection at ¶ 162 n.30) (quoting Fransmart, 768 F. Supp. 2d at 861) The complete text is as follows, with the omission in bold: "The rationale for not allowing the free assignability of personal services contracts is that performance by a particular person is a material term of the contract; yet, that rationale does not apply in cases where the contract is between two corporate entities *and the contract specifically provides that anyone can perform the contractual duties.*" Fransmart, 768 F. Supp. 2d at 861 (emphasis added).

93.     Here, Major League Baseball is a highly integrated association of Clubs where the identity of any proposed owner or controlling individual for a Club, including the honesty, integrity and net worth of such individual, is highly material and carefully evaluated in

---

[23]     The other cases cited by the Debtors are likewise not applicable, as assignment in those cases was permitted because the contract terms clearly indicated that the parties did not intend for the identity of the counterparty to be material. See L.L. Brown Paper Co. v. Hydroiloid, Inc., 118 F.2d 674, 677-78 (2d Cir. 1941) (license to exploit patent rights did not require the provision of services by "any particular individual" and, in any event, beneficiary under the license had long since waived its right to object to the assignment); Bd. of Trs. of Mich. State Univ. v. Research Corp., 898 F.Supp. 519, 522 (W.D. Mich. 1995) (contract to prosecute patents and develop related technology did not "specify any particular individuals" and was for an "indefinite duration reflecting that no particular persons were specified as essential to the [c]ontract" and, in any event, objecting party had previously ratified the assignment by its conduct).

49

connection with any transfer of ownership. The Baseball Agreements clearly establish that Mr. McCourt's role as the controlling individual in the ownership structure of the Dodgers is a material term. See Kurtz Decl., Ex. 4 (Ownership Guidelines) at 2. For example, the Ownership Guidelines provide:



Id. (emphasis added). Thus, the Baseball Agreements, unlike the contracts cited in the Objection, explicitly require the provision of services and the fulfillment of duties by a single specified individual.

94.     The Debtors' argument that "the 29 MLB Clubs are not a single commercial entity but a collection of separate businesses" is a non-sequitur. (Objection at ¶ 165) The law prohibiting assignments of contracts that involve trust and confidence do not require that there be "a single commercial entity." Indeed, most of the "trust and confidence" cases do not involve a single commercial entity. See In re Grove Rich Realty, 200 B.R. at 510; Sally Beauty, 801 F.2d at 1008; N.Y. Bank Note, 73 N.E. at 52. Nonetheless, Baseball is certainly a single

enterprise, and the MLB Clubs are connected not only by the core business of playing baseball games, but also through revenue sharing, approval rights and the like.[24]

### v.      Federal Intellectual Property Law Prohibits Assignment

95.      The Debtors also cannot assume the Baseball Agreements because Section 365(c) of the Bankruptcy Code prohibits assignment of intellectual property rights. The Debtors argue that Major League Baseball licenses only trademarks, and trademarks are assignable. (Objection at ¶ 167-169) The Debtors are wrong.

96.      One, trademarks are not assignable under section 365(c) of the Bankruptcy Code. See In re XMH Corp., 647 F.3d 690, 695 (7th Cir. 2011) (not permitting debtor to assign a trademark under section 365(c) because "the universal rule is that trademark licenses are not assignable in the absence of a clause expressly authorizing assignment"); In re N.C.P. Mktg. Group, Inc., 337 B.R. 230, 236-37 (D. Nev. 2005) ("Because the owner of the trademark has an interest in the party to whom the trademark is assigned so that it can maintain the goodwill, quality, and value of its products and thereby its trademark, trademark rights are personal to the assignee and not freely assignable to a third party.") The authorities cited by the Debtors do not hold otherwise.[25] (Objection at ¶ 169)

---

[24]      The Debtors' reliance on Am. Needle, Inc. v. NFL, 130 S. Ct. 2201 (2010), which held that the NFL and its member teams were capable of conspiring under Section 1 of the Sherman Act, is puzzling. (Objection at ¶ 164) That case had nothing to do with the type of trust and confidence that exists between a professional sports league and its members. Likewise it is irrelevant that MLB Clubs maintain confidentiality over commercially sensitive information. (Objection at ¶ 165) The fact that MLB Clubs maintain certain information as confidential does not mean that membership interests in Major League Baseball are assignable.

[25]      The one case cited by the Debtors for the uncontroversial point that exclusive copyright licenses may be sublicensed also recognized that nonexclusive licenses, such as the licenses here, are personal in nature and may not be assigned in bankruptcy. In re Golden Books Family Entm't, Inc., 269 B.R. 311, 314 (Bank. D. Del. 2001) (recognizing that a nonexclusive license is personal in nature and may not be assigned in bankruptcy). The other cases relied on by the Debtors do not even discuss the assignability of a trademark under section 365(c). Krebs Chrysler-Plymouth, Inc. v. Valley Motors Inc., 141 F.3d 490, 497 (3d Cir. 1998) (considering whether a franchise was "property" under section 541 of the Bankruptcy Code and state law); In re Sunrise Rests., Inc., 135 B.R. 149, 153 (Bankr. M.D. Fla. 1991) (simply holding that "the relationship between parties was nothing more than a strict business transaction to furnish economic gains to both contracting parties" and that, therefore, the franchise was

51

97.     Two, as Debtors well know, Major League Baseball also owns copyrights. Such copyrights, like trademarks, are also unassignable under Section 365(c) of the Bankruptcy Code.  See In re Valley Media, Inc. 279 B.R. 105, 135-36 (Bankr. D. Del 2002) (holding that non-exclusive copyrights are not assignable under section 365(c)); In re Golden Books Family Entm't, Inc. 269 B.R. 300, 310 (Bankr. D. Del 2001) (same)

**b.   The Identity Of A Hypothetical Assignee Of The Baseball Agreements Is Material To Major League Baseball And The Owners Of The Other 29 MLB Clubs**

98.     With respect to the third prong of its analysis, the court in Allentown noted that the inquiry considers the "nature of the debtor's business and the legitimate expectations of the non-debtor party to the executory contract." 361 B.R. at 454 n.69.  Thus, a contract also may not be assumed or assigned where the identity of an assignee is material to the non-debtor counterparty, considering the nature of the parties' enterprise.  See id. at 453-54. Major League Baseball and the MLB Clubs have a legitimate expectation that the Baseball Agreements will not be freely assigned without their approval, because the identity of each owner, a public figure representing Major League Baseball, is material to the 30-member integrated league.

99.     In Dewey Ranch, the debtors tried to sell an NHL club.  The NHL refused to approve the sale of one of its clubs because of, among other things, concerns regarding the "character and integrity" of the purchaser's principal.  In re Dewey Ranch Hockey, LLC, 414 B.R. 577, 585, 591 (Bankr. D. Ariz. 2009).  The court denied the debtors' motion to sell, finding because that the NHL had "the right to admit only new members who meet its written

---

assignable); Varisco v. Oroweat Food Co. (In re Varisco), 16 B.R. 634 (Bankr. M.D. Fla. 1981) (concluding that contract was not a personal service contract but saying nothing about the transfer of trademarks).

NEWYORK 8297616 (2K)

requirements." Id. at 585, 591;[26] see also Prof'l Hockey Corp. v. World Hockey Ass'n, 191 Cal. Rptr. 773, 777 (Cal. Ct. App. 1983) ("The bylaws provide for board approval of a new team owner. This requirement rests upon the unspoken premise the league as a whole will suffer if one team is financially weak, unable to meet its obligations. The league's goodwill, credibility and financial strength are involved.").

> **4.    The Debtors' Plan Is Futile Also Because No One Will Bid To Purchase The Media Rights Unless The Dodgers Are A Part Of Major League Baseball**

100.    As discussed in the Motion to Terminate Exclusivity, an auction to sell the Media Rights is futile and a waste of time because it will result in an incurable default under the Baseline Agreements and prevent the Debtors from assuming them. If the Debtors are not part of Major League Baseball, the Media Rights hold no value and will not attract any meaningful bidders. (Motion to Terminate Exclusivity at ¶ 83) The Debtors concede this point by not discussing it in their Objection. Where the proposed sale of the Media Rights Motion suffers from such a deficiency, the Debtors should not be permitted to continue pursuing this futile reorganization strategy and the Debtors' exclusivity should be terminated.

**B.    Exclusivity Should Be Terminated Also Because The Debtors Are Pursuing The Interests Of Only Mr. McCourt**

101.    Cause for terminating exclusivity also exists because Mr. McCourt has caused the Debtors to pursue a reorganization strategy that benefits him personally and not the interests of the Debtors' estates or their stakeholders. (See Motion to Terminate Exclusivity at

---

[26]    The Debtors argue that Dewey Ranch is distinguishable because, in that decision, the court declined to approve the sale of the NHL club to the limited partnership, which planned to relocate the club over the objection of the NHL, on the ground that the league's interests could not be adequately protected. (Objection at ¶ 159) The Debtors miss the point. The Dewey Ranch court denied the motion to approve the sale of a team because of the NHL's objection to the sale (based primarily on the proposed buyer). The Dewey Ranch court recognized applicable non-bankruptcy law generally provided the NHL with the right to choose the identity of its members (subject to its governing rules to which each member consented) because the identity of the club owners was material. 414 B.R. at 591.

53

¶¶ 84-89) Mr. McCourt is completely conflicted. Because Mr. McCourt is the person who will determine the prevailing bidder, if there are any bids, the Court must apply the entire fairness test to the proposed transaction.

102.    Mr. McCourt cannot discharge his burden of demonstrating the entire fairness of any conceivable transaction resulting from an auction of the Dodgers' Media Rights. The Dodgers own the full value of the right to broadcast their games. That value can be monetized through rights fees, upfront fees, equity in an RSN, or any combination thereof. Mr. McCourt has enormous personal debts amounting to more than $160 million, which includes the $130 million reportedly needed to fund his divorce. (Kurtz Decl., Ex. 37 (McCourt July 15 Declaration at ¶ 11; Litvack August 3 Declaration at ¶ 11); Ex. 35 (Bill Shaikin, Frank and Jamie McCourt Reach Settlement Involving Dodgers, LA. TIMES (October 17, 2011)) ██████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████ Mr. McCourt has barely any money and his only source of income is the Dodgers. (See Kurtz Decl., Ex. 37 (McCourt July 15 Declaration at ¶¶ 3, 4)) Consequently, Mr. McCourt will necessarily select a bidder that will provide him personally, or through a wholly-owned subsidiary, value that otherwise would be received by the Club, either through increased rights fees or by providing the equity directly to the Club. There is simply no way that Mr. McCourt has any ability to demonstrate the entire fairness of a transaction that diverts revenues from the Debtors to himself.

103.    The Debtors' assertion that they owe a fiduciary duty to Mr. McCourt is troubling. (Objection at ¶¶ 173-178) The duty is to the Debtors and the estates, not an equity holder. The estates have a duty to maximize the value of the assets to the benefit of all

NEWYORK 8297616 (2K)

constituencies, not just equity. Thus, the Debtors are obligated to increase the value of the entire estates, which may benefit equity, but cannot divert assets from the Debtors to equity. See e.g., In re Cent. Ice Cream Co., 59 B.R. 476, 487 (Bankr. N.D. Ill. 1985) (where creditors would be paid in full, court determined that debtors should not compel the creditors to wait through a "protracted litigation at large cost and with great risk" because certain shareholders wanted a higher payment). Diverting money from the estate, to a non-debtor equity holder, is a clear breach of their fiduciary duty. See, e.g. In re NuGelt, Inc., 142 B.R. 661, 666 (Bankr. D. Del. 1992) ("The premise that [non-debtor shareholders] may simply take what they need or want of the estate's assets is contrary to the Bankruptcy Code and the fiduciary duty owed the estate and its creditors. There is universal agreement among the courts that using estate property to pay personal expenses of the debtor's [non-debtor shareholders] is a misuse of estate property.") The Debtors do not cite a single case that has permitted an estate asset to be diverted to a non-debtor equity holder.

104. Mr. McCourt's continued manipulation of the Debtors for his own purposes and to the detriment of the Dodgers and the Debtors' stakeholders constitutes cause for terminating exclusivity.

## C.   Termination Of Exclusivity Will Bring These Chapter 11 Cases To A Swift And Successful Conclusion

105. The merits of the options in these Chapter 11 cases are clear. The MLB Plan will benefit everyone, and Mr. McCourt's plan will harm everyone. The following chart illustrates a comparison of the proposed plan efforts in these cases:

|  | McCourt Plan | MLB Plan |
|---|---|---|
| Dodgers | • Possible loss of its membership in Major League Baseball <br>• Costly litigation with other | • Consensual reorganization supported by all creditors <br>• New, well-capitalized owner capable of |

NEWYORK 8297616 (2K)

| | McCourt Plan | MLB Plan |
|---|---|---|
| | stakeholders<br><br>• Continue to be controlled by under-capitalized owner<br><br>• Weak cash position from over-leveraged capital structure<br><br>• Limited ability to make capital expenditures (e.g., Dodger Stadium renovations and farm system)<br><br>• Declining on-field performance from an inability to sign the necessary talent<br><br>• Weak attendance due to disenfranchised fan base | investing in the Club<br><br>• Cash for necessary capital expenditures and to sign the best players<br><br>• Better chance at competing at the highest levels on the field<br><br>• Fan base support |
| Creditors | • Risk of receiving less than payment in full if the Dodgers lose their membership in Major League Baseball and the Debtors are liquidated | • Certainty of payment in full |
| Mr. McCourt | • Retains control of the Dodgers<br><br>• Takes proceeds of the Media Rights Transaction to pay personal debts | • Sells the Dodgers<br><br>• Receives hundreds of millions of dollars in surplus proceeds from sale of the Club |
| Major League Baseball | • Further weakened, under-capitalized Dodgers<br><br>• Negative impact on revenue sharing among the MLB Clubs<br><br>• Override important rights and authorities under the Baseball Agreements<br><br>• Negative impact on the relationship with strategic partner to the League (Fox Sports) | • Dodgers reinvigorated by a well-capitalized, new owner<br><br>• Positive impact on revenue sharing of Dodgers operating as a healthy Club<br><br>• Bolster brand<br><br>• Maintain healthy partnership with strategic partner to the League (Fox Sports) |
| Fox Sports | • Costly litigation to enforce its bargained-for rights<br><br>• Uncertain damages claim against Debtors, whose value could evaporate if the Club is terminated | • Benefit of their bargained-for agreement |
| Fans | • Less competitive Dodgers<br><br>• Continued erosion of fan base | • More competitive Dodgers<br><br>• A new owner with adequate capital to deliver a team fans can support |

106.    A termination of the Debtors' Exclusivity to allow Major League Baseball

to pursue the MLB Plan clearly would move these Chapter 11 Cases toward a swift resolution.

56

NEWYORK 8297616 (2K)

The Debtors do not offer any substantive response, and misrepresent Major League Baseball's position, arguing that Major League Baseball seeks to terminate exclusivity based on the existence of litigation is wrong. (Objection at ¶ 76) Major League Baseball seeks to terminate exclusivity because (i) the Debtors, under the control of a conflicted owner, are pursuing a futile plan to sell the Media Rights over the Commissioner's objection, and will not be able to emerge from bankruptcy without the approval of Major League Baseball, and (ii) the Baseball Agreements are not assignable. The fact that terminating exclusivity will also avoid protracted and expensive litigation only strengthens the motion.

107.    The Debtors are pursuing a futile reorganization strategy, and exclusivity must be terminated to permit Major League Baseball to file and solicit acceptances of the MLB Plan for the benefit of all stakeholders.

## II.

### IF THE DEBTORS' EXCLUSIVITY IS NOT TERMINATED, THEN THE DEBTORS SHOULD BE COMPELLED TO SEEK ASSUMPTION OF THE BASEBALL AGREEMENTS BEFORE PURSUING A MEDIA RIGHTS TRANSACTION

108.    Out of 80 pages of their brief, the Debtors devote only three pages to the issue of assumption, and offer almost no response to the arguments raised in support of that relief. According to the Debtors, a motion to assume "would be a useless and wasteful exercise at this stage of the case." (Objection at ¶ 182) The Debtors posit that "[t]he weight of authority strongly supports that LAD is entitled to pursue [its reorganization] strategy without first assuming each and every agreement that is necessary to such reorganization." (Objection at ¶ 185) The Baseball Agreements are not just part of the reorganization strategy. Rather, the Baseball Agreements provide the Dodgers with virtually all of their value. The Debtors need to understand that at this juncture of the cases they must comply with the Baseball Agreements in order to have any chance of successfully reorganizing. Mr. McCourt needs to understand his

57

obligations now, before it is potentially too late for the Dodgers to emerge as a part of Major League Baseball.

109.   The Debtors do not require any more time to make their decision.  Rather, the Debtors admit they have already made their decision to assume the Baseball Agreements. (See Objection at ¶ 13) ("[T]he Debtors fully intend to assume the Baseball Agreements."); Objection at ¶ 182 ("[T]he Debtors have made their intention to assume the Baseball Agreements entirely clear. . . ."); (Objection at ¶ 186) ("[T]he Commissioner can rest assured that LAD will seek to assume the Baseball Agreements in due course.")  Accordingly, the decisions finding that a debtor should have more time to evaluate their executory agreements are irrelevant.[27]   The Debtors do not require additional time where their decision has already been made because assumption of the Baseball Agreement is the *only* path to an effective reorganization in these Chapter 11 Cases.

110.   As described herein and in the Motion to Terminate Exclusivity, the Debtors have breached their obligations under the Baseball Agreements.  See supra ¶¶ 53-74; (Motion to Terminate Exclusivity at ¶¶ 105-108)  Therefore, the Debtors' reliance on cases like In re Physician Health Corp., 262 B.R. 290, 295 (Bankr. D. Del. 2001), as supporting a delay in assumption, likewise are inapposite.  Physician Health, as the Debtors note, involved a situation where the debtors were performing under the contracts their counterparty sought to have

---

[27]   See Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.), 208 F.3d 498, 505 n.6 (5th Cir. 2000) ("'[Delaying the decision to assume or reject a contract until confirmation] is often a useful means for the debtor to avoid binding itself to contracts or leases before it has formulated a feasible business plan under which it knows whether it will want the benefits and burdens of each agreement.'"); Data-Link Sys., Inc. v. Whitecomb Keller Mort. Co., Inc. (In re Whitcomb & Keller Mortg. Co.), 715 F.2d 375, 379 (7th Cir. 1983) (denying motion to compel pre-confirmation assumption or rejection on the basis that "§ 365(d) allows the . . . debtor in possession a reasonable time within which to *determine whether adoption or rejection of the executory contract would be beneficial to an effective reorganization.*") (emphasis added); In re Hernandez, 287 B.R. 795, 804 (Bankr. D. Ariz. 2002) (in response to a § 362(d)(2) motion, court may "set[] a reasonable time in which the debtor must decide whether to assume or reject"); In re St. Mary's Hosp., 89 B.R. 503, 513 (Bankr. E.D. Pa. 1988) (the "balance of hurts and good to be achieved is definitely in favor of allowing the Debtor to delay in [its] decision") (all emphases added).

NEWYORK 8297616 (2K)

assumed or rejected on an expedited basis.  (Objection at ¶ 184); see also In re Dana Corp., 350 B.R. 144, 149 (Bankr. S.D.N.Y. 2006) (finding movant failed to meet burden in motion to compel decision on assumption or rejection where, among other things, debtor was continuing to perform under contracts).  Here, the Dodgers are breaching the Baseball Agreements, and Mr. McCourt's refusal to comply with the Baseball Agreements precipitated the Motion to Terminate Exclusivity.

111.    Contrary to the Debtors' conclusory remarks, Major League Baseball's interests will be prejudiced if the Debtors are permitted to complete a Media Rights Transaction before assuming the Baseball Agreements.  As explained herein and in the Motion to Terminate Exclusivity, the completion of a Media Rights Transaction over the objection of Major League Baseball will breach the Baseball Agreements.  And that is exactly what the Debtors intend to do—use chapter 11's pre-assumption limbo period to complete a Media Rights sale in breach of the Baseball Agreements before seeking assumption.

112.    As set forth in the Motion to Terminate Exclusivity, the decision in In re Resource Tech. Corp., 254 B.R. 215, 227 (Bankr. N.D. Ill. 2000)—which the Debtors ignore wholesale in their Objection—is instructive here.  (See Motion to Terminate Exclusivity at ¶¶ 119-21).  In Resource Technology, the court required the debtor to promptly seek assumption of a lease agreement, after the debtor had made clear that its planned reorganization depended on the *assumption* of a particular lease agreement.  See 254 B.R. at 220.[28]  The same situation exists in these Chapter 11 Cases.  If the Debtors cannot assume the Baseball Agreements under section

---

[28]    In re Whitcomb & Keller Mortg. Co., 715 F.2d at 379 (7th Cir. 1983), cited by the Debtors, is inapposite. There, the court found that the requirement of assumption or rejection was unnecessary because the debtor had paid all the fees due under the contract, and thus the counterparty's interests were being adequately protected. Here, monetary payment cannot adequately protect Major League Baseball's intangible rights, nor do the Debtors even contend that Major League Baseball's rights are adequately protected.

NEWYORK 8297616 (2K)

365 of the Bankruptcy Code, their reorganization will fail. Accordingly, the Debtors' stakeholders, including Major League Baseball and the other 29 MLB Clubs, would be significantly prejudiced if the Media Rights sale process moves forward without the Court first determining whether the Debtors can assume the Baseball Agreements.

<u>CONCLUSION</u>

113. For the foregoing reasons, the Motion to Terminate Exclusivity should be granted.

Dated: October 24, 2011
       Wilmington, Delaware

**OFFICE OF THE COMMISSIONER**
**OF BASEBALL**

By: */s/ Jeffrey M. Schlerf*
    Jeffrey M. Schlerf (DE ID No. 3047)
    Eric M. Sutty (DE ID No. 4007)
    Carl D. Neff (DE ID No. 4895)
    L. John Bird (DE ID No. 5310)
    FOX ROTHSCHILD LLP
    919 Market Street, Suite 1600
    Wilmington, DE 19801-2323
    Telephone: (302) 654-7444
    Facsimile: (302) 656-8920

    -and-

    Thomas E Lauria
    Glenn M. Kurtz
    John K. Cunningham
    WHITE & CASE LLP
    1155 Avenue of the Americas
    New York, NY 10036
    (212) 819-8200

    -and-

    Bradley I. Ruskin
    Jeffrey W. Levitan
    PROSKAUER ROSE LLP
    Eleven Times Square

60

New York, NY 10036
(212) 969-3000

-and-

Mark K. Thomas
Jeremy T. Stillings
PROSKAUER ROSE LLP
70 West Madison, Suite 3800
Chicago, IL 60602-4342
(312) 962-3550

*Counsel to the Office of the
Commissioner of Baseball*

NEWYORK 8297616 (2K)