## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| LOS ANGELES DODGERS LLC., *et al.*, | ) | Case No. 11-12010(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re Dkt No. 783 and 978** |

## <u>MEMORANDUM OPINION</u>

The Court is ruling on the Amended Motion of Los Angeles Dodgers LLC to Approve

Marketing Procedures for Licensing of Telecast Rights (the "Amended Motion") (D.I. 783).

The Amended Motion has the support of the Official Committee of Unsecured Creditors (the

"Committee").  The sole objector is FOX Sports Net West 2, LLC ("FOX"), whose telecast

rights are the subject of the Amended Motion.  The ruling follows an evidentiary hearing on

December 7-8, 2011, at which the Court heard expert testimony and argument.  The Court

entered its Order on December 13, 2011, indicating the opinion would follow.  The Court

would prefer a lengthier opinion, but the parties need and are entitled to a prompt ruling. The

Court must issue its ruling now to provide the Debtors with meaningful relief to which the

Court finds they are entitled, and to enable FOX to proceed with the appeal it has

commenced.

## BACKGROUND

### A.  The Case

One of the jewels of the sports world, the Los Angeles Dodgers baseball team (the "Dodgers" or the "Team"), filed for bankruptcy on June 27, 2011 (the "Petition Date") on the ground that it was unable to meet its current obligations, including the payroll of the Team.[1]  At the time of its filing, Debtors' sole equity holder, Frank W. McCourt ("Mr. McCourt") and the Commissioner of Baseball, Mr. Allan H. "Bud" Selig (the "Commissioner"), were locked in a public dispute which Debtors' claimed had attributed to the Debtors' financial woes.[2]  Ironically, the Debtors claimed at the time of the Petition Date, and thereafter, that it was the Commissioner's refusal to approve a new agreement between the Dodgers and FOX for the sale of the telecast rights and  which would have generated a substantial cash payment to Debtors that would have obviated any need for the bankruptcy filing.

The case began with an intense contest over debtor in possession financing.  For purposes of this opinion, it is sufficient to summarize that dispute.  Debtors had arranged with Highbridge Capital for financing, which the Commissioner d/b/a Major League Baseball ("MLB") opposed.  Debtors, in turn, opposed the offer from MLB to provide the needed

---

[1]  Pending before the Court for a hearing is FOX's motion to dismiss the case as a bad faith filing. The Court is making no factual finding with respect to such motion, including whether or not the bankruptcy filing was made in good faith.

[2]  The Court is aware of the allegations that Mr. McCourt's lavish lifestyle and divorce proceedings were the principal causes of the bankruptcy.  The Court has never taken evidence on these allegations.

2

funding because of its distrust of the Commissioner who made it clear that he wanted a sale of the Dodgers with the result that Mr. McCourt would no longer be associated with baseball. Ultimately, after the Court denied the financing from Highbridge Capital, the Debtors and MLB agreed upon MLB's financing on more favorable terms.

On September 16, 2011, Debtors filed an earlier version of a telecast rights motion seeking the Court's approval of the marketing and sale procedures for the post- 2013 telecast rights.  FOX then joined the fray, bringing an adversary proceeding against Debtors and joining with MLB in an effort to compel the sale of the Dodgers.

## B.  Mediation and Settlement

As the parties became ever more entrenched in what the Court could see would become a protracted, expensive and non-productive struggle over the control of the Dodgers, the Court determined that  mediation was essential for the benefit of Debtors' estate.  The Court was also mindful that a negotiated business settlement could benefit MLB.  The Court turned to recently retired United States District Court Judge Joseph J. Farnan, Jr. (the "Mediator") to bring his considerable skills, knowledge, experience and business savvy to a mediation.  Debtors and MLB agreed to privately mediate, given the public attention to the matter.  Later the Court entered an Order confirming and making public the mediation.

After the Mediator guided MLB and Debtors through months of negotiations, on November 2, 2011, MLB, Debtors and the Committee reached a settlement (the "Settlement').  The Settlement, which the Court was only recently asked to approve and

3

which is scheduled for hearing in the near future, provides, *inter alia*, for the sale of the Dodgers pursuant to a plan of reorganization on or before April 30, 2012. The sale is to be managed by Blackstone Group. In addition, and the subject of the Amended Motion, was the agreement, to which MLB takes no position, that Debtors would be entitled to seek the sale of the telecast rights which FOX presently owns.

## C.  Telecast Rights

FOX Entertainment Group, Inc. ("Fox Group") purchased the Dodgers in 1998. and created a Regional Sports Network associated with the Dodgers. Thereafter, Fox entered into a Telecast Rights Agreement, dated November 1, 2001 (the "TRA") with the Dodgers to broadcast the Dodgers' baseball games on cable television within a defined territory, thereby creating a Regional Sports Network. Debtors Exhibit ("DX") 1. In 2003, Fox Group decided to sell the Team and real estate (the stadium and surrounding parking lots) and in early 2004, Mr. McCourt purchased the Dodgers and real estate. The specifics of the complex sale and financing are not germane to the matters under consideration.

In connection with his purchase, Mr. McCourt and FOX entered into the Dodgers/FOX Rights Amendment - Amendment to Telecast Rights Agreement, dated February 13, 2004 (the "Rights Amendment"). The relevant terms of the Rights Amendment as applicable to the Amended Motion, including the "back end" rights (the "Back End Rights") are as follows:

1.    The term of the Rights Amendment was extended to the last day of the last game of the 2013 season.  Fox Exhibit ("FX") 1, paragraph 1(d).

2.    Fox received an exclusive renegotiation right (the "Exclusive Negotiation Period") for an additional five year term, with such negotiations to take place from October 15 through November 30, 2012.  FX 1, paragraph 2(e).

3.    Fox received a right of first refusal ("ROFR") of third party offers.  FX 1, paragraph 2(f).

The precise language of the Back End Rights is as follows:

(a)   General.   Except as this Agreement may be terminated in accordance with Section 15 hereof, or otherwise by operation of law, the term of this Agreement (the "Term") shall commence on the Effective Date and shall terminate on the end of the last day of the last Game of the 2013 MLB season."

"(b)   End of Term Right of First Negotiation.   From October 15, 2012 through November 30, 2012 (the "Exclusive Negotiating Period"), LAD and FOX Sports shall negotiate confidentially, exclusively and in good faith with respect to the terms and conditions on which FOX Sports may retain exclusive Cable Television Rights to Exhibit future Games for a subsequent term of at least five years beginning with the 2014 MLB season.  LAD shall not solicit offers from or negotiate with any person or entity (other than FOX Sports) for Cable Television Rights with Respect to any future Games at any time preceding November 20, 2012."

"(c)   Right of First Refusal.   (I) If, at the end of the Exclusive Negotiating Period, LAD and FOX Sports have not reached an agreement, LAD shall make a final written offer (the "Team Final Offer") to FOX Sports for the exclusive Cable Television Rights to Exhibit a comparable number of future Games for a subsequent term of at least five (5) years beginning

5

with the 2014 MLB season setting forth the proposed Rights Fees for such future Games. LAD shall provide FOX Sports with a copy of the Team Final Offer no later than five (5) business days following the expiration of the Exclusive Negotiation Period, and FOX Sports shall have thirty (30) days to accept the Team Final Offer. If FOX Sports does not accept the Team Final Offer, the Team shall be free to enter into an agreement with any third party for such Cable Television Rights, but only for a term of at least five (5) MLB seasons and only pursuant to the terms of the Team Final Offer or terms and conditions more favorable to LAD then were contained in the Team Final Offer. In addition, if FOX Sports does not accept the Team Final Offer, FOX Sports and LAD shall, within ten (10) days after rejection of the Team Final Offer, agree upon an independent appraiser of national standing (the "Appraiser") which shall, if needed, make the determinations set forth below regarding the Non-Cash Consideration (as defined below). Any offer made to any third party by LAD which such third party has expressed an intention to accept, or made to LAD by a third party and which LAD intends to accept, and which such offer by or to LAD is less favorable to LAD than the Team Final Offer, must be presented to FOX Sports prior to its acceptance by such third party or LAD (as applicable), and FOX Sports shall have ten (10) days following its receipt to accept such less favorable offers (each a "Less Favorable Offer"). LAD shall, together with delivery to FOX Sports of the Less Favorable Offer, set forth the cash value of any of the terms of such Less Favorable Offer that could only be reasonably met by the third party making or receiving the offer (the "Non-Cash Consideration"), which determination appropriate documentation provided concurrently to FOX Sports (the "Cash Determination"). If FOX Sports desires to accept the Less Favorable Offer, FOX Sports shall have the right, in lieu of matching the Non-Cash Consideration, to pay LAD the equivalent cash value of the Non-Cash Consideration. If FOX Sports believes that the Cash Determination was not commercially reasonable, FOX Sports shall provide notice of objection to LAD within ten (10) days after receipt of such Less Favorable Offer. In such event, the parties shall deliver the Less Favorable Offer to the Appraiser, and the Appraiser shall determine, within thirty (30) days after

6

submission, whether the Cash Determination was commercially reasonable. If the Appraiser determines that the Cash Determination was commercially reasonable, then FOX Sports shall be deemed to have rejected the Less Favorable Offer. If the Appraiser determines that the Cash Determination was not commercially reasonable, than the Appraiser shall, within ten (10) days after such determination, provide to the parties a written appraisal of the fair market value of the Non-Cash Consideration. FOX Sports shall have the right, by providing written notice to LAD within five (5) days after receipt of such appraisal, to accept such Less Favorable Offer (with, at the option of FOX Sports, the substitution of cash for the Non-Cash Consideration in the amount of the fair market value of such Non-Cash Consideration determined by the Appraiser); if FOX Sports does not timely accept such Less Favorable Offer (with or without such substitution), FOX Sports shall be deemed to have rejected such Less Favorable Offer. The parties shall share equally the fees and costs, if any, of the Appraiser.

(ii) Notwithstanding the foregoing, LAD shall have no obligation under subsection (c)(I) in the event that LAD enters into a television rights agreement that includes all of its Cable Television rights for a subsequent term of at least five (5) MLB seasons with any entity that will telecast Team games (the "Media Affiliate"); provided, however, for this subsection (c)(ii) to apply, no other beneficial owner of the Media Affiliate shall have a larger equity interest (after giving effect to the exercise of any options, warrants, convertible securities or other rights to acquire direct or indirect interests) or have greater voting rights with respect to the Media Affiliate than (collectively) LAD and LAD's direct and indirect beneficial owners, nor shall any of the beneficial ownership interest in the Media Affiliate be held, directly or indirectly, by any of the three (3) entities (or their respective successors) set forth on Schedule 1 to this Amendment (such three entities and their respective successors referred to as the "ROFR Entities"). With respect to any Media Affiliate in which an ROFR Entity holds (directly or indirectly) any beneficial ownership interest, subsection (c)(ii) shall apply."

### D.  The Amended Motion

The Debtors are asking the Court's approval of a process whereby the telecast rights for Dodgers games may be sold with the sale of the Team which, Debtors argue,  will maximize value to the estate.  To do so, Debtors propose to accelerate, not change or change only minimally, the timing of the Back End Rights of the Rights Amendment.  Debtors would advance the Exclusive Renegotiation Period from the October 15 through November 30, 2012 period, to the same 45 days but instead beginning November 30, 2011.  The Exclusive Renegotiation Period would therefore  remain as is, but would be taking place 10.5 months earlier.  The remaining Back End Rights of the Rights Amendment would remain materially identical, except they, too, would advance since they follow the close of  the Exclusive Renegotiation Period.  FX 24 and 24A, DX7, Testimony of Timothy R. Coleman ("Coleman Testimony").

### ISSUES

Debtors frame the issues as being whether the Amended Motion is appropriate as leading to maximizing the estate's value and whether in the context of this case the Court should override the "no shop" provision in the Rights Amendment.  Debtors also indicate what the Amended Motion is not.  It is not an attempt to bind any future owner, a request to assume or reject the Rights Amendment pursuant to Section 365, to assume and assign it pursuant to Section 365(f), seeking approval of any specific agreement pursuant to Section 363(b), or requesting approval of bidding procedures.

FOX has framed many issues for the Court to address. These include whether the marketing and sale process is necessary for a successful exit from bankruptcy payment in full to creditors, the sale of the Team; not necessary because Mr. McCourt can bring a higher price for the sale of the Team by including the parking lots and other land; whether Mr. McCourt is being unjustly enriched and the Amended Motion is primarily for his benefit; and most forcefully at the Hearing, whether the potential damages to FOX are so great that they outweigh any benefit to Debtors and place creditor recovery at risk. FOX also weighs in strongly against Debtors' argument that the "no shop" provision is unenforceable.

The proposed marketing procedures deal exclusively with the Back End Rights of the Rights Amendment. Debtors agreed on the record at the Hearing that they would adopt the language of the Back End Rights in the Rights Amendment word for word except that the Exclusive Renegotiation Period would run 45 days from November 30 to January 15, 2012 instead of October 15 to November 30, 2012 (now January 19, 2012), and the terms will be subject to the approval of the eventual buyer of the Dodgers in addition to the Commissioner.

### THE HEARING[3]

The Hearing took place over two days with the parties calling witnesses, each of whom the Court qualified as experts. Debtors offered the testimony of Timothy R. Coleman ("Mr. Coleman"); and FOX offered the testimony of Edwin S. Desser ("Mr. Desser") and Bob Thompson ("Mr Thompson").

---

[3]  The Court will cite to the record as "Tr." followed by the Volume ("I" for December 7 and "II" for December 8), followed by the page number.

Mr. Coleman.    Senior Managing Director and Head of Restructuring and Reorganization Group of    Blackstone Advisory Partners L.P. ("Blackstone Advisory"), an affiliate of The Blackstone Group L.P. ("Blackstone"), a distinguished global asset manager and provider of financial advisory services.    He also serves on Blackstone's Executive Committee.    Blackstone Advisory is servings as Debtors' financial advisor and investment banker.    Mr. Coleman has extensive experience over more than 20 years of advising numerous financially distressed companies and chapter 11 debtors on, among other matters, liquidity issues, emerging from bankruptcy and maximizing value for stakeholders.

Mr. Coleman testified credibly and extensively that the Amended Motion, if granted, will maximize Debtors' value, provide Debtors with flexibility, and assist Debtors' emergence from bankruptcy. Tr.I, 123, 124.    If the Rights Amendment remained unchanged and the no-shop provision were to be enforced, it remains uncertain that creditors would be paid in full. Tr.I, 164, 165.    Although Mr. Coleman testified that has not previously participated in a sale of media rights, he has participated in many other sales and, based on his experience, it his opinion that the relief which Debtors seek in the Amended Motion will maximize value.    Tr.I, 124, 126-28.    Mr. Coleman is of the view that any damages to FOX will not offset the benefits of the amended procedures, and that the procedures in any significant manner. Tr.I, 189. Further, the procedure Debtors are suggesting, estimation, will enable them to determine in advance whether the damages are or are not substantial and terminate their marketing efforts. Tr.I, 197, 198, 199.    Mr. Coleman compared the sale of the Team with a new telecast

agreement with the sale of a building that was fully leased at market rates versus empty, i.e., no tenants. Tr.I, 94. The former would bring a higher sale price and, likewise, the sale of the Dodgers with a revised, long term telecast agreement at present market rates would bring a higher price for the Team. Tr.I, 94. A revised broadcast agreement will maximize value. Tr.I, 124. Further, Debtors have nothing to lose by proceeding with the effort to sell the telecast rights per the Amended Motion. If the successful bidder for the Dodgers does not want the new contract, if the damages to FOX are greater than expected, the Rights Amendment remains in place. Tr.I, 114, 115.

<u>Mr. Desser</u>. Originally retained by MLB for its opposition to the marketing of the telecast rights. He is President of Desser Sports Media, Inc., consultancy firm serving the sports television industry Mr. Desser has 35 years of experience with the sports media industry, 23 of which were with the National Basketball Association where, among other responsibilities, he was the chief negotiator for all media agreements and led the drive for the NBA television channel. Mr. Desser has spent 17 years in the Los Angeles sports and media market. He has also negotiated regional media agreements for a number of professional teams in various sports and in baseball has advised the Houston Astros. Mr. Desser has negotiated with virtually all of the major sports networks and cable operators, including FOX. His *curriculum vitae* clearly establishes his expertise in the field of sports telecast rights agreements. Mr. Desser never previously represented or was employed by FOX in any capacity.

11

Mr. Desser testified that the Back End Rights which FOX negotiated in the Rights Amendment are very valuable because they provide a strong likelihood that FOX will be successful in negotiating for a new contract upon termination of the Rights Amendment. Tr.II, 16, 17, 18.   The Back End Rights are carefully negotiated terms and are designed to "perpetuate the marriage" between the Dodgers and FOX. Tr.II, 30.   The Exclusive Renegotiation Period obligates both parties to negotiate in good faith. Tr.II, 31.   What the Debtors now propose, unlike under the Rights Amendment, means that even if agreement is reached, it will be subject to a buyer's approval whereas before it was subject only to MLB's approval.   Tr.II, 35, 36; FX 24, 24A.   Thus, FOX becomes a mere stalking horse. Tr.II, 35, 36.   Mr. Desser also testified that there will be collateral damage to FOX. Tr.II, 43, 44.   The loss of Dodgers broadcast rights would make it more difficult for FOX to negotiate with cable providers in the Dodgers region because they will not have the Dodgers to include with their cable package, resulting in the loss of business. Tr.II, 43, 44.   On cross examination[4] Mr. Desser conceded he has never negotiated media rights in a bankruptcy case or in a merger or acquisition context. Tr.II, 53, 54.   Mr. Desser also testified that the Rights Amendment entitles Debtors to start their own regional sports network, without FOX, at the conclusion of the

---

[4] A number of Mr. Desser's concerns with the Amended Motion disappeared when Debtors agreed to adopt the precise language in the Rights Amendment and to revise certain language.   For example, Mr. Desser was concerned that the words "exclusively" and "confidential" in paragraph 2(b) were deleted. Debtors will include that language.   Similarly, Mr. Desser was troubled that Blackstone Advisory would determine the value of non-cash consideration rather than an appraiser.   Debtors have now added that in the event of a dispute, the Court will serve rather than the appraiser.   Mr. Desser also thought that the marketing procedures in the Amended Motion required an auction of the broadcasting rights.   There will not be an auction.   Compare FX 24 and RX 24A.

Rights Amendment in 2014. Indeed, Debtors would not even have an obligation to continue negotiations with FOX. Tr.II, 73, 74; DX 1. Mr. Desser also testified that in the future, and when the Rights Amendment terminates, the Dodgers will command significantly increasing prices for the Team's broadcast rights. Also significant to the Court, Mr. Desser testified that the Rights Amendment does not include a provision that time is of the essence, and does not provide that if FOX has an opportunity to match the offer of a third party, such agreement will be binding. Tr.II, 71, 76. The original agreement between the Dodgers and FOX at the time that FOX owned the Team did make it clear that a matching offer by FOX was "binding." DX1, paragraph 2(c).

    Bob Thompson.    Worked for Fox Sports or an entity with which it merged for nearly 20 years and continues to serve FOX as an advisor. Mr. Thompson retired in 2009 and has formed his own company which represents industries in dealing with television networks, professional teams and collegiate conferences. Mr. Thompson also worked in the cable television business for approximately 15 years prior to moving to FOX. During his career, Mr. Thompson played an important role in expanding FOX's national cable sports networks. He negotiated nearly 200 television rights agreements pertaining to sports. In July 2000, Mr. Thompson became President of FOX Sports Network and Fox Sports International in 2000 and in 2007 he became President of Fox National and International Cable Sports Networks.

    Mr. Thompson testified that back end rights agreements are a critical component of television rights agreements, including the Rights Amendment. Tr.II, 139, 140. Mr.

Thompson did not, however, negotiate the Rights Amendment on behalf of FOX since it was part of an acquisition and the deal lawyers were the negotiators. Tr.II, 152,153,170,171. Back end rights provisions maximize a network's opportunity to extend its rights after a telecast rights agreement expires. Tr.II, 185-188. Baseball is very important to regional sports networks such as FOX because, among other reasons, baseball is played during the summer months when few other sports (football and basketball in particular, both college and professional) are in season. Tr.II, 137, 138. The Amended Motion eviscerates FOX's Back End Rights and thereby, in Mr. Thompson's opinion, reduces the value of the Rights Amendment by twenty-five percent, a number never supported by evidence. Tr.II, 152, 153.

On cross examination, Debtors established that: (1) it was unclear whether FOX would profit from the two remaining years in the Rights Amendment, (Tr.II, 188-191) (2) the amounts paid for broadcast rights were increasing steadily, (Tr.II, 185-187) (3) FOX lost broadcast rights for the Lakers (professional basketball) and Galaxy (professional soccer), Tr.II, 113-114) (4) there is no material difference between ROFR in the Rights Amendment and the proposed language, (Tr.II, 169) (5) there is no certainty as to the terms of any agreement that might result from renegotiation, (Tr.II, 170) (6) the word "binding" does not appear in the Rights Amendment, (Tr.II, 170) and (7) the renegotiation period in the Rights Amendment is not as advantageous as in the prior agreement with the FOX owned Dodgers, i.e., the TRA. (Tr.II, 165).

## DISCUSSION

### A.    The "No Shop" Provision Is Invalid

FOX's threshold argument is that the Debtors are not entitled to market the telecast rights at this time because the Rights Amendment prohibits it.  This "no-shop" provision is not enforceable against a bankruptcy entity.  *In re Big Rivers Elec. Corp.*, 233 B.R. 739 (W.D.Ky. 1998).  The same is true under Delaware law which prohibits such clauses where, as here, the clause would prevent the exercise of the fiduciary duty to maximize value.  The testimony of Mr. Coleman made it clear that there is no certainty that the sale of the Team alone, without marketing the telecast rights, will provide creditors with payment in full, but the sale of the Team and telecast rights will result in full creditor recovery. Tr.II, 164, 165, 172.

FOX argues that because Debtors are solvent, the no-shop provision remains enforceable.  The answer to FOX's argument, as Debtors point out, is that if Debtors are solvent the remedy is money damages.  *Cont'l Sec. Corp. v. Shenandoah Nursing Home P'ship*, 193 B.R. 769, 774 (W.D. Va. 1996), *aff'd*, *In re Shenandoah Nursing Home P'ship*, 104 F.3d 359 (4th Cir. 1996).  Debtors are obligated to maximize the value of the estate even if solvent.  *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004).

### B.    The Amended Motion Constitutes
### The Proper Exercise of Business Judgment

The testimony at the Hearing supports the Court's finding that the Debtors' have met their burden of showing that the marketing of the telecast rights at this time is in the best interest of Debtors' estate and that Debtors properly exercised their business judgment.[5]

FOX counters with its testimony and argument that the damages FOX will suffer and which Debtors will be required to pay negate any benefit from the proposed marketing and, indeed, place creditor recovery at risk.  The Court does not agree based upon the following findings[6]:

1.    The only changes to the Rights Amendment are the acceleration of the Exclusive Renegotiation Period by a mere 10.5 months and the addition of the Team buyer to the Commissioner of whose approvals are needed. Tr.II, 142, 196.  The other change is the replacement of the Court for an appraiser to determine the value of non-cash consideration. Tr.II, 82-83.  FOX's own expert, Mr. Thompson, testified that these changes are not material and the Court agrees. Tr.II, 168-169.

2.    FOX's telecast rights for 2012 and 2013 remain in place; it will telecast Dodgers games in accordance with the Rights Amendment.  It is only the Back End Rights which are affected and then only a few terms which are non-material.  Any damages flowing from these

---

[5]  *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986).

[6]  These are preliminary findings relating only to the Amended Motion.  FOX will have the opportunity to prove damages at an estimation hearing scheduled for February 2012 – which will provide Debtors with ample opportunity to cure any default, including canceling the sale of the marketing rights.

16

changes are highly speculative and therefore unsubstantiated.  Moreover, under the Rights
Amendment (Section 2(c)(ii)), the Dodgers have no obligation whatsoever to FOX should the
Dodgers decide to form its own regional sports network. Tr.II, 75, 76.

3.      Mr. Thompson testified that he does not even know if the Rights Amendment
is profitable for FOX. Tr.II, 188-191.

4.      FOX's experts, Mr. Desser and Mr. Thompson, agree that the cost to telecast
Dodgers games will be steadily increasing in the coming years.  Therefore, it may well be to
FOX's advantage to advance negotiations. Tr.II,185-187.

5.      FOX has no guarantee that it will own the telecast rights for Dodgers games
after the 2013 baseball season.

6.      Absent from the TRA, and the Rights Amendment, is a "time of the essence"
clause.  The absence of such a clause indicates that the time for performance is not material.
 See, e.g., *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 66 Cal.Rptr. 3d 1, 24-26 (Ct. App. 2007);
*Miller v. Cox*, 31 P 161, 163 (Cal. 1892) (an old case which is still hornbook law, holding that
for time to be of the essence, it must so clearly state).  Compare *In re Empire Equities Capital
Corp.,* 405 B.R. 687, 691 (Bankr. S.D.N.Y. 2009), (failure to exercise an option within the
specified time period did work against the debtor because the breach was material and
incurable).  Therefore, with time not of the essence, advancing the dates is not a material
change.

17

7.      The Rights Amendment contains several provisions which weaken FOX's rights when compared with the TRA and thereby weaken the damages arguments of FOX.

a.      The TRA provided FOX the right to match any offer by a third party regardless of the terms and conditions of the offer.  The Rights Amendment does not.

b.      The Rights Amendment allows Debtors to form a regional sports network without FOX.

c.      Any matching offers by FOX are not "binding".

## C. **FOX's "Laundry List" of Issues is Unpersuasive**

FOX raised a number of additional concerns, most of them addressing issues relating to Mr. McCourt[7] and harms the Debtors will suffer from approving the Amended Motion. The McCourt related "concerns" of FOX take the Court back to the irony it expressed earlier in this opinion.  Prior to Debtors' bankruptcy filing, when FOX had agreed to a revised telecast rights agreement which the Commissioner did not approve, FOX was prepared to advance in excess of $300 million to Mr. McCourt without restriction and without any apparent concern for Debtors, the Dodgers, creditors and regardless of how Mr. McCourt was going to use such a small fortune.  That was when it benefitted FOX, and MLB argued it mortgaged the future of the Team.  Now, when FOX faces changes to the Rights Amendment,

---

[7]  FOX tried repeatedly to get Mr. Coleman to testify that the schedule for the sale of the Team and the accelerated marketing of telecast rights are to enable Mr. McCourt to be able to pay for his divorce settlement by the divorce agreement deadline of April 30, 2012, the same date as proposed for the sale of the Team.  The Court acknowledges that the dates are not a coincidence.  The Court however, is more concerned that creditors receive their promised full recovery than that Mr. McCourt might receive money for his equity interest.

FOX raises arguments about what is in Debtors' best interest. FOX is not a credible party to raise such issues. The Creditors' Committee, whose fiduciary duty it is to explore what is in Debtors' best interests, supports the Amended Motion, which is significant and lends support to Debtors' views. Also, only FOX objected – no other creditor.

## WAIVER OF STAY

Debtors have asked the Court to waive the stay of its ruling pursuant to Bankruptcy Rule 6004(h). The Court will waive the stay because, as is clear from this opinion, Debtors are operating within a small time frame. They must complete the marketing and sale of their telecast rights by April 30, 2012, by which date Debtors must also consummate the sale of the Team. It is therefore critical that the Exclusive Negotiating Period continue to run during the period of time that a stay would be in place. The Court would normally grant a stay of a few days as a courtesy to the District Court, removing any need of the unsuccessful party, here FOX, to think it has to rush to the District Court to seek a stay pending appeal.

FOX does not face such an emergency. It has nearly 40 days to seek a ruling. Negotiations between Debtors and FOX were ongoing before the Hearing and are continuing with the assistance of the Mediator. Debtors will negotiate exclusively with FOX until January 19, 2011, and it is within FOX's control during the Exclusive Negotiating Period whether it will negotiate in good faith and take advantage of its opportunity. A stay would only delay and thereby prejudice Debtors' marketing opportunity.

19

## CONCLUSION

The prelude to the bankruptcy filing and to the present dispute had FOX negotiating with and arriving at a new telecast rights agreement.  It is therefore disingenuous for FOX now to fight Debtors' marketing procedures which move exclusive, confidential and good faith negotiations to an earlier date.  FOX's concern is that Debtors may thereafter be able to market telecast rights to third parties.  However, what FOX seeks, the delay of negotiations, would prevent what Debtors must do now, namely, maximize value.  The Court's ruling will enable Debtors to seek at present what they will be unable to obtain later, better telecast terms - first exclusively negotiated with FOX - in conjunction with the sale of the Team, thereby maximizing the value of both.

Accordingly, the Court has entered an Order approving the Amended Motion (D.I. 978).

Dated: December 15, 2011

KEVIN GROSS, U.S.B.J.