# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| LOS ANGELES DODGERS LLC, *et al.*,[1] | ) | Case No. 11-12010 (KG) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

FILED / RECEIVED
MAR 26 2012
EPIQ BANKRUPTCY SOLUTIONS, LLC

**REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

1. Name of Claimant: Office of the Commissioner of Baseball

2. Debtor Claim asserted against: Los Angeles Dodgers LLC

3. Nature and description of the claim incurred during or arising on or before February 22, 2012: See Addendum

4. Date(s) claim arose: June 27, 2011–February 22, 2012

5. Amount of claim: See Addendum

6. Documentation supporting the claim is attached hereto as Exhibit A.

Dated: March 26, 2012

Filed: USBC - District of Delaware
LADLLC, Et Al.
11-12010 (KG)
0000000318

Signature: [signature]
Name: Allan H. Selig, Commissioner
Address: Office of the Commissioner of Baseball
245 Park Avenue 31st Floor
New York, New York 10167
Phone: (212) 931-7800
Email: ____________
Fax: ____________

---

[1] The Debtors, together with the last four digits of each of the Debtors' federal tax identification number, are: Los Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567); LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029). The location of the Debtors' corporate headquarters and the service address for the Debtors is 1000 Elysian Park Avenue, Los Angeles, California 90012.

# ADDENDUM TO REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM OF OFFICE OF THE COMMISSIONER OF BASEBALL

The Office of the Commissioner of Baseball, doing business as Major League Baseball (the "Claimant"), is the holder of certain claims (collectively, the "Administrative Expense Claims") to be allowed as administrative expense claims against Los Angeles Dodgers LLC (the "Debtor", and collectively with its affiliated debtors and debtors in possession, the "Debtors") pursuant to, inter alia, section 503(b) the Bankruptcy Code as set forth herein, in the jointly administered cases (the "Cases") under chapter 11 of title 11, United States Code (11 U.S.C. §§ 101, et seq., the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors commenced the Cases by filing the voluntary petitions for relief under chapter 11 of the Bankruptcy Code on June 27, 2011 (the "Petition Date").

This Request for Payment of Administrative Expense Claim (the "Administrative Expense Proof of Claim") is based upon the information available to Claimant at the time of its filing. This Administrative Expense Proof of Claim is filed as required by the Bankruptcy Court's Order Fixing Deadline for Filing a Request for Allowance of Administrative Expense Claims Arising on or Before February 22, 2012 and Designating Form and Manner of Notice Thereof (the "Administrative Claims Bar Date Order"). The Administrative Claims Bar Date Order sets forth March 26, 2012 as the deadline to file requests for payment of certain administrative expense claims (the "Administrative Claims Bar Date"). This Administrative Expense Proof of Claim is filed to protect the Claimant from forfeiture of its Claims against the Debtor by reason of the Administrative Claims Bar Date.

## A. Materials Evidencing the Claims

Claimant has attached hereto and incorporated herein by reference copies of certain materials to further support the Administrative Expense Claims. Claimant is in possession of certain additional materials that may further evidence the Administrative Expense Claims, but which have not been attached hereto because they are voluminous and/or include confidential information which Claimant intends to disclose only pursuant to an appropriate confidentiality agreement or protective order of the Bankruptcy Court. Claimant reserves its right to supplement and/or prove up the Administrative Expense Claims, or respond to any objections thereto, with additional materials.

## B. Summary of the Claims

Beginning on the Petition Date, Claimant incurred, and continues to incur, certain fees, costs, and expenses, which are to be reimbursed by the Debtor, including, without limitation, fees, costs and expenses incurred by Claimant during the pendency of the Debtor's bankruptcy case. From the Petition Date and prior to and including February 22, 2012, Claimant incurred not less than $7,773,244.19 in the aggregate of Professional Fees & Expenses and MLB Incurred Expenses (each term as defined below).

a. Professional Fees, Costs and Expenses Related to the Debtor's Bankruptcy Case

Prior to the Petition Date, the Debtor entered into that certain Assumption Agreement and Subservience Agreement whereby the Debtor agreed, among other things, to be bound by any agreements, contracts, rules, guidelines, regulations, policies, and requirements related to the Debtor's association with, and membership in, Major League Baseball (collectively, the "Baseball Agreements"). These agreements include, but are not limited to, the Major League Constitution.

Pursuant to Article 6, Section 2 of the Major League Constitution,[1] among other things, the Debtor is liable to Claimant for all fees, costs and expenses incurred by Claimant associated with disputes and litigation between the Debtor and Claimant including, without limitation, those arising from the enforcement of the Baseball Agreements.

From the Petition Date and prior to and including February 22, 2012, Claimant incurred professional fees, costs, and expenses related to the Debtor's bankruptcy case (the "Professional Fees & Expenses").[2] Pursuant to the Baseball Agreements, the Debtor is liable to the Claimant for all such Professional Fees & Expenses. Further, Claimant continues to incur Professional Fees & Expenses related to the Debtor's bankruptcy case. The Debtor is indebted and liable to Claimant for any amounts Claimant has paid and may hereafter pay on account of the Debtor's obligations under the Baseball Agreements, including, but not limited to, Professional Fees & Expenses incurred as a result of Claimant's enforcement of the Baseball Agreements.

Claimant reserves all of its rights to seek payment of any and all Professional Fees & Expenses incurred after February 22, 2012 in accordance with the Baseball Agreements, the Bankruptcy Code, the Administrative Claims Bar Date Order or any other order of the Bankruptcy Court in the Debtor's chapter 11 case, and as otherwise provided under applicable law.

b. MLB Incurred Expenses

Pursuant to that certain Agreement Regarding Sale of the Los Angeles Dodgers Baseball Club and Stadium or Entities Owning Such Assets dated November 2, 2011, the Special Terms Related to the Sale of the Los Angeles Dodgers Baseball Club (the "MLB Settlement") and the Order Approving Settlement Agreement with the Office of the Commissioner of Baseball, Doing Business As Major League Baseball dated January 11, 2012 (the "Order Approving Settlement Agreement") [Docket No. 911], the Debtor and certain of its affiliates agreed to reimburse Claimant for any unpaid fees and expenses incurred by Claimant related to the sale of the Los Angeles Dodgers Major League Baseball Club that are not otherwise paid by potential buyers (the "MLB Incurred Expenses"), including, but not limited to, fees, costs and expenses incurred in conducting background checks with respect to potential purchasers and fees, costs and expenses of professionals retained to advise the Claimant with respect to such sale (not otherwise

[1] The Major League Constitution is attached hereto within Exhibit A.

[2] Certain time entries and expenses may not have not been processed and/or reflected as of the date hereof in the estimated amounts set forth herein. MLB expressly reserves the right to amend this claim to reflect such additional amounts.

included as Professional Fees & Expenses). Additionally, at the hearing on January 11, 2012,[3] the Honorable Kevin Gross approved the Debtor's request to reimburse the Claimant for the MLB Incurred Expenses. Thus, pursuant to the MLB Settlement and the Order Approving Settlement Agreement, the Debtor is liable to the Claimant for all such fees, costs and expenses to the extent such amounts are not otherwise paid by the potential buyers. Further, Claimant continues to incur MLB Incurred Expenses. The Debtor is indebted and liable to Claimant for any MLB Incurred Expenses not otherwise paid by potential buyers.

Claimant reserves all of its rights to seek payment of any and all MLB Incurred Expenses incurred after February 22, 2012 in accordance with the MLB Settlement, the Bankruptcy Code, the Administrative Claims Bar Date Order or any other order of the Bankruptcy Court in the Debtor's chapter 11 case, and as otherwise provided under applicable law.

c. Other Contractual Rights and Claims

Claimant asserts any and all other rights and remedies arising as a matter of law or equity or pursuant to any of the Baseball Agreements or any other agreements, contracts, rules, guidelines, regulations, policies and requirements of Claimant, to which the Debtor is bound, whether or not such agreements, contracts, rules, guidelines, regulations, policies or requirements are specifically identified herein.

C. Amendment of Claims

The Administrative Expense Claims are subject to adjustment, upward or downward, and amendment for a variety of reasons, including, without limitation, as a result of future events, the discovery and analysis of additional information, the correction of any errors, changes in foreign currency exchange rates (if applicable), the resolution of disputes, the resolution of governmental investigations (whether or not the Debtor and/or its affiliates are involved in the investigation), the resolution of lawsuits (whether or not the Debtor and/or its affiliates are named parties to the lawsuit) and the assertion of any rights of setoff, netting and/or recoupment. The Administrative Expense Claims include any and all contingent and unliquidated claims of Claimant arising under any of the transactions, agreements, facts or circumstances set forth or referenced herein, and Claimant reserves the right to amend this Administrative Expense Proof of Claim accordingly and to set forth its Administrative Expense Claims with more particularity as Claimant obtains more information.

D. Reservation of Rights

This Administrative Expense Proof of Claim is without prejudice to Claimant's right to assert additional claims that are not subject to the Administrative Bar Date. Further, this Administrative Expense Proof of Claim is without prejudice to Claimant's right to assert that Claimant holds cure claims against the Debtor arising under, without limitation, the Baseball Agreements required to be paid by the Debtor pursuant to section 365(b) of the Bankruptcy Code, including, but not limited to, all amounts asserted in the proofs of claim submitted by

---

[3] The relevant portion of the hearing transcript is attached hereto within Exhibit B.

Claimant and certain of its affiliates on account of prepetition claims (the "Prepetition Claims"). The Prepetition Claims include Proofs of Claim Nos. 228-240.

Additionally, Claimant expressly preserves any common law indemnity claims against the Debtor arising in respect of the transactions described herein or described in any amendment hereof. Claimant also reserves the right to assert additional claims against the Debtor, including but not limited to, claims for misrepresentation, actual or constructive fraud, fraud in the inducement, false pretenses and/or false representation. Neither the filing of this Administrative Expense Proof of Claim nor the making of the allegations contained herein, constitute or shall be construed to effect a waiver by the Claimant or any of its affiliates of any rights, claims, causes of action, offsets, setoffs, netting or defenses (or remedies with respect thereto) that Claimant or any of its affiliates may have against or with respect to any person or entity, including, without limitation, against the Debtor or any affiliates of the Debtor.

The execution and filing of this Administrative Expense Proof of Claim is not and shall not be deemed: (a) a waiver or release of the Claimant's rights against any other entity or person liable for all or any part of the Administrative Expense Claim asserted herein; (b) a waiver of the right to withdraw the reference with respect to the subject matter of the Administrative Expense Claim, any objection or other proceedings commenced with respect thereto, or any other proceedings commenced in this case against, or otherwise involving, the Claimant; (c) a waiver or release by the Claimant of its right to trial by jury, or a consent by the Claimant to a trial by jury, in this Court or any other court; (d) a waiver of any right to seek subordination, in favor of the Claimant, of indebtedness or liens held by any creditors of the Debtor; or (e) an election of remedies which waives or otherwise affects any other remedy.

E. <u>Right to Determination in Other Forums</u>

Claimant reserves all rights to have the Administrative Expense Claims and any defenses, counterclaims, or objections thereto determined before a jury, by arbitration, or before any other judicial or administrative body having jurisdiction and, to the extent necessary to preserve such rights, makes demand therefor. Claimant submits itself to the jurisdiction of the district court and, solely to the extent the Bankruptcy Court may constitutionally exercise the powers of the district court, of the Bankruptcy Court solely for the purpose of the allowance of the Administrative Expense Claims. Claimant objects to the exercise of jurisdiction by the district court or the Bankruptcy Court over Claimant or its property for any other purpose.

F. Notice

Notices should be sent to:

Office of the Commissioner of Baseball
245 Park Avenue
New York, New York 10167
Attention: Thomas J. Ostertag, Senior Vice President and General Counsel

-and-

White & Case LLP
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Attention: John K. Cunningham, Esq.

**Summary of Professional Fees & Expenses**

| | Description | Amount[1] |
|---|---|---|
| White & Case LLP | Among other things, review and preparation of filings, analysis of litigation strategy, involvement in discovery and hearings, negotiations with the Los Angeles Dodgers and other parties, review and analysis of bid documents, conferences and discussions with Major League Baseball regarding same. | $6,150,641.65 |
| Proskauer Rose LLP | Among other things, review and preparation of filings, analysis of litigation strategy, involvement in discovery and hearings, negotiations with the Los Angeles Dodgers and other parties, review and analysis of bid documents, conferences and discussions with Major League Baseball regarding same. | $887,957.62 |
| Paul Weiss Rifkand Wharton Garrison LLP[2] | Among other things, review documents in connection with bidder applications, drafting related agreements, conferences and discussions with Major League Baseball regarding same. | $234,881.78 |

[1] Certain time entries and expenses may not have not been processed and/or reflected as of the date hereof in the estimated amounts set forth herein. MLB expressly reserves the right to amend this claim to reflect such additional amounts.

[2] Of the amount incurred by Paul Weiss Rifkand Wharton Garrison LLP, approximately $193,920.75 constitutes MLB Incurred Expenses.

| | Description | Amount[1] |
|---|---|---|
| Fox Rothschild LLP | Among other things, review and preparation of filings, analysis of litigation strategy, involvement in discovery and hearings, negotiations with the Los Angeles Dodgers and other parties, review and analysis of bid documents, conferences and discussions with Major League Baseball regarding same. | $231,222.57 |
| Allen & Co. | Expert consulting services. | $192,464.57 |
| Desser Sports Media | Expert witness services. | $76,076.00 |
| | **Total:** | **$7,773,244.19** |

# EXHIBIT "A"

# MAJOR LEAGUE CONSTITUTION

(originally adopted as the Major League Agreement on January 12, 1921)

## Article I

## FORMATION AND DURATION OF CONSTITUTION

This Major League Constitution constitutes an agreement among the Major League Baseball Clubs, each of which shall be entitled to the benefits of and shall be bound by all the terms and provisions hereof, and it shall remain in effect through December 31, 2012, except that the provisions of Article II, Section 3(g) shall expire at such time as the current Commissioner ceases to hold office.

## Article II

## THE COMMISSIONER

Sec. 1. The Office of the Commissioner of Baseball is an unincorporated association also doing business as Major League Baseball and has as its members the Major League Baseball Clubs.

Sec. 2. The functions of the Commissioner shall include:

(a) To serve as Chief Executive Officer of Major League Baseball. The Commissioner shall also have executive responsibility for labor relations and shall serve as Chairman, or shall designate a Chairman, of such committees as the Commissioner shall name or the Major League Clubs shall from time to time determine by resolution.

(b) To investigate, either upon complaint or upon the Commissioner's own initiative, any act, transaction or practice charged, alleged or suspected to be not in the best interests of the national game of Baseball, with authority to summon persons and to order the production of documents, and, in case of refusal to appear or produce, to impose such penalties as are hereinafter provided.

(c) To determine, after investigation, what preventive, remedial or punitive action is appropriate in the premises, and to take such action either against Major League Clubs or individuals, as the case may be.

(d) From time to time, to formulate and to announce the rules of procedure to be observed by the Commissioner and all other parties in connection with the discharge of the Commissioner's duties. Such rules shall always recognize the right of any party in interest to appear before the Commissioner and to be heard.

(e) To appoint a President of each League to perform such functions as the Commissioner may direct.

(f) To make decisions, or to designate an officer of the Commissioner's Office to make decisions, regarding on-field discipline, playing rule interpretations, game protests and any other matter within the responsibility of the League Presidents prior to 2000.

Sec. 3. In the case of conduct by Major League Clubs, owners, officers, employees or players that is deemed by the Commissioner not to be in the best interests of Baseball, punitive action by the Commissioner for each offense may include any one or more of the following:

(a) a reprimand; (b) deprivation of a Major League Club of representation in Major League Meetings; (c) suspension or removal of any owner, officer or employee of a Major League Club; (d) temporary or permanent ineligibility of a player; (e) a fine, not to exceed $2,000,000 in the case of a Major League Club, not to exceed $500,000 in the case of an owner, officer or employee, and in an amount consistent with the then-current Basic Agreement with the Major League Baseball Players Association, in the case of a player; (f) loss of the benefit of any or all of the Major League Rules, including but not limited to the denial or transfer of player selection rights provided by Major League Rules 4 and 5; and (g) such other actions as the Commissioner may deem appropriate.

Sec. 4. Notwithstanding the provisions of Section 2, above, the Commissioner shall take no action in the best interests of Baseball that requires the Clubs to take, or to refrain from taking, action (by vote, agreement or otherwise) on any of the matters requiring a vote of the Clubs at a Major League Meeting that are set forth in Article II, Section 9 or in Article V, Section 2(a) or (b); provided, however, that nothing in this Section 4 shall limit the Commissioner's authority to act on any matter that involves the integrity of, or public confidence in, the national game of Baseball. Integrity shall include without limitation, as determined by the Commissioner, the ability of, and the public perception that, players and Clubs perform and compete at all times to the best of their abilities. Public confidence shall include without limitation the public perception, as determined by the Commissioner, that there is an appropriate level of long-term competitive balance among Clubs.

Sec. 5. Notwithstanding the provisions of Sections 2 and 4, above, the powers of the Commissioner to act in the best interests of Baseball shall be inapplicable to any matter relating to the process of collective bargaining between the Clubs and the Major League Baseball Players Association.

Sec. 6. In the case of conduct by organizations not parties to this Constitution, or by individuals not connected with any of the parties hereto, that is deemed by the Commissioner not to be in the best interests of Baseball, the Commissioner may pursue appropriate legal remedies, advocate remedial legislation and take such other steps as the Commissioner may deem necessary and proper in the interests of the morale of the players and the honor of the game.

Sec. 7. The Office of the Commissioner shall be financed in such manner as the Major League Clubs shall by rule and/or agreement determine. Audited financial statements for the preceding fiscal year and a proposed budget for the ensuing year shall be submitted annually by the Commissioner for the approval of the members of the Executive Council. The Commissioner shall obtain the approval of the Executive Council before incurring any expenses in excess of the annual budget so approved by the Executive Council, except that the Commissioner need not secure such approval in the case of expenses that the Commissioner would be required by law or pre-existing contract to pay in any event.

Sec. 8.

(a) The Commissioner shall hold office for a minimum term of three years or for such longer term as shall be established by the Major League Clubs at the time of the Commissioner's election. The Commissioner shall be eligible to succeed himself or herself.

(b) Any re-election shall be considered at a Major League Meeting held not less than six months nor more than 15 months prior to the expiration of any term. The Commissioner's compensation shall be fixed at the time of election.

(c) No diminution of the compensation or powers of the present or any succeeding Commissioner shall be made during the Commissioner's term of office.

Sec. 9. The election of a Commissioner hereunder shall be at a Major League Meeting; the vote shall be by Clubs and by written ballot, and to elect shall require the affirmative vote of not less than three-fourths of all Major League Clubs. The re-election of a Commissioner to succeed himself or herself shall be by Clubs and by written ballot, and to re-elect shall require the affirmative vote of not less than a majority of all Major League Clubs. During any period of incapacity of the

Commissioner, as determined by a majority of the Executive Council or by the Commissioner, all the powers and duties of the Commissioner shall be conferred upon and exercised by the Executive Council. During any vacancy in the Office of the Commissioner, all the powers and duties of the Commissioner shall be conferred upon and thenceforth exercised by the Executive Council, until a Commissioner of Baseball has been elected as herein set forth. Notwithstanding the two preceding sentences, in the event of such incapacity or vacancy and upon the affirmative vote of not less than three-fourths of all Major League Clubs, a Commissioner Pro Tem may be elected to serve for any period less than three years, with all of the powers and duties that are conferred upon the Commissioner pursuant to this Constitution.

## Article III

## THE EXECUTIVE COUNCIL

Sec. 1. The Major League Executive Council shall be composed of the Commissioner and eight Club members, four from each League. The Club members shall be appointed by the Commissioner and ratified by the vote of a majority of the Major League Clubs. Club members shall serve a four-year term, with the term of one member from each League expiring annually. The Commissioner may designate a substitute or alternate to serve at any meeting of the Council in the absence of any member of the Council. The Commissioner and five other members shall constitute a quorum at all meetings. Each member of the Council shall have one vote. In the case of a division within the Council, the decision of a majority shall be controlling and final. The Commissioner shall have authority, solely and finally, to determine and decide all jurisdictional questions.

Sec. 2. The Executive Council shall have jurisdiction in the following matters:

(a) To cooperate, advise and confer with the Commissioner and other offices, agencies and individuals in an effort to promote and protect the interests of the Clubs and to perpetuate Baseball as the national game of America, and to surround Baseball with such safeguards as may warrant absolute public confidence in its integrity, operations and methods.

(b) To survey, investigate and submit recommendations for change in, elimination of, addition to or amendments to any rules, regulations, agreements, proposals or other matters in which the Major League Clubs have an interest and particularly in respect to:

(1) Rules and regulations determining relationships between players and Clubs and between Clubs, and any and all matters concerning players' contracts or regulations; and

(2) Rules and regulations to govern the playing of World Series games, All-Star Games and any other contests or games in which Major League Clubs participate and/or games that may be played for charitable purposes.

(c) In the interim between Major League Meetings, to exercise full power and authority over all other matters pertaining to the Major League Clubs, not within the jurisdiction granted to the Commissioner under this Constitution, including the adoption, amendment or suspension of Major League Rules, for said interim; provided that all actions of the Executive Council pursuant to this paragraph (c) shall be noticed for action at the next regular or special Major League Meeting for approval or other disposition.

(d) To submit to the Major League Clubs recommendations as to persons to be considered for election as Commissioner whenever a vacancy may exist in that office.

(e) To review and to either approve or disapprove, in whole or in part, the proposed budget submitted annually by the Commissioner for the financing of the Commissioner's Office and requests by the Commissioner for authority to incur expenses in excess thereof.

Nothing contained in this Section 2 shall be deemed to diminish or curtail the jurisdiction granted to the Commissioner under Article II hereof or to empower the Executive Council to amend or suspend in any respect any provisions of this Constitution.

Sec. 3. The Commissioner shall be permanent Chairman of the Executive Council. The members of the Executive Council shall receive no compensation or reimbursement of expenses for their services as members thereof.

Sec. 4. The Executive Council shall hold regularly scheduled meetings at least bi-monthly each calendar year. The Executive Council shall hold such other meetings as may, from time to time, be called at the request of the Commissioner or a majority of the Major League Clubs. The Executive Council shall establish its own rules of procedure for all such meetings and shall keep minutes of its meetings.

## Article IV

## RULES, RESOLUTIONS AND REGULATIONS

Any rules, resolutions or regulations adopted as provided in this Constitution shall be binding upon the Major League Clubs and shall not thereafter be amended or repealed except as provided in Article III, Section 2(c), Article V, Section 2 or Article XI, Section 3 hereof. The authority of the Commissioner shall include the authority to determine finally a disagreement over a rule, resolution, regulation or this Constitution.

## Article V

## MAJOR LEAGUE MEETINGS

Sec. 1.

(a) Four regular Major League Meetings shall be held each year on such dates and at such places as the Commissioner shall designate. One such regular meeting shall be held each off-season in December or January. The Commissioner may either cancel a regular meeting so called or may fail to call a regular meeting if in the Commissioner's judgment there is not sufficient business to justify holding the meeting. The Commissioner may also hold any meeting by teleconference or videoconference or conduct any vote by mail, facsimile, electronic mail or other means. At all Major League Meetings, the Commissioner shall preside, except that the Commissioner shall not preside at any Major League Meeting for the election of a Commissioner or for consideration of the term of office or duties of a Commissioner. In the absence of the Commissioner, the presiding officer shall be elected by written ballot of a majority vote of the Major League Clubs represented at the meeting. Whatever Clubs shall be represented at a Major League Meeting shall constitute a quorum. Each Club at a Major League Meeting shall be represented by a person having full authority to act for the Club and to bind the Club on all matters. Voting shall be by roll call of the Clubs, in rotating alphabetical order; provided, however, that upon the majority vote of all Clubs, the vote shall be by written ballot.

(b) The Commissioner or the Executive Council or any Major League Club may, from time to time, propose to the Major League Clubs the adoption, amendment or rescission of any rule, resolution or other matter for action at a Major League Meeting. Except by unanimous consent, no action shall be taken at any Major League Meeting upon any matter of which at least 20 days, or at any special meeting upon any matter of which at least 10 days, of prior written

notice shall not have been given all Major League Clubs and the Executive Council. The notice calling any Major League Meeting may specify that the meeting shall act in Executive Session either entirely or as to any particular matter specified therein. Upon the affirmative vote of a majority of the Major League Clubs represented at a Major League Meeting or at the Commissioner's direction, such meeting shall go into Executive Session. At an Executive Session each Club shall be represented by not more than two representatives.

Sec. 2.

(a) The vote of a majority of the Major League Clubs shall be required for the approval of any of the following:

(1) Any action relating to the process of collective bargaining with the Major League Baseball Players Association or with any representative of the Major League umpires;

(2) Any action relating to scheduling for the championship season;

(3) Any action relating to the All-Star Game, Division Series, League Championship Series or World Series;

(4) Any action to amend Major League Rule 25 relating to the Uniform Playing Rules and Official Scoring Rules; provided, however, that any action to amend the designated hitter rule shall require the vote of three-fourths of all Clubs;

(5) Any action relating to radio, television or other audio or video media (including the Internet or any other online technology), including but not limited to any agreement or amendment thereto with any other party, pursuant to which there is the grant, license or other transfer of radio, television or other audio or video media rights for Major League Baseball games; or

(6) Any action to extend the term of this Constitution.

(b) The vote of three-fourths of the Major League Clubs shall be required for the approval of any of the following:

(1) Expansion by the addition of a new Club or Clubs or contraction by the subtraction of a Club or Clubs;

(2) The sale or transfer of a control interest in any Club; provided, however, that a majority vote of all Major League Clubs shall be sufficient to approve any such sale or transfer occurring upon the death of an owner to a spouse or one or more lineal descendants. For purposes hereof, the term "control" shall mean the possession by the transferee, directly or indirectly, of the power or authority to influence substantially the management policies of the Club. A sale or transfer of a non-control interest in any Club shall require only the approval of the Commissioner;

(3) The relocation of any Major League Club;

(4) Any change from the present form of three-division play in either League (e.g., two-division or four-division play);

(5) The realignment of one or more Clubs into a different division(s) or into the other League; provided, however, that no Club may be moved to a different division or to the other League without its consent;

(6) Any provision affecting the sharing by the Major League Clubs of revenues from any source;

(7) Any provision amending this Constitution, except as specifically provided elsewhere in this Constitution; or

(8) The involuntary termination of the rights, privileges and properties of a Major League Club pursuant to the procedures of Article VIII hereof.

(c) Except as specifically provided in Article II, Section 9 and Article V, Section 2(b) of this Constitution, all actions to be voted upon by the Major League Clubs shall be decided by a majority vote of all Major League Clubs.

(d) Interpretation and applicability of this Section 2 shall be made by the Commissioner and that decision shall be final and non-appealable.

Sec. 3. Special Major League Meetings may be called by the Commissioner and shall be so called whenever the Commissioner is requested in writing by any eight Major League Clubs. If the Commissioner shall, within five days after receipt of such request, fail to call a Major League Meeting, any Major League Club so requesting may call the Major League Meeting.

## Article VI

## ARBITRATION

Sec. 1. All disputes and controversies related in any way to professional baseball between Clubs or between a Club(s) and any Major League Baseball entity(ies) (including in each case, without limitation, their owners, officers, directors, employees and players), other than those whose resolution is expressly provided for by another means in this Constitution, the Major League Rules, the Basic Agreement with the Major League Baseball Players Association, or the collective bargaining agreement with any representative of the Major League umpires, shall be submitted to the Commissioner, as arbitrator, who, after hearing, shall have the sole and exclusive right to decide such disputes and controversies and whose decision shall be final and unappealable. The procedure set forth in this Section is separate from and shall not alter or affect the procedure set forth in Article V governing the role of the Commissioner at Major League Meetings, or the Commissioner's powers to act in the best interests of Baseball under Article II.

Sec. 2. The Major League Clubs recognize that it is in the best interests of Baseball that all actions taken by the Commissioner under the authority of this Constitution, including, without limitation, Article II and this Article VI, be accepted and complied with by the Clubs, and that the Clubs not otherwise engage in any form of litigation between or among themselves or with any Major League Baseball entity, but resolve their differences pursuant to the provisions of this Constitution. In furtherance thereof, the Clubs (on their own behalf and including, without limitation, on behalf of their owners, officers, directors and employees) severally agree to be finally and unappealably bound by actions of the Commissioner and all other actions, decisions or interpretations taken or reached pursuant to the provisions of this Constitution and severally waive such right of recourse to the courts as would otherwise have existed in their favor. In the event of any legal action other than as prescribed by Section 1 of this Article VI by any Club (including, without limitation, their owners, officers, directors and employees) in connection with any dispute or controversy related in any way to professional baseball, or in the event of noncompliance with any action of the Commissioner, with any action or decision taken or reached pursuant to the provisions of this Constitution, or with the terms or intent of this Article VI, in addition to any other remedy that may be available to the Commissioner, the Commissioner may direct that the costs, including attorneys' fees, to the Office of the Commissioner or any other Baseball entity, whether as plaintiff or defendant, of any court proceeding or other form of litigation resulting therefrom be reimbursed to the Office of the Commissioner or such other Baseball entity by such non-complying Club (on its own behalf and including, without limitation, on behalf of its owners, officers, directors and

employees). Nothing herein shall be construed to limit any rights of indemnity that the Major League Clubs or any Major League Baseball entity may have against any Club.

Sec. 3. The form of player's contract to be used by the Major League Clubs, and all contracts between Major League Clubs and their officers and employees, shall contain a clause by which the parties agree to submit themselves to the jurisdiction of the Commissioner, and to accept the Commissioner's decisions rendered in accordance with this Constitution.

## Article VII

## SUPERSEDING EFFECT

This Constitution, and all actions taken pursuant to this Constitution, shall supersede any conflicting provisions of any other agreement, as amended, whether now existing or hereinafter entered into, to which any Major League Club is a party and any conflicting actions taken pursuant thereto.

## Article VIII

## CLUBS AND TERRITORIES

Sec. 1. **Clubs.** There shall be 30 Major League Clubs, which agree hereby to act at all times in the best interests of Baseball. The Clubs shall be organized into two Leagues, the American League and the National League, with three divisions in each League, as follows:

| American League | National League |
|---|---|
| East | East |
| Baltimore Orioles | Atlanta Braves |
| Boston Red Sox | Florida Marlins |
| New York Yankees | New York Mets |
| Tampa Bay Rays | Philadelphia Phillies |
| Toronto Blue Jays | Washington Nationals |

| | |
|---|---|
| Central | Central |
| Chicago White Sox | Chicago Cubs |
| Cleveland Indians | Cincinnati Reds |
| Detroit Tigers | Houston Astros |
| Kansas City Royals | Milwaukee Brewers |
| Minnesota Twins | Pittsburgh Pirates |
| | St. Louis Cardinals |
| West | West |
| Los Angeles Angels of Anaheim | Arizona Diamondbacks |
| Oakland Athletics | Colorado Rockies |
| Seattle Mariners | Los Angeles Dodgers |
| Texas Rangers | San Diego Padres |
| | San Francisco Giants |

Sec. 2. **Expansion, Contraction, Realignment, Divisions.** Any increase or decrease in the number of or any realignment of the Major League Clubs or any change from the present form of three-division play shall be governed by the voting provisions in Article V, Section 2 (b).

Sec. 3. **Voluntary Termination.** A Major League Club may withdraw from this Constitution only with the approval of three-fourths of all Major League Clubs, subject to such terms and conditions as the Commissioner may require, by submitting a written request to withdraw to the Commissioner, making full payment of all Baseball indebtedness and offering to assign to the Commissioner or the Commissioner's designee all of the withdrawing Club's rights, privileges and other property rights hereunder and under any other Baseball-related agreement.

Sec. 4. **Involuntary Termination.** The rights, privileges and other property rights of a Major League Club hereunder and under any other Baseball-related agreement may be terminated (i) in the event of contraction, pursuant to Article V, Section 2 (b) (1), or (ii) involuntarily, with the approval of three-fourths of all Major League Clubs, if the Club in question shall do or suffer any of the following:

(a) Disband its team;

(b) Disband its business organization or cease its business;

(c) Except pursuant to official policies promulgated by the Commissioner, allow gambling of any kind upon its grounds or any building owned or controlled by it;

(d) Offer, agree, conspire or attempt to lose any game participated in by the Club; or fail to suspend immediately any player, employee or officer who shall be proved guilty of offering, agreeing, conspiring or attempting to lose any such game or of being interested in any pool or wager on any game in which a Club participates;

(e) Fail to present its team at the time and place it is scheduled to play any championship game, unless such failure is caused by unavoidable accident in travel or conditions beyond the control of the Club or its officers;

(f) Fail or refuse to comply with any requirement of the Commissioner;

(g) Willfully violate any provision of this Constitution or any provision of the Professional Baseball Agreement, or any rules duly adopted pursuant to either of those agreements;

(h) Transfer or assign such number of its player contracts as will prevent it from functioning as a Major League Club;

(i) Fail to pay any indebtedness owing to Baseball within thirty days after receiving written notice from the Commissioner of default of such payment;

(j) Fail or refuse to fulfill its contractual obligations;

(k) Fail to maintain a ballpark suitable for the playing of home Major League Baseball games; or

(l) Make an assignment for the benefit of its creditors or file a voluntary petition in bankruptcy, or if a receiver or trustee in bankruptcy is appointed for the properties and assets of the Club, or if reorganization proceedings in bankruptcy are instituted by or against the Club.

Sec. 5. **Termination Procedure.** The Commissioner shall determine the procedure to be followed with respect to a termination of a Club's rights hereunder, whether voluntary or involuntary. Such procedures shall include, in the case of a proposed involuntary termination, a written charge identifying the basis for the proposed involuntary termination, and an opportunity for the Club in question to be heard with respect to the charge.

Sec. 6. **Effect of Termination.** Upon termination of a Major League Club in accordance with Section 3 or 4 hereof, the Commissioner may, but is not required to,

cancel and/or make such other disposition of the terminated Club's rights, privileges and other property rights hereunder or under any other Baseball-related agreement as the Commissioner deems appropriate. Without limiting the foregoing, the Commissioner is hereby authorized and empowered (but not required) to acquire through a designee and operate or dispose of the baseball park (or leasehold interest therein if such park is leased by such Club) and/or all other baseball properties, including without limitation the Club and the television, radio and other media contracts of such Club, the Player Development Contracts of such Club, the trademark and copyright rights of such Club and any other property, contracts, rights under this Constitution or other rights the Commissioner shall designate. Any terminated Club shall be obligated to assist in carrying out the provisions of any intended sale or other disposition and will execute and deliver any and all documents determined by the Commissioner to be necessary or convenient therefor, including without limitation instruments of conveyance, transfer, lease, bill of sale, assignment or quit claim. In the event of a failure, refusal or inability of any terminated Club to execute any and all such documents, each Club agrees i) that the Commissioner shall have the full and complete authority, to execute any and all such documents on behalf of the terminated Club in order to carry out the intended sale or other disposition, and ii) that any court of competent jurisdiction may enter any orders, judgments or decrees necessary to enforce and carry out the provisions hereof and that such Club will not oppose the entry of any such orders, judgments or decrees. Upon consummation of such purchase or sale, the Commissioner may first apply the proceeds to the payment of Baseball-related debts of the terminated Club, and finally any balance remaining thereafter shall be paid over to the terminated Club. The cancellation, operation, acquisition or disposition of a terminated Club's rights, privileges and properties shall be conducted in such manner, if any, as may be decided by the Commissioner in the Commissioner's sole discretion.

Sec. 7. **Effect of Termination on Active Player Contracts and Reservation Rights.** Upon a termination of a Major League Club in accordance with Section 3 or 4 hereof, title to the contracts of all active players then under contract to the terminated Club and all rights of player reservation of such Club shall, at the option of the Commissioner, thereupon vest in the Commissioner or a designee of the Commissioner, to be disposed of in such manner as the Commissioner may determine. The Commissioner may exercise this option with respect to all or less than all of the active player contracts and reservation rights of the terminated Club.

Sec. 8. **Operating Territories.** The Major League Clubs shall have assigned operating territories within which they have the right and obligation to play baseball games as the home Club.

(a) National League. The National League Clubs shall have the following operating territories:

| | |
|---|---|
| Arizona Diamondbacks: | Maricopa County in Arizona; |
| Atlanta Braves: | City of Atlanta; and Fulton, Cobb, Gwinette and Dekalb Counties in Georgia; |
| Chicago Cubs: | Cook, Lake, DuPage, Will, Kendall, McHenry and Grundy Counties in Illinois; and Lake and Porter Counties in Indiana; provided, however, that this territory shall be shared with the Chicago White Sox franchise in the American League; |
| Cincinnati Reds: | Butler, Warren, Clermont and Hamilton counties in Ohio; Boone, Kenton and Campbell Counties in Kentucky; and Dearborn and Franklin Counties in Indiana; |
| Colorado Rockies: | City of Denver; and Adams, Arapahoe, Boulder, Broomfield, Douglas, Jefferson and Denver Counties in Colorado; |
| Florida Marlins: | Dade and Broward Counties in Florida; provided, however, that with respect to all Major League Clubs, Palm Beach County in Florida shall also be included; |
| Houston Astros: | City of Houston; and Harris, Brazoria, Chambers, Fort Bend, Galveston, Liberty, Montgomery and Waller Counties in Texas; |
| Los Angeles Dodgers: | Orange, Ventura and Los Angeles Counties in California; provided, however, that this territory shall be shared with the Los Angeles Angels of Anaheim franchise in the American League; |
| Milwaukee Brewers: | Milwaukee, Ozaukee and Waukesha Counties in Wisconsin; |
| New York Mets: | City of New York; Nassau, Suffolk, Rockland and Westchester Counties in New York; Bergen, Hudson, Essex and Union Counties in New Jersey; and that |

| | |
|---|---|
| | portion of Fairfield County in Connecticut located south of Interstate 84 and west of Route 58; provided, however, that this territory shall be shared with the New York Yankees franchise in the American League; |
| Philadelphia Phillies: | Bucks, Montgomery, Chester, Delaware and Philadelphia Counties in Pennsylvania; and Gloucester, Camden and Burlington Counties in New Jersey; |
| Pittsburgh Pirates: | City of Pittsburgh and Allegheny County in Pennsylvania; |
| St. Louis Cardinals: | City of St. Louis; and St. Louis, Jefferson, St. Charles and Franklin Counties in Missouri; and St. Clair, Madison, Monroe and Jersey Counties in Illinois; |
| San Diego Padres: | San Diego County in California; |
| San Francisco Giants: | City of San Francisco; and San Francisco, San Mateo, Santa Cruz, Monterey and Marin Counties in California; provided, however, that with respect to all Major League Clubs, Santa Clara County in California shall also be included; |
| Washington Nationals: | District of Columbia; and Arlington, Fairfax and Prince William Counties, and all independent cities bordering such counties, in Virginia. |

(b) American League. The American League Clubs shall have the following operating territories:

| | |
|---|---|
| Baltimore Orioles: | City of Baltimore; and Baltimore, Anne Arundel, Howard, Carroll and Harford Counties in Maryland; |
| Boston Red Sox: | Suffolk, Middlesex, Essex, Bristol, Worcester, and Norfolk Counties in Massachusetts; provided, however, that Bristol and Worcester Counties and the territory south and west of Highway 128 in Norfolk County shall be shared with the Pawtucket franchise in the International League; |

| | |
|---|---|
| Chicago White Sox: | Cook, Lake, DuPage, Will, Kendall, McHenry and Grundy Counties in Illinois; and Lake and Porter Counties in Indiana; provided, however, that this territory shall be shared with the Chicago Cubs franchise in the National League; |
| Cleveland Indians: | Cuyahoga, Lorrain, Medina, Geauga, Lake and Summit Counties in Ohio; provided, however, that Summit County shall be shared with the Akron franchise in the Eastern League; |
| Detroit Tigers: | Wayne, Monroe, Washtenaw, Oakland, Macomb and St. Clair Counties in Michigan; |
| Kansas City Royals: | Johnson, Wyandotte, Miami and Leavenworth Counties in Kansas; and Clay, Jackson, Cass and Platte Counties in Missouri; |
| Los Angeles Angels of Anaheim: | Los Angeles, Orange and Ventura Counties in California; provided, however, that this territory shall be shared with the Los Angeles Dodgers franchise in the National League; |
| Minnesota Twins: | Ramsey and Hennepin Counties in Minnesota; |
| New York Yankees: | City of New York; Nassau, Suffolk, Rockland and Westchester Counties in New York; Bergen, Hudson, Essex and Union Counties in New Jersey; and that portion of Fairfield County in Connecticut located south of Interstate 84 and west of Route 58; provided, however, that this territory shall be shared with the New York Mets franchise in the National League; |
| Oakland Athletics: | Alameda and Contra Costa Counties in California; |
| Seattle Mariners: | King County in Washington; |
| Tampa Bay Rays: | Hillsborough and Pinellas Counties in Florida; |
| Texas Rangers: | Cities of Dallas, Ft. Worth and Arlington; and Dallas and Tarrant Counties in Texas; |

Toronto Blue Jays: Cities of Scarborough, York, East York, North York, Etobicoke and Toronto, commonly referred to as Metropolitan Toronto.

Sec. 9. **Home Television Territories.** The definitions of the home television territories of the Major League Clubs shall be maintained in the Commissioner's Office. Amendments to such territories shall be made only with the approval of the Executive Council.

## Article IX

## CONDUCT OF CHAMPIONSHIP SEASON AND POST-SEASON

Sec. 1. **Schedule.** The games for each championship season shall be arranged in a written schedule prepared by the Commissioner, acting in accordance with any standing resolutions passed at a Major League Meeting and with the Basic Agreement with the Major League Baseball Players Association. No Major League Club shall schedule or play any exhibition game during the championship season without the prior approval of the Commissioner.

Sec. 2. **Playing Rules.** All championship games shall be played under the Official Baseball Rules.

Sec. 3. **Parks Not to be Changed During Season.** No Club shall change the size or dimensions of its playing field during the championship season.

Sec. 4. **Championship Season and Post-Season.** The Commissioner shall have responsibility for all matters relating to the administration of the championship season and the post-season, which shall be conducted in accordance with the Major League Rules and the Major League Regulations.

Sec. 5. **All-Star Game.** The Clubs shall provide the necessary services of players, and, if selected as a host Club, the park, facilities and equipment needed for the playing of an All-Star Game during each baseball season. All-Star Games shall be played under the supervision, control and direction of the Commissioner. The date and the park in which an All-Star Game is to be played shall be determined by the Executive Council. Each host Club agrees that when it is designated to conduct an All-Star Game, it will provide the park, facilities and equipment for such a game for a total rental of one dollar and will act as agent for the Major League Clubs in the conduct of said game.

## Article X

## MAJOR LEAGUE CENTRAL FUND

Sec. 1. **Maintenance of Major League Central Fund.** There shall be maintained for the Major League Clubs in the Office of the Commissioner a separate account to be known as the "Major League Central Fund" and to be administered by the Executive Council. All sums received for the account of the parties hereto under this Constitution shall be deposited in the Major League Central Fund. The Commissioner is hereby appointed the fiscal agent of the Major League Central Fund.

Sec. 2. **All-Star Game Revenues and Expenses.** The All-Star Game host Club shall be required to submit such revenue and expense budgets for the All-Star Game and reasonably related events as may from time to time be required by the Commissioner. The host Club shall be entitled to reimbursement of its reasonable and necessary expenses out of such revenues. With the approval of the Commissioner, reimbursement of expenses included in the budget may be made on application of the host Club periodically in advance of each All-Star Game. Final settlement pursuant to the approved budget shall be made following submission of a post-game accounting by the host Club. All-Star Game receipts from the sale of tickets (net of applicable local taxes) shall be transmitted by the host Club to the Major League Central Fund without deduction for expenses, but the host Club may retain revenues received from related activities until the final accounting and settlement.

The net proceeds of each such game and related activities after the payment of expenses shall be deposited in the Major League Central Fund and shall be credited to the Major League Clubs equally.

Sec. 3. **Major League Club Broadcasts.** Major League Club practices with regard to the telecasting and radio broadcasting of games are governed as follows:

(a) The Clubs hereby agree that each Club shall have, with respect to each game in which it participates, the right to authorize the telecast of such game only by means of over-the-air, cable and satellite technology, and only within its home television territory.

(b) Each Club shall have, with respect to each game in which it participates, the right to authorize the radio broadcast of such game (1) if such Club is a home Club, over any radio broadcast station in the United States, for Clubs in the United States, or in Canada, for Clubs in Canada, except a station whose transmitter is not

located within 50 miles of such Club's ballpark and is located within 50 miles of the visiting Club's ballpark, or (2) if such Club is a visiting Club, over any radio broadcast station in the United States, for Clubs in the United States, or in Canada, for Clubs in Canada, whose transmitter is located within 50 miles of such visiting Club's ballpark, except as may be agreed by the home Club and the visiting Club.

(c) Each Club shall provide in its ballpark to the visiting Club suitable space to be used for the purposes described in subparagraphs (a) and (b), above, together with the ability to install and maintain in such ballpark such wires, cables and other equipment and items as may be necessary for such purposes, at the expense of the visiting Club or the visiting Club's rightsholder. Each home Club will additionally admit such employees and agents of the visiting Club and the visiting Club's rightsholder to the home Club's ballpark free of charge as may be necessary for the purposes described in subparagraphs (a) and (b), above.

(d) Each Club hereby agrees, with respect to each game in which it participates, that the other participating Club shall have the right, and hereby authorizes the Commissioner to grant to national rightsholders the right, to make use of the Club's trademarks in connection with all productions made pursuant to subparagraphs (a) and (b), above, and Section 4, below, and all advertising related thereto. All such use of trademarks shall inure to the benefit of the trademark owner and shall be made pursuant to all established standards of quality.

Sec. 4. **National Broadcasts, Copyright Royalties.** Subject to such approving vote of the Major League Clubs as may be required by Article V, Section 2 of this Constitution, the Major League Clubs grant to the Commissioner, acting as their agent, with the prior advice and prior consent of the Major League Executive Council, the exclusive right to sell on their behalf, throughout the United States and other territories as chosen by the Commissioner, exclusive or non-exclusive television and radio or other video or audio media rights (including the Internet and any other online technology) (live or taped) to the World Series, League Championship Series, Division Series, All-Star Games, regular season championship games, spring training games, exhibition games and other Major League Baseball events. All contracts for the sale of such television, radio and other video and audio media and online rights shall be administered by the Commissioner on behalf of the Clubs, and the contracts shall so provide.

The Clubs further authorize and empower the Commissioner, acting as their agent, to make exclusive demand and present formal claim on their behalf, by appropriate notice, filings and otherwise, and to negotiate and enter into settlement agreements with respect to the collection of royalty fees for broadcasts of Major League Baseball games carried as distant signal programming by cable television systems, satellite providers

and other media providers, pursuant to applicable provisions of the United States, Canada and foreign copyright laws.

The proceeds received from the sales of television and radio or other video or audio media rights to the World Series, League Championship Series, Division Series, All-Star Games, regular season championship games, spring training games and exhibition games and from copyright royalty fees shall be made payable to the Commissioner as agent for the Clubs, and when received by the Commissioner, shall be deposited in the Major League Central Fund and shall be credited to each of them equally.

Sec. 5. **Payments from Central Fund, Books of Account.** Each of the Major League Clubs hereto hereby authorizes and directs the Commissioner to make the following payments on its behalf out of the Major League Central Fund. These payments are to be charged to the Clubs equally.

(a) There shall be payments of such contributions to the Major League Baseball Players Benefit Plan as the Clubs are or may become obligated to contribute to the Benefit Plan by agreement with the Major League Baseball Players Association or by action of the Clubs.

(b) In October of each year, there shall be paid to the Commissioner an amount which shall be sufficient for the following purposes:

(1) to enable the Commissioner, after expenditure of the receipts of the Commissioner's Office from all other sources, to cover (i) the clerical, administrative and operational expenses of the Commissioner's Office and the Executive Council incurred during the fiscal year ending in that month pursuant to the budget for such year as approved by the Executive Council, and (ii) expenditures for contributions and other non-operational purposes made pursuant to the appropriations for such purposes recommended by the Executive Council, and

(2) to provide, as of the close of each fiscal year, a reserve fund for the Commissioner's Office of at least $10,000,000, or such amount approved by the Executive Council (such reserve fund to be the excess of all assets over all liabilities).

(c) There shall be paid from time to time such amounts as shall be approved by the Executive Council for the administrative expenses of the Central Fund and for other purposes common to all Clubs, including the compensation and expenses of advisors, attorneys, actuaries and other persons retained or employed by the

Commissioner in connection with player relations matters and the Major League Baseball Players Benefit Plan or other matters.

(d) The balance of each Club's share of the Major League Central Fund remaining after said payments (less the reserve) shall be paid to the Clubs on or before October 31 of the year in which received, or as soon thereafter as possible, unless otherwise determined by the Commissioner.

The Commissioner may from time to time invest any balance of the Major League Central Fund on hand in certificates of deposit, obligations of the United States Government, $A_1P_1$ rated commercial paper or such other interest bearing accounts or instruments as have been approved in advance by the Major League Finance & Compensation Committee.

Upon termination of the Major League Central Fund, any remaining funds shall be distributed and paid to the Clubs.

The Commissioner shall provide and keep true and accurate books of account and records of all receipts and disbursements and other transactions involving or pertaining to the Major League Central Fund.

On or before February 15 of each year, the Commissioner shall submit to the Executive Council an accurate statement of account showing all receipts and disbursements and other transactions involving or pertaining to the Major League Central Fund during the preceding fiscal year ending October 31 and, in addition thereto, setting forth a full and complete schedule of all cash obligations of the United States Government and other property then comprising the Major League Central Fund.

Each Major League Club shall be furnished a copy of such annual statement and shall be entitled at all times during business hours to inspect the books of account and records of the Major League Central Fund.

Sec. 6. **Termination of Central Fund.** The Major League Central Fund shall be in existence continuously unless and until three-fourths of the Major League Clubs shall have given to the Commissioner written notice on or before June 30 of any year of their intention to terminate the Major League Central Fund, and upon the giving of any such notice the Major League Central Fund shall terminate on the 31st day of December of the year following the year in which such notice is given.

## Article XI

## MISCELLANEOUS

Sec. 1. **Fiscal Responsibility**. Each Major League Club shall comply with the Debt Service Rule and any other rules dealing with fiscal responsibility as may be contained in the then-current Basic Agreement with the Major League Baseball Players Association, as may be amended in accordance with Article V, Section 2(a)(1).

Sec. 2. **Indemnification of Officials.** The Major League Clubs hereby jointly indemnify each person who is now or hereafter serves as the Commissioner of Baseball, or as an employee, officer or director of the Office of the Commissioner of Baseball, Major League Baseball Properties, Inc., Major League Baseball Enterprises, Inc., Major League Baseball Advanced Media, L.P., the Major League Scouting Bureau, the Arizona Fall League, Inc. or any other similar or affiliated entity currently existing or hereafter created to carry out functions of interest to Major League Baseball or to professional baseball, and each person who is an officer, director, employee or representative of a Major League Club who has been or is hereafter elected, appointed or selected by the Commissioner of Baseball or the Commissioner's designee or the Major League Executive Council to perform, individually or as a member of a committee, a function related to the Office of the Commissioner of Baseball or any other matter of interest to Major League Baseball or to professional baseball, whether or not then acting as such Commissioner of Baseball, employee, officer or director or as such a person so elected, appointed or selected, against expenses (including attorney's fees) judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative to which he or she shall have been made a party by reason of his or her being or having served in such capacity if he or she acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of baseball, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interest of baseball, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

The Commissioner shall hereafter be indemnified in any case, provided that he or she has met the applicable standard of conduct set forth in the preceding portion

of this resolution. In the case of any other person covered by this resolution, indemnification shall be only as authorized in a specific case upon a determination either by the Commissioner or a majority vote of the Major League Clubs that the indemnification of the person is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the preceding portion of this resolution.

Sec. 3. **Major League Regulations.** The Commissioner shall adopt a set of Major League Regulations relating to games, ballparks, uniforms and other matters and may otherwise promulgate bulletins and directives binding on the Major League Clubs (including without limitation their owners, officers, directors and employees) in matters relating to the Commissioner's functions and the administration of the game of baseball that are not inconsistent with this Constitution. Amendments to such Regulations, bulletins and directives may be made in the discretion of the Commissioner.

# EXHIBIT "B"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Case No. 11-12010 (KG) |
| | ) Chapter 11 |
| LOS ANGELES DODGERS LLC, et al. | ) |
| | ) Courtroom No. 3 |
| Debtors. | ) 824 Market Street |
| | ) Wilmington, Delaware 19801 |
| | ) |
| | ) |
| | ) January 11, 2012 |
| | ) 10:00 A.M. |

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Dewey & LeBoeuf LLP<br>By: SIDNEY P. LEVINSON, ESQ.<br>333 South Grand Avenue, Suite 2600<br>Los Angeles, California 90071 |
| For Office of Commissioner: | White & Case LLP<br>By: JOHN CUNNINGHAM, ESQ.<br>1155 Avenue of the Americas<br>New York, New York 10036<br>(212) 819-8200 |
| ECRO: | GINGER MACE |
| Transcription Service: | Reliable<br>1007 N. Orange Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 654-8080<br>E-Mail: gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

THE COURT: Yes.

MR. LEVINSON: And obviously given that (indiscernible) litigation that was resolved, and I think we've seen already the benefits of this process, you know, even since the beginning of November. You know, we believe that settlement is warranted, or approval of the settlement is warranted.

There is one additional term that I would just like to bring to Your Honor's attention. This came up between discussions with Major League Baseball and the Debtors, and it relates to certain expenses that Major League Baseball will be incurring in connection with their review of potential bidders and the cost that they may incur in connection with that.

And the parties have agreed that any what's defined as unpaid MLB incurred expenses of any bidder group will be paid by Major League Baseball, or paid to Major League Baseball, I'm sorry, by Los Angeles Dodgers LLC simultaneously with the closing of the purchase of the Dodgers.

THE COURT: All right.

MR. LEVINSON: So with that one addition we would ask Your Honor to approve the settlement as proposed.

THE COURT: And I'm not being asked to approve the special terms at this point?

MR. LEVINSON: Correct.

THE COURT: Only what I've reviewed, and the special terms in no way are inconsistent with or impair the settlement agreement that I'm approving?

MR. LEVINSON: They do not impair any of the benefits of the Debtor, and we are not asking Your Honor to approve the settlement, or to approve the special terms.

THE COURT: Okay, very well, thank you. Who else wishes to be heard? Ms. Patton, hello, good morning.

MS. PATTON: Good morning, Your Honor, Tiara Patton on behalf of the United States Trustee. With the addition of the estate paying MLB fees, we just say that any fees are subject to our review and comment.

THE COURT: I would say, is that acceptable? Major League Baseball, I guess, I ought to be asking. Now these would not be counsel fees or would it? Mr. Cunningham, I'm sorry.

MR. CUNNINGHAM: Your Honor, these are expenses that would be incurred by Major League Baseball. It includes investigation, background checks, and they could very well include attorney's fees and costs.

THE COURT: It could, certainly.

MR. CUNNINGHAM: The key issue here, Your Honor, is that the obligation, the initial obligation to pay these are all going to be borne by the applicants themselves.

THE COURT: Yes.

MR. CUNNINGHAM: That's the process that has been set up. They're going to be asked to, each applicant; individual applicant is going to have to pay up front $25,000.00 fee directly to the Debtors. The Debtors are going to hold the money. There is an obligation to the Debtors by applicants to cover those expenses. Our, you know, protection here is as Mr. Levinson stated which is that upon a sale to the extent we are out of pocket or applicants haven't paid us, we will get paid out of the sale proceeds, but the Debtors will continue to have the right to enforce the applicant's obligations including to, you know, come before Your Honor to make them reimburse the Debtors for that.

THE COURT: Okay.

MR. CUNNINGHAM: So this is a customary arrangement in all sales of MLB teams that Major League Baseball gets reimbursed for these, Your Honor, and I'm not certain as to why the U.S. Trustee is asking to review our fees. Obviously, they're whatever we're out of pocket on and, you know, clearly if there is a dispute it could be brought before the Court, but these are again --

THE COURT: These are actual costs and expenses.

MR. CUNNINGHAM: -- that's exactly right. These are the out of pocket costs and expenses.

THE COURT: Yes.

MR. CUNNINGHAM: You know, again, related solely to the investigation work in connection with the sale process itself.

THE COURT: Okay. Thank you, Mr. Cunningham. Ms. Patton, does that help?

MS. PATTON: That does help, but, however, because the estate is obligated to pay these expenses, these are expenses and fees, attorney fees that are being paid out of the estate's party that pocket that comes under the United States purview. So we're not willing to relinquish the right to review and comment on any fees that are paid out of the estate.

THE COURT: They're paid out of the estate, but almost as a pass through.

MR. CUNNINGHAM: That's right, Your Honor.

THE COURT: And, Ms. Patton, in this case I'm not going to impose that obligation because they are actual expenses, and it is, in effect, a term of the settlement, I think, and Major League Baseball has agreed to the terms of the settlement so I'm not going to interpose that requirement here. I don't think, again, it is a pass through situation and it is not money that is being borne directly by the Debtors, so I think I am satisfied that it won't be, it will be neither necessary nor appropriate under these circumstances.

MS. PATTON: I just have question. What in the instance if the expenses and fees are more than what the applicant's pay? You say there may be a $25,000.00 fee, but what if their attorney fees and expenses are more than that? Than that is an expense of the estate.

MR. CUNNINGHAM: That is a direct obligation of the applicant in which the Debtors can then go against the applicant, and go before Your Honor to get those expenses reimbursed. They're agreeing to that essentially when they submit their application. They are bound by that obligation to the Debtors to cover those expenses so that the estate is not bearing.

THE COURT: Yes. Okay, and given what we're talking about in terms of what we all anticipate will be the recovery from the sale versus these expenses, we're talking, I think, about an extremely small almost very minor cost in any event. We're talking about an arrangement of a billion dollars on a sale, and I don't even want to use a number, but it's got to be far less than 1%. We're talking in tenths of percent's probably.

MR. LEVINSON: I think that's correct, Your Honor. And also, and I am sorry I rushed through it and I really should have provided the background for Ms. Patton's benefit and others and so I am sorry for that.

THE COURT: Yes.

MR. LEVINSON: We have established escrow arrangements, and we do not intend to be out of pocket a dime in connection with this process. The bidder interest is high. They're prepared to, and they understand that this is an expense that would always be borne as part of this process, and they understand and are fully prepared to, at least those who are serious bidders, are prepared to go forward with providing the escrow funds, and to pay whatever expenses, and to incur that obligation. So we don't anticipate any out of pocket expense whatsoever in connection with this process.

THE COURT: Right. Exactly; in other words, Major League Baseball is looking to the Debtor technically because the Debtor, it's in privity with the Debtor at this point.

MR. CUNNINGHAM: That's right, Your Honor.

THE COURT: But as a practical matter, whoever is buying the team will then become associated with Major League Baseball and understands that this is part of the, if you will initiation fee, or whatever you want to call it.

MR. CUNNINGHAM: That's right, Your Honor.

MR. LEVINSON: But we were even, I mean, it certainly wasn't going to be an issue for the buyer of the team. The issues that we were concerned about were those that bid and ultimately don't succeed, but whose background checks were, nonetheless, necessary.

THE COURT: That's right.

MR. LEVINSON: And it was with respect to them that we wanted to make sure we had protections in place, and through the escrow we will accomplish that.

THE COURT: Very well, thank you. Thank you, I hope that satisfies Ms. Patton's concerns, and I'm satisfied.

MR. CUNNINGHAM: Thank you, Your Honor, and finally just in closing obviously Major League Baseball, we're very pleased with our settlement with the Debtors, and I know that Debtors feel the same way. We just want to thank Your Honor and especially Judge Farnan.

THE COURT: Yes.

MR. CUNNINGHAM: Who without his involvement and guidance I don't know if we would ever get to this settlement or at least in the timeframe that we did. So we thank Your Honor and especially Judge Farnan.

THE COURT: Yes, he did remarkable work here, and I can't tell you how grateful I am to him for his efforts because it was going to be a very long and difficult process to decide the, you know, the relative rights of the Debtor and Major League Baseball, and we've avoided that here and hopefully we'll avoid it permanently, you know, in any future matters. Mr. Levinson.

MR. LEVINSON: Yes, I certainly want to echo Mr. Cunningham's thank to both Your Honor and to Judge Farnan not

And it looks like from what I read in the paper and I can't avoid the paper, there are a lot of people who are interested, so let's hope it keeps going.

MR. LEVINSON: Thank you, Your Honor.

THE COURT: All right, anything else anyone? Thank you all, and I wish you all well, and a good safe trip home everyone. And we will stand in recess. Thank you.

(Court Adjourned)

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Mary Zajaczkowski
Mary Zajaczkowski, CET**D-531

January 11, 2012
Date

H
A
N
D

D
E
L
I
V
E
R
Y

FILED / RECEIVED
MAR 26 2012
EPIQ BANKRUPTCY SOLUTIONS, LLC

4:30

RECEIVED BY: DATE TIME

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| LOS ANGELES DODGERS LLC, *et al.*,[1] | ) | Case No. 11-12010 (KG) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

FILED / RECEIVED
MAR 26 2012
EPIQ BANKRUPTCY SOLUTIONS, LLC

**REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

1. Name of Claimant: Baseball Finance LLC

2. Debtor Claim asserted against: Los Angeles Dodgers LLC

3. Nature and description of the claim incurred during or arising on or before February 22, 2012: See Addendum

4. Date(s) claim arose: June 27, 2011–February 22, 2012

5. Amount of claim: See Addendum

6. Documentation supporting the claim is attached hereto as Exhibit A.

Dated: March 26, 2012

Filed: USBC - District of Delaware
LADLLC, Et Al.
11-12010 (KG) 0000000321

Signature: [signature]
Name: Jonathan Mariner
Address: Baseball Finance LLC
c/o Major League Baseball
245 Park Avenue
New York, New York 10167
Email: jonathan.mariner@mlb.com
Fax: (212) 931-7791

[1] The Debtors, together with the last four digits of each of the Debtors' federal tax identification number, are: Los Angeles Dodgers LLC (3133); Los Angeles Dodgers Holding Company LLC (4851); LA Holdco LLC (2567); LA Real Estate Holding Company LLC (4850); and LA Real Estate LLC (3029). The location of the Debtors' corporate headquarters and the service address for the Debtors is 1000 Elysian Park Avenue, Los Angeles, California 90012.

ADDENDUM TO REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM OF BASEBALL FINANCE LLC

Baseball Finance LLC (the "Claimant") is the holder of certain claims (collectively, the "Administrative Expense Claims") to be allowed as administrative expense claims against Los Angeles Dodgers LLC (the "Debtor", and collectively with its affiliated debtors and debtors in possession, the "Debtors") pursuant to, inter alia, section 503(b) the Bankruptcy Code as set forth herein, in the jointly administered cases (the "Cases") under chapter 11 of title 11, United States Code (11 U.S.C. §§ 101, et seq., the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors commenced the Cases by filing the voluntary petitions for relief under chapter 11 of the Bankruptcy Code on June 27, 2011 (the "Petition Date").

This Request for Payment of Administrative Expense Claim (the "Administrative Expense Proof of Claim") is based upon the information available to Claimant at the time of its filing. This Administrative Expense Proof of Claim is filed as required by the Bankruptcy Court's Order Fixing Deadline for Filing a Request for Allowance of Administrative Expense Claims Arising on or Before February 22, 2012 and Designating Form and Manner of Notice Thereof (the "Administrative Claims Bar Date Order"). The Administrative Claims Bar Date Order sets forth March 26, 2012 as the deadline to file requests for payment of certain administrative expense claims (the "Administrative Claims Bar Date"). This Administrative Expense Proof of Claim is filed to protect the Claimant from forfeiture of its Claims against the Debtor by reason of the Administrative Claims Bar Date.

A. Materials Evidencing the Claims

Claimant has incorporated herein by reference certain materials to further support the Administrative Expense Claims. Claimant is in possession of certain additional materials that may further evidence the Administrative Expense Claims, but which have not been attached hereto because they are voluminous and/or include confidential information which Claimant intends to disclose only pursuant to an appropriate confidentiality agreement or protective order of the Bankruptcy Court. Claimant reserves its right to supplement and/or prove up the Administrative Expense Claims, or respond to any objections thereto, with additional materials.

B. Summary of the Claims

On August 8, 2011 the Court entered the Final Order Authorizing Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, and 364 (the "Final DIP Order") [Docket No. 339]. Pursuant to the Final DIP Order and section 364(b) of the Bankruptcy Code, Claimant is granted an "allowed administrative expense claim (the "Administrative DIP Claim") under section 503(b)(1) of the Bankruptcy Code for all DIP Obligations (as defined [in the Final DIP Order])." Final DIP Order ¶ 5. Such DIP Obligations include, but are not limited to, (i) all of the obligations and indebtedness arising under, in respect of or in connection with the DIP Documents (as defined in the Final DIP Order) and the Final DIP Order, including all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and the Final DIP Order, and any other obligations under the DIP Documents and the Final DIP Order, and (ii) all

reasonable costs and/or expenses and other amounts reimbursed or reimbursable by the Debtors to the Claimant under the DIP Documents.

Prior to and including February 22, 2012, the Debtor incurred DIP Obligations pursuant to the DIP Documents, the Final DIP Order and sections 365(b) and 503(b)(1) of the Bankruptcy Code, and is liable to Claimant for such amount to the extent that such DIP Obligations have not yet been satisfied. Further, the Debtor is liable to Claimant for any additional or future DIP Obligations which may arise after February 22, 2012 including, but not limited to, interest, fees and costs related to the DIP Documents.

Claimant reserves all of its rights to seek payment of any and all DIP Obligations incurred after February 22, 2012 in accordance with the Final DIP Order, the Documents, the Bankruptcy Code, the Administrative Claims Bar Date Order or any other order of the Bankruptcy Court in the Cases, and as otherwise provided under applicable law.

The Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code for Los Angeles Dodgers LLC And Its Debtor Affiliates dated February 17, 2012 [Docket No. 1323] (the "Plan") specifically provides that the Claimant shall be paid 100% of the Administrative DIP Claim. Plan § 2.1. Notwithstanding this provisions of the Plan, Claimant is filing this Request for Payment of Administrative Expense Claim out of an abundance of caution to protect its right to be paid the Administrative DIP Claim.

Furthermore, Claimant asserts any and all other rights and remedies arising as a matter of law or equity or pursuant to the DIP Documents or any other agreements, contracts, rules, guidelines, regulations, policies and requirements of Claimant, to which the Debtor is bound, whether or not such agreements, contracts, rules, guidelines, regulations, policies or requirements are specifically identified herein.

C. Amendment of Claims

The Administrative Expense Claims are subject to adjustment, upward or downward, and amendment for a variety of reasons, including, without limitation, as a result of future events, the discovery and analysis of additional information, the correction of any errors, changes in foreign currency exchange rates (if applicable), the resolution of disputes, the resolution of governmental investigations (whether or not the Debtor and/or its affiliates are involved in the investigation), the resolution of lawsuits (whether or not the Debtor and/or its affiliates are named parties to the lawsuit) and the assertion of any rights of setoff, netting and/or recoupment. The Administrative Expense Claims include any and all contingent and unliquidated claims of Claimant arising under any of the transactions, agreements, facts or circumstances set forth or referenced herein, and Claimant reserves the right to amend this Administrative Expense Proof of Claim accordingly and to set forth its Administrative Expense Claims with more particularity as Claimant obtains more information.

D. Reservation of Rights

This Administrative Expense Proof of Claim is without prejudice to Claimant's right to assert additional claims that are not subject to the Administrative Bar Date. Additionally, Claimant expressly preserves any common law indemnity claims against the Debtor arising in

respect of the transactions described herein or described in any amendment hereof. Claimant also reserves the right to assert additional claims against the Debtor, including but not limited to, claims for misrepresentation, actual or constructive fraud, fraud in the inducement, false pretenses and/or false representation. Neither the filing of this Administrative Expense Proof of Claim nor the making of the allegations contained herein, constitute or shall be construed to effect a waiver by the Claimant or any of its affiliates of any rights, claims, causes of action, offsets, setoffs, netting or defenses (or remedies with respect thereto) that Claimant or any of its affiliates may have against or with respect to any person or entity, including, without limitation, against the Debtor or any affiliates of the Debtor.

The execution and filing of this Administrative Expense Proof of Claim is not and shall not be deemed: (a) a waiver or release of the Claimant's rights against any other entity or person liable for all or any part of the Administrative Expense Claim asserted herein; (b) a waiver of the right to withdraw the reference with respect to the subject matter of the Administrative Expense Claim, any objection or other proceedings commenced with respect thereto, or any other proceedings commenced in this case against, or otherwise involving, the Claimant; (c) a waiver or release by the Claimant of its right to trial by jury, or a consent by the Claimant to a trial by jury, in this Court or any other court; (d) a waiver of any right to seek subordination, in favor of the Claimant, of indebtedness or liens held by any creditors of the Debtor; or (e) an election of remedies which waives or otherwise affects any other remedy.

E. Right to Determination in Other Forums

Claimant reserves all rights to have the Administrative Expense Claims and any defenses, counterclaims, or objections thereto determined before a jury, by arbitration, or before any other judicial or administrative body having jurisdiction and, to the extent necessary to preserve such rights, makes demand therefor. Claimant submits itself to the jurisdiction of the district court and, solely to the extent the Bankruptcy Court may constitutionally exercise the powers of the district court, of the Bankruptcy Court solely for the purpose of the allowance of the Administrative Expense Claims. Claimant objects to the exercise of jurisdiction by the district court or the Bankruptcy Court over Claimant or its property for any other purpose.

F. Notice

Notices should be sent to:

Baseball Finance LLC
c/o Major League Baseball
245 Park Avenue
New York, New York 10167
Attention: Jonathan Mariner & Thomas J. Ostertag, Senior Vice President and General Counsel

-and-

White & Case LLP
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Attention: John K. Cunningham, Esq.

H A N D

D E L I V E R Y

FILED / RECEIVED

MAR 2 6 2012

EPIQ BANKRUPTCY SOLUTIONS, LLC

RECEIVED BY:

DATE

4:30

TIME